**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| HELEN KRUKAS, on behalf of herself and all others similarly situated,<br><br>  2121 North Ocean Blvd., Apt. 308 W, Boca Raton, FL 33431<br><br><br><br>                    Plaintiff,<br><br>    v.<br><br>AARP, INC., AARP SERVICES INC., and AARP INSURANCE PLAN,<br><br>  601 E Street, NW, Washington, D.C. 20049<br><br>                    Defendants. | **CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**PRIVATE ATTORNEY GENERAL AND CLASS ACTION COMPLAINT**

Plaintiff Helen Krukas ("Plaintiff"), individually and on behalf of all others similarly situated and the general public, brings this Class Action Complaint against AARP, Inc., AARP Services Inc., and AARP Insurance Plan, (collectively, "AARP" or "Defendant") based upon information and belief and her personal knowledge, and alleges as follows:

**SUMMARY OF THE ACTION**

1.     This is a consumer class action seeking to recoup millions of dollars on behalf of a class of senior citizens and disabled individuals throughout the United States (excluding California)  who, by the deceptive practices and unlawful acts alleged herein, were fooled into paying AARP an undisclosed 4.95% commission when paying for Medicare supplemental health insurance policies, called Medigap plans.  AARP is not licensed as an insurance broker or agent

in Washington, D.C. (where it maintains its principal place of business), the state of Florida (where Plaintiff currently resides) or in any other state so it may not legally collect these commissions.

2.      Defendant AARP, Inc., formerly known as the American Association of Retired Persons, along with its subsidiaries (collectively, "AARP"), is a membership organization for seniors aged 50 years and older. AARP markets itself as a protector and advocate of the nation's senior community, and today AARP is reported to have over 40 million members, about half of whom are over the age of 65.

3.      AARP reaps substantial income—in the form of commissions—through business partnerships with large insurance companies like UnitedHealth Group, Inc. and UnitedHealthcare Insurance Company (collectively, "UnitedHealth").

4.      As alleged herein, Defendant AARP and UnitedHealth, together and through their respective subsidiaries, have orchestrated an elaborate scheme where AARP, as the de facto agent of UnitedHealth, helps market, solicit, and sell or renew AARP Medigap policies and generally administers the AARP Medigap program for UnitedHealth, in exchange for an undisclosed and illegal 4.95% commission that AARP collects from Plaintiff and Class Members (defined below) when they pay AARP for their Medigap policies ("AARP Medigap Policies").

5.      As explained in more detail below, Defendants represent in solicitation materials, letters to prospective customers, billing statements, renewal letters, and its website that "UnitedHealthcare Insurance Company pays royalty fees to AARP for the use of its intellectual property. These fees are used for the general purposes of AARP."  While this general disclosure may inform consumers that AARP has a financial incentive for promoting UnitedHealth, it does not indicate that Plaintiff and Class Members (and *not* UnitedHealth) will be required to pay a

transactional level fee to AARP when they purchase or renew their AARP Medigap Policies.  In fact, regardless of whether the money that AARP receives is denominated as a "royalty" or a "commission", UnitedHealth does not pay it—Plaintiff and class members pay it directly to AARP when they pay for Medigap.  Nor do Defendants ever disclose the 4.95% cost.

6.      Moreover, the statement is misleading because the payment is not a royalty but, in fact, an illegal commission that AARP collects for soliciting its members to purchase AARP Medigap Policies and collecting premiums from them and remitting those premiums to UnitedHealth.  The 4.95% commission AARP receives is *in addition to* the premiums that it remits to UnitedHealth and is based on the amount of such premiums.  Again, these are facts that Defendants never disclose.  Indeed, the Ninth Circuit recently found that AARP's collection of 4.95% on top of premiums satisfies the definition of a commission.  *See*, *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1052-53 (9th Cir. 2017) (Defining commission as "'compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount of value thereof" and finding that Plaintiff plausibly alleged that AARP collection of 4.95% was for soliciting insurance and was based on premiums collected).

7.      The Ninth Circuit's definition of commission is consistent with how the term is defined under the law of the District of Columbia.  *See Gordon v. Dist. Unemployment Comp. Bd.*, 402 A.2d 1251, 1257 (D.C. 1979) (citing *Reliable Life Ins. Co. v. United States*, 356 F. Supp. 235, 239 (E.D. Mo. 1973)) ("the court defined 'commission' 'in the ordinary (sense) of the word' as 'compensation based on a percentage of an amount collected, received or agreed to be paid for results accomplished…").

8.      AARP's' motive to label a commission payment a "royalty" is two-fold: it allows AARP to avoid oversight by insurance regulators, and it allows AARP to avoid paying taxes on the income it generates through insurance sales. Calling the commission payment a "royalty" is merely a fiction created by Defendants to further its illegal scheme. Indeed, other associations similar to AARP do the right thing and acquire a license to act as an agent, subjecting themselves to regulatory oversight, and paying taxes.[1] Insurance regulations uniformly preclude persons or entities who are not licensed from engaging in the solicitation of insurance or accepting a commission for the sale or renewal of an insurance policy. *See, e.g.*, DC ST § 31-1131.13(b) ("A person shall not accept a commission, service fee, brokerage fee, or other valuable consideration for selling, soliciting, or negotiating insurance in the District if that person is required to be licensed under this chapter and is not licensed."); DC ST § 31-2502.31 (Compensation of unlicensed persons prohibited); Fla. Stat. § 626.838(2) (prohibiting any person "other than a licensed and appointed health agent" from accepting a commission); Fla. Stat. § 626.112 (requiring a license "to engage in the solicitation of insurance," including "[d]escribing the benefits or terms of insurance coverage, "[m]aking general or specific recommendations as to insurance products," and "[c]omparing insurance products."); D.C. ST § 31-1131.03 ("A person shall not sell, solicit, or negotiate insurance in the District for any class of insurance unless the person is licensed for that line of authority in accordance with this chapter.").  Despite the fact that AARP is not licensed as an insurance agent in Washington, D.C. (where it maintains its principal place of business), the State of Florida (where Plaintiff currently resides), or any other state, it regularly acts as the de facto agent for UnitedHealth by helping market, solicit, and sell AARP Medigap policies in exchange for a 4.95% commission from every policy sold or

---

[1] The automobile club AAA, for example, is licensed to sell insurance.

renewed. This constitutes an illegal kickback because AARP, as an unlicensed broker, is ineligible to receive insurance commissions.

9.      Simply put, because AARP is not licensed as an insurance agent, it may not collect a commission for its marketing, soliciting, and selling or renewing of AARP Medigap Policies on behalf of UnitedHealth.

10.     The end result is that Defendants collected from Plaintiff and Class Members a 4.95% commission that is both undisclosed and prohibited by law.

11.     Had AARP disclosed the fact that the "member contribution amount" that Plaintiff and Class Members paid monthly to AARP included an embedded 4.95% commission payment to AARP, Plaintiff would have sought out another Medigap policy offering the same services for a lower rate. Moreover, if Defendants had acted within the bounds of the law, AARP would not have been able to collect an additional 4.95% from Plaintiff and Class Members.

12.     To be sure, similar Medigap policies from other providers without the "AARP brand" offer identical benefits—often at a lower cost in part because those insurers do not secretly charge unlawful insurance agent commissions to consumers. Plaintiff and Class members would have sought out such coverage had AARP made proper disclosures informing them that it collects not only premiums from Plaintiffs and Class Members that it remits to UnitedHealth, but *an additional* 4.95% commission that AARP keeps for itself on each AARP Medigap Policy sale or renewal.

13.     Ultimately, Defendants' deceptive and unlawful scheme takes advantage of unsuspecting senior citizens and disabled individuals who unfortunately put their trust in the AARP name.

14.     But for Defendants' deceptive and unlawful acts, Plaintiff and the Class members would not have agreed to pay the 4.95% illegal insurance commission secretly charged on top of their insurance premiums.

15.     Plaintiff and Class Members were injured by their payment of the unlawful 4.95% commission on top of their premium. Had the 4.95% fee to AARP been disclosed, Plaintiff and Class members would have sought out and purchased another Medigap policy offering the same benefits for a lower cost. Additionally, Plaintiff and Class members were injured because they paid more for their AARP Medigap Policy, all due to Defendants' deceptive and illegal conduct.

16.     Plaintiff brings this action on behalf of the Class for equitable relief and to recover damages and restitution for AARP's violation of the District of Columbia Consumer Protection Act, conversion and unjust enrichment.

17.     Plaintiff acts for the benefit of the General Public as a Private Attorney General for claims in this action arising under the CPPA, which expressly authorizes an individual to act "on behalf of both the individual and the general public … seeking relief from the use of a trade practice in violation of a law of the District when that trade practice involves consumer goods or services that the individual purchased…." D.C. Code § 28-3905(k)(1)(B).

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because at least one member of the Class, as defined below, is a citizen of a different state than defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District, AARP resides in this

District, and because Defendants (a) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of "AARP-branded" Medicare supplement insurance policies ("AARP Medigap") in this District; (b) the group policy that UnitedHealth issues to AARP is issued in the District and governed by the law of the District; (c) conduct substantial business in this District; and (d) are subject to personal jurisdiction in this District.

## PARTIES

20.     Plaintiff Helen Krukas is a resident of Boca Raton, Florida. She purchased an AARP Medigap policy in 2012, and continued to renew the policy and pay her premium for that policy every month through November 2016. But for Defendants' deceptive and unlawful acts as alleged herein, Ms. Krukas would not have agreed to pay an additional 4.95% above the premium for an AARP Medigap policy, and would have sought out other, cheaper and lawful Medigap insurance. Plaintiff sent her payment to AARP who then sent the money (less its commission) to UnitedHealth.

21.     Defendant AARP, Inc. is a non-profit corporation organized under the laws of the District of Columbia and maintains its national headquarters and primary place of business is at 601 E Street, NW, Washington, D.C. 20049. AARP, Inc. conducts substantial business in the District of Columbia.  According to the notes to AARP, Inc.'s Consolidated Financial Statements for 2015-2016, its "programs, activities, and operations are managed and supported primarily from its national headquarters in Washington, D.C." AARP's corporate policies and practices, including those for AARP Medigap Policies, are established in, and emanate from, Washington, D.C.

22.     Defendant AARP Services, Inc. ("ASI") is a wholly-owned subsidiary of AARP, organized under the laws of Delaware. ASI maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049. ASI conducts substantial business in Washington, D.C. ASI is AARP's taxable "for-profit" division that negotiates, oversees, and manages lucrative contracts with AARP's insurance business partners. AARP created ASI in 1999 pursuant to a settlement agreement with the U.S. Internal Revenue Service ("IRS") resulting from an investigation by the IRS into the large amount of income that AARP, Inc., the "non-profit" tax-exempt organization, earned through its "endorsement" deals. This settlement was one of several that AARP, Inc. entered into with the IRS and other entities, such as the U.S. Postal Service and the tax authorities of the District of Columbia, all relating to AARP, Inc.'s failure to fully pay unrelated business income tax on its commercial activities, as well as improperly mailing health insurance solicitations at non-profit rates. Defendant AARP Insurance Plan ("AARP Trust") is a grantor trust organized by AARP, Inc. under the laws of the District of Columbia and maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049. The AARP Trust holds group policies, including one for UnitedHealth for AARP Medigap coverage, and maintains depository accounts to initially collect insurance premiums directly from Plaintiff and Class Members, and remits those premiums to UnitedHealth.  The group policy that UnitedHealth issues to AARP is issued in the District and governed by the law of the District.  In its Certificate of Insurance, AARP expressly states: "We have issued this Certificate under Group Policy number […]. We issued the Group Policy in the District of Columbia to the [Trustees of the AARP Insurance Plan]. It provides insurance for AARP members and is governed by the laws of the District of Columbia." The AARP Trust also collects the illegal 4.95% commission directly from Plaintiff and Class Members, but AARP Trust pays that amount

to AARP, Inc. In short, AARP Trust is the vehicle through which AARP, Inc. collects and remits premium payments and the unlawful 4.95% commission for AARP Medigap Policies, AARP Trust conducts substantial business in the District of Columbia.

23.     At all material times, AARP, Inc. dominated and controlled its subsidiaries and affiliates ASI and AARP Trust and establish their policies and practices, including those for AARP Medigap Policies, from its home office and headquarters in Washington, D.C.

24.     AARP, Inc., ASI, and AARP Trust are collectively referred to herein as "AARP."

## FACTUAL ALLEGATIONS

25.     AARP is a membership organization for seniors aged 50 years and older. AARP markets itself as the protector and advocate of the nation's senior community, and today AARP is reported to have over 40 million members, about half of whom are over the age of 65.

26.     By any measure, AARP is a large, complex, and sophisticated enterprise with over $3.8 billion in total assets and operating revenues of over $1.6 billion in 2016.

27.     AARP earns substantial revenue through business partnerships with large insurance companies, like UnitedHealth, to sell its own "AARP-branded" insurance policies.

28.     Among other products, AARP endorses three types of Medicare-related insurance: Part D prescription drug insurance, Medicare Advantage, and Medigap.

29.     Medigap plans offer extra coverage to Medicare beneficiaries (*i.e.*, seniors and the disabled) enrolled in traditional Medicare, such as first-dollar coverage and reduced co-payment and deductibles. In addition, all Medigap plans provide coverage for hospital stays and reduce seniors' out-of-pocket costs for physician office visits. Medigap enrollees must pay a monthly premium that exceeds their Medicare premium in order to receive these additional benefits. In

2015, over 11.9 million Americans were enrolled in a Medigap plan to supplement their traditional Medicare coverage.

30.     AARP Medigap is the dominant player in the Medigap market. Nationwide, AARP Medigap has over three times as many Medigap enrollees as its closest competitor, Mutual of Omaha. As of December 2015, 34% of all Medicare beneficiaries enrolled in a Medigap insurance plan were enrolled in AARP Medigap.

31.     The only Medigap plans insured by UnitedHealth (the largest health insurer in the country) are AARP Medigap plans. Any consumer who wants to purchase Medigap coverage from UnitedHealth must purchase the AARP Medigap plan, and thereby unknowingly fund the 4.95% illegal commission to AARP.

32.     In 2016, AARP generated $880 million in revenues from its so called "royalties," which is nearly three times higher than income generated from membership dues and makes up over 54% of AARP's 2016 total operating revenue.

33.     Of the $880 million in total "royalty" income generated by AARP across all of its product offerings in 2016, 68% came from UnitedHealth insurance products.

34.     In 2012 and 2011, AARP Trust processed $7.8 billion and $7.5 billion, respectively, in insurance premiums from all sources. In 2012 and 2011, $376 million and $359 million, respectively, was paid to AARP as "royalties" from AARP Trust.

35.     Because of its tax-exempt status, the substantial income that AARP generates has drawn the attention of the IRS and the tax authorities in the District of Columbia on more than one occasion.

36.     In 1999, AARP entered into a settlement agreement with the IRS due to AARP's failure to fully pay unrelated business income tax on its commercial activities. As part of that

10

settlement, AARP created ASI to act as AARP's "for-profit" arm. Even with the creation of ASI as a taxable entity, however, AARP still retains the vast majority of its income—tax free.

## AARP Scheme to Defraud Senior Citizens

37.     According to AARP's 2015 and 2016 financial statements, UnitedHealth is AARP's largest business partner—over 67% of AARP's "royalty" income is consistently derived from the sale or renewal of UnitedHealth insurance products. AARP's current AARP Medigap business relationship with UnitedHealth began on February 26, 1997, when AARP and UnitedHealth entered into a joint venture agreement entitled the "AARP Health Insurance Agreement" (the "Agreement").

38.     Under the terms of the Agreement, AARP would: (1) market, solicit, sell and renew AARP Medigap policies with UnitedHealth; (2) collect and remit premium payments on behalf of UnitedHealth; (3) generally administer the AARP Medigap program; and (4) otherwise act as UnitedHealth's agent.

39.     In exchange for its services, the Agreement provided AARP with a 4% "allowance" for every dollar received from the sale or renewal of an AARP Medigap policy, as well as an additional 2.5% for each dollar over $1 billion:

ARTICLE 6
ALLOWANCES AND COMPENSATION

10 6.1 AARP ALLOWANCE. AARP shall be entitled to receive an allowance for AARP's sponsorship of the [Supplemental Health Insurance Program ("SHIP"), aka AARP Insurance] and the license to use the AARP Marks in connection therewith. *For each Policy Year, this allowance shall be equal to the sum of (i) four percent of the first $1 billion in Member Contributions plus (ii) two and one-half percent of the Member Contributions in excess of $1 billion.* This allowance shall be payable in accordance with Section 6.7 hereof. (Emphasis added).

40.     The Agreement was amended in December 28, 1999 in connection with AARP's

settlement with the IRS. The 1999 amendment, *inter alia*, renamed AARP's "allowance" a

"royalty" and directed 8% of AARP's "royalty" to its taxable subsidiary, ASI:

> It is intent [*sic*] of the parties hereto that the payment made by United to AARP
> pursuant to the United Agreement and referred to as an allowance is a royalty and
> pursuant to this Assignment and the agreement referred to in this paragraph, the
> royalty is to be bifurcated into a payment to AARP Services for Quality Control
> and monitoring and to AARP for use of the AARP Marks. AARP shall grant United
> an exclusive license to use the AARP Marks by separate agreement. Such separate
> agreement shall obligate United to compensate AARP for the use of its intangible
> property by the payment of a royalty.

41.     The Agreement was amended again on December 23, 2002, to increase the

amount of AARP's "royalty":

> Subsection 6.1 of the Agreement is amended by deleting this subsection in its
> entirety and replacing it with (sic) following:
>
> 6.1 AARP Royalty. AARP shall be entitled to receive a royalty for AARP's
> sponsorship of the SHIP and the license to use the AARP Marks in connection
> therewith. This royalty shall be 3.25% of Member Contribution for Policy Year
> 2002 and 3.75% of Member Contributions for Policy Year 2003. For Policy Years
> 2004 through 2007, the royalty shall be 4% of Member Contribution, with a review
> of the increased royalty amount on rates and competitive position prior to
> implementation.

42.     In 2007, the parties extended the Agreement through to December 31, 2014, as

explained in UnitedHealth's quarterly report, filed with the U.S. Securities and Exchange

Commission ("SEC") on May 9, 2007:

> On April 13, 2007, we entered into an agreement to extend and expand our
> relationship with AARP through December 31, 2014. The agreement was expanded
> to give us a right to use the AARP brand on our Medicare Advantage offerings and
> to ***extend our arrangement to use the AARP brand on our Medicare Supplement
> products and services*** and Medicare Part D offerings. (Emphasis added.)

43.     Six months later, the parties further extended the Agreement for an additional

three years through to December 31, 2017, as explained in UnitedHealth's 2007 yearly report

filed with the SEC:

> On October 3, 2007, we entered into four agreements with AARP that amended our
> existing AARP arrangements and incorporated many of the terms of the April 13,
> 2007 AARP agreement. These agreements extended our arrangements with AARP
> on the Supplemental Health Insurance Program [AARP Insurance] to December
> 31, 2017, extended our arrangement with AARP on the Medicare Part D business
> to December 31, 2014, and gave us an exclusive right to use the AARP brand on
> our Medicare Advantage offerings until December 31, 2014, subject to certain
> limited exclusions.

44.     On October 15, 2013, AARP and UnitedHealth announced that they were

extending the Agreement to run through December 2020. Stephen J. Hemsley, president and

CEO of UnitedHealth Group, noted that "We are honored to build upon our unique and

innovative relationship with AARP, which has helped both UnitedHealthcare and AARP provide

better support and value to the consumers we serve."[2]

45.     Under the terms of the current Agreement, in exchange for AARP's administering

of the insurance program and its marketing, soliciting, and selling or renewing of AARP

Medigap policies on behalf of UnitedHealth, as well as its collecting and remitting insurance

premiums on behalf of UnitedHealth, AARP earns a 4.95% commission—disguised as a

"royalty"—on each policy sold or renewed.

46.     The Agreement's terms require AARP to aid in the solicitation of the sale of

insurance and to generally act as the insurance agent of UnitedHealth.

47.     The Agreement also specifically notes that AARP owns all solicitation materials

related to the AARP Medigap program:

7.2 MEMBER COMMUNICATIONS.

---

[2] https://www.optum.com/about/news/unitedhealth-grouptoextendbroadenitsrelationshipwithaarptofocusm.html (last accessed on April 19, 2018).

. . . AARP OWNERSHIP. All communications to AARP members pertaining to the SHIP [AARP Medigap included], including without limitation scripts, solicitation materials and other written materials mailed on behalf of AARP to any members, shall be the property of AARP, to the extent specifically identified by United or AARP, as the case may be, as developed and used exclusively for the SHIP. AARP shall have the sole right to copyright all or any of such pieces as it considers appropriate to the fullest extent permitted by law; provided, however, that AARP shall not have the right to copyright the United Marks.

48.     The Agreement, as of 2011, was reviewed by Congressional staff members from

the House Committee on Ways and Means as part of its investigation into AARP's tax status.

AARP's obligations under the Agreement were described in a December 21, 2011 letter from the

Ways and Means Committee to the IRS as follows:

Congressional staff recently had the opportunity to review three redacted contracts between AARP and AARP Services, Inc. (ASI) and United. The contracts covered United's marketing and sale of AARP branded Medigap, Medicare Advantage, and Medicare Part D policies. The contracts raised a number of issues related to AARP's involvement in for-profit business activities and governance issues among the various AARP entities.

The three contracts, signed in January 2008 and which are still in effect, detail AARP and ASI's extensive influence over United's operations, most notably in the Medigap business, and several instances in which United is required to take specific actions, beyond making "royalty" payments, to the benefit of AARP. The contracts include the following provisions that raise numerous questions about AARP's involvement in for profit activities:

a.     ASI is placed in the role of quality control contractor and overseer of United's operations, as it relates to Medigap, Medicare Advantage, and Medicare Part D.

b.     The contracts create a "Senior Leaders" team that oversees all aspects of performance under the contracts. Both United and ASI each have two officials appointed to the "Senior Leaders" team, which coordinates all aspects of contract performance and must consent to any action under the contract. At least one United and one ASI "Senior Leader" must consent to any decision. Further demonstrating AARP's active role in directing the decisions of the insurer, ASI must approve United's appointments to the "Senior Leaders" team.

14

c.   ASI has authority over United's "Operating Plan" and may "approve, modify on a line by line basis, or provide specific direction to United," regarding the plan.

d.   ASI is given prior review and approval authority over all proposed electronic, print, verbal, or scripted communication regarding AARP-endorsed Medigap plans directed at both AARP members and non-AARP members.

e.   United is responsible for marketing campaign audits and analysis, but all strategy developments and modifications must be made in collaboration with AARP.

f.   ASI oversees and monitors the agent certification process and must approve the agent compensation program.

g.   ASI has consultation, review, and consent rights related to any proposed plan design changes including, but not limited to, annual budgets, premium levels and rates, and sales and distribution plans.

h.   United is barred from directly or indirectly marketing or offering products or programs that compete with AARP-endorsed Medigap plans.

i.   ASI has review and modification authority over United's Medigap-related contracts with third-party vendors exceeding $250,000.

j.   United must submit to ASI a detailed projection of policy financials, including recommended member premiums for the coming year. ASI may object to the premium levels, and if no agreement is reached the issue goes to dispute resolution.

k.   United may contract with ASI separately to perform consulting and marketing services in connection with the sale of AARP-endorsed Medigap plans. Such agreements are separate from the primary contract but indicate the possibility of the AARP subsidiary's further involvement in business operations.

l.   United's annual incentive program for senior executives is, in part, dependent on meeting the "transformational" goals established by AARP and ASI.

m.   Any expenditure of Medigap funds not addressed in the contract requires the prior written approval of ASI.

49.   UnitedHealth compensates AARP to act as its agent in connection with the marketing, solicitation, sale, and administration of AARP Medigap Policies.

15

50.     At all material times, AARP actively helped, and continues to help, to solicit and market AARP Medigap Policies for UnitedHealth through television commercials, its website, mailings, and advertisements in various periodicals and publications.

51.     At all material times, AARP was engaged, and continues to be engaged, in actively soliciting consumers to purchase AARP Medigap and has thus acted, and continues to act, as an unlicensed insurance agent of UnitedHealth so as to avoid insurance regulations. AARP openly acknowledges that it engages in solicitation of AARP Medigap:

- www.aarphealthcare.com advertised details of AARP Medigap insurance and explicitly states, **"This is a solicitation of insurance."** (Emphasis in original.)

- www.aarphealthcare.com explains that its members should get an AARP Medigap plan because it is "the only Medicare Supplement plan endorsed by AARP" and that the plan has a "94% Customer Satisfaction Rate of those Surveyed."

- www.aarpmedicareplans.com provides even greater detail about the AARP Medigap plans that are offered and allows users to enter their Florida zip code to "View Plans & Pricing."

- www.aarpmedicareplans.com also explicitly states, "**This is a solicitation of insurance."** (Emphasis in original.)

- AARP television and Internet video advertisements promoting the AARP Medigap plans also display the same language, **"This is a solicitation of insurance."** (Emphasis in original.)

- Print advertisements for the AARP Medigap plans in the AARP Bulletin magazine note: **"This is a solicitation of insurance."** (Emphasis in original.)

52.     Moreover, AARP acknowledges in its 2016 Audited Financial Statement that it collects and remits payments on behalf of UnitedHealth as part of an agency relationship:

The Plan, a grantor trust, holds group policies, and maintains depository accounts to initially collect insurance premiums received from participating members.  In accordance with the agreement referenced above, collections are remitted to third-party insurance carriers within contractually specified periods of time, net of the contractual royalty payments that are due to AARP, Inc., which are reported as royalties in the accompanying consolidated statements of activities . . . .The

16

collection of premiums and submission of amounts due to the insurance carrier are
classified as agency transactions and, as such, are not recorded as either revenue or
expenses in the accompanying consolidated  statements of activities.

53.     AARP's solicitation, marketing, and sale of AARP Medigap Policies constitutes

the sale of consumer goods or services in the ordinary course of business.

54.     For every AARP Medigap policy sold or renewed, AARP collected, and

continues to collect, insureds' premium payments *plus* the 4.95% commission via the AARP

Trust on behalf of, and as agent for, UnitedHealth

55.     After deducting the 4.95% commission from the consumers' payment and

remitting this amount to AARP, Inc. and ASI, AARP then invests the insurance premiums that it

collects on behalf of UnitedHealth in a wide range of securities. UnitedHealth gives AARP the

right to retain any gains on those investments, *in addition to* its 4.95% commission. In 2009,

2010, 2011 and 2012, AARP earned $89,985,195, $56,668,525, $14,484,000 and $59,191,000,

respectively, on the investment of premiums that it held in the AARP Trust prior to remittance of

the premiums due to UnitedHealth.

56.     As premium payments become due, the AARP Trust remits the premiums to

UnitedHealth.

57.     The 4.95% commission amount paid to AARP from the AARP Trust is

bifurcated, with 8% going to ASI (the taxable entity) and 92% going to AARP, Inc.

58.     AARP's 4.95% commission is not *deducted from* the actual insurance premiums

paid by consumers.  The Agreement makes clear that AARP's commission is charged to

consumers *on top of* the premiums for the actual insurance coverage by distinguishing between

the amount actually billed to and paid by consumers (*i.e.*, "Member Contributions") and the

insurance premiums themselves: "SHIP GROSS PREMIUMS for a Policy Year means the

amount of Member Contributions minus the AARP allowance [which became "royalty" when

the Agreement was amended] determined under Section 6.1 hereof for such policy year."

59.     Consistent with this provision in the Agreement, Barry Rand, the CEO of AARP,

testified before the House Ways and Means Committee on April 1, 2011, that "royalties have

nothing to do with the premiums of beneficiaries. Nothing to do with the premiums." Mr. Rand

also testified that "[a]ll of the money that we have that comes out of the trust in interest goes to

our mission. None of the money is taken out of any of the premiums."[3]

60.     In addition, AARP's then President, W. Lee Hammond, testified the royalty

payment was in addition to the premiums for insurance coverage: "We do take royalty payments

from that money that comes in, and then, as requested by the insurance companies to cover their

products, we return the balance of that money to them."[4]

61.     Mr. William Josephson, Of Counsel at Fried, Frank, Harris, Shriver and Jacobsen,

LLP, and former Assistant Attorney General-in-Charge of the New York State Law

Department's Charities Bureau, testified at the hearing that the evidence may suggest "the

amounts characterized by AARP as royalty really are closer to insurance commissions, which I

believe would be subject to unrelated business income tax. This is a factual inquiry that is not

necessarily resolved by questions of law."[5]

62.     Thus, while AARP and UnitedHealth disclose the existence of a payment in

general to AARP—which they term a "royalty" paid for the use of AARP's intellectual

property—they hide the fact that the cost of AARP Medigap insurance includes a percentage-

---

[3] https://waysandmeans.house.gov/hearing-on-aarps-organizational-structure-management-and-finances/ (last accessed on April 19, 2018).
[4] *Id*.
[5] *Id*.

based commission to AARP, funded by consumers (and not UnitedHealth), *in addition to* the insurance premium paid to UnitedHealth for coverage.

63.     The Ninth Circuit recently found in *Friedman v. AARP, Inc*., 855 F.3d 1047, 1055 (9th Cir. 2017) ("*Friedman*") that AARP's disclosure practices in this regard can plausibly mislead consumers:

> Friedman has plausibly alleged that members of the public are likely to be deceived into paying AARP's additional 4.95% fee because AARP collects and labels the fee as a "royalty" rather than what Friedman alleges it actually is—a "commission" collected on top of the premium. At the motion to dismiss stage, these allegations are adequate to establish material misrepresentations supporting Plaintiff's claims.

64.     AARP and UnitedHealth affirmatively state in their AARP Medigap disclaimer language the following:

> Premiums are collected from you on behalf of the trustees of the [AARP] Trust. These premiums are used to pay expenses incurred by the Trust in connection with the insurance programs and to pay the insurance company for your insurance coverage. Income earned from the investment of premiums while on deposit with the Trust is paid to AARP and used for the general purposes of AARP and its members.

65.     This statement is highly misleading and deceptive in that Defendants do not disclose that the amounts members are paying are not just "premiums" to pay for the actual insurance coverage, and the administrative expenses incurred by the AARP Trust, but a 4.95% commission on top of the premiums that AARP remits to UnitedHealth.

66.     The Ninth Circuit in *Friedman* found: "[Plaintiff] contends, AARP misleadingly told its members that their payments only covered AARP's expenses and the premium for UnitedHealth's Medigap coverage, but in reality, the payments include an imbedded commission which was not an expense payment.  We agree that these allegations plausibly allege deception." *Friedman v. AARP, Inc*., 855 F.3d 1047, 1056 (9th Cir. 2017).

67.     The following disclaimer by AARP and UnitedHealth, included on correspondence to Plaintiff and Class members, is also misleading: "UnitedHealthcare Insurance Company pays royalty fees to AARP for the use of its intellectual property. These fees are used for the general purposes of AARP." AARP never reveals that Plaintiff and Class Members—and not UnitedHealth—will be the ones to pay UnitedHealth's "fees" or that the amount of that fee is 4.95% on top of the premiums AARP forwards to UnitedHealthcare. Moreover, the payment is a commission—not a royalty.

68.     AARP's misrepresentations and omissions regarding AARP Medigap Policies constitute an unfair, deceptive, and misleading practice.

### AARP's Conduct Is Unlawful and Deceptive

69.     At all material times, UnitedHealth authorized AARP to act as its agent in the marketing, solicitation, and sale or renewal of AARP Medigap policies.

70.     On information and belief, AARP formulated and conceived its role in the scheme largely in the District of Columbia, directed the scheme complained of herein from the District of Columbia, and its communications and other efforts to execute the scheme largely emanated from the District of Columbia.

71.     For purposes of the scheme, the relationship between AARP and its members, including Plaintiff, was centered in the District of Columbia.  AARP's decision to market AARP Medigap Policies to AARP members, its policies and practices relating to AARP Medigap Policies, including the oversight of the marketing to AARP members regarding AARP Medigap Policies and decision to collect the 4.95% commission from AARP Members emanated from the District of Columbia.  AARP collected its commission in the District of Columbia and the group

policy that UnitedHealth issues to AARP is issued in the District of Columbia and governed by the law of the District of Columbia.

72.    As indicated above, pursuant to its agreement with UnitedHealth, AARP owns all the communications sent to AARP members pertaining to AARP Medigap Policies, "including without limitation scripts, solicitation materials and other written materials mailed on behalf of AARP to any members," and has prior review and approval authority over such materials before they are sent to AARP members.

73.    At all material times, AARP acted as the authorized agent of UnitedHealth in the transaction of insurance, and therein engaged in the following acts:

a.    solicited the sale and renewal of insurance on behalf of UnitedHealth;

b.    solicited an application for insurance on behalf of UnitedHealth;

c.    received, collected, and/or transmitted an insurance premium to UnitedHealth; and

d.    generally aided in the transaction of the business of insurance.

74.    While AARP acts as an insurance agent to solicit insurance on behalf of UnitedHealth, it has never obtained a license to act as an insurance agent and therefore cannot act as such in Washington, D.C., DC ST § 31-1131.03 (where AARP maintains its principal place of business), the State of Florida (where Plaintiff resides) under Florida law. *See* Fla. Stat. §§ 626.838(2), 626.112 or any other state.

75.    Because AARP is not licensed as an insurance agent, it is therefore self-evident that AARP may not collect a commission for its marketing, solicitation, administration, sale, or renewal of AARP Medigap policies on behalf of UnitedHealth.

76.    Moreover, as outlined above, AARP makes misleading statement and omits materials facts about the 4.95% commission that it collects from Plaintiff and Class Members.

**Defendant's Scheme Has Caused Injury to Plaintiff and the Class**

77.     The end result of AARP's unlawful and deceptive practices is that consumers pay more for Medigap insurance than they otherwise would absent Defendant's unlawful and deceptive practices.

78.     Other Medigap policies offered without the highly regarded "AARP brand" provide identical benefits, often at a lower cost in part because those insurers do not secretly charge consumers unlawful insurance-agent commissions on top of the premiums assessed.

79.     Plaintiff and Class members would have sought out and purchased such other policies offering a lower rate had Defendant properly disclosed the existence of this unlawful scheme to embed a commission payment to the AARP on top of the premium payment to UnitedHealth.

80.     Instead, unsuspecting senior citizens, who put their trust in the AARP name, were taken advantage of by Defendants' deceptive and unlawful scheme.

81.     As a result of Defendants' unlawful and deceptive acts and conduct, consumers—including Plaintiff and Class members—are harmed financially because they: (a) would have sought out and paid less for their Medigap coverage and/or (b) paid AARP a 4.95% commission that AARP is not legally entitled to as it is not a licensed insurance agent or broker.

82.     But for Defendants' deceptive and unlawful acts, Plaintiff and Class members would not have paid the illegal commission as part of their purchase and/or renewal of their AARP Medigap policies.

83.     To be clear, Plaintiff does not challenge the rates charged or the reasonableness of the approved rate. Instead, Plaintiff challenges: (1) the Defendants' misrepresentations and deceitful tactics in soliciting insurance that prevented Plaintiff and Class Members from being

able to make informed decisions when purchasing Medigap policies and/or (2) paying AARP

undisclosed and unlawful commissions on top of the insurance premiums that AARP collected

and sent to UnitedHealth for Medigap coverage.

## CLASS ALLEGATIONS

84.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3), and in

the alternative Rule 23(c)(4), of the Federal Rules of Civil Procedure, individually, and on behalf

of the following Class:

> All persons in the United States, excluding California, who purchased or renewed
> an AARP Medigap Policy.

85.     Specifically excluded from the Class are AARP, its officers, directors, agents,

trustees, parents, children, corporations, trusts, representatives, employees, principals, servants,

partners, joint venturers, or entities controlled by AARP, and its heirs, successors, assigns, or

other persons or entities related to or affiliated with AARP and/or its officers and/or directors,

the judge assigned to this action, and any member of the judge's immediate family.

86.     Given the potential complexity of this case, Plaintiff seeks relief from the 90-day

filing requirement set forth by the Local Rules and seeks that a schedule for the briefing of class

certification be set forth in the initial scheduling conference of this matter.

87.     **Numerosity**. The members of the Class are geographically dispersed throughout

the United States and are so numerous that individual joinder is impracticable. Upon information

and belief, Plaintiff reasonably estimates that there are hundreds of thousands of members in the

Class. Although the precise number of Class members is unknown to Plaintiff, the true number

of Class members is known by AARP. More specifically, AARP maintain databases that contain,

at least, the following information: (i) the name of each Class member enrolled in an AARP

Medigap policy; (ii) the address of each Class member; and (iii) each Class member's payment

information related to AARP Medigap. Thus, Class members may be identified and notified of the pendency of this action by first-class mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

88.  **Common Issues Predominate**. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.  whether AARP improperly solicited an application for insurance and/or aided in the transaction of the business of an insurer without a license;

b.  whether AARP improperly acted as an authorized agent of an insurer without a license;

c.  whether AARP's conduct is constitutes a violation of the District of Columbia Consumer Protection Act;

d.  whether AARP has unlawfully converted money from Plaintiff and the Class;

e.  whether AARP is liable to Plaintiff and the Class for unjust enrichment;

f.  whether AARP is liable to Plaintiff and the Class for fraudulent concealment;

g.  whether Plaintiff and the Class have sustained monetary loss and the proper measure of that loss;

h.  whether Plaintiff and Class are entitled to declaratory and injunctive relief; and

i.  whether Plaintiff and the Class are entitled to restitution and disgorgement from AARP.

89.  **Typicality**. Plaintiff's claims are typical of the claims of the Class members. Plaintiff and all Class members were damaged by the same wrongful conduct by AARP. Class members, like Plaintiff, were deceived by Defendants into paying an additional and unlawful 4.95% commission payment on top of their premium payments.

90.     **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

91.     **Superiority**. Proceeding on a classwide basis is a superior method for the fair and efficient adjudication of the controversy because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expenses that individual actions would entail. Class treatment will allow injured persons and entities to seek compensation for injuries that would not be practical to pursue individually because the damages suffered by individual Class members is relatively small compared to the burden and expense of individual litigation of their claims against AARP. These benefits substantially outweigh any difficulties that may arise out of class treatment.

<u>**COUNT I**</u>
**VIOLATION OF WASHINGTON D.C.  CONSUMER PROTECTION PROCEDURES ACT**
**(DC ST. § 28-3901, *et seq*.)**

92.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated therein. This cause of action is brought pursuant to District of Columbia Consumer Protection Procedures Act ("CPPA"), DC ST § 28-3901 *et seq.*

93.     The CPPA prohibits unlawful trade practices. The prohibited trade practices include, in part, the misrepresentation of a material fact which has a tendency to mislead, failure to state a material fact if such failure tends to mislead, use of innuendo or ambiguity as to a

material fact, which has a tendency to mislead, and misrepresentation of a material fact which is otherwise misleading.  DC ST § 28-3904 (e), (f), (f-1).

94.     As defined by CPPA, AARP is a "merchant", Plaintiff and class members are "consumers", AARP's conduct in connections with the solicitation of and collection of a commission for AARP Medigap Policies is a "trade practice" involving "goods or services".  DC ST § 28-3901 (a) (2), (3), (6), (7).

95.     Defendant's unfair and deceptive practices are likely to mislead—and have in fact misled—reasonable consumers, such as Plaintiff Krukas and the Class, and therefore violate DC ST § 28-3904.

96.     AARP misrepresented material facts, failed to state material facts and used innuendo or ambiguity as to material facts, which had a tendendcy to mislead, and did mislead, Plaintiff and Class Members.  AARP misled consumers, including Plaintiff, by failing to disclose material facts, including that: (a) Plaintiff and Class members would be directly funding UnitedHealth's financial obligation to AARP; (b) AARP collected and retained for itself a commission from money that Plaintiffs and Class members sent AARP for their Medigap coverage; (c) the amount of the commission was 4.95% *on top of* the premiums that AARP remitted to UnitedHealthcare; the commission was for AARP's role in marketing, soliciting, selling, or renewing AARP Medigap policies on behalf of UnitedHealth, as well as AARP's services in administering the AARP Medigap program for UnitedHealth; and/or (d) AARP was not licensed in Washington, D.C., Florida or any other state to act as an insurance broker or agent so could not legally collect the 4.95% commission. As a result, Defendants' material omissions and affirmative statements—such as "UnitedHealthcare Insurance Company pays royalty fees to AARP for the use of its intellectual property," and "[p]remiums are collected from

you on behalf of the trustees of the [AARP] Trust[, which] premiums are used to pay expenses incurred by the Trust in connection with the insurance programs and to pay the insurance company for your insurance coverage"—are rendered false, misleading, and deceptive.

97.     Plaintiff and the Class have been actually aggrieved by Defendant's unfair and deceptive practices in that they purchased the misrepresented product AARP was selling in the course of trade or commerce and were harmed financially because they: (a) would have sought out and paid less for their Medigap coverage and/or (b) paid AARP a 4.95% commission that AARP is not legally entitled to as it is not a licensed insurance agent or broker.

98.     Reasonable consumers, including Plaintiff, must and do rely on the AARP brand, to honestly represent the true nature of its products.

99.     Defendants have deceived reasonable consumers, including Plaintiff and the Class, into paying more for their Medicare supplemental health insurance policies than they otherwise would have absent Defendants' deceptive and illegal conduct.

100.   As a result of Defendants' deceptive trade practices detailed herein, Plaintiff and the Class have been deprived of truthful information regarding their choice of Medicare supplemental health insurance policies.

101.   Plaintiff and the Class suffered damages and are entitled to damages and injunctive relief.

102.   The damages suffered by Plaintiff and the Class were directly and proximately caused by Defendants' deceptive, misleading, and unfair practices.

103.   Plaintiff and the Class seek injunctive relief for, among other things, the Court to enjoin Defendants' above-described wrongful acts and practices, and for restitution and disgorgement.

**COUNT II**
**CONVERSION**

104.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated therein.

105.    Plaintiff and the Class have an ownership right to the 4.95% of their payments that was wrongfully charged and illegally diverted to AARP as a commission.

106.    Defendants have wrongly asserted dominion over the 4.95% of these payments unlawfully charged and illegally diverted to AARP as a commission. Defendants have done so every month Plaintiff and the Class paid premiums for their AARP Medigap insurance policies.

107.    As a direct and proximate cause of Defendants' conversion, each Plaintiff and Class member suffered damages in the amount of the premium for which they were unlawfully and additionally charged—4.95%.

**COUNT III**
**UNJUST ENRICHMENT**

108.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

109.    Plaintiff and the Class conferred a benefit on Defendants in the form of the hidden 4.95% charge on top of their monthly premium payments that were unlawfully and deceptively charged and illegally diverted to AARP as a commission. Plaintiff and the Class have conferred this benefit every month they paid for their AARP Medigap insurance policies.

110.    Defendants voluntarily accepted and retained this benefit.

111.    Because this benefit was collected without proper disclosure and amounted to a commission that was obtained in violation of DC ST § 31-1131.13(b); DC ST § 31-2502.31; Fla.

Stat. §§ 626.838(2), 626.112, it would be inequitable for the Defendants to retain it without paying the value thereof to Plaintiff and the Class.

## COUNT IV
## FRAUDULENT CONCEALMENT

112.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

113.     AARP concealed or failed to disclose a material fact to Plaintiff and the Class, to wit that AARP was collecting a 4.95% commission on top of Plaintiff's premium payments were being illegally diverted to AARP as a commission.

114.     AARP knew or should have known that this material fact should be disclosed or not concealed.

115.     In so concealing this material fact, AARP acted in bad faith.

116.     AARP knew that by concealing or failing to disclose the material fact, Plaintiff and the Class would be induced to act by purchasing an AARP-endorsed Medigap plan.

117.     Plaintiff and the Class suffered damages as a result of the concealment or failure to disclose in the form of the 4.95% on top of their monthly premium payments that were unlawfully charged and illegally diverted to AARP as a commission.

118.     AARP had a duty to speak given that they were parties to transactions with Plaintiff and the Class, they had a duty to say enough to prevent their words from misleading Plaintiff and the Class, and they had special knowledge about the materials facts that Plaintiff and the Class did not possess.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

A. For an Order requiring AARP to restore all money or other property taken from identifiable persons by means of unlawful acts or practices and award judgment for damages and restitution in an amount within the jurisdictional limits of this Court to compensate for such losses;

B. For an Order requiring the disgorgement of all sums taken from consumers by means of deceptive practices, together with all proceeds, interest, income, profits and accessions thereto;

C. That the Court certify this action and the Class as requested herein, appointing Plaintiff as Class Representative, and appointing her counsel as Class Counsel;

D. Award Plaintiff and the Class members court costs and reasonable and necessary attorneys' fees in relation to the amount of work expended, and any other relief the Court determines is proper; and

E. Provide such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: May 10, 2018                    Respectfully submitted,

/s/ Jason S. Rathod
Jason S. Rathod (D.C. Bar No. 100082)*
Nicholas A. Migliaccio (D.C. Bar No. 484366)*
**MIGLIACCIO & RATHOD LLP**
412 H St. NE, Suite 302
Washington D.C. 20002
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
Email: jrathod@classlawdc.com

Kevin Landau**
Brett Cebulash**
Tess Bonoli**
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204

New York, New York 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
Email: klandau@tcllaw.com

Daniel E. Gustafson**
Daniel C. Hedlund**
David Goodwin**
Brittany Resch**
GUSTAFSON GLUEK PLLC
220 South Sixth Street #2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

Scott D. Hirsch**
SCARLETT & HIRSCH PA
7301 W. Palmetto Park Road
Suite 207A
Boca Raton, FL 33433
Telephone: (561) 278-6707
Facsimile: (561) 278-6244
Email: scott@shlawfla.com

*Attorneys for Plaintiff*

 *   Admitted to the court
** *Pro hac vice* motions forthcoming