# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HELEN KRUKAS,

        Plaintiff,

        v.

AARP, Inc., *et al.*,

        Defendants.

Civil Action No. 18-1124 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Helen Krukas, individually, and on behalf of all others similarly situated (except for individuals residing in California), as well as the general public, brings this putative class action against the defendants, AARP Inc., ("AARP"), AARP Services Inc. ("ASI"), and AARP Insurance Plan ("AARP Trust") (collectively referred to as "AARP"), alleging a violation of the Washington D.C. Consumer Protection Procedures Act ("CPPA"), D.C. CODE § 28-3901 *et seq.*, as well as common law violations of conversion, unjust enrichment, and fraudulent concealment, based on her purchase of a Medicare supplemental health insurance policy, also known as a "Medigap" policy, administered by AARP.  *See* Compl. ¶¶ 1, 16, 17, 88, ECF No. 1. These statutory and common law claims are predicated on the plaintiff's allegations that she was "fooled into paying AARP an undisclosed 4.95% commission" when purchasing her Medigap policy and, since "AARP is not licensed as an insurance broker or agent," the defendants "may not legally collect these commissions."  *Id.* ¶ 1.  Pending before the Court is the defendants' Motion to Dismiss for failure to state a claim upon which relief can be granted under Federal

1

Rule of Civil Procedure 12(b)(6).  *See* Defs.' Mot. to Dismiss & Mem. in Supp. ("Defs.' Mem."),

ECF No. 8.[1]  For the reasons set forth below, the defendants' motion is denied.[2]

## I.      BACKGROUND

The plaintiff challenges AARP's role in soliciting, marketing, and administering Medigap

policies, a state-regulated form of health insurance to supplement Medicare.  Since at least 1997,

AARP has held, in its name, group Medigap policies underwritten by UnitedHealth Group and

UnitedHealthcare Insurance Company (collectively, "UnitedHealth") and offered participation in

those group policies to individual AARP members and the general public.  *See* Compl. ¶¶ 22, 37,

51.  The plaintiff alleges that AARP's administration and provision of other services in support

of these group Medigap policies amounted to acting as an unlicensed insurance agent, that the

"royalties" paid to AARP as a percentage of premiums constituted illegal commissions, and that

AARP materially misrepresented the nature and source of the "royalties," causing consumers to

pay more for AARP Medigap policies than they otherwise would.  *See* Compl. ¶¶ 4–15.  The

following discussion provides a general overview of Medigap policies and summarizes the

plaintiff's allegations, claims against AARP, and desired relief.

### A.  Medigap Policies Generally

A Medigap policy is insurance offered by a private insurer to help pay for certain "gaps"

in Medicare coverage.  *See United States v. Blue Cross & Blue Shield of Md., Inc.*, 989 F.2d 718,

721 (4th Cir. 1993) (citing Pub. L. No. 96-265, § 507, 94 Stat. 441, 476 (codified as amended at

---

[1]      At the parties' request, the deadline to seek class certification has been tolled until resolution of the defendants' pending Motion to Dismiss.  *See* Min. Order (Aug. 9, 2018) (granting Joint Mot. to Extend (Aug. 9, 2018), ECF No. 12).  Accordingly, whether a class should be certified or whether the plaintiff, by herself and absent class certification, would meet the amount-in-controversy requirement for diversity jurisdiction, are issues not addressed herein.

[2]      The defendants' request for oral argument is denied because the ample briefing is sufficient to resolve the pending motion.  *See* D.D.C. Local Civil Rule 7(f) (allowance of an oral hearing is "within the discretion of the Court").

42 U.S.C. § 1395ss)).  The Centers for Medicare and Medicaid Services has described a Medigap

policy as "health insurance [sold by private insurance companies that] can help pay some of the

health care costs that Original Medicare doesn't cover, like coinsurance, copayments, or

deductibles."  CTRS. FOR MEDICARE & MEDICAID SERVS., CHOOSING A MEDIGAP POLICY: A

GUIDE TO HEALTH INSURANCE FOR PEOPLE WITH MEDICARE 5 (2019),

https://www.medicare.gov/Pubs/pdf/02110-Medicare-Medigap-guide.pdf [hereinafter "CMS

Medigap Guide]; *see also* Compl. ¶ 29 ("Medigap plans offer extra coverage to Medicare

beneficiaries . . . such as first-dollar coverage and reduced co-payment and deductibles.").[3]

"Each standardized Medigap policy must offer the same basic benefits, no matter which

insurance company sells it.  Cost is usually the only difference between [standardized] Medigap

policies . . . sold by different insurance companies," CMS Medigap Guide at 9, because

"[d]ifferent insurance companies may charge different premiums for the same exact policy," *id.*

at 13.  Indeed, "big differences" may occur "in the premiums that different insurance companies

charge for exactly the same coverage."  *Id.* at 19.  Age, where a person lives, medical

underwriting, and discounts may affect an insurance company's choice of what premium to

charge.  *Id.* at 17.

### B.  AARP's Alleged Role in Administering UnitedHealth's Medigap Policies

The plaintiff, currently a resident of Boca Raton, Florida, originally purchased a

UnitedHealth Medigap policy from AARP in Louisiana in 2012, and continuously maintained

---

[3]      While matters "outside the pleadings" generally may not be considered on a Rule 12(b)(6) motion without
converting the motion to one for summary judgment, *see* FED. R. CIV. P. 12(d), this conversion rule is not triggered
by consideration of "documents incorporated into the complaint by reference, and matters of which a court may take
judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Judicial notice is taken of
the CMS Medigap Guide, which is issued by a component of a federal agency, the U.S. Department of Health and
Human Services.  *See* FED. R. EVID. 201(b); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013)
(taking judicial notice of public records posted online); *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp.
3d 159, 167 (D.D.C. 2016) (same).

this coverage by paying her monthly premium to AARP until November 2016. *See* Compl. ¶ 20; Pl.'s Mem. in Opp'n to Mot. to Dismiss ("Pl.'s Opp'n") at 16, ECF No. 13. Her most recent renewal of her AARP Medigap policy coverage occurred when she resided in Florida. *See* Compl. ¶ 20; Pl.'s Opp'n at 16. She alleges that "[b]ut for Defendants' deceptive and unlawful acts . . . [she] would not have agreed to pay an additional 4.95% above the premium for an AARP Medigap policy, and would have sought out other, cheaper and lawful Medigap insurance." Compl. ¶ 20.

Defendant AARP is a non-profit membership organization for seniors aged 50 years or older, with reportedly over 40 million members, about half of whom are over the age of 65. *See id.* ¶¶ 2, 21, 25. The organization is organized under the laws of the District of Columbia and maintains its national headquarters and primary place of business in Washington, D.C., *id.* ¶ 21, which is where AARP establishes its "corporate policies and practices, including those for AARP Medigap policies," *id.* Defendant ASI is a wholly owned subsidiary of AARP, organized under the laws of Delaware, with its primary place of business in Washington, D.C. *Id.* ¶ 22. As AARP's taxable, "for-profit" division, ASI "negotiates, oversees, and manages lucrative contracts with AARP's insurance business partners." *Id.* AARP created ASI in 1999 pursuant to a settlement agreement with the U.S. Internal Revenue Service (IRS), following an IRS investigation into the income that AARP earned through endorsement deals. *See id.* ¶¶ 22, 36. Defendant AARP Trust is a grantor trust organized by AARP under the laws of Washington, D.C., where the Trust maintains its primary place of business. *Id.* ¶ 22.

AARP is not a licensed insurance broker or agent. *Id.* ¶ 8. Rather, AARP, through AARP Trust, serves as the group policy holder for Medigap coverage underwritten by UnitedHealth. *See id.* ¶ 22. In this role, AARP Trust maintains depository accounts to collect

insurance premiums from individual purchasers of Medigap policies through AARP's group plan and, as part of that premium, AARP Trust also collects the challenged 4.95% "royalty" charge assessed on every Medigap policy sold or renewed.  *See id.* ¶¶ 22, 52, 54.  AARP Trust remits premiums to UnitedHealth, and transfers the money collected as a 4.95% "royalty" to AARP and ASI.  *Id.* ¶¶ 22, 56, 57; *see also id.* ¶ 52 ("In accordance with the agreement [with UnitedHealth] . . . collections [of premiums] are remitted to third-party insurance carriers . . . , *net of the contractual royalty payments that are due to AARP, Inc.,* which are reported as royalties.") (quoting AARP's 2016 Audited Financial Statement) (emphasis added).

A joint venture agreement ("Agreement"), first entered in 1997, governs AARP and UnitedHealth's relationship with respect to Medigap insurance.  *Id.* ¶ 37; *see also* Defs.' Mem., Ex. 1 (Agreement), ECF No. 8-1.[4]  The Complaint provides detail on the evolution of the Agreement over time, most notably that AARP was initially entitled to an "allowance," which was renamed a "royalty" after AARP's 1999 settlement with the IRS.  Compl. ¶¶ 39, 40.  Under the Agreement, AARP agrees to: (1) market, solicit, sell and renew AARP Medigap policies with UnitedHealth; (2) collect and remit premium payments on behalf of UnitedHealth; (3) generally administer the AARP Medigap program; and (4) otherwise act as UnitedHealth's agent.  *Id.* ¶ 38. The Agreement makes clear that AARP owns all solicitation materials related to the Medigap program.  *Id.* ¶ 47 (citing Agreement Subsection 7.2, "Member Communications").  "[I]n exchange for AARP's administering of the insurance program and its marketing, soliciting, and selling or renewing of AARP Medigap policies on behalf of UnitedHealth, as well as its

---

[4]     As noted, *supra* n.3, judicial notice may be taken of documents referenced in the Complaint, such as the Agreement.  *See, e.g.*, *Hurd v. D.C., Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)); *Eagle Tr. Fund v. U.S. Postal Serv.*, No. 17-cv-2450 (KBJ), 2019 WL 451350, at *5 (D.D.C. Feb. 4, 2019) (documents incorporated by reference in the complaint may be considered even when the document is attached as exhibit to defendant's motion to dismiss); *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46–47 (D.D.C. 2009) (collecting cases).

collecting and remitting insurance premiums on behalf of UnitedHealth, AARP earns a 4.95% commission—disguised as a 'royalty'—on each policy sold or renewed." *Id*. ¶ 45. In 2016, AARP generated $880 million in revenues from "royalties," of which 68% came from UnitedHealth insurance products, including Medigap Policies and other insurance products. *See id*. ¶¶ 28, 32, 33, 37. The $880 million in royalty revenue equated to over 54% of AARP's 2016 total operating revenue. *Id*. ¶ 32.

The nature of the 4.95% charge, and AARP's representations to consumers regarding this charge, are the focus of the plaintiff's claims. While the defendants describe the 4.95% charge as a royalty compensating AARP for UnitedHealth's use of its intellectual property, *see id*. ¶¶ 40–45, the plaintiff alleges, relying on a Ninth Circuit case for support, that the 4.95% charge is an illegal and not properly disclosed commission compensating AARP for agreeing to act as UnitedHealth's agent in connection with the marketing, solicitation, sale, and administration of Medigap policies. *See id*. ¶¶ 49, 62–68; *see also id*. ¶ 6 (citing *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1052–53 (9th Cir. 2017) (finding that the plaintiff had sufficiently alleged that AARP's royalty fits California's definition of "commission wages" as "compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof" and holding that AARP's retention of this commission could plausibly violate California law). The plaintiff suggests that AARP characterizes its "commission" as a "royalty" to avoid oversight by insurance regulators and to avoid paying taxes on the income generated through insurance sales, whereas other associations "do the right thing and acquire a license to act as an agent." Compl. ¶ 8 & n.1 (citing example of the automobile club AAA, which is licensed to sell insurance).

According to the plaintiff, "AARP and UnitedHealth, together and through their respective subsidiaries, have orchestrated an elaborate scheme where AARP, as the de facto agent of UnitedHealth, helps market, solicit, and sell or renew AARP Medigap policies and generally administers the AARP Medigap program for UnitedHealth, in exchange for an undisclosed and illegal 4.95% commission that AARP collects from" plaintiff and other consumers when they pay AARP for their Medigap policies. *Id.* ¶ 4. The plaintiff further complains that "[d]espite the fact that AARP is not licensed as an insurance agent," *id.* ¶ 8, AARP received "a 4.95% commission from every policy sold or renewed," *id.*, which "constitutes an illegal kickback," *id.* Set against the local statutory bar prohibiting unlicensed entities from engaging in the solicitation of insurance or accepting a commission for the sale or renewal of an insurance policy, *id.* ¶¶ 8, 74 (citing D.C. CODE §§ 31-1131.13(b); 31-2502.31; 31-1131.03), the plaintiff bolsters her allegation that AARP has acted as an unlicensed insurance agent or broker by pointing to AARP's marketing materials, which are owned by AARP under the Agreement, *id.* ¶¶ 47, 72, and explicitly state "[t]his is a solicitation of insurance," *id.* ¶ 51 (citing AARP sponsored websites, www.aarphealthcare.com and www.aarpmedicareplans.com, as well as AARP's television, Internet, and print advertisements).

The plaintiff identifies certain harms resulting from AARP's actions, alleging that "[h]ad AARP disclosed the fact that the 'member contribution amount' that [she] paid monthly to AARP included an embedded 4.95% commission payment to AARP, [she] would have sought out another Medigap policy offering the same services for a lower rate. . . . [or] if Defendants had acted within the bounds of the law, AARP would not have been able to collect" the 4.95% charge." *Id.* ¶ 11; *see also id.* ¶¶ 12, 77, 79, 81, 82. The plaintiff avers that "[b]ut for Defendants' deceptive and unlawful acts, [she] would not have agreed to pay the 4.95% illegal

insurance commission," *id.* ¶ 14 and that she was injured both by paying this commission and by being denied information that would have prompted her to seek out and purchase another Medigap policy for a lower price, *id.* ¶ 15. The plaintiff notes that "[o]ther Medigap policies offered without the highly regarded 'AARP Brand' provide identical benefits, often at a lower cost in part because those insurers do not secretly charge consumers unlawful insurance-agent commissions on top of the premiums assessed." *Id.* ¶ 78.

Based on the foregoing, the plaintiff alleges that AARP collects an illegal commission, acts as an unlicensed insurance agent, and materially misrepresents information about the 4.95% charge, all of which constitute violations of the CPPA and common law.

### C. Claims Against AARP

The plaintiff brings four claims, asserting, in Count One, that AARP violated the CPPA, D.C. CODE § 28-3901 *et seq.*, by engaging in an unlawful trade practice by misrepresenting material facts concerning the 4.95% payment and the fact that AARP is not a licensed insurance broker or agent in its solicitation materials, letters to prospective consumers, billing statements, renewal letters, and website. Compl. ¶¶ 5, 92–103. The plaintiff alleges financial harm from these unlawful trade practices and being "deprived of truthful information regarding [her] choice" of Medigap policies, *id.* ¶ 100, because she would have sought a different Medigap policy that did not incorporate a 4.95% "commission that AARP is not legally entitled to," *id.* ¶ 97. For these alleged violations of the CPPA, the plaintiff seeks damages and injunctive relief. *Id.* ¶ 101.

In Count Two, the plaintiff claims the defendants' conversion of her "ownership right to the 4.95% of [her] payments that was wrongfully charged and illegally diverted to AARP as a

commission," *id.* ¶¶ 104–06, resulted in damages in the amount of the premium for which she was wrongfully charged, *id.* ¶ 107.

In Count Three, the plaintiff alleges unjust enrichment, based on her conferral of a benefit to the defendants "in the form of the hidden 4.95% charge on top of [her] monthly premium payments that [was] unlawfully and deceptively charged and illegally diverted to AARP as a commission." *Id.* ¶ 109. The defendants "voluntarily accepted and retained this benefit," *id.* ¶ 110, which was "collected without proper disclosure and amounted to a commission in violation of" District of Columbia law, *id.* ¶ 111, such that the defendants' retention of this benefit without paying its value to the plaintiff would be "inequitable," *id.*

Finally, in Count Four, the plaintiff alleges fraudulent concealment stemming from AARP's "conceal[ing] or fail[ing] to disclose [the] material fact" that AARP was collecting a 4.95% commission, *id.* ¶ 113, that AARP "knew or should have known that this material fact should be disclosed or not concealed," *id.* ¶ 114, that it concealed the fact "in bad faith," *id.* ¶ 115, in spite of its "duty to speak," *id.* ¶ 118, and that it thereby "induced [the plaintiff] to act by purchasing an AARP-endorsed Medigap plan," *id.* ¶ 116. The plaintiff alleges that she suffered damages as a result of this fraudulent concealment, *id.* ¶ 117.

As relief, the plaintiff seeks orders: (1) requiring AARP to restore all money or other property taken by means of unlawful acts or practices, *id.* at 30; (2) requiring the disgorgement of all sums taken from consumers by means of deceptive practices, together with all proceeds, interest, income, and accessions, *id.*; (3) certifying a proposed class of "[a]ll persons in the United States, excluding California, who purchased or renewed an AARP Medigap Policy," *id.* ¶ 84, with plaintiff as Class Representative and her counsel as Class Counsel, *id*. at 30; and (4)

awarding court costs and reasonable attorneys' fees and any other relief the Court deems just and proper, *id.*

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action" to provide "grounds" for "entitle[ment] to relief," *Twombly*, 550 U.S. at 555 (internal quotation marks omitted; alteration in original), and "nudge[] [the] claims across the line from conceivable to plausible," *id.* at 570; *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires more than a sheer possibility that a defendant has acted unlawfully.") (internal quotation marks omitted).  Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (second alteration in original).

In considering a motion to dismiss for failure to plead a claim for which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, "even if doubtful in fact," and construe all reasonable inferences in favor

of the plaintiff. *See Twombly*, 550 U.S. at 555; *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (per curiam) ("We assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in the plaintiff's favor.") (citing *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014)). The court, however, "is not required to accept the plaintiff's legal conclusions as correct," *Sissel*, 760 F.3d at 4, nor is it required to "accept inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the complaint." *Nurriddin*, 818 F.3d at 756 (alterations in original) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## III. DISCUSSION

The defendants raise, under Federal Rule of Civil Procedure 12(b)(6), several threshold issues challenging the justiciability of the plaintiff's claims, as well as the sufficiency of the plaintiff's factual allegations to support the plausibility of her claims. Specifically, the defendants argue that the Complaint must be dismissed due to: (1) the primary jurisdiction doctrine; (2) the filed-rate doctrine; and (3) operation of the applicable statute of limitations.[5] In addition, the defendants raise choice-of-law issues as to whether Florida, Louisiana, or District of Columbia law applies to this action.[6] These threshold issues—none of which warrants

---

[5] The defendants correctly frame these justiciability arguments as reasons to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), rather than as reasons to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). *See Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 & n.3 (D.C. Cir. 2018) (noting that "merits-based barrier" to claims posed by preemption challenge is subject to review under Rule 12(b)(6), by contrast to jurisdictional challenge implicating the power of the forum to adjudicate the dispute, which is resolved under Rule 12(b)(1)); *Sierra Club v. Jackson*, 648 F.3d 848, 853 (D.C. Cir. 2011) (noting that "distinction between a claim that is not justiciable because relief cannot be granted upon it and a claim over which the court lacks subject matter jurisdiction is important," and finding justiciability challenge subject to review under Rule 12(b)(6)); *see also Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1233 n.6 (S.D. Fla. 2015) (collecting cases holding that a motion to dismiss under the filed-rate doctrine is properly treated as part of a motion to dismiss under 12(b)(6)).

[6] The defendants also initially argued that the first-to-file rule favored dismissal or a stay of this case because an earlier filed, pending case in Florida asserted similar claims. *See* Defs.' Mem. at 28–37. That Florida case has since been voluntarily dismissed, which the defendants concede "disposes" of their first-to-file argument. *See* Defs.' Notice of Supp. Auth. at 2, ECF No. 25.

dismissal—are addressed, before turning to consideration of whether the plaintiff has plausibly stated a claim.

### A. The Primary Jurisdiction Doctrine Does Not Bar The Instant Claims

The defendants seek a stay or dismissal of this action under the primary jurisdiction doctrine. *See* Defs.' Mem. at 50–51. The primary jurisdiction doctrine applies where a court has jurisdiction over a claim or set of claims, but adjudication of those claims "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956); *see also Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (describing primary jurisdiction doctrine as "specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency" to which "referral" may be made, "staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling"); *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 31 F.3d 1184, 1186 (D.C. Cir. 1994) (explaining that the primary jurisdiction doctrine may be invoked when the agency is "best suited to make the initial decision on the issues in dispute, even though the district court has subject-matter jurisdiction"); *Lawlor v. District of Columbia*, 758 A.2d 964, 973 (D.C. 2000) (explaining that the primary jurisdiction doctrine "comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body" (quoting *Drayton v. Poretsky Mgmt., Inc.*, 462 A.2d 1115, 1118 (D.C. 1983))).

Noting that state regulatory agencies comprehensively regulate virtually all aspects of the Medigap market, including approval for rates and advertising, and that the plaintiff already has this mechanism for raising her concerns, the defendants urge that this case be stayed while the

plaintiff pursues relief before a state regulatory agency. *See* Defs.' Mem. at 37. For example, in

the District of Columbia, AARP's Medigap program is regulated by the District of Columbia

Department of Insurance, Securities and Banking ("DISB"), pursuant to D.C. CODE § 31-3701 *et*

*seq.* and D.C. MUN. REGS. tit. 26-A, § 2200 *et seq.* UnitedHealth must file proposed rates with

DISB, which reviews the rates to ensure that they are reasonable, *see* D.C. CODE § 31-3704, and

further requires at least 75% of aggregate group policy Medigap premiums to be paid toward

benefit claims, *see* D.C. MUN. REGS. tit. 26-A, § 2212.1(a). If a Medigap policy fails to meet this

loss ratio standard, insurers must rebate excess revenue. *Id.* §§ 2213.2, 2213.4. DISB also

enforces prohibitions against misleading advertising, *see id.* §§ 2224.1, 2224.2, and, to this end,

insurers are required to submit advertisements to DISB for review, *see id.*, § 2223.1; D.C. CODE

§ 31-3708. DISB also limits compensation and commission arrangements. *See* D.C. MUN.

REGS. tit. 26-A, § 2217. The defendants suggest that due to this comprehensive regulation,

primary jurisdiction rests with DISB or insurance regulators in Florida or Louisiana, rather than

with this Court.

Four factors are relevant to determining whether to apply the primary jurisdiction

doctrine: "(1) whether the issue is within the conventional expertise of judges; (2) whether the

issue lies within the agency's discretion or requires the exercise of agency expertise; (3) whether

there is a substantial danger of inconsistent rulings; and (4) whether a prior application to the

agency has been made." *APCC Servs., Inc. v. WorldCom, Inc.*, 305 F. Supp. 2d 1, 13 (D.D.C.

2001); *see also United States v. Philip Morris USA Inc.*, 686 F.3d 832, 837 (D.C. Cir. 2012)

(noting that "no fixed formula exists" but that "some principles emerge from our precedents,"

including a "concern for uniform outcomes," the "advantages of allowing an agency to apply its

expert judgment," and whether the question is "within the particular competence of an agency"

(internal alterations and citations omitted)).  Consideration of these factors demonstrates that no stay is necessary to permit DISB or any other state insurance agency the first opportunity to opine on the merits of the plaintiff's instant claims.

The plaintiff has not made a prior application to DISB, or to any other state insurance agency that regulates Medigap insurance, and thus no apparent danger of inconsistent rulings between this Court and a state insurance agency is presented that, as a matter of comity, would warrant this Court abstaining.  While mindful that DISB has the authority to review rates and even advertising related to Medigap insurance, and that nothing prevents a consumer troubled by the 4.95% charge from alerting DISB to her concerns rather than pursuing a nationwide class action, the mere availability of regulatory review is not sufficient reason to apply the primary jurisdiction doctrine.  Simply put, DISB has no exclusive jurisdiction over the claims at issue here.

Moreover, rather than requiring agency expertise, the claims at issue here—whether advertising is deceptive or misleading, and related common law claims of conversion, unjust enrichment and fraudulent concealment—are regularly subject to judicial review and therefore fall squarely within the conventional expertise of the courts.   The Supreme Court's decision in *Nader v. Allegheny Airlines*, 426 U.S. 290, 292 (1976), well illustrates this point.  There, the Court declined the defendant's request to stay the plaintiff's common law tort suit for fraudulent misrepresentation stemming from the airline's overbooking policy and refer the claim to the Civil Aeronautics Board.  Noting that the plaintiff was not challenging the airline's tariff and that the Board's authority to ban deceptive practices did not displace the tort suit, the Court held that the tort suit was "within the conventional competence of the courts, . . . the judgment of a technically expert body was not likely to be helpful in the application of the [tort] standards."  *Id.*

304–06. *See also Philip Morris USA Inc.*, 686 F.3d at 838 (observing that "courts consistently have refused to invoke the primary jurisdiction doctrine for 'claims based upon fraud or deceit'—claims that are "within the conventional competence of courts" (citing *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 1990) and *In re Long Distance Telecomms. Litig.*, 831 F.2d 627, 633–34 (6th Cir. 1987))). Likewise, here, the plaintiff does not directly challenge the reasonableness of the insurance rates charged and has chosen to pursue in this Court her CPPA and common law claims. These statutory and tort claims may be resolved without the need for "an informed evaluation of the economics or technology of the regulated industry." *Nader*, 426 U.S. at 305. Thus, the expertise vested in a specialized regulatory agency, which expertise might make the agency the preferred forum in some instances, is not necessary to resolve the claims at issue here. Accordingly, the primary jurisdiction doctrine does not bar this suit.

### B. The Filed-Rate Doctrine Does Not Bar The Instant Claims

Following a brief review of the purpose and scope of the filed-rate doctrine, the defendants' arguments urging application of this doctrine are considered. The Court concludes the filed-rate doctrine does not apply here.

### 1. The Filed-Rate Doctrine Generally

The parties spill much ink disputing whether the judicially created filed-rate doctrine (also known as the "filed-tariff" doctrine) requires dismissal of this case. The filed-rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory entity." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981). The filed[-]rate doctrine has its origins in [the Supreme] Court's cases interpreting the Interstate Commerce Act ["ICA"], . . . and has been extended across the spectrum of regulated utilities."

*Id.* (internal citations omitted). One of those originating cases was *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922), in which the Supreme Court rejected antitrust challenges to rates that had been filed with and approved as reasonable by the Interstate Commerce Commission. Regardless of the regulated industry involved, "[t]he considerations underlying the doctrine are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to [e]nsure that regulated companies charge only those rates of which the agency has been made cognizant." *Ark. La. Gas Co.*, 453 U.S. at 577–78 (internal quotation marks and alterations omitted). The Second Circuit has termed these interests as "two 'companion principles'—(1) preventing carriers from engaging in price discrimination as between ratepayers (the 'nondiscrimination strand') and (2) preserving the exclusive role of federal agencies in approving rates . . . that are 'reasonable' by keeping courts out of the rate-making process (the 'nonjusticiability strand')." *Marcus v. AT&T Corp.*, 138 F.3d 46, 58 (2d Cir. 1998).

A corollary of the filed-rate doctrine is that regulatory agencies have the sole authority to decide whether rates are reasonable and "[n]o court may substitute its own judgment on reasonableness for the judgment" of the regulatory agency. *Ark. La. Gas Co.*, 453 U.S. at 577. This principle typically has a statutory basis and has been expressed, for example, in Federal Energy Regulatory Commission (FERC) cases, due to provisions in the Natural Gas Act, 15 U.S.C. § 717c *et seq.*, that require regulated entities to file their rates and deem such rates are lawful only if they are "just and reasonable" *as determined by the Commission*. *See Ark. La. Gas Co.*, 453 U.S. at 577 ("The authority to decide whether the rates are reasonable is vested by [15 U.S.C. § 717c(a)] of the [Natural Gas] Act solely in the Commission."). In telecommunications cases, the corollary is derived from the tariff-filing provisions of the Federal Communications

Act ("FCA"), 47 U.S.C. § 203(a). *See Marcus*, 138 F.3d at 58. In ICA cases, the corollary reflects the Interstate Commerce Commission's authority to determine that filed rates are "reasonable and non-discriminatory." *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 415 (1986) (citing *Keogh*, 260 U.S. at 161; 49 U.S.C. § 10101 *et seq.*).

In the FCA, FERC and ICA contexts, the filed-rate doctrine supports the supremacy of federal regulation over certain federal as well as state and common law claims. Thus, when plaintiffs attempt to evade the filed-rate doctrine by bringing claims seeking relief that would affect the approved rates charged by the entities subject to the regulatory regimes of the ICA, FERC or FCA, the claims have been dismissed. *See, e.g., AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998) (stating, in the context of a case seeking to apply state law claims to a federally regulated telecommunications carrier, that "even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff"); *id.* at 223–24 (refusing to hold the filed-rate doctrine inapplicable to claims regarding the "provisioning of services and billing," and noting that "[a]ny claim for excessive rates can be couched as a claim for inadequate services and vice versa" (internal quotation marks omitted)); *Ark. La. Gas Co.*, 453 U.S. at 580 ("[W]hen [C]ongress has established an exclusive form of regulation, 'there can be no divided authority over interstate commerce.'" (quoting *Mo. Pac. R.R. Co. v. Stroud*, 267 U.S. 404, 408 (1925))); *S. Union Co. v. FERC*, 857 F.2d 812, 817 (D.C. Cir. 1988) ("[T]he preemptive effect of the [Natural Gas Act] is not . . . limited to state actions that directly and expressly relate to the price term of sale transactions. The test is instead whether state law conflicts or interferes with attainment of federal law objectives."); *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 45 (D.D.C. 2007) ("The filed[-]rate doctrine 'provides that state law, and some federal

law (e.g. antitrust law), may not be used to invalidate a filed rate or to assume a rate would be charged other than the rate adopted by the federal agency in question.' . . . when 'the relief sought by plaintiff would require the court to set damages by assuming a hypothetical rate,' it violates the filed[-]rate doctrine." (internal alterations, brackets, and citations omitted)).

Notwithstanding that the filed-rate doctrine preempts "those suits that seek to alter the terms and conditions provided for in the tariff," this doctrine "does not serve as a shield against all actions based in state law." *Cent. Office Tel.*, 524 U.S. at 229–31 (Rehnquist, C.J., concurring) ("The tariff does not govern . . . the entirety of the relationship between the common carrier and its customers."). Where a claim does not seek to alter the terms and conditions of a tariff, "[t]here is no direct relationship [to the filed-rate doctrine] at all and it is simply not the case that any action which might arguably and coincidentally implicate rates, much less those determined by a state, rather than a federal agency, is governed by the doctrine." *Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 73 (1st Cir. 2005). Similarly, in the preemption context, courts have recognized that federal regulatory regimes do not necessarily preempt state law actions prohibiting deceptive business practices, false advertisement, or common law fraud. *See Marcus*, 138 F.3d at 54. Indeed, "states may have an equal or greater interest in preventing [a carrier from misrepresenting the nature of its rates] as manifested by state consumer protection laws." *Id.*

Thus, the filed-rate doctrine operates to bar only claims, which, if successful, would undermine the critical policies underlying the filed-rate doctrine in the first place: nondiscrimination among customers and nonjusticiability as to the reasonableness of a rate. *See id.* at 59 ("[T]he focus for determining whether the filed[-]rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." (internal quotation

marks omitted) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 489 (8th Cir. 1992)). In other words, the filed-rate doctrine bars claims that would require a regulated entity to charge more or less than the rate approved by the federal regulatory authority but does not reach those claims for which the remedy would leave the regulated entity in compliance with the approved rate.

Consequently, when a claim seeks to vindicate rights or tortious harms without disturbing a properly filed rate—for example, by seeking prospective injunctive relief against the regulated entity—the filed-rate doctrine poses no obstacle. *See, e.g.*, *Square D*, 476 U.S. at 417, 422 & n.28 (explaining that filed-rate doctrine barred antitrust price-fixing claims for treble damages against regulated entities for their rates fixed by ICC since "rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier," but injunctive antitrust actions are permitted); *Marcus*, 138 F.3d at 62–63 (affirming dismissal of common law fraud and negligent misrepresentation claims and state false advertising claims for damages against telecommunications company for its billing policies, because the regulated entity was required to charge the rates on file, but explaining that "a suit for injunctive relief appears not to interfere with the nondiscrimination policy underlying the filed rate doctrine"); *cf. Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 913 (D.C. Cir. 1997) (affirming dismissal of fraud claims against a telecommunications company on grounds other than filed-rate doctrine, without addressing "whether the district court correctly held that the filed[-]tariff doctrine bars all the claims made in the complaint. As such, we leave for another day the question whether there are any circumstances in which injunctive relief may be based upon a billing practice disclosed in a filed tariff").

Contrary to the defendants' contention, this case does not fall neatly into the body of cases in which the filed-rate doctrine has been found to apply. The plaintiff raises no challenge to the setting or reasonableness of the Medigap insurance rates, asserts no claims against the regulated entity responsible for filing, and obtaining approval for, those rates, and thus seeks no damages from a regulated entity or even a third-party that would vary or enlarge the approved rate. Instead, the plaintiff challenges the conduct of a third-party doing business with the regulated entity and seeks relief that may be awarded without any alteration in the approved premiums collected by the regulated entity. As discussed further below, and as other courts have found, this makes a difference. *See, e.g.*, *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 796–98 (6th Cir. 2012) (reversing district court's holding on preclusive effect of filed-rate doctrine and holding that the doctrine is inapplicable to claims challenging "side-agreements" made by utility's affiliate for rebates to favored customers allowing those customers to pay lower rates than plaintiffs since a "ruling by this court will have no effect on the filed tariff or rate" (internal quotation marks and citation omitted)); *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 764–65 (3d Cir. 2009) (finding that "[t]he filed-rate doctrine bars suit from" plaintiffs who "think that the price they paid . . . was unfair," but not claims "alleg[ing] a violation of fair business practices through the use of illegal kickback payments" (internal citation omitted)); *Alpert v. Nationstar Mortg. LLC*, 243 F. Supp. 3d 1176, 1182 (W.D. Wash. 2017) (collecting cases challenging kickbacks and concluding that the filed-rate doctrine "will bar kickback claims as long as they upset the principles set forth in *Keogh*," but does not serve as a bar where the plaintiffs do not challenge the filed rates); *Jackson v. U.S. Bank, N.A.*, 44 F. Supp. 3d 1210, 1216–17 (S.D. Fla. 2014) (holding the filed-rate doctrine "unavailable as a defense" where defendants "are not insurers subject to the relevant regulatory regime" (internal quotation marks and citation

omitted)); *Maloney v. Indymac Mortg. Servs.,* No. CV 13-04781 DDP (AGRx), 2014 WL 6453777, at *4 (C.D. Cal. Nov. 17, 2014) (drawing a distinction between a challenge to the defendants' conduct in an alleged kickback scheme and a challenge to the rates themselves, and noting that the regulated entity's conduct with respect to third parties "is not dependent upon or made pursuant to any ratemaking authority"); *Valdez v. Saxon Mortg. Servs., Inc.*, No. 2:14-cv-03595-CAS(MANx), 2014 WL 7968109, at *10–11 (C.D. Cal. Sept. 29, 2014) (same); *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1036–38 (N.D. Cal. 2013) (acknowledging contrary authority but permitting plaintiffs to maintain a lawsuit challenging kickbacks rather than the cost of insurance).

### 2. Assuming The Filed-Rate Doctrine Applies To State-Regulated Insurance Rates, Plaintiff's Claims Are Not Barred

At the outset, the parties do not dispute but assume, without analysis, that the filed-rate doctrine extends beyond comprehensive federal regulatory regimes, which have specific statutory provisions granting a regulatory agency some exclusivity regarding the setting of reasonable rates or tariffs as well as the constitutional underpinning of the Supremacy Clause. The Court makes the same assumption that the filed-rate doctrine applies in a case raising state-law claims implicating state-regulated insurance rates. *See In re N.J. Title Ins. Litig.*, No. 08-1425, 2009 WL 3233529, at *3 (D.N.J. Oct. 5, 2009) (noting that "a number of courts have recognized that the filed[-]rate doctrine applies in the context of private suits challenging insurance rates approved by state regulatory agencies") (collecting cases).[7] The parties disagree whether the filed-rate doctrine bars the plaintiff's claims.

---

[7]     The D.C. Circuit has not addressed whether the filed-rate doctrine applies to state-regulated insurance rates. Likewise, the D.C. Court of Appeals has not addressed this issue and only references the filed-rate doctrine in the context of public utilities. *See, e.g., Office of People's Counsel v. D.C. Pub. Serv. Comm'n*, 989 A.2d 190, 193 (D.C. 2010); *District of Columbia v. D.C. Pub. Serv. Comm'n*, 905 A.2d 249, 256–57 (D.C. 2006); *Watergate E., Inc. v. D.C. Pub. Serv. Comm'n*, 662 A.2d 881, 888–89 (D.C. 1995). The defendants, for their part, point to no provision of District of Columbia law requiring the plaintiff to exhaust any remedies with a state insurance agency

The defendants argue that because Medigap policies are extensively regulated in each state, and because the plaintiff was charged precisely the premium filed with, and approved by, the state regulatory agencies in Florida and Louisiana, she is barred from challenging those rates except by bringing appropriate action before those state regulatory agencies. *See* Defs.' Mem. at 23–28. Otherwise, the defendants contend, the plaintiff would violate the nonjusticiability principle of the filed-rate doctrine because her claim attacks the rate that insurance regulators have already approved, and would violate the nondiscrimination principle because she seeks damages that, if paid, would reduce the rate below the rate on file with state regulators. *Id.* at 26–27 ("[B]y seeking a refund of the portion of the rate she claims is improper (i.e., the royalty), Plaintiff seeks to effectively pay a lower rate than the filed rate paid by other insureds under the Policy. That claim is exactly the type of collateral attack barred by the filed rate doctrine.").

The plaintiff counters that the filed-rate doctrine does not bar her suit because she challenges neither the setting of the rates nor their reasonableness, or even the collection by the regulated entity, UnitedHealth, of the Medigap insurance premiums. *See* Pl.'s Opp'n at 16–18, (acknowledging that filed-rate doctrine "generally bars suits asserting that the filed rate was unreasonable" but highlighting that "Plaintiff does not seek a refund for or challenge the appropriateness, reasonableness, or legality of the premiums UnitedHealth received for AARP Medigap coverage"). Instead, she claims damages only from the defendants' misrepresentations

---

prior to filing suit. Indeed, as for the CPPA claim, the D.C. Court of Appeals has explained that the legislative history of the CPPA confirms that it "may be used even when other laws provide 'different enforcement procedures and mechanisms.'" *Atwater v. D.C. Dep't of Consumer & Regulatory Affairs*, 566 A.2d 462, 467 (D.C. 1989) (quoting Council of the District of Columbia, Comm. on Pub. Servs. & Consumer Affairs, Rep. on Bill No. 1-253, at 24 (Mar. 24, 1976)); *see also Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 325 (D.C. 1999) ("[W]hile the CPPA is broad in the conduct it proscribes, even more important perhaps is the array of enforcement mechanisms it contains."). *Cf. Alpert*, 243 F. Supp. 3d at 1182–83 (noting that even though Washington recognizes the filed-rate doctrine, courts will consider state consumer protection act claims unless they "run squarely against the filed[-]rate doctrine." (internal citation and quotation marks omitted)).

and deceitful tactics that prevented consumers from making informed decisions about the undisclosed and unlawful "commission" the defendants collected. Compl. ¶ 83; *see also id.* ¶¶ 59, 60 (quoting AARP's own executives' statements before Congress in 2011 that the royalties— what the plaintiff challenges—have "nothing to do" with premiums). In this way, the "Court is being asked to rule on the misleading and deceitful nature of Defendants' conduct when it solicits its members to purchase AARP Medigap," but is "not [being asked] to alter the rate or make a determination of the rate's reasonableness." Pl.'s Opp'n at 18. As the plaintiff points out, UnitedHealth is not a defendant in this action and would not be liable for any refund she seeks. *See id.*

The defendants urge wholesale rejection of the plaintiff's theory that the filed-rate doctrine is inapplicable when the plaintiff challenges only the conduct by a third-party in charging an allegedly illegal commission "to consumers on top of the premiums." Compl. ¶ 58 (emphasis omitted). The defendants point to UnitedHealth and AARP's Agreement, which expressly states that the royalty *is paid out of the premium rate approved by state regulators*, and to UnitedHealth's public rate filings in Florida, which indicate the same. Defs.' Mem. at 27–28. The defendants also note that, as to the claim of allegedly misleading advertising, the Florida Insurance Commissioner already has the authority to determine whether an insurance advertisement has a capacity or tendency to mislead or deceive. *Id.* at 26. As noted above, DISB has this authority as well. *See supra* Section III.A.

For the reasons that follow, this Court holds that the filed-rate doctrine cannot be used as a shield to bar review of claims predicated on fraudulent misrepresentation against a third-party doing business with a regulated entity just because those claims have *some* relation to filed rates for state insurance coverage. First, at the motion-to-dismiss stage, without a full record

regarding the information UnitedHealth filed concerning its rates and the precise role of the payments to AARP in each state in question, concluding that this suit "seek[s] to alter the terms and conditions provided for in the tariff," *Central Office Telephone*, 524 U.S. at 229 (Rehnquist, C.J., concurring), would be premature. Although the defendants attached a number of exhibits to their motion to dismiss, including copies of UnitedHealth's rate filings in Louisiana and Florida (but not the District of Columbia), the defendants did not seek to, and the Court declines to, convert their dismissal motion to one for summary judgment. *See* FED. R. CIV. P. 12(d) (requiring, "[i]f, on a motion under Rule 12(b), . . . matters outside the pleadings are presented to and not excluded by the court," that motion "be treated as one for summary judgment under Rule 56"). Thus, the Court looks only to the plaintiff's Complaint, which alleges that consumers are not informed that expenses charged to them as part of a premium include a 4.95% royalty UnitedHealth is contractually obligated to pay AARP. Importantly, the plaintiff does not seek to "enforce agreements to provide services on terms different from those listed in the tariff," which "is all that the tariff governs," *Central Office Telephone*, 524 U.S. at 229, but rather to hold AARP responsible for violating state laws banning unfair and deceptive trade practices and related common law claims, *see id.* at 230 (the filed-rate doctrine "does not affect whatever duties state law might impose" on the regulated entity).

Second, the plaintiff's claims focus on her relationship with AARP and its affiliates, not with UnitedHealth, the regulated entity responsible for filing rates. This fact underscores that the plaintiff challenges behavior independent of the terms and conditions of the filed rate. The plaintiff alleges that, through unfair and deceptive trade practices, the defendants collect and retain a commission to which they are not legally entitled. Should the plaintiff prevail on these claims to require AARP to stop collecting that "commission" on extant terms, no change to

UnitedHealth's rates would necessarily follow. Indeed, nothing about the plaintiff's claims against AARP and its affiliates prevents UnitedHealth from continuing to collect precisely the approved rates. Any follow-on disruption to UnitedHealth and AARP's side agreement regarding the "royalty" payment and whether, as a result of this disruption, UnitedHealth will decide to change the rates filed going forward is irrelevant to an analysis of whether the filed-rate doctrine bars plaintiff's claims against AARP now. As the Second Circuit held, "the focus for determining whether the filed[-]rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." *Marcus*, 138 F.3d at 59 (internal quotation marks and citation omitted); *see also Medco Energi US, L.L.C. v. Sea Robin Pipeline Co., L.L.C.*, 729 F.3d 394, 399 (5th Cir. 2013) (per curiam) (explaining that filed-rate cases "ask this question: when the plaintiff's claims—at least on their face—do not attempt to challenge a filed rate, do the claims implicate the parties' rights and liabilities under that rate?") (internal quotation marks, alterations, and citation omitted). Any decision that AARP's advertising practices violate District of Columbia consumer protection laws or related common law claims has no effect on agency procedures and rate determinations and does not affect plaintiff or UnitedHealth's rights and liabilities under that rate. Therefore, the filed-rate doctrine is not implicated.

A recent case, challenging as unlawful the commissions paid by a telephone service provider to a Sheriff's Office for inmate telephone calls when state law allegedly did not authorize such commission payments, illustrates why the plaintiff's claims here are independent of a challenge to the rates UnitedHealth files. In *Pearson v. Hodgson*, the Court held that the filed-rate doctrine posed no bar to the plaintiffs' claim that the telephone provider's commission payments violated state law and helped the Sherriff's Office to "circumvent state law." No. 18-

cv-11130-IT, 2018 WL 6697682, at *9 (D. Mass. Dec. 20, 2018). The court reasoned that the claim "stands independent of any challenges to the specific rates charged," *id.*, and "is enough to survive a motion to dismiss," *id.* Acknowledging that parts of the complaint "may implicate the cost of" the inmate call services, *id.*, the *Pearson* Court nonetheless found that the plaintiffs were not "alleging that a contractual rate . . . differed from the [filed] rates," *id.*, but only that "what [the telephone provider] is doing with the revenue that it receives from the telephone calls" may violate state law, "and the filed[-]rate doctrine does not shield [the telephone provider] from claims of unfair or deceptive acts relating to their use of these funds," *id.*

Just as the *Pearson* Court reasoned that challenging allegedly unfair and deceptive practices in payments by the provider to the Sheriff's Office of unlawful commissions was "independent of any challenges to the specific rates charged," *id.,* so too here: so long as the claims challenge the deceptive and misleading statements and acts concerning the collection of allegedly unlawful payments, without seeking any change to the rate—and where the rate-filer is not even a defendant—the filed-rate doctrine is no obstacle.[8]

Although the defendants rely on several decisions from the Second, Fifth and Eleventh Circuits that have applied the filed-rate doctrine to bar actions for common law fraud or claims seeking relief under state consumer protection statutes, those cases are distinguishable on their facts. *See* Defs.' Mem. at 23–28 (citing *Medco Energi*, 729 F.3d 394; *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004); *Marcus*, 138 F.3d 46; *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994)); Defs.' Reply Supp. of Mot. to Dismiss ("Defs.'

---

[8]  Indeed, on *Pearson*'s logic, which allowed a suit against the regulated entity, even a suit against UnitedHealth might withstand the filed-rate doctrine so long as the plaintiff challenged not the rates, but the unlawful allocation of funds. The Court need not decide this issue, however, as UnitedHealth is not a defendant in the instant action.

Reply") at 10–14, ECF No. 15 (citing *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314 (11th Cir. 2018)).

The defendants rely in particular on *Patel,* where the Eleventh Circuit held that the filed-rate doctrine barred the plaintiffs' state and federal claims, including for breach of contract, tortious interference, and unjust enrichment, against a regulated insurance company and mortgage service providers, which had an exclusive arrangement to place the insurance company's hazard insurance. *Patel*, 904 F.3d at 1317. In that case, the plaintiffs expressly challenged the premium insurance rates they were charged for hazard insurance required to be maintained on real property securing the plaintiffs' mortgage loans ("force-placed insurance"), which premiums were allegedly "artificially inflated" to cover the cost of the insurance company's alleged "kickback" to mortgage loan servicers. *Id.* at 1317, 1326. In reaching this conclusion, the Eleventh Circuit focused on "[t]he most obvious basis," *id*. at 1325, namely, "the fact that the plaintiffs repeatedly state that they are challenging [the insurance company's] premiums," *id.* at 1325–26, using language targeting "artificially inflated premiums," "unreasonably high force-placed insurance premiums," and "amounts charged for insurance coverage," *id*. at 1326, such that "[t]he plain language of the complaints therefore shows that the plaintiffs are challenging the reasonableness of [the insurance company's] premiums; and since these premiums are based upon rates filed with state regulators, plaintiffs are directly attacking those rates as being unreasonable as well," *id.* The court described these claims "directly challenging the rates … filed with state regulators" as "textbook examples of the sort of claims that we have previously held are barred by the nonjusticiability principle." *Id.*

The other circuit cases on which the defendants rely are distinguishable from the plaintiff's claims for precisely the reason *Patel* is: in each case, the plaintiffs directly challenged

the filed rate. *See e.g.*, *Medco*, 729 F.3d at 399 (concluding that the plaintiff's claim against regulated entity for "misrepresentation about repair times, though 'extra-contractual,' involve the specific subject matter of the tariff [concerning interruptible pipeline service]"); *Hill*, 364 F.3d at 1316–17 (holding that misrepresentation claims against a telecommunications provider for not disclosing that it passed a federally required fee through to consumers as part of its filed rate "in effect" challenged the rate because it "seeks recovery of [the] . . . undisclosed charges" and damages would therefore reduce the filed rate (internal quotation marks and citation omitted)); *Marcus*, 138 F.3d at 59–62 (holding that the filed-rate doctrine prohibited false advertising claims for damages against telecommunications provider for its practice of "rounding up" the length of a long-distance call because any damages would have the effect of reducing the rate); *Wegoland*, 27 F.3d at 20–21 (concluding that the filed-rate doctrine blocked common law fraud claims against a telecommunications carrier that provided regulating agencies with misleading information in seeking approval of its rate, because in calculating damages the court would have to determine what the reasonable rate would have been absent the fraud).

By contrast to *Patel* and the other circuit cases on which the defendants rely, the Complaint at issue does not challenge the amount of the Medigap insurance rate or the amount collected by the insurance provider that has been approved by state insurance agencies. The focus of the plaintiff's claims is not the approved rate but AARP's description and practices related to the payments collected by AARP from each premium paid. The crafting of the claims here carefully avoids any direct criticism of the approved Medigap rates, as well as skipping any direct claims against the insurance provider. This makes a difference since, again, this suit against AARP targets not the insurance premiums but the disclosures about the defendants' side

agreement with a regulated entity and, if successful, does not alter the rate the regulated entity is entitled to charge.

This is not the first case to raise the question whether the filed-rate doctrine bars state consumer protection or common law fraud claims against AARP and/or UnitedHealth for the same 4.95% "royalty" charge at issue here. Those courts to address this issue have reached different outcomes, but closer scrutiny shows this is due to differences in the claims asserted. The defendants highlight that district courts in Texas and New York have held that the filed-rate doctrine barred state law claims regarding the 4.95% charge. Defs.' Mem. at 19 (citing *Peacock v. AARP, Inc.*, 181 F. Supp. 3d 430, 441 (S.D. Tex. 2016); *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 415–19 (S.D.N.Y. 2009), *aff'd*, 379 F. App'x 30 (2d Cir. 2010) (summary order)). District courts in California and New Jersey have rejected this position. *See Bloom v. AARP, Inc.*, No. 18-cv-2788-MCA-MAH (D.N.J. Nov. 30, 2018), Order at 2–4, ECF No. 40; *Levay v. AARP, Inc.*, No. 17-09041 DDP (PLAx), 2018 WL 3425014, at *7 (C.D. Cal. July 12, 2018); *Friedman v. AARP, Inc.*, 283 F. Supp. 3d 873, 877–79 (C.D. Cal. 2018).[9]

The reasoning of the two courts that have applied the filed-rate doctrine to bar claims regarding the 4.95% charge is neither binding nor persuasive given the differences in the claims here. In *Peacock*, for example, the plaintiffs "flatly allege[d] that the rates are illegal," 181 F. Supp. 3d at 440, and asserted claims that "attack[ed] the legality *vel non* of the rates charged by

---

[9]     AARP and UnitedHealth have sought dismissal due, *inter alia*, to the filed-rate doctrine in other cases challenging the 4.95% charge, but those dismissal motions remain pending. *See, e.g.*, *Dane v. Unitedhealthcare Ins. Co.*, No. 18-cv-792-SRU (D. Conn.); *Christoph v. AARP, Inc.*, No. 18-cv-3453-NIQA (E.D. Pa.). In addition, other similar cases have been dismissed voluntarily without a decision on the merits. *See, e.g.*, *Sacco v. AARP, Inc.*, No. 18-cv-14041-JEM (S.D. Fla. Jan. 23, 2019), Stipulation of Dismissal, ECF No. 89 (a putative class action filed on behalf of Florida residents against AARP and UnitedHealth and raising Florida law claims was stayed by the Southern District court of Florida and then voluntarily dismissed upon the Eleventh Circuit's denial of a petition for rehearing in *Patel*); *Baruch v. AARP, Inc.*, No. 18-cv-1563-AJN (S.D.N.Y. Mar. 26, 2018), Notice of Voluntary Dismissal, ECF No. 30 (a putative class action filed on behalf of New York residents raising New York state claims against AARP and UnitedHealth).

[AARP and UnitedHealth] for group insurance," *id.* at 441. The *Peacock* Court therefore had no trouble concluding that this direct attack on the filed rates was barred by the filed-rate doctrine. *Id.* This reasoning is easily distinguishable since the instant suit is not filed against UnitedHealth and does not challenge the legality of the approved rates charged by UnitedHealth. Rather, the plaintiff's claims challenge AARP's practices and disclosures regarding the defendants' retention of a portion of the rates UnitedHealth filed.

*Roussin* similarly sheds little light on the filed-rate doctrine's application to the instant claims. Although the plaintiff in *Roussin* sued only AARP and its affiliates, and not UnitedHealth, her suit directly attacked the reasonableness of the filed rates by arguing that the defendants had "failed to fulfill their fiduciary duties to keep insurance premiums reasonable," 664 F. Supp. 2d at 414 (internal quotation marks omitted), a claim the court concluded "at base, challeng[ed] the reasonableness of the cost of her AARP-sponsored health insurance rates," *id.* at 415, and would require the court to determine whether the rates were reasonable as a predicate to assessing AARP's breach of any duty to the plaintiff, *see id.* at 417, 419. No such determination about the reasonableness of the Medigap insurance rate is necessary here. For these reasons, *Peacock* and *Roussin* are inapposite.

By contrast, the district courts in New Jersey and California, which rejected application of the filed-rate doctrine to bar claims challenging the 4.95% charge under state consumer protection laws, are more closely analogous to the instant suit. In *Bloom*, the plaintiff sued both AARP and UnitedHealth and their affiliates for failing to disclose, and for false and misleading material statements about, UnitedHealth's payment of the 4.95% commission to AARP. The court found that "'the filed[-]rate doctrine simply does not apply' where a Plaintiff challenges

'allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct.'" *Bloom*, No. 18-cv-2788, Order at 2 (quoting *Alston*, 585 F.3d at 765).

Similarly, the plaintiffs in *Levay* and *Friedman* were not barred from pursuing unfair business practices and false advertising claims against both AARP and UnitedHealth because the claims were "essentially about false or misleading advertising, and not challenges to the reasonableness of the actual rates that were approved by the [state department of insurance]," *Levay*, 2018 WL 3425014, at *7, and were "more akin to challenges to Defendants' alleged misrepresentations, rather than challenges to the approved rate, or challenges to whether the rate is reasonable in light of the statutorily prescribed loss ratios for Medigap insurance," *Friedman*, 283 F. Supp. 3d at 878 (footnote omitted).

The *Levay* Court further explained that the theory of injury did "not concern the price of the insurance policy *per se*," but was that "consumers were 'duped' into joining AARP and paying membership fees in order to access the AARP-branded polices from UnitedHealth," without being told that AARP made "a commission on each sale" and had this ulterior motive to recommend the policies. *See Levay*, 2018 WL 3425014, at *5. As such, the *Levay* Court concluded that the state insurance agency's "rate determination is different from what is at issue here—whether the lender mischaracterized the nature of the charges. . . . [u]nder this theory of recovery, the adjudication of Plaintiffs' claims would not improperly encroach on . . . rate-making authority." *Id.* at *7 (internal quotation marks, alterations, and citation omitted). The *Friedman* Court similarly reasoned that "the gravamen of the complaint is not the premium rate per se, but the failure to disclose the allegedly fraudulent nature of the commission charged to borrowers," such that the challenged payments "appear to fall outside of the scope of the . . .

regulatory approval of rates," and the filed-rate doctrine. 283 F. Supp. 3d at 878–79 (internal quotation marks and citation omitted).

Just as in *Bloom*, *Levay* and *Friedman,* the plaintiff's state law claims against AARP and its affiliates regarding AARP's allegedly deceptive conduct and unfair business practices are independent of any approved rates UnitedHealth filed in the District of Columbia, or any other state. Thus, resolution of these claims about whether the plaintiff was *deceived by* and *injured by* the defendants' false representations concerning the 4.95% charge, or its incorporation as part of the premiums on file, does not necessitate any determination about the reasonableness of the rate.

Accordingly, the filed-rate doctrine does not bar the plaintiff's claims.

## C. Choice of Law

The defendants contend that because the plaintiff originally purchased a Medigap policy in 2012 when she resided in Louisiana, and later renewed that coverage while residing in Florida, either Louisiana or Florida law should apply. Defs.' Mem. at 17 n.3, 28. The plaintiff seeks application of District of Columbia law. Pl.'s Opp'n at 22–28. The Court agrees that District of Columbia law applies, though without agreeing with all of the plaintiff's reasoning.

The plaintiff first submits that her claims must be considered under District of Columbia law due to a provision in the group policy indicating as much. *See* Compl. ¶ 22 (quoting the Certificate of Insurance as stating that AARP "issued the Group Policy in the District of Columbia. . . . [and] [i]t provides insurance for AARP members and is governed by the laws of the District of Columbia"); Pl.'s Opp'n at 22–24. The defendants argue persuasively, however, that this provision only governs contractual claims related to the insurance policy and does not apply to the tort claims alleged here. *See* Defs.' Mem. at 32 n.9; Defs.' Reply at 23. The Court agrees that the contractual choice-of-law provision does not necessarily bind parties with respect to non-contractual causes of action, such as those asserted here. *See Base One Techs., Inc. v. Ali*,

78 F. Supp. 3d 186, 192 (D.D.C. 2015) (noting that contractual choice-of-law provisions do not bind parties with respect to tort actions) (citing *Minebea Co., Ltd. v. Papst*, 377 F. Supp. 2d 34, 38–39 (D.D.C. 2005)).  Nevertheless, under a choice-of-law analysis, the plaintiff prevails on the issue of which state's law governs this action.

When exercising diversity jurisdiction, the choice-of-law rules of the forum apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1045 (D.C. Cir. 2010).  Under District of Columbia law, the first step in a choice-of-law analysis is determining "whether a 'true conflict' exists between the laws of the [competing] jurisdictions—'that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different.'"  *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51–52 (D.C. Cir. 2014) (citing *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992); *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C. 1970)).  If there is no conflict, the law of the District of Columbia applies by default.  *See Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 20–21 (D.D.C. 2011).  If a conflict does exist, courts must employ a "modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute."  *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006) (internal quotation marks and citation omitted); *see also Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009) ("District of Columbia courts blend a 'governmental interests analysis' with a 'most significant relationship' test." (internal quotation marks and citation omitted)).  The Court addresses each of these issues *seriatim*.

### 1. Florida and Louisiana Law Conflicts With District of Columbia Law

"A conflict of laws does not exist when the laws of the different jurisdictions are identical or would produce the identical result on the facts presented."  *USA Waste of Md., Inc. v. Love*, 954 A.2d 1027, 1032 (D.C. 2008) (footnote omitted).  On the other hand, a conflict may be

found when two jurisdictions have different applicable laws, which would result in different outcomes. *See id.* In this case, the defendants argue vigorously that if the plaintiff were to litigate her claims under Florida law or Louisiana law, the outcome of this case would be different because her claims would be barred by the filed-rate doctrine. Defs.' Reply at 10–11 (citing *Patel*, 904 F.3d at 1320, 1326 (Florida law)); Defs.' Mem. at 27 n.8 (citing *Medco Energi, U.S., LLC v. Sea Robin Pipeline Co.*, 895 F. Supp. 2d 794, 816 (W.D. La. 2012), *aff'd*, 729 F.3d 394 ((Louisiana law)). The plaintiff appears to concede a conflict with Louisiana law, while suggesting her claim is distinguishable from Florida-law claims barred by the filed-rate doctrine because UnitedHealth is not a defendant in the action. *See* Pl.'s Opp'n at 18 & n.5.[10] No matter. Even assuming a demonstrated conflict among the laws of these three jurisdictions, consideration of the "governmental interest" and "significant relationship" tests confirms that the plaintiff's claims are governed by District of Columbia law.

### 2. Governmental Interest Test Favors Application of District of Columbia Law

The governmental interest analysis requires a court to "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Oveissi*, 573 F.3d at 842 (internal quotation marks and citation omitted). The defendants point out that Florida and Louisiana have comprehensive regulatory schemes for Medigap insurance and therefore have a strong governmental interest in having their laws applied. *See* Defs.' Mem. at 30–32. Moreover, they contend that Florida and Louisiana's interests outweigh the interests of the District of Columbia because the defendants' "place of business bears no meaningful connection to claims

---

[10] Notably, the plaintiff made this argument before the Eleventh Circuit issued its opinion in *Patel*, holding that the filed-rate doctrine applies when an intermediary passes the cost of regulator-approved rates on to a third party. *See* 904 F.3d at 1322.

regarding a Louisiana and Florida resident who purchased Louisiana- and Florida-regulated insurance." *Id.* at 31–32.

The plaintiff counters that the most heavily weighted factor is the place of the conduct causing injury, which "favors the District of Columbia because that is where AARP devised its scheme, prepared and approved of the marketing materials, entered into the Agreement with UnitedHealth, and where AARP Trust skimmed off 4.95% of Plaintiff's Medigap payments and forwarded it to AARP and ASI." Pl.'s Opp'n at 25–26. The plaintiffs' argument, based on the nature of the claims here, is more persuasive.

The plaintiff is seeking to vindicate her own rights, and the rights of those similarly situated under the District of Columbia's CPPA. For CPPA claims, "[t]he District of Columbia has an interest in protecting its own citizens from being victimized by unfair trade practices *and an interest in regulating the conduct of its business entities*." *Shaw*, 605 F.3d at 1045 (emphasis added). Indeed, the CPPA is not limited in its application to consumers or companies who are residents of the District, so the plaintiff's residence in Florida or previous residence in Louisiana does not prevent her from stating a claim under the CPPA. *See* D.C. CODE § 28-3904 (it is a violation of the CPPA for any "person" to engage in deceptive trade practices); *see also Washkoviak*, 900 A.2d at 180–83 (allowing non-residents to bring claims under the CPPA and claims under District of Columbia common law). Even if Florida or Louisiana have an equal interest as the District of Columbia in applying their own laws, in such a situation the law of the forum state should apply. *See Washkoviak*, 900 A.2d at 182 (citing *Logan v. Providence Hosp. Inc.*, 778 A.2d 275, 278 (D.C. 2001)). Thus, the District of Columbia has a strong governmental interest in the application of the CPPA in this case.

### 3. The Significant Relationship Test Favors Application of D.C. Law

When evaluating which jurisdiction has the "most significant relationship" to the case, courts in the District of Columbia "must consider the factors enumerated in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145, which are: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Oveissi*, 573 F.3d at 842 (internal quotation marks, alterations, and citations omitted); *Washkoviak*, 900 A.2d at 180.[11] The weighing of these four factors demonstrates that the District of Columbia has a more significant relationship to the plaintiff's misrepresentation and deceptive advertising claims, as well as the common law claims based on the same set of facts.

---

[11] In reply, the defendants suggest that Section 148 of the Second Restatement concerning "fraud and misrepresentation," should be applied here rather than Section 145. *See* Defs.' Reply at 21–22. While the D.C. Court of Appeals has previously looked to Section 148 as a "useful framework for selecting the law which applies to multi-state misrepresentation claims," *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 566 A.2d 31, 43 (D.C. 1989), more recent cases primarily look to Section 145, *see Washkoviak*, 900 A.2d at 182 n.18 (relying on Section 145 but noting the result would be no different under Section 148); *Jones v. Clinch*, 73 A.3d 80, 82 (D.C. 2013) (citing *Hercules* but nonetheless relying on Section 145 when analyzing a CPPA claim alleging misrepresentation); *see also In re APA Assessment Fee Litig.*, 766 F.3d at 53–55 (following *Washkoviak* and conducting an analysis of choice of law for misrepresentation claims under Section 145, but concluding there would be no difference if the question were considered under Section 148); *Margolis v. U-Haul Int'l, Inc.*, 818 F. Supp. 2d 91, 102 n.7 (D.D.C. 2011) (pointing to counsel's concession that "there is no case under the CPPA in the Superior Courts or in federal court that has ever applied [Section] 148") (internal alteration and quotation marks omitted); *Mobile Satellite Commc'n's, Inc. v. Intelsat USA Sales Corp.*, 646 F. Supp. 2d 124, 130 (D.D.C. 2009) (noting that the D.C. Court of Appeals "has applied [Section] 145 even in cases of fraudulent misrepresentation," and citing both *Washkoviak* and *Hercules*). Given this background, the Court concludes that Section 145 provides the appropriate framework. The plaintiff's motion for leave to submit a surreply to address this argument (among others) is therefore unnecessary. *See* Pl.'s Mot. for Leave to File Surreply, ECF No. 17. Further, as the defendants note, *see* Defs.' Opp'n to Pl.'s Mot. for Leave to File Surreply at 4, ECF No. 18, the plaintiff has failed to attach her proposed surreply for the Court's consideration. *See id.* (citing *Glass v. Lahood*, 786 F. Supp. 2d 189, 231 (D.D.C. 2011) (in which the plaintiff submitted her proposed surreply so that the Court could evaluate whether it was warranted); *Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 54, 63–64 (D.D.C. 2011) (same)). Therefore, the plaintiff's Motion for Leave to File a Surreply is denied as both defective and unnecessary, since the issues the plaintiff seeks to address would not aid in the Court's resolution of the pending motion to dismiss.

### a. The Place of Injury

The first factor requires the Court to consider the place where the injury to the plaintiff occurred. In a typical misrepresentation case, the injury occurs where the plaintiff "received the alleged misrepresentations and made their payments." *Washkoviak*, 900 A.2d at 181. In this case, the plaintiff alleges that the defendants violated the CPPA by falsely advertising and misrepresenting the source and purpose of the 4.95% charge. The parties agree that the place of the plaintiff's injury for her misrepresentation claims are Florida or Louisiana, where she "received the alleged misrepresentations," *Washkoviak*, 900 A.2d at 181. *See* Pl.'s Opp'n at 25; Defs.' Mem. at 30–31.

Yet, according to the Restatement and the D.C. Court of Appeals, "the place of injury is less significant in the case of fraudulent misrepresentations" than "in the case of personal injuries and of injuries to tangible things." *Washkoviak*, 900 A.2d at 181–82 (internal quotation marks and citation omitted) (stating that there was a "discounted value of the place of injury in cases . . . involving claims of misrepresentation"); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. f ("[T]he place of injury is less significant in the case of fraudulent misrepresentations and of such unfair competition as consists of false advertising and the misappropriation of trade values.") (internal citation omitted). Accordingly, although this factor weighs in favor of applying Florida or Louisiana law, the significance of this result is diminished because of the nature of the claims.

### b. The Place Where the Conduct Causing the Injury Occurred

The second factor in the choice-of-law analysis requires assessment of where the conduct causing the injury occurred. According to the Restatement, as previously discussed, "the place of injury does not play so important a role for choice-of-law purposes in the case of false advertising. . . . Instead, the principal location of the defendant's conduct is the contact that will

usually be given the greatest weight." Restatement (Second) of Conflict of Laws § 145

cmt. f. *See also Margolis*, 818 F. Supp. 2d at 102–03 (quoting *Washkoviak*, 900 A.2d at 181–82

for the proposition that the place of injury has a "discounted value" in cases involving claims of

misrepresentation).

Likewise, in cases alleging a misrepresentation, the place where the conduct causing the

injury occurred is the place where the defendant has its principal place of business and sets its

policies and practices. *See Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014) (Kavanaugh, J.)

(holding that the "conduct causing the injury" occurred in the location of the defendant's

principal place of business); Restatement (Second) of Conflict of Laws § 145 cmt. e

(where the conduct occurred will usually be given particular weight when the place of injury

"can be said to be fortuitous or when for other reasons it bears little relation to the occurrence

and the parties with respect to the particular issue. . . . such as in the case of fraud and

misrepresentation"). The defendants do not dispute that they set their practices and policies in

the District of Columbia, where AARP is headquartered and where each of the AARP affiliates

has its primary place of business. As a result, this second factor favors the application of District

of Columbia law.

### c.  The Residence, Place of Incorporation, and Place of Business of the Parties

The third factor of the choice-of-law analysis focuses on the residency of the parties in

the case. At the time she purchased AARP's Medigap policies, the plaintiff was a resident either

of Louisiana or of Florida. *See* Pl.'s Opp'n at 25. The defendants AARP, AARP Trust, and ASI

are all incorporated, headquartered, and maintain their primary place of business in the District

of Columbia. *Id.* at 26 (citing Compl. ¶¶ 21–23). As already noted, the District of Columbia has

an interest in regulating the conduct of businesses incorporated there. *See Shaw*, 605 F.3d at

1045. Although the states of Florida and Louisiana may have an interest in regulating insurance

companies within their states, AARP is not such an insurance company. Moreover, to the extent

those other states have an interest in regulating third-parties involved in the sale of insurance

policies within their states, those interests are less than that third-party's place of incorporation

and place of business. In any event, where interests may be equal, the forum state's law applies.

*See Washkoviak*, 900 A.2d at 182. Consideration of this factor thus favors application of District

of Columbia law.

### d. Where the Relationship Between the Parties is Centered

The fourth Restatement factor instructs the Court to determine where the relationship

between the parties is centered. The defendants suggest that because Medigap policies are

subject to state regulation, the plaintiff's relationship to the defendants was centered in

Louisiana, where she originally purchased her Medigap policy, and Florida, where she renewed

it. *See* Defs.' Mem. at 31. The plaintiff counters that the fourth factor "clearly favors the

District of Columbia above any other jurisdiction [because] (1) the AARP membership

organization is located in the District of Columbia and AARP membership is a requirement for

purchasing Medigap insurance policies; (2) AARP's decision to market AARP Medigap Policies

to AARP members emanated from the District of Columbia; and (3) it is where AARP Trust

segregates Plaintiff's money, forwarding her premiums to UnitedHealth and diverting 4.95% to

AARP and ASI." Pl.'s Opp'n at 26 (citing Compl. ¶¶ 22, 23, 71).

In this action, where the gravamen of the plaintiff's complaint is misrepresentation and

false advertising, the Court agrees that the plaintiff's relationship with the defendants is centered

in the District of Columbia, where the defendants have their primary place of business and where

they make their policies and practices regarding advertising.

### 4. District of Columbia Law Is Applied

Having considered both the governmental interest analysis and the significant relationship test, informed by the four factors outlined by Section 145 of the Second Restatement, the Court concludes that District of Columbia law should govern this dispute. The place of the plaintiff's alleged injury due to the defendants' alleged misrepresentations and failure to disclose certain information occurred in Louisiana or Florida, but the alleged misconduct emanated from District of Columbia, where the defendants are headquartered and have their primary place of business. As the plaintiff alleges, "AARP formulated and conceived its role in the scheme largely in the District of Columbia, directed the scheme complained of . . . from the District of Columbia, and its communications and other efforts to execute the scheme largely emanated from the District of Columbia. . . . [including] AARP's decision to market AARP Medigap policies to AARP members, its policies and practices relating to AARP Medigap Policies, including the . . . decision to collect the 4.95% commission." Compl. ¶¶ 70–71. In light of the fact that this case involves allegations of misrepresentation, for which the place of the alleged injury is less important than in other tort cases, *see In re APA Assessment Fee Litig.*, 766 F.3d at 54 (citing *Washkoviak*, 900 A.2d at 182), bolstered by the District of Columbia's interest in regulating companies incorporated under its laws, District of Columbia law will be applied to the instant claims.

### D. Statutes of Limitations

The defendants raise yet another threshold issue: namely, that the plaintiff filed the instant Complaint outside of the statute of limitations under both Louisiana and District of Columbia law, since she first purchased her Medigap policy in 2012. *See* Defs.' Mem. at 37–38. The plaintiff counters that she last renewed her policy in November 2016, within the District of Columbia's three-year statute of limitations for the filing of her Complaint in 2018, and in any

event her claim should be allowed under either a "continuing tort" or "fraudulent concealment" theory. *See* Pl.'s Opp'n at 32–34 & n.17. For the following reasons, the Court declines, at this stage, to dismiss the Complaint as untimely.

A defendant may raise a statute of limitations defense "in a pre-answer motion under . . . Rule[] 12(b)." *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 577 (D.C. Cir. 1998). The D.C. Circuit has "repeatedly held," however, that "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the fact of the complaint." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam). "[S]tatute of limitations issues often depend on contested questions of fact, [so] dismissal is appropriate only if the complaint on its face is conclusively time-barred." *Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014) (internal quotation marks omitted) (quoting *de Csepel v. Republic of Hungary*, 714 F.3d 591, 603 (D.C. Cir. 2013)).

Under District of Columbia law, the plaintiff must bring her CPPA and related common law claims within three years from the time when her right to maintain the action accrued. *See* D.C. CODE § 12-301(8); *Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 369 n.7 (D.C. 2015). A claim accrues when the plaintiff has "either 'actual notice of her cause of action' or is deemed to be on 'inquiry notice' by failing to 'act reasonably under the circumstances in investigating matters affecting her affairs, where 'such an investigation, if conducted, would have led to actual notice.'" *Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011) (quoting *Harris v. Ladner*, 828 A.2d 203, 205–06 (D.C. 2003)). "[W]hat constitutes the accrual of a cause of action is a question of law; the actual date of accrual, however, is a question of fact." *Medhin*, 26 A.3d at 310 (internal alteration, quotation marks, and citation omitted). Moreover "[w]hat is 'reasonable under the circumstances' is a highly factual analysis. The relevant circumstances include, but are not

limited to, the conduct and misrepresentations of the defendant, and the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations." *Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996).

Related to the assessment of the reasonableness of reliance, the District of Columbia recognizes a "discovery rule" that operates to trigger the accrual date for the limitations period upon discovery of the injury when the alleged tortious conduct obscures when the injury occurred. *See Hughes v. Abell*, 794 F. Supp. 2d 1, 12 (D.D.C. 2010). Under this rule, a cause of action accrues "when one knows or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." *Id.* (internal quotation marks omitted) (quoting *Morton v. Nat'l Med. Enters., Inc.*, 725 A.2d 462, 468 (D.C. 1999)). "[W]hen one person defrauds another, there will be a delay between the time the fraud is perpetrated and the time the victim awakens to that fact." *In re Estate of Delaney*, 819 A.2d 968, 981 (D.C. 2003) (internal quotation marks and citation omitted).

Relatedly, the District of Columbia also recognizes a "continuing tort doctrine," which allows a plaintiff to recover for harms that would otherwise be time barred when she suffers "(1) a continuous and repetitive wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act . . . within the limitation period." *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 547–48 (D.C. 2002) (internal quotation marks and citation omitted). This doctrine may apply when the claimed "injury might not have come about but for the entire course of conduct." *Pleznac v. Equity Residential Mgmt., L.L.C.*, 320 F. Supp. 3d 99, 104 (D.D.C. 2018) (internal quotation marks and emphasis omitted) (quoting *John McShain, Inc. v. L'Enfant Plaza Props., Inc.*, 402 A.2d 1222, 1231 n.20 (D.C. 1979)).

As to this latter theory, the defendants argue that the continuing tort doctrine is inapplicable to a situation where the plaintiff makes a series of periodic payments, all stemming from an initial wrong outside of the limitations period, relying heavily on *Pleznac*, a case that is not binding on this Court.  Defs.' Reply at 15–16 (citing *Pleznac*).  The plaintiff in *Pleznac* alleged that she was fraudulently induced into signing a lease and that the renewal of that lease, occurring within the statute of limitations period, allowed her to bring a claim for the initial fraud.  *Pleznac*, 320 F. Supp. 3d at 105–06.  The Court rejected that argument, but held open the possibility that a plaintiff in a similar situation could "seek[] relief based on . . . subsequent lease renewals. . . . [because] [i]t could theoretically be the case that the renewals were independent acts of deception rather than mere injuries flowing from the initial misrepresentations or omissions."  *Id.* at 105.  The possibility that the Court held open in *Pleznac* applies here where the plaintiff alleges that AARP misrepresented the nature of the 4.95% charge both when she originally bought her policy *and* when she renewed it, and that therefore each renewal was an "independent act[] of deception" subject to the continuing tort doctrine.  *Id.*

In any event, assuming that the plaintiff's claim did not accrue until she learned the specifics of the 4.95% charge constituting a "royalty" UnitedHealth owed AARP and that consumers were charged the royalty in conjunction with their premium payments, she does not specify in her Complaint *when* she learned those details.  Nor does any party address whether the plaintiff should be deemed to have been on inquiry notice of her claim as a result of the filing, as early as 2009, of other lawsuits against AARP with similar allegations, as well as AARP's testimony in 2011 before the House Ways and Means Committee, which testimony and related Congressional investigations are cited in the Complaint, *see* Compl. ¶¶ 48, 59–61. Moreover, the Complaint does not specify when the plaintiff viewed the defendants' advertisements or

statements regarding the 4.95% charge, or when the plaintiff learned facts leading her to believe that such advertisements or statements were materially false. These dates may be relevant to an analysis of whether the plaintiff's claims are time barred or whether the discovery rule should apply. Yet, given that these factual matters remain unknown, and since the Complaint is not "on its face" conclusively time barred, *Bregman*, 747 F.3d at 875, dismissal for statute of limitations reasons is not appropriate at this time.

### E. The Plaintiff Plausibly States a Claim for Relief

The plaintiff asserts four claims against all three defendants: unfair trade practices under the CPPA, conversion, unjust enrichment, and fraudulent concealment. Since the factual allegations sufficiently state plausible claims, as explained further below, the defendants' motion to dismiss for failure to state a claim is denied.

### 1. Count One States a Violation of the CPPA

The CPPA is a "comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." *Atwater*, 566 A.2d at 465. This law is expressly intended to "be construed and applied liberally to promote its purpose." D.C. CODE § 28-3901(c). The plaintiff invokes the CPPA to challenge the defendants' conduct in marketing, soliciting members to enroll in, and administering Medigap policies. Specifically, the plaintiff alleges that AARP committed an unlawful trade practice, in violation of the CPPA, by issuing solicitation materials, letters to prospective consumers, billing statements, renewal letters, and website statements containing misrepresentations of material facts concerning the 4.95% payment and AARP's collection and receipt, without being a licensed insurance broker or agent, of a commission on each policy sale or renewal. Compl. ¶¶ 5, 92–96. The plaintiff claims financial harm by these unlawful trade practices because she would have sought a different Medigap policy that did not incorporate a 4.95% "commission that AARP is not legally entitled

to," *id.* ¶ 97, and because the defendants' actions "deprived [her] of truthful information regarding [her] choice" of Medigap policies, *id.* ¶ 100.

The defendants challenge the validity of this CPPA claim on four grounds: (1) the CPPA does not apply to transactions conducted outside the District of Columbia, Defs.' Mem. at 38–39; (2) the plaintiff lacks standing because she does not allege an injury in fact, *id.* at 39–41; (3) the defendants do not qualify as a "merchant" under the CPPA, *id.* at 41; and (4) unfair trade practices through material misrepresentations have not been sufficiently pled, *id.* at 42–44  Each of these arguments falls short.

### a.   The CPPA Applies to the Alleged Transactions

The CPPA applies to the transactions alleged in this case.  The defendants argue that the CPPA only "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia," and, since the plaintiff never alleges that she purchased, leased, or even saw any advertisements in the District of Columbia, the CPPA claim should be dismissed.  Defs.' Mem. at 39 (emphasis omitted) (citing D.C. CODE § 28-3901(c)).  Noting that the CPPA must "be construed and applied liberally to promote its purpose," Pl.'s Opp'n at 35 (internal quotation marks omitted) (quoting D.C. CODE § 28-3901(c)), the plaintiff contends that, regardless of her connections to other states, the CPPA applies when "the plaintiff . . . avers that the defendant[s'] actions in the District of Columbia gave rise to the plaintiff's claims under the CPPA," which the plaintiff has done here,  Pl.'s Opp'n at 35 (emphasis omitted) (quoting *Renchard v. Prince William Marine Sales, Inc.*, 87 F. Supp. 3d 271, 283 (D.D.C. 2015)).  The Complaint expressly alleges that "AARP formulated and conceived its role in the scheme largely in the District of Columbia, directed the scheme . . . from the District of Columbia, and its communications and other efforts to execute the scheme largely emanated from the District of Columbia. . . .

[including] the oversight of the marketing . . . and decision to collect the 4.95% commission"
Compl. ¶¶ 70, 71. These allegations sufficiently "aver[] that the defendants' actions in the
District of Columbia gave rise to [her] claims under the CPPA." *Renchard*, 87 F. Supp. 3d at
283 (emphasis omitted).

The defendants question the plaintiff's reliance on *Renchard*, *see* Defs.' Reply at 17, a
case in which a yacht owner asserted a CPPA claim against the Virginia company that financed
his yacht purchase and subsequently seized the yacht in the District of Columbia for failure to
make payment for improvements made to the yacht in the District of Columbia. *See Renchard*,
87 F. Supp. 3d at 274–76. The Court found no merit to defendants' claims that the CPPA would
involve extraterritorial conduct because in *Renchard*, the District of Columbia was "where the
injury occurred and the place where the conduct causing the injury occurred." *Id.* at 283. The
defendants attempt to distinguish *Renchard* by pointing out that the Court *also* noted that the
yacht was received in the District of Columbia, whereas in this suit the plaintiff purchased and
received insurance in Florida and Louisiana. Defs.' Reply at 17. Yet this overlooks the Court's
strong reliance on the plaintiff's allegations that "the defendants' actions *in the District of
Columbia* gave rise to the plaintiff's claims under the CPPA," *Renchard*, 87 F. Supp. 3d at 283
(emphasis in original), and that even if other states may have interests in the matter, "the injury
complained of, and direct conduct contributing to that injury, occurred in Washington D.C.," *id.*
The same is true here: the plaintiff alleges that the defendants' false advertising and unfair
business practices emanated from the District of Columbia, where they are based, and, as noted
*supra* in Section III.C.3, the place of the plaintiff's injury is less important in false representation
cases than where the conduct causing the injury occurred.

Furthermore, this Court has previously held that the CPPA had "extraterritorial" application and could govern disputes between out-of-state plaintiffs and a defendant headquartered in the District of Columbia. *See Shaw v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 141, 147 & n.4, 149 (D.D.C. 2007). Indeed, *Shaw* noted that "courts in the District of Columbia have already concluded that its policies are advanced by application of the CPPA to cases involving non-District of Columbia consumers, merchants, and transactions." *Id.* at 149–50 (citing *Williams v. First Gov't Mortg. & Inv'rs Corp.*, 176 F.3d 497, 499 (D.C. Cir. 1999); *Washkoviak*, 900 A.2d at 177, 180–81)); *see also In re APA Assessment Fee Litig.*, 766 F.3d at 53–55 (upholding the District Court's choice-of-law analysis applying District of Columbia law when out-of-state plaintiffs sued a defendant headquartered in the District of Columbia for misrepresentations regarding membership fees).

In light of this precedent, the Court concludes that the CPPA applies to the conduct alleged in this case.

### b. The Plaintiff Has Standing to Bring a CPPA Claim

Contrary to the defendants' contentions, the plaintiff has standing to pursue this CPPA claim. The "irreducible constitutional minimum" of standing consists of three elements. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff must have suffered (1) an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable judicial decision. *City of Boston Delegation v. FERC*, 897 F.3d 241, 248 (D.C. Cir. 2018). The injury in fact must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

The defendants contend that the plaintiff suffered no injury in fact because she paid precisely the premium that was approved by state regulatory agencies, Defs.' Mem. at 40, and

even if she believes she should have received more information about the royalties deducted from that premium, she "has not alleged, and cannot plausibly allege, any loss caused by United[Health]'s allocation of premium revenue to program expenses, including the AARP royalty," *id.* According to the defendants, the plaintiff cannot avoid this flaw in her alleged injury in fact by positing that had she known about the defendants' alleged misconduct, she would have purchased Medigap insurance from another company. *See id.* (citing Compl. ¶ 79). The defendants further contend that the plaintiff "alleges no facts making this bald assertion plausible," including, for example, "what alternative carrier Plaintiff would have considered, the rates offered by that hypothetical alternative provider, or whether those rates were lower." Defs.' Mem. at 40. Consequently, this "conclusory statement that she would have purchased different coverage does not," in the defendants' view, "permit an inference that she suffered any loss." *Id.* at 40–41.

Drawing all inferences in the plaintiff's favor, as is required at this procedural stage, she has sufficiently alleged financial harm. *See Attias v. CareFirst, Inc.*, 865 F.3d 620, 622, 627–28 (D.C. Cir. 2017) (recognizing that allegations, rather than evidence of injury, may support standing at the motion-to-dismiss stage). This is especially true in the context of Medigap policies, which are often identical in every respect except for price. *See* CMS Medigap Guide at 9, 13, 19 ("Different insurance companies may charge different premiums for the same exact policy."). The plaintiff asserts that she has sufficiently alleged an injury in fact based on: (1) the financial harm she suffered when AARP misled her into paying an illegal 4.95% commission; and (2) the violation of her statutory right to truthful information. Pl.'s Opp'n at 37. The plaintiff has sufficiently alleged that, had she understood what was presented to her as a "premium" to "pay expenses incurred by the [AARP] Trust in connection with the insurance

programs and to pay the insurance company for . . . insurance coverage," Compl. ¶ 64, also included a 4.95% charge intended to meet UnitedHealth's royalty obligations, she would have sought out a different, lower-priced policy, and therefore she was financially harmed by the allegedly misleading advertisements. These allegations suffice to establish an injury in fact at this stage.

In making this determination, resolving whether the 4.95% charge is properly characterized as a "commission" or a "royalty" or an unlawful "kickback" is unnecessary. Regardless of labels, all the plaintiff is required to do is sufficiently to allege economic harm, "a classic form of injury-in-fact." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015) (internal quotation marks and citation omitted); *see also Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.) ("A dollar of economic harm is still an injury-in-fact for standing purposes."). She has sufficiently stated an injury in fact, as other courts have found with respect to virtually identical allegations regarding the same 4.95% charge. *See Levay*, 2018 WL 3425014, at *4–5; *Friedman*, 283 F. Supp. 3d at 879–80 (holding that the plaintiff had established an injury, but dismissing the claim because the plaintiff no longer held a Medigap policy and therefore had no standing to pursue injunctive relief).[12]

---

[12] As for the plaintiff's argument that she has alleged standing by virtue of asserting a violation of her statutory right to truthful information, the Court agrees with the defendants that this alleged violation, *without more*, is insufficient to establish standing. *See* Defs.' Mem. at 39–40; Pl.'s Opp'n at 37–38. "Although it might violate the CPPA to present misleading information even if no one was misled, a private plaintiff cannot bring a suit in federal court to enforce that claim unless he or she has suffered an injury in fact." *Mann v. Bahi*, 251 F. Supp. 3d 112, 119 (D.D.C. 2017) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). The plaintiff does not have standing unless she can allege that the defendants violated the CPPA *and* that she suffered an injury in fact as a result. *See Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016); *Silvious v. Snapple Beverage Co.*, 793 F. Supp. 2d 414, 417 (D.D.C. 2011) (collecting cases for the proposition that "a lawsuit under the CPPA does not relieve a plaintiff of the requirement to show a concrete injury-in-fact to himself").

The plaintiff has sufficiently alleged financial harm as a result of the defendants' actions, and thus has met the injury in fact requirement to seek damages in Count One alleging a violation of the CPPA.[13]

### c.  The Defendants Qualify as Merchants Under the CPPA

The defendants argue that the CPPA only applies to "merchants" who supply "goods and services," whereas none of the defendants sold, supplied, or transferred insurance policies to the plaintiff in a consumer-merchant relationship. Defs.' Mem. at 41–42.  "[T]he CPPA does not cover all consumer transactions, and instead only covers 'trade practices arising out of consumer-merchant relationships.'" *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015) (quoting *Snowder v. District of Columbia*, 949 A.2d 590, 599 (D.C. 2008)).  The CPPA defines "merchant" as one "who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services . . . or would supply the goods or services which are or would be the subject matter of a trade practice."  D.C. Code § 28-3901(a)(3).  Persons or entities sufficiently "connected with the supply side of the consumer transaction" meet the CPPA's definition of a merchant.  *Adler v. Vision Lab Telecomms., Inc.*, 393 F. Supp. 2d 35, 39 (D.D.C. 2005) (internal quotation marks omitted) (quoting *Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory Sch.*, 514 A.2d 1152, 1159 (D.C. 1986)).

The plaintiff alleges that "AARP's solicitation, marketing, and sale of AARP Medigap Policies constitutes the sale of consumer goods or services in the ordinary course of business." Compl. ¶ 53.  In support, the plaintiff points out that, under the Agreement with UnitedHealth,

---

[13]     The plaintiff lacks standing, however, to pursue injunctive relief under the CPPA, *see* Compl. ¶ 103, because she does not allege that she is currently enrolled in an AARP Medigap policy.  *See Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 346 (D.C. Cir. 2018) (plaintiffs must demonstrate standing separately for each form of relief sought, and standing for prospective relief requires showing continuing or imminent harm); *Levay*, 2018 WL 3425014, at *3 (holding that plaintiffs lacked standing to pursue injunctive relief when they had not alleged how they would *continue* to be harmed by AARP's misrepresentations concerning the Medigap policies).

AARP: (1) markets, solicits, sells, and renews AARP Medigap policies, *id.* ¶ 38; (2) collects and remits premium payments on behalf of UnitedHealth, *id.*; (3) owns all solicitation materials related to the AARP Medigap program, *id.* ¶ 47; (4) performs quality control and generally oversees UnitedHealth operations relating to the Medigap program, *id.* ¶ 48; (5) has authority over UnitedHealth's operations regarding the Medigap program, *id.*; (6) gives prior review and approval over all communication regarding the Medigap program, *id.*; (7) has the authority to consult, review, and consent to premium levels and rates and sales and distribution plans, *id.*; and (8) has review and modification authority over UnitedHealth's Medigap-related contracts with certain third-party vendors, *id.* The plaintiff posits that the 4.95% royalty charge is how UnitedHealth "compensates AARP to act as its agent in connection with the marketing, solicitation, sale, and administration of AARP Medigap policies." *Id.* ¶ 49; *see also id.* ¶¶ 50–52 (describing this "agency" relationship); *id.* ¶ 73 (suggesting that these activities render AARP an unlicensed insurance agent or broker). In other words, according to the plaintiff, "the [defendants'] involvement in the allegedly fraudulent [scheme] in this case is . . . far greater than a mere recommendation for services." *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 92 (D.D.C. 2016).

Notwithstanding all of the defendants' alleged activities to connect consumers to Medigap policies, the defendants argue that they are not "merchants" within the meaning of the CPPA because the plaintiff has not alleged that they "sold, supplied, or transferred insurance policies" in a manner creating a consumer-merchant relationship. Defs.' Mem. at 41. To the extent the plaintiff does allege such activities, *see, e.g.*, Compl. ¶¶ 38–52, the defendants dismiss these allegations as "bare legal conclusions regarding AARP's actions" under its Agreement for licensing intellectual property. Defs.' Mem. at 42. To the contrary, the plaintiff has alleged far

more than "bare legal conclusions" and has, in fact, provided ample detail concerning AARP's extensive responsibilities with respect to marketing, advertising, soliciting, and administering Medigap policies to allow the reasonable inference that the defendants are so "connected with the supply side of the consumer transaction" so as to constitute merchants under the CPPA. *See Adler*, 393 F. Supp. 2d at 39 (internal quotation marks omitted).

Moreover, the defendants' reliance on *Adler* to distinguish their activities is based on an apparent misinterpretation of its holding. The defendants cite *Adler* for the proposition that a "defendant that sent unsolicited advertisements on behalf of third party was not a 'merchant' within the meaning of the CPPA because the plaintiffs did not purchase or receive services from defendant." Defs.' Mem. at 42. The defendants' case summary ignores *Adler's* holding that the defendants were merchants, but no consumer-merchant relationship existed because the plaintiffs *never bought anything*, and thus were not consumers. 393 F. Supp. 2d at 40. *Adler* explicitly held that parties who do more than merely recommend goods and services may qualify as merchants under the CPPA, *id.* at 39–40, consistent with the holdings in other cases from this Court addressing this issue. *See, e.g.*, *Hall v. S. River Restoration, Inc.*, 270 F. Supp. 3d 117, 123 (D.D.C. 2017) (CKK); *McMullen*, 164 F. Supp. 3d at 91–92 (JEB); *Ihebereme v. Capital One, N.A.*, 730 F. Supp. 2d 40, 52 (D.D.C. 2010) (ESH). Based on the plaintiff's allegations of the defendants' extensive involvement in marketing, selling, and administering Medigap policies to consumers, the defendants do far more than endorse UnitedHealth's Medigap policies.

For the foregoing reasons, the plaintiff has sufficiently alleged facts plausibly showing that the defendants meet the CPPA's definition of "merchant."

### d. The Plaintiff Sufficiently Alleged Material Misrepresentations

Finally, the plaintiff has sufficiently and plausibly alleged that the defendants engaged in unfair trade practices under the CPPA by materially misrepresenting information about the 4.95% charge.

The CPPA forbids a variety of "unfair or deceptive trade practice[s], whether or not any consumer is in fact misled, deceived, or damaged thereby," D.C. CODE § 28-3904, and "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." *Mann*, 251 F. Supp. 3d at 116–17 (citing D.C. CODE §§ 28-3901 to 28-3903; *id.* § 28-3901(c)) (establishing enforceable right to truthful information). A "trade practice" is "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods and services." D.C. CODE § 28-3901(a)(6).

The plaintiff asserts violations of three CPPA "unfair or deceptive trade practice" provisions, claiming the defendants (1) misrepresented a material fact which has a tendency to mislead, in violation of *id.* § 28-3904(e); (2) failed to state a material fact if such failure tends to mislead, in violation of *id.* § 28-3904(f); and (3) used innuendo or ambiguity as to a material fact, which has a tendency to mislead, in violation of *id.* § 28-3904(f-1). Compl. ¶ 93. As to each CPPA provision, the plaintiff points to three basic categories of misrepresentations: (1) the defendants' statements or omissions regarding the 4.95% charge, including its amount, what it is used for, and who pays it, *see* Compl. ¶ 96; (2) the defendants' activities as a *de facto* or unlicensed insurance agent of UnitedHealth, rendering their activities on behalf of UnitedHealth to be unfair trade practices, *id.*; and (3) the defendants' misrepresentation of the 4.95% charge a

"royalty" when it qualifies as a commission and may not lawfully be collected by AARP under District of Columbia law, *id.*

In assessing whether the plaintiff's allegations plausibly plead an unfair or deceptive trade practice through use of material misrepresentations, a court must "consider an alleged unfair trade practice 'in terms of how the practice would be viewed and understood by a reasonable consumer.'" *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013) (quoting *Pearson v. Chung*, 961 A.2d 1067, 1075 (D.C. 2008)). The same "reasonable consumer" standard applies to the question of whether information has a tendency to mislead. *See Saucier*, 64 A.3d at 442. "How the practice would be viewed by a reasonable consumer is generally a question for the jury," *Mann*, 251 F. Supp. 3d at 126, although "there are times when it is sufficiently clear to be determined as a matter of law," *id.* (citing *Alicke*, 111 F.3d at 912 (determining that no reasonable person could interpret the consumer phone contract at hand in the manner the plaintiff had asserted)). For claims under D.C. Code § 28-3904 (e), (f), and (f-1), "a statement or 'omission is material if a significant number of unsophisticated consumers would find that information important in determining a course of action.'" *Mann*, 251 F. Supp. 3d at 126 (internal quotation marks omitted) (quoting *Saucier*, 64 A.3d at 442). "Ordinarily the question of materiality should not be treated as a matter of law." *Saucier*, 64 A.3d at 442 (internal quotation marks and citation omitted).

With respect to the first category of alleged misrepresentations, concerning the defendants' statements or omissions regarding the nature and purpose of the 4.95% charge, the plaintiff identifies two specific material misrepresentations: (1) AARP's disclaimer indicating that premiums are used to pay expenses incurred by AARP Trust and to pay UnitedHealth for insurance coverage; and (2) AARP's disclosure that UnitedHealth pays royalty fees to AARP for

use of its intellectual property.  *See* Compl. ¶ 96.  The statements are made on AARP's websites,

s*ee* Compl. ¶ 51, and "through television commercials . . .  mailings, and [print] advertisements,"

*id.* ¶ 50.  Although the plaintiff does not specify when she saw these statements or came to

believe they were misleading, the defendants concede that the identified statements appear on

AARP products or sponsored advertising, and have even attached exhibits of the advertising

materials.  *See* Defs.' Mem. at 17–18 (referring to Ex. 2 and Ex. 3 and quoting language

disclosing the existence of the "royalty").  The only question, then, is whether the plaintiff has

sufficiently alleged that the statements are materially misleading under the CPPA.

The plaintiff alleges that AARP's Medigap disclaimer misleads consumers by stating that

"premiums [collected from consumers] are used to pay expenses incurred by [AARP] Trust in

connection with the insurance programs and to pay the insurance company for [consumer's]

insurance coverage," Compl. ¶ 64, which, the plaintiff alleges, is "highly misleading and

deceptive in that Defendants do not disclose that the amounts members are paying are not just

'premiums' to pay for the actual insurance coverage, and the administrative expenses incurred by

the AARP Trust, but a 4.95% commission on top of the premiums that AARP remits to

UnitedHealth," that AARP is in any event not entitled to collect because it is not an insurance

agent or broker, *id.* ¶¶ 65, 75; *see also* Pl.'s Opp'n at 43.

Even if the 4.95% charge is not a commission, however, the plaintiff alleges that the

disclaimer nevertheless misrepresents what the amounts collected from consumers are used for,

"obfuscat[ing] the cost of the Medigap premiums [and] leading reasonable consumers to pay

more than what they otherwise would."  Pl.'s Opp'n at 43 (citing Compl. ¶ 99).  That is, the

plaintiff alleges that if the defendants disclosed that consumers were being charged "premiums . .

. to pay expenses incurred by [AARP] Trust in connection with the insurance programs and to

pay the insurance company for [consumer's] insurance coverage," Compl. ¶ 64, *and* a 4.95%

charge (on the amount of the premium) to satisfy UnitedHealth's obligation to "pay[] royalty

fees to AARP for the use of its intellectual property. . . . [which] fees are used for the general

purposes of AARP," Compl. ¶¶ 5, 67, they would not be misled because they would reasonably

understand that their "premiums" included a specific charge—calculated as a percentage of those

premiums—paid solely to AARP and unconnected to their insurance coverage. *See* Pl.'s Opp'n

at 43.

The defendants' disclosure regarding that charge, "included on correspondence to" the

plaintiff and other consumers, Compl. ¶ 67, according to the plaintiff, is misleading on its own.

*See* Pl.'s Opp'n at 45 n.19; Compl. ¶¶ 62–65. The disclosure indicates that "UnitedHealthcare

Insurance Company pays royalty fees to AARP for the use of its intellectual property. These

fees are used for the general purposes of AARP." Compl. ¶¶ 5, 67. This disclosure is allegedly

"false and misleading" by failing to inform consumers that they, and not UnitedHealth, will be

required to pay this "royalty." *Id.* ¶ 5. Nor does the disclosure inform consumers that the

"royalty" is equivalent to 4.95% of their premiums. *Id.* ¶¶ 5, 67. Again, nowhere does AARP

disclose that any portion of the "premiums" is in fact used to pay the "royalties" UnitedHealth is

obligated to pay AARP. *See id.* ¶¶ 65, 62 ("[W]hile AARP and UnitedHealth disclose the

existence of a payment in general to AARP—which they term a 'royalty' paid for the use of

AARP's intellectual property—they hide the fact that the cost of AARP Medigap insurance

includes a percentage-based commission to AARP, funded by consumers (and not

UnitedHealth), *in addition to* the insurance premium paid to UnitedHealth for coverage.")

(emphasis in original).

Based on these allegations, the plaintiff has sufficiently alleged that both misrepresentations, independently but even more so when considered together, would be misleading to the reasonable consumer. Contrary to the statement made in the AARP Medigap disclaimer, royalties owed by UnitedHealth are neither "expenses incurred by [AARP] Trust" nor payment to UnitedHealth for "insurance coverage." Compl. ¶ 64. Especially in combination with the defendants' representations elsewhere that *UnitedHealth* pays "royalty fees" to AARP for "use of its intellectual property" and that such fees are "used for the general purposes of AARP," *id.* ¶ 5, the plaintiff has sufficiently alleged that a consumer may lack information to understand that UnitedHealth satisfied its contractual obligations to AARP by including an additional, percentage-based charge as part of the premium. *See* Pl.'s Opp'n at 45–46; Compl. ¶¶ 64–67.

Having concluded that the plaintiff sufficiently alleged that the two statements were misleading, the Court also concludes that she has sufficiently alleged that they were material. A matter is material if: "a reasonable [person] would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question; or the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in his or her choice of action, although a reasonable [person] would not so regard it." *Saucier*, 64 A.3d at 442 (internal alterations omitted) (quoting RESTATEMENT OF THE LAW (SECOND) TORTS § 538(2)).

Based on the disclosures the plaintiff quotes in her Complaint, a reasonable consumer could lack information to understand that: (1) a portion of her premiums satisfied UnitedHealth's obligation to pay royalties to AARP; (2) such royalties were calculated as a percentage of what she paid for Medigap coverage; and (3) the operable percentage was 4.95%. This additional

charge was billed to the plaintiff as part of her premium, the price of which, as already noted, is generally the *sole* differentiating factor among Medigap policies. This price, and its components, are factors that a reasonable person would likely attach importance to in determining whether to buy a Medigap policy and whether to buy an AARP-sponsored one. Therefore, these factors may likely be material to a reasonable consumer.

At this stage, regardless of whether the 4.95% charge is properly deemed a "royalty" rather than a "commission," the plaintiff has stated a claim under the CPPA based on the defendants' allegedly materially misleading representations concerning the 4.95% charge.

With respect to the second and third categories of alleged misrepresentations and unfair or deceptive practices, concerning whether the defendants are *de facto* or unlicensed insurance agents of UnitedHealth and whether the 4.95% royalty, paid as a percentage of premiums, qualifies as a commission that may not lawfully be collected by AARP under District of Columbia law, *see* Compl. ¶ 96, the plaintiff notes that "it is well-established under the CPPA that 'a merchant that presents misleading information about its services in violation of another statute commits an unlawful trade practice, even if that statute is not specifically enumerated elsewhere in the CPPA," Pl.'s Mem. at 43–44 (citing *Mann*, 251 F. Supp. 3d at 121; *Osbourne*, 727 A.2d at 325–26). The plaintiff argues that if the defendants solicit insurance without being licensed to do so, they are misleading consumers about the services they are authorized by law to perform in violation of the CPPA. Compl. ¶ 96 Further, because AARP is not licensed as an insurer, it is not legally allowed to collect a commission. *Id.* The plaintiff alleges that AARP's disclosures regarding the 4.95% charge misled consumers by leading them to believe that the charge is part of the premiums paid to UnitedHealth rather than a commission AARP would not otherwise be authorized to collect. *See id.* ¶¶ 6, 62–65, 96–97.

District of Columbia law bars the payment or receipt of commissions in consideration for the sale, solicitation, or negotiation of insurance if the person paid was required to be licensed and was not. D.C. CODE § 31-1131.13. Persons who sell, solicit, or negotiate insurance must be licensed to do so. *Id.* § 31-1131.03. Key terms in this statutory provision are further defined, with "Sell" defined to mean "to sell or exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company," *id.* § 31-1131.02(16), and "Solicit" defined to mean "attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company," *id.* § 31-1131.02(17). "Commission" is not defined. *See id.* § 31-1131.02 (the definitions section for insurance regulations).

The defendants are not licensed insurance agents. Despite this, the plaintiffs allege that the defendants have agreed to: (1) market, solicit, sell and renew AARP Medigap policies with UnitedHealth; (2) collect and remit premium payments on behalf of UnitedHealth; (3) generally administer the AARP Medigap program; and (4) otherwise act as UnitedHealth's agent. *Id.* ¶ 38. In addition, AARP owns all solicitation materials related to the Medigap program. *Id.* ¶ 47, and its advertisements plainly state "This is a solicitation of insurance," *id.* ¶ 51. Further, in exchange for AARP's services on behalf of UnitedHealth, it "earns a 4.95% commission— disguised as a 'royalty'—on each policy sold or renewed." *Id.* ¶ 45.

Although District of Columbia law does not define "commission," the plaintiff has adequately alleged that the defendants solicit insurance without being licensed to do so and that the 4.95% charge, calculated as a percentage of premiums, represents the payment or receipt of "a commission, service fee, brokerage fee, or other valuable consideration" for the sale, solicitation, or negotiation of insurance, which is prohibited if the person paid was required to be licensed and was not. D.C. CODE § 31-1131.13. The plaintiff has also sufficiently alleged that

the defendants' advertisements and disclaimers concerning that charge and their role in soliciting insurance misled consumers about the services they are legally authorized to perform and their right to receive payment in consideration for the sale of insurance. *See Mann*, 251 F. Supp. 3d at 126 (holding that whether a business's "statements implied that it was licensed in D.C. is a question of fact for the jury").

Finally, the plaintiff has adequately alleged that the defendants' statements obscuring AARP's status as an unlicensed insurance agent that was not entitled to receive a commission were material, because had she understood that AARP received an unlawful commission for each sale, she would have sought a lower-priced Medigap insurance policy or one sold by a company that complied with District of Columbia laws. *See* Compl. ¶¶ 81–83 . Therefore, as to the second and third categories of misstatements, the plaintiff has sufficiently alleged that the defendants have committed an unfair trade practice in violation of the CPPA.

Accordingly, the defendants' motion to dismiss Count I is denied.

### 2. Count Two States a Claim of Conversion

In Count Two, the plaintiff alleges conversion of her ownership right to the 4.95% of her payments that was wrongfully charged and illegally diverted to AARP as a commission. *Id.* ¶¶ 104–07. She contends that the defendants "wrongly asserted dominion" over 4.95% of her payments, *id.* ¶ 106, and that she is entitled to damages in the amount for which she was wrongfully charged, *id.* ¶ 107.

As a general principle, conversion is defined as "any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of [her] rights thereto." *Hall v. District of Columbia*, 867 F.3d 138, 151 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Chase Manhattan Bank v. Burden*, 489 A.2d 494, 495 (D.C. 1985)). "[M]oney can . . . be the subject of a conversion claim 'if the plaintiff has the right to a specific

identifiable fund of money.'" *Papageorge v. Zucker*, 169 A.3d 861, 864 (D.C. 2017) (quoting *McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013)).

The defendants contend that the plaintiff's conversion claim fails because she has not identified the right to any specific identifiable source of money. *See* Defs.' Mem. at 45 & n.11 (citing *McNamara*, 950 F. Supp. 2d at 194). This is incorrect. The plaintiff's Complaint alleges that for every AARP Medigap policy sold or renewed, AARP Trust collects premium payments that include the 4.95% charge, Compl. ¶ 54, that AARP Trust then deducts funds equivalent to the 4.95% charge and remits that amount to AARP, Inc. and ASI, with 8% going to ASI and 92% going to AARP, Inc, *id.* ¶¶ 55, 57, and that the Agreement AARP has with UnitedHealth clearly delineates between the amount billed and paid by consumers, referred to as "Member Contributions," and the premiums remitted to UnitedHealth, referred to as "SHIP Gross Premiums," *id.* ¶ 58. The plaintiff alleges that she has a right to the money accumulated as a result of the 4.95% charge—namely: Member Contributions minus SHIP Gross Premiums. The Court is persuaded that this rationale sufficiently alleges a right to a specific, identifiable source of money.

The plaintiff also sufficiently alleges that the defendants' assertion of dominion over this source of funds was wrongful. As noted elsewhere, the plaintiff has adequately alleged that she was misled into paying the 4.95% charge because she did not understand that 4.95% of her premiums were being used to make allegedly unlawful commission payments, and, had she understood the nature of the arrangement, she would have sought other coverage. The defendants' motion to dismiss this claim is therefore denied.

### 3. Count Three States a Claim of Unjust Enrichment

In Count Three, the plaintiff alleges unjust enrichment based on allegations that she conferred a benefit on defendants "in the form of the hidden 4.95% charge on top of [her]

monthly premium payments that [was] unlawfully and deceptively charged and illegally diverted to AARP as a commission," *id.* ¶ 109, that the defendants "voluntarily accepted and retained this benefit," *id.* ¶ 110, which was "collected without proper disclosure and amounted to a commission in violation of" District of Columbia law, *id.* ¶ 111, and that it would be "inequitable" for the defendants to retain the benefit without paying its value to the plaintiff, *id.*

An unjust enrichment claim under District of Columbia law requires the plaintiff to allege that she (1) conferred a benefit on the defendants; (2) the defendants retained the benefit that was conferred; and (3) it would be unjust for the defendant to retain the benefit under the circumstances. *See Euclid St., LLC v. D.C. Water & Sewer Auth.*, 41 A.3d 453, 463 n.10 (D.C. 2012). The doctrine applies "when a person retains a benefit (usually money) which in justice and equity belongs to another." *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016) (internal quotation marks omitted) (quoting *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C. 2005)).

The plaintiff undisputedly conferred on the defendants a benefit they retained. *See* Defs.' Mem. at 46 (conceding that the defendants retained a benefit). The defendants argue, however, that the plaintiff cannot show that any benefits were retained *unjustly* because the "premium paid by Plaintiff afforded her the exact coverage she elected when she purchased the policy, and the royalty paid by United[Health] to AARP was simply a[] [fully disclosed] expense incurred by United[Health] in licensing intellectual property from AARP for its operation of the program." *Id.* Further, the defendants note that the plaintiff "received precisely the Medigap coverage she purchased at the rate mandated." *Id.*

The plaintiff does not contest the coverage she received, but insists that, under the circumstances, the defendants retained 4.95% of her premiums unjustly. Specifically, she argues

the defendants are not insurance agents and cannot retain a commission, yet nevertheless collected 4.95% of her premium without proper disclosures or licensing. Pl.'s Opp'n at 48–50. Regardless of whether the charge is a "commission" or not, the plaintiff alleges that she was deceived regarding the cost and purposes of her premiums. She understood these premiums to amount to a sum certain, which sum would be used to pay expenses incurred by AARP Trust in connection with her Medigap program and to pay UnitedHealth for the coverage itself. Compl. ¶ 64. Yet a portion of those premiums in fact satisfied UnitedHealth's obligations to pay "royalties" to AARP—a fact that she alleges was never fully disclosed and that would have affected how she compared Medigap policy rates. *See id.* ¶ 11.

Given these allegations of misrepresentation, the defendants' argument that no unjust enrichment claim exists when the plaintiff received her coverage as expected and was told that UnitedHealth paid royalties to AARP erroneously assumes the plaintiff understood (or did not care) that such royalties were paid as a percentage of the plaintiff's premiums. The plaintiff plainly alleges she did *not* understand this fact and that it *was* material to her.

The D.C. Circuit, in an analogous context, held that plaintiffs had properly stated an unjust enrichment claim when they alleged that they were misled into paying a special assessment fee because they believed payment of such fee was necessary to retain membership in an organization. *See In re APA Assessment Fee Litig.*, 766 F.3d at 48. In fact, the fee was used to pay for lobbying services. *Id.* at 47. The defendants' argument that such lobbying services were performed adequately was accordingly no barrier to the plaintiffs' claims, which rested, as do the plaintiff's claims here, on an allegation that the purpose of the payment was misrepresented to them. *Id.* at 48; *see also id.* at 47 (holding that a theory of "mistaken payment

of money not due" is "one of the core cases of restitution") (internal quotation marks, alterations, and citation omitted).

Under the circumstances, the plaintiff has sufficiently alleged that the defendants unjustly retained money accrued as a result of the 4.95% charge. The defendants' motion to dismiss this claim is thereby denied.

### 4. Count Four States a Claim of Fraudulent Misrepresentations or Omissions

The plaintiff titles her claim in Count IV "Fraudulent Concealment" and alleges that the defendants "concealed or failed to disclose [the] material fact . . . that AARP was collecting a 4.95% commission," Compl. ¶ 113, that AARP "knew or should have known that this material fact should be disclosed or not concealed," *id.* ¶ 114, that the defendants concealed the fact "in bad faith," *id.* ¶ 115, and in spite of their "duty to speak," *id.* ¶ 118, and that the defendants thereby "induced [the plaintiff] to act by purchasing an AARP-endorsed Medigap plan," *id.* ¶ 116. The plaintiff alleges that she suffered damages as a result of this fraudulent concealment, *id.* ¶ 117.

At the outset, the defendants rebut the plaintiff's fraudulent concealment claim relying solely on cases addressing the claim in the context of whether the statute of limitations should be tolled. *See* Defs.' Mem. at 48 n.13 (citing *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994); *Quick v. EduCap, Inc.*, 318 F. Supp. 3d 121, 143 (D.D.C. 2018); *Woodruff v. McConkey*, 524 A.2d 722, 728 (D.C. 1987)). Indeed, generally, a plaintiff need not assert a fraudulent concealment claim in the Complaint until after the defendant has answered asserting a statute of limitations affirmative defense. *See Firestone*, 76 F.3d at 1210. The source of the confusion may be the plaintiff's reliance on *Howard University v. Watkins*, 857 F. Supp. 2d 67 (D.D.C. 2012) for the elements of a fraudulent concealment claim under District of Columbia law, *see* Pl.'s Opp'n at 50 (citing *Howard Univ.*, 857 F. Supp. 2d at 75). *Howard University,* in

64

turn, cites for the elements of this claim another case, *Alexander v. Washington Gas Light Co.*, 481 F. Supp. 2d 16, 36–37 (D.D.C. 2006), which outlined the elements of a fraudulent concealment claim under *Maryland* law.  The plaintiff's fourth claim is assumed to be pleading a related claim for fraudulent misrepresentations or omissions under District of Columbia law, which requires showing that the defendant: "(1) made a false representation of or willfully omitted a material fact; (2) had knowledge of the misrepresentation or willful omission; (3) intended to induce another to rely on the misrepresentation or willful omission; (4) the other person acted in reliance on that misrepresentation or willful omission; and (5) [the other person] suffered damages as a result of that reliance."  *Sundberg*, 109 A.3d at 1130–31 (internal alterations quotation marks, alterations, and citations omitted).  A false representation may be either an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen.  *Id.* at 1131.

Fraudulent misrepresentation claims are subject to the heightened pleading standard under Federal Rule of Civil Procedure 9(b), requiring a plaintiff to plead "with particularity the circumstances constituting fraud or mistake," FED. R. CIV. P. 9(b).[14]  Intent, however, may be pleaded generally.  *Id.*  The information necessary to establish a fraud claim often includes "specific fraudulent statements, who made the statements, what was said, when or where these statements were made, and how or why the alleged statements were fraudulent."  *Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1127 (D.C. Cir. 2015) (internal quotation marks and citation omitted).  "[T]he point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both

---

[14]     By contrast, claims alleging violations of the CPPA are not subject to this heightened pleading standard. *See, e.g.*, *Frese v. City Segway Tours of Wash., D.C.*, 249 F. Supp. 3d 230, 235 (D.D.C. 2017); *McMullen*, 164 F. Supp. 3d at 90–91; *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 130 F. Supp. 3d 236, 267 (D.D.C. 2015) (collecting cases).

afford the defendant the opportunity to prepare a response and to warrant further judicial process." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015).

The plaintiff has adequately pled the "who, what, where, when, and how" of her fraudulent misrepresentation claim. *See* Pl.'s Opp'n at 50 & nn.24–28. She has alleged that AARP, Inc., ASI, and AARP Trust, Compl. ¶¶ 2, 21, 22, concealed that 4.95% of plaintiff's premiums paid UnitedHealth's "royalties" to AARP, *id.* ¶¶ 5, 6, 62, 64, 67, that such misrepresentations and omissions were printed in documents sent to the plaintiff and published online, *id.* ¶¶ 5, 51, 67, that these misrepresentations have existed in some form since 1999, including when the plaintiff bought or renewed her policy, *id.* ¶¶ 40–45, 20, and that the plaintiff reasonably relied on the misrepresentations to her detriment because she would not have purchased a Medigap policy whose premiums included a "royalty" charge, but instead would have purchased a lower-priced policy offering identical benefits, *id.* ¶¶ 20, 79, 81. Those allegations are sufficient, at this stage of the proceedings, to state a claim for fraudulent misrepresentation or omission.

The plaintiff also adequately alleges that the defendants failed to disclose a material fact—the nature and purpose of the 4.95% charge, which they had knowledge of—when a duty to disclose that fact had arisen. Under District of Columbia law, a party to a transaction has no duty of disclosure unless the party is a fiduciary to the other or the party knows that the other is acting unaware of a material fact that is unobservable or undiscoverable by an ordinarily prudent person upon reasonable inspection. *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 107 (D.D.C. 2015). One party's "superior knowledge can give rise to a duty to disclose," *id.*, or such duty may arise "as a result of a partial disclosure," *Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 187 (D.D.C. 2016) (internal quotation marks and citation omitted). The

plaintiff alleges that defendants had a "duty to speak given that they were parties to transactions with [plaintiff] . . . [and] had a duty to say enough to prevent their words from misleading [plaintiff] . . . and they had special knowledge about the material[] facts that [plaintiff] . . . did not possess." Compl. ¶ 118.

The defendants suggest that their public rate filings and disclosure that AARP received a 4.95% royalty from UnitedHealth were observable or discoverable by an ordinarily prudent person upon reasonable inspection, and therefore the plaintiff has failed to establish fraudulent misrepresentation. Defs.' Mem. at 48–49. In general, "examining readily available public records [is] part of the responsibility of an 'ordinarily prudent person' conducting a 'reasonable inspection,' and . . . failure to perform this basic due diligence preclude[s] a fraud claim." *Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 52 (D.D.C. 2011). Here, however, the plaintiff has adequately alleged that the defendants' disclaimer that UnitedHealth paid AARP a "royalty" was only a partial disclosure, as it did not sufficiently alert consumers to the undiscoverable or unobservable fact that they were being charged 4.95% of their premiums in order to satisfy that obligation. *See* Compl. ¶ 67. Moreover, the plaintiff further alleges that the defendants are so entwined in the solicitation of and administration of UnitedHealth's insurance policies that the defendants should be considered unlicensed insurance agents or brokers. *See, e.g.*, *id.* ¶¶ 8, 47, 51, 73. While the Court declines to resolve that issue at this stage of the proceedings, allowing the plaintiff's claims to go forward will supplement the record as to whether this alleged role creates a fiduciary duty or any other duty to disclose. *But see Attias v. CareFirst, Inc.*, No. 15 cv-00882 (CRC), 2019 WL 367984, at *16 (D.D.C. Jan. 30, 2019) (noting that District of Columbia generally considers the relationship between the insurer and the insured to be a contractual, rather than fiduciary relationship) (citing cases).

For the reasons already discussed, *see supra* Section III.E.1.d, the plaintiff has adequately alleged that the defendants' misrepresentations or omissions regarding the nature, cost, and purpose of the 4.95% charge may be material because they affected her understanding of the cost of her Medigap insurance. She has further sufficiently alleged that this misrepresentation was intended to induce consumers to purchase AARP-sponsored Medigap insurance over other policies that offered identical benefits, believing that their premiums paid only for "expenses incurred by [AARP] Trust in connection with the insurance programs and to pay the insurance company for [consumer's] insurance coverage," Compl. ¶ 64, obscuring the fact that consumers were also being charged a 4.95% "royalty" fee, and that she relied on AARP's partial disclosures in making her purchasing decisions, foregoing the chance to purchase insurance that did not include such charge.

The plaintiff's allegations sufficiently state a fraudulent misrepresentation or omission claim, and the defendants' motion to dismiss is therefore denied.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss, ECF No. 8, is denied as to all counts in the plaintiff's Complaint.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: March 17, 2019

_____
BERYL A. HOWELL
Chief Judge