# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| HELEN KRUKAS, ANDREA KUSHIM, and GEORGIA LUKE, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> AARP, INC.; AARP SERVICES INC.; and AARP INSURANCE PLAN, <br><br> Defendants. | Case No.: 1:18-CV-01124 BAH <br><br> <u>Class Action</u> <br><br> **Declaration of Gregory Pinsonneault In Support Of Plaintiffs' Motion for Class Certification** <br><br> Judge:    Hon. Beryl A. Howell |

# TABLE OF CONTENTS

I.    Introduction ...........................................................................................................1

II.   Qualifications ........................................................................................................1

III.  Background ...........................................................................................................3

    A.  Plaintiff's Class Allegations .........................................................................3

        1.  Proposed Class ....................................................................................3

        2.  Causes of Action at Issue ....................................................................4

    B.  Statement of Instruction on Damages for Causes of Action .........................4

    C.  Overview of Medicare Plans .........................................................................5

        1.  Medicare Supplement ("Medigap") Plans ...........................................5

        2.  Medicare Advantage Plans ..................................................................6

        3.  Part D Plans ........................................................................................7

IV.   Bases for Opinions ................................................................................................8

    A.  Overview of AARP Agreements ....................................................................8

        1.  Overview of Terms of United – AARP SHIP Agreements ......................8

            (a)  The 1997 SHIP Agreement ........................................................9

                (1)  Amendments to the 1997 SHIP Agreement Affecting Payments to AARP ...........................................................11

            (b)  The 2008 SHIP Agreement ......................................................14

            (c)  The 2014 SHIP Agreement ......................................................16

        2.  Overview of the Terms of United –AARP Part D / Medicare Advantage Plans .................................................................................................20

            (a)  Terms of the 2014 Part D Agreement ......................................20

                (1)  First Amendment to the 2014 Part D Agreement ..................22

            (b)  Terms of the 2014 MA Agreement ..........................................23

                (1)  First Amendment to the 2014 MA Agreement .......................24

            (c)  Exemplar Calculation of the Effective Royalty Rates Paid Under Part D / Medicare Advantage Agreements ..................................25

        3.  Other Agreements Related to the United – AARP Agreements .............30

            (a)  Master Services Agreement ......................................................30

            (b)  Consulting Agreement .............................................................32

            (c)  Relationship Agreement ...........................................................33

        4.  Discussion of the Royalties Paid to AARP in the SHIP Agreement ......34

            (a)  United Does Not Have a Profit Incentive to Reduce the Royalties Paid to AARP .........................................................................34

            (b)  The Royalties Paid to AARP Have Consistently Increased Over Time ........35

            (c)  The Royalties Paid to AARP in the SHIP Program Are Significantly Higher Than the Effective Rates Paid Under Reasonable Benchmark Programs ................................................................................36

(d)  Conclusion ........................................................................................... 37

    B.   Damages Can Be Calculated on a Classwide Basis ...................................... 37

          1.   Conclusion ......................................................................................... 40

V.    Documents, Data, and Other Information Received ............................................ 41

VI.    Compensation ................................................................................................... 41

VII.   Potential Additional Analyses to Perform .......................................................... 41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PINSONNEAULT DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Gregory Pinsonneault, declare under penalty of perjury as follows:

## I.    Introduction

1.    I have been retained on behalf of Helen Krukas and Andrea Kushim (collectively "Plaintiffs"), and the class they seek to represent, to determine whether the damages suffered by purchasers of AARP Medigap policies can be reliably calculated on a classwide basis.  I will refer to Plaintiffs along with the class Plaintiffs seeks to represent as the "Class Plaintiffs."  I will refer to the defendants AARP, Inc. ("AARP"), AARP Services Inc. ("ASI") and AARP Insurance Plan, collectively, as "Defendants."

2.    I submit this declaration in support of Plaintiffs' motion for class certification.  The analysis below seeks to apply my specialized knowledge based on my experience, training, and education to documents and information produced in discovery.  If called as a witness, I could competently testify to the opinions set forth in this declaration.

3.    For purposes of developing the opinions that I set forth in this declaration, I have assumed that Plaintiffs' allegations are true and that liability will be established.  I offer no opinions related to the veracity of Plaintiffs' allegations or the assumption that liability will be proven.

## II.    Qualifications

4.    My qualifications are set forth in my curriculum vitae, which is included at Exhibit A to this declaration.  My curriculum vitae includes a list of the cases in which I have served as an expert and provided expert testimony through declaration, deposition, or before a finder of fact, as well as a list of my publications and speeches.  I include a brief summary of my qualifications below.

5.    I am a Managing Director and the Chief Executive Officer of LitiNomics, Inc. ("LitiNomics"), a financial and economic consulting firm of about 10 professionals that is primarily dedicated to supporting corporations, law firms, and financial institutions as they address issues that arise in commercial litigation.  LitiNomics was started in 2007 and its primary office is located in Walnut Creek, California.

6.     Prior to becoming a Managing Director and Chief Executive Officer at LitiNomics in September 2016, I held the positions of Director and Chief Executive Officer, Principal and Chief Operating Officer, Principal, and Senior Associate from the time I started at LitiNomics in April 2007.  Prior to joining LitiNomics, I held positions with increasing responsibility at Charles River Associates International from 2003 to 2007 (ending with Senior Associate) and worked as an independent consultant for several consulting firms.

7.     I earned two bachelor degrees from the University of Washington in 1996: a Bachelor of Science (cum laude) in computer science and a Bachelor of Arts (cum laude) in economics and mathematics.  I also earned a Master of Arts in economics from the University of California at Berkeley in 2002, with fields of specialization of Industrial Organization and Econometrics.  During my time at the University of California at Berkeley, I was a graduate student instructor for Industrial Organization (three semesters) and Econometrics (one semester), in addition to other economic courses, and I was awarded the "Outstanding Graduate Student Instructor Award" in 2002.

8.     During my 18-year consulting career, I have consulted on more than 210 matters, more than 170 of which have involved the calculation of economic damages.  I have been the retained expert or project lead (in non-litigation matters) in more than 90 of these matters, involving a wide range of causes of action, including cases involving intellectual property disputes (patent infringement, misappropriation of trade secrets, copyright infringement and trademark infringement), consulting on reasonable license terms (non-litigation), breach of contract disputes, class certification issues, and other issues.  The matters for which I have consulted have included a wide range of technologies, including consumer electronics, medical devices, touchscreen devices, online advertising, computers, chip design and manufacturing, software, and e-commerce.

9.     I am a Certified Licensing Professional, a designation that is intended to recognize professionals who have demonstrated their experience and proficiency in the licensing and commercialization of intellectual property.  I am a member of the American Economic Association, the Western Economic Association International, the Licensing Executive Society, and the

American Intellectual Property Law Association.  I am also an Associate of the American Bar Association, and a committee member of the patent litigation, copyright litigation, and trademark litigation committees of the American Bar Association.  I have been a member of the planning committee for the USC Gould School of Law Intellectual Property Institute since 2011, and a member of the planning committee for the Stanford-Berkeley Advanced Patent Law Institute: Silicon Valley since 2015.

## III. Background

### A. Plaintiff's Class Allegations[1]

10. According to Plaintiffs' First Amended Class-Action Complaint:[2]

> This is a consumer class action seeking to recoup millions of dollars on behalf of a class of senior citizens and disabled individuals throughout the United States who—as a result of Defendants' deceptive practices, unlawful acts, and self-dealing alleged herein—were fooled into paying AARP an undisclosed 4.95% commission for Medicare supplemental health-insurance policies, called Medigap plans. AARP is not licensed as an insurance broker or agent in Washington, D.C.[, …] or in any other state, so it may not legally collect these commissions.

### 1. Proposed Class

11. In its class-certification motion, I understand that Plaintiffs seek to certify the following class:

> All persons in the United States who purchased or renewed an AARP Medigap Policy between January 1, 2011 and the present.[3]

12. Based on this class definition, I will use "Class Period" to refer to the period from January 1, 2011 and the present.

---

[1] In this section I set forth my understanding of the background of the case and Class Plaintiffs' allegations based on the latest complaint filed in this matter, my review of relevant motions and court transcripts, and discussions with counsel.

[2] First Amended Class-Action Complaint (hereafter, "First Amended Complaint"), pp. 1-2.

[3] I understand the proposed class specifically excludes the judge or magistrate assigned to this case; Defendants; any entity in which Defendants have a controlling interest; and Defendants' officers, directors, legal representatives, successors, and assigns.

### 2.   Causes of Action at Issue

13.     I understand that Plaintiffs seek to certify a class pursuing claims for (1) Violations of Washington D.C. Consumer Protection Procedures Act; (2) Conversion; (3) Unjust Enrichment; and (4) Fraudulent Omission.[4] As discussed above, I understand the over-arching allegation relating to these claims is that Defendants engaged in the unlicensed solicitation of insurances and collected an undisclosed commission from Class Members, which the Defendants characterize as a royalty.[5]

### B.  Statement of Instruction on Damages for Causes of Action

14.     I understand from counsel that if Plaintiffs prevail in proving Defendants' liability for the claims described above, District of Columbia law provides that restitution and disgorgement are remedies that are available for the causes of action at issue.[6]

15.     I understand from counsel that Plaintiffs are seeking class certification of its claims for damages under Rule 23(b)(3),[7] and that to do so, Plaintiffs must show that damages are capable of measurement on a classwide basis, in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the Plaintiffs' legal theory.  At the same time, I understand from counsel that Plaintiffs need *not* show that class members' damages from the injurious conduct are identical.  Further, I understand from counsel that legal precedent requires only that some reasonable basis of computation be used, and the damages may be computed even if the result reached is an approximation.

---

[4] First Amended Complaint, pp. 30-35.
[5] First Amended Complaint, pp. 1-3, 30-35.
[6] *Grayson v. AT&T Corp.*, 15 A.3d 219, 240-241, 245 (D.C. 2011). *See also Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 820 (D.C. 2009). *See also Wash. Gas Light Co. v. PSC of the Dist. of Columbia*, 61 A.3d 662, 676–77 (D.C. 2013). *See also Trs. of the Univ. of the Dist. of Columbia v. Vossoughi*, 963 A.2d 1162, 1175 (D.C. 2009).
[7] First Amended Complaint, pp. 27-33.

**C. Overview of Medicare Plans**

**1. Medicare Supplement ("Medigap") Plans**

16.     The Medicare.gov website provides the following overview of Medicare Supplement Insurance ("Medigap"):[8]

Medigap is Medicare Supplement Insurance that helps fill "gaps" in Original Medicare and is sold by private companies. Original Medicare pays for much, but not all, of the cost for covered health care services and supplies. A Medicare Supplement Insurance (Medigap) policy can help pay some of the remaining health care costs, like:

Copayments

Coinsurance

Deductibles

[...]

Some Medigap policies also cover services that Original Medicare doesn't cover, like medical care when you travel outside the U.S. If you have Original Medicare and you buy a Medigap policy, here's what happens:

Medicare will pay its share of the Medicare-approved amount for covered health care costs.

Then, your Medigap policy pays its share.

8 things to know about Medigap policies

1. You must have Medicare Part A and Part B.

2. A Medigap policy is different from a Medicare Advantage Plan.  Those plans are ways to get Medicare benefits, while a Medigap policy only supplements your Original Medicare benefits.

3. You pay the private insurance company a monthly premium for your Medigap policy. You pay this monthly premium in addition to the monthly Part B premium that you pay to Medicare.

4. A Medigap policy only covers one person. If you and your spouse both want Medigap coverage, you'll each have to buy separate policies.

5. You can buy a Medigap policy from any insurance company that's licensed in your state to sell one.

---

[8] Medicare website, "What's Medicare Supplement Insurance (Medigap)?", accessed at <https://www.medicare.gov/supplements-other-insurance/whats-medicare-supplement-insurance-medigap> on January 4, 2021.

6. Any standardized Medigap policy is guaranteed renewable even if you have health problems. This means the insurance company can't cancel your Medigap policy as long as you pay the premium.

7. Some Medigap policies sold in the past cover prescription drugs. But, Medigap policies sold after January 1, 2006 aren't allowed to include prescription drug coverage. If you want prescription drug coverage, you can join a Medicare Prescription Drug Plan (Part D). If you buy Medigap and a Medicare drug plan from the same company, you may need to make 2 separate premium payments. Contact the company to find out how to pay your premiums.

8. It's illegal for anyone to sell you a Medigap policy if you have a Medicare Advantage Plan, unless you're switching back to Original Medicare.

17.     Another Medicare.gov webpage confirms that "Medicare doesn't pay any of the costs for you to get a Medigap policy.  You have to pay the premiums for a Medigap policy."[9]

**2.  Medicare Advantage Plans**

18.     The Medicare.gov website provides an overview of Medicare Advantage Plans:[10]

Medicare Advantage Plans are another way to get your Medicare Part A and Part B coverage. Medicare Advantage Plans, sometimes called "Part C" or "MA Plans," are offered by Medicare-approved private companies that must follow rules set by Medicare. Most Medicare Advantage Plans include drug coverage (Part D). In many cases, you'll need to use health care providers who participate in the plan's network and service area for the lowest costs. These plans set a limit on what you'll have to pay out-of-pocket each year for covered services, to help protect you from unexpected costs.  Some plans offer out-of-network coverage, but sometimes at a higher cost. Remember, you must use the card from your Medicare Advantage Plan to get your Medicare-covered services. Keep your red, white, and blue Medicare card in a safe place because you'll need it if you ever switch back to Original Medicare. Below are the most common types of Medicare Advantage Plans.

Health Maintenance Organization (HMO) Plans

Preferred Provider Organization (PPO) Plans

Private Fee-for-Service (PFFS) Plans

Special Needs Plans (SNPs)

---

[9] Medicare webpage, "Medigap costs," accessed at <https://www.medicare.gov/supplements-other-insurance/whats-medicare-supplement-insurance-medigap/medigap-costs> on January 4, 2021.
[10] Medicare webpage, "Medicare Advantage Plans," accessed at <https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans> on January 4, 2021.

19.   MedPAC, an independent congressional agency that advises congress on issues relating to the Medicare program,[11] provides an overview of the Medicare Advantage program as follows:[12]

> The Medicare Advantage (MA) program allows Medicare beneficiaries to receive their Medicare benefits from private plans rather than from the traditional fee-for-service (FFS) program. Under some MA plans, beneficiaries may receive additional benefits beyond those offered under traditional Medicare and may pay additional premiums for them. Medicare pays plans a capitated rate for the 39 percent of beneficiaries enrolled in MA plans in 2020. These payments amounted to $274 billion in 2019.

> Available MA plans include health maintenance organizations (HMOs), preferred provider organizations (PPOs), private fee-for-service (PFFS) plans, and special needs plans (SNPs). For payment purposes, there are two different categories of MA plans: local plans and regional plans. Local plans may be any of the available plan types and may serve one or more counties. Medicare pays them based on their enrollees' counties of residence. Regional plans, however, must be PPOs and must serve all of one of the 26 regions established by the Centers for Medicare & Medicaid Services (CMS). Each region comprises one or more entire states. […]

> Under the MA program, Medicare buys insurance coverage for its beneficiaries from private plans with payments made monthly. The coverage must include all Medicare Part A and Part B benefits except hospice. All plans, except PFFS plans, must also offer an option that includes the Part D drug benefit. Plans may limit enrollees' choices of providers more narrowly than under the traditional FFS program. Plans may supplement Medicare benefits by reducing cost-sharing requirements or providing coverage of non-Medicare benefits. Plans may charge a premium for these benefits.

**3.   Part D Plans**

20.   MedPAC provides an overview of the Part D program as follows:[13]

---

[11] MedPAC's "About MedPAC" webpage describes it as follows: "The Medicare Payment Advisory Commission (MedPAC) is an independent congressional agency established by the Balanced Budget Act of 1997 (P.L. 105-33) to advise the U.S. Congress on issues affecting the Medicare program. The Commission's statutory mandate is quite broad: In addition to advising the Congress on payments to private health plans participating in Medicare and providers in Medicare's traditional fee-for-service program, MedPAC is also tasked with analyzing access to care, quality of care, and other issues affecting Medicare." (MedPAC webpage, "About MedPac," accessed at <http://medpac.gov/-about-medpac-> on January 4, 2021.

[12] MedPAC Report, "Medicare Advantage Program Payment System," October 2020, accessed at <http://medpac.gov/docs/default-source/payment-basics/medpac_payment_basics_20_ma_final_sec.pdf?sfvrsn=0> on January 4, 2021.

[13] MedPAC Report, "Part D Payment System," October 2020, accessed at <http://medpac.gov/docs/default-source/payment-basics/medpac_payment_basics_20_partd_final_sec.pdf?sfvrsn=0> on January 4, 2021.

In 2006, Medicare began a voluntary outpatient drug benefit known as Part D. A combination of stand-alone prescription drug plans (PDPs) and Medicare Advantage (MA)–Prescription Drug plans (MA–PDs) delivers the benefit. In each of 34 geographic regions, plans compete for enrollees on the basis of annual premiums, benefit structures, specific drug therapies covered, pharmacy networks, and quality of services. Plans bear some risk for their enrollees' drug spending. Overall, Medicare subsidizes premiums by about 75 percent and provides additional subsidies for beneficiaries who have low levels of income and assets. Medicare's payments to plans are determined through a competitive bidding process, and enrollee premiums are tied to plan bids. [...]

For each Medicare enrollee in a plan (either stand-alone PDP or MA–PD), Medicare provides plans with a subsidy that aims to average 74.5 percent of standard coverage for all types of beneficiaries. That average subsidy takes two forms:

• Direct subsidy—a capitated payment to plans calculated as a share of the adjusted national average of plan bids.

• Individual reinsurance—Medicare subsidizes 80 percent of drug spending above the out-of-pocket threshold. Reinsurance acts as a form of risk adjustment by providing greater federal subsidies for the highest cost enrollees.

## IV.    Bases for Opinions

21.     In this section, I discuss my opinions and the bases for them.  The first section evaluates the terms of the United – AARP SHIP Agreements, as well as other related agreements. The second section discusses damages methodologies that can be used to calculate damages on a classwide basis.

### A.  Overview of AARP Agreements

#### 1.  Overview of Terms of United – AARP SHIP Agreements

22.     I understand that the business relationship involving Medicare supplement insurance policies between United HealthCare Insurance Company (hereafter, "United" or "UHC") and Defendants started with an agreement dated February 26, 1997.[14]  Prior to the agreement with United, AARP was offering Medicare supplement insurance through a SHIP program with

---

[14] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745.

PINSONNEAULT DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Prudential.[15]  This section provides an overview of the payment terms, and other related terms, from the start of United's involvement in the SHIP program through the most recent agreements.

### (a) The 1997 SHIP Agreement

23.     In an agreement dated February 26, 1997, AARP, the Trustees of the AARP Insurance Plan, and United entered into the "AARP Health Insurance Agreement" (hereafter, the "1997 SHIP Agreement").[16]  The recitals to the 1997 SHIP Agreement state that AARP had determined United was ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[17]  The 1997 SHIP Agreement had a "Commencement Date" of January 1, 1998, and the initial term of the 1997 SHIP Agreement continued for 10 years, until December 31, 2007.[18]

24.     The 1997 SHIP Agreement included exclusivity clauses to both parties – United agreed that it would "not market group health insurance products or programs comparable to those ████████████████ the SHIP to any other nonemployer group without the prior consent of AARP ████████████" other than plans in existence at the time of the agreement.[19]  AARP agreed to exclusively license the "AARP Marks" to United for the provision of the SHIP program: ███████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████,"[20]

---

[15] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '673-674, '676-678, '680-681, '696. *See also* Mercer Presentation, Working Draft, "HPQRC Orientation," September 10, 2014, AARP_KRUKAS_0073890-939 at '910-911.
[16] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745.
[17] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '660-661.
[18] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '663, '725.
[19] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '692-693.
[20] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '694.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25.      In terms of payments, AARP received a payment referred to as the "AARP

Allowance," which was defined as follows: "████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████,"[21]

26.      With respect to payments to United, the 1997 SHIP Agreement calls out

Administrative Service Fees and Pass-Through Expenses to be approved by AARP through a

budget process, as well as "Risk and Profit Charges" calculated as a percentage of the SHIP Net

Premiums, but the percentages terms are redacted in the version of the 1997 SHIP Agreement I

have reviewed.[22]  The SHIP Net Premiums were defined as "████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████[23]

27.      The 1997 SHIP Agreement specifically calls for the allowance payment and

payments to United to be made out of Member Contributions:[24]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

28.      The 1997 SHIP Agreement also established a "Rate Stabilization Fund" ("RSF"),

described as follows:[25]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[21] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '701.
[22] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '702-705.
[23] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '670.
[24] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '709-710.
[25] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '716.

[text redacted]

(                [text redacted]

29.     AARP and United entered into several amendments to the 1997 SHIP Agreement.[26] Based upon my review, the primary amendments that affected the payments to AARP under the 1997 SHIP Agreement are the amendments dated December 28, 1999 and December 23, 2002.  I discuss these amendments in this section.

30.     An Amendment and Assignment to the 1997 SHIP Agreement was entered into as of December 28, 1999 (hereafter, "Third Amendment").[27]  In the Third Amendment, ASI was added as a party to the agreement, and the certain activities including quality control operations were assigned to ASI, as explained by the recitals: "[text redacted]

[text redacted]

[text redacted]

[text redacted]"[28]

31.     The Third Amendment specified that the "[text redacted]

[text redacted]

[text redacted]"[29]  The Third Amendment further states:[30]

[text redacted]

[text redacted]

[text redacted]

---

[26] AARP_KRUKAS_0159746-840.
[27] Amendment and Assignment, December 28, 1999, AARP_KRUKAS_0159754-761.
[28] Amendment and Assignment, December 28, 1999, AARP_KRUKAS_0159754-761 at '754.
[29] Amendment and Assignment, December 28, 1999, AARP_KRUKAS_0159754-761 at '755.
[30] Amendment and Assignment, December 28, 1999, AARP_KRUKAS_0159754-761 at '755.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████

32.     What is referred to as "Exhibit B" in the excerpt above appears to be included as a "Royalty Agreement" in the Third Amendment, which includes a recital that indicates that "██████████
████████████████████████████████████[31]  The payment terms that the Third Amendment describes as a "royalty fee" are identical to the payment terms in the 1997 SHIP Agreement, except that the Third Amendment deducts the amounts paid to ASI (which are defined to include 8% of the allowance amount plus any other amounts paid to ASI) as follows:[32]

████████████████████████████████████████████████
█████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████

33.     The Sixth Amendment to the AARP health Insurance Agreement was dated December 26, 2002 (hereafter, "Sixth Amendment").[33]  In the Sixth Amendment, the payment terms to AARP were increased.  The recitals to the Sixth Amendment state that "█████████████████
████████████████████████████████████████████████
███████████████████████████████████

[31] Amendment and Assignment, December 28, 1999, AARP_KRUKAS_0159754-761 at '758.
[32] Amendment and Assignment, December 28, 1999, AARP_KRUKAS_0159754-761 at '759.
[33] Sixth Amendment to the AARP Health Insurance Agreement, December 23, 2002, AARP_KRUKAS_0159776-777.

1  ███████████████████████████████████████████████████████████

2  ██████████████████████████████."[34]  The "Royalty" was increased to 3.25% of

3  Member Contribution for 2002, 3.75% of Member Contributions for 2003, and 4.0% of Member

4  Contribution for 2004 through 2007, "████████████████████████████████████████

5  ████████████████████████."[35]

6       34.    I note that the Sixth Amendment is dated the same as the effective date of the

7  Seventh Amendment, and the Sixth Amendment specifically incorporates an agreement to execute

8  the Seventh Amendment "██████████████████████████████████████████

9  █████████████."[36]  Even though the payment terms are redacted in the Seventh Amendment, it

10 appears the Seventh Amendment increases the "risk and profit charge" to United.  For example, the

11 Seventh Amendment includes the following recital, reflecting a higher payment contemplated for

12 United: "███████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████████

15 ████████████████████████████[37]

16      35.    I also note that the Ninth Amendment to the 1997 SHIP Agreement added a new

17 insurance plan for AARP members with ages 50 to 64, but the payment terms for such plans are

18 redacted.[38]

19

20

_____

21 [34] Sixth Amendment to the AARP Health Insurance Agreement, December 23, 2002,
22 AARP_KRUKAS_0159776-777.
   [35] Sixth Amendment to the AARP Health Insurance Agreement, December 23, 2002,
23 AARP_KRUKAS_0159776-777 at '777.
   [36] Sixth Amendment to the AARP Health Insurance Agreement, December 23, 2002,
24 AARP_KRUKAS_0159776-777. *See also* Seventh Amendment to the AARP Health Insurance Agreement,
   Effective as of December 23, 2002, AARP_KRUKAS_0159777-779.
25 [37] Seventh Amendment to the AARP Health Insurance Agreement, Effective as of December 23, 2002,
   AARP_KRUKAS_0159777-779 at '778.
26 [38] Ninth Amendment to the AARP Health Insurance Agreement, Effective as of October 1, 2003,
   AARP_KRUKAS_0159787-809.

27

28

1

**(b) The 2008 SHIP Agreement**

2    36.    Extending the 1997 SHIP Agreement, AARP, ASI, and United entered into the

3    Supplemental Health Insurance Program and Quality Control Services Agreement dated October 3,

4    2007 and effective January 1, 2008 (hereafter, the "2008 SHIP Agreement").[39]  On the same date

5    and with the same effective date, AARP and United entered into the AARP License Agreement

6    (hereafter, "2008 SHIP License Agreement).[40]  The term of the 2008 SHIP Agreement was stated as

7    ending on December 31, 2017.[41]

8    37.    Based on my review, at a high level, the 2008 SHIP Agreement and 2008 SHIP

9    License Agreement appear to include and continue the primary components of the 1997 SHIP

10   Agreement, including:

11   • A license grant to AARP "Licensed Marks" is included in the 2008 SHIP
       License Agreement:

12

13

14

15                                                              The 2008 SHIP License

16   Agreement defines

17   • The 2008 SHIP Agreement includes similar exclusivity terms as the 1997
       SHIP Agreement.  For example, United agreed to not offer any program

18     competitive with any SHIP plan (excluding Part D and Medicare

19     Advantage plans).[44]  Further, in the accompanying 2008 SHIP License
       Agreement, AARP provided an exclusivity provision that provides

20

21   [39] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007
     and effective January 1, 2008, AARP_KRUKAS_0161635-809.

22   [40] AARP license Agreement, dated October 3, 2007 and effective January 1, 2008, UNITED_KRU
     _0072158-175.

23   [41] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007
     and effective January 1, 2008, AARP_KRUKAS_0161635-809 at '697.

24   [42] AARP license Agreement, dated October 3, 2007 and effective January 1, 2008, UNITED_KRU
     _0072158-175 at '160.

25   [43] AARP license Agreement, dated October 3, 2007 and effective January 1, 2008, UNITED_KRU
     _0072158-175 at '158.

26   [44] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007
     and effective January 1, 2008, AARP_KRUKAS_0161635-809 at '662.

27

28

1  AARP would not "███████████████████████████████
2  ████████████████"[45]

3  • The 2008 SHIP Agreement continues to include the Rate Stabilization
   Fund.[46]

4  38.     With respect to payments, the 2008 SHIP Agreement specified payment to AARP as

5  follows: "██████████████████████████████████████████

6  ███████████████████████████████████████

7  ████████████████████"[47]  The 2008 SHIP License Agreement (the "SHIP License

8  Agreement" referenced in this clause) provides for a royalty of ██████████████████

9  ███████████████████████████████████████

10 ██████[48]

11     39.     The 2008 SHIP Agreement also includes a "Risk and Profit Charge" to United

12 "██████████████████████████████████████"[49] ████

13 ████████████████████████████████████████████

14 █████████████████████████████████████

15 █████████████████[50] ██████████████████████

16 ████████████████████████████████████████████

17 ████████████████.[51]

---

[45] AARP license Agreement, dated October 3, 2007 and effective January 1, 2008, UNITED_KRU
_0072158-175 at '160, '163.
[46] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007
and effective January 1, 2008, AARP_KRUKAS_0161635-809 at '670.
[47] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007
and effective January 1, 2008, AARP_KRUKAS_0161635-809 at '667.
[48] AARP license Agreement, dated October 3, 2007 and effective January 1, 2008,
UNITED_KRU_0072158-175 at '163.
[49] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007
and effective January 1, 2008, AARP_KRUKAS_0161635-809 at '667.
[50] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007
and effective January 1, 2008, AARP_KRUKAS_0161635-809 at '667-668, '686-687.
[51] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007
and effective January 1, 2008, AARP_KRUKAS_0161635-809 at '668-669.

40.     The 2008 SHIP Agreement includes a ███████████████████

████████████████████████████████████████████████████████

████████████████████████████

41.     The 2008 SHIP Agreement also includes ███████████████

██████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████

42.     I have reviewed five amendments to the 2008 SHIP Agreement; based on my review, none of the amendments ████████████████████████████

**(c)  The 2014 SHIP Agreement**

43.     Prior to the expiration of the 2008 SHIP Agreement (the term of which was to end December 31, 2017), AARP, ASI, United, and Optum Services, Inc. (hereafter, "Optum") entered into a Ship Program License and Quality Control Services Agreement effective as of January 1, 2014 (hereafter, the "2014 SHIP Agreement").[55]  The 2014 SHIP Agreement contained an initial term through December 31, 2020.[56]

44.     Based on my review, at a high level, the 2014 SHIP Agreement appears to include and continue the primary components of the 2008 SHIP Agreement, including:

---

[52] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007 and effective January 1, 2008, AARP_KRUKAS_0161635-809 at '668.

[53] Supplemental Health Insurance Program and Quality Control Services Agreement, dated October 3,2007 and effective January 1, 2008, AARP_KRUKAS_0161635-809 at '679.

[54] AARP_KRUKAS_0003637-702.

[55] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170.

[56] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '092.

- A license grant to AARP "Licensed Marks" is included in the 2014 SHIP Agreement: " ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[57]██████████████████████████████████████████████████,[58]

- With respect to exclusivity, ███████████████████████████████████████████████████████████████████████████████████[59].██████████████████[60]

- The 2014 SHIP Agreement continues to include the Rate Stabilization Fund.[61]

45.    With respect to payments to AARP, the 2014 SHIP Agreement specifies a ██████ ████████████████████████████████████████████████████████████████[62]██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[57] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '079, 136.

[58] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '106. *See also* Relationship Agreement, effective January 1, 2014, AARP_KRUKAS_0000001-048 at '038.

[59] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '078.

[60] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '079.

[61] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '080, '144-145.

[62] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '139.

PINSONNEAULT DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION



46.     With respect to payments to United, the 2014 SHIP Agreements calls for

---

[63] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '139-140.

[64] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '139-140.

[65] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '141.

[66] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '141-142.

[67] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '076-077, '143.

47.   In addition, under Section 6.2, ███████████████████
████████████████████████████████████ ██████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████ ██████████████████████████████████████████████
████████████████████████████████████████

48.   In addition to the ████████████████████████████
████████████████████████████████████████████████████
███████████

49.   The 2014 SHIP Agreement increased the ████████████████
███████████████████████████████████████████████████
██████ ███████████████████████████████████

50.   The 2014 SHIP Agreement also includes ██████████████████
████████████████████████████████████████████████████
██████████████



[68] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '077.
[69] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '077.
[70] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '077-078.
[71] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '143-144.
[72] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '080.
[73] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '082.

PINSONNEAULT DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

51.     A United letter discussing █████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

52.     In addition to the 2014 SHIP Agreement, I have reviewed four amendments to the

2014 SHIP Agreement.[75]  The second amendment to the 2014 SHIP Agreement replaces the

discussion of █████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  The fourth amendment, effective July 12, 2017, ████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

## 2.  Overview of the Terms of United –AARP Part D / Medicare Advantage Plans

### (a)  Terms of the 2014 Part D Agreement

53.     Effective January 1, 2014, AARP, ASI, and United entered into a Part D Program

Trademark License Agreement (hereafter, the "2014 Part D Agreement").[78]  Per the Recitals of the

agreement, the parties had entered into an Amended and Restated Trademark License Agreement

effective January 1, 2008, and entered into the 2014 Part D Agreement to amend, restate, and

---

[74] United Letter from Gary Steele to David Mathis Re: 2015 Final Operating Expenses Estimates, March 31, 2014, AARP_KRUKAS_0021889-903 at '891.

[75] Amendment No. 1 to 2014 Agreement, effective January 1, 2014, AARP_KRUKAS_0022755-756. *See also* Amendment No. 2 to 2014 Agreement, effective January 1, 2016, AARP_KRUKAS_0000487-500. *See also* Amendment No. 3 to 2014 Agreement, effective July 15, 2016, AARP_KRUKAS_0000501-506. *See also* Amendment No. 4 to 2014 Agreement, effective July 12, 2017, AARP_KRUKAS_0000396-477.

[76] Amendment No. 2 to 2014 Agreement, effective January 1, 2016, AARP_KRUKAS_0000487-500 at '488.

[77] Amendment No. 4 to 2014 Agreement, effective July 12, 2017, AARP_KRUKAS_0000396-477 at '401.

[78] Part D Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008844-873.

replace the 2008 agreement in its entirety.[79]  The 2014 Part D Agreement had an initial term that continued through December 31, 2020.[80]

54.    In the 2014 Part D Agreement, AARP granted to United a ████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███  ████████████████████████████████████████████████████████

████████████████████████

55.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

---

[79] Part D Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008844-873 at '847-848.

[80] Part D Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008844-873 at '860.

[81] Part D Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008844-873 at '848.

[82] Part D Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008844-873 at '850.

[83] Part D Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008844-873 at '860. The Exhibit 3.1 referenced in the excerpt above lists all 50 U.S. States, as well as U.S. territories including the District of Columbia, Puerto Rico, Guam, the U.S. Virgin Islands, American Somoa, and Northern Mariana Islands. (Part D Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008844-873 at '869-872.)

1    56.    The royalty for the license grant is a █████████████████
2  ████████████████████████████████████████████████████
3  ████████████████████████████████████████████████████
4  ████████████████████████████████

       (1) First Amendment to the 2014 Part D Agreement

5    57.    A First Amendment to the 2014 Part D Agreement was entered into and effective
7  July 12, 2017.[85] ██████████████████████████████████████
8  ████████████████████████████████████████████████████
9  ████████████████████████████████████████████████████
10 ████████████████████████████████████████████████████
11 ████████████████████████████████████████████████████
12 ████████████████████████████████████████████████████
13 ███████

     58.    The First Amendment to the 2014 Part D Agreement ████████████████
15 ████████████████████████████████████████████████████
16 ████████████████████████████████████████████████████
17 █████████████████████████████████████████████████████
18 ████████████████████████████████████████

---

[84] Part D Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008844-873 at '858.

[85] Amendment No. 1 to Part D Program Trademark License Agreement, effective July 12, 2017, AARP_KRUKAS_0163205-226.

[86] Amendment No. 4 to 2014 Agreement, effective July 12, 2017, AARP_KRUKAS_0000396-477.

[87] Amendment No. 1 to Part D Program Trademark License Agreement, effective July 12, 2017, AARP_KRUKAS_0163205-226 at '209.

[88] Amendment No. 4 to 2014 Agreement, effective July 12, 2017, AARP_KRUKAS_0000396-477 at '401.

[89] Amendment No. 1 to Part D Program Trademark License Agreement, effective July 12, 2017, AARP_KRUKAS_0163205-226 at '208, '222.

PINSONNEAULT DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1 ██████████████████████████████████████████████████

2 ███████████████████████████████████

3 ██████████████████████████████████████████████████

4 ████████  ████

5
6 ████████████████████████████████████
7
8 ████████████████████████████████████

**(b) Terms of the 2014 MA Agreement**

9

10 59.     Effective January 1, 2014, AARP, ASI, and United entered into an MA Program

Trademark License Agreement (hereafter, the "2014 MA Agreement").[92] ████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ███████████████  ███████████████████████████

15 █████████████████

16 60.     In the 2014 MA Agreement, AARP granted to United a ██████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████  In

20

[90] Amendment No. 1 to Part D Program Trademark License Agreement, effective July 12, 2017, AARP_KRUKAS_0163205-226 at '208, '222-224.
[91] Amendment No. 1 to Part D Program Trademark License Agreement, effective July 12, 2017, AARP_KRUKAS_0163205-226 at '224.
[92] MA Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008874-908.
[93] MA Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008874-908 at '876-877.
[94] MA Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008874-908 at '891.
[95] MA Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008874-908 at '877.

1  addition, ███████████████████████████████████
2  ██████
3      61.  ███████████████████████████████████
4  ███████████████████████████████
5  
6
7
8
9
10
11
12      62.   The royalty for the license grant is a ███████████████
13  ███████████████████████████████████████
14  ████████████████████████████████████████
15  ██████████████████

16          (1) First Amendment to the 2014 MA Agreement

17      63.   A First Amendment to the 2014 MA Agreement was entered into and effective July

18  12, 2017.[99]  The First Amendment to the 2014 MA Agreement was effective the same date as the

19  Fourth Amendment to the 2014 SHIP Agreement, which, among other things, extended the Term of

20  the 2014 SHIP Agreement.[100]  The First Amendment to the 2014 MA Agreement extends the term

21

22  [96] MA Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008874-908
23  at '879.
   [97] MA Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008874-908
24  at '891.
   [98] MA Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008874-908
25  at '889.
   [99] Amendment No. 1 to MA Program Trademark License Agreement, effective July 12, 2017,
26  AARP_KRUKAS_0163174-204.
   [100] Amendment No. 4 to 2014 Agreement, effective July 12, 2017, AARP_KRUKAS_0000396-477.
27

28

1 | of the 2014 MA Agreement an additional five years, through 2025, and provides ███

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ███

5        64.    The First Amendment to the 2014 MA Agreement includes ██

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ██████████████████████████████████████████

11 ██████████████████████████████

12 ████████████████████████████████████████████████

13 ████



14

15

16

17

18     **(c)** **Exemplar Calculation of the Effective Royalty Rates Paid Under Part D / Medicare Advantage Agreements**

19        65.    As discussed above, both the 2014 Part D Agreement and the 2014 MA Agreement

20 call for ███████████████████████████████████████

21

22

[101] Amendment No. 1 to MA Program Trademark License Agreement, effective July 12, 2017,
AARP_KRUKAS_0163174-204 at '179.

[102] Amendment No. 4 to 2014 Agreement, effective July 12, 2017, AARP_KRUKAS_0000396-477 at '401.

[103] Amendment No. 1 to MA Program Trademark License Agreement, effective July 12, 2017,
AARP_KRUKAS_0163174-204 at '178, '200.

[104] Amendment No. 1 to MA Program Trademark License Agreement, effective July 12, 2017,
AARP_KRUKAS_0163174-204 at '178, '200-201.

[105] Amendment No. 1 to MA Program Trademark License Agreement, effective July 12, 2017,
AARP_KRUKAS_0163174-204 at '201.

1 ██████████████████████████ Although I have not reviewed the earlier Part D

2 and MA agreements, it appears the ████████████████████████

3 ████████████ The 2017 amendments discussed above ████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████████

8 ████████████████████████████████████

9 ████████████████████████████████████████

10 ██████

11     66.    In order to compare these ██████████████████████████

12 ████████████████████, I have searched for information regarding the total premiums paid to

13 United for the Part D and Medicare Advantage agreements in order to calculate an effective royalty

14 rate paid under these agreements.

15     67.    AARP produced a September 2015 presentation that reports information about the

16 ████████████████████████████████████████████

17 ████████ For the Part D Plan, the presentation reports ██████████████████████

18 ████████████████████ Using this information, ████████████████████

19 ████████████████████████████ Performing a similar

20 calculation for Medicare Advantage, ██████████████████████████

21 ████████████████████████

22

23

24 [106] Materials for ASI Health Products Quality Review Committee Meeting, May 6, 2015, AARP_KRUKAS_0027963-8064 at '8058-8059.

25 [107] Mercer Presentation, "HPQRC Orientation," September 9, 2015, AARP_KRUKAS_0086271-336 at '281.
[108] Mercer Presentation, "HPQRC Orientation," September 9, 2015, AARP_KRUKAS_0086271-336 at '281.

26 [109] Schedule 2.3. (Exhibit B)
[110] Schedule 2.3. (Exhibit B)

27

28

1    68.    To confirm this is a reasonable estimate of premiums paid by the insureds for the

2  Part D and MA Plans, I also performed the calculation for Medicare Supplement, which resulted in

3  total annual premium collected from insureds for Medicare Supplement estimated to be ████

4  ████,[111] which is close to the ████████████████████████████████████

5  ████████████████████████.[112]  Therefore, it appears this 2015 presentation

6  provides a reasonable way to estimate the insureds portion of premiums for the Part D and MA

7  Plans.

8    69.    However, as I discussed in Section III.C, unlike the situation with Medicare

9  Supplement plans, for which Medicare does not contribute to the premiums, Medicare (CMS) does

10  contribute to the premiums for Part D and Medicare Advantage plans.  For example, ████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████  ████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████  Therefore, I understand the bulk of the MA premiums received by United are from

17  CMS, and at least some portion of the Part D premiums received by United are from CMS.

18    70.    I have not reviewed any information produced in this case that allows for a

19  calculation of the total premiums received by United from CMS for its Part D and Medicare

20  Advantage programs.  Therefore, I have estimated the total premiums for 2014 using United's

21  publically reported revenue for 2014 in its form 10-k.  UnitedHealth Group Inc.'s 2014 form 10-k

22  reports the following information:

---

[111] Schedule 2.3. (Exhibit B)
[112] AARP_KRUKAS_0004364.xlsm, tab "Exh H".
[113] Mercer Presentation, "HPQRC Orientation," September 9, 2015, AARP_KRUKAS_0086271-336 at '302.
[114] Mercer Presentation, "ASI Health Products Quality Review Committee, 2017 Orientation," November 2017, AARP_KRUKAS_0066950-977 at '972.

Pᴵᴺᔆᴼᴺᴺᴱᴬᵁᴸᵀ Dᴱᶜᴸᴬᴿᴬᵀᴵᴼᴺ Iᴺ Sᵁᴾᴾᴼᴿᵀ Oꜰ Pᴸᴬᴵᴺᵀᴵꜰꜰᔆ' Mᴼᵀᴵᴼᴺ ꜰᴼᴿ Cᴸᴬᔆᔆ Cᴱᴿᵀᴵꜰᴵᶜᴬᵀᴵᴼᴺ

- UnitedHealthcare Medicare & Retirement business had revenue of $46.258 billion in 2014, and UnitedHealth Group had total consolidated revenue of $130.474 billion.[115]

- "UnitedHealthcare Medicare & Retirement offers a spectrum of risk-based Medicare products that may be purchased by individuals or on a group basis, including Medicare Advantage plans, Medicare Prescription Drug Benefit (Medicare Part D) and Medicare Supplement products that extend and enhance traditional fee-for-service coverage. UnitedHealthcare Medicare & Retirement services include care management and clinical management programs, a nurse health line service, 24-hour access to health care information, access to discounted health services from a network of care providers and administrative services."[116]

- "Premium revenues from the Centers for Medicare & Medicaid Services (CMS) represented 29% of UnitedHealth Group's total consolidated revenues for the year ended December 31, 2014, most of which were generated by UnitedHealthcare Medicare & Retirement."[117]

- "Medicare Advantage. UnitedHealthcare Medicare & Retirement provides health care coverage for seniors and other eligible Medicare beneficiaries primarily through the Medicare Advantage program administered by CMS, including Medicare Advantage HMO plans, preferred provider organization (PPO) plans, Point-of-Service plans, Private-Fee-for-Service plans and Special Needs Plans (SNPs). Under the Medicare Advantage program, UnitedHealthcare Medicare & Retirement provides health insurance coverage in exchange for a fixed monthly premium per member from CMS and in some cases consumer premiums. Premium amounts received from CMS vary based on the geographic areas in which members reside; demographic factors such as age, gender, and institutionalized status; and the health status of the individual. UnitedHealthcare Medicare & Retirement had approximately 3 million people enrolled in its Medicare Advantage products as of December 31, 2014."[118]

- "Medicare Part D. UnitedHealthcare Medicare & Retirement provides Medicare Part D benefits to beneficiaries throughout the United States and its territories through its Medicare Advantage and stand-alone Medicare Part D plans. UnitedHealthcare Medicare & Retirement offers two stand-alone Medicare Part D plans: the AARP MedicareRx Preferred and the AARP MedicareRx Saver Plus plans. The stand-alone Medicare Part D plans address a large spectrum of beneficiaries' needs and

---

[115] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 42.
[116] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 5.
[117] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 5.
[118] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 5.

preferences for their prescription drug coverage, including low cost prescription options. Each of the plans includes the majority of the drugs covered by Medicare and provides varying levels of coverage to meet the diverse needs of Medicare beneficiaries. As of December 31, 2014, UnitedHealthcare enrolled approximately 8 million people in the Medicare Part D programs, including more than 5 million individuals in the stand-alone Medicare Part D plans and approximately 3 million in Medicare Advantage plans incorporating Medicare Part D coverage."[119]

71.     Based on this information, to provide a rough estimate of total Part D and MA premiums from CMS, United's total premiums from CMS can be estimated based on applying 29% referenced above to UHG's total consolidated revenue of $130.474 billion,[120] which results in an estimated premium revenue from CMS of $37.837 billion.[121]  Given the form 10-k reports that "most" of this revenue was generated by UnitedHealthcare Medicare & Retirement,[122] I multiply this total premium revenue from CMS by 75% to estimate the 2014 premiums from CMS related to the UnitedHealthcare Medicare & Retirement business: $28,378 million.[123]  As discussed above, I understand that CMS does not pay any portion of the premiums for Medicare Supplement, so these premiums related to MA and Part D Plans.

72.     The form 10-k indicates that United had 3 million people enrolled in MA products at the end of 2014,[124] whereas ████████████████████████████████████████████ ████████████████[125]  Based on this information, I estimate that ████ of United's MA plans are AARP MA plans.  For Part D Plans, the form-10k indicates that "more than 5 million" individuals are in the two stand-alone Medicare Part D plans, both of which are AARP plans, and an additional 3 million individuals receive Part D coverage through an MA plan incorporating Part D coverage ████████████████████████████████.[126]  For the purposes of this estimate, I conservatively assume that ████ of United's MA and Part D Plan premiums from CMS are related to United's AARP MA and

---

[119] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 6.
[120] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, pp. 5, 42.
[121] Schedule 2.2. (Exhibit B)
[122] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 5.
[123] Schedule 2.2. (Exhibit B)
[124] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 5.
[125] Mercer Presentation, "HPQRC Orientation," September 9, 2015, AARP_KRUKAS_0086271-336 at '281.
[126] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 6.

1    Part D Plans, resulting in an estimate of $17.027 billion of premiums paid by CMS to United for

2    AAPR MA and Part D Plans.[127]  To these premiums paid by CMS, I add the estimated premiums

3    paid by the insureds of ██████████████████████████████████████, resulting in

4    total premiums in 2014 of the AARP Part D and MA Plans in the amount of ██████████.[128]

5    Therefore, based on the 2014 total annual royalty of ████████████████████████, the

6    effective royalty rate for 2014 is estimated to be ██████.[129]

7        73.    Based on UnitedHealth Group's information reported in its form 10-k, it appears that

8    the total premiums related to AARP MA and Part D Plans likely increased over the Class Period,

9    which would result in an even lower effective royalty rate later in the Class Period.  For example, in

10   its form-10k for 2018, UHG reports that Medicare Advantage plans increased to 4.9 million

11   individuals as of December 31, 2018 and Part D increased to 9.0 million individuals (4.7 million in

12   stand-alone, and 4.3 million in MA plans incorporating Part D coverage).[130]

13       74.    The calculations in this section have been performed to provide an example of the

14   effective royalty rate paid under the MA and Part D Plans.  If United produces information on the

15   total premiums it has earned under the respective programs, I will calculate the effective royalty

16   rates using such information.

17   **3.  Other Agreements Related to the United – AARP Agreements**

18       75.    In addition to the agreements discussed above, various parties to the agreements

19   entered into additional agreements that are discussed in the sub-sections below.

20       **(a) Master Services Agreement**

21       76.    AARP and ASI entered into an Amended and Restated AARP/ASI Master Services

22   Agreement effective January 1, 2014 (hereafter, the "2014 MSA").[131]  The 2014 MSA states it is

23   ████████████████████████████████████████████████████████████

---

24   [127] Schedule 2.2. (Exhibit B)
25   [128] Schedule 2.1. (Exhibit B)
     [129] Schedule 2.1. (Exhibit B)
     [130] UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2018, pp. 4-5.
26   [131] Amended and Restated AARP/ASI Master Services agreement, effective January 1, 2014,
     AARP_KRUKAS_0163120-173.

27

28

1 ██████████████████████████████████████████[132]   The Statements of

2 Work were to ████████████████████████[133]

3       77.     The 2014 MSA provides for ███████████████████████████

4 ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 █████████████████████████████████████████████████

7 ███████[134]   The total of these five categories is specified to be ████████████████

8 ████████████████████████████████████████████[135]   The 2014 MSA

9 specifies that the ████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 █████████████████████████████████[136]

12       78.     I have reviewed an (unsigned) Statement of Work #4 with creation date August 13,

13 2014 that relates to "Quality Control (Health)" and covers the Medicare Supplement, Part D Plan,

14 and Medicare Advantage plan, among other plans.[137]   This Statement of Work #4 indicates that

15 payment for services under the Statement of Work would be made ███████████████████

16 ████████████████████████████████████████████[138]   AARP also

[132] Amended and Restated AARP/ASI Master Services agreement, effective January 1, 2014, AARP_KRUKAS_0163120-173 at '122.
[133] Amended and Restated AARP/ASI Master Services agreement, effective January 1, 2014, AARP_KRUKAS_0163120-173 at '122.
[134] Amended and Restated AARP/ASI Master Services agreement, effective January 1, 2014, AARP_KRUKAS_0163120-173 at '122-123.
[135] Amended and Restated AARP/ASI Master Services agreement, effective January 1, 2014, AARP_KRUKAS_0163120-173 at '123.
[136] Amended and Restated AARP/ASI Master Services agreement, effective January 1, 2014, AARP_KRUKAS_0163120-173 at '123.
[137] AARP & AARP Services, Inc. Statement of Work #4, Creation Date August 13, 2014, AARP_KRUKAS_0077114-119 at '114, '119.
[138] AARP & AARP Services, Inc. Statement of Work #4, Creation Date August 13, 2014, AARP_KRUKAS_0077114-119 at '118.

produced a (signed) Statement of Work #4 (and Attachments) with a creation date of June 25, 2012 that relates to an earlier version of the MSA that was effective January 1, 2010.[139]

79.     Per the terms of the Statement of Work #4 with a creation date of August 13, 2014, Attachment #6 to Statement of Work #4 relates to the SHIP-Medicare Supplement program, Attachment #2 to Statement of Work #4 relates to the Part D Plan, and Attachment #4 to the Statement of Work #4 relates to Medicare Advantage.[140]  I have reviewed a version of Attachment #6 that relates to the 2015 Statement of Work,[141] as well as a red-lined version that reflects a change from the 2014 Statement of Work to the 2015 Statement of Work.[142]  In addition, I have reviewed versions of Attachment #2 and Attachment #4 that related to the 2015 Statement of Work.[143]

**(b) Consulting Agreement**

80.     ASI and United entered into an Amended and Restated Consulting Agreement effective as of January 1, 2014 (hereafter, the "2014 Consulting Agreement").[144]  The Recitals to the 2014 Consulting Agreement state that the parties ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

The Term of the 2014 Consulting Agreement matched the 2014 SHIP Agreement, running through the end of 2020.[146]

---

[139] AARP & AARP Services, Inc. Statement of Work #4, Creation Date June 25, 2012, AARP_KRUKAS_0037974-994 at '974, 978.
[140] AARP & AARP Services, Inc. Statement of Work #4, Creation Date August 13, 2014, AARP_KRUKAS_0077114-119 at '114, '119.
[141] AARP_KRUKAS_0007801.
[142] AARP_KRUKAS_0075622-623.
[143] AARP_KRUKAS_0077135. *See also* AARP_KRUKAS_0077131.
[144] Amended and Restated Consulting Agreement, effective January 1, 2014, AARP_KRUKAS_0069712-726.
[145] Amended and Restated Consulting Agreement, effective January 1, 2014, AARP_KRUKAS_0069712-726 at '712.
[146] Amended and Restated Consulting Agreement, effective January 1, 2014, AARP_KRUKAS_0069712-726 at '717-718.

81.     The Services to be provided under the 2014 ████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████ [147]

82.     The 2014 Consulting Agreement specifies compensation to ASI to be ████████
████████████████████████████████████████████████

████████ [148]  The 2014 Consulting Agreement also specifies that this ████████████
████████████████████████████████████████████████████████████████
████████████████████ [149]

### (c) Relationship Agreement

83.     In conjunction with the 2014 SHIP Agreement, AARP, ASI, and Optum entered into

a Relationship Agreement, also effective January 1, 2014 (hereafter, the "2014 Relationship

Agreement").[150]  The purpose of the 2014 Relationship Agreement is specified as being ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ [151]  The three Programs mentioned in the 2014 Relationship Agreement are the SHIP

Program, the MA Program, and the Part D Program.[152]

84.     An April 8, 2014 internal Memorandum discussing the 2014 Relationship

Agreement provides an overview of the Relationship Agreement: ████████████████████

---

[147] Amended and Restated Consulting Agreement, effective January 1, 2014, AARP_KRUKAS_0069712-726 at '714.
[148] Amended and Restated Consulting Agreement, effective January 1, 2014, AARP_KRUKAS_0069712-726 at '717.
[149] Amended and Restated Consulting Agreement, effective January 1, 2014, AARP_KRUKAS_0069712-726 at '717.
[150] Relationship Agreement, effective January 1, 2014, AARP_KRUKAS_0000001-048.
[151] Relationship Agreement, effective January 1, 2014, AARP_KRUKAS_0000001-048 at '006-007.
[152] Relationship Agreement, effective January 1, 2014, AARP_KRUKAS_0000001-048 at '007.

1

2

### 4. Discussion of the Royalties Paid to AARP in the SHIP Agreement

85.     In my opinion, based on my review of the SHIP agreements discussed above, as well as how those agreements compare to the economic terms of the Part D and Medicare Advantage programs above, the payment terms to AARP reflected in the 2014 SHIP Agreement are significantly inflated over a royalty for AARP's intellectual property that would be reached outside the context of the SHIP Program.  I reach this opinion based on analysis of several aspects of the SHIP agreements, as described in this section.

### (a) United Does Not Have a Profit Incentive to Reduce the Royalties Paid to AARP

86.     The structure of the SHIP agreement is set up such that United does not have a profit incentive to reduce the payments to AARP.  As I understand the mechanics of the SHIP agreement,

Instead, United is paid                                         and any remaining amounts in the SHIP program after expenses flow to the RSF.  For example,

---

[153] Internal Memorandum, "Overview of Relationship Agreement with Optum Regarding New Opportunities," April 8, 2014, AARP_KRUKAS_0026518-521 at '518.
[154] Draft Memorandum, "2017 Insured Products Pricing Report for the Health Products Quality Review Committee," May 2016, AARP_KRUKAS_0154128-185 at '142.

1    87.    Given the SHIP program framework, ██████████████████████

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████

4    **(b) The Royalties Paid to AARP Have Consistently Increased Over Time**

5    88.    As summarized in my discussion of the SHIP Agreements, the percentage of

6    Member ContributionD paid to AARP have consistently ██████████

- In the 1997 SHIP Agreement, 4% of the first $1 billion and 2.5% thereafter.[155]

- In the 2002 Amendment to the 1997 SHIP Agreement, the rates were increased to 3.25% for 2002, 3.75% for 2003, and 4.0% for 2004 through 2007.[156]

- In the 2008 SHIP Agreement, the rate was increased to ██████████ ████████████████████████████████████ ██████████

- In the 2014 SHIP Agreement, ██████████████████████ ████████████████████████████████████████

89.    Every change to the payment rate increased the rate, ██████████████ ████████████████ For example, using information produced by AARP on ████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Therefore, when the rate

[155] AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '701.
[156] Sixth Amendment to the AARP Health Insurance Agreement, December 23, 2002, AARP_KRUKAS_0159776-777 at '777.
[157] AARP license Agreement, dated October 3, 2007 and effective January 1, 2008, UNITED_KRU_0072158-175 at '163.
[158] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '139-140.
[159] Mercer Presentation, Working Draft, "HPQRC Orientation," September 10, 2014, AARP_KRUKAS_0073890-939 at '911.
[160] Schedule 3.1. (Exhibit B)

PINSONNEAULT DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

was set to a flat 3.25% in 2002 under 2002 amendment, the royalty rate increased, and increased further when the royalty rate subsequently increased to 3.75% in 2003 and 4.0% in 2004.

90.    In the 2014 SHIP Agreement, AARP received ███████████████████████████ ████████████ ███████████████████████████████████████████████ ████████████

91.    Given the SHIP framework does not provide a profit incentive to United to limit the payments to AARP, it is not surprising that the payments to AARP have steadily increased throughout the time United has been involved.  I also note that increases in the rates paid to AARP often appear to coincide with increases in the payment rates to United.  For example, as discussed in Section IV.A.1(a)(1), it appears that when AARP's payment rate increased in 2003, United's risk and profit rate increased effective as of the same date.  Given the redactions in the pre-2008 agreements, I cannot confirm whether the risk and profit rate increased in the 2008 SHIP Agreement.  In the 2014 SHIP Agreement, United received similar downside protection for its Risk and Profit charge as AARP received for its royalty.

**(c)  The Royalties Paid to AARP in the SHIP Program Are Significantly Higher Than the Effective Rates Paid Under Reasonable Benchmark Programs**

92.    As discussed above in Section IV.A.2(c), I estimated the combined effective royalty rate for the MA and Part D Plans to be ██████████.  By comparison, the royalty rate in 2014 for under the 2014 SHIP Agreement is ██████.  I am not aware of any reason why the rate should be nearly ██████████ for the Medicare Supplement program.  In fact, based on the terms of the agreements that I have summarized above, it appears that the rates paid under the MA and Part D Plans are reasonable benchmarks for what an appropriate royalty would be.  Indeed, the agreements include similar terms in licensing AARP's intellectual property, and license the AARP intellectual property for similar use cases.

---

[161] Deposition of John Larew, November 5, 2020, pp. 42-44, 49-51.

**(d) Conclusion**

93.     Based on my review of the 2014 SHIP Agreement and my discussion in this section, in my opinion, the payment terms to AARP reflected in the 2014 SHIP Agreement are significantly inflated over a royalty for AARP's intellectual property that would be reached outside the context of the SHIP Program.  Further, the effective royalty rates paid under the Part D and MA agreements are reflective of market-based rates for the intellectual property licensed in the 2014 SHIP Agreement.  Based on the information available to me as of the date of this declaration, I estimate the combined effective royalty rate for the MA and Part D Plans was 0.53% in 2014.

**B.  Damages Can Be Calculated on a Classwide Basis**

94.     As discussed in Section III.B, I understand that the remedies available to Class Members include restitution or disgorgement of the payment to AARP that AARP refers to as a royalty.[162]  Based on my review, for those causes of action for which restitution or disgorgement is an available remedy, it is my opinion that the damages suffered by Class Members can be calculated on a classwide basis.

95.     The SHIP agreements that were in effect during the Class Period were the 2008 SHIP Agreement and the 2014 SHIP Agreement, and both of these agreements specify royalty rates that are a fixed percentage of Member Contributions / Member Premiums in a particular year.  As discussed in Section IV.A.1(b), the 2008 SHIP Agreement, which was in effect from January 1, 2008 through December 31, 2013 (when it was superseded and replaced by the 2014 SHIP Agreement), specifies that the royalty payment to AARP be a ████████████████████ ██████████████████   As discussed in Section IV.A.1(c), the 2014 SHIP Agreement, which I understand was in effect from January 1, 2014 through the end of the Class Period, specifies that the royalty payment to AARP be a ████████████████████████████

---

[162] This opinion is also applicable to other damages measures that are not strictly restitution or disgorgement, but that are based on the payment to AARP.
[163] AARP license Agreement, dated October 3, 2007 and effective January 1, 2008, UNITED_KRU_0072158-175 at '163.

1 ████████████████████████████████████████████████████████

2 ████████████████████

3    96.    Defendants have produced data and information regarding the total royalties that

AARP earned for the Medicare Supplement/Select program, as well as the Member Contribution

for the Medicare Supplement/Select program.[165]  From this data, the payment rate applicable to

each policy year can be determined.  For example, Defendants produced Excel spreadsheets that

included cover pages titled "SHIP Program Report" that covered years in the Class Period through

September 2018. [166]  These "SHIP Program Reports" include data about the current year as well as

the prior year; for example, the December 2015 version includes data for the full year 2015 as well

as the full year 2014.  I have used the information in the "SHIP Program Reports" about the royalty

payments and Member Contributions for Medicare Supplement/Select to calculate the royalty rate

by year as follows:

---

[164] SHIP Program License and Quality Control Services Agreements, Effective January 1, 2014, AARP_KRUKAS_0000058-170 at '139-140.

[165] I understand that Medicare SELECT programs are a type of more restrictive Medigap policies, and therefore would be included in the class definition.  For example, the Medicare.gov website includes a blow-up box defining Medicare SELECT as "a type of Medigap policy that may require you to use hospitals and, in some cases, doctors within its network to be eligible for full benefits." (Medicare webpage, "Medigap costs," accessed at < https://www.medicare.gov/supplements-other-insurance/whats-medicare-supplement-insurance-medigap/medigap-costs> on January 4, 2021.)

[166] AARP_KRUKAS_0004174.xlsm, tabs "Exh H" and "Exh L". *See also* AARP_KRUKAS_0000947.xlsm, tabs "Exh H" and "Exh L". *See also* AARP_KRUKAS_0000988.xlsm, tabs "Exh H" and "Exh L". *See also* AARP_KRUKAS_0004364.xlsm, tabs "Exh H" and "Exh L". *See also* AARP_KRUKAS_0004384.xlsm, tabs "Exh H" and "Exh L". *See also* AARP_KRUKAS_0004382.xlsm, tabs "Exh H" and "Exh L". *See also* AARP_KRUKAS_0124555.xlsm, tabs "Exh H" and "Exh L".

1

2

3

4

5

6

7

8

9

10        97.      At the time of my declaration, the data I have received runs through September

11   2018; I can supplement these calculations when Defendants produced additional data covering the

12   full year 2018, 2019, 2020, and subsequent years.

13        98.      I also note that third-party production from Grant Thornton also confirms these rates.

14   For example, a spreadsheet labeled ██████████████████████████████

15   ████████████████████████████████████████████████

16   ██████████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   Another Grant Thornton spreadsheet notes that the ████████████████████████

20   ██████████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████

23        99.      Given the royalty rate paid under the 2008 SHIP Agreement is ████████████████

24   ████████████████, and the royalty rate paid under the 2014 SHIP Agreement can be calculated

25   _____

26   [167] Schedule 1.1. (Exhibit B)
     [168] GT0005.xlsx, tab "E2410.1 - Contract Terms".

27   [169] GT0006.xlsx, tab "E2410.1 - Contract Terms".

28

or identified in documents for each year in the Class Period through 2019, and could be either estimated or obtained through discovery for 2020 and subsequent years, the amount of the royalty related to each Class Member can be calculated in a straightforward manner by applying the royalty rate paid to AARP for each policy year to the premiums paid by Class Members in that year.

100.     To the extent that the disgorgement remedy for certain of the causes of action at issue is determined to be the profit earned by Defendants related to the royalty payment (as opposed to the entire royalty payment), such a remedy can also be calculated on a classwide basis.  To the extent that AARP can identify expenses that are appropriately deducted from the royalty payments to AARP when calculating its profit, such deductions are very likely to be expenses incurred by AARP for the program as a whole, instead of expenses relating to individual Class Members. Similarly, to the extent that AARP provides evidence that a portion of the payment (or profit) it received from the program should be credited to AARP's contributions to the royalty payment, such contributions by AARP are likely to apply to the program as a whole, instead of contributions specific to individual Class Members.  Therefore, any reduction to the royalty payment received by AARP related to either deductible expenses or apportionment would serve to reduce the percentage that would be applicable to each of the Class Members in a particular year when calculating disgorgement.  However, the same percentage would apply to all Class Members in a particular policy year, so disgorgement can still be calculated on a classwide basis.

**1.  Conclusion**

101.     Based on my discussion in this section, regardless of whether restitution or disgorgement is calculated based on the entire royalty payment made to AARP or based on the profit earned by AARP related to the royalty payment, it is my opinion that damages can be calculated on a classwide basis.[170]

---

[170] This opinion is also applicable to other damages measures that are not strictly restitution or disgorgement, but that are based on the payment to AARP.

## V.      Documents, Data, and Other Information Received

102.    I have cited in this declaration the specific documents and evidence that support the opinions that I have reached at this time.

## VI.     Compensation

103.    I am being compensated for my time in this matter at the billing rate of $550 per hour.  My fees are not contingent upon the nature of any findings, or of any analyses, testimony, or the outcome of the proceeding in this matter.

## VII.    Potential Additional Analyses to Perform

104.    My opinions are based on the information received as of the date of my declaration. I will consider any additional information provided to me, as well as any criticisms of my opinions or bases for my opinions brought to my attention or offered by experts retained by Defendants. Any of this additional information or work may cause me to change my opinions.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Walnut Creek, California this 7th day of January 2021.

Gregory Pinsonneault

# EXHIBIT A

**CURRICULUM VITAE**
**GREGORY A. PINSONNEAULT**

| | |
|---|---|
| **POSITION** | Managing Director and Chief Executive Officer, LitiNomics, Inc. |

**RANGE OF EXPERIENCE**

Mr. Pinsonneault has more than eighteen years of experience providing consulting services and expert testimony for economic, financial, and business issues related to commercial litigation, primarily in the calculation of economic damages. He has consulted on more than 210 different projects, in a variety of complex litigation matters including intellectual property disputes, breach of contract, predatory pricing and buying, and antitrust monopolization.

Mr. Pinsonneault has been designated as an expert witness or non-litigation project lead in at least 90 matters, including cases involving intellectual property disputes (patent infringement, misappropriation of trade secrets, copyright infringement and trademark infringement), consulting on reasonable license terms (non-litigation), breach of contract disputes, class certification and damages issues, and other issues. He has provided live sworn expert testimony on eighteen occasions (eleven times at deposition, three times at arbitration, once at trial in state court, and three times at trial in U.S. District Court).

Mr. Pinsonneault is a Certified Licensing Professional.

**EDUCATION**

M.A. in Economics, University of California-Berkeley (2002)
   Fields of Specialization: Industrial Organization and Econometrics

B.S. in Computer Science, University of Washington (1996)
   Honors: *cum laude*

B.A. in Mathematics and Economics, University of Washington (1996)
   Honors: *cum laude*

**PROFESSIONAL AND BUSINESS HISTORY**

LitiNomics, Inc. (Mountain View, CA)
   Managing Director and Chief Executive Officer, September 2016 - Present
   Director and Chief Executive Officer, September 2011 - September 2016
   Principal and Chief Operating Officer, March 2011 - August 2011
   Principal, January 2009 - March 2011
   Senior Associate, April 2007 - December 2008

CRA International, Inc. (Palo Alto, CA)
   Senior Associate, January 2006 - April 2007
   Consulting Associate, December 2003 - December 2005

Independent Consultant, January 2002 - November 2003
   Consultant to CRA, November 2003
   Consultant to LECG, June 2003 - July 2003
   Consultant to MiCRA, May 2002 - March 2003

Safeway, Inc., (Bellevue, WA)
   Assistant Store Manager, 1993 - 1996
   Various Positions, 1990 – 1993

| | |
|---|---|
| **TEACHING HISTORY** | University of California-Berkeley (Berkeley, CA)<br>   Graduate Student Instructor:<br>     - Spring 2002  Head Graduate Student Instructor<br>     - Fall 2001     Industrial Organization (Professor - Dr. Glenn Woroch)<br>     - Spring 2001  Industrial Organization (Professor - Dr. Glenn Woroch)<br>     - Fall 2000     Industrial Organization (Professor - Dr. Jordi Gual)<br>     - Fall 1999     Econometrics (Professor - Dr. Bronwyn Hall)<br>     - Fall 1997     Introduction to Economics (Professor - Dr. James Pierce)<br><br>Awarded "Outstanding Graduate Student Instructor Award," University of California-Berkeley Economics Department, 2002 |
| **PROFESSIONAL AFFILIATIONS AND CERTIFICATIONS (Current)** | Certified Licensing Professional, 2015 - Present<br><br>Member, American Economic Association, 1998 - Present<br><br>Member, Western Economic Association International, 2016 - Present<br><br>Member, Licensing Executive Society, 2015 - Present<br><br>Member, American Intellectual Property Law Association, 2015 - Present<br>  &bull; Committee Member, Patent Litigation, 2017 - Present<br>  &bull; Committee Member, Patent Litigation Damages Subcommittee, 2017 - Present<br><br>Associate, American Bar Association, 2011 - Present<br>  &bull; Member, Section of Intellectual Property Law, 2011 - Present<br>  &bull; Committee Member, Patent Litigation, 2011 - Present<br>  &bull; Committee Member, Trademark Litigation, 2012 - Present<br>  &bull; Committee Member, Copyright Litigation, 2012 - Present<br>     &cir; Subcommittee Member, Copyright Damages, 2012 - Present<br><br>Member, Planning Committee for USC Gould School of Law Intellectual Property Institute, 2011 - Present<br>  &bull; Committee Member, Planning Committee for Patent Damages Roundtable, 2014 - 2015<br>  &bull; Committee Member, Planning Committee for I.P. Remedies Roundtable, 2016 - 2017<br><br>Member, Planning Committee for Stanford-Berkeley Advanced Patent Law Institute: Silicon Valley (APLISV), 2015 – Present |
| **PROFESSIONAL AFFILIATIONS AND CERTIFICATIONS (Past)** | Member, Intellectual Property Owners Association, 2008-2010, 2018 - 2019<br>  &bull; Committee Member, Damages & Injunctions Committee, 2018 - 2019 |

**PUBLICATIONS**        "The Perceived Shortage of High-Tech Workers" (with Clair Brown and Ben Campbell), Editorial, Spring 1998.

"Employment Systems, Technological Change and Plant Performance in the Semiconductor Industry" (with Clair Brown and Daniel Rascher), CSM-HR Working Paper, University of California, Berkeley, 1999.

"The Use of New Technology and HR Systems in Improving Semiconductor Manufacturing Performance" (with Clair Brown and Daniel Rascher), Working Paper, Center for Work, Technology, and Society, University of California, Berkeley, 1999.

ABA Report and Proposed Resolution re *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC* (with Jonathan Muenkel, Katie Karn, and Karl Gross), January 2012.

ABA Report and Proposed Resolution re Remedies in Trademark Litigation (with Nicole Emmons, Kenneth Davis, Jessica Bahr, Erin Tanner, and Justin Ourso), March 2013.

"Reasonable Royalty Damages: History and Recent Guidance," Paper Submitted for ABA IPL 30th Annual Intellectual Property Law Conference, March 2015.

ABA Report and Proposed Resolution re Mentor Graphics Corp. v. Eve-USA, Inc. et al. (with Alan Ratliff, Karl Gross, Audrey Grace Ogurchak), July 2017.

"Pre- and Post-Judgment Interest" (with Christian Tregillis), Chapter In *Lost Profits Damages: Principles, Methods, and Applications*, Edited by Everett P. Harry and Jeffrey H. Kinrich, Valuation Products and Services, 2017.

"Design Patent Damages: History and Recent Developments," Paper Submitted for AIPLA 2020 Virtual Annual Meeting, October 2020.

"Pre- and Post-Judgment Interest" (with Christian Tregillis), Chapter In *Lost Profits Damages: Principles, Methods, and Applications*, *2nd Edition*, Edited by Everett P. Harry and Jeffrey H. Kinrich, Valuation Products and Services, forthcoming 2021.

**PRESENTATIONS**   "The Rapidly Changing Patent Damages Landscape: How to Stay Ahead" (with Dominic M. Persechini), Presentation at California Society of CPAs, Litigation Section (Economic Damages) Meeting, October 2011.

"The Legacy of Judge Rader: Tying Damages to the Claimed Invention (And How Technical Experts Can Help)," Presentation at University Club of Palo Alto Luncheon, July 2014.

"Modern Approaches to Calculating Reasonable Royalty Damages" (with Matthew Blackburn, Bill Choi, and Justin Lewis), Presentation at ABA IPL 30th Annual Intellectual Property Law Conference, March 2015.

"The Winds of Change in the Patent World," Presentation to King Hall Intellectual Property Association (KHIPLA), University of California, Davis, October 2016.

"Lost Profits and Patent Damages – Lessons Learned from *Masimo v. Philips*" (with Mark Kachner), Presentation to California Society of CPAs Forensic Services Section, Economic Damages Section Meeting, February 2017.

"Apportionment, Early Damages Disclosures, Enhanced Damages, and More!" (Moderator for panel including Karen Boyd, Daralyn Durie, and Leah Waterland), Presentation at 18th Annual Berkeley – Stanford Advanced Patent Law Institute Silicon Valley, December 2017.

"Design Patents and the Supreme Court – Takeaways from the *Apple v. Samsung* Litigation," Presentation at Berkeley Center for Law & Technology (BCLT) / Berkeley Technology Law Journal (BTLJ) Law & Tech Speaker Series, Boalt Law School, September 2018.

"IP Damages Workshop: Navigating Through Murky Waters; Recent Developments in IP Damages Law" (with Lisa S. Glasser, Blake B. Inglish, Randall E. Kay, Ryan W. Koppelman, Justin Lewis, Erik J. Olson, Jeffery A. Stec, Moderated by Shelly Irvine), Presentation at USC Gould School of Law 2019 Intellectual Property Institute, March 2019.

"Design Patents Damages – From Carpet Wars to Smartphone Wars," Presentation to American Intellectual Property Law Association (AIPLA) Damages Subcommittee, April 16, 2019.

"Design Patents Damages – From Carpet Wars to Smartphone Wars," Webinar for American Intellectual Property Law Association – AIPLA Online CLE & Programs, October 3, 2019.

"Design Patents Damages – Past and Present," Presentation to Intellectual Property Owners (IPO) Damages and Injunctions Committee, October 10, 2019.

"Damages Contentions: Theory and Practice" (Moderator for panel including Magistrate Judge Susan van Keulen and Paul Bondor), Presentation at 20th Annual Berkeley – Stanford Advanced Patent Law Institute Silicon Valley, December 2019.

"Early Damages Disclosures and Contentions – Update on Implementation," Presentation to American Intellectual Property Law Association (AIPLA) Damages Subcommittee, January 21, 2020.

**PRESENTATIONS
(Continued)**

"Disgorgement of Profits for Design Patents: From the 19th Century to the 21st," Webinar for California Lawyers Association (formerly The State Bar of California Sections), February 4, 2020.

"Design Patent Damages: What you need to know to get your design patent damages case ready for trial," (presented with Nicholas Kim, Scott Daniels, Scott Kamholz, the Honorable Randall Rader (retired), and Felicia Boyd as part of panel "Double Dutch: Mastering the Interplay Between District Court and PTAB Litigation: Leveraging PTAB with District Court Proceedings, and vice versa"), Presentation at AIPLA 2020 Virtual Annual Meeting, October 2020.

**TESTIMONY /
DECLARATION
EXPERIENCE**

*Grewal v. Choudhury*, U.S. District Court - N.D. of CA, Case No. 3:07-cv-04218, Trial Testimony (2008), Declaration (2008).

*Jaramillo v. The Coca-Cola Company et al.*, Superior Court of California, County of Madera, Case No. MCV037482, Deposition Testimony (2008).

*MedCorp, Inc. v. PinPoint Technologies, Inc. et al.*, U.S. District Court - District of Colorado, Civil Action No. 1:08-cv-00867, Deposition Testimony (2009).

*Ryder-Loomis v. Allstate Insurance Company*, Superior Court of California, County of San Francisco, Case No. CPF-09-509981 (referred to Arbitration at ADR Services), Arbitration Testimony (2010).

*Dr. Ho v. California Advanced Imaging Medical Associates, Inc. d/b/a National Orthopedic Imaging Associates et al.*, JAMS, Arbitration Testimony (2010), Deposition Testimony (2010).

*O'Donovan, De La Torre, Saysourivong, and all others similarly situated. v. CashCall, Inc.*, U.S. District Court - Northern District of California, Case No. 3:08-cv-03174, Declaration (2010).

*Bibiji Inderjit Kaur Puri v. Golden Temple of Oregon, LLC*, Arbitration Service of Portland, Arbitration Testimony (via perpetuation deposition, 2011).

*Bernal and all others similarly situated v. Southwestern Pacific Specialty Finance, Inc. d/b/a Check 'N Go*, U.S. District Court - Northern District of California, Case No. 4:12-cv-05797, Declaration (2012).

*FortuNet, Inc. v. Playbook Publishing, LLC, et al.*, Nevada District Court, Clark County, Case No. A-11-645734-B, Trial Testimony (2013).

*PQ Labs, Inc. v. Yang Qi, et al.*, U.S. District Court - Northern District of California, Cse No. 4:12-cv-00450, Deposition Testimony (2013), Declaration (2014), Trial Testimony (2014).

*Munson v. Splice Communications, Inc., Coan, and Bischoff*, U.S. District Court - Northern District of California, Case No. 3:12-cv-05089, Trial Testimony (2014).

*Sky Zone, LLC v. Raymond et al.*, U.S. District Court - District of Nevada, Case No. 3:11-cv-00141, Deposition Testimony (2015).

*Alfred, Barrish, and all others similarly situated v. Pepperidge Farm, Inc.*, U.S. District Court - Central District of California, Case No. 2:14-cv-07086, Declaration (2015).

*Robert Tomassini, and all others similarly situated v. FCA US LLC (f/k/a Chrysler Group LLC)*, U.S. District Court – Northern District of New York, Case No. 3:14-cv-01226, Declaration (2016), Deposition Testimony (2017).

*Anthony Shamrell and Daryl Tysdyk, and all others similarly situated v. Apple, Inc.*, Superior Court of California, County of San Diego, Case No. 37-2013-00055830, Declaration (March 2017, August 2018, November 2018, and August 2019), Deposition Testimony (March 2017, September 2018, June 2019).

**TESTIMONY /
DECLARATION
EXPERIENCE
(Continued)**

*William S. Callaway and all other similarly situated v. Mercedes-Benz USA, LLC et al.*, U.S. District Court - Northern District of California, Case No. 2:16-cv-01346, Declaration (2017).

*Jennifer Hasemann and Debbie Hoth, and all others similarly situated v. Gerber Products Co.*, *Jeremy Greene and Cetaria Wilkerson, and all others similarly situated v. Gerber Products Co.*,and *Wendy Manemeit, and all others similarly situated v. Gerber Products Co.*, U.S. District Court – Eastern District of New York, Consolidated Case Nos. 1:15-cv-02995; 1:16-cv-01153, and 2:17-cv-00093, Declaration (March 2018, June 2018, August 2018, March 2020), Deposition Testimony (March 2018).

*Snap Lock Industries, Inc. v. Swisstrax Corp.*, U.S. District Court, District of Nevada, Case No. 2:17-cv-02742, Deposition Testimony (June 2020), Declaration (August 2020).

*IntergrityMessageBoards.com, LLC, Retour, Inc., individually and on behalf of all others similarly situated v. Facebook, Inc.*, U.S. District Court, Northern District of California, Case No. 4:18-cv-05286, Declaration (December 2020).

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 1 | Capital One Financial Corp. et al., Counterclaim-Plaintiffs  v. Intellectual Ventures I LLC et al., Counterclaim-Defendants (Case No. 8-14-cv-00111) | D | Antitrust | U.S. District Court, District of Maryland (Greenbelt Division) | Damages Analysis | ☐ |
| 2 | Cisco Sys. Inc. v. Alcatel USA, Inc. et al. | D | Antitrust | U.S. District Court, Eastern District of Texas | Antitrust Liability and Damages Analysis | ☐ |
| 3 | Smith Street Mill, Inc. v. Weherhaeuser (Civil No. 04-1049-PA) | D | Antitrust | U.S. District Court, District of Oregon | Antitrust Liability and Damages Analysis | ☐ |
| 4 | Syngenta Seeds, Inc. v. Monsanto Company | D | Antitrust | U.S. District Court, District of Delaware | Antitrust Liability and Damages Analysis | ☐ |
| 5 | Washington Alder v. Weyerhaeuser (Civil No. 03-0552-PA) | D | Antitrust | U.S. District Court, District of Oregon | Antitrust Liability and Damages Analysis | ☐ |
| 6 | Westwood Lumber Co. v. Weyerhaeuser (Civil No. 03-0551-PA) | D | Antitrust | U.S. District Court, District of Oregon | Antitrust Liability and Damages Analysis | ☐ |
| 7 | Bancorp v. Sun Life Assurance | P | Breach of Contract | | Damages Analysis | ☐ |
| 8 | Bank One, Oklahoma, N.A. et al. v. Trammel Crow Services, Inc. et al. (Case No. 03 C 3624) | D | Breach of Contract | U.S. District Court, Northern District of Illinois (Eastern Division) | Damages Analysis | ☐ |
| 9 | Columbia Aircraft v. Affiliated FM Insurance | P | Breach of Contract | Circuit Court of the State of Oregon, Multnomah County | Damages Analysis | ☐ |
| 10 | Etex Corp. v. Medtronic, Inc. | P | Breach of Contract | Arbitration | Damages Analysis | ☐ |
| 11 | Lima Development Inc.et al. v. Columbia Aircraft Manufacturing fka The Lancair Company | D | Breach of Contract | Oregon Circuit Court, Deschutes County | Perform Financial Review Related to Insolvency | ☐ |
| 12 | Pixelworks v. Fox (individual) | P | Breach of Contract | | Damages Analysis | ☐ |
| 13 | MedCorp, Inc. v. Pinpoint Technologies, Inc. et al. | P | Breach of Contract and Fraud in the Inducement | U.S. District Court, District of Colorado | Damages Analysis | ☑ |
| 14 | Fortunet, Inc. v. Playbook Publishing et al. (Case No. A-11-645734-B) | P | Breach of Contract, Breach of Fiduciary Duty, Fraud, RICO, Misappropriation (Theft) of Trade Secrets | Nevada District Court, Clark County | Damages Analysis | ☑ |
| 15 | Viasphere International, Inc. v. Aram Vardanyan (Case No. 5:12-cv-01536) | P | Breach of Contract, Intentional and Negligent Misrepresentation, Conversion, and Other Misc. Allegations | U.S. District Court, Northern District of California, San Jose Division | Damages Analysis | ☑ |
| 16 | Dr. Ho (Individual) v. California Advanced Imaging Medical Associates, et al. | P | Breach of Contract; Employment | Judicial Arbitration and Mediation Services (JAMS) | Damages Analysis | ☑ |
| 17 | Asahi Kasei Pharma Corp. v. Actelion Ltd. Et al. | P | Breach of Contract; Intentional Interference with Contract | Superior Court of the State of California, County of San Mateo | Damages Analysis | ☐ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|
| 18 | Illinois Tool Works, Inc. et al. vs. Seattle Safety, LLC | D | Breach of Contract; Misappropriation (Theft) of Trade Secrets; Conversion; Unfair Competition | U.S. District Court, Western District of Washington (Seattle) | Damages Analysis | ☐ |
| 19 | DefensTech International, Inc. v. Edward Robert Fyfe, et al. (Case No. 30-2014-00697473) | P | Breach of Fiduciary Duty and Slander of Title | Superior Court of California, County of Orange | Damages Analysis | ☑ |
| 20 | Bradburn Parent/Teacher Store, Inc.. v. 3M | D | Class Action - Antitrust | U.S. District Court, Eastern District of Pennsylvania | Class Certification (Damages) Analysis | ☐ |
| 21 | In re American Express Anti-Steering Rules Antitrust Litigation | P | Class Action - Antitrust | U.S. District Court, Southern District of New York | Class Certification Analysis; Antitrust Liability and Damages Analysis | ☐ |
| 22 | In Re Microsoft Corp. Antitrust Litigation | P | Class Action - Antitrust | U.S. District Court, District of Maryland Maryland | Antitrust Liability Analysis | ☐ |
| 23 | In re Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation | P | Class Action - Antitrust | U.S. District Court, Eastern District of New York | Class Certification (Damages) Analysis | ☐ |
| 24 | Morelock Enterprises, Inc. v. Weyerhaeuser | D | Class Action - Antitrust | U.S. District Court, District of Oregon | Class Certification, Antitrust Liability and Damages Analysis | ☐ |
| 25 | Tardibuono-Quigle and all others similarly situated v. HSBC Mortgage Corp. and HSBC Bank USA, N.A. (Case No. 7:15-cv-06940) | P | Class Action - Breach of Contract, Violation of NY General Business Law Sec. 349, and Claim Under NY Banking Law Sec. 598(3) | U.S. District Court, Southern District of New York | Class Certification (Damages) Analysis | ☐ |
| 26 | In re Chase Bank USA, N.A. "Check Loan" Contract Litigation | P | Class Action - Breach of Implied Covenant of Good Faith and Fair Dealing | U.S. District Court, Northern District of California | Class Certification (Damages) Analysis | ☐ |
| 27 | Tyler Barnett PR, LLC, One, LLC, and Jonathan Murdough and all others similarly situated v. Facebook, Inc. | P | Class Action - California Unfair Competition Law, Breach of Implied Duty to Perform with Reasonable Care | U.S. District Court, Northern District of California (Oakland Division) | Class Certification (Damages) Analysis | ☐ |
| 28 | Shamrell et al. v. Apple, Inc. (Case No. 37-2013-00055830) | P | Class Action - Consumers Legal Remedies Act, Breach of Express and Implied Warranty, Violation of Song-Beverly Act, Magnuson-Moss Warranty Act, California Unfair Competition | Superior Court of California, County of San Diego | Class Certification (Damages) Analysis | ☑ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 29 | Alfred, Barrish, and all others similarly situated v. Pepperidge Farm, Inc. (Case No. 2:14-cv-07086) | P | Class Action - Employment (Failure to Pay California Overtime Compensation and other Misc. Allegations) and Violations of the Unfair Competition Law; and Representative Action Complaint for Civil Penalties Under Labor Code Private Attorney General Act | U.S. District Court, Central District of California | Class Certification (Damages) Analysis | ☑ |
| 30 | In re Textile Rental Services Litigation (Case No. CV-05-19) | Both | Class Action - Fraud and Breach of Contract | Circuit Court of Barbour County, Alabma (Clayton Division) | Valuation of settlement agreement | ☐ |
| 31 | Hasemann and Hoth and all others similarly situated v. Gerber Products Co. (Case No. 1:15-cv-02995) | P | Class Action - Fraudulent Concealment, Intentional Misrepresentation, Negligent Misrepresentation, and Violations of New York's General Business Law | U.S. District Court, Eastern District of New York | Class Certification (Damages) Analysis | ☑ |
| 32 | Callaway, Callaway, and all others similarly situated v. Mercedes-Benz USA, LLC and Mission Imports d/b/a Mercedes-Benz of Laguna Niguel (Case No. 8:14-cv-02011) | P | Class Action - Fraudulent Non-Disclosure, Violations of CA Business and Professions Code, Violations of CA Consumers Legal Remedies Act | U.S. District Court, Central District of California | Class Certification (Damages) Analysis | ☐ |
| 33 | Tomassini, and all others similarly situated v. FCA US LLC (f/k/a Chrysler Group LLC) (Case No. 3:14-cv-01226) | P | Class Action - Unfair and Deceptive Trade Practices, Breach of Express Warranty, | U.S. District Court, Northern District of New York | Class Certification (Damages) Analysis | ☑ |
| 34 | Paula Bernal, et al. (Class) v. Southwestern & Pacific Specialty Finance, Inc. DBA Check 'N Go (Case No. 4:12-cv-05797) | P | Class Action - Unfair Competition and Violation of California Finance Lender's Law | U.S. District Court, Northern District of California (Oakland Division) | Class Certification (Damages) Analysis | ☑ |
| 35 | Schmitz and Steward, et al. v. Wal-Mart Stores, Inc. | P | Class Action - Unfair Competition, Consumer Legal Remedies Act, False Advertising | U.S. District Court, Eastern District of California | Class Certification (Damages) Analysis | ☐ |
| 36 | Perez, et al. v. First American Title Insurance Company | P | Class Action - Unjust Enrichment and Unfair Discriminatin | U.S. District Court, District of Arizona | Class Certification (Damages) Analysis | ☐ |
| 37 | O'Donovan et al. (Class) v. CashCall, Inc. | P | Class Action - Unlawful / Unfair Business Practices and Other Misc. Violations | U.S. District Court, Northern District of California | Class Certification (Damages) Analysis | ☑ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 38 | In RE: Monat Hair Care Products Marketing, Sales Practices, and Products Liability Litigation | P | Class Action - Violation of FL Deceptive / Unfair Trade Practices Act, Violation of Magnuson-Moss Warranty Act, Breach of Implied Warranty of Merchantability, Violation of Express Warranty, and Misc. state consumer protection / fraud / advertising claims | U.S. District Court, Southern District of Florida (Miami Division) | Class Certification (Damages) Analysis | ☑ |
| 39 | Manemeit and all others similarly situated v. Gerber Products Co. d/b/a Nestle Nutrition, Nestle Infant Nutrition, and Nestle Nutrition North America (Case No. 2:17-cv-00093) | P | Class Action - Violation of the Florida Deceptive and Unfair Trade Practices Act, Misleading advertising (Florida), Violation of the Wisconsin Deceptive Trade Practices Act, and False Representations (Wisconsin) | U.S. District Court, Eastern District of New York | Class Certification (Damages) Analysis | ☑ |
| 40 | Keskinen and all other similarly situated v. Edgewell Personal Care Co.; Edgewell Personal Care, LLC; Edgewell Personal Care Brands, LLC; Playtex Products, LLC; and Sun Pharmeceuticals, LLC (Case No. 2:17-cv-07721) | P | Class Action - Violations of CA Unfair Competition Law, CA Consumer Legal Remedies Act, and CA False Advertising Law; Fraud / Intentional and Negligent Mispresentation; Breach of Express/Implied Warranty; etc. | U.S. District Court, Central District of California | Class Certification (Damages) Analysis | ☑ |
| 41 | IntegrityMessageBoards.com and all others similarly situated v. Facebook, Inc. (Case No. 4:18-cv-05286) | P | Class Action - Violations of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, et seq. | U.S. District Court, Northern District of California (Oakland Division) | Class Certification (Damages) Analysis | ☑ |
| 42 | Helen Krukas, Andrea Kushim, and George Luke, and all others similarly situated v. AARP, Inc.; AARP Services, Inc.; and AARP Insurance Plan (Case No. 1:18-cv-01124) | P | Class Action - Violations of DC Consumer Protection Procedures Act, Breach of Fiduciary Duty, Conversion, Fraudulent Concealment, and Unjust Enrichment | U.S. District Court, District of Columbia | Class Certification (Damages) Analysis | ☑ |
| 43 | Greene and Wilkerson and all others similarly situated v. Gerber Products Co. (Case No. 1:16-cv-01153) | P | Class Action - Violations of OH Consumer Sales Practices Act, Violation of the OH Deceptive Trade Practices Act, Violations of the NC Unfair and Deceptive Trade Practices Act, Fraudulent Concealment, Intentional / Negligent Misrepresentation | U.S. District Court, Eastern District of New York | Class Certification (Damages) Analysis | ☑ |
| 44 | Gilbert et al. v. MoneyMutual, LLC et al. (Case No. 4:13-cv-01171) | P | Class Action - Violations of the California Deferred Deposit Transaction Law, Violations of California's Unfair Competition Law, Racketeering Influenced and Corrupt Organizations Act | U.S. District Court, Northern District of California, Oakland Division | Class Certification (Damages) Analysis | ☑ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|
| 45 | Champion Residential Services, Inc. v. Sierra Air, Inc. et al. (Case No. 3:19-cv-00375) | D | Copyright Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☑ |
| 46 | Weinrib v. Williams-Sonoma, Inc., et al. | D | Copyright Infringement | U.S. District Court, Southern District of New York | Damages Analysis | ☑ |
| 47 | CrowdStrike, Inc. v. NSS Labs, Inc. (Case No. 1:17-cv-00146) | P | Copyright Infringement, Misappropriation of Trade Secrets, False Advertising, Breach of Contract, Tortious Interference with Contract, Fraud, Violation of the Computer Fraud and Abuse Act | U.S. District Court, District of Delaware | Damages Analysis | ☑ |
| 48 | XimpleWare Corp. v. Versata Software, Inc. f/k/a Trilogy Software, Inc. et al. (Case No. 3:13-cv-05160) | P | Copyright Infringement, Violation of Lanham Act 43(a), Breach of Contract, Unfair Competition | U.S. District Court, Northern District of California | Damages Analysis | ☑ |
| 49 | Holtzclaw v. CertainTeed Corp. | D | Employment | U.S. District Court, Eastern District of California (Fresno) | Damages Analysis | ☑ |
| 50 | Jeannine Clark v. AmTrust E&S Insurance Services, Inc., Amtrust North America, Inc., AmTrust Financial Services, Inc., and Tony Weddle (Case No. 3:16-cv-05561) | D | Employment | U.S. District Court, Northern District of California | Damages Analysis | ☑ |
| 51 | Martin (Individual) v. Ricoh Americas Corporation et al. | D | Employment | Judicial Arbitration and Mediation Services (JAMS) | Damages Analysis | ☑ |
| 52 | Quintana v. AAA Business Supplies, LP d/b/a AAA Business Supplies and Interiors | D | Employment | American Arbitration Association | Damages Analysis | ☑ |
| 53 | Dennis E. Munson v. Splice Communications, Inc., Andrew Coan, and Scott Bischoff (Case No. 3:12-cv-05089) | D | Employment (Unlawful Retaliation, Breach of Agreement, Violation of Labor Code, and Other Misc. Allegations) | U.S. District Court, Northern District of California | Damages Analysis | ☑ |
| 54 | United States of America ex rel. R.C. Taylor, III v. Mario Gabelli, et al. (03-cv-08762) | D | False Claims Act (Qui Tam) | U.S. District Court, Southern District of New York | Liability and Damages Analysis | ☐ |
| 55 | Grewal (Individual) v. Choudhury (Individual) | P | Fraud and Deceit, Recovery on a Promissory Note | U.S. District Court, Northern District of California | Damages Analysis | ☑ |
| 56 | The Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc. (Case No. 4:19-cv-01424-YGR) | P | Lanham Act (False Advertising and False Designation of Origin), Violations of CA False Advertising Law | U.S. District Court, Northern District of California (Oakland Division) | Damages Analysis | ☐ |
| 57 | JCM American Corporation v. Mars Electronics International, Inc., Thomas P. Nugent | P | Misappropriation (Theft) of Trade Secrets | Nevada District Court, Clark County; Case No. A507304 | Damages Analysis | ☐ |
| 58 | UniRam Technology, Inc. v. Monolithic System Technology, Taiwan Semiconductor Manufacturing Company, Ltd., TSMC North America | P | Misappropriation (Theft) of Trade Secrets | U.S. District Court, Northern District of California.  Case No. CV-04-01268-VRW | Damages Analysis | ☐ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 59 | Nevada Heat Treating, Inc. v. Sulphco, Inc. | P | Misappropriation (Theft) of Trade Secrets, Breach of Contract | Nevada District Court, Washoe County | Damages Analysis | ☑ |
| 60 | Vesta Corp. v. Amdocs Management Ltd. and Amdocs, Inc. (Case No. 3:14-cv-01142) | D | Misappropriation (Theft) of Trade Secrets, Breach of Contract | U.S. District Court, District of Oregon (Portland Division) | Damages Analysis | ☐ |
| 61 | Creative Concepts Software, Inc. v. Mobiletech Solutions, Inc., et al. (Case No. SA CV 05-00670) | D | Misappropriation (Theft) of Trade Secrets, Breach of Contract & Tortious Interference, Lanham Act (False Advertising) | U.S. District Court, Central District of California (Southern Division) | Damages Analysis | ☐ |
| 62 | Elemental LED, LLC and Elemental LED, Inc. v. Alan B. Rose, Lighting Management Group, and Alloy LED, LLC (Case No. BC602281) | P | Misappropriation (Theft) of Trade Secrets, Breach of Contract, and Breach of Implied Covenant of Good Faith and Fair Dealing | Superior Court of California, County of Los Angeles, Central District | Damages Analysis | ☑ |
| 63 | Elemental LED, LLC and Elemental LED, Inc. v. Maxwell E. Darling (Case No. CV15-02247) | P | Misappropriation (Theft) of Trade Secrets, Breach of Contract, and Breach of Implied Covenant of Good Faith and Fair Dealing | Nevada District Court, Washoe County | Damages Analysis | ☑ |
| 64 | Macsolutions, Inc. v. Apple Computer, Inc. | P | Misappropriation (Theft) of Trade Secrets, Breach of Contract, Fraud | | Damages Analysis | ☐ |
| 65 | BladeRoom Group Limited, et al., v. FaceBook, Inc. (Case No. 5:15-cv-01370) | P | Misappropriation (Theft) of Trade Secrets, Breach of Contract, Unfair Business Practices / Unfair Competition; Breach of Covenant of Good Faith & Fair Dealing | U.S. District Court, Northern District of California - San Jose Division | Damages Analysis | ☐ |
| 66 | PQ Labs, Inc. v. Yang Qi, ZaagTech Inc., Jinpeng Li, and Haipeng Li (Case No. 4:12-cv-00450) | D | Misappropriation (Theft) of Trade Secrets, Copyright Infringement, Trademark Infringement, Lanham Act Violations, and Other Misc. Allegations | U.S. District Court, Northern District of California, Oakland Division | Damages Analysis | ☑ |
| 67 | Ameranth, Inc. v. Genesis Gaming Solutions, Inc., et al. (Case No. 8:11-cv-00189) | D | Misappropriation (Theft) of Trade Secrets, Interference with Contractual Relations, Interference with Prospective Economic Advantage, Patent Infringement | U.S. District Court, Central District of California | Damages Analysis | ☑ |
| 68 | Waymo LLC v. Uber Technologies, Inc.; Ottomotto LLC; Otto Trucking LLC (Case No. 3:17-cv-00939) | P | Misappropriation (Theft) of Trade Secrets, Patent Infringement, Violation of CA Bus. & Prof. Code 17200 | U.S. District Court, Northern District of California (San Francisco Division) | Damages Analysis | ☐ |
| 69 | IV League, Inc. v. Pharmaco, Inc. et al | D | Misappropriation (Theft) of Trade Secrets, Unfair Business Practices | Superior Court of the State of California | Damages Analysis | ☐ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 70 | North American Title v. Liberty Title Company | D | Misappropriation (Theft) of Trade Secrets, Unfair Business Practices, Intentional Interference | Superior Court of the State of California (Contra Costa County) | Damages Analysis | ☐ |
| 71 | Global Sign, LLC et al. v. Merto (individual) et al. | P | Misappropriation (Theft) of Trade Secrets, Unfair Competition, Theft of Trade Name, Breach of Contract | Superior Court of the State of California (Orange County) | Damages Analysis | ☐ |
| 72 | Ajaxo, Inc. v. E*Trade Group, Inc et al. | D | Misappropriation (Theft)of Trade Secrets, Breach of Contract | Superior Court of Califonia, County of Santa Clara | Damages Analysis | ☐ |
| 73 | Boston Scientific Corp.; BostonScientific SciMed, Inc.; and Fortis Advisors v. BioCardia, Inc. (Case No. 3:19-cv-05645) | D | Misappropriation of Trade Secrets Under CA UTSA, Breach of Contract, Correction of Inventorship | U.S. District Court, Northern District of California (San Francisco Division) | Damages Analysis | |
| 74 | Consulting work for Cohen and ProCinea | N/A | Non-Litigation Consulting | N/A | Design Financial Analytical Model | ☐ |
| 75 | Consulting work for COMPTEL/ALTS | N/A | Non-Litigation Consulting | N/A | Prepare FCC Comment Analyzing Local Phone Pricing | ☐ |
| 76 | Consulting work for Fidelity Investments | N/A | Non-Litigation Consulting | N/A | Analyze Trading Data for Evidence of Wrongful Conduct | ☐ |
| 77 | Consulting work for Lloyds of London | N/A | Non-Litigation Consulting | N/A | Analyze Lloyds Insurance Liability Related to Enron | ☐ |
| 78 | Consulting work for Sprint | N/A | Non-Litigation Consulting | N/A | Prepare Comment for Texas PUC | ☐ |
| 79 | Consulting work for Sprint and Nextel realted to their proposed merger | N/A | Non-Litigation Consulting | N/A | Merger Analysis | ☐ |
| 80 | Consulting work for Telstra | N/A | Non-Litigation Consulting | N/A | Perform Benchmarking Study | ☐ |
| 81 | Consulting work for Vodafone | N/A | Non-Litigation Consulting | N/A | Prepare Comment for EU on Cellular Roaming Charges | ☐ |
| 82 | Licensing Consulting related to automobile battery systems | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 83 | Licensing Consulting related to Casino Gaming (cannot disclose due to confidentiality agreement) | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 84 | Licensing Consulting related to casino gaming devices | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 85 | Licensing Consulting related to casino gaming systems | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 86 | Licensing Consulting related to computers, printers, and enterprise hardware | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 87 | Licensing Consulting related to computers, printers, tablets, and enterprise hardware | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 88 | Licensing Consulting related to enterprise and security software | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 89 | Licensing Consulting related to hearing instruments | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 90 | Licensing Consulting related to insurance | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 91 | Licensing Consulting related to internet advertising | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☐ |
| 92 | Licensing consulting related to networking equipment | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 93 | Licensing Consulting related to operating system software | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☐ |
| 94 | Licensing Consulting related to printers and scanners | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 95 | Licensing Consulting related to printers and scanners | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 96 | Licensing Consulting related to printers and scanners | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 97 | Licensing Consulting related to printers, computers, and storage systems | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☐ |
| 98 | Licensing Consulting related to printers, scanners and cameras | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 99 | Licensing Consulting related to printers, scanners, and cameras | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 100 | Licensing Consulting related to printers, scanners, cameras, and medical devices | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 101 | Licensing Consulting related to Providers of Cellular Service | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 102 | Licensing Consulting related to retail banking | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 103 | Licensing Consulting related to server operating systems | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 104 | Licensing Consulting related to servers and middleware software | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☐ |
| 105 | Licensing Consulting related to servers, storage systems, and middleware software | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☐ |
| 106 | Licensing Consulting related to social networking platforms | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 107 | Licensing Consulting related to tablet devices and advertising | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 108 | Licensing Consulting related to video game systems | N/A | Non-litigation Consulting (Licensing) | N/A | Licensing Consulting | ☑ |
| 109 | Advanced Neuromodulation Systems, Inc. v. Advanced Bionics Corporation (Civil No. 4:04cv131) | P | Patent Infringement | U.S. District Court, Eastern District of Texas (Sherman Division) | Damages Analysis | ☐ |
| 110 | Aircraft Technical Publishers v. Avantext, Inc. | P | Patent Infringement | U.S. District Court, Northern District of California (San Francisco Division) | Damages Analysis | ☐ |
| 111 | AllVoice Developments v. Microsoft Corp. | P | Patent Infringement | U.S. District Court, Western District of Washington | Damages Analysis | ☐ |
| 112 | Altana Pharma, AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals, Ltd. | D | Patent Infringement | U.S. District Court, District of New Jersey | Declaration related to Motion for Injunction | ☐ |
| 113 | Ameranth, Inc. v. Genesis Gaming Solutions, Inc., et al. (Case No. 8:13-cv-00720) | D | Patent Infringement | U.S. District Court, Central District of California | Damages Analysis | ☐ |
| 114 | Apple Inc. v. Samsung Electronics Co., Ltd. et al. (Case No. 12-cv-00630) | D | Patent Infringement | U.S. District Court, Northern District of California | Damages Analysis | ☐ |
| 115 | Bally Technologies, Inc. v. Business Intelligence Systems Solutions, Inc. | P | Patent Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☑ |
| 116 | Bee Stinger, LLC v. Leven Industries (Case No. 2:13-cv-00026) | D | Patent Infringement | U.S. District Court, District of Utah | Damages Analysis | ☑ |
| 117 | Big Baboon, Inc. v. Dell Inc. et al. | P | Patent Infringement | U.S. District Court, Central District of California (Western Division) | Damages Analysis | ☐ |
| 118 | Charles E. Hill & Associates, Inc. v. Abercrombie & Fitch Co., et al. | P | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 119 | Charles E. Hill & Associates, Inc. v. Abt Electronics, Inc. et al. (2:09-cv-00313) | P | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 120 | Commonwealth Scientific and Industrial Research Organization v. Toshiba et al. | P | Patent Infringement | U.S. District Court, Eastern District of Texas (Tyler Division) | Damages Analysis | ☐ |
| 121 | Convolve, Inc. v. Dell, Inc. et al. | P | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 122 | Datcard Systems Inc. v. Codonics, Inc. | P | Patent Infringement | U.S. District Court, Central District of California | Damages Analysis | ☐ |
| 123 | Dominion Assets LLC v. Masimo Corp. and Cercacor Laboratories, Inc. (Case No. 5:12-cv-02773) | D | Patent Infringement | U.S. District Court, Northern District of California, Oakland Division | Damages Analysis | ☑ |
| 124 | Dominion Assets LLC v. Masimo Corp. and Cercacor Laboratories, Inc. (Case No. 5:14-cv-03002) | D | Patent Infringement | U.S. District Court, Northern District of California, Oakland Division | Damages Analysis | ☑ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 125 | Eagle Harbor Holdings LLC and MediusTech, LLC v. Ford Motor Co. (Case No. 3:11-cv-05503) | P | Patent Infringement | U.S. District Court, Western District of Washington (Tacoma) | Damages Analysis | ☐ |
| 126 | Eolas Technologies Inc. v. Adobe Systems Inc., et al. (client is Texas Instruments Inc.) | D | Patent Infringement | U.S. District Court, Eastern District of Texas (Tyler Division) | Damages Analysis | ☑ |
| 127 | Extang Corp.; UnderCover, Inc.; and Laurmark Enterprises, Inc. d/b/a BAK Industries v. Truck Accessories Group, LLC d/b/a LEER, Inc. (Case No. 1:19-cv-00923) | P | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☑ |
| 128 | Function Media LLC v. Google, Inc. and Yahoo!, Inc. | D | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 129 | FutureLogic, Inc. v. Nanoptix, Inc. | D | Patent Infringement | U.S. District Court, Central District of California (Western Division) | Damages Analysis | ☑ |
| 130 | GraphOn Corp v. Classified Ventures, LLC et al. | P | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 131 | GraphOn Corp. v. Juniper Networks, Inc. | P | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 132 | GraphOn v. AutoTrader.com, Inc. | P | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 133 | Guest Tek Interactive Entertainment LTD. v. Nomadix, Inc. (Civil Action No. 18-1394) | D | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☑ |
| 134 | Huawei Technologies Co., Ltd.; Huawei Device Co., Ltd.; and Huawei Digital Technologies (Chengdu) Co., Ltd. v. Verizon Communications, Inc.; Cellco Partnership D/B/A Verizon Wireless; and Verizon Business Networks Services, Inc. | P | Patent Infringement | U.S. District Court, Western District of Texas (Waco Division) | Damages Analysis | ☐ |
| 135 | In Re: Copaxone 775 Patent Litigation (Teva Pharmaceuticals USA, Inc. et al. v. Sandoz, Inc. et al.) - Case No. 16-1267-GMS) | P | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☐ |
| 136 | In re: NeuroGrafix ('360) Patent Litigation, retained by Toshiba America Medical Systems and Toshiba Medical Systems Corp. (MDL No. 13-md-2432) | D | Patent Infringement | U.S. District Court, District of Massachusetts | Damages Analysis | ☑ |
| 137 | INAG, Inc. and Mark H. Jones and Sheryle L. Jones as Trustees of the Mark Hamilton Jones and Sheryle Lynn Jones Family Trust U/A/D November 7, 2013 v. Richar, Inc. (Case No. 2:16-cv-00722) | P | Patent Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☑ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 138 | Intel Corp., et al. v. Commonwealth Scientific and Industrial Research Organisaztion | D | Patent Infringement | U.S. District Court, Eastern District of Texas (Tyler Division) | Damages Analysis | ☐ |
| 139 | Intellectual Ventures I LLC and Intellectual Ventures II LLC v. Symantec Corp. (Case No. 1:13-cv-00440) | P | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☐ |
| 140 | Intellectual Ventures I LLC v. Check Point Software Technologies Ltd. Et al. (Case No. 10-cv-1067) | P | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☐ |
| 141 | Intellectual Ventures I LLC v. Trend Micro Inc. and Trend Micro, Inc. (USA) (Case No. 12-cv-01581) | P | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☐ |
| 142 | Intellectual Ventures I LLC, et al. v. Capital One Financial Corp., et al. (Case No. 1:13-cv-00740) | P | Patent Infringement | U.S. District Court, Eastern District of Virginia (Alexandria Division) | Damages Analysis | ☐ |
| 143 | Intellectual Ventures I LLC, et al. v. Capital One Financial Corp., et al. (Case No. 8-14-cv-00111) | P | Patent Infringement | U.S. District Court, District of Maryland (Greenbelt Division) | Damages Analysis | ☐ |
| 144 | Intellectual Ventures I LLC, et al. v. PNC Financial Services Group, Inc., et al. (Case No. 2:13-cv-00740) | P | Patent Infringement | U.S. District Court, Western District of Pennsylvania | Damages Analysis | ☐ |
| 145 | Intellectual Ventures II LLC v. Commerce Bancshares, Inc. and Commerce Bank (Case No. 2:13-cv-04160) | P | Patent Infringement | U.S. District Court, Western District of Missouri - Central Division | Damages Analysis | ☐ |
| 146 | Intellectual Ventures II LLC v. JP Morgan Chase & Co. et al. (Case No. 1:13-cv-03777) | P | Patent Infringement | U.S. District Court, Southern District of New York | Damages Analysis | ☐ |
| 147 | Intellectual Ventures II LLC v. SunTrust Banks, Inc. and SunTrust Bank (Case No. 1:13-cv-02454) | P | Patent Infringement | U.S. District Court, Northern District of Georgia - Atlanta Division | Damages Analysis | ☐ |
| 148 | Japan Cash Machine Co. Ltd. and JCM American Corp. v. MEI, Inc. | P | Patent Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☐ |
| 149 | JS Products, Inc. v. Kabo Tool Co. et al. (2:11-cv-01856) | P | Patent Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☑ |
| 150 | Juniper Networks, Inc. v. GraphOn Corp. et al. | D | Patent Infringement | U.S. District Court, Eastern District of Virginia (Alexandria Division) | Damages Analysis | ☐ |
| 151 | Light Guard Systems, Inc. v. Spot Devices, Inc. | P | Patent Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☑ |
| 152 | Marvell v. Commonwealth Scientific and Industrial Research Organization | D | Patent Infringement | U.S. District Court, Eastern District of Texas (Tyler Division) | Damages Analysis | ☐ |
| 153 | Masimo Corp. v. Philips Electronics North America Corp. and Philips Medizin Systeme Boblingen GMBH (Civil Action No. 09-80) | P | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☐ |

## GREGORY A. PINSONNEAULT
## CONSULTING AND TESTIMONY CASE LISTING

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 154 | Masimo Corp. v. Philips Electronics North America Corp. and Philips Medizin Systeme Boblingen GMBH (Civil Action No. 11-742) | P | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☐ |
| 155 | MEI, Inc. v. JCM American Corp. and Japan Cash Machine Co. Ltd. | D | Patent Infringement | U.S. District Court, District of New Jersey | Damages Analysis | ☐ |
| 156 | Microscan Systems, Inc. v. Cognex Corp. et al. | P | Patent Infringement | U.S. District Court, Western District of Washington (Seattle) | Damages Analysis | ☑ |
| 157 | Microsoft Corp. v. St. Clair Intellectual Property Consultants, Inc. | D | Patent Infringement | U.S. District Court, District of Delaware | Damages and Econometric Analysis | ☐ |
| 158 | Microsoft Corp., et al. v. Commonwealth Scientific and Industrial Research Organisaztion | D | Patent Infringement | U.S. District Court, Eastern District of Texas (Tyler Division) | Damages Analysis | ☐ |
| 159 | Micronuity Systems Engineering, Inc. v. Acer Inc., et al. (client: Texas Instruments Inc.; Motorola Mobility, Inc.; LG Electronics, Inc.; LG Electronics Mobilecomm U.S.A., Inc.; Nokia Corp.; and Nokia Inc.) | D | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 160 | Motorola Mobility, Inc. v. Microsoft Corp. | P | Patent Infringement | U.S. District Court, Southern District of Florida | Damages Analysis | ☐ |
| 161 | Otter Products, LLC v. Treefrog Developments, Inc. d/b/a LifeProof (Case No. 1:11-cv-02180) | P | Patent Infringement | U.S. District Court, District of Colorado | Damages Analysis | ☐ |
| 162 | Paid Search Engine Tools, LLC v. Google, Inc. and Microsoft Corp. | D | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 163 | Papyrus Technology Corp. v. New York Stock Exchange, Inc. | P | Patent Infringement | U.S. District Court, Southern District of New York | Damages Analysis | ☐ |
| 164 | Power Integrations, Inc. v. Fairchild Semiconductor Intl. et al. | D | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☐ |
| 165 | Premier International Associates, LLC v. Microsoft Corp. et al. | P | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 166 | Qualcomm, Inc v. Broadcom Corp. (Case No. 05 CV 1662 B (DLM)) | D | Patent Infringement | U.S. District Court, Southern District of California | Damages Analysis | ☐ |
| 167 | Richtek Technology Corp. v. uPI Semiconductor Corp. et al. (Case No. 3:09-cv-05659) | P | Patent Infringement | U.S. District Court, Northern District of California | Damages Analysis | ☐ |
| 168 | Semcon IP Inc. v. MediaTek Inc. and MediaTek USA Inc. (Case No. 2:16-cv-00438) | D | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 169 | Semcon IP Inc. v. Texas Instruments Inc. (Case No. 2:16-cv-00440) | D | Patent Infringement | U.S. District Court, Eastner District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 170 | Silicon Graphics, Inc. v. ATI Technologies, Inc. | D | Patent Infringement | U.S. District Court, Western District of Wisconsin | Damages Analysis | ☐ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 171 | Sky Zone, LLC v. Raymond et al. (Case No. 3:11-cv-00141) | P | Patent Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☑ |
| 172 | St. Clair Intellectual Property Consultants, Inc. v. Acer, Inc. et al. | P | Patent Infringement | U.S. District Court, District of Delaware | Damages and Econometric Analysis | ☐ |
| 173 | St. Clair Intellectual Property Consultants, Inc. v. Hewlett-Packard Co. | P | Patent Infringement | U.S. District Court, District of Delaware | Damages and Econometric Analysis | ☐ |
| 174 | St. Jude Medical, Inc. et al. v. Access Closure, Inc. | D | Patent Infringement | U.S. District Court, Western District of Arkansas (Texarkana Division) | Damages Analysis | ☐ |
| 175 | Symantec v. Microsoft Corp. | P | Patent Infringement | | Damages Analysis | ☐ |
| 176 | TableMax IP Holdings, Inc., TableMax Gaming, Inc., and Vegas Amusement, Inc. v. Shuffle Master, Inc. | P | Patent Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☑ |
| 177 | Townshend Intellectual Property, LLC v. Broadcom Corp. | P | Patent Infringement | U.S. District Court, Northern District of California (San Jose) | Damages Analysis | ☐ |
| 178 | TV Interactive Corp. v. Microsoft Corp. (Case No. 02 C 02385) | P | Patent Infringement | U.S. District Court, Norther District of California (Oakland Division) | Damages Analysis | ☐ |
| 179 | United Coin Machine, Co. v. Ardent Progressive Systems and Games, LLC, Golden Gaming, Inc., Golden Tavern Group, LLC, Golden Route Operations, LLC, Herbst Gaming, Inc., and E-T-T, Inc. | P | Patent Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☑ |
| 180 | Universal Electronics Inc. v. Roku, Inc. (Case No. 8:18-cv-01850) | D | Patent Infringement | U.S. District Court, Central District of California (Southern Division) | Damages Analysis | ☑ |
| 181 | University of South Florida Research Foundation, Inc. v. Brit Systems, Inc. (Case No. 3:18-cv-0250) | P | Patent Infringement | U.S. District Court, Northern District of Texas (Dallas Division) | Damages Analysis | ☑ |
| 182 | University of South Florida Research Foundation, Inc. v. Fujifilm Medical Systems U.S.A., Inc. (Case No. 3:18-cv-00215) | P | Patent Infringement | U.S. District Court, District of Connecticut | Damages Analysis | ☑ |
| 183 | UNOVA v. Hewlett Packard | P | Patent Infringement | U.S. District Court, Central District of California (Western Division) | Damages Analysis | ☐ |
| 184 | Versata Software, Inc. et al. v. SAP America, Inc. et al. | D | Patent Infringement | U.S. District Court, Eastern District of Texas (Marshall Division) | Damages Analysis | ☐ |
| 185 | Volumetrics Medical Imaging v. Medison Co. et al. | D | Patent Infringement | U.S. District Court, Middle District of North Carolina | Damages Analysis | ☐ |
| 186 | Walker Digital, LLC and Walker Digital Lottery, LLC v. Multi-State Lottery Association (Case No. 1:10-cv-01113) | P | Patent Infringement | U.S. District Court, District of Delaware | Damages Analysis | ☑ |

**GREGORY A. PINSONNEAULT**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 187 | Winn, Inc. v. Eaton Corp. | P | Patent Infringement | U.S. District Court, Eastern District of Michigan (Southern Division) | Damages Analysis | ☐ |
| 188 | XimpleWare Corp. v. Versata Software, Inc. f/k/a Trilogy Software, Inc. et al. (Case No. 3:13-cv-05161) | P | Patent Infringement | U.S. District Court, Northern District of California | Damages Analysis | ☑ |
| 189 | Nichia Corporation v. Seoul Semiconductor, Ltd. and Seoul Semiconductor, Inc. | D | Patent Infringement (Design Patent) | U.S. District Court, Northern District of California | Damages Analysis | ☐ |
| 190 | Nike, Inc. v. Skechers U.S.A., Inc. (Case No. 2:17-cv-08509) | D | Patent Infringement (Design Patents) | U.S. District Court, Central District of California | Damages Analysis | ☐ |
| 191 | Snap-On Inc. v. Harbor Freight Tools USA, Inc. (Case 16-C-1265) | D | Patent Infringement (Design Patents) | U.S. District Court, Eastern District of Wisconsin | Damages Analysis | ☑ |
| 192 | Bally Gaming, Inc. v. Aristocrat Technologies, Inc., Video Gaming Technologies, Inc., and Aristocrat Leisure Ltd. (Case No. 2:16-cv-02359) | D | Patent Infringement (Design Patents); Trademark Infringement; False Designation of Origin / Unfair Competition | U.S. District Court, District of Nevada | Damages Analysis | ☐ |
| 193 | Apple Inc. v. Samsung Electronics Co., Ltd. et al. (Case No. 11-cv-01846) | D | Patent Infringement (Utility and Design Patents), Trade Dress Infringement and Dilution, and Trademark Infringement | U.S. District Court, Northern District of California | Damages Analysis | ☐ |
| 194 | BlackBerry Ltd. v. Typo Products LLC and Show Media LLC (Case No. 3:14-cv-00023) | P | Patent Infringement (Utility and Design Patents), Trade Dress Infringement and Dilution, and Unfair Business Practices | U.S. District Court, Northern District of California | Damages Analysis | ☑ |
| 195 | Masimo Corp. v. Shenzhen Mindray Bio-Medical Electronics Co., LTD. (Case No. 8-12-cv-02206) | P | Patent Infringement, Breach of Contract | U.S. District Court, Central District of California (Southern Division) | Damages Analysis | ☐ |
| 196 | Grace (Individual) v. California State Automobile Association | P | Personal Injury | N/A | Damages Analysis | ☑ |
| 197 | James Neighbor (individual) v. Owens Mortgage Investment Fund, et al. | D | Personal Injury | Superior Court of California, County of Contra Costa | Damages Analysis | ☑ |
| 198 | Jaramillo v. BCI Coca-Cola et al. | P | Personal Injury | Superior Court of California, County of Madera | Damages Analysis | ☑ |
| 199 | Ryder-Loomis (Individual) v. Allstate Insurance Co. | P | Personal Injury | Superior Court of California, County of San Francisco | Damages Analysis | ☑ |
| 200 | Weiss (Individual) v. Laderman (Individual) | P | Personal Injury | Superior Court of California, County of San Francisco | Damages Analysis | ☑ |
| 201 | LCA-Vision, Inc. d/b/a LasikPlus et al. v. Vision Group Holdings, LC et al. (Case No. A1901821) | D | Tortious Interference with Contract, Tortious Interference with Business Relations and/or Corporate Raiding, Breach of Contract, Breach of Duty of Loyalty, and Civil Conspiracy | Court of Common Pleas of Ohio, Hamilton County | Damages Analysis | ☑ |

## GREGORY A. PINSONNEAULT
## CONSULTING AND TESTIMONY CASE LISTING

| | Lawsuit | | Type | Court | Work Performed | Retained Expert |
|---|---|---|---|---|---|---|
| 202 | Masimo Corp. and Cercacor Laboratories, Inc. v. True Wearables, Inc. and Marcelo Lamego (Case No. 8:18-cv-02001) | P | Trade Secret Misappropriation, Breach of Contract, Breach of Fiduciary Duty, and Patent Infringement | U.S. District Court, Central District of California (Southern Division) | Damages Analysis | ☑ |
| 203 | Aesthetica LLC v. LunchboxWax Holdings, LLC, Lunchbox Franchise, LLC, and Rocketbox Ltd. (Case No. 2:17-cv-01045) | P | Trademark Infringement | U.S. District Court, District of Nevada | Damages Analysis | ☑ |
| 204 | Cross Trailers, Inc. v. Cross Trailer Manufacturing And Sales, LLC, et al. | D | Trademark Infringement | U.S. District Court, Western District of Texas (Waco Division) | Damages Analysis | ☑ |
| 205 | Puri v. Golden Temple of Oregon, LLC | D | Trademark Infringement | Arbitration Service of Portland | Damages Analysis | ☑ |
| 206 | Snap Lock Industries, Inc. v. Swisstrax Corp. (Case No. 2:17-cv-02742) | D | Trademark Infringement, False Advertising, Breach of Contract, Unfair Competition | U.S. District Court, District of Nevada | Damages Analysis | ☑ |
| 207 | Rosetta Stone Ltd. v. Google Inc. | D | Trademark Infringement, False Representation, and Unfair Competition | U.S. District Court, Eastern District of Virginia (Alexandria Division) | Damages Analysis | ☐ |
| 208 | John Fogerty v. Stuart Cook, Douglas Clifford, and Poor Boy Productions, Inc. (Case No. 2:15-cv-06069) | P | Trademark Infringement, Lanham Act Violations, Unfair Competition, Breach of Contract | U.S. District Court, Central District of California | Damages Analysis | ☑ |
| 209 | Gabriel et al. v. Idearc Media | D | Unfair Business Practices | U.S. District Court, Central District of California | Damages Analysis | ☐ |
| 210 | Department of Enforcement v. Frank Quattrone | D | Violations of NASD Rules | National Association of Securities Dealers | Damages Analysis | ☐ |
| 211 | Dias v. Kaiser Permanente | P | Wrongful Death | Mediation | Damages Analysis | ☑ |

# EXHIBIT B

Highly Confidential - Subject to Protective Order

**Helen Krukas, et al. v. AARP, Inc., et al.**

**Exhibit B**

**Table of Contents**

| Series 1: | Summary of Royalties, Contributions, and Calculated Royalty Rates for Medicare Supplement/Select |
|---|---|
| Schedule 1.1 | Royalties, Member Contributions, and Calculated Royalty Rate for Medicare Supplement/Select, 2011 - YTD September 2018 |

| Series 2: | Analysis of Effective Royalty Rates – MA / Part D Plans |
|---|---|
| Schedule 2.1 | 2014 Total Effective Royalty Rate (MA and Part D Plans) |
| Schedule 2.2 | 2014 Estimated Premium Payments by CMS (MA and Part D Plans) |
| Schedule 2.3 | 2014 Estimated Premium Payments by Insureds (Medicare Supplement, MA, and Part D Plans) |

| Series 3: | Analysis of Effective Royalty Rates – 1997 SHIP Agreement |
|---|---|
| Schedule 3.1 | 2001 Estimated Royalty Rate for Medicare Supplement/Select |

Highly Confidential - Subject to Protective Order

**Helen Krukas, et al. v. AARP, Inc., et al.** $\hspace{3cm}$ **Schedule 1.1**

**Summary of Royalties, Contributions, and Calculated Royalty Rates for Medicare Supplement/Select**

**Royalties, Member Contributions, and Calculated Royalty Rate for Medicare Supplement/Select, 2011 - YTD September 2018**

| | Date | Royalty for Medicare Supplement/Select | Member Contribution for Medicare Supplement/Select | Calculated Royalty Rate |
|---|---|---|---|---|
| [a] | 2011 | | | |
| [b] | 2012 | | | |
| [c] | 2013 | | | |
| [d] | 2014 | | | |
| [e] | 2015 | | | |
| [f] | 2016 | | | |
| [g] | 2017 | | | |
| [h] | 2018 (YTD Sep.) | | | |

Sources:

[a]  *AARP_KRUKAS_0000947.xlsm, tabs "Exh H" and "Exh L". See also AARP_KRUKAS_0004174.xlsm, tabs "Exh H" and "Exh L".*

[b]  *AARP_KRUKAS_0000988.xlsm, tabs "Exh H" and "Exh L". See also AARP_KRUKAS_0000947.xlsm, tabs "Exh H" and "Exh L".*

[c]  *AARP_KRUKAS_0000988.xlsm, tabs "Exh H" and "Exh L".*

[d]  *AARP_KRUKAS_0004364.xlsm, tabs "Exh H" and "Exh L".*

[e]  *AARP_KRUKAS_0004384.xlsm, tabs "Exh H" and "Exh L".  See also AARP_KRUKAS_0004364.xlsm, tabs "Exh H" and "Exh L".*

[f]  *AARP_KRUKAS_0004382.xlsm, tabs "Exh H" and "Exh L".  See also AARP_KRUKAS_0004384.xlsm, tabs "Exh H" and "Exh L".*

[g]  *AARP_KRUKAS_0004382.xlsm, tabs "Exh H" and "Exh L".*

[h]  *AARP_KRUKAS_0124555.xlsm, tabs "Exh H" and "Exh L".*

Highly Confidential - Subject to Protective Order

**Helen Krukas, et al. v. AARP, Inc., et al.**                                    **Schedule 2.1**
**Analysis of Effective Royalty Rates – MA / Part D Plans**
**2014 Total Effective Royalty Rate (MA and Part D Plans)**

| | | | |
|---|---|---|---|
| [a] | Estimated Minimum Premiums Paid by CMS for United's AARP MA / Part D Plans | $17,026,857,000 | [1] |
| [b] | Estimated Total Premiums Paid by Insureds for United's AARP MA Plans | ██████ | [2] |
| [b] | Estimated Total Premiums Paid by Insureds for United's AARP Part D Plans | ██████ | [3] |
| | **Estimated Total MA and Part D Plan Premiums** | ██████ | [4] = [1] + [2] + [3] |
| [c] | MA Plan Annual Royalty | ██████ | [5] |
| [d] | Part D Plan Annual Royalty | ██████ | [6] |
| | **Total Annual Royalty** | ██████ | [7] = [5] + [6] |
| | **Effective Royalty Rate for MA and Part D Plans in 2014** | ██████ | [8] = [7] / [4] |

Sources:

[a]   Schedule 2.2
[b]   Schedule 2.3
[c]   MA Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008874-908 at '889.
[d]   Part D Program Trademark License Agreement, Effective January 1, 2014, AARP_KRUKAS_0008844-873 at '858.

Highly Confidential - Subject to Protective Order

**Helen Krukas, et al. v. AARP, Inc., et al.**                                          **Schedule 2.2**
**Analysis of Effective Royalty Rates – MA / Part D Plans**
**2014 Estimated Premium Payments by CMS (MA and Part D Plans)**

| | | | |
|---|---|---|---|
| [a] | People Enrolled in United AARP MA Plans | ■■■■ | [1] |
| [b] | People Enrolled in All United MA Plans | 3,000,000 | [2] |
| | **Estimated AARP Percent of United MA Plans** | **60%** | [3] = [2] / [1] |
| [c] | UnitedHealth Group Total Consolidated Revenue | $130,474,000,000 | [4] |
| [b] | Premiums from CMS as Percent of UHG Total Consolidated Revenue | 29% | [5] |
| | **UHG Premiums from CMS** | **$37,837,460,000** | [6] = [4] * [5] |
| [b] | Adjustment to Account for "Most" of Premiums Generated by UHC M&R | 75% | [7] |
| | **Estimated Premiums from CMS for United's MA / Part D Plans** | **$28,378,095,000** | [8] = [6] * [7] |
| | Minimum AARP Percentage of MA / Part D Plans | 60% | [3] |
| | **Estimated Minimum Premiums Paid by CMS for United's AARP MA / Part D Plans** | **$17,026,857,000** | [9] = [3] * [8] |

*Sources:*

[a]  *Mercer Presentation, "HPQRC Orientation," September 9, 2015, AARP_KRUKAS_0086271-336 at '281.*
[b]  *UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 5.*
[c]  *UnitedHealth Group Inc.'s Form 10-k for the fiscal year ended December 31, 2014, p. 42.*

Highly Confidential - Subject to Protective Order

**Helen Krukas, et al. v. AARP, Inc., et al.**                                                                  **Schedule 2.3**
**Analysis of Effective Royalty Rates – MA / Part D Plans**
**2014 Estimated Premium Payments by Insureds (Medicare Supplement, MA, and Part D Plans)**

| | | | |
|---|---|---|---|
| [a] | People Enrolled in United's AARP Medicare Supplement Plans | ███████ | [1] |
| [a] | United's AARP Medicare Supplement Average Monthly Premium Paid by Insureds | ██████ | [2] |
| | Months in 2014 | 12 | [3] |
| | **Estimated Total Premiums Paid by Insureds for United's AARP Medicare Supplement Plans** | █████████ | [4] = [1] * [2] * [3] |
| | | | |
| [a] | People Enrolled in United's AARP MA Plans | ██████ | [5] |
| [a] | United's AARP MA Average Monthly Premium Paid by Insureds | █████ | [6] |
| | Months in 2014 | 12 | [7] |
| | **Estimated Total Premiums Paid by Insureds for United's AARP MA Plans** | ███████ | [8] = [5] * [6] * [7] |
| | | | |
| [a] | People Enrolled in United's AARP Part D Plan | ██████ | [9] |
| [a] | United's AARP Part D Plan Average Monthly Premium Paid by Insureds | █████ | [10] |
| | Months in 2014 | 12 | [11] |
| | **Estimated Total Premiums Paid by Insureds for United's AARP Part D Plans** | ███████ | [12] = [9] * [10] * [11] |

*Sources:*

 [a]  *Mercer Presentation, "HPQRC Orientation," September 9, 2015, AARP_KRUKAS_0086271-336 at '281.*

Highly Confidential - Subject to Protective Order

**Helen Krukas, et al. v. AARP, Inc., et al.**                                                    **Schedule 3.1**
**Analysis of Effective Royalty Rates – 1997 SHIP Agreement**
**2001 Estimated Royalty Rate for Medicare Supplement/Select**

| | | | |
|---|---|---:|---|
| [a] | Average Premium Rate Increase per Year Since 2000 | ■■■ | [1] |
| | Start Year | 2001 | |
| | End Year | 2014 | |
| | Years of Growth | 13 | [2] |
| | **2001 Premium Rate as Percentage of 2014 Premium Rate** | ■■■ | [3] = 1 / ( ( 1+ [1] ) ^ [2] ) |
| [b] | 2001 AARP Medicare Supplement Enrollment | ■■■ | [4] |
| [b] | 2014 AARP Medicare Supplement Enrollment | ■■■ | [5] |
| | **2001 as Percentage of 2014 AARP Medicare Supplement Enrollment** | ■■■ | [6] = [4] / [5] |
| [c] | 2014 Member Contribution for AARP Medicare Supplement/Select | ■■■ | [7] |
| | 2001 Premium Rate as Percentage of 2014 Premium Rate | ■■■ | [3] |
| | 2001 as Percentage of 2014 AARP Medicare Supplement Enrollment | ■■■ | [6] |
| | **Estimated 2001 Member Contribution for AARP Medicare Supplement/Select** | **$2,812,543,010** | [8] = [7] * [3] * [6] |
| | First $1 Billion of 2001 Member Contributions | $1,000,000,000 | [9] |
| [d] | Royalty Rate for First $1 Billion of 2001 Member Contributions | 4.00% | [10] |
| | **Estimated Royalties for First $1 Billion of 2001 Member Contributions** | **$40,000,000** | [11] = [9] * [10] |
| | 2001 Member Contributions Over $1 Billion | $1,812,543,010 | [12] = [8] - [9] |
| [d] | Royalty Rate for 2001 Member Contributions Over $1 Billion | 2.50% | [13] |
| | **Estimated Royalties for 2001 Member Contributions Over $1 Billion** | **$45,313,575** | [14] = [12] * [13] |
| | Estimated Total Royalties in 2001 | $85,313,575 | [15] = [11] + [14] |
| | Estimated 2001 Member Contributions | $2,812,543,010 | [8] |
| | **Effective Royalty Rate in 2001** | **3.03%** | [16] = [15] / [8] |

*Sources:*

[a]   *Mercer Presentation, Working Draft, "HPQRC Orientation," September 10, 2014, AARP_KRUKAS_0073890-939 at '911.*

[b]   *Mercer Report, "2018 Annual Legislative, Regulatory and Marketplace Report for the ASI Health Products Quality Review Committee," January 30, 2018, AARP_KRUKAS_0059815-859 at '851.*

[c]   *AARP_KRUKAS_0004364.xlsm, tab "Exh H".*

[d]   *AARP Health Insurance Agreement, February 26, 1997, AARP_KRUKAS_0159645-745 at '701.*