# Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

HELEN KRUKAS, ANDREA KUSHIM, and
GEORGIA LUKE, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

    v.

AARP, INC.; AARP SERVICES INC.; and AARP
INSURANCE PLAN,

        Defendants.

No. 18-cv-1124 (BAH)


**Expert Report of**
**Holly L. Blanchard, FLMI, AIE, CCP, ACP, INS, MCM**
**Regulatory Insurance Advisors, LLC**
**December 20, 2020**

## I.  INTRODUCTION AND QUALIFICATIONS

1. I have been retained by the Plaintiffs' Counsel to offer my opinion on the issue of whether AARP, Inc. ("AARP"), AARP Services Inc. ("ASI"), and AARP Insurance Plan, (collectively "Defendants.") engaged in certain unlicensed insurance practices and whether this issue can be resolved on a class-wide basis.

2. I submit this declaration in support of Plaintiffs' motion for class certification. The analysis below seeks to apply my specialized knowledge—which is based on my experience, training, and education—to documents and information produced in discovery. If called as a witness, I could competently testify to the opinions set forth in this declaration.

3. My qualifications are set forth in my resume, which is included at Attachment 1 to this declaration. I include a brief summary of my qualifications below.

4. I have been a senior-level insurance regulator for over 16 years and am frequently asked to make presentations as a subject-matter expert on insurance-related issues.

5. My career in the insurance industry extends over 20 years, with 16 of those spent in an insurance-regulatory capacity.

6. I am the co-founder and President of Regulatory Insurance Advisors (RIA), a consulting firm that provides expert regulatory insurance-consulting services to governmental entities and insurance carriers.

7. Prior to founding RIA, I worked as an insurance regulator for the State of Nebraska Department of Insurance (NDOI), where I served as a Market Conduct Examiner-in-Charge. In this capacity I lead Market Conduct Examinations into the conduct of insurance carriers to ensure that they complied with state and federal statutes.  After serving as a Market Conduct Examiner-in-Charge, I was promoted to the Life and Health Administrator, where I oversaw the rate-and-form-filing section of the NDOI.  In this capacity, my team reviewed rates and product documents for all lines of Life and Health insurance, including Medigap/Medicare Supplement products.

8. Throughout the course of my career I have performed over 60 Market Conduct exams, including reviews of producer-licensing requirements and violations thereof.

9. I currently serve as an independent board member for Maiden Holdings, Inc. and Maiden Re. As a board member, I serve on the Audit Committee, Corporate Governance Committee, and Compensation Committee.

10. I am the past President and currently serve on the Board of Directors for the Insurance Regulatory Examiners Society.

1

11. I previously served on the Board of Directors for the Association of Insurance Compliance Professionals.

## II.  REMUNERATION

12. I am being compensated for my time in this matter at a rate of $395 per hour. My fees are not contingent upon the nature of any findings or of any analyses, testimony, or the outcome of the proceeding in this matter.

## III.  BACKGROUND

13. I understand Plaintiffs to be alleging that Defendants violated D.C. statutory law and common law by collecting an undisclosed and illegal commission by soliciting Plaintiffs and proposed class members to purchase AARP Medigap policies without a license. This understanding is based on my review of the Plaintiffs' First Amended Complaint and the Court's orders in this case.  According to the Court's March 17, 2019 order, Plaintiff alleges:

> [A] violation of the Washington D.C. Consumer Protection Procedures Act ("CPPA"), D.C. CODE § 28-3901 *et seq.*, as well as common law violations of conversion, unjust enrichment, and fraudulent concealment, based on her purchase of a Medicare supplemental health insurance policy, also known as a "Medigap" policy, administered by AARP. *See* Compl. ¶¶ 1, 16, 17, 88, ECF No. 1. These statutory and common law claims are predicated on the plaintiff's allegations that she was "fooled into paying AARP an undisclosed 4.95% commission" when purchasing her Medigap policy and, since "AARP is not licensed as an insurance broker or agent," the defendants "may not legally collect these commissions." *Id.* ¶ 1
>
> ***
>
> The plaintiff challenges AARP's role in soliciting, marketing, and administering Medigap policies, a state-regulated form of health insurance to supplement Medicare. Since at least 1997, AARP has held, in its name, group Medigap policies underwritten by UnitedHealth Group and UnitedHealthcare Insurance Company (collectively, "UnitedHealth") and offered participation in those group policies to individual AARP members and the general public. *See* Compl. ¶¶ 22, 37, 51. The plaintiff alleges that AARP's administration and provision of other services in support of these group Medigap policies amounted to acting as an unlicensed insurance agent, that the "royalties" paid to AARP as a percentage of premiums constituted illegal commissions, and that AARP materially misrepresented the nature and source of the "royalties," causing consumers to pay more for AARP Medigap policies than they otherwise would. *See* Compl. ¶¶ 4–15.[1]

14. I understand that Plaintiffs seek to certify the following class:

---

[1] *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 9 (D.D.C. 2019).

2

> All persons in the United States who purchased or renewed an AARP Medigap Policy between January 1, 2011 and the present. This class definition excludes the judge or magistrate assigned to this case; Defendants; any entity in which Defendants have a controlling interest; and Defendants' officers, directors, legal representatives, successors, and assigns.

15. I also understand from counsel that the laws of the District of Columbia apply to all the causes of action in this case.

## IV. BASES FOR MY OPINION

16. Based on my experience in the insurance industry,  including my experience as a regulator with the responsibility for preventing misconduct in the insurance industry, as well my experience advising clients on compliance issues, I have an understanding of the terms "soliciting," "selling," "commission," and "producer" as they are used in the industry (described in more detail below).

17. My understanding of these terms is consistent with and corroborated  by how those terms are described in resources commonly used by insurance-industry professionals, including  the uniform standards set by the National Association of Insurance Commissioners ("NAIC");[2] federal regulations set by the Center for Medicaid and Medicare Services (CMS); Model Law 218: The Producer Licensing Act ("The Model Act") (attached hereto as Attachment 2);[3] and the District of Columbia insurance statute, D.C. Code § 31-1131, et seq.,[4]   which defines these terms in a manner that is consistent with my understanding.

### A.  Common insurance-industry definition and understanding of "soliciting insurance."

18. "Solicit," as the term is used in the industry, is the act of trying to persuade an insured or potential insured to purchase a particular insurance product from a particular company.  This is supported by the definition used in D.C. Code §31-1131.02 and the

---

[2] The NAIC is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight. NAIC staff supports these efforts and represents the collective views of state regulators domestically and internationally. NAIC members, together with the central resources of the NAIC, form the national system of state-based insurance regulation in the U.S. For additional information visit www.naic.org.

[3] The NAIC, in conjunction with the state regulators, creates Model Laws regarding insurance oversight. The Model Laws are intended to provide consistent statutory requirements for the insurance industry and regulation thereof.  These laws are then adopted by the states as presented in the Model Law or amended to incorporate state-specific requirements.

[4] CMS is a department within the Federal Health and Human Services Division  charged with overseeing programs including Medicare, Medicaid, the Children's Health Insurance Program (CHIP), and the state and federal health insurance marketplaces. CMS collects and analyzes data, produces research reports, and works to eliminate instances of fraud and abuse within the healthcare system.

Model Act, both of which provide that "'[s]olicit' means attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company."

### B. Common insurance-industry definition and understanding of "selling" insurance

19. To "sell" insurance, as the term is used in the industry, is to exchange insurance coverage for money on behalf of an insurance company.  This understanding is constituent with the Model Act's definition of "sell" as meaning "to exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company."  D.C. Code §31-1131.02 similarly defines "sell" as meaning "to sell or exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company."

### C. Common insurance-industry definition and understanding of a "commission"

20. A "commission," as the term is used in the industry, is a percentage-based amount of premiums earned for the sale of insurance.  The NAIC defines "commissions" as "a percentage of premium paid to agents by insurance companies for the sale of policies." Similarly, the definition utilized by state and federal insurance regulators, as provided by the Market Regulation Handbook to determine if an incentive received by a producer or agent is a commission, is:

> **Definition:** Commission is the incentive received by the insurance agent or salesperson for the sales achieved in a given period.

> **Description:** Commission is generally paid as a percentage of the premium on the insurance policies. This proves as an efficient way of rewarding the concerned person wherein his rewards are directly proportional to the policies sold by him.

### D. Licensing is required for persons to receive commissions for soliciting, negotiating, or selling insurance.

21. With limited exceptions not applicable here, a person must be a licensed "producer" in order to solicit, negotiate, or sell insurance, and to receive a commission for those actions.  NAIC Producer Licensing Model Act (Model Law 218) outlines of the definition of a Producer, provides the licensing requirements for producers, and defines what qualifies as a commission payment.  The Model Act was adopted by all 50 states and five US territories, including the District of Columbia's D.C. Code §§ 31-1131.01 to 31-1131.19, and D.C. Mun Reg Title 26A 100-199, therefore the definition of "producer" and "commission" are consistent throughout the States.

22. The Model Act and D.C. Code §31-1131.02 define an "insurance producer" as "a person required to be licensed under the laws of this state to sell, solicit or negotiate insurance." The Act and statute then go on to define a "person" as "an individual or

business entity," and a "business entity" as "a corporation, association, partnership, limited liability company, limited liability partnership, or other legal entity."

23. D.C. Code §31-1131.03(a) goes on to state that "[a] person shall not sell, solicit, or negotiate insurance in the District for any class of insurance unless the person is licensed for that line of authority in accordance with this chapter. The license itself shall not create any authority in the licensee to represent or commit an insurance carrier."

24. Section 13 of the Model Act precludes the payment of commission or other valuable consideration to unlicensed producers:

 A. An insurance company or insurance producer shall not pay a commission, service fee, brokerage, or other valuable consideration to a person for selling, soliciting or negotiating insurance in this state if that person is required to be licensed under this Act and is not so licensed.

 B. A person shall not accept a commission, service fee, brokerage or other valuable consideration for selling, soliciting or negotiating insurance in this state if that person is required to be licensed under this Act and is not so licensed.

 C. Renewal or other deferred commissions may be paid to a person for selling, soliciting, or negotiating insurance in this state if the person was required to be licensed under this Act at the time of the sale, solicitation or negotiation and was so licensed at the time.

25. This language was adopted as D.C. Code §§ 31-1131.13-COMMISSIONS, which states:

 (a) An insurer or insurance producer shall not pay a commission, service fee, brokerage fee, or other valuable consideration to a person for selling, soliciting, or negotiating insurance in the District if that person is required to be licensed under this chapter and is not licensed.

 (b) A person shall not accept a commission, service fee, brokerage fee, or other valuable consideration for selling, soliciting, or negotiating insurance in the District if that person is required to be licensed under this chapter and is not licensed.

 (c) Renewal or other deferred commissions may be paid to a person for selling, soliciting, or negotiating insurance in the District if the person was required to be licensed under this chapter at the time of the sale, solicitation, or negotiation and was licensed at that time.

 (d) An insurer or insurance producer may pay or assign commissions, service fees, brokerage fees, or other valuable consideration to an insurance agency or to persons who do not sell, solicit, or negotiate insurance in the District unless the payment would violate this chapter or any other District law relating to insurance.

### E.  Record Evidence

26. AARP and ASI have entered into a contractual agreement with United Healthcare Insurance Company ("United") and Optum Services Inc. ("Optum," a United subsidiary) to underwrite and issue the AARP-branded Medicare Supplement plans.  In this arrangement, AARP serves as the non-profit organization through which the AARP-branded Medicare Supplement plans are offered to AARP members and issued by United. ASI works in conjunction with AARP, United, and Optum to market the AARP-branded Medicare Supplement plans. Premium payments for AARP -branded Medicare Supplement plans are collected through the AARP Trust and subsequently submitted to United.[5]

27. As a member benefit, AARP provides access to AARP Medicare Supplemental Coverage insurance plans. Each of these insurance products are offered and sold by AARP to its members through an exclusive agreement with United. AARP advertises these products through print and online marketing materials presented to members and potential members.[6]

28. A review of the marketing materials presented in print and online show that the materials are consistently co-branded with the AARP logo and the United logo. The co-branding appears to be required by contractual agreements between AARP and United.[7] Through the consistent co-branding, AARP urges its members or potential members to apply for and purchase AARP Medicare Supplemental Coverage from United (i.e., from a particular company). Additionally, all marketing materials reviewed contain the disclaimer that "This is a solicitation of insurance. A licensed agent/producer may contact you."[8]

29. AARP and ASI are significantly involved in AARP Medigap marketing efforts. ASI works closely with United on AARP marketing strategy. ASI conducts analyses designed to

████████████████████████████████████████████[9]██

████████████████████████████████[10]████████████

---

[5] Agreement—AARP, AARP TRUST, United, dated February 26, 1997 (provides the contractual obligations between the parties, AARP, AARP Trust, and United).

[6] AARP Health Medicare Supplement Plans TV Commercial, 'Get The Ball Rolling' – iSpot.tv – YouTube.

[7] As presented in the Amendment No. 1 Relationship Agreement, 7/3/2017: 

[8] *See, e.g.*, AARP_KRUKAS_0000220; AARP_KRUKAS_0000263; AARP_KRUKAS_0000271.

[9] AARP_KRUKAS_0033984.

[10] AARP_KRUKAS_0047556 at '568; *see also* AARP_KRUKAS_0036870 at '877.

 [11] These efforts were in fact intended to ███████████████████████ ████ [12]

30. Defendants administer and oversee the AARP Medigap program, generally. ██████ ████████████████████████████████; [13] h██████████████████████████████████████ ██████████████████████████████████ [14] a██████████████████ ████████████████████████ [15]

31. Premiums charged for members who purchase AARP-branded products are collected by the AARP Trust.  The Trust then forwards 4.95% of that payment to AARP. The remainder goes to United for premium payments:[16]

---

[11] *See, e.g.*, AARP_KRUKAS_0020783 at slide 4; AARP_KRUKAS_0031814.

[12] AARP_KRUKAS_0037170 at '172.

[13] *See* AARP_KRUKAS_0020777; AARP_KRUKAS_0018344; AARP_KRUKAS_0018345.

[14] *See* AARP_KRUKAS_0037327; *see also* AARP_KRUKAS_0021526 at slide 62; AARP_KRUKAS_0034083.

[15] *See, e.g.*, AARP_KRUKAS_0020282 at '284; AARP_KRUKAS_0033945; AARP_KRUKAS_0017635.

[16] AARP_KRUKAS_0018026 at '045.



32. According to the terms of the Relationship Agreement, an individual must be an AARP member to purchase the AARP-branded Medicare Supplement products sold through United, and AARP membership is automatically renewed when members join or renew the United plans.

## V.  OPINION

33. Based on my experience, as well as the commonly understood meaning of the terms and concepts discussed above and the documents reviewed, it is my opinion that AARP and its affiliates are operating in the capacity of a producer and collecting insurance commissions in the form of fees identified as "royalties" without having the appropriate license.

34. Specifically, Defendants were involved in the development of products, distribution channels, marketing, and oversight of the AARP-branded Medicare Supplement products. They are engaged in soliciting insurance through these activities because they are urging members and potential members to purchase Medicare Supplement products from United and benefitting directly from that purchase.

35. In addition, by soliciting insurance and collecting premiums, AARP is selling insurance, i.e., it is causing the exchange of insurance because the policies do not become effective until Defendants collect the premium.

36. Further, a fee in the amount of 4.95% is collected monthly by AARP based on the amount of premiums paid by the members for new and renewed policies. This is a commission. The amount paid is variable based on the premium amount and is contingent upon the purchase of a policy. If a policy is not purchased, the fee is not paid. This is in contrast to a one-time, nominal referral fee, which can be collected regardless of the purchase of a policy. Additionally, the catalyst for receiving the fee is the sale of an insurance policy. The fee would not be paid unless the policy is sold, and therefore is tied directly to the policy. This fee is valuable consideration for selling, soliciting, and negotiating insurance.

37. It appears based on my experience, that AARP engaged in all of these insurance related activities without being a licensed insurance producer.

38. The determination above can be applied on a class wide basis. to consumers in all U.S. jurisdictions.

## VI. MATERIALS REVIEWED

39. To form an opinion of the facts presented, the contracted experts reviewed contracts, marketing materials, and other information to provide their assessment and opinion. The list of documents and materials reviewed is cited herein and/or included herein as Attachment 3.

## VII. COMMENTS

40.  My understanding of the facts in this case is based upon a preliminary assessment of the documents available to date. If additional documents are presented that may alter the facts presented, and my findings may change.


I declare under penalty of perjury under the laws of the State of Nebraska that the foregoing is true and correct.

Executed on this 8th day of January 2021.

_Holly L. Blanchard_
_____

Holly Blanchard

ATTACHMENT 1



## HOLLY BLANCHARD

Phone: (402) 217-7745
Email: hblanchard@riaconsulting.net

---

## EMPLOYMENT

**Regulatory Insurance Advisors**                                    January 2016 – Present
*President*:                                                         Lincoln, NE

Oversees the daily operations and strategic growth of Regulatory Insurance Advisors (RIA). Provides regulatory services for state and federal regulators and oversees a team of insurance experts to provide exceptional regulatory consulting and compliance for our clients. Areas of focus includes: comprehensive market conduct examinations; specialty and targeted market conduct examinations;  risk-assessments for insurers and regulators; creating examination templates and training processes; ACA regulation; Mental Health and Substance Use Disorder parity regulation; Property and Casualty examinations; product filing development and compliance; student health plan expertise; annuity suitability; ACL sampling; and developing market regulation best practices for insurers and regulators.

**Examination Resources**                                            July 2013 – December 2015
*Director*:                                                          Atlanta, GA

Oversaw a team of form filing reviews and market conduct examiners in providing services to the Center for Consumer Information and Insurance Oversight (CCIIO) for reviewing product filings and market conduct examinations on the ACA direct enforcement states. Provided guidance, training and supervision on various projects, including state and federal ACA examinations. Provided guidance and oversight on special projects for state and federal regulators, including overseeing Network Adequacy and Deficiency Reviews, and targeted examinations in an advisory role.

**Nebraska Department of Insurance**                                 February 2005 - July 2013

*Life and Health Administrator*:                                     Lincoln, NE

Regulatory Compliance and Oversight:  Oversaw the rates and form filings for all Life and Annuities, Accident and Sickness and Health policies, including the ACA. Provided, in-depth knowledge of insurance operations and products, producer licensing and oversight as well as extensive knowledge on state statues, regulations and NAIC model laws to interested parties. Lead division in being one of the most effective and efficient in the country by increasing productivity and accuracy and decreasing our turnaround time on filings. Additionally, served on several NAIC Committees and Subcommittees and assisted with editing the Market Regulation Handbook. Worked closely with the Federal Regulators, State Legislatures, and Insurance Companies for the implementation of the Affordable Care Act in the State of Nebraska.

*Project Director:*

Served as the Project Director for the Rate Review Grant established under the Patient Protection and Affordable Care Act (PPACA).  As the Project Director, established and implemented enhancements and requirements for premium rates submitted on Major Medical policies.  In this capacity interacted frequently with the Federal CCIO staff on reporting requirements, federal regulations, and budget operations. Established the original interactive web-based tool for rate information in Nebraska to provide transparency on rate filings to the Nebraska consumers.

*Market Conduct Senior Examiner/Examiner in Charge:*

Performed comprehensive and targeted market conduct examinations on companies and agents in Life and Health and Property and Casualty insurers.  As an Examiner in Charge, worked closely with the examination

team to identify areas of non-compliance on market regulation aspects of the company such as: Operations and Management; Producer Licensing, Underwriting, Marketing and Sales; Policyholder Services; Forms and Rates; Complaints and Claims. Managed the examination from beginning to end, including ensuring comprehensive documentation was compiled, communication with the company was clear and frequent, and statutory violations were identified.  Created comprehensive reports and corrective actions based on findings and violations.

## EDUCATION
- Speech Pathology, University of Nebraska, Lincoln
- Bachelor of Science, Business Administration, Nebraska Wesleyan University
  - Minor in Communication
  - Minor in Marketing
- Cornell University, Executive Women in Leadership Certificate, March 2020

## PROFESSIONAL CREDENTIALS
- Market Conduct Management (MCM) designation
- Accredited Insurance Examiner (AIE) designation
- Fellow, Life Management Institute (FLMI)
- Accredited Insurance Examiner (AIE)
- Certified Compliance Professional (CCP)
- Accredited Insurance Professional (ACP)
- Certificate in general Insurance (INS)

## PROFESSIONAL ACTIVITIES AND AFFILIATIONS
- Maiden Holding Board of Directors
  - Audit Committee
  - Corporate Governance Committee
  - Compensation Committe
- IRES Board of Directors, Executive Committee – 2010 through 2014
- IRES Board of Directors – 2006 through current
- AICP Board of Directors-2017 through 2019
- National Small Business Association-Leadership Council 2016 through current

## PRESENTATIONS, PUBLICATIONS & TRAINING
- Association of Insurance Compliance Professionals (AICP) Annual Conference
  - *Intro to Compliance (2020)-Podcast*
  - *Oversight of MEWA's and Association Groups (2020)*
  - *Disability Income and PSO laws (2019)*
  - *Rule Making and Rule Breaking; Short Term Limited Duration Medical Policies (2019)*
  - *Mental Health Parity (2018)*
  - *Short Duration Health Plans (2018)*
  - *Hot Topics in Health Insurance (2017)*
  - *Walking the Line: Knowing if your product is in or out of the ACA (2017)*

- Insurance Regulatory Examiners Society (IRES) Career Development Seminar
  - *Into the Market Conduct Examination (2020)*
  - *Oversight of the Affordable Care Act (2019)*
  - *Regulating Third Parties (2019)*
  - *Short-Term Limited Duration Insurance Cont (2019)*
  - *Short Term Duration Plans (2018)*
  - *Hot Topics in Health Insurance (2018)*
  - *1332 Waivers (2017)*

- o  *Deep dive into the Mental Health Parity and Addiction Act (2017)*
- o  *The Evolution of Excepted Benefits in the current era of Healthcare Reform (2017)*
- o  *Disability Income (2017)*
- o  *ACA for Dummies (2015)*
- o  *ACA Implementation, A changing Landscape (2016)*
- o  *"Think Tank": Emerging Regulatory Issues (2016, 2017 and 2018)*

- IRES Foundation Market Conduct School
  - o  *Market Conduct 101 (2018)*
  - o  *ACA-The Next Phase- Examinations (2017)*
  - o  *ACA-We're not done yet (2016)*
  - o  *Cybersecurity (2015)*

- LOMA
  - o  *LOMA 301 Course Instructor (2015)*

- Society of Actuaries Annual Health Meeting 2017
  - o  *Rating and Market Regulation for ACA Products*

ATTACHMENT 2

NAIC Model Laws, Regulations, Guidelines and Other Resources—January 2004

# UNFAIR TRADE PRACTICES ACT

**Table of Contents**

Section 1.        Purpose
Section 2.        Definitions
Section 3.        Unfair Trade Practices Prohibited
Section 4.        Unfair Trade Practices Defined
Section 5.        Favored Agent or Insurer; Coercion of Debtors
Section 6.        Power of Commissioner
Section 7.        Hearings, Witnesses, Appearances, Production of Books,
                  and Service of Process
Section 8.        Cease and Desist and Penalty Orders
Section 9.        Judicial Review of Orders
Section 10.       Judicial Review by Intervenor
Section 11.       Penalty for Violation of Cease and Desist Orders
Section 12.       Regulations
Section 13.       Provisions of Act Additional to Existing Law
Section 14.       Immunity from Prosecution
Section 15.       Separability Provision

**Prefatory Note:** By adopting amendments to this model act in June 1990, the NAIC separated provisions dealing with unfair claims settlement into a newly adopted Unfair Claims Settlement Practices Model Act, to make clearer distinction between general unfair trade practices and more specific unfair claim settlement issues and to focus on market conduct practices and market conduct regulation. By doing so, the NAIC is not recommending that states repeal existing acts, but states may modify them for the purpose of capturing the substantive changes. However, for those states wishing to completely rewrite their comprehensive approach to unfair claims practices, this separation of unfair claims from unfair trade practices is recommended.

## Section 1.        Purpose

The purpose of this Act is to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945 (Public Law 15, 79th Congress) and the Gramm-Leach-Bliley Act (Public Law 106-102, 106th Congress), by defining, or providing for the determination of, all such practices in this state that constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined. Nothing herein shall be construed to create or imply a private cause of action for a violation of this Act.

## Section 2.        Definitions

When used in this Act:

A.        "Affiliate" means any company that controls, is controlled by, or is under common control with another company.

B.        "Commissioner" means the commissioner of insurance of this state.

**Drafting Note**: Insert the appropriate term for the chief insurance regulatory official wherever the term "commissioner" appears.

C.        "Customer" means an individual who purchases, applies to purchase, or is solicited to purchase insurance products primarily for personal, family or household purposes.

D.        "Depository institution" means a bank or savings association. The term depository institution does not include an insurance company.

E.        "Insured" means the party named on a policy or certificate as the individual with legal rights to the benefits provided by such policy.

F.      "Insurer" means any person, reciprocal exchange, interinsurer, Lloyd's insurer, fraternal benefit society, and any other legal entity engaged in the business of insurance, including producers, adjusters and third-party administrators. Insurer shall also mean medical service plans, hospital service plans, health maintenance organizations, prepaid limited health care service plans, dental, optometric and other similar health service plans as defined in Sections [insert applicable section]. For purposes of this Act, these foregoing entities shall be deemed to be engaged in the business of insurance.

**Drafting Note:** Each state may wish to consider the advisability of defining "insurance" for purposes of this Act if its present insurance code is not satisfactory in this regard. In some cases a cross reference will be sufficient.

G.      "Person" means a natural or artificial entity, including but not limited to, individuals, partnerships, associations, trusts or corporations.

H.      "Policy" or "certificate" means a contract of insurance, indemnity, medical, health or hospital service, suretyship, or annuity issued, proposed for issuance, or intended for issuance by any insurer.

I.      "Producer" means a person required to be licensed under the laws of this state to sell, solicit, or negotiate insurance.

## Section 3.      Unfair Trade Practices Prohibited

It is an unfair trade practice for any insurer to commit any practice defined in Section 4 of this Act if:

A.      It is committed flagrantly and in conscious disregard of this Act or of any rules promulgated hereunder; or

B.      It has been committed with such frequency to indicate a general business practice to engage in that type of conduct.

## Section 4.      Unfair Trade Practices Defined

Any of the following practices, if committed in violation of Section 3, are hereby defined as unfair trade practices in the business of insurance:

A.      Misrepresentations and False Advertising of Insurance Policies. Making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison that:

(1)      Misrepresents the benefits, advantages, conditions or terms of any policy; or

(2)      Misrepresents the dividends or share of the surplus to be received on any policy; or

(3)      Makes a false or misleading statement as to the dividends or share of surplus previously paid on any policy; or

(4)      Is misleading or is a misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates; or

(5)      Uses any name or title of any policy or class of policies misrepresenting the true nature thereof; or

(6)      Is a misrepresentation, including any intentional misquote of premium rate, for the purpose of inducing or tending to induce the purchase, lapse, forfeiture, exchange, conversion or surrender of any policy; or

(7)      Is a misrepresentation for the purpose of effecting a pledge or assignment of or effecting a loan against any policy; or

(8)      Misrepresents any policy as being shares of stock.

                                                      © 2004 National Association of Insurance Commissioners

B.      False Information and Advertising Generally. Making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly to be made, published, disseminated, circulated, or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any insurer in the conduct of its insurance business, which is untrue, deceptive or misleading.

C.      Defamation. Making, publishing, disseminating, or circulating, directly or indirectly, or aiding, abetting or encouraging the making, publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article or literature which is false, or maliciously critical of or derogatory to the financial condition of any insurer, and which is calculated to injure such insurer.

D.      Boycott, Coercion and Intimidation. Entering into any agreement to commit, or by any concerted action committing any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance.

E.      False Statements and Entries.

        (1)     Knowingly filing with any supervisory or other public official, or knowingly making, publishing, disseminating, circulating or delivering to any person, or placing before the public, or knowingly causing directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of an insurer.

        (2)     Knowingly making any false entry of a material fact in any book, report or statement of any insurer or knowingly omitting to make a true entry of any material fact pertaining to the business of such insurer in any book, report or statement of such insurer, or knowingly making any false material statement to any insurance department official.

F.      Stock Operations and Advisory Board Contracts. Issuing or delivering or permitting agents, officers or employees to issue or deliver, agency company stock or other capital stock, or benefit certificates or shares in any common law corporation, or securities or any special or advisory board contracts or other contracts of any kind promising returns and profits as an inducement to purchase insurance.

G.      Unfair Discrimination.

        (1)     Making or permitting any unfair discrimination between individuals of the same class and equal expectation of life in the rates charged for any life insurance policy or annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such policy.

        (2)     Making or permitting any unfair discrimination between individuals of the same class and of essentially the same hazard in the amount of premium, policy fees or rates charged for any accident or health insurance policy or in the benefits payable thereunder, or in any of the terms or conditions of such policy, or in any other manner.

**Drafting Note:** In the event that unfair discrimination in connection with accident and health coverage is treated in other statutes, this paragraph should be omitted.

        (3)     Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazard by refusing to insure, refusing to renew, canceling or limiting the amount of insurance coverage on a property or casualty risk solely because of the geographic location of the risk, unless such action is the result of the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience.

(4)     Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to insure, refusing to renew, canceling or limiting the amount of insurance coverage on the residential property risk, or the personal property contained therein, solely because of the age of the residential property.

(5)     Refusing to insure, refusing to continue to insure, or limiting the amount of coverage available to an individual because of the sex, marital status, race, religion or national origin of the individual; however, nothing in this subsection shall prohibit an insurer from taking marital status into account for the purpose of defining persons eligible for dependent benefits. Nothing in this section shall prohibit or limit the operation of fraternal benefit societies.

(6)     To terminate, or to modify coverage or to refuse to issue or refuse to renew any property or casualty policy solely because the applicant or insured or any employee of either is mentally or physically impaired; provided that this subsection shall not apply to accident and health insurance sold by a casualty insurer and, provided further, that this subsection shall not be interpreted to modify any other provision of law relating to the termination, modification, issuance or renewal of any insurance policy or contract.

(7)     Refusing to insure solely because another insurer has refused to write a policy, or has cancelled or has refused to renew an existing policy in which that person was the named insured. Nothing herein contained shall prevent the termination of an excess insurance policy on account of the failure of the insured to maintain any required underlying insurance.

(8)     Violation of the state's rescission laws at [insert reference to appropriate code section].

**Drafting Note:** A state may wish to include this section if it has existing state laws covering rescission and to insert a reference to a particular code section.

H.     Rebates.

(1)     Except as otherwise expressly provided by law, knowingly permitting or offering to make or making any life insurance policy or annuity, or accident and health insurance or other insurance, or agreement as to such contract other than as plainly expressed in the policy issued thereon, or paying or allowing, or giving or offering to pay, allow, or give, directly or indirectly, as inducement to such policy, any rebate of premiums payable on the policy, or any special favor or advantage in the dividends or other benefits thereon, or any valuable consideration or inducement whatever not specified in the policy; or giving, or selling, or purchasing or offering to give, sell, or purchase as inducement to such policy or annuity or in connection therewith, any stocks, bonds or other securities of any insurance company or other corporation, association or partnership, or any dividends or profits accrued thereon, or anything of value whatsoever not specified in the policy.

(2)     Nothing in Subsection G, or Paragraph (1) of Subsection H shall be construed as including within the definition of discrimination or rebates any of the following practices:

(a)     In the case of life insurance policies or annuities, paying bonuses to policyholders or otherwise abating their premiums in whole or in part out of surplus accumulated from nonparticipating insurance, provided that any such bonuses or abatement of premiums shall be fair and equitable to policyholders and for the best interests of the company and its policyholders;

(b)     In the case of life insurance policies issued on the industrial debit plan, making allowance to policyholders who have continuously for a specified period made premium payments directly to an office of the insurer in an amount that fairly represents the saving in collection expenses;

(c)     Readjusting the rate of premium for a group insurance policy based on the loss or expense thereunder, at the end of the first or any subsequent policy year of insurance thereunder, which may be made retroactive only for such policy year; or

© 2004 National Association of Insurance Commissioners

(d)    Engaging in an arrangement that would not violate Section 106 of the Bank Holding Company Act Amendments of 1972 (12 U.S.C. 1972), as interpreted by the Board of Governors of the Federal Reserve System, or Section 5(q) of the Home Owners' Loan Act, 12 U.S.C. 1464(q).

**Drafting Note:** Section 104 (d)(2)(B)(viii) of the Gramm-Leach-Bliley Act provides that any state restrictions on anti-tying may not prevent a depository institution or affiliate from engaging in any activity that would not violate Section 106 of the Bank Holding Company Act Amendments of 1970, as interpreted by the Board of Governors of the Federal Reserve System. The Board of Governors of the Federal Reserve System has stated that nothing in its interpretation on combined-balance discount arrangements is intended to override any other applicable state and federal law. FRB SR 95-32 (SUP). Section 5(q) of the Home Owners' Loan Act is the analogous provision to Section 106 for thrift institutions. The Office of Thrift Supervision has a regulation 12 C.F.R. 563.36 that allows combined-balance discounts if certain requirements are met.

**Drafting Note:** Each state may wish to examine its rating laws to assure that they contain sufficient provision against rebating. If they do not, this section might be expanded to cover all lines of insurance.

I.    **Prohibited Group Enrollments.** No insurer shall offer more than one group policy of insurance through any person unless such person is licensed, at a minimum, as a limited insurance representative. However, this prohibition shall not apply to employer/employee relationships, nor to any such enrollments.

J.    **Failure to Maintain Marketing and Performance Records.** Failure of an insurer to maintain its books, records, documents and other business records in such an order that data regarding complaints, claims, rating, underwriting and marketing are accessible and retrievable for examination by the insurance commissioner. Data for at least the current calendar year and the two (2) preceding years shall be maintained.

K.    **Failure to Maintain Complaint Handling Procedures.** Failure of any insurer to maintain a complete record of all the complaints it received since the date of its last examination under Section [insert applicable section]. This record shall indicate the total number of complaints, their classification by line of insurance, the nature of each complaint, the disposition of each complaint, and the time it took to process each complaint. For purposes of this subsection, "complaint" shall mean any written communication primarily expressing a grievance.

L.    **Misrepresentation in Insurance Applications.** Making false or fraudulent statements or representations on or relative to an application for a policy, for the purpose of obtaining a fee, commission, money or other benefit from any provider or individual person.

M.    **Unfair Financial Planning Practices.** An insurance producer:

(1)    Holding himself or herself out, directly or indirectly, to the public as a "financial planner," "investment adviser," "consultant," "financial counselor," or any other specialist engaged in the business of giving financial planning or advice relating to investments, insurance, real estate, tax matters or trust and estate matters when such person is in fact engaged only in the sale of policies. This provision does not preclude persons who hold some form of formal recognized financial planning or consultant certification or designation from using this certification or designation when they are only selling insurance. This does not permit persons to charge an additional fee for services that are customarily associated with the solicitation, negotiation or servicing of policies.

(2)    (a)    Engaging in the business of financial planning without disclosing to the client prior to the execution of the agreement provided for in Paragraph 3, or solicitation of the sale of a product or service that

(i)    He or she is also an insurance salesperson, and

(ii)    That a commission for the sale of an insurance product will be received in addition to a fee for financial planning, if such is the case.

(b)    The disclosure requirement under this subsection may be met by including it in any disclosure required by federal or state securities law.

Unfair Trade Practices Act

(3)    (a)    Charging fees other than commissions for financial planning by insurance producer, unless such fees are based upon a written agreement, signed by the party to be charged in advance of the performance of the services under the agreement. A copy of the agreement must be provided to the party to be charged at the time the agreement is signed by the party.

(i)    The services for which the fee is to be charged must be specifically stated in the agreement.

(ii)    The amount of the fee to be charged or how it will be determined or calculated must be specifically stated in the agreement.

(iii)    The agreement must state that the client is under no obligation to purchase any insurance product through the insurance producer or consultant.

**Drafting Note**: This subsection is intended to apply only to persons engaged in personal financial planning.

(b)    The insurance producer shall retain a copy of the agreement for not less than three (3) years after completion of services, and a copy shall be available to the commissioner upon request.

N.    Failure to file or to certify information regarding the endorsement or sale of long-term care insurance. Failure of any insurer to:

(1)    File with the insurance department the following material:

(a)    The policy and certificate;

(b)    A corresponding outline of coverage; and

(c)    All advertisements requested by the insurance department; or

(2)    Certify annually that the association has complied with the responsibilities for disclosure, advertising, compensation arrangements, or other information required by the commissioner, as set forth by regulation.

O.    Failure to Provide Claims History

(1)    Loss Information—Property and Casualty. Failure of a company issuing property and casualty insurance to provide the following loss information for the three (3) previous policy years to the first named insured within thirty (30) days of receipt of the first named insured's written request:

(a)    On all claims, date and description of occurrence, and total amount of payments; and

(b)    For any occurrence not included in Subparagraph (a) of this paragraph, the date and description of occurrence.

(2)    Should the first named insured be requested by a prospective insurer to provide detailed loss information in addition to that required under Paragraph (1), the first named insured may mail or deliver a written request to the insurer for the additional information. No prospective insurer shall request more detailed loss information than reasonably required to underwrite the same line or class of insurance. The insurer shall provide information under this subparagraph to the first named insured as soon as possible, but in no event later than twenty (20) days of receipt of the written request. Notwithstanding any other provision of this section, no insurer shall be required to provide loss reserve information, and no prospective insurer may refuse to insure an applicant solely because the prospective insurer is unable to obtain loss reserve information.

© 2004 National Association of Insurance Commissioners

(3)     The commissioner may promulgate regulations to exclude the providing of the loss information as outlined in Paragraph (1) for any line or class of insurance where it can be shown that the information is not needed for that line or class of insurance, or where the provision of loss information otherwise is required by law.

**Drafting Note:** Loss information on workers' compensation is an example in some states of loss information otherwise required by law.

(4)     Information provided under Paragraph (2) shall not be subject to discovery by any party other than the insured, the insurer and the prospective insurer.

**Drafting Note:** This provision may not be required in states that have a privacy act that governs consumer access to this information. Those states considering applying this requirement to life, accident and health lines of insurance should first review their state privacy act related to issues of confidentiality of individual insured information.

P.     Violating any one of Sections [insert applicable sections].

**Drafting Note:** Insert section numbers of any other sections of the state's insurance laws deemed desirable or necessary to include as an unfair trade practice, such as cancellation and nonrenewal laws.

## Section 5.     Favored Agent or Insurer; Coercion of Debtors

A.     No person or depository institution, or affiliate of a depository institution may require as a condition precedent to the lending of money or extension of credit, or any renewal thereof, that the person to whom such money or credit is extended or whose obligation a creditor is to acquire or finance, negotiate any policy or renewal thereof through a particular insurer or group of insurers or agent or broker or group of agents or brokers. Further, no person or depository institution, or affiliate of a depository institution, may reject an insurance policy solely because the policy has been issued or underwritten by a person who is not associated with the depository institution or affiliate when insurance is required in connection with a loan or extension of credit.

B.     No person or depository institution, or affiliate of a depository institution, who lends money or extends credit may:

(1)     As a condition for extending credit or offering any product or service that is equivalent to an extension of credit, require that a customer obtain insurance from a depository institution or an affiliate of a depository institution, or a particular insurer or producer. However, this provision does not prohibit a person or depository institution, or affiliate of a depository institution, from informing a customer or prospective customer that insurance is required in order to obtain a loan or credit, or that loan or credit approval is contingent upon the procurement by the customer of acceptable insurance, or that insurance is available from the person or depository institution, or affiliate of a depository institution;

(2)     Unreasonably reject a policy furnished by the customer or borrower for the protection of the property securing the credit or lien. A rejection shall not be deemed unreasonable if it is based on reasonable standards, uniformly applied, relating to the extent of coverage required and the financial soundness and the services of an insurer. Such standards shall not discriminate against any particular type of insurer, nor shall such standards call for rejection of a policy because it contains coverage in addition to that required in the credit transaction;

(3)     Require that any customer, borrower, mortgagor, purchaser, insurer, broker or agent pay a separate charge, in connection with the handling of any policy required as security for a loan on real estate, or pay a separate charge to substitute the policy of one insurer for that of another. This paragraph does not include the interest that may be charged on premium loans or premium advancements in accordance with the terms of the loan or credit document. Further, this paragraph does not apply to charges that would be required when the person or depository institution or affiliate of a depository institution is the licensed producer providing the insurance;

Unfair Trade Practices Act

(4)     Require any procedures or conditions of duly licensed producers or insurers not customarily required of those producers or insurers affiliated or in any way connected with the person who lends money or extends credit;

(5)     Use an advertisement or other insurance promotional material that would cause a reasonable person to mistakenly believe that the federal government or the state is responsible for the insurance sales activity of, or stands behind the credit of, the person, depository institution or its affiliate;

(6)     Use an advertisement or other insurance promotional material that would cause a reasonable person to mistakenly believe that the federal government or the state guarantees any returns on insurance products or is a source of payment on any insurance obligation of or sold by the person, depository institution or its affiliate;

(7)     Act as a producer unless properly licensed in accordance with [insert appropriate statutory provisions for producer licensing];

(8)     Pay or receive any commission, brokerage fee or other compensation as a producer, unless the person holds a valid producer's license for the applicable class of insurance. However, an unlicensed person may make a referral to a licensed producer provided that the person does not discuss specific insurance policy terms and conditions. The unlicensed person may be compensated for the referral; however, in the case of a referral of a customer, the unlicensed person may be compensated only if the compensation is a fixed dollar amount for each referral that does not depend on whether the customer purchases the insurance product from the licensed producer. Furthermore, any person who accepts deposits from the public in an area where such transactions are routinely conducted in the depository institution may receive for each customer referral no more than a one-time, nominal fee of a fixed dollar amount for each referral that does not depend on whether the referral results in a transaction;

**Drafting Note:** The last sentence of this paragraph further limits the referral for customers of personal, family and household insurance products as a result of Section 305 of the Gramm-Leach-Bliley Act and the subsequent adoption of regulations by the federal banking regulators at 12 C.F.R. 14.50, 208.85, 343.50 and 536.50. By including this language the paragraph will be consistent with the Gramm-Leach-Bliley Act and the federal regulations while maintaining the integrity of Section 104(d)(2)(B)(iv) and (v) of the Gramm-Leach-Bliley Act.

(9)     Solicit or sell insurance, other than credit insurance or flood insurance, unless the solicitation or sale is completed through documents separate from any credit transactions;

(10)     Include the expense of insurance premiums, other than credit insurance premiums or flood insurance premiums, in the primary credit transaction without the express written consent of the customer;

(11)     Solicit or sell insurance unless its insurance sales activities are, to the extent practicable, physically separated from areas where retail deposits are routinely accepted by depository institutions; or

(12)     Solicit or sell insurance unless it maintains separate and distinct books and records relating to the insurance transactions, including all files relating to and reflecting consumer complaints.

**Drafting Note:** The Gramm-Leach-Bliley Act contains two "safe harbors" that relate to information sharing. Section 104(d)(2)(B)(vi) describes the circumstances surrounding the release of a customer's insurance information. Section 104(d)(2)(B)(vii) describes the circumstances surrounding the use of a customer's health information obtained from the insurance records of the customer. If a state has adopted the NAIC's Privacy of Consumer Financial and Health Information Model Regulation, no further action is needed. If not, language implementing the two safe harbors should be considered. It should be noted, however, that during the drafting process, there were concerns expressed about the application of the preemption provisions of the Fair Credit Reporting Act (FCRA) in circumstances involving the sharing of information with affiliates. Nothing in this Act shall be construed to modify, limit or supersede the operation of the FCRA (15 U.S.C. 1681 *et seq.*). In addition, no inference shall be drawn on the basis of the provisions of this Act regarding whether information is transaction or experience information under Section 603 of FCRA.

                         © 2004 National Association of Insurance Commissioners

C.      Every person or depository institution, or affiliate of a depository institution that lends money or extends credit and who solicits insurance primarily for personal, family or household purposes shall disclose to the customer in writing that the insurance related to the credit extension may be purchased from an insurer or producer of the customer's choice, subject only to the lender's right to reject a given insurer or agent as provided in Subsection B(2). Further, the disclosure shall inform the customer that the customer's choice of insurer or producer will not affect the credit decision or credit terms in any way, except that the depository institution may impose reasonable requirements concerning the creditworthiness of the insurer and the scope of coverage chosen as provided in Subsection B(2).

D.      (1)      A depository institution that solicits, sells, advertises or offers insurance, and any person who solicits, sells, advertises or offers insurance on behalf of a depository institution or on the premises of a depository institution shall disclose to the customer in writing, where practicable and in a clear and conspicuous manner, prior to a sale, that the insurance:

        (a)      Is not a deposit;

        (b)      Is not insured by the Federal Deposit Insurance Corporation or any other federal government agency;

        (c)      Is not guaranteed by the depository institution, its affiliate (if applicable) or any person that is soliciting, selling, advertising or offering insurance (if applicable); and

        (d)      Where appropriate, involves investment risk, including the possible loss of value.

        (2)      For purposes of these requirements, an affiliate of a depository institution is subject to these requirements only to the extent that it sells, solicits, advertises, or offers insurance products or annuities at an office of a depository institution or on behalf of a depository institution. These requirements apply only when an individual purchases, applies to purchase, or is solicited to purchase insurance products or annuities primarily for personal, family or household purposes and only to the extent that the disclosure would be accurate.

**Drafting Note:** The requirements of this provision are meant to apply only when the consumer may have a reasonable belief that the product is a deposit; that it is insured by the Federal Deposit Insurance Corporation; that it is guaranteed by the person or depository institution; and that, where appropriate, it involves investment risk, including the possible loss of value. This provision is not intended to require every entity or person in a financial holding company to provide the disclosure as a result of having both solicitation of insurance and extending of credit or lending of money occurring within an entity in the financial holding company group.

        (3)      A depository institution that solicits, sells, advertises or offers insurance, and any person who solicits, sells, advertises or offers insurance on behalf of a depository institution or on the premises of a depository institution shall obtain written acknowledgement of the receipt of the disclosure from the customer at the time the customer receives the disclosure or at the time of the initial purchase of the insurance policy. If the solicitation is conducted by telephone, the person or depository institution shall obtain an oral acknowledgement of receipt of the disclosure, maintain sufficient documentation to show that the acknowledgment was given by the customer, and make reasonable efforts to obtain a written acknowledgment from the customer. If a customer affirmatively consents to receiving the disclosures electronically and if the disclosures are provided in a format that the customer may retain or obtain later, the person or depository institution may provide the disclosure and obtain acknowledgement of the receipt of the disclosure from the customer using electronic media.

        (4)      For the purposes of Paragraph (1), a person is selling, soliciting, advertising or offering insurance on behalf of a depository institution, whether at an office of the depository institution or another location, if at least one of the following applies:

        (a)      The person represents to the customer that the sale, solicitation, advertisement or offer of the insurance is by or on behalf of the depository institution;

Unfair Trade Practices Act

(b)    The depository institution refers a customer to the person who sells insurance and the depository institution has a contractual arrangement to receive commissions or fees derived from the sale of insurance resulting from the referral; or

(c)    Documents evidencing the sale, solicitation, advertisement or offer of insurance identify or refer to the depository institution.

E.    The commissioner shall have the power to examine and investigate those insurance activities of any person, depository institution, affiliate of a depository institution or insurer that the commissioner believes may be in violation of this section. The person, depository institution, affiliate of a depository institution or insurer shall make its insurance books and records available to the commissioner and the commissioner's staff for inspection upon reasonable notice. An affected person may submit to the commissioner a complaint or material pertinent to the enforcement of this section.

F.    Nothing herein shall prevent a person or depository institution, or affiliate of a depository institution, who lends money or extends credit from placing insurance on real or personal property in the event the mortgagor, borrower or purchaser has failed to provide required insurance in accordance with the terms of the loan or credit document.

G.    Nothing contained in this section shall apply to credit related insurance.

**Drafting Note:** The consumer protection rules promulgated by the banking regulatory agencies pursuant to Section 305 of the Gramm-Leach-Bliley Act apply to retail sales practices, solicitations, advertising or offers of any insurance product or annuity. If a state has adopted the NAIC's Consumer Credit Insurance Model Act and Consumer Credit Insurance Model Regulation, no further action is needed. If not, the state should consider eliminating Subsection G.

## Section 6.    Power of Commissioner

The commissioner shall have power to examine and investigate the affairs of every person or insurer in this state in order to determine whether such person or insurer has been or is engaged in any unfair trade practice prohibited by this Act. However, in the case of depository institutions, the commissioner shall have the power to examine and investigate the insurance activities of depository institutions, in order to determine whether the depository institution has been or is engaged in any unfair trade practice prohibited by this Act. The commissioner shall notify the appropriate federal banking agency of the commissioner's intent to examine or investigate a depository institution and advise the appropriate federal banking agency of the suspected violations of state law prior to commencing the examination or investigation.

## Section 7.    Hearings, Witnesses, Appearances, Production of Books, and Service of Process

A.    Whenever the commissioner shall have reason to believe that any insurer, person, depository institution or affiliate of a depository institution has been engaged or is engaging in this state in any unfair trade practice whether or not defined in this Act, and that a proceeding by the commissioner in respect thereto would be in the interest of the public, the commissioner shall issue and serve upon such insurer, person, depository institution or affiliate of a depository institution, a statement of the charges in that respect and a notice of a hearing thereon to be held at a time and place fixed in the notice, which shall not be less than [insert number] days after the date of the service thereof. With respect to a depository institution, the commissioner's authority to call a hearing is limited to the depository institution's insurance underwriting, sales, solicitation and cross marketing activities. The commissioner shall provide a copy of the notice of hearing to the appropriate federal banking agency when a depository institution is involved.

B.    At the time and place fixed for the hearing, the insurer, person, depository institution or affiliate of a depository institution shall have an opportunity to be heard and to show cause why an order should not be made by the commissioner requiring the insurer, person, depository institution or affiliate of a depository institution to cease and desist from the acts, methods or practices so complained of. Upon good cause shown, the commissioner shall permit any person to intervene, appear and be heard at the hearing by counsel or in person.

    © 2004 National Association of Insurance Commissioners

C.      Nothing contained in this Act shall require the observance at the hearing of formal rules of pleading or evidence.

D.      The commissioner, at the hearing, may administer oaths, examine and cross examine witnesses, receive oral and documentary evidence, and shall have the power to subpoena witnesses, compel their attendance, and require the production of books, papers, records, correspondence or other documents the commissioner deems relevant to the inquiry, provided, however, that in the case of depository institutions, the commissioner shall have the power to require the production of books, papers, records, correspondence or other documents that the commissioner deems relevant to the inquiry only on the insurance activities of the depository institution. The commissioner, may, and upon the request of any party, shall cause to be made a stenographic record of all the evidence and all the proceedings at the hearing. If no stenographic record is made and if a judicial review is sought, the commissioner shall prepare a statement of the evidence and proceeding for use on review. In case of a refusal of any person to comply with any subpoena or to testify with respect to any matter concerning which he may be lawfully interrogated, the [insert title] Court of [insert county] County or the county where the person resides, on application of the commissioner, may issue an order requiring such person to comply with the subpoena and to testify; and any failure to obey any order of the court may be punished by the court as contempt.

E.      Statements of charges, notices, orders and other processes of the commissioner under this Act may be served by anyone duly authorized by the commissioner, either in the manner provided by law for service of process in civil actions, or by registering and mailing a copy thereof to the person affected by the statement, notice, order or other process at the person's residence or principal office or place of business. The verified return by the person so serving the statement, notice, order, or other process, setting forth the manner of service, shall be proof of the same, and the return postcard receipt for the statement, notice, order or other process, registered and mailed as specified, shall be proof of the service of the same.

## Section 8.      Cease and Desist and Penalty Orders

A.      If, after a hearing, the commissioner finds that an insurer, person, depository institution or affiliate of a depository institution has engaged in an unfair trade practice, the commissioner shall reduce the findings to writing and shall issue and cause to be served upon the insurer, person, depository institution or affiliate of a depository institution charged with the violation, a copy of the findings in an order requiring the insurer, person, depository institution or affiliate of a depository institution to cease and desist from engaging in the act or practice and the commissioner may, at the commissioner's discretion order:

(1)      Payment of a monetary penalty of not more than $1,000 for each violation, but not to exceed an aggregate penalty of $100,000, unless the violation was committed flagrantly in a conscious disregard of this Act, in which case the penalty shall not be more than $25,000 for each violation not to exceed an aggregate penalty of $250,000; and/or

(2)      Suspension or revocation of the insurer's license if the insurer knew or reasonably should have known that it was in violation of this Act.

B.      In the case of a depository institution, the commissioner shall, if practicable, notify the appropriate federal regulator before imposing a monetary penalty on a depository institution or suspending or revoking the depository institution's insurer's license, and provide to the federal regulator a copy of the findings.

Unfair Trade Practices Act

**Section 9.          Judicial Review of Orders**

A.     An insurer, person, depository institution or affiliate of a depository institution subject to an order of the commissioner under Section 8 or Section 11 may obtain a review of the order by filing in the [insert title] Court of [insert county] County, within [insert number] days from the date of the service of the order, a written petition praying that the order of the commissioner be set aside. A copy of the petition shall be served upon the commissioner, and thereupon the commissioner shall certify and file in the court a transcript of the entire record in the proceeding, including all the evidence taken and the report and order of the commissioner. Upon filing of the petition and transcript, the court shall have jurisdiction of the proceeding and of the question determined therein, shall determine whether the filing of the petition shall operate as a stay of the order of the commissioner, and shall have power to make and enter upon the pleadings, evidence and proceedings set forth in the transcript a decree modifying, affirming or reversing the order of the commissioner, in whole or in part. The findings of the commissioner as to the facts, if supported by [insert type] evidence, shall be conclusive.

**Drafting Note:** Insert appropriate language to accommodate to local procedure the effect given the commissioner's determination.

B.     To the extent that the order of the commissioner is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of the order of the commissioner. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that the additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the commissioner, the court may order additional evidence to be taken before the commissioner and to be adduced upon the hearing in such manner and upon such terms and conditions as the court may deem proper. The commissioner may modify the findings of fact, or make new findings by reason of the additional evidence so taken, and shall file the modified or new findings that are supported by [insert type] evidence with a recommendation if any, for the modification or setting aside of the original order, with the return of the additional evidence.

**Drafting Note:** Insert appropriate language to accommodate to local procedure the effect given the commissioner's determination. In a state where final judgment, order or decree would not be subject to review by an appellate court provision therefor should be inserted here.

C.     An order issued by the commissioner under Section 8 shall become final:

    (1)     Upon the expiration of the time allowed for filing a petition for review if no such petition has been duly filed within such time; except that the commissioner may thereafter modify or set aside the order to the extent provided in Section 9B; or

    (2)     Upon the final decision of the court if the court directs that the order of the commissioner be affirmed or the petition for review dismissed.

D.     No order of the commissioner under this Act or order of a court to enforce the same shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this state.

**Section 10.          Judicial Review by Intervenor**

If after any hearing under Section 7 or Section 11, the report of the commissioner does not charge a violation of this Act, then any intervenor in the proceedings may within [insert number] days after the service of the report, cause a petition [notice of appeal] [petition for writ of certiorari] to be filed in the [insert title] Court of [insert county] County for a review of the report. Upon review, the court shall have authority to issue appropriate orders and decrees in connection therewith, including, if the court finds that it is to the interest of the public, orders enjoining and restraining the continuance of any method of competition, act or practice which it finds, notwithstanding the report of the commissioner, constitutes a violation of this Act, and containing penalties pursuant to Section 8.

**Drafting Note:** The type of procedure should conform to state procedure. See also note to Section 9 concerning review by appellate courts.

© 2004 National Association of Insurance Commissioners

**Section 11.**        **Penalty for Violation of Cease and Desist Orders**

Any insurer, person, depository institution or affiliate of a depository institution that violates a cease and desist order of the commissioner and while such order is in effect, may after notice and hearing and upon order of the commissioner, be subject at the discretion of the commissioner to:

A.        A monetary penalty of not more than $25,000 for each and every act or violation not to exceed an aggregate of $250,000 pursuant to any such hearing; and/or

B.        Suspension or revocation of the insurer's license.

**Section 12.**        **Regulations**

The commissioner may, after notice and hearing, promulgate reasonable rules, regulations and orders as are necessary or proper to carry out and effectuate the provisions of this Act. Such regulations shall be subject to review in accordance with Section [insert applicable section].

**Drafting Note:** Insert section number providing for review of administrative orders.

**Section 13.**        **Provisions of Act Additional to Existing Law**

The powers vested in the commissioner by this Act shall be additional to any other powers to enforce any penalties, fines or forfeitures authorized by law with respect to the methods, acts and practices hereby declared to be unfair or deceptive.

**Section 14.**        **Immunity From Prosecution**

If any person shall ask to be excused from attending and testifying or from producing any books, papers, records, correspondence or other documents at any hearing on the ground that the testimony or evidence required may tend to incriminate or subject the person to a penalty or forfeiture, and shall notwithstanding be directed to give testimony or produce evidence, the person shall nonetheless comply with the direction, but shall not thereafter be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which the person may testify or produce evidence thereto, and no testimony so given or evidence produced shall be received against the person upon any criminal action, investigation or proceeding; provided, however, that no person so testifying shall be exempt from prosecution or punishment for any perjury committed while so testifying and the testimony or evidence so given or produced shall be admissible against the person upon any criminal action, investigation or proceeding concerning such perjury, nor shall the person be exempt from the refusal, revocation or suspension of any license, permission or authority conferred, or to be conferred, pursuant to the Insurance Law of this state. Any such person may execute, acknowledge and file in the office of the commissioner a statement expressly waiving immunity or privilege in respect to any transaction, matter or thing specified in the statement and thereupon the testimony of the person or evidence in relation to the transaction, matter or thing may be received or produced before any judge or justice, court, tribunal, grand jury or otherwise, and if so received or produced the person shall not be entitled to any immunity or privilege on account of any testimony the person may give or evidence produced.

**Section 15.**        **Separability Provision**

If any provision of this Act, or the application of the provision to any person or circumstances, shall be held invalid, the remainder of the Act, and the application of the provision to person or circumstances other than those as to which it is held invalid, shall not be affected thereby.

Unfair Trade Practices Act

_____

*Chronological Summary of Actions (all references are to the Proceedings of the NAIC).*

*1947 Proc. 383, 392-400, 413 (adopted).*
*1960 Proc. II 485-487, 509-515, 516 (reprinted).*
*1972 Proc. I 15, 16, 443-444, 491, 493-501 (amended and reprinted).*
*1977 Proc. I 26, 28, 211, 226-227 (amended).*
*1979 Proc. II 31, 34, 38, 39, 525 (amended).*
*1985 Proc. I 19, 39, 85-86 (amended).*
*1989 Proc. II 13, 21, 129-130, 132, 133-140) (amended and reprinted).*
*1990 Proc. I 6, 25, 122, 146 (changed name of model).*
*1990 Proc. II 7, 13-14, 160, 169-177 (amended and reprinted).*
*1991 Proc. I 9, 16, 192-193, 196-203 (amended and reprinted).*
*1993 Proc. I 8, 136, 242, 246-254 (amended and reprinted).*
*1993 Proc. 1st Quarter 3, 34, 267, 274, 276 (amended).*
*2001 Proc. 2nd Quarter 7, 9, 836, 843-853 (amended and reprinted).*

© 2004 National Association of Insurance Commissioners

The NAIC amended this model during the 2008 Summer National Meeting. These amendments were adopted as guidelines under the NAIC's model laws process. The 2008 2nd Quarter Guideline Amendments are highlighted in grey.

## UNFAIR TRADE PRACTICES ACT

**Table of Contents**

Section 1.       Purpose
Section 2.       Definitions
Section 3.       Unfair Trade Practices Prohibited
Section 4.       Unfair Trade Practices Defined
Section 5.       Favored Agent or Insurer; Coercion of Debtors
Section 6.       Power of Commissioner
Section 7.       Hearings, Witnesses, Appearances, Production of Books,
                 and Service of Process
Section 8.       Cease and Desist and Penalty Orders
Section 9.       Judicial Review of Orders
Section 10.      Judicial Review by Intervenor
Section 11.      Penalty for Violation of Cease and Desist Orders
Section 12.      Regulations
Section 13.      Provisions of Act Additional to Existing Law
Section 14.      Immunity from Prosecution
Section 15.      Separability Provision

**Prefatory Note:** By adopting amendments to this model act in June 1990, the NAIC separated provisions dealing with unfair claims settlement into a newly adopted Unfair Claims Settlement Practices Model Act, to make clearer distinction between general unfair trade practices and more specific unfair claim settlement issues and to focus on market conduct practices and market conduct regulation. By doing so, the NAIC is not recommending that states repeal existing acts, but states may modify them for the purpose of capturing the substantive changes. However, for those states wishing to completely rewrite their comprehensive approach to unfair claims practices, this separation of unfair claims from unfair trade practices is recommended.

**Section 1.        Purpose**

The purpose of this Act is to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945 (Public Law 15, 79th Congress) and the Gramm-Leach-Bliley Act (Public Law 106-102, 106th Congress), by defining, or providing for the determination of, all such practices in this state that constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined. Nothing herein shall be construed to create or imply a private cause of action for a violation of this Act.

**Section 2.        Definitions**

When used in this Act:

    A.    "Affiliate" means any company that controls, is controlled by, or is under common control with another company.

    B.    "Commissioner" means the commissioner of insurance of this state.

**Drafting Note:** Insert the appropriate term for the chief insurance regulatory official wherever the term "commissioner" appears.

    C.    "Customer" means an individual who purchases, applies to purchase, or is solicited to purchase insurance products primarily for personal, family or household purposes.

    D.    "Depository institution" means a bank or savings association. The term depository institution does not include an insurance company.

    E.    "Insured" means the party named on a policy or certificate as the individual with legal rights to the benefits provided by such policy.

Unfair Trade Practices Act

F.   "Insurer" means any person, reciprocal exchange, interinsurer, Lloyd's insurer, fraternal benefit society, and any other legal entity engaged in the business of insurance, including producers, adjusters and third-party administrators. Insurer shall also mean medical service plans, hospital service plans, health maintenance organizations, prepaid limited health care service plans, dental, optometric and other similar health service plans as defined in Sections [insert applicable section]. For purposes of this Act, these foregoing entities shall be deemed to be engaged in the business of insurance.

**Drafting Note:** Each state may wish to consider the advisability of defining "insurance" for purposes of this Act if its present insurance code is not satisfactory in this regard. In some cases a cross reference will be sufficient.

G.   "Person" means a natural or artificial entity, including but not limited to, individuals, partnerships, associations, trusts or corporations.

H.   "Policy" or "certificate" means a contract of insurance, indemnity, medical, health or hospital service, suretyship, or annuity issued, proposed for issuance, or intended for issuance by any insurer.

I.   "Producer" means a person required to be licensed under the laws of this state to sell, solicit, or negotiate insurance.

## Section 3.        Unfair Trade Practices Prohibited

It is an unfair trade practice for any insurer to commit any practice defined in Section 4 of this Act if:

A.   It is committed flagrantly and in conscious disregard of this Act or of any rules promulgated hereunder; or

B.   It has been committed with such frequency to indicate a general business practice to engage in that type of conduct.

## Section 4.        Unfair Trade Practices Defined

Any of the following practices, if committed in violation of Section 3, are hereby defined as unfair trade practices in the business of insurance:

A.   Misrepresentations and False Advertising of Insurance Policies. Making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison that:

(1)   Misrepresents the benefits, advantages, conditions or terms of any policy; or

(2)   Misrepresents the dividends or share of the surplus to be received on any policy; or

(3)   Makes a false or misleading statement as to the dividends or share of surplus previously paid on any policy; or

(4)   Is misleading or is a misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates; or

(5)   Uses any name or title of any policy or class of policies misrepresenting the true nature thereof; or

(6)   Is a misrepresentation, including any intentional misquote of premium rate, for the purpose of inducing or tending to induce the purchase, lapse, forfeiture, exchange, conversion or surrender of any policy; or

(7)   Is a misrepresentation for the purpose of effecting a pledge or assignment of or effecting a loan against any policy; or

(8)   Misrepresents any policy as being shares of stock.

        © 2008 National Association of Insurance Commissioners

B.      False Information and Advertising Generally. Making, publishing, disseminating, circulating or placing before the public, or causing, directly or indirectly to be made, published, disseminated, circulated, or placed before the public, in a newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster, or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any insurer in the conduct of its insurance business, which is untrue, deceptive or misleading.

C.      Defamation. Making, publishing, disseminating, or circulating, directly or indirectly, or aiding, abetting or encouraging the making, publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article or literature which is false, or maliciously critical of or derogatory to the financial condition of any insurer, and which is calculated to injure such insurer.

D.      Boycott, Coercion and Intimidation. Entering into any agreement to commit, or by any concerted action committing any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance.

E.      False Statements and Entries.

    (1)     Knowingly filing with any supervisory or other public official, or knowingly making, publishing, disseminating, circulating or delivering to any person, or placing before the public, or knowingly causing directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of an insurer.

    (2)     Knowingly making any false entry of a material fact in any book, report or statement of any insurer or knowingly omitting to make a true entry of any material fact pertaining to the business of such insurer in any book, report or statement of such insurer, or knowingly making any false material statement to any insurance department official.

F.      Stock Operations and Advisory Board Contracts. Issuing or delivering or permitting agents, officers or employees to issue or deliver, agency company stock or other capital stock, or benefit certificates or shares in any common law corporation, or securities or any special or advisory board contracts or other contracts of any kind promising returns and profits as an inducement to purchase insurance.

G.      Unfair Discrimination.

    (1)     Making or permitting any unfair discrimination between individuals of the same class and equal expectation of life in the rates charged for any life insurance policy or annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such policy.

    (2)     (a)     Refusing life insurance to, refusing to continue life insurance of, or limiting the amount, extent, or kind of life insurance coverage available to an individual based on the individual's past lawful travel experiences.

            (b)     Refusing life insurance to, refusing to continue life insurance of, limiting the amount, extent, or kind of life insurance coverage available to an individual, or determining the premium of life insurance based on the individual's future lawful travel plans unless:

                    (i)     (I)     The risk of loss for individuals who travel to a specified destination at a specified time is reasonably anticipated to be greater than if the individuals did not travel to that destination at that time; and

                            (II)    The risk classification is based on sound actuarial principles and actual or reasonably anticipated experience.

Unfair Trade Practices Act

(ii)   An action shall be deemed to meet the requirements of subparagraph (i) of this paragraph if it is taken because either one of the following is true with respect to the travel destination:

(I)   The Director of the Centers for Disease Control and Prevention of the Department of Health and Human Services has issued a highest level alert or warning, including a recommendation against non-essential travel, due to a serious health-related condition; or

(II)   There is an ongoing armed conflict involving the military of a sovereign nation foreign to the country of conflict.

(c)   (i)   The commissioner may adopt regulations necessary to implement the provisions of this paragraph and may provide for limited exceptions that are based upon national or international emergency conditions that affect the public health, safety, and welfare and that are consistent with public policy.

(ii)   An insurer shall make any pertinent underwriting guidelines and supporting analyses available to the commissioner on request.

(3)   Making or permitting any unfair discrimination between individuals of the same class and of essentially the same hazard in the amount of premium, policy fees or rates charged for any accident or health insurance policy or in the benefits payable thereunder, or in any of the terms or conditions of such policy, or in any other manner.

**Drafting Note:** In the event that unfair discrimination in connection with accident and health coverage is treated in other statutes, this paragraph should be omitted.

(4)   Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazard by refusing to insure, refusing to renew, canceling or limiting the amount of insurance coverage on a property or casualty risk solely because of the geographic location of the risk, unless such action is the result of the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience.

(5)   Making or permitting any unfair discrimination between individuals or risks of the same class and of essentially the same hazards by refusing to insure, refusing to renew, canceling or limiting the amount of insurance coverage on the residential property risk, or the personal property contained therein, solely because of the age of the residential property.

(6)   Refusing to insure, refusing to continue to insure, or limiting the amount of coverage available to an individual because of the sex, marital status, race, religion or national origin of the individual; however, nothing in this subsection shall prohibit an insurer from taking marital status into account for the purpose of defining persons eligible for dependent benefits. Nothing in this section shall prohibit or limit the operation of fraternal benefit societies.

(7)   To terminate, or to modify coverage or to refuse to issue or refuse to renew any property or casualty policy solely because the applicant or insured or any employee of either is mentally or physically impaired; provided that this subsection shall not apply to accident and health insurance sold by a casualty insurer and, provided further, that this subsection shall not be interpreted to modify any other provision of law relating to the termination, modification, issuance or renewal of any insurance policy or contract.

(8)   Refusing to insure solely because another insurer has refused to write a policy, or has cancelled or has refused to renew an existing policy in which that person was the named insured. Nothing herein contained shall prevent the termination of an excess insurance policy on account of the failure of the insured to maintain any required underlying insurance.

© 2008 National Association of Insurance Commissioners

(9)    Violation of the state's rescission laws at [insert reference to appropriate code section].

**Drafting Note:** A state may wish to include this section if it has existing state laws covering rescission and to insert a reference to a particular code section.

H.    Rebates.

(1)    Except as otherwise expressly provided by law, knowingly permitting or offering to make or making any life insurance policy or annuity, or accident and health insurance or other insurance, or agreement as to such contract other than as plainly expressed in the policy issued thereon, or paying or allowing, or giving or offering to pay, allow, or give, directly or indirectly, as inducement to such policy, any rebate of premiums payable on the policy, or any special favor or advantage in the dividends or other benefits thereon, or any valuable consideration or inducement whatever not specified in the policy; or giving, or selling, or purchasing or offering to give, sell, or purchase as inducement to such policy or annuity or in connection therewith, any stocks, bonds or other securities of any insurance company or other corporation, association or partnership, or any dividends or profits accrued thereon, or anything of value whatsoever not specified in the policy.

(2)    Nothing in Subsection G, or Paragraph (1) of Subsection H shall be construed as including within the definition of discrimination or rebates any of the following practices:

(a)    In the case of life insurance policies or annuities, paying bonuses to policyholders or otherwise abating their premiums in whole or in part out of surplus accumulated from nonparticipating insurance, provided that any such bonuses or abatement of premiums shall be fair and equitable to policyholders and for the best interests of the company and its policyholders;

(b)    In the case of life insurance policies issued on the industrial debit plan, making allowance to policyholders who have continuously for a specified period made premium payments directly to an office of the insurer in an amount that fairly represents the saving in collection expenses;

(c)    Readjusting the rate of premium for a group insurance policy based on the loss or expense thereunder, at the end of the first or any subsequent policy year of insurance thereunder, which may be made retroactive only for such policy year; or

(d)    Engaging in an arrangement that would not violate Section 106 of the Bank Holding Company Act Amendments of 1972 (12 U.S.C. 1972), as interpreted by the Board of Governors of the Federal Reserve System, or Section 5(q) of the Home Owners' Loan Act, 12 U.S.C. 1464(q).

**Drafting Note:** Section 104 (d)(2)(B)(viii) of the Gramm-Leach-Bliley Act provides that any state restrictions on anti-tying may not prevent a depository institution or affiliate from engaging in any activity that would not violate Section 106 of the Bank Holding Company Act Amendments of 1970, as interpreted by the Board of Governors of the Federal Reserve System. The Board of Governors of the Federal Reserve System has stated that nothing in its interpretation on combined-balance discount arrangements is intended to override any other applicable state and federal law. FRB SR 95-32 (SUP). Section 5(q) of the Home Owners' Loan Act is the analogous provision to Section 106 for thrift institutions. The Office of Thrift Supervision has a regulation 12 C.F.R. 563.36 that allows combined-balance discounts if certain requirements are met.

**Drafting Note:** Each state may wish to examine its rating laws to assure that they contain sufficient provision against rebating. If they do not, this section might be expanded to cover all lines of insurance.

I.    Prohibited Group Enrollments. No insurer shall offer more than one group policy of insurance through any person unless such person is licensed, at a minimum, as a limited insurance representative. However, this prohibition shall not apply to employer/employee relationships, nor to any such enrollments.

J.    Failure to Maintain Marketing and Performance Records. Failure of an insurer to maintain its books, records, documents and other business records in such an order that data regarding complaints, claims, rating, underwriting and marketing are accessible and retrievable for examination by the insurance commissioner. Data for at least the current calendar year and the two (2) preceding years shall be maintained.

© 2008 National Association of Insurance Commissioners

Unfair Trade Practices Act

K.  Failure to Maintain Complaint Handling Procedures. Failure of any insurer to maintain a complete record of all the complaints it received since the date of its last examination under Section [insert applicable section]. This record shall indicate the total number of complaints, their classification by line of insurance, the nature of each complaint, the disposition of each complaint, and the time it took to process each complaint. For purposes of this subsection, "complaint" shall mean any written communication primarily expressing a grievance.

L.  Misrepresentation in Insurance Applications. Making false or fraudulent statements or representations on or relative to an application for a policy, for the purpose of obtaining a fee, commission, money or other benefit from any provider or individual person.

M.  Unfair Financial Planning Practices. An insurance producer:

(1)  Holding himself or herself out, directly or indirectly, to the public as a "financial planner," "investment adviser," "consultant," "financial counselor," or any other specialist engaged in the business of giving financial planning or advice relating to investments, insurance, real estate, tax matters or trust and estate matters when such person is in fact engaged only in the sale of policies. This provision does not preclude persons who hold some form of formal recognized financial planning or consultant certification or designation from using this certification or designation when they are only selling insurance. This does not permit persons to charge an additional fee for services that are customarily associated with the solicitation, negotiation or servicing of policies.

(2)  (a)  Engaging in the business of financial planning without disclosing to the client prior to the execution of the agreement provided for in Paragraph 3, or solicitation of the sale of a product or service that

(i)  He or she is also an insurance salesperson, and

(ii)  That a commission for the sale of an insurance product will be received in addition to a fee for financial planning, if such is the case.

(b)  The disclosure requirement under this subsection may be met by including it in any disclosure required by federal or state securities law.

(3)  (a)  Charging fees other than commissions for financial planning by insurance producer, unless such fees are based upon a written agreement, signed by the party to be charged in advance of the performance of the services under the agreement. A copy of the agreement must be provided to the party to be charged at the time the agreement is signed by the party.

(i)  The services for which the fee is to be charged must be specifically stated in the agreement.

(ii)  The amount of the fee to be charged or how it will be determined or calculated must be specifically stated in the agreement.

(iii)  The agreement must state that the client is under no obligation to purchase any insurance product through the insurance producer or consultant.

**Drafting Note**: This subsection is intended to apply only to persons engaged in personal financial planning.

(b)  The insurance producer shall retain a copy of the agreement for not less than three (3) years after completion of services, and a copy shall be available to the commissioner upon request.

N.  Failure to file or to certify information regarding the endorsement or sale of long-term care insurance. Failure of any insurer to:

© 2008 National Association of Insurance Commissioners

   (1)      File with the insurance department the following material:

           (a)      The policy and certificate;

           (b)      A corresponding outline of coverage; and

           (c)      All advertisements requested by the insurance department; or

   (2)      Certify annually that the association has complied with the responsibilities for disclosure, advertising, compensation arrangements, or other information required by the commissioner, as set forth by regulation.

O.      Failure to Provide Claims History

   (1)      Loss Information—Property and Casualty. Failure of a company issuing property and casualty insurance to provide the following loss information for the three (3) previous policy years to the first named insured within thirty (30) days of receipt of the first named insured's written request:

           (a)      On all claims, date and description of occurrence, and total amount of payments; and

           (b)      For any occurrence not included in Subparagraph (a) of this paragraph, the date and description of occurrence.

   (2)      Should the first named insured be requested by a prospective insurer to provide detailed loss information in addition to that required under Paragraph (1), the first named insured may mail or deliver a written request to the insurer for the additional information. No prospective insurer shall request more detailed loss information than reasonably required to underwrite the same line or class of insurance. The insurer shall provide information under this subparagraph to the first named insured as soon as possible, but in no event later than twenty (20) days of receipt of the written request. Notwithstanding any other provision of this section, no insurer shall be required to provide loss reserve information, and no prospective insurer may refuse to insure an applicant solely because the prospective insurer is unable to obtain loss reserve information.

   (3)      The commissioner may promulgate regulations to exclude the providing of the loss information as outlined in Paragraph (1) for any line or class of insurance where it can be shown that the information is not needed for that line or class of insurance, or where the provision of loss information otherwise is required by law.

**Drafting Note:** Loss information on workers' compensation is an example in some states of loss information otherwise is required by law.

   (4)      Information provided under Paragraph (2) shall not be subject to discovery by any party other than the insured, the insurer and the prospective insurer.

**Drafting Note:** This provision may not be required in states that have a privacy act that governs consumer access to this information. Those states considering applying this requirement to life, accident and health lines of insurance should first review their state privacy act related to issues of confidentiality of individual insured information.

P.      Violating any one of Sections [insert applicable sections].

**Drafting Note:** Insert section numbers of any other sections of the state's insurance laws deemed desirable or necessary to include as an unfair trade practice, such as cancellation and nonrenewal laws.

**Section 5.**   **Favored Agent or Insurer; Coercion of Debtors**

A.   No person or depository institution, or affiliate of a depository institution may require as a condition precedent to the lending of money or extension of credit, or any renewal thereof, that the person to whom such money or credit is extended or whose obligation a creditor is to acquire or finance, negotiate any policy or renewal thereof through a particular insurer or group of insurers or agent or broker or group of agents or brokers. Further, no person or depository institution, or affiliate of a depository institution, may reject an insurance policy solely because the policy has been issued or underwritten by a person who is not associated with the depository institution or affiliate when insurance is required in connection with a loan or extension of credit.

B.   No person or depository institution, or affiliate of a depository institution, who lends money or extends credit may:

(1)   As a condition for extending credit or offering any product or service that is equivalent to an extension of credit, require that a customer obtain insurance from a depository institution or an affiliate of a depository institution, or a particular insurer or producer. However, this provision does not prohibit a person or depository institution, or affiliate of a depository institution, from informing a customer or prospective customer that insurance is required in order to obtain a loan or credit, or that loan or credit approval is contingent upon the procurement by the customer of acceptable insurance, or that insurance is available from the person or depository institution, or affiliate of a depository institution;

(2)   Unreasonably reject a policy furnished by the customer or borrower for the protection of the property securing the credit or lien. A rejection shall not be deemed unreasonable if it is based on reasonable standards, uniformly applied, relating to the extent of coverage required and the financial soundness and the services of an insurer. Such standards shall not discriminate against any particular type of insurer, nor shall such standards call for rejection of a policy because it contains coverage in addition to that required in the credit transaction;

(3)   Require that any customer, borrower, mortgagor, purchaser, insurer, broker or agent pay a separate charge, in connection with the handling of any policy required as security for a loan on real estate, or pay a separate charge to substitute the policy of one insurer for that of another. This paragraph does not include the interest that may be charged on premium loans or premium advancements in accordance with the terms of the loan or credit document. Further, this paragraph does not apply to charges that would be required when the person or depository institution or affiliate of a depository institution is the licensed producer providing the insurance;

(4)   Require any procedures or conditions of duly licensed producers or insurers not customarily required of those producers or insurers affiliated or in any way connected with the person who lends money or extends credit;

(5)   Use an advertisement or other insurance promotional material that would cause a reasonable person to mistakenly believe that the federal government or the state is responsible for the insurance sales activity of, or stands behind the credit of, the person, depository institution or its affiliate;

(6)   Use an advertisement or other insurance promotional material that would cause a reasonable person to mistakenly believe that the federal government or the state guarantees any returns on insurance products or is a source of payment on any insurance obligation of or sold by the person, depository institution or its affiliate;

(7)   Act as a producer unless properly licensed in accordance with [insert appropriate statutory provisions for producer licensing];

   © 2008 National Association of Insurance Commissioners

(8)  Pay or receive any commission, brokerage fee or other compensation as a producer, unless the person holds a valid producer's license for the applicable class of insurance. However, an unlicensed person may make a referral to a licensed producer provided that the person does not discuss specific insurance policy terms and conditions. The unlicensed person may be compensated for the referral, however, in the case of a referral of a customer, the unlicensed person may be compensated only if the compensation is a fixed dollar amount for each referral that does not depend on whether the customer purchases the insurance product from the licensed producer. Furthermore, any person who accepts deposits from the public in an area where such transactions are routinely conducted in the depository institution may receive for each customer referral no more than a one-time, nominal fee of a fixed dollar amount for each referral that does not depend on whether the referral results in a transaction;

**Drafting Note:** The last sentence of this paragraph further limits the referral for customers of personal, family and household insurance products as a result of Section 305 of the Gramm-Leach-Bliley Act and the subsequent adoption of regulations by the federal banking regulators at 12 C.F.R. 14.50, 208.85, 343.50 and 536.50. By including this language the paragraph will be consistent with the Gramm-Leach-Bliley Act and the federal regulations while maintaining the integrity of Section 104(d)(2)(B)(iv) and (v) of the Gramm-Leach-Bliley Act.

(9)  Solicit or sell insurance, other than credit insurance or flood insurance, unless the solicitation or sale is completed through documents separate from any credit transactions;

(10) Include the expense of insurance premiums, other than credit insurance premiums or flood insurance premiums, in the primary credit transaction without the express written consent of the customer;

(11) Solicit or sell insurance unless its insurance sales activities are, to the extent practicable, physically separated from areas where retail deposits are routinely accepted by depository institutions; or

(12) Solicit or sell insurance unless it maintains separate and distinct books and records relating to the insurance transactions, including all files relating to and reflecting consumer complaints.

**Drafting Note:** The Gramm-Leach-Bliley Act contains two "safe harbors" that relate to information sharing. Section 104(d)(2)(B)(vi) describes the circumstances surrounding the release of a customer's insurance information. Section 104(d)(2)(B)(vii) describes the circumstances surrounding the use of a customer's health information obtained from the insurance records of the customer. If a state has adopted the NAIC's Privacy of Consumer Financial and Health Information Model Regulation, no further action is needed. If not, language implementing the two safe harbors should be considered. It should be noted, however, that during the drafting process, there were concerns expressed about the application of the preemption provisions of the Fair Credit Reporting Act (FCRA) in circumstances involving the sharing of information with affiliates. Nothing in this Act shall be construed to modify, limit or supersede the operation of the FCRA (15 U.S.C. 1681 *et seq.*). In addition, no inference shall be drawn on the basis of the provisions of this Act regarding whether information is transaction or experience information under Section 603 of FCRA.

C.  Every person or depository institution, or affiliate of a depository institution that lends money or extends credit and who solicits insurance primarily for personal, family or household purposes shall disclose to the customer in writing that the insurance related to the credit extension may be purchased from an insurer or producer of the customer's choice, subject only to the lender's right to reject a given insurer or agent as provided in Subsection B(2). Further, the disclosure shall inform the customer that the customer's choice of insurer or producer will not affect the credit decision or credit terms in any way, except that the depository institution may impose reasonable requirements concerning the creditworthiness of the insurer and the scope of coverage chosen as provided in Subsection B(2).

D.  (1)  A depository institution that solicits, sells, advertises or offers insurance, and any person who solicits, sells, advertises or offers insurance on behalf of a depository institution or on the premises of a depository institution shall disclose to the customer in writing, where practicable and in a clear and conspicuous manner, prior to a sale, that the insurance:

(a)  Is not a deposit;

(b)  Is not insured by the Federal Deposit Insurance Corporation or any other federal government agency;

© 2008 National Association of Insurance Commissioners

Unfair Trade Practices Act

(c)     Is not guaranteed by the depository institution, its affiliate (if applicable) or any person that is soliciting, selling, advertising or offering insurance (if applicable); and

(d)     Where appropriate, involves investment risk, including the possible loss of value.

(2)     For purposes of these requirements, an affiliate of a depository institution is subject to these requirements only to the extent that it sells, solicits, advertises, or offers insurance products or annuities at an office of a depository institution or on behalf of a depository institution. These requirements apply only when an individual purchases, applies to purchase, or is solicited to purchase insurance products or annuities primarily for personal, family or household purposes and only to the extent that the disclosure would be accurate.

**Drafting Note:** The requirements of this provision are meant to apply only when the consumer may have a reasonable belief that the product is a deposit; that it is insured by the Federal Deposit Insurance Corporation; that it is guaranteed by the person or depository institution; and that, where appropriate, it involves investment risk, including the possible loss of value. This provision is not intended to require every entity or person in a financial holding company to provide the disclosure as a result of having both solicitation of insurance and extending of credit or lending of money occurring within an entity in the financial holding company group.

(3)     A depository institution that solicits, sells, advertises or offers insurance, and any person who solicits, sells, advertises or offers insurance on behalf of a depository institution or on the premises of a depository institution shall obtain written acknowledgement of the receipt of the disclosure from the customer at the time the customer receives the disclosure or at the time of the initial purchase of the insurance policy. If the solicitation is conducted by telephone, the person or depository institution shall obtain an oral acknowledgement of receipt of the disclosure, maintain sufficient documentation to show that the acknowledgment was given by the customer, and make reasonable efforts to obtain a written acknowledgment from the customer. If a customer affirmatively consents to receiving the disclosures electronically and if the disclosures are provided in a format that the customer may retain or obtain later, the person or depository institution, may provide the disclosure and obtain acknowledgement of the receipt of the disclosure from the customer using electronic media.

(4)     For the purposes of Paragraph (1), a person is selling, soliciting, advertising or offering insurance on behalf of a depository institution, whether at an office of the depository institution or another location, if at least one of the following applies:

(a)     The person represents to the customer that the sale, solicitation, advertisement or offer of the insurance is by or on behalf of the depository institution;

(b)     The depository institution refers a customer to the person who sells insurance and the depository institution has a contractual arrangement to receive commissions or fees derived from the sale of insurance resulting from the referral; or

(c)     Documents evidencing the sale, solicitation, advertisement or offer of insurance identify or refer to the depository institution.

E.      The commissioner shall have the power to examine and investigate those insurance activities of any person, depository institution, affiliate of a depository institution or insurer that the commissioner believes may be in violation of this section. The person, depository institution, affiliate of a depository institution or insurer shall make its insurance books and records available to the commissioner and the commissioner's staff for inspection upon reasonable notice. An affected person may submit to the commissioner a complaint or material pertinent to the enforcement of this section.

F.      Nothing herein shall prevent a person or depository institution, or affiliate of a depository institution, who lends money or extends credit from placing insurance on real or personal property in the event the mortgagor, borrower or purchaser has failed to provide required insurance in accordance with the terms of the loan or credit document.

G.      Nothing contained in this section shall apply to credit related insurance.

© 2008 National Association of Insurance Commissioners

**Drafting Note:** The consumer protection rules promulgated by the banking regulatory agencies pursuant to Section 305 of the Gramm-Leach-Bliley Act apply to retail sales practices, solicitations, advertising or offers of any insurance product or annuity. If a state has adopted the NAIC's Consumer Credit Insurance Model Act and Consumer Credit Insurance Model Regulation, no further action is needed. If not, the state should consider eliminating Subsection G.

### Section 6.        Power of Commissioner

The commissioner shall have power to examine and investigate the affairs of every person or insurer in this state in order to determine whether such person or insurer has been or is engaged in any unfair trade practice prohibited by this Act. However, in the case of depository institutions, the commissioner shall have the power to examine and investigate the insurance activities of depository institutions, in order to determine whether the depository institution has been or is engaged in any unfair trade practice prohibited by this Act. The commissioner shall notify the appropriate federal banking agency of the commissioner's intent to examine or investigate a depository institution and advise the appropriate federal banking agency of the suspected violations of state law prior to commencing the examination or investigation.

### Section 7.        Hearings, Witnesses, Appearances, Production of Books, and Service of Process

A.        Whenever the commissioner shall have reason to believe that any insurer, person, depository institution or affiliate of a depository institution has been engaged or is engaging in this state in any unfair trade practice whether or not defined in this Act, and that a proceeding by the commissioner in respect thereto would be in the interest of the public, the commissioner shall issue and serve upon such insurer, person, depository institution or affiliate of a depository institution, a statement of the charges in that respect and a notice of a hearing thereon to be held at a time and place fixed in the notice, which shall not be less than [insert number] days after the date of the service thereof. With respect to a depository institution, the commissioner's authority to call a hearing is limited to the depository institution's insurance underwriting, sales, solicitation and cross marketing activities. The commissioner shall provide a copy of the notice of hearing to the appropriate federal banking agency when a depository institution is involved.

B.        At the time and place fixed for the hearing, the insurer, person, depository institution or affiliate of a depository institution shall have an opportunity to be heard and to show cause why an order should not be made by the commissioner requiring the insurer, person, depository institution or affiliate of a depository institution to cease and desist from the acts, methods or practices so complained of. Upon good cause shown, the commissioner shall permit any person to intervene, appear and be heard at the hearing by counsel or in person.

C.        Nothing contained in this Act shall require the observance at the hearing of formal rules of pleading or evidence.

D.        The commissioner, at the hearing, may administer oaths, examine and cross examine witnesses, receive oral and documentary evidence, and shall have the power to subpoena witnesses, compel their attendance, and require the production of books, papers, records, correspondence or other documents the commissioner deems relevant to the inquiry, provided, however, that in the case of depository institutions, the commissioner shall have the power to require the production of books, papers, records, correspondence or other documents that the commissioner deems relevant to the inquiry only on the insurance activities of the depository institution. The commissioner, may, and upon the request of any party, shall cause to be made a stenographic record of all the evidence and all the proceedings at the hearing. If no stenographic record is made and if a judicial review is sought, the commissioner shall prepare a statement of the evidence and proceeding for use on review. In case of a refusal of any person to comply with any subpoena or to testify with respect to any matter concerning which he may be lawfully interrogated, the [insert title] Court of [insert county] County or the county where the person resides, on application of the commissioner, may issue an order requiring such person to comply with the subpoena and to testify; and any failure to obey any order of the court may be punished by the court as contempt.

Unfair Trade Practices Act

E.  Statements of charges, notices, orders and other processes of the commissioner under this Act may be served by anyone duly authorized by the commissioner, either in the manner provided by law for service of process in civil actions, or by registering and mailing a copy thereof to the person affected by the statement, notice, order or other process at the person's residence or principal office or place of business. The verified return by the person so serving the statement, notice, order, or other process, setting forth the manner of service, shall be proof of the same, and the return postcard receipt for the statement, notice, order or other process, registered and mailed as specified, shall be proof of the service of the same.

## Section 8.  Cease and Desist and Penalty Orders

A.  If, after a hearing, the commissioner finds that an insurer, person, depository institution or affiliate of a depository institution has engaged in an unfair trade practice, the commissioner shall reduce the findings to writing and shall issue and cause to be served upon the insurer, person, depository institution or affiliate of a depository institution charged with the violation, a copy of the findings in an order requiring the insurer, person, depository institution or affiliate of a depository institution to cease and desist from engaging in the act or practice and the commissioner may, at the commissioner's discretion order:

  (1)  Payment of a monetary penalty of not more than $1,000 for each violation, but not to exceed an aggregate penalty of $100,000, unless the violation was committed flagrantly in a conscious disregard of this Act, in which case the penalty shall not be more than $25,000 for each violation not to exceed an aggregate penalty of $250,000; and/or

  (2)  Suspension or revocation of the insurer's license if the insurer knew or reasonably should have known that it was in violation of this Act.

B.  In the case of a depository institution, the commissioner shall, if practicable, notify the appropriate federal regulator before imposing a monetary penalty on a depository institution or suspending or revoking the depository institution's insurer's license, and provide to the federal regulator a copy of the findings.

## Section 9.  Judicial Review of Orders

A.  An insurer, person, depository institution or affiliate of a depository institution subject to an order of the commissioner under Section 8 or Section 11 may obtain a review of the order by filing in the [insert title] Court of [insert county] County, within [insert number] days from the date of the service of the order, a written petition praying that the order of the commissioner be set aside. A copy of the petition shall be served upon the commissioner, and thereupon the commissioner shall certify and file in the court a transcript of the entire record in the proceeding, including all the evidence taken and the report and order of the commissioner. Upon filing of the petition and transcript, the court shall have jurisdiction of the proceeding and of the question determined therein, shall determine whether the filing of the petition shall operate as a stay of the order of the commissioner, and shall have power to make and enter upon the pleadings, evidence and proceedings set forth in the transcript a decree modifying, affirming or reversing the order of the commissioner, in whole or in part. The findings of the commissioner as to the facts, if supported by [insert type] evidence, shall be conclusive.

**Drafting Note:** Insert appropriate language to accommodate to local procedure the effect given the commissioner's determination.

B.  To the extent that the order of the commissioner is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of the order of the commissioner. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that the additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the commissioner, the court may order additional evidence to be taken before the commissioner and to be adduced upon the hearing in such manner and upon such terms and conditions as the court may deem proper. The commissioner may modify the findings of fact, or make new findings by reason of the additional evidence so taken, and shall file the modified or new findings that are supported by [insert type] evidence with a recommendation if any, for the modification or setting aside of the original order, with the return of the additional evidence.

© 2008 National Association of Insurance Commissioners

**Drafting Note:** Insert appropriate language to accommodate to local procedure the effect given the commissioner's determination. In a state where final judgment, order or decree would not be subject to review by an appellate court provision therefor should be inserted here.

C.      An order issued by the commissioner under Section 8 shall become final:

      (1)      Upon the expiration of the time allowed for filing a petition for review if no such petition has been duly filed within such time; except that the commissioner may thereafter modify or set aside the order to the extent provided in Section 9B; or

      (2)      Upon the final decision of the court if the court directs that the order of the commissioner be affirmed or the petition for review dismissed.

D.      No order of the commissioner under this Act or order of a court to enforce the same shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this state.

## Section 10.      Judicial Review by Intervenor

If after any hearing under Section 7 or Section 11, the report of the commissioner does not charge a violation of this Act, then any intervenor in the proceedings may within [insert number] days after the service of the report, cause a petition [notice of appeal] [petition for writ of certiorari] to be filed in the [insert title] Court of [insert county] County for a review of the report. Upon review, the court shall have authority to issue appropriate orders and decrees in connection therewith, including, if the court finds that it is to the interest of the public, orders enjoining and restraining the continuance of any method of competition, act or practice which it finds, notwithstanding the report of the commissioner, constitutes a violation of this Act, and containing penalties pursuant to Section 8.

**Drafting Note:** The type of procedure should conform to state procedure. See also note to Section 9 concerning review by appellate courts.

## Section 11.      Penalty for Violation of Cease and Desist Orders

Any insurer, person, depository institution or affiliate of a depository institution that violates a cease and desist order of the commissioner and while such order is in effect, may after notice and hearing and upon order of the commissioner, be subject at the discretion of the commissioner to:

A.      A monetary penalty of not more than $25,000 for each and every act or violation not to exceed an aggregate of $250,000 pursuant to any such hearing; and/or

B.      Suspension or revocation of the insurer's license.

## Section 12.      Regulations

The commissioner may, after notice and hearing, promulgate reasonable rules, regulations and orders as are necessary or proper to carry out and effectuate the provisions of this Act. Such regulations shall be subject to review in accordance with Section [insert applicable section].

**Drafting Note:** Insert section number providing for review of administrative orders.

## Section 13.      Provisions of Act Additional to Existing Law

The powers vested in the commissioner by this Act shall be additional to any other powers to enforce any penalties, fines or forfeitures authorized by law with respect to the methods, acts and practices hereby declared to be unfair or deceptive.

Unfair Trade Practices Act

## Section 14.    Immunity From Prosecution

If any person shall ask to be excused from attending and testifying or from producing any books, papers, records, correspondence or other documents at any hearing on the ground that the testimony or evidence required may tend to incriminate or subject the person to a penalty or forfeiture, and shall notwithstanding be directed to give testimony or produce evidence, the person shall nonetheless comply with the direction, but shall not thereafter be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which the person may testify or produce evidence thereto, and no testimony so given or evidence produced shall be received against the person upon any criminal action, investigation or proceeding; provided, however, that no person so testifying shall be exempt from prosecution or punishment for any perjury committed while so testifying and the testimony or evidence so given or produced shall be admissible against the person upon any criminal action, investigation or proceeding concerning such perjury, nor shall the person be exempt from the refusal, revocation or suspension of any license, permission or authority conferred, or to be conferred, pursuant to the Insurance Law of this state. Any such person may execute, acknowledge and file in the office of the commissioner a statement expressly waiving immunity or privilege in respect to any transaction, matter or thing specified in the statement and thereupon the testimony of the person or evidence in relation to the transaction, matter or thing may be received or produced before any judge or justice, court, tribunal, grand jury or otherwise, and if so received or produced the person shall not be entitled to any immunity or privilege on account of any testimony the person may give or evidence produced.

## Section 15.    Separability Provision

If any provision of this Act, or the application of the provision to any person or circumstances, shall be held invalid, the remainder of the Act, and the application of the provision to person or circumstances other than those as to which it is held invalid, shall not be affected thereby.

_____

*Chronological Summary of Actions (all references are to the Proceedings of the NAIC).*

*1947 Proc. 383, 392-400, 413 (adopted).*
*1960 Proc. II 485-487, 509-515, 516 (reprinted).*
*1972 Proc. I 15, 16, 443-444, 491, 493-501 (amended and reprinted).*
*1977 Proc. I 26, 28, 211, 226-227 (amended).*
*1979 Proc. II 31, 34, 38, 39, 525 (amended).*
*1985 Proc. I 19, 39, 85-86 (amended).*
*1989 Proc. II 13, 21, 129-130, 132, 133-140) (amended and reprinted).*
*1990 Proc. I 6, 25, 122, 146 (changed name of model).*
*1990 Proc. II 7, 13-14, 160, 169-177 (amended and reprinted).*
*1991 Proc. I 9, 16, 192-193, 196-203 (amended and reprinted).*
*1993 Proc. I 8, 136, 242, 246-254 (amended and reprinted).*
*1993 Proc. 1st Quarter 3, 34, 267, 274, 276 (amended).*
*2001 Proc. 2nd Quarter 7, 9, 836, 843-853 (amended and reprinted).*
*2008 Proc. 2nd Quarter, Vol. I, 159-162, 294, 398, 422, 569-582, 717 (guideline amendments adopted).*

                                                                                  © 2008 National Association of Insurance Commissioners

## UNFAIR TRADE PRACTICES ACT

This chart is intended to provide readers with additional information to more easily access state statutes, regulations, bulletins or administrative rulings related to the NAIC model. Such guidance provides readers with a starting point from which they may review how each state has addressed the model and the topic being covered. The NAIC Legal Division has reviewed each state's activity in this area and has determined whether the citation most appropriately fits in the Model Adoption column or Related State Activity column based on the definitions listed below. The NAIC's interpretation may or may not be shared by the individual states or by interested readers.

This chart does not constitute a formal legal opinion by the NAIC staff on the provisions of state law and should not be relied upon as such. Nor does this state page reflect a determination as to whether a state meets any applicable accreditation standards. Every effort has been made to provide correct and accurate summaries to assist readers in locating useful information. Readers should consult state law for further details and for the most current information.

**UNFAIR TRADE PRACTICES ACT**

This page is intentionally left blank

© 2016 National Association of Insurance Commissioners

## UNFAIR TRADE PRACTICES ACT

**KEY:**

**MODEL ADOPTION**: States that have citations identified in this column adopted the most recent version of the NAIC model in a **substantially similar manner**. This requires states to adopt the model in its entirety but does allow for variations in style and format. States that have adopted portions of the current NAIC model will be included in this column with an explanatory note.

**RELATED STATE ACTIVITY**: Examples of Related State Activity include but are not limited to: older versions of the NAIC model, statutes or regulations addressing the same subject matter, or other administrative guidance such as bulletins and notices. States that have citations identified in this column **only** (and nothing listed in the Model Adoption column) have **not** adopted the most recent version of the NAIC model in a **substantially similar manner.**

**NO CURRENT ACTIVITY:** No state activity on the topic as of the date of the most recent update. This includes states that have repealed legislation as well as states that have never adopted legislation.

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Alabama | | ALA. CODE §§ 27-12-1 to 27-12-24 (1971/1994). |
| Alaska | ALASKA STAT. §§ 21.36.010 to 21.36.350 (1976/2009). | ALASKA STAT. § 21.36.500 (1992) (financial planners); § 45.50.471 (1970/2009); ALASKA ADMIN. CODE tit. 3, § 26.110 (2015); BULLETIN 2007-6 (2007). |
| American Samoa | NO CURRENT ACTIVITY | |
| Arizona | ARIZ. REV. STAT. ANN. §§ 20-441 to 20-461 (1954/2008). | |
| Arkansas | ARK. CODE ANN. §§ 23-66-201 to 23-66-316 (1959/2011). | ARK. CODE R. 19 (1985/2005); BULLETIN 8-2014 (2014). |
| California | CAL. INS. CODE §§ 790 to 790.10 (1959/2000). | CAL. INS. CODE §§ 759 to 764 (2002). |
| Colorado | COLO. REV. STAT. §§ 10-3-1101 to 10-3-1113 (1963/2015). | B-5.32 (2013); BULLETIN B-4.72 (2014). |
| Connecticut | CONN. GEN. STAT. §§ 38a-815 to 38a-819 (1955/2013). | CONN. GEN. STAT. §§ 38a-824 to 38a-832 (1949/1980); BULLETIN HC-69-010 (2008); BULLETIN IC-35 (2013). |
| Delaware | DEL. CODE ANN. tit. 18, §§ 2301 to 2314 (1953/2013). | |
| District of Columbia | D.C. CODE §§ 31-2231.01 to 31-2231.25 (2000/2012). | |
| Florida | FLA. STAT. §§ 626.951 to 626.9641 (1982/2014). | FLA. STAT. § 626.572 (1990/2005) (rebating). |

### UNFAIR TRADE PRACTICES ACT

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Georgia | GA. CODE ANN. §§ 33-6-1 to 33-6-14 (1972/2005). | GA. COMP. R. & REGS. 120-2-20-.03 to 120-2-20-.04 (2012). |
| Guam | | GU ST. T. 5 § 32201 (1993/2007). |
| Hawaii | HAW. REV. STAT. §§ 431:13-101 to 431:13-204 (1988/2014). | |
| Idaho | IDAHO CODE ANN. §§ 41-1301 to 41-1331 (1961/2005). | BULLETIN 88-2 (1988). |
| Illinois | | 215 ILL. COMP. STAT. 5/421 to 5/434 (1959/2015); 5/236 (1937/2004). |
| Indiana | IND. CODE §§ 27-4-1-1 to 27-4-1-18 (1947/2009). | |
| Iowa | IOWA CODE §§ 507B.1 to 507B.14 (1955/2010). | IOWA ADMIN. CODE r. 191-15.11 (2011); BULLETIN 13-07 (2013); Bulletin 2014-2 (2014). |
| Kansas | KAN. STAT. ANN. §§ 40-2401 to 40-2421 (1955/2007). | |
| Kentucky | KY. REV. STAT. ANN. §§ 304.12-010 to 304.12-230 (1970/2010). | KY. REV. STAT. ANN. § 304.17A-150 (1994/2012) (Health benefit plans); Advisory Opinion 2014-1 (2014). |
| Louisiana | LA. REV. STAT. ANN. §§ 22:1961 to 22:1973 (1966/2014). | |
| Maine | ME. REV. STAT. ANN. tit. 24-A, §§ 2151 to 2182 (1970/2001) (Some extra provisions). | BULLETIN 384 (2012). |
| Maryland | MD. CODE ANN., INS. §§ 27-101 to 27-219 (1957/2014). | MD. CODE REGS. 31.15.01.01 to 31.15.14.9999 (1970/2014); BULLETIN 2014-23 (2014). |
| Massachusetts | MASS. GEN. LAWS ch. 176D, §§ 1 to 14 (1972/2012). | BULLETIN B-2010-10 (2010). |
| Michigan | MICH. COMP. LAWS §§ 500.2001 to 500.2093 (1957/2011) (Some extra provisions). | BULLETIN 2006-07 (2006). |
| Minnesota | MINN. STAT. §§ 72A.17 to 72A.32 (1967/2013). | BULLETIN 2013-3 (2013). |
| Mississippi | MISS. CODE ANN. §§ 83-5-29 to 83-5-51 (1956/2009). | |

© 2016 National Association of Insurance Commissioners

**UNFAIR TRADE PRACTICES ACT**

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Missouri | MO. REV. STAT. §§ 375.930 to 375.948 (1978/2004). | MO. REV. STAT. § 376.502 (2009); MO. CODE REGS. ANN. tit. 20, § 100-2.100 (2008) (financial planners). |
| Montana | MONT. CODE ANN. §§ 33-18-101 to 33-18-1006 (1959/2015). | Memorandum 1-29-2014 (2014). |
| Nebraska | NEB. REV. STAT. §§ 44-1522 to 44-1535 (1973/2003). | |
| Nevada | NEV. REV. STAT. §§ 686A.010 to 686A.280 (1971/2013). | BULLETIN 2014-009 (2014). |
| New Hampshire | N.H. REV. STAT. ANN §§ 417:1 to 417:17 (1947/2010). | |
| New Jersey | N.J. REV. STAT. §§ 17:29B-1 to 17:29B-14 (1947/2001). | |
| New Mexico | N.M. STAT. ANN. §§ 59A-16-1 to 59A-16-30 (1985/1999). | |
| New York | N.Y. INS. LAW §§ 2401 to 2409; §§ 2602 to 2612 (1984/2013). | |
| North Carolina | N.C. GEN. STAT. §§ 58-63-1 to 58-63-60 (1949/1999). | |
| North Dakota | N.D. CENT. CODE §§ 26.1-04-01 to 26.1-04-19 (1983/2011). | |
| Northern Marianas | 4 N. MAR. ISLAND CODE § 7302 (1984). | |
| Ohio | OHIO REV. CODE ANN. §§ 3901.19 to 3901.26 (1955-1956/2013); OHIO ADMIN. CODE § 3901-1-07 (1975/2011). | |
| Oklahoma | OKLA. STAT. tit. 36, §§ 1201 to 1220 (1957/2012); § 1250.5 (2012). | |
| Oregon | | OR. REV. STAT. §§ 746.005 to 746.270 (1967/2010); OR. ADMIN. R. 836-080-0235 (1980/2010). |
| Pennsylvania | 40 PA. CONS. STAT. §§ 1171.1 to 1171.15 (1974/2014). | 40 PA. CONS. STAT. §§ 1171.3 to 1171.5 (2014). |

NAIC Model Laws, Regulations, Guidelines and Other Resources— 2nd Quarter 2016

## UNFAIR TRADE PRACTICES ACT

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Rhode Island | R.I. GEN. LAWS §§ 27-29-1 to 27-29-13 (1958/2015). | HEALTH BULLETIN 2013-5 (REVISED) (2014). |
| Puerto Rico | P.R. LAWS ANN. tit. 26, §§ 2701 to 2740 (1974/1987). | |
| South Carolina | S.C. CODE ANN. §§ 38-57-10 to 38-57-310; §§ 38-59-10 to 38-59-50 (1988/1999). | S.C. CODE ANN. § 38-55-50 (1987/2004) (rebating). |
| South Dakota | S.D. CODIFIED LAWS §§ 58-33-1 to 58-33-46.1  (1966/2000); §§ 58-33-66 to 58-33-69 (1986/1989). | |
| Tennessee | TENN. CODE ANN. 56-8-104 (2012). | |
| Texas | TEX. INS. CODE ANN. §§ 541.001 to 541.454 (2005/2013). | 28 TEX. ADMIN. CODE §§ 21.1 to 21.122 (1981/2010). |
| Utah | | UTAH ADMIN. CODE r. 590-154 (1993/2013) (Unfair marketing practices); BULLETIN 2013-5 (2013); BULLETIN 2015-8 (2015). |
| Vermont | VT. STAT. ANN. tit. 8, §§ 4721 to 4726 (1974/2007). | |
| Virgin Islands | | V.I. CODE ANN. tit. 22, §§ 1201 to 1228 (1968). |
| Virginia | VA. CODE ANN. §§ 38.2-500 to 38.2-516 (1986/2013). | |
| Washington | WASH. REV. CODE ANN. §§ 48.30.010 to 48.30.270 (1947/2015). | |
| West Virginia | W. VA. CODE §§ 33-11-1 to 33-11-10 (1957/2005). | |
| Wisconsin | | WIS. STAT. §§ 628.31 to 628.46 (1975/1998); WIS. ADMIN. CODE INS. § 6.68 (1979/1984). |
| Wyoming | WYO. STAT. ANN. §§ 26-13-101 to 26-13-124 (1967/1986). | 33 WYO. CODE R. §§ 1 to 5 (1980/1997). |

© 2016 National Association of Insurance Commissioners

NAIC Model Laws, Regulations, Guidelines and Other Resources—January 2011

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the Proceedings of the NAIC

On June 5, 1944, the Supreme Court handed down the decision in the *Southeastern Underwriters* case, (*United States v. Southeastern Underwriters Association* 64 U.S. 1162) which reversed the fundamental basis underlying state regulation of the business of insurance by holding that insurance was commerce. One of the immediate effects of this decision was to make applicable to the insurance business a number of federal acts which were, in many cases, in direct conflict with the provision of state laws. **1945 Proceedings 26.**

Immediately after *Southeastern Underwriters*, proposals were considered by Congress to put insurance regulation back in the hands of the states. One suggestion was an amendment to the Federal Trade Commission Act eliminating insurance business from the scope of that act. **1945 Proceedings 28.**

Public Law 15 of the 79th Congress (known as the McCarran-Ferguson Act) was adopted to specifically declare that Congress felt continued regulation of insurance by the states was in the public interest. The Federal Trade Commission Act would not apply to the business of insurance or to acts in the conduct thereof. The Sherman Act provision regarding boycott, coercion or intimidation would continue to apply. **1946 Proceedings 132-133.**

P.L. 15 contained a moratorium from the application of federal laws to permit the states time to develop laws. After that period federal law would apply to the extent states had not assumed the responsibility. **1946 Proceeding 134.**

One of the initial efforts at developing state legislation in response to McCarran-Ferguson was the development of trade practices legislation. Among the considerations in developing a model law was the view that it was impractical to give each commissioner the power to determine what constituted unfair trade practices. It was contended such a plan would lead to lack of uniformity in administration and conflicting interpretations of the same practices in different jurisdiction. On the other hand it was asserted that if individual trade practices acts were not enacted in each state, the field would not be covered completely, thereby creating dual jurisdiction with its attendant problems. **1946 Proceedings 142-143.**

At the time it was first developed, the drafters gave the model the title "An Act Relating to Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance." The task force considering market conduct activities recommended changing the title to "Unfair Trade Practices Act" as it was commonly known. There was no intent that the change should imply any change in concept. **1990 Proc. IA 146.**

The prefatory note was added in 1990 when provisions regarding claims settlement practices were deleted from the Unfair Trade Practices Act and incorporated in a freestanding model. **1990 Proc. II 169.** [See proceeding citations for Model 900 for further information.]

After passage of the Gramm-Leach-Bliley Act of 1999 (known as "GLBA" or the Financial Services Modernization Act), a new working group was appointed to consider ways for states to enforce adequate consumer safeguards related to bank sales of insurance. The new federal law affirmed the McCarran-Ferguson Act, the 1945 law that authorized the states to regulate the business of insurance, and provided for "functional regulation" of insurance activities by state insurance regulators. State law would be subject to preemption only if it "prevents or significantly interferes" with a bank's insurance sales activities. **2000 Proc. 1st Quarter 984-985.**

GLBA provided 13 "safe harbors" from preemption for state regulatory authority over bank sales activities. State laws that imposed restrictions that are substantially the same as the safe harbors, but not more restrictive, were protected from federal preemption. **2000 Proc. 1st Quarter 985**.

The working group discussed the form of state adoption of the safe harbors. Some interested parties urged adoption of a model law. Others said there was no need for legislation, since the safe harbors were outlined in GLBA and legislative remedies were only needed if problems were identified. **2000 Proc. 2nd Quarter 1016.**

An interested party said that legislation about the 13 safe harbors would promote uniformity among the states. It was important for public policy reasons, because if states did not act, they faced federal preemption. A consumer representative also spoke in favor of a proactive rather than a reactive approach. **2000 Proc. 2nd Quarter 1017.**

# UNFAIR TRADE PRACTICES ACT

## Proceeding Citations
Cited to the Proceedings of the NAIC

A trade association representative noted that the NAIC's Unfair Trade Practices Act already contained many of the safe harbors within it, and she believed another layer of regulation would be confusing for consumers. A commissioner opined that, if states do not have the safe harbors codified in state law, they may have abdicated their regulatory reach to a federal agency. She expressed surprise that the trade associations were not advocating uniformity in this instance, given the uniformity mantra they had been espousing. **2000 Proc. 2nd Quarter 1017**.

A commissioner urged the group to develop model legislation as soon as possible. The chair noted that the group has not yet reached consensus on that issue. Some favored development of a whole model law, some favored developing model language by section, and some favored doing nothing. He suggested that if federal regulators did not take action on the pending preemption requests, the working group could decide a model was unnecessary. If the federal regulators took an aggressive stance toward preemption, the working group should develop more precise language for states to follow to avoid preemption requests. **2000 Proc. 3rd Quarter 1003**.

By the next meeting of the working group, a decision had been made to draft amendments to the NAIC Unfair Trade Practices Act to incorporate the safe harbors and rules from Section 305 of the Gramm-Leach-Bliley Act. Federal banking regulators were supportive of the idea, hoping that having a uniform model law available that has been reviewed by all parties would minimize the number of individual preemption requests received. **2000 Proc. 4th Quarter 851**.

The Unfair Trade Practices Act already contained a section on coercion of debtors. For that reason, the working group decided to amend the Unfair Trade Practices Act to address the 13 safe harbors. **2000 Proc. 4th Quarter 852**.

A regulator opined that it was preferable for states to create consistent public policy through development of model laws rather than leaving interpretation of dissimilar laws to the courts. The chair agreed that, even with the model law approach, there will be some litigation; however, the model law approach at least provided a framework. **2000 Proc. 4th Quarter 853**.

During development of the 2001 amendments, regulators addressed 11 of the 13 safe harbors in the proposed amendments to the Unfair Trade Practices Act. They decided not to address the two safe harbors related to privacy, as the NAIC's privacy regulations adequately addressed privacy disclosures. **2001 Proc. 2nd Quarter 836**.

## Section 1.        Purpose

A committee was appointed to draft model legislation to attempt to cover the field through state legislation with respect to matters covered by Section 5 of the Federal Trade Commission Act. The committee expressed the opinion that state laws must be strengthened if insurance commissioners were to be in a position to demonstrate that the states were adequately covering the field. **1946 Proc. 145.**

The committee reported, after review of various alternatives, that there was doubt whether existing state statutes would sustain the argument that insurance business was subject to state control in the field of unfair trade practices. After continued study they recommended a pattern of legislation for strengthening state laws bearing on unfair trade practices. **1946 Proc. 148.**

Section 1 was, on its face, a declaration on the part of the adopting state of the state legislature's intention to cover the field previously occupied by the Federal Trade Commission. The legislation served as an answer to the invitation by Congress for the states to act if federal laws are not to apply. The drafters considered it to be of legal and practical importance to unmistakably establish the intention of state legislatures to act under P.L. 15 and to occupy the field. **1946 Proc. 148.**

When amendments were being considered, it was suggested that a consumer class action suit might be authorized for commission of unfair trade practices. The proposals included: (1) creating unlimited class action rights; (2) creating a right to a class action triggered only by a finding by the commissioner that an unfair trade practice had been committed; and (3) empowering the commissioner to sue on behalf of injured members of a class for damages sustained. **1971 Proc. II 344.**

© 2011 National Association of Insurance Commissioners

# UNFAIR TRADE PRACTICES ACT

## Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 1** (cont.)

The advisory committee spoke out against inclusion of consumer class action suits for damages resulting from violations of the Act. They felt such a provision was unnecessary and undesirable for several reasons: (1) the common law in all states recognizes the principle of representative actions, so the consumer is not without remedy; (2) there is less reason for such legislation as applied to such a heavily regulated industry as insurance; (3) the regulator has the practical power to accomplish on behalf of the consumer what consumer class actions are designed to accomplish; (4) insurers would not then be able to rely on the decision of the regulator; (5) consumer class actions would result in "judicial" regulation of the insurance business; (6) the class action principle has been abused, with the principle beneficiaries being lawyers; (7) class actions impact on the entire industry and are not restricted to isolated acts by one insurer; (8) class actions tend to encourage champerty; (9) the insurer would not be able to rely on the opinion of counsel, or even the decision of the regulator, regarding interpretation of unclear laws because of the fear of class actions; and (10) the costs of the defense of class action suits are prohibitive. **1971 Proc. II 350-351.**

When revisions were adopted in late 1971, the final decision of the subcommittee was that a provision related to class actions was inappropriate. The remedies in the model bill provided broad relief, thus affording the consumer the complete protection of the insurance department, including complaint handling mechanisms, which had proved most effective. **1972 Proc. I 491.**

In 1989 the subgroup considering amendments to the model discussed what the NAIC position was regarding whether a private cause of action was intended to be created by the Unfair Trade Practices Act. They decided no private cause of action was intended and added proposed draft language to that effect. **1989 Proc. II 204.**

The amendment adopted in 1990 included a new final sentence to this section to clarify the private cause of action issue. **1990 Proc. II 169.**

The amendments developed in 2000-2001 in response to the Gramm-Leach-Bliley Act (GLBA) included a direct reference to that act in the purpose section. An insurance association commented that the proposal to identify GLBA expressly illustrated the harm that would be perpetuated by adoption of unnecessary model laws. They opined that any state that identified GLBA in its statute would be limiting rather than expanding the Unfair Trade Practices Act. They argued that the proposed amendment would surrender the states' most valuable tool in regulating insurance trade practices. **2000 Proc. 4th Quarter 846.**

**Section 2.        Definitions**

A.        The definition of affiliate was included in the 2001 amendments. **2001 Proc. 2nd Quarter 844.**

C.        One interested party commented that the definition of "customer" was overly simplistic and broad. The definition of customer could be interpreted to apply to corporate entities, expanding the reach of the consumer protections beyond natural persons. The draft that was the subject of this comment used the term "person" in the definition. **2000 Proc. 4th Quarter 847.**

Another interested party argued that the protections of the Unfair Trade Practices Act should extend to all customers. Like individuals, corporate entities could also be the victim of unfair or deceptive practices or be harmed by inequalities in bargaining power. **2000 Proc. 4th Quarter 847.**

A comment on the first draft suggested that the definition of customer should not extend to persons who were solicited to obtain insurance because soliciting has little to do with being a customer. Another interested party responded that this misperceives the nature of the protections of the Unfair Trade Practices Act. These protections were designed to prevent unfair or deceptive trade practices to anyone that could be a victim of such practices, whether he was a policyholder, applicant, or just being solicited to commence the purchasing process. **2000 Proc. 4th Quarter 847.**

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 2C** (cont.)

After review of a later draft of the model, an industry trade association again urged the working group to redefine customer more narrowly to apply solely to individuals. The suggested language was incorporated into the draft of the model. **2001 Proc. 1st Quarter 753**.

The federal consumer protection rules were drafted to apply solely to individuals and insurance regulators expressed no objection to using the same definition in the NAIC model. **2001 Proc. 2nd Quarter 838**.

D.      The definition of "depository institution" was added with the amendments adopted in 2001. An interested party commented that the definition was too simplistic, potentially building controversial extraterritorial authority, for example, expanding the act to cover depository institutions outside the state. **2000 Proc. 4th Quarter 846**.

Another interested party countered that the first comment misunderstood the nature of insurance regulation. Whereas banks were regulated according to where the bank was located, insurance was regulated according to where the customer was located. The fact that the Unfair Trade Practices Act did not specify that it applied to institutions within the regulating state was fully consistent with other insurance regulation. Persons doing business in the regulating state were subject to the state's restrictions regardless of where they were located. **2000 Proc. 4th Quarter 847**.

Later in the drafting process the chair pointed out that the definition of depository institution was clarified by adding that a depository institution does not include an insurance company. **2001 Proc. 1st Quarter 752**.

An insurance trade association continued to urge adoption of a more extensive definition of depository institution, arguing that the definition in the model was too simplistic. **2001 Proc. 1st Quarter 754**.

E.      This subsection was added when technical amendments were adopted in December 1990. **1991 Proc. IA 197**.

F.      The amended model adopted in 1971 included a provision to bring Blue Cross and Blue Shield plans under its terms. **1972 Proc. I 491**.

The amendments adopted in 1990 included revisions to this section. The entities that had been referenced in the drafting note were defined as insurers and the drafting note eliminated. In addition, the model was changed throughout to replace "person" with "insurer" where appropriate. **1990 Proc. II 170**.

I.      When considering amendments to the model in 1991 and 1992, the drafters agreed to add a definition of producer to make the Act consistent with recent amendments to other NAIC models. It recognized the producer concept to include not just agents, but anyone involved in the production of insurance business. **1992 Proc. IA 226**.

**Section 3.        Unfair Trade Practices Prohibited**

The subgroup drafting model amendments in 1989 held extensive discussions as to whether it was appropriate to broaden the scope of the model act regarding the long-standing "general business practice" standards. **1989 Proc. II 204**.

**Section 4.        Unfair Trade Practices Defined**

The drafters of the model cautioned that no statute of this character could specify every act or practice that might meet the concept of what is unfair or deceptive. The initial adopted model included the following unfair trade practices: misrepresentation and false advertising of policy contracts, false information, defamation, boycott and coercion, false financial statements, stock operations and advisory committee contracts, discrimination and rebates. **1946 Proceedings 145-146**.

© 2011 National Association of Insurance Commissioners

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 4** (cont.)

A member of other subjects were considered by the committee for inclusion, but after consideration were excluded. Fraud, barratry, bribery, and making of political contributions were excluded, as preferably being dealt with as unfair trade practices generally, and not as unfair trade practices confined to the insurance business. **1946 Proc. 146.**

At the time the model was adopted, the drafters again cautioned that no statute could specify every act, method or practice which might be unfair or deceptive. All that can be expected is a reasonably adequate coverage of sufficient extent to reflect a considered exercise of legislative judgment and declaration of policy. **1946 Proc. 149.**

When considering amendments to propose to regulators, the advisory committee had to determine what "trade practices" were for the purposes of the Act. In order to determine what prohibitions might be appropriate under the model act, they recommended against inclusion of practices which might, in the general scheme of statutory enactments, be found in other portions of the insurance law. For example, a practice relating to unfair discrimination in fire and casualty rates should appear in the rating laws rather than in an unfair trade practices act. They suggested the model act should not become a repository for specific acts which the commissioner can reach through existing law. **1971 Proc. II 345-346.**

A.       One of the unfair practices identified was lowballing: purposely quoting a lower rate. The phrase added to Paragraph (6) was designed to address this concern. **1991 Proc. IA 219.**

When the drafters were considering the addition of language to Paragraph (5) to refer to race, religion and national origin, there was extensive debate about whether to add similar language to Paragraphs (1) and (2). On one side were those who asserted that broadened nondiscrimination language would assure that discrimination would be dealt with effectively no matter how it might manifest itself. The responsive argument was advanced that discrimination was already dealt with effectively in the state rating law and that adding a provision to Paragraphs (1) and (2) would be redundant, unnecessary, and potentially would lead one to falsely conclude that the language was actually necessary for a state to deal effectively with discrimination on the basis of race, religion or national origin. **1992 Proc. IIA 150.**

B.       After the decision in *Federal Trade Commissioner v. Traveler's Insurance Co.* 362 U.S. 293 (1960) was handed down, the committee looked at ways to provide a method for the commissioner to proceed against a nonadmitted insurer for commission of any unfair trade practice. Since the concern of the committee was not limited to the area of false advertising, but reached all unlawful activities of nonadmitted insurers, a more comprehensive solution was needed. **1960 Proc. II 486-487.**

E.       It was proposed that Section 4E(2) be amended by adding the last phrase. It was the intent of the drafters to hold companies responsible for oral statements made to department officials or contract examiners. **1992 Proc. IA 227.**

G.       When amendments were being considered in 1971, it was suggested that specific language be added dealing with refusal to insure risks solely because of age, residence, race, color, creed, marital status, ancestry, lawful occupation; or solely because the insured would not agree to place collateral business with a particular insurer, if such practices are performed with such frequency as to constitute a general business practice. **1971 Proc. II 342.**

The subcommittee reviewed several drafts which would have restricted the right of insures to reject persons as risks solely because of race, color, creed, marital status, sex, national origin, residence, age, lawful occupation, failure to place collateral insurance, or previous refusal by another insurer. They decided not to incorporate the provisions because some of the matters were covered in civil rights laws, some were covered in special laws related to auto insurance, and the broad philosophical issues would appear to be more appropriate for a separate bill. **1972 Proc. I 491.**

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 4G** (cont.)

While considering amendments to the Unfair Trade Practices Act dealing with redlining and similar discriminatory practices, the task force also recommended addition of a provision to prohibit discrimination based on the sex or marital status of an individual. Although the initial thought was to adopt a provision related to auto insurance, the paragraph drafted covers all lines of insurance. **1979 Proc. II 552-554.**

In 1977 a task force was appointed to consider the issue of "redlining," especially with respect to personal lines insurance. More specifically, the committee was charged to develop a definition of redlining and consider its relationship to the unfair trade practices laws in the states. **1977 Proc. II 627.**

A statement of principles and objectives adopted by the Availability of Essential Insurance Subcommittee stated there was evidence that some insurers were refusing to insure, refusing to renew, or limiting the amount or type of property and automobile insurance coverage available to individuals because of the geographic location of a particular risk. The availability of insurance should not be dependent on the geographic location of a particular risk. It is the position of the NAIC that the insurance industry has been perceived to be redlining, and the perception can only be altered by implementing such practices as stating exact reasons for rejections, cancellations and nonrenewals. The insurance industry should also abandon underwriting "short-cuts" such as refusing to accept an application solely because the applicant was refused coverage by another carrier. **1978 Proc. I 628.**

The first draft of an amendment to prevent redlining was simply to define as an unfair trade practice "refusing to insure, refusing to continue to insure, or limiting the amount of coverage available to a risk because of the geographic location of the risk." An accompanying drafting note stated the language was intended to have broad application to all lines of insurance where unfair discrimination is practiced with regard to the geographic location of the risk. However, the drafters recognized that some states might want to limit the application of the proposed language to certain lines or classes of insurance. **1978 Proc. I 629.**

A nonprofit public interest organization presented a report on redlining to the committee considering amendments to the Unfair Trade Practices Act. **1978 Proc. I 642-644.** Their definition of redlining included arbitrary and capricious denial of insurance based on the geographic location of the property to be insured, and arbitrary and unfair price discrimination based on the geographic location of the property. **1978 Proc. I 643.**

The report suggested that insurance has become a necessity for everyday life for most citizens, and as such, must be available to anyone who wants it at a fair price. Risk must be taken into account on a fair, equitable and open basis. Classes of risk with similar characteristics should be treated consistently, in an objective fashion. The report suggested that rating territories should be entire states or large sections of states. Cities should not be rating territories, nor should there be special rate factors for cities. **1978 Proc. I 644.**

Another type of rate differential the drafters were asked to define as discriminatory was differing rates based on the age of the property being insured. One comment received suggested that this was a way of discriminating against those in low income groups. **1978 Proc. I 659.**

The committee was interested in the extent of the redlining problem and suggested hearings in the states and the possibility of a study to determine the full extent of the problem. **1978 Proc. II 467-471.**

In attempting to illustrate the meaning of the proposed redlining amendment to the model, the task force also prepared a draft model regulation. Its purpose was to state specific examples of the types of practices that should be deemed unfair. **1978 Proc. II 475-476.**

A study of redlining in New York was included in the *Proceedings*. **1978 Proc. II 478-509.**

© 2011 National Association of Insurance Commissioners

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 4G** (cont.)

An advisory committee was asked to prepare a report on steps the insurance industry must take to address the concerns outlined by the redlining task force. The committee was asked to address itself to several issues: (1) what is the duty of the insurance industry to educate policy holders as to the reason for rejection or cancellation; (2) what has the industry done, or should it do, to identify potential problem areas and advise consumers of necessary corrective action to continue insurance coverage. They also reported on alternative forms of coverage. **1978 Proc. II 515-556.**

The model amendment adopted included the substance of the proposed model regulation, so the need for a separate model regulation was obviated. **1979 Proc. II 525.**

A representative from the U.S. Commission on Civil Rights spoke against the model amendments adopted. He felt that inclusion of the phrase prohibiting the practice unless it is "for a business purpose that is not a pretext for unfair discrimination," amounts to little more than fitting regulations comfortably around current practices rather than curtailing abusive practices. **1979 Proc. II 579.**

The task force spent a considerable amount of time deciding between two alternative amendments to deal with the discrimination issue in general and redlining in particular. The general amendment simply prohibited discrimination in the issuance, renewal, cancellation or limitation of property insurance. A regulation spelled out details with regard to redlining. **1979 Proc. II 547-548.** A more specific amendment detailed types of discrimination prohibited, and this is the alternative adopted. **1979 Proc. II 39-40.**

When modifications were made to the Unfair Trade Practices Act in 1990 to accommodate the separate free-standing act, there remained unfinished business relative to fair treatment of consumers. The changes to ensure an actively competitive marketplace included consideration of several issues: redlining, refusal to offer coverage, recision of policies and blackballing (using the underwriting decision of other insurers to deny coverage). **1991 Proc. IIA 265.**

In an attempt to deal with the issue of redlining the drafters considered several proposals. The one they ended up adopting changed Paragraph (3) to add the phrase about sound underwriting in place of a provision which had allowed a limitation for a business purpose that was not a pretext for unfair discrimination. **1992 Proc. IA 227-228.**

A change was also suggested to Paragraph (4) to add the word "solely" and again delete language related to a business purpose. It was the regulators' intent for this to be an affirmative change to not allow any such exception based upon age of the property alone. **1992 Proc. IA 228, 1993 Proc. I.**

A consumer advocate raised the issue regarding the failure of the Unfair Trade Practices Act to specify race, religion and national origin in Section 4G(5). There was a general consensus that Paragraph (5) should be amended. **1992 Proc. IIA 149.**

As a subsequent drafting session, it was decided that there should be provided an exception for fraternal insurance companies since such insurers are inherently allowed to discriminate in these areas by statute. **1992 Proc. IIA 144.**

A new Paragraph (7) was added in 1992 to deal with the issue of "blackballing." Some insurers apparently considered it efficient to simply reject those consumer that other insurers had previously rejected without any appropriate underwriting. The advisory committee objected that such language would pose a problem for surplus lines business where an insurer actually must inquire as to the rejection of a risk. The drafters changed the original language, which had prohibited an insurer from requesting information about prior cancellation, to respond to this concern. The drafters stated that the purpose of the provision was to make insurers base their decisions upon sound underwriting principles and not merely on rejection by another insurer. One industry attendee suggested that the policy was currently allowed in life and health business, and wondered if this provision was to apply only to property and casualty business. The committee chair responded that the majority of regulators supported the new language without exceptions. **1992 Proc. IA 230.**

© 2011 National Association of Insurance Commissioners

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 4G** (cont.)

At the next drafting session it was decided to add the second sentence to exempt excess and surplus lines. **1992 Proc. IIA 144.**

Several suggestions were considered for what became the recision reference in Paragraph (8). A concern considered by the drafters was the need to address post claims underwriting to require underwriting on a timely basis. **1992 Proc. IA 232.**

Later the drafters decided that the suggested paragraph was ambiguous, and that a model recision, cancellation and nonrenewal law should be developed as a separate project. The reference was changed so that Paragraph (8) simply referred to the state's law on recision. **1992 Proc. IIA 148.**

H.      The drafters of the initial NAIC model surveyed state laws to see what type of unfair trade practice laws were already in place. The only law found to be in effect in all states in 1945 was a prohibition on rebating. **1946 Proc. 148-149.**

The model as originally adopted applied only to rebates of premiums for life insurance, annuities, and accident and health insurance. The drafters considered enlarging this section to apply to all lines. The advisory committee expressed disagreement with that concept, pointing out that rating laws might already contain such a provision, which would lead to duplication and could have the effect of imposing double penalties. For states without a rebate provision in the rating law, the advisory committee recommended adoption of that provision rather than enlarging upon the provisions of the Unfair Trade Practices Act. **1972 Proc. I 503.**

Paragraph (2)(d) and the drafting note following it were added in 2001 to recognize specifically one of the safe harbors of the Gramm-Leach-Bliley Act of 1999 (GLBA). This amendment was just one of a set of amendments made in response to GLBA. **2001 Proc. 1st Quarter 752.**

Federal thrift regulators suggested changes to the draft proposal to incorporate reference to the Home Owner's Loan Act. **2001 Proc. 1st Quarter 754.**

I.      This subsection was added when the model was revised in 1990. **1990 Proc. II 173.**

J.      With little discussion, the proposal to require maintenance of marketing and performance records was included in the model revisions. **1992 Proc. IA 232-233.**

K.      The subcommittee appointed to consider amendments to the model wanted to include specific language which would define as an unfair trade practice the failure of an insurer to assemble all of the complaints received by the company, or its representatives, in one place to facilitate periodic review by insurance department examiners. They decided the proposal should include a requirement that information be maintained indicating the number of complaints received by classification of coverage; the nature of these complaints; the number rejected; and the length of time it took the insurer to act on the complaints. **1971 Proc. II 342.**

The revised model adopted in 1971 contained the provision now labeled Subsection K. Complaint handling procedures were of increasing interest to regulators. The efficiency with which complaints are handled is a test of public confidence due the insurer. In addition, reporting of complaint handling data would reveal much about the efficiency of the laws, regulations and other regulatory tools used by insurance departments. **1972 Proc. I 492.**

The subcommittee considered making the complaint report a public document. The advisory committee spoke out against the idea, since the *number* of complaints may not be a good measure of how good a job a company is doing. Complaint files must be reviewed by examiners to determine whether a complaint is justified. The advisory committee listed several

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the Proceedings of the NAIC

**Section 4K** (cont.)

objections: (1) it would be one more set of reports to prepare; (2) making the report a public document could do great harm to insurers because the document could be used without considering the premium volume of the insurer, the geographic area, or the method of operation of the insurer; and (3) it would be admissible evidence in any hearing. **1972 Proc. I 507.**

L.        Misrepresentation in insurance applications was not clearly covered by the original law. For this reason the amended version included this provision to make it clear that such actions were prohibited. **1972 Proc. I 492.**

M.        This subsection was added to the model in 1989. The drafting committee first considered development of a model law on financial planners, but decided instead to address the concerns voiced regarding the need for adequate disclosure to consumers. **1989 Proc. II 131-132.**

While the 2001 amendments were under development, a suggestion from a financial planning association was considered. It resulted in the inclusion in Subsection M(1) of language that had been in a drafting note below the paragraph. The financial planner also suggested adding the term "certification," since technically a designation is permanent, such as an MBA or Ph.D., but a certification is on-going. **2001 Proc. 1ˢᵗ Quarter 755**.

N.        In 1993 this subsection was added by the Long-Term Care Insurance Task Force. It coordinated with amendments to the Long-Term Care Insurance Model Regulation detailing association responsibilities when an association markets or endorses long-term care insurance. **1993 Proc. 1st Quarter 276.**

O.        When drafting amendments to the model in 1991 and 1992, the committee first considered a brief proposal requiring claims information for the prior three years be made available to the policyholder. There was considerable concern expressed by the advisory committee with particular objection to providing information on group policies. It was the intent of the drafters to limit this to property/casualty policies so they amended the draft to show that. **1992 Proc. IA 233.**

The next time the subcommittee met to consider the draft, they again discussed the issue of whether this provision should apply only to property and casualty policies. A consumer advocate voiced the opinion that it should be made to apply to life and health insurance as well. A regulator from one state suggested that the provision was incomplete because it did not specify what needed to be included in the claims history and recommended the addition of language similar to that found in his state code. One attendee pointed out that the language being put forth was not found in that state's Unfair Trade Practices Act. **1992 Proc. IIA 148-149.**

There was extended discussion by the drafters on whether claims history needed to be provided automatically within a certain number of days prior to nonrenewal or only upon request. The concern was raised that if the information was required only 60 days prior to nonrenewal that would not be sufficient time for an insured to utilize it prior to being nonrenewed. The chair of the advisory committee noted that there was no general objection to providing claims history in property and casualty insurance or even in life and health with certain stated limits. However, the advisory committee objected to producing a claims history automatically to every insured when it is in actuality only required in less than one percent of all cases. **1992 Proc. IIA 149.**

At a subsequent meeting the language earlier suggested from one of the state codes was adopted, with some modifications. The primary source of debate was whether there exists sufficient justification to report this information at all. It was articulated by the regulators that in many instances the insured was left in the untenable position of being required by a replacing insurer to provide certain loss information when its existing insurer would not provide it. If the industry wants this type of information in order to underwrite an insured, it must also provide the information. Currently if a replacing insurer asks for data that the insured is not able to provide, the replacing company typically will not quote the business. **1992 Proc. IIA 142-143.**

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the Proceedings of the NAIC

**Section 4O** (cont.)

There was discussion on whether the time frame for providing the information should be 30 days or 45 days. First the drafters decided to use 45 days, but then agreed that 30 days was clearly sufficient time in the personal lines area. It was also agreed to add a drafting note stating that the provision might not be required in states with a privacy law governing access to the information. **1992 Proc. IIA 143-144.**

At one point in the drafting process it was suggested that the provisions of Subsection O should only apply to *commercial* property and casualty policies. The word was added to the draft at that point, but later removed. **1992 Proc. IIA 149.**

The provisions adopted as a consensus position included removal of a requirement to provide loss reserve information, the addition of a requirement that companies be prohibited from requesting loss reserve information on open claims to underwrite applicants for insurance, and inclusion of an indication that the written notification of the right to request loss information be "prominent." **1993 Proc. IA 244.**

P.    The drafters considered several options for what became the drafting note reference to cancellation laws. They wanted to deal with issues of cancellation and nonrenewal. After discussion there was a consensus that the issue should be considered elsewhere in the insurance code and not in the Unfair Trade Practices Act. It was decided that in place of the drafters' suggestions, a reference would be made to existing state law. **1992 Proc. IA 231.**

At a later point in the drafting process the drafters again considered including cancellation and nonrenewal in the model. The advisory committee stated the position that it was not appropriate to refer to cancellation and nonrenewal because states have other laws already in their codes. They were concerned with the position courts would take in interpreting the states' inclusion of cancellation and nonrenewal laws under the Unfair Trade Practices Act as well as the possibility of it leading to bad faith claims judgments. **1992 Proc. IIA 130.**

The position finally agreed upon was to delete any specific reference to cancellation and nonrenewal laws and just to refer in Subsection P to any other sections with a drafting note suggesting states may insert any other laws deemed desirable or necessary, including cancellation and nonrenewal laws. **1993 Proc. IA 243.**

**Section 5.        Favored Agent or Insurer; Coercion of Debtor**

Before adoption of the model act, the drafters considered adding another defined unfair trade practice. The committee gave serious consideration to the practice followed by some lenders of insisting upon control of the insurance property before they would agree to loan money. Because this type of provision would have affected people and institutions beyond those normally subject to insurance regulation, it was felt this would be a more appropriate provision for a general statute rather than an insurance regulatory statute. The committee pointed this out in their report lest their action in deleting the section be construed as an abandonment by the committee of its condemnation of the practice. **1946 Proc. 395.**

A group was created in 1971 to review the model Unfair Trade Practices Act. There was considerable interest in four additional practices which the committee wanted to define as unfair trade practices: (a) favored agent or insurer coercion of debtors; (b) use of insurance as an inducement to purchase goods and services; (c) interlocking boards of directors; and (d) claims practices. **1971 Proc. II 341-342.**

The committee looked at provisions prohibiting any requirement that insurance be purchased or renewed through any particular agent, broker, or insurer as a condition to furnishing a loan, service or property. The provisions would not prevent the exercise upon a reasonable basis of any right to approve or disapprove the insurer selected by a person. The advisory committee recommended that this provision be included in the model act as an additional defined unfair practice. **1971 Proc. II 346.**

© 2011 National Association of Insurance Commissioners

NAIC Model Laws, Regulations, Guidelines and Other Resources—January 2011

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 5** (cont.)

The amended model contained a new section that prohibited discrimination by creditors in favor of certain insurers or agents, and it prohibited coercion of debtors with regard to insurance. The new section was an expansion of the law, but since the abuses related directly in insurance they fit the purpose of the law and were a proper concern. **1972 Proc. I 492.**

In the mid 1970's a task force was created to consider amendments to this section. The objective was to strengthen the model legislation to provide the insurance-buying public freedom of choice as to the placement of insurance and to remove opportunities for unfair competitive advantages held by lender affiliated insurance agencies. **1976 Proc. II 373.**

In December 1976 the format of the section was completely revised. **1977 Proc. I 226-227.**

Amendments to the model under consideration in late 2000 made a number of changes to Section 5. One interested party commented that the proposed amendments extended the model to an affiliate of a depository institution merely because of the affiliation. In the absence of a genuine problem warranting such a compliance burden, the regulatory extension itself would be argued to be discriminatory and susceptible to challenge by either depository institutions or their federal regulator. **2000 Proc. 4th Quarter 847**.

Another interested party suggested deleting all reference to depository institutions in Section 5. The commenter agreed that the expansion of the Unfair Trade Practices Act was necessary to ensure that banks were subject to the same treatment as other insurance providers. However, this could be accomplished by expanding the definition of person to include banks and savings associations. This would accomplish the goal of bringing banks within the scope of the model, but would avoid several problems with the various references to depository institutions or affiliates of depository institutions. **2000 Proc. 4th Quarter 847-848**.

The interested party noted that although the restrictions in Section 5 were intended to apply to all entities that engaged in leading activities (including insurance agents), distinguishing between banks and other entities by naming them separately only increased the possibility that these restrictions would be seen as applying to them separately, and thus impermissibly. **2000 Proc. 4th Quarter 848**.

A.      In addition to the references to depository institutions, the 2001 amendments added the last sentence of Subsection A to the model. **2001 Proc. 2nd Quarter 848**.

B.      This subsection was adopted when the entire section was revised in 1976. **1977 Proc. I 226-227**.

When amendments to the model were considered in 2000-2001, the first draft retained the old language of Paragraph (1), but added additional text about the fact that acceptable insurance was required and that it would be available from the depository institution. **2000 Proc. 4th Quarter 863**.

An interested party commented that no safe harbor in the Gramm-Leach-Bliley Act protected the prohibition that had been in the model since 1976 that said a person that lent money could not solicit insurance for the protection of real property after a person indicated interest in securing a first mortgage credit extension, until the person received a commitment in writing from the lender. The commenter opined that this type of restriction would significantly interfere with a depository institution's ability to sell insurance, because the depository institution would be unable to market certain types of insurance products during a time when the customer may need those products the most. **2000 Proc. 4th Quarter 848**.

Another interested party responded that a provision would not be prohibited merely because it was not on the list of 13 safe harbors. There must be evidence that the provision significantly interfered with a bank's ability to do business. The commenter opined there was no evidence that Paragraph (1) constituted such an impediment. The reason put forth was that it applied to all lenders, including banks, so did not treat banks any differently. **2000 Proc. 4th Quarter 848**.

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 5B** (cont.)

The commenter pointed out that the new proposed language to be added specifically provided that the restriction did not prohibit a lender from informing a customer that insurance was required and noting it was available from that lender. This limitation would enable lenders to inform consumers of their insurance needs and of the availability of the insurance products from the lender. **2000 Proc. 4th Quarter 849**.

An early draft of the 2001 model revisions contained a provision requiring a depository institution to obtain a customer's express consent to disclose credit-related insurance information. Some interested parties raised concerns related to privacy and to the Fair Credit Reporting Act. The chair reported in early 2001 that the paragraph had been deleted and replaced by a drafting note that referred to the NAIC's model privacy regulations and the Fair Credit Reporting Act. **2001 Proc. 1st Quarter 753**.

An interested party suggested that the new Paragraph (7) on licensing was unnecessary as it was covered in other NAIC models and was not a safe harbor. The chair responded that the drafters had not limited themselves to the safe harbors, but noted that two of the safe harbors were closely related to licensing. Another interested party noted that there might be difficulty prosecuting an unlicensed individual under the current Unfair Trade Practices Act; the language might limit a regulator's options. **2001 Proc. 1st Quarter 754-755**.

A representative from an insurance trade association urged deletion of Paragraph (7). She said that language might allow individuals to pursue a private right of action with respect to licensing matters in those states that allow a private right of action under their Unfair Trade Practices Act. Regulators disagreed that there was potential harm from including the provision. **2001 Proc. 2nd Quarter 839**.

The trade association representative also urged deletion of Paragraph (8). She said it was unnecessary because it was covered by another NAIC model and was too restrictive. The working group gave the comment serious consideration but declined to change the draft. **2001 Proc. 2nd Quarter 839**.

Just before adoption of the model the working group made a change to Paragraph (8). The purpose of the change was to address concerns regarding the application of the "one-time nominal fee" language. **2001 Proc. 2nd Quarter 836**.

An interested party suggested an amendment to the new Paragraph (11) to add the words "by depository institutions" to give context to the term "retail deposits." The generally accepted meaning of "retail deposits" would be deposits accepted in the teller area of a depository institution. Without adding the clarifying context, the term could be read to apply to brokerage and other transactions. **2001 Proc. 1st Quarter 754**.

C.      The Subcommittee on Unfair Competition considered the possibility of further amendments to this section to address the problems presented by the implicit economic leverage that exists when a credit relationship is established with a lending institution, **1984 Proc. II 78.**

The amendments adopted in 1984 added the second paragraph of Subsection C to address coercion of debtor problems identified. **1985 Proc. I 85-86.**

Subsection C was significantly revised when the 2001 amendments were developed. Interested parties suggested the revisions were redundant and duplicative. Credit lenders were already required by the federal Truth in Lending Act to disclose that property insurance may be obtained from a person of the consumer's choice. **2000 Proc 4th Quarter 850**.

An interested party suggested adding a limitation regarding personal, family or household purposes, similar to the action the working group took for Subsection D(1). **2001 Proc. 1st Quarter 754**.

© 2011 National Association of Insurance Commissioners

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 5** (cont.)

D.      A new Subsection D was developed as a result of the Gramm-Leach-Bliley Act (GLBA) amendments considered in 2000 and 2001. An interested party commented that the first paragraph of Subsection D required a depository institution or affiliate to make four standard disclosures concerning the limited financial backing of an insurance product. Those disclosures were required to be made prior to the insurance sale and must be in writing. He opined that GLBA generally protected this type of state restriction from federal preemption, but the safe harbor would require the disclosure to be in writing "where practicable." He said that this was an important qualifier; it recognized that there were certain situations, such as a telephone solicitation, where it was extremely impractical to provide disclosures in writing prior to the sale. He suggested that the model include the "where practicable" language to avoid a restriction that would significantly interfere with a depository institution's authorized insurance activities. **2000 Proc. 4th Quarter 850**.

Another commenter opposed the inclusion of the "where practicable" language. He said several agents associations opposed the inclusion of such open-ended, discretionary language without guidance on what is or is not "practicable." If the language would be included, the NAIC should specify exactly what circumstances would warrant relaxation of the requirement and to what extent. **2000 Proc. 4th Quarter 850**.

As the first draft was written, Subsection D contained only Paragraph (1) and a part of Paragraph (2) requiring written acknowledgment. An interested party suggested that this would confuse consumers with mandatory disclosures not related to property and casualty products. He suggested that the disclosures should only be required for insurance products with investment components. **2000 Proc. 4th Quarter 850**.

The next draft was changed by adding language limiting the disclosure requirements to insurance transactions that occur on the premises of the depository institution or on behalf of the depository institution. Paragraph (2) was enhanced by limiting the application of the disclosure requirements to insurance products intended for personal, family or household purposes. **2001 Proc. 1st Quarter 753**.

An interested party commented on the provisions of Paragraph (3) in regard to electronic commerce. He expressed concern about the potential conflict between the requirement for written acknowledgment and electronic commerce. He noted that it is highly unlikely this provision would be consistent with a state's insurance code. **2001 Proc. 1st Quarter 755**.

E.      The amendments considered in late 2000 included a revision of this subsection, first added in 1976. Most important was a sentence allowing the commissioner to examine the books and records.

An interested party voiced objection to this language because it expanded the commissioner's power far beyond what had been permissible. He said that under existing laws regulators did not have *carte blanche* to examine the banking or lending records of a financial institution. Lenders have neither the authority nor the right to reveal protected borrow information to regulators. The interested party suggested either eliminating the proposed changes or fine-tuning the language so that lenders were not required to make contractually protected consumer information available to insurance commissioners. **2000 Proc. 4th Quarter 850**.

G.      As originally drafted in 1976, the section referred to credit life and health insurance. A credit insurance trade association suggested adding credit property and credit involuntary unemployment to that list. **2000 Proc. 4th Quarter 850**.

An insurer asked regulators to consider adding mortgage insurance to the exemption in Subsection G. Like credit life insurance and credit health insurance, financial institutions have had the authority to offer mortgage insurance products for decades. The commenter suggested the purpose of the proposed amendments was to address new marketing opportunities available to financial institutions as a result of the passage of the Gramm-Leach-Bliley Act. Accordingly, the scope of the NAIC's model should not include products that lenders have been authorized to offer for decades. He urged the working group to accept the argument that mortgage insurance was functionally equivalent to credit insurance. Like credit insurance, optional mortgage insurance was intrinsically tied to the loan transaction. **2001 Proc. 1st Quarter 753**.

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 5** (cont.)

The drafting note at the end of Section 5 was part of the amendments adopted in 2001 in response to the Gramm-Leach-Bliley Act. **2001 Proc. 2nd Quarter 851**.

**Section 6.        Power of Commissioner**

Section 6 was substantially revised in 2001 by the addition of the last two sentences. To broaden its scope, references to persons were added wherever insurers were noted. **2001 Proc. 2nd Quarter 851**.

**Section 7.        Defined and Undefined Practices: Hearings, Witnesses, Appearances, Production of Books, and Service of Process**

The sections now numbered Sections 7 and 8 were originally drafted in six sections setting up procedures for enforcement of the model's prohibitions similar to the procedures prescribed by the Federal Trade Commission Act. **1946 Proc. 149.** Before adoption they were consolidated in much the same fashion as the current version. **1946 Proc. 39.**

The procedures for dealing with "undefined" unfair trade practices in the original model were felt by many commissioners to be too cumbersome. This required notice and hearing, and the commissioner to make a determination, but he had no power to order the licensee to desist from such practices. He was required to go to court to get an injunction in order to enforce his findings. **1971 Proc. II 343.**

The NAIC model was drafted to closely parallel the federal law on trade practices and much of the language was lifted bodily from the federal law. Unlike the federal law, the NAIC model enumerated certain defined acts or practices peculiar to the business of insurance. Since any such enumeration could not cover every conceivable situation, the model act contained an omnibus provision virtually identical to the federal laws. In addition, both acts contained similar enforcement provisions. The persons charged with enforcement of the acts were given the authority to examine and investigate, conduct hearings, and issue cease and desist orders, which were subject to judicial review. Even the penalty provision of the two acts were identical. **1971 Proc. II 345.**

One state regulator submitted suggestions for changes. He recommended a rule-making authority to be substituted for the omnibus clause because it was more equitable to those being regulated by the Act, and could be broader in scope than a cease and desist order, to get at the concept of the unfair act or practice at issue. **1971 Proc. II 367.**

A.        References to depository institutions were added with the 2001 amendments. The last two sentences were added at the same time. **2001 Proc. 2nd Quarter 851**.

B.        During the development of amendments in 2001, Subsection B was amended to clarify that persons, depository institutions and affiliates of depository institutions would be afforded the same rights as insurers. **2001 Proc. 1st Quarter 753**.

D.        Language regarding production of records of depository institutions was added as part of the 2001 amendments. **2001 Proc. 2nd Quarter 851**.

**Section 8.        Cease and Desist and Penalty Orders**

A.        The original model adopted did not contain any specific language for penalties for violation of cease and desist orders. When amendments were being considered in 1971, one suggestion was for specific language amending the penalty section to include a monetary penalty for violations of the act. **1971 Proc. II 342.**

© 2011 National Association of Insurance Commissioners

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the Proceedings of the NAIC

**Section 8A** (cont.)

An advisory committee presented a report to the drafting committee suggesting changes to streamline administrative procedures and put more "teeth" in the model. The model as it existed only provided a penalty after a cease and desist order was violated. **1971 Proc. II 343.**

The version adopted in 1971 greatly strengthened the enforcement procedures in the model bill. Every department that had been contacted by the subcommittee expressed dismay and discontent with the originally adopted enforcement powers. The new model made clear that hearings may be held and penalties applied for violations of both defined and undefined trade practices; that the penalties included cease and desist orders, monetary penalties, suspension and revocation of licenses, and other reasonable relief; and that the commissioner could promulgate rules to further clarify the defined unfair trade practices. **1972 Proc. I 492.**

The draft adopted in 1971 set up in Paragraph (1) a two-stage penalty, a lesser amount ($1,000) for so-called "innocent" or "technical" violations, and a higher amount ($5,000) for commission of acts which the person "knew or reasonably should have known" were in violation of the Act. The advisory committee suggested that it would be more appropriate not to include monetary penalties for "innocent" violations. **1972 Proc. I 508.**

The penalties were increased when model amendments were adopted in 1990. The aggregate penalty was raised from $10,000 to $100,000. The penalty for flagrant violations was raised from $5,000 to $25,000 with an aggregate of $250,000 instead of $50,000. **1991 Proc. IA 201.**

The grant of authority included in Paragraph (2) the 1971 revision allowed the commissioner to suspend a license if the person "knew or reasonably should have known" he was in violation of the act. The advisory committee suggested the term "willfully" be used instead because it was a somewhat stricter test and was typically required in other state statutes. Consistency with the general statutory scheme would be desirable and appropriate. **1972 Proc. I 508-509.**

The proposed draft of 1971 contained a third alternative penalty. It allowed the commissioner to order such other relief as is reasonable and appropriate. The advisory committee strenuously opposed the provision. They felt it wasn't needed because the commissioner already had ample authority. They also suggested it conferred on the commissioner the powers of a court of equity without any of the limitations or safeguards prescribed for judicial proceedings. They argued the provision went beyond the authority conferred upon other regulators and was too broad. The laws and legislation committee deleted the provision before final adoption of the model revisions. **1972 Proc. I 509.**

When the model was amended in 2001, Section 8 was rewritten to clarify that persons, depository institutions and affiliates of depository institutions would be afforded the same rights as insurers. **2001 Proc. 1st Quarter 753.**

B.        Subsection B was added with the 2001 amendments. **2001 Proc. 2nd Quarter 852.**

### Section 9.        Judicial Review of Orders

A.        While the NAIC was drafting amendments in 2001 in response to the Gramm-Leach-Bliley Act of 1999, reference to depository institutions and insurers was added to Subsection A. **2001 Proc. 2nd Quarter 852.**

### Section 10.        Judicial Review of Intervenor

## UNFAIR TRADE PRACTICES ACT

### Proceeding Citations
Cited to the Proceedings of the NAIC

**Section 11.        Penalty for Violation of Cease and Desist Orders**

Under the original model act the commissioner could recover up to $5,000 in penalties in a civil action if there was violation of a cease and desist order. The revisions adopted in 1971 permitted the commissioner to call a hearing and assess a penalty up to $10,000. A provision was also added to allow suspension or revocation of the insurer's license. **1972 Proc. I 500.**

While amendments were being developed in 2001, reference to insurers and depository institutions was added to Section 11. **2001 Proc. 2nd Quarter**.

**Section 12.        Regulations**

The original model did not confer on the commissioner any authority to promulgate regulations. Some commissioners on the drafting committee considering amendments thought the act could be made more effective if some authority was added in this area. One suggestion was to give the commissioner the power by regulation to add new specific unfair trade practices to the list enumerated in Section 4. **1971 Proc. II 343-344.**

The language of the section was broadened in 1990. Instead of specifying acts prohibited by Sections 4 and 5 which would serve as the subject of regulations, the model was changed to give authority to carry out the provisions of the act by promulgating regulations. **1990 Proc. II 176.**

**Section 13.        Provision of Act Additional to Existing Law**

**Section 14.        Immunity from Prosecution**

**Section 15.        Separability Provision**

―――――――――――――――――――――――――

*Chronological Summary of Actions*

*June 1947: Model law adopted.*
*December 1971: Included hospital and medical service plans under Act; added provisions regarding claims settlement practices. Section 5 on coercion of debtors also added. Penalty and enforcement provisions strengthened; authority to adopt regulations added.*
*December 1976: Revised Section 5 on coercion of debtors.*
*June 1979: Added subsection on unfair discrimination in response to concerns about redlining.*
*December 1984: Amended Section 5.*
*June 1989: Added disclosure provisions for financial planners.*
*December 1989: Changed name of model.*
*June 1990: Developed freestanding model on claims settlement practices and deleted provisions on subject from Unfair Trade Practices Act. Added provision that no private cause of action is created by model. Made technical amendments.*
*December 1990: Further technical amendments to coordinate trade practices and claims settlement practices provisions. Increased penalty for violation of cease and desist orders.*
*December 1992: Changed terminology to refer to "producer" throughout model, revised unfair discrimination subsection, and added requirement to maintain marketing records. Added requirement to provide claims history upon request.*
*June 1993: Added provision requiring insurers to certify information related to association endorsement of long-term care insurance to Section 4.*
*June 2001: Adopted amendments to address issues raised by the federal Gramm-Leach-Bliley Act of 1999.*
*June 2008: Adopted guideline amendments to address lawful travel underwriting issues.*

© 2011 National Association of Insurance Commissioners

# Medicare Communications and Marketing Guidelines (MCMG)

## Date: September 5, 2018

**Table of Contents**

**10 – Introduction** .................................................................................................... **1**

**20 – Communications and Marketing Definitions** .......................................... **2**

20.1 – Factors for Activity and Material Determination ................................. 2

20.2 – Activity and Material Designation ........................................................ 3

**30 – General Communication Requirements** .................................................. **4**

30.1 – Anti-Discrimination ............................................................................. 4

30.2 – Standardization of Plan Name Type ..................................................... 4

30.3 – Non-English Speaking Population ......................................................... 4

30.4 – Hours of Operation Requirements for Materials ................................... 5

30.5 – Use of TTY Numbers ........................................................................... 5

30.6 – Electronic Communication Policy ........................................................ 5

30.7 – Prohibited Terminology/Statements ..................................................... 6

30.8 – Product Endorsements/Testimonials .................................................... 6

30.9 – Co-branding ......................................................................................... 7

30.9.1 – Co-branding with Providers or Downstream Entities ........................ 7

30.9.2 – Plan's/Part D Sponsor's Relationships with State Pharmaceutical Assistance Programs (SPAP) .................................................................................................. 7

**40 – General Marketing Requirements** ........................................................... **8**

40.1 – Plan Comparisons ................................................................................ 8

40.2 – Marketing Through Unsolicited Contacts ............................................ 8

40.3 – Marketing Through Telephonic Contact ............................................... 9

40.4 – Nominal Gifts ...................................................................................... 10

40.5 – Exclusion of Meals as a Nominal Gift ................................................. 10

40.6 – Marketing Star Ratings ........................................................................ 10

40.6.1 – Marketing Plans/Part D Sponsors with an Overall 5-Star Rating ...... 11

40.6.2 – Low Performing Icon Plans/Part D Sponsors ..................................... 11

40.7 – Prohibition of Open Enrollment Period Marketing .............................. 12

40.8 – Marketing of Rewards and Incentives Programs .................................. 12

**50 – Outreach Activities** ................................................................................... **13**

50.1 – Educational Events ........................................................................................... 13

50.2 – Marketing/Sales Events ................................................................................... 13

50.3 – Personal/Individual Marketing Appointments ................................................. 14

**60 – Activities in a Healthcare Setting ............................................................... 14**

60.1 – Provider-Initiated Activities ........................................................................... 14

60.2 – Plan-Initiated Provider Activities in the Healthcare Setting ........................... 14

60.3 – Contracted Provider Oversight Responsibilities ............................................. 15

60.4 – Plan/Part D Sponsor Activities in the Healthcare Setting .............................. 16

60.4.1 – Special Guidance for Institutional Special Needs Plans (I-SNPs) Serving Long- Term Care Facility Residents ............................................................... 16

60.5 – Provider Affiliation Announcements .............................................................. 17

**70 – Websites and Social/Electronic Media ......................................................... 17**

70.1 – Plan/Part D Sponsor Required Websites ........................................................ 17

70.1.1 – General Website Requirements .................................................................... 17

70.1.2 – Documents to be Posted on Website ............................................................ 18

70.1.3 – Required Content ......................................................................................... 19

70.2 – Searchable Formularies and Directories ......................................................... 20

70.3 – Social Media ................................................................................................... 20

70.4 – Mobile Applications ....................................................................................... 20

**80 – Call Centers ................................................................................................... 21**

80.1 – Customer Service Call Center Requirements and Standards ........................... 21

80.2 – Customer Service Call Center Hours of Operations ....................................... 21

80.3 – Informational Scripts ...................................................................................... 22

80.4 – Telesales and Enrollment Scripts ................................................................... 22

80.5 – Pharmacy Technical Help Call Center Requirements and Standards .............. 23

80.6 – Part D Sponsor Coverage Determinations and Appeals Call Center Requirements and Standards ..................................................................................... 23

80.7 – Activities That Do Not Require the Use of State-Licensed Marketing Representatives ... 24

**90 – Tracking, Submission, and Review Process .................................................. 24**

90.1 – Material Identification ..................................................................................... 24

90.1.1 – Materials Subject to Submission .................................................................. 25

90.2 – Material Replacement ..................................................................................... 25

90.3 – Non-English Language and Alternate Format Materials ................................. 26

90.4 – Submission of Websites and Webpages for Review ........................................ 26

90.5 – Submission of Multi-Plan Materials ............................................................ 26

90.6 – Status of HPMS Material .............................................................................. 28

90.7 – Resubmitting Previously Disapproved Pieces ............................................. 29

90.8 – File & Use Process ........................................................................................ 29

90.9 – File & Use Retrospective Monitoring Reviews ............................................ 30

90.10 – Standardized Model Materials .................................................................... 30

90.11 – Non-Standardized Model Materials ............................................................ 30

90.12 – Template Materials ..................................................................................... 30

90.13 – Static Templates .......................................................................................... 31

90.14 – Standard Templates .................................................................................... 31

**100 – Required Materials ....................................................................................... 32**

100.1 – Mailings to Multiple Beneficiaries at One Household ............................... 32

100.2 – Electronic Delivery of Materials ................................................................ 32

100.2.1 - Notification of Availability of Electronic Materials ............................... 32

100.2.2 – Electronic Delivery of Required Materials .............................................. 33

100.3 – Changes and Corrections to Existing Documents ...................................... 33

100.4 – List of Required Materials ......................................................................... 34

**110 – Agent/Broker Activities, Oversight, and Compensation Requirements ........................ 52**

110.1 – Agent Requirements ................................................................................... 52

110.2 – Permitted Agent Activities ........................................................................ 52

110.3 – Plan/Part D Sponsor Oversight .................................................................. 53

110.4 – Compensation Applicability and Definitions ............................................ 53

110.5 – Plan/Part D Sponsor Compensation Reporting Requirements .................. 54

110.6 – Compensation ............................................................................................. 54

110.6.1 – Initial Compensation ............................................................................... 54

110.6.2 – Renewal Compensation ........................................................................... 54

110.6.3 – Referral/Finder's Fees .............................................................................. 54

110.6.4 – Paying Compensation .............................................................................. 55

110.6.5 – Paying Initial Compensation ................................................................... 55

110.6.6 – Paying Renewal Compensation ............................................................... 55

110.6.7 – Other Compensation Scenarios ............................................................... 55

110.7 – Compensation Recovery Requirements (Charge-backs) ........................... 56

110.7.1 – Rapid Disenrollment ................................................................................ 56

110.7.2 – Other Compensation Recovery ...................................................... 57

110.8 – Payments other than Compensation ............................................... 57

**120 – Use of Medicare Beneficiary Information Obtained from CMS** ................................... **57**

120.1 – Consent Requirements for Non-Health Related Mailings ............................... 58

**Appendix 1 – Definitions** ........................................................................ **59**

**Appendix 2 – Disclaimers** ....................................................................... **63**

**Appendix 3 – Pre-Enrollment Checklist** ................................................. **67**

**Appendix 4 – External Links** ................................................................... **69**

**Appendix 5 – Summary of Benefits Instructions** ................................... **71**

**Appendix 6 - Employer/Union Group Health Plans** ................................ **74**

**Appendix 7 – Use of Medicare Mark for Part D Sponsors** ..................... **76**

# 10 – Introduction

The Medicare Communications and Marketing Guidelines (MCMG) interpret and provide guidance on the marketing and communication rules for Medicare Advantage (MA-only, MA-PD) plans (also referred to as "plans"), Medicare Prescription Drug plans (PDP) (also referred to as "Part D sponsors"), and except where otherwise specified, Section 1876 cost plans (also referred to as "plans") and employer/union-sponsored group MA or Part D plans.  These plans are governed under Title 42 of the Code of Federal Regulations (CFR), Parts 422, 423, and 417. These requirements also apply to Medicare-Medicaid Plans (MMPs), except as modified or clarified in state-specific marketing guidance for each state's demonstration. Such state-specific guidance for MMPs is considered an addendum to the MCMG, and will be posted to: https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/MMPInformationandGuidance/MMPMarketingInformation andResources.html.

These requirements generally do not apply to Programs of All-Inclusive Care for the Elderly (PACE) organizations or section 1833 Health Care Pre-payment plans unless otherwise noted in the MCMG.

The term "marketing" is referenced at sections 1851(h) and 1860 D-4 of the Social Security Act (the Act). "Communications" and "marketing" covered by the MCMG are defined at 42 CFR sections 422.2260 and 423.2260.

### _Compliance_

Plans/Part D sponsors are responsible for ensuring compliance with CMS' current communication and marketing regulations and guidance. This includes monitoring and overseeing the activities of their subcontractors, downstream entities, and/or delegated entities. If CMS finds that Plans/Part D sponsors have failed to comply with applicable rules and guidance, CMS may take compliance and/or enforcement actions, including, but not limited to, intermediate sanctions and/or civil money penalties.

> **Note**: Plans/Part D sponsors may impose additional restrictions on their subcontractors, downstream entities, and/or delegated entities, provided they do not conflict with the requirements outlined in the MCMG.

The guidance set forth in this document is subject to change as policy, communications technology, and industry marketing practices evolve. Any new rulemaking or interpretive guidance (e.g., annual Call Letter guidance or Health Plan Management System (HPMS) memoranda) may supersede the guidance provided in this document.

## 20 – Communications and Marketing Definitions
42 CFR §§ 422.2260, 423.2260

***Communications*** means activities and use of materials to provide information to current and prospective enrollees. This means that all activities and materials aimed at prospective and current enrollees, including their caregivers and other decision makers associated with a prospective or current enrollee, are "communications" within the scope of the regulations at 42 CFR Parts 417, 422, and 423.

***Marketing*** is a subset of communications and includes activities and use of materials by the Plan/Part D sponsor with the intent to draw a beneficiary's attention to a plan or plans and to influence a beneficiary's decision-making process when selecting a plan for enrollment or deciding to stay enrolled in a plan (that is, retention-based marketing).
Additionally, marketing contains information about the plan's benefit structure, cost sharing, measuring, or ranking standards.

However, CMS excludes materials that might meet the definition of marketing based on content, but do not meet the intent requirements of marketing. Additionally, CMS excludes certain required materials (as outlined under section 100), and reserves the ability to exclude additional materials based on their use or purpose.

The MCMG discusses requirements applicable to all communication activities and materials, as well as additional requirements only applicable to marketing activities and materials. All marketing, unless otherwise noted, must adhere to the communication requirements.

### 20.1 – Factors for Activity and Material Determination
42 CFR §§ 422.2260, 422.2262, 422.2268, 423.2260, 423.2262, 423.2268

As outlined above, communication activities and materials are distinguished from marketing activities and materials based on both ***intent*** and ***content***.

**Intent** – the purpose of marketing activities and materials is to draw a prospective or current enrollee's attention to a plan or group of plans to influence a beneficiary's decision when selecting and enrolling in a plan or deciding to stay in a plan (retention-based marketing).

**Content** – based on the exclusions in the definition of marketing and marketing materials and the type of information that would be intended to draw attention to a plan or influence a beneficiary's enrollment decision, marketing activities and materials include:
- Information about benefits or benefit structure;
- Information about premiums and cost sharing;
- Comparisons to other Plan(s)/Part D sponsor(s);
- Rankings or measurements in reference to other Plan(s)/Part D sponsor(s); or
- Information about Star Ratings.

To identify marketing activities and materials, CMS will evaluate both the intent and content of the activities and materials to determine if the definition of marketing is met.

Examples:

1. A flyer reads "Swell Health is now offering Medicare Advantage coverage in Nowhere County. Call us at 1-800-SWELL-ME for more information."
   *Marketing or Communication?* Communication. While the intent is to draw a beneficiary's attention to Swell Health, the information provided does not contain any marketing content.

2. A billboard reads "Swell Health Offers $0 Premium Plans in Nowhere County" *Marketing or Communication?* Marketing. The advertisement includes both the intent to draw the viewer's attention to the plan and has content that mentions zero-dollar premiums being available.

3. A letter is sent to enrollees to remind them to get their flu shot. The body of the letter says, "Swell Health enrollees can get their flu shot for $0 copay at a network pharmacy…"
   *Marketing or Communication?* Communication. While the letter mentions cost sharing, the intent is not to steer the reader into making a plan selection or to stay with the plan, but rather to encourage existing enrollees to get a flu shot. The letter contains factual information about coverage and was provided only to current enrollees.

## 20.2 – Activity and Material Designation
42 CFR §§ 422.2260, 423.2260

CMS designates as communication or marketing all required materials in Section 100 of this document. Plans/Part D sponsors will need to review regulations at 42 CFR §§ 422.2260 and 423.2260 and these guidelines to determine if a plan-created material (i.e., something not listed as a required material in Section 100) is considered a communication or marketing material. The difference between communication and marketing activities and materials is based on the intent and content of what is being conveyed. Plans/Part D sponsors are also encouraged to consult with their Regional Office Account Manager or Marketing Reviewer should they have any marketing or communication questions.

Materials are static in nature, whereas activities are more dynamic. Interactions with a beneficiary could begin as a communication activity but become a marketing activity. In cases where a communication activity has the potential to become a marketing activity, the Plan/Part D sponsor or its downstream entities must adhere to all marketing requirements to ensure full compliance. For example, an enrollee calls the Plan's/Part D sponsor's customer service number for questions related to coverage under the plan in which the beneficiary is currently enrolled; during the call, the enrollee asks about other health plan options, moving the call from communications to marketing.

3

# 30 – General Communication Requirements

The following guidance applies to all communications (including marketing). Items distributed by the Plan/Part D sponsor and/or its first tier, downstream, and related entities must meet the requirements in this section.

## 30.1 – Anti-Discrimination
42 CFR §§ 422.110, 422.2268(a)(12), 423.2268(a)(12), and 45 CFR Part 92

Plans/Part D sponsors may not discriminate based on race, ethnicity, national origin, religion, gender, sex, age, mental or physical disability, health status, receipt of health care, claims experience, medical history, genetic information, evidence of insurability, or geographic location. Plans/Part D sponsors may not target potential enrollees from higher income areas, state or imply that plans are only available to seniors rather than to all Medicare beneficiaries, or state or imply that plans are only available to Medicaid beneficiaries unless the plan is a Dual Eligible Special Needs Plan (D-SNP) or MMP. Only Special Needs Plans (SNPs) and MMPs may limit enrollments to individuals meeting eligibility requirements based on health and/or other status; such limitations must be consistent with the scope of their Medicare Advantage, Medicare Improvement for Patients and Providers Act of 2008 (MIPPA) or three-way contracts with CMS.

Plans/Part D sponsors must comply with their obligations under other federal anti-discrimination rules and requirements.  This guidance focuses only on the anti-discrimination requirements in 42 C.F.R. Parts 422 and 423; Plans/Part D sponsors must be aware of and comply with their other obligations under federal law that are not addressed here.

## 30.2 – Standardization of Plan Name Type
Sections 1851(h)(6) and 1860D-4(l)(3) of the Social Security Act; 42 CFR §§ 422.2268(a)(6), 423.2268(a)(6)

Plans/Part D sponsors must include the plan type in each plan's name using standard terminology. This must be placed at the end of each plan name. For instance, an HMO plan named "Golden Medicare Plan" would appear as follows: "Golden Medicare Plan (HMO)." Plans/Part D sponsors containing the plan type at the end of the plan name (e.g., Gold Plan Private Fee-For-Service) are not required to repeat the plan type at the end of the plan name. Plans/Part D sponsors must include the plan type on all communication or marketing materials when the plan name is mentioned.

Plans/Part D sponsors must include the plan type on the front page or at the beginning of the communication or marketing document. The plan type is not required throughout the document.

## 30.3 – Non-English Speaking Population
42 CFR §§ 422.111(h)(1), 422.112(a)(8), 423.128(d)(1)(iii), 422.2268(a)(7), 423.2268(a)(7)

Plan/Part D sponsor call centers receive calls from current and prospective enrollees. Call centers must have interpreter services available to answer questions from non-English speaking or limited English proficient (LEP) beneficiaries. This requirement is applicable regardless of the percentage of non-English speaking or LEP beneficiaries in a plan benefit package (PBP) service area.

CMS has designated materials in section 100 that the agency considers vital and thus Plans/Part D sponsors must make available in any language that is the primary language of at least five (5) percent of a Plan's/Part D sponsor's PBP service area.

> **Note**: The enrollee identification (ID) card is excluded from this requirement.

### 30.4 – Hours of Operation Requirements for Materials
42 CFR §§ 422.111(h), 422.2262(c), 423.128(d), 423.2262(c)

Plan's/Part D sponsor's hours and days of operation must be included when a customer service number is provided on all marketing and communications materials in order to ensure that notice of the customer service contact information is adequate and not confusing or misleading. This does not apply to enrollee ID cards and the standardized Star Ratings document. In addition, Plans/Part D sponsors must list the hours and days of operation for 1-800-MEDICARE on every material where 1-800-MEDICARE or Medicare TTY appears (i.e., 24 hours a day/7 days a week).

> **Note**: CMS requires Plans/Part D sponsors to list the hours and days of operation only once in conjunction with the customer service number and 1-800-MEDICARE listings.

### 30.5 – Use of TTY Numbers
Section 504 of the Rehabilitation Act

A toll-free TTY number must appear in conjunction with the customer service number in the same font size as the other phone numbers, except as outlined below. Plans/Part D sponsors may use their own TTY number, 711 for Telecommunications Relay Service, or state relay services, as long as the number is accessible from TTY equipment.

Exceptions:
- Outdoor advertising (ODA) or banner/banner-like ads
- Radio advertisements and radio sponsorships (e.g., sponsoring an hour of public radio)
- In television ads, the TTY number may be a different font size/style than other phone numbers to limit possible confusion

### 30.6 – Electronic Communication Policy
42 CFR §§ 422.2268(b), 423.2268(b)

A Plan/Part D sponsor may initiate contact via email to prospective enrollees and to retain enrollment for current enrollees. Plans/Part D sponsors must include an opt-out process on each communication to elect to no longer receive emails.

> **Note:** Text messaging and other forms of electronic direct messaging (e.g., social media platforms) would fall under unsolicited contact and is not permitted.

## 30.7 – Prohibited Terminology/Statements
42 CFR §§ 422.2264, 423.2264, 422.2268(a)(2), 423.2268(a)(2)

Plans/Sponsors are prohibited from distributing communications that are materially inaccurate, misleading, or otherwise make misrepresentations or could confuse beneficiaries.

Plans/Part D sponsors may not:
- Claim that they are recommended or endorsed by CMS, Medicare, or the Department of Health & Human Services (DHHS);
- Use unsubstantiated absolute or qualified superlatives or pejoratives;
    > **Note**: Unsubstantiated absolute and/or qualified superlatives may be used in logos/taglines.
- Market that they will not disenroll individuals due to failure to pay premiums; or,
- Use the term "free" to describe a zero-dollar premium, reduction in premiums (including Part B buy-down), reduction in deductibles or cost sharing, low-income subsidy (LIS), cost sharing for individuals with dual eligibility.

    > **Note**: Medical Savings Account (MSA) plans may not imply that the plan operates as a supplement to Medicare.

MA plans that are not D-SNPs may not:
- Imply that their plan is designed for dual eligible individuals;
- Claim that they have a relationship with the state Medicaid agency, unless the MA plan (or its parent organization) has contracted with the state to coordinate Medicaid services, and the contract is specific to that MA plan (not for a separate D-SNP or MMP); or
- Target their marketing efforts exclusively to dual eligible individuals.

Plans/Part D sponsors may:
- State that the Plan/Part D sponsor is approved to participate in Medicare programs and/or is contracted to administer Medicare benefits;
- Use the term "Medicare-approved" to describe their benefits and/or services within their marketing materials; and,
- Use the term "free" in conjunction with mandatory, supplemental, and preventive benefits provided at a zero-dollar cost sharing for all enrollees.

## 30.8 – Product Endorsements/Testimonials
42 CFR §§ 422.2264, 423.2264, 422.2268, 423.2268

Product endorsements and testimonials must adhere to the following requirements:
- The speaker must identify the Plan's/Part D sponsor's product or company by name;
- Medicare beneficiaries endorsing or promoting a Plan/Part D sponsor must be enrolled in the Plan/Part D sponsor at the time the endorsement or testimonial was created;
- If an individual is paid or has been paid to endorse or promote the plan or product, the advertisement must clearly state this (e.g., "paid endorsement");
- If an individual, such as an actor, is paid to portray a real or fictitious situation, the advertisement must clearly state it is a "Paid Actor Portrayal", and,

- The Plan/Part D sponsor must be able to substantiate any claims made in the endorsement/testimonial.

  **Note**: Reuse of individual users' content or comment from social media sites (e.g., Facebook, Twitter) that promotes a Plan's/Part D sponsor's product is considered a product endorsement/testimonial and must adhere to the guidance in this section.

### 30.9 – Co-branding
42 CFR §§ 422.2262, 422.2264, 422.2268, 423.2262, 423.2264, 423.2268

Plans/Part D sponsors must enter in HPMS any co-branding relationships, including any changes in or newly formed co-branding relationships, prior to marketing them. CMS does not review or approve such relationships but needs the information to review associated marketing materials. Plans/Part D sponsors should refer to the HPMS Bid Submission User Manual for instructions on entering co-branding information.

### 30.9.1 – Co-branding with Providers or Downstream Entities
42 CFR §§ 422.2262, 422.2268(a)(5), 423.2262, 423.2268(a)(5)

Plans/Part D sponsors that choose to co-brand with providers/pharmacies may include the name and/or logo of co-branded providers/pharmacies on materials other than enrollee ID cards as long as the Plan/Part D sponsor makes it clear to beneficiaries that the providers/pharmacies are part of the plan's network. In addition, Plans/Part D sponsors must include the appropriate model disclaimer on co-branded materials (refer to Appendix 2).

Neither the Plan/Part D sponsor nor its co-branding providers/pharmacies may imply that the co-branding partner is endorsed by CMS, or that its products or services are Medicare-approved. The Plan/Part D sponsor must submit the co-branded marketing materials to CMS.

Names and/or logos of co-branded providers on the plan's enrollee ID card are prohibited, unless the provider names and/or logos are in the name of the plan name and/or are related to an enrollee's selection of a specific provider/provider organization, (e.g., physician, hospital, medical group).

Part D sponsors are prohibited from displaying the names and/or logos of co-branded pharmacies on the Part D sponsor's enrollee ID card.

  **Note**: Consistent with the National Council for Prescription Drug Program's (NCPDP) "Pharmacy and/or Combination ID Card" standard, the Pharmacy Benefit Manager (PBM) name may be included on an enrollee ID card.

### 30.9.2 – Plan's/Part D Sponsor's Relationships with State Pharmaceutical Assistance Programs (SPAP)

A Plan's/Part D sponsor's logo may be used in connection with the coverage of benefits provided under an SPAP and may contain an emblem or symbol indicating such a relationship.

## 40 – General Marketing Requirements
42 CFR §§ 422.2262, 422.2264, 422.2268(a)(2), 423.2262, 423.2264, 423.2268(a)(2)

Plans/Part D sponsors cannot market for an upcoming plan year prior to October 1. Plans/Part D sponsors are permitted to simultaneously market the current and prospective years starting on October 1, provided marketing materials clearly indicate what plan year is being discussed.

Plans/Part D sponsors may only advertise in their defined service area, unless unavoidable (e.g., advertising in media with a national audience or with an audience that includes some individuals outside of the service area, such as a Metropolitan Statistical Area that covers two regions). Plans/Part D sponsors must clearly disclose their service area in the marketing materials.

### 40.1 – Plan Comparisons
42 CFR §§422.2260, 422.2268(a)(2), 423.2260, 423.2268(a)(2)

Plans/Part D sponsors may compare their plan to another Plan/Part D sponsor, provided the Plans/Part D sponsors can support them (e.g., by studies or statistical data) and such comparisons are factually based and not misleading.

### 40.2 – Marketing Through Unsolicited Contacts
42 CFR §§ 422.2268(b)(13), 423.2268(b)(13)

Plans/Part D Sponsors may make unsolicited direct contact with potential enrollees using the following methods:
- Conventional mail and other print media (e.g., advertisements, direct mail)
- Email provided all emails contain an opt-out function

Plans/Part D sponsors may not:
- Use door-to-door solicitation, including leaving information such as a leaflet or flyer at a residence;
- Approach potential enrollees in common areas (e.g., parking lots, hallways, lobbies, sidewalks, etc.); or,
- Use telephonic solicitation, including text messages and leaving electronic voicemail messages.

  **Note:** Agents/brokers who have a pre-scheduled appointment with a potential enrollee who is a "no-show" may leave information at that potential enrollee's residence. If a potential enrollee provides permission to be contacted, the contact must be event- specific, and may not be treated as open-ended permission for future contacts.

**40.3 – Marketing through Telephonic Contact**
42 CFR §§ 422.2268, 423.2268

Plans/Part D sponsors and their agents/brokers may not make unsolicited telephone calls to prospective enrollees. However, they are permitted to contact their current enrollees to discuss plan business, but cannot market prior to October 1 under the pretense of plan business.

Plans/Part D sponsors, and their agents/brokers, may conduct the following specific telephonic activities:

- Call current enrollees, including those in non-Medicare products, to discuss plan business (examples of this include calls to enrollees aging into Medicare from commercial products offered by the same organization, calls to an organization's existing Medicaid/MMP plan enrollees to talk about its Medicare products, and calls to current MA enrollees to promote other Medicare plan types or to discuss plan benefits);
- Call beneficiaries who submit enrollment applications to conduct business related to enrollment;
- Call former enrollees after the disenrollment effective date to conduct disenrollment surveys for quality improvement purposes (disenrollment surveys conducted telephonically, email or conventional mail may not include sales or marketing information);
- Under limited circumstances with approval from the CMS Account Manager, call LIS-eligible enrollees that a plan is prospectively losing due to reassignment to encourage them to remain enrolled in their current plan;
- Call individuals who have given permission for a plan or sales agent to contact them (examples of permission include filling out a business reply card, emailing the Plan/Part D sponsor requesting a return call, or asking a customer service representative to have an agent contact them); and,

    > **Note:** Permission applies only to the entity from which the individual requested contact and for the duration and topic of that transaction.

- Return phone calls or messages from individuals or enrollees, as these are not considered unsolicited contacts.

Plans/Part D sponsors, and their agents/brokers, may not conduct telephonic activities that include, but are not limited to, the following:

- Unsolicited calls about other business as a means of generating leads for Medicare plans (e.g., bait and switch strategies);
- Calls based on referrals (if an individual would like to refer a friend or relative to an agent or Plan/Part D sponsor, the agent or Plan/Part D sponsor may provide contact information such as a business card that the individual could provide to a friend or relative);
- Calls to market plans or products to former enrollees who have disenrolled, or to current enrollees who are in the process of voluntarily disenrolling;
- Calls to beneficiaries who attended a sales event, unless the beneficiary gave express permission at the event for a follow-up call (there must be documentation of permission to be contacted); or,

- Calls to prospective enrollees to confirm receipt of mailed information.

## 40.4 – Nominal Gifts
42 CFR §§ 422.2268(b)(1),(2),(12), 423.2268(b)(1),(2),(12)

Plans/Part D sponsors may offer nominal gifts ($15 or less, $75 aggregate, per person, per year) to beneficiaries for marketing purposes, provided the gift is given regardless of whether they enroll, and without discrimination.

The following rules apply to nominal gifts:
- If a nominal gift is a chance to receive one large gift or a communal experience (e.g., a concert, raffle, drawing), the total fair market value must not exceed the nominal per person value based on anticipated attendance. For example, if 10 people are expected to attend an event, the nominal gift may not be worth more than $150 ($15 for each of the 10 anticipated attendees). Anticipated attendance must be based on venue size, response rate, and/or advertisement circulation.
- Nominal gifts may not be in the form of cash or other monetary rebates even if their worth is $15 or less.

   **Note**: Plans/Part D sponsors should refer to the Office of Inspector General's website for advisory opinions and guidance on gifts and gift cards.

## 40.5 – Exclusion of Meals as a Nominal Gift
42 CFR §§ 422.2268(b)(15), 423.2268(b)(15)

Plans/Part D sponsors may not provide or subsidize meals at sales/marketing events. Refreshments and light snacks may be provided. Plans/Part D sponsors should ensure that items provided could not be reasonably considered a meal and/or that multiple items are not being "bundled" and provided as if a meal.

Meals may be provided at CMS-defined educational events and other events that would fall under the definition of communications (refer to Appendix 1).

## 40.6 – Marketing Star Ratings
42 CFR §§ 422.2260, 422.2262, 422.2264, 422.2268(a)(1) and (2), 423.2260, 423.2262, 423.2264, 423.2268(a)(1) and (2)

Plans/Part D sponsors must provide Star Ratings information to beneficiaries through the standardized Star Ratings information document available in HPMS. New Plans/Part D sponsors that do not have any Star Ratings information are not required to provide this information until their Star Ratings data are available.

The following rules apply to all Plans/Part D sponsors when referring to Star Ratings:
- References to individual Star Ratings measure(s) must also include references to the contract's highest rating, overall rating (MA-PD), Part C summary rating (MA-only), or Part D summary rating (PDPs), with equal or greater prominence;
- Must not use an individual underlying category or measure to imply higher overall or summary Star Ratings;

- Any reference to a contract's Star Rating must make it clear that the rating is "    out of five (5) stars." (letters, numbers, graphic representation, or any combination may be used);
- Must clearly identify which Star Ratings contract year applies;
- May only market the Star Ratings in the service area in which the Star Rating is applicable; and,
- May direct beneficiaries to https://www.medicare.gov for more information on Star Ratings.

## 40.6.1 – Marketing Plans/Part D Sponsors with an Overall 5-Star Rating
42 CFR §§ 422.2260, 422.2262, 422.2264, 422.2268(a)(1) and (2), 423.2260, 423.2262, 423.2264, 423.2268(a)(1) and (2)

The following marketing rights and rules apply to Plans/Part D Sponsors with an overall 5-star rating:
- May market their ability to enroll beneficiaries through the 5-star special enrollment period (SEP).
- May not specifically target enrollees in poor performing plans.
- May include CMS' gold star icon on marketing materials. Must be clear that the 5-star rating is for the applicable contract. CMS' Regional Offices will provide the gold star icon each fall. Plans are not permitted to create their own gold star icon or any other icon of distinction.
- Plans with one or more contracts without 5-star ratings must not disseminate materials that imply other contracts achieved this rating. Materials must list specific contracts with overall 5-star ratings or be specific to a contract with an overall 5-star rating.
- If a 5-star contract fails to receive a 5-star rating for the upcoming year, marketing for the purpose of accepting enrollees under the 5-star SEP must be discontinued by November 30 of the current year.

## 40.6.2 – Low Performing Icon Plans/Part D Sponsors
42 CFR §§ 422.2260, 422.2262, 422.2264, 422.2268(a)(1), 423.2260, 423.2262, 423.2264, 423.2268(a)(1)

The following marketing rules apply to low performing Plans/Part D Sponsors:
- Low Performing Icon (LPI) must be included in all marketing materials about or that reference the specific contract's Star Ratings (**Note**: changes to the icon are not permitted);
- Plans/Part D sponsors assigned an LPI may not attempt to discredit or refute their LPI status by showcasing a higher overall Star Rating on another contract or specific measure Star Ratings;
- Must clearly indicate LPI status when referencing its Star Ratings - must state the LPI means that the Plan/Part D sponsor received a summary rating of 2.5 stars or below in Part C and/or Part D for the last three years;
- If an LPI has an overall Star Rating of 3 or above on its marketing materials, the LPI must also be clearly stated on its marketing materials; and,
- May not inform beneficiaries that they may request an SEP and move to a higher rated

plan if they are dissatisfied with low performing plan.

## 40.7 – Prohibition of Open Enrollment Period Marketing
42 CFR §§ 422.2268(b)(10), 423.2268(b)(10)

Plans/Part D sponsors are prohibited from knowingly targeting or sending unsolicited marketing materials to any MA enrollee or Part D enrollee during the continuous Open Enrollment Period (OEP) (January 1 to March 31). "Knowingly" takes into account the intended recipient as well as the content of the message.

During the OEP, Plans/Part D sponsors may:
- Conduct marketing activities that focus on other enrollment opportunities, including but not limited to:
  - Marketing to age-ins (who have not yet made an enrollment decision),
  - Marketing by 5-star plans regarding their continuous enrollment SEP, and
  - Marketing to dual-eligible and LIS beneficiaries who, in general, may make changes once per calendar quarter during the first nine months of the year.
- Send marketing materials when a beneficiary makes a proactive request;
- At the beneficiary's request, have one-on-one meetings with a sales agent; and
- At the beneficiary's request, provide information on the OEP through the call center

  **Note**: The unintentional receipt of other marketing materials by beneficiaries who have already made an enrollment decision is not be considered knowingly targeting. For example, if a Plan sends mailers to a list of age-ins discussing the Initial Coverage Election Period (ICEP), it is possible that some recipients may have already made an enrollment decision; however, the content of the message to the intended audience of age-ins is not prohibited OEP marketing.

During the OEP, Plans/Part D sponsors may not:
- Send unsolicited materials advertising the ability/opportunity to make an additional enrollment change or referencing the OEP;
- Specifically target beneficiaries who are in the OEP because they made a choice during Annual Enrollment Period (AEP) by purchase of mailing lists or other means of identification;
- Engage in or promote agent/broker activities that intend to target the OEP as an opportunity to make further sales; or
- Call or otherwise contact former enrollees who have selected a new plan during the AEP.

For more information on the OEP, please reference to Chapter 2 - Medicare Advantage Enrollment and Disenrollment of the Medicare Managed Care Manual or Appendix 4 to access the CMS Eligibility and Enrollment Guidance link.

## 40.8 – Marketing of Rewards and Incentives Programs
42 CFR §§ 422.134(c)(2)(ii), 422.2268

MA Plans may include information about rewards and incentives programs in marketing materials for potential enrollees. Marketing of rewards and incentives programs must:

- Not be used in exchange for enrollment;
- Be provided to all potential enrollees without discrimination;
- Be provided in conjunction with information about plan benefits; and
- Include information about all rewards and incentives programs offered by the MA Plan, and are not limited to a specific program, or a specific reward or incentive within a program.

> **Note:** For information regarding rewards and incentives program requirements, see Chapter 4 of the Medicare Managed Care Manual. Nominal gifts that are part of a promotional activity are different from rewards and incentives.

Part D plans are not permitted by 42 CFR § 423.134 to develop or use rewards and incentives programs; therefore, Part D sponsors may not market reward and incentive programs.


## 50 - Outreach Activities

### 50.1 – Educational Events
42 CFR §§ 422.2262, 422.2268(b)(7),(8), and (11),423.2262, 423.2268(b)(7),(8), and (11)

Educational events are designed to inform beneficiaries about Medicare Advantage, Prescription Drug, or other Medicare programs. Educational events:
- Must be explicitly advertised as educational;
- May be hosted in a public venue by the Plan/Part D sponsor or an outside entity;
- May include communication activities and distribution of communication materials;
- May answer beneficiary initiated questions;
- May set up a future marketing appointment, and distribute business cards and contact information for beneficiaries to initiate contact (this includes completing and collecting a Scope of Appointment (SOA) form);
- Must not include marketing or sales activities or distribution of marketing materials or enrollment forms; and
- May not conduct a marketing/sales event immediately following an educational event in the same general location (e.g., same hotel).

### 50.2 – Marketing/Sales Events
42 CFR §§ 422.2268(b)(1-5), 423.2268(b)(1-5)

Marketing/Sales Events are designed to steer or attempt to steer potential enrollees, or the retention of current enrollees, toward a plan or limited set of plans. The following requirements apply to all marketing/sales events:
- Plans/Part D sponsors must submit scripts and presentations to CMS prior to use, including those to be used by agents/brokers;
- Sign in sheets must clearly be labeled as optional;
- Health screenings or other activities that may be perceived as, or used for, "cherry picking" are not permitted;
- Plans/Part D sponsors may not require attendees to provide contact information as a prerequisite for attending an event; and

- Contact information provided for raffles or drawings may only be used for that purpose.

### 50.3 – Personal/Individual Marketing Appointments
42 CFR §§ 422.2268(b)(3-5),(11), 423.2268(b)(3-5) and (11)

SOA parameters (and documentation) are required for all one-on-one appointments, regardless of venue (e.g., home, telephone). During these appointments, discussions may only concern previously agreed upon plan products documented in the SOA, and may only market health-related products, and not, for example, annuities or life insurance. Individuals may not solicit/accept enrollment applications for a January 1 effective date until October 15 of the preceding calendar year, unless the beneficiary is entitled under another enrollment period.


## 60 –Activities in a Healthcare Setting
Section 1851(j)(1)(D), 42 CFR §§ 422.2268(a)(1),(2), and (5); 422.2268(b)(7) and (9), 423.2268(a)(1),(2), and (5), 423.2268(b)(7) and (9)

To maintain appropriate beneficiary safeguards while not impeding the provider/patient relationship, CMS distinguishes between provider-initiated activities and plan-initiated activities in a healthcare setting.

### 60.1– Provider-Initiated Activities
42 CFR §§ 422.2260, 423.2260

Provider-initiated activities are those conducted by a healthcare professional, including pharmacists, at the request of the patient or as a matter of a course of treatment, when meeting with the patient as part of the professional relationship between healthcare provider and patient. Provider-initiated activities do not include those conducted at the request of the Plan/Part D sponsor or pursuant to the network participation agreement between the Plan/Part D sponsor and the provider. Provider-initiated activities fall outside of the definition of marketing as outlined in §§422.2260 and 423.2260.

Permissible contracted provider-initiated activities include:
- Distributing unaltered, printed materials created by CMS, such as reports from Medicare Plan Finder, the "Medicare & You" handbook, or "Medicare Options Compare" (from https://www.medicare.gov) including in areas where care is delivered;
- Providing the names of Plans/Part D sponsors with which they contract and/or participate;
- Answering questions or discussing the merits of a plan or plans, including cost sharing and benefit information (these discussions may occur in areas where care is delivered);
- Referring patients to other sources of information, such as State Health Insurance Assistance Program (SHIP) representatives, plan marketing representatives, State
- Medicaid Office, local Social Security Office, CMS' website at https://www.medicare.gov, or 1-800-MEDICARE;
- Referring patients to Plan marketing materials available in common areas; and
- Providing information and assistance in applying for the LIS.

### 60.2 – Plan-Initiated Provider Activities in the Healthcare Setting
42 CFR §§ 422.2260, 422.2268(b)(7), 423.2260, 423.2268(b)(7)

CMS defines plan-initiated activities as those activities where either a Plan/Part D sponsor requests contracted providers to perform a task or the provider is acting -on behalf of the Plan/Part D sponsor. For the purpose of plan-initiated activities, the Plan/Part D sponsor must ensure compliance with requirements applicable to communication and marketing.

Plan/Part D sponsor requests for providers to discuss benefits and cost sharing would fall under the definition of marketing and are hence prohibited from taking place where care is being delivered.

Plans/Part D sponsors may not allow contracted providers to:
- Accept/collect scope of appointment forms;
- Accept Medicare enrollment applications;
- Make phone calls or direct, urge, or attempt to persuade their patients to enroll in a specific plan based on financial or any other interests of the provider;
- Mail marketing materials on behalf of Plans/Part D sponsors;
- Offer inducements to persuade their patients to enroll in a particular plan or organization;
- Conduct health screenings as a marketing activity;
- Distribute marketing materials/applications in areas where care is being delivered;
- Offer anything of value to induce enrollees to select them as their provider; or
- Accept compensation from the plan for any marketing or enrollment activities.

Plans/Part D sponsors may allow contracted providers to:
- Make available, distribute, and display communication materials, including in areas where care is being delivered; and
- Provide or make available plan marketing materials and enrollment forms outside of the areas where care is delivered (such as common entryways, vestibules, hospital or nursing home cafeterias, and community, recreational, or conference rooms).

### 60.3 – Contracted Provider Oversight Responsibilities
42 CFR §§ 422.2268 and 423.2268

Plans/Part D sponsors must advise contracted providers, through their agreements with those providers, of the need for providers to remain neutral when assisting beneficiaries with enrollment decisions.

Plans/Part D sponsors that have agreements with providers in connection with plan marketing activities should ensure that those agreements address marketing activities in a manner consistent with Medicare regulations and guidelines.

Plans/Part D sponsors may use providers and/or facilities to distribute and/or make available Plan/Part D sponsor marketing materials, as long as the provider and/or facility distributes and makes available Plan/Part D sponsor marketing materials for all plans with which the provider participates, if requested by other Plan/Part D sponsors. CMS does not expect providers to proactively contact all participating Plans.

## 60.4 – Plan/Part D Sponsor Activities in the Healthcare Setting
42 CFR §§ 422.2268(b)(7) and 423.2268(b)(7)

Plans/Part D sponsors may conduct sales activities, including sales presentations, the distribution of marketing materials, and the distribution and collection of enrollment forms in common areas of a healthcare setting. Common areas in a healthcare setting include, but are not limited to common entryways, vestibules, waiting rooms, hospital or nursing home cafeterias, and community, recreational, or conference rooms. Plans/Part D sponsors may not market in restricted areas. Restricted areas generally include, but are not limited to: exam rooms, hospital patient rooms, treatment areas where patients interact with a provider and his/her clinical team and receive treatment (including dialysis treatment facilities), and pharmacy counter areas (where patients interact with pharmacy providers and obtain medications).

Communication materials may be distributed and displayed in all areas of the healthcare setting.

## 60.4.1 – Special Guidance for Institutional Special Needs Plans (I-SNPs) Serving Long-Term Care Facility Residents
42 CFR §§ 422.2260, 422.2268(b)(7), 423.2260, 423.2268(b)(7)

In addition to the guidance previously provided in this section, the following requirements apply to marketing and communication by I-SNPs serving long-term care facility residents and by contracted providers of I-SNPs.

As outlined in section 60.1, when contracted providers I-SNPs discuss health care options at the request of residents of a long-term care facility or as a matter of course in treatment, it is considered provider-initiated and does not fall under the requirements of marketing. Plans/Part D sponsors may provide contracted long-term care facilities with materials for inclusion in admission packets that announce the Plan/Part D sponsor's contractual relationship. CMS considers these communication materials.

CMS permits Plans/Part D sponsors to schedule appointments with residents of long-term care facilities (e.g., nursing homes, assisted living facilities, board and care homes) upon a resident's request. If a resident did not request an appointment, any visit by an agent or broker is considered unsolicited door-to-door marketing.

Depending on the context of a given situation, I-SNP long-term care facilities and staff can be viewed as both provider and Plan. I-SNPs should put the necessary boundaries in place between clinical and sales staff to mitigate conflicts of interest. I-SNPs may use staff operating in a social worker capacity to provide information, including marketing materials, to residents. Such information must not include an enrollment form and the social worker may not accept or collect a scope of appointment or enrollment form on behalf of the I-SNP. The beneficiary or authorized representative must initiate additional communication with the Plan/Part D sponsor following the receipt of a business reply card, phone number or marketing materials.

**60.5 – Provider Affiliation Announcements**
42 CFR §§ 422.2262(a), 422.2268, 423.2262(a), 423.2268

Plans/Part D sponsors and/or contracted providers (including pharmacies) may announce new or continuing affiliations with specific Plans/Part D sponsors once a contractual agreement between the Plan/Part D sponsor and provider has been agreed upon by both parties. Provider affiliation announcements may be made through direct mail, email, telephone, or advertisement. The announcement must clearly state that the provider may also contract with other Plans/Part D sponsors, if applicable.  These announcements are considered communication materials.

Provider affiliation announcement materials that include additional information, such as descriptions of plan benefits, premiums, or cost sharing are considered marketing materials. Plans/Part D sponsors must submit these materials in HPMS. Plans/Part D sponsors must ensure their network providers and pharmacies adhere to distribution and mailing guidance set forth in these guidelines.

# 70 – Websites and Social/Electronic Media

**70.1 – Plan/Part D Sponsor Required Websites**
42 CFR §§ 422.111(h), 422.2264, 422.2268, 423.128(d), 423.2264, 423.2268

CMS requires all Plans/Part D sponsors to have a website that includes the specific documents and content listed outlined in sections 70.1.1 and 70.1.2. Plans/Part D sponsors may include other information, including both communications and marketing information on their website.

**70.1.1 – General Website Requirements**
42 CFR §§ 422.111(h), 422.2264, 422.2268, 423.128(d), 423.2264, 423.2268

Plan/Part D sponsor websites must:
- Be clear and easy to navigate;
- Maintain the current contract year content through December 31 of each year;
- Notify users when they will leave the Plan's/Part D sponsor's Medicare information webpage if there is a link that will take an individual to non-Medicare information webpage or to a different website; and
- Include applicable model text and disclaimers (refer to Appendix 2) on each webpage.

Plan/Part D sponsor websites may not:
- Provide links to foreign drug sales, including links from advertisements on the Plan/Part D sponsor's website;
- Require users to enter any information other than a zip code, county, and/or state for access to non-beneficiary specific website content; or
- State that the Plan/Part D sponsor is not responsible for the content of their social media pages or the websites of any downstream entity that provides information on the Plan's/Part D sponsor's behalf.

Plan's/Part D sponsor's must ensure that their website:

- Maintains a separate and distinct section for their Medicare information covered by these guidelines if the Plan/Part D sponsor markets other lines of business. Plans/Part D sponsors may not include or market Medicare Supplement (Medigap) content in their Medicare information section;
- Is reviewed monthly and updated as needed (See Prescription Drug Benefit Manual, Chapter 6 for information on updates and notice to beneficiaries regarding midyear formulary changes);
- Includes the date of the last update on each webpage;
- Clearly labels all links; and
- Complies with Section 508 of the Rehabilitation Act.

**70.1.2 – Documents to be posted on Website**
42 CFR §§ 422.111(b) and (h)(2), 423.128(b) and (d)(2)

Plans/Part D sponsors must post on their website all required documents outlined below and ensure these documents are downloadable. This includes translated documents, as applicable. "(M)" denotes a required marketing material, and "(C)" denotes a required communication material. If a required document is found to have errors, or is updated, the updated document must posted on the website as soon as possible.

| Required Document | Required Posting Date for Renewing Plans | Required Posting date for New Plans |
|---|---|---|
| Summary of Benefits (M)* | By October 15 | By October 15 |
| Annual Notice of Change (M)* | By October 15 | Not applicable |
| Evidence of Coverage (C)* | By October 15 | By October 15 |
| Provider Directory (C) | By October 15 | By October 15 |
| Pharmacy Directory (C) | By October 15 | By October 15 |
| Formulary (C)* | By October 15 | By October 15 |
| CMS Star Ratings document (M)* | 21 days after the release of Star Ratings on Medicare Plan Finder | 21 days after the release of Star Ratings on Medicare Plan Finder |
| Privacy Notice under the HIPAA Privacy Rule* | Posted all year (updates as required) | By January 1 |
| Exception Request Forms for physicians* | Posted all year (updates as required) | By January 1 |
| Utilization Management Forms for physicians and enrollees* | Posted all year (updates as required) | By October 15 |

| Prescription Drug Transition Policy* | Posted all year (updates as required) | By January 1 |
| LIS Premium Summary Chart | Posted all year (updates as required) | By October 15 |
| Prior Authorization Forms for Physicians and Enrollees* | Posted all year (updates as required) | By January 1 |
| Part D Model Coverage Determination and Redetermination Request Forms | Posted all year (updates as required) | By January 1 |

\* If the document is updated following the initial posting, the date of the new document must be indicated in the link or near the link

## 70.1.3 – Required Content
42 CFR §§ 417.427, 422.111(a)(3), (b) and (h)(2), 423.128(a)(3), (b) and (d)(2)

In addition to required documents, the following content must be present on the website:

- Toll-free customer service number, days and hours of operation, TTY number, and either a physical or Post Office Box address;
- Information on enrollees' and Plans'/Part D sponsors' rights and responsibilities upon disenrollment;
- Instructions on how to appoint a representative and a link to the downloadable version of the CMS Appointment of Representative Form (CMS Form-1696);
- A description of and information on how to file a grievance, an organizational/coverage determination, and an appeal, including:
  - Procedures for filing;
  - A direct link on the grievance/coverage determination webpage to the Medicare.gov complaint website at:

    https://www.medicare.gov/MedicareComplaintForm/home.aspx, where an enrollee can enter a complaint in lieu of calling 1-800-MEDICARE;
  - Phone number(s) for receiving oral requests;
  - Mailing address for written requests;
  - Fax number for written requests;
  - Links, if applicable, to any forms created by the Plan/Part D sponsor for appeals and grievances;
  - Information on how to obtain an aggregate number of grievances, appeals, and exceptions filed with the Plan/Part D sponsor; and
  - Contact numbers for enrollees and/or physicians to use for process or status questions.
- A link to the PFFS Terms and Conditions of Payment (for PFFS plans);
- Immediate access to the coverage determination and redetermination processes through a secure location (for Plans offering Part D);
- Quality assurance policies and procedures;
- Drug and/or utilization management information (for plans offering Part D);
- For MSA plan websites only:

- o The statement: "You must file Form 1040, 'US Individual Income Tax Return,' along with Form 8853, 'Archer MSA and Long-Term Care Insurance Contracts' with the Internal Revenue Service (IRS) for any distributions made from your Medicare MSA account to ensure you aren't taxed on your MSA account withdrawals. You must file these tax forms for any year in which an MSA account withdrawal is made, even if you have no taxable income or other reason for filing a Form 1040. MSA account withdrawals for qualified medical expenses are tax free, while account withdrawals for non-medical expenses are subject to both income tax and a fifty (50) percent tax penalty."
  - o The statement: "Tax publications are available on the IRS website at http://www.irs.gov or from 1-800-TAX-FORM (1-800-829-3676)."
- Enrollment instructions and forms; and
- Medication Therapy Management (MTM) program requirements as found on https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/MTM.html.

## 70.2 – Searchable Formularies and Directories
42 CFR §§ 422.111(h)(2), 423.128(b)(4), (b)(5), (d)(2)

Plans/Part D sponsors must have provider/pharmacy directories and formularies posted on their websites for use and download/printing. Plans/Part D sponsors are encouraged to have searchable, machine-readable formularies, provider, and pharmacy directories. A searchable tool (e.g., search engine/database) may be a substitute for downloadable directories and formularies (i.e., electronic versions of hard copies) when the searchable tool complies with all instructions and contains all required template information, including introductory language and disclaimers, in the model documents.

## 70.3 – Social Media
Plans/Part D sponsors must submit social media posts (e.g., Facebook, Twitter, YouTube) that meet the definition of marketing into HPMS, using code 4038.

## 70.4 – Mobile Applications
42 CFR §§ 422.111, 422.2260, 422.2262, 422.2268, 423.128, 423.2260, 423.2262, 423.2268
Plans/Part D sponsors that use mobile applications (apps) must:

- Submit data that meets the definition of marketing into HPMS;
- Provide CMS, upon request, access to the mobile app;
- If limited plan benefit/cost sharing information is in the app, instruct beneficiaries where to find complete information; and
- Provide equal prominence to all in-network providers/pharmacies if the app contains this data. Apps that limit data based on geographic location must indicate the limited geographic area.

## 80 – Call Centers

### 80.1 – Customer Service Call Center Requirements and Standards
42 CFR §§ 422.111(h)(1), 422.564, 422.2268, 423.128(d)(1), 423.564, 423.2268

Plans/Part D sponsors must operate a toll-free customer service call center. All requirements in this section also apply to call centers operated by downstream entities.

Customer service call centers must:
- Provide information in response to inquiries outlined in sections 80.3 and 80.4;
- Follow an explicitly defined process for handling customer complaints;
- Provide interpreter services when requested and inform callers that interpreter services are free. Interpreters should be available within eight (8) minutes of reaching the customer service representative (CSR);
- Provide TTY service. CSRs available through the TTY service should be available within seven (7) minutes of the time of answer;
- Limit average hold time to two (2) minutes. The average hold time is defined as the time spent on hold by the caller following the interactive voice response (IVR) system, touch-tone response system, or recorded greeting and before reaching a live person;
- Answer 80 percent of incoming calls within 30 seconds;
- Limit the disconnect rate of all incoming calls to five (5) percent (a disconnected call is defined as a call that is unexpectedly dropped by the Plan/Part D sponsor);
- Plans/Part D sponsors are prohibited from using hold time messages to sell non-health related products.

### 80.2 – Customer Service Call Center Hours of Operations
42 CFR §§ 422.111(h)(1)(i), 423.128(d)(1)(i)

Plans/Part D sponsor customer service call centers must operate during usual business hours. Customer service call center hours and days must be the same for all individuals regardless of whether they speak English, a non-English language, or use assistive devices for communication.

In light of the scope and nature of services and benefits provided by Plans/Part D sponsors, CMS interprets usual business hours as meaning at least the following:

October 1 – March 31:
- Live CSRs available seven days a week, from 8:00 a.m. to 8:00 p.m. in all time zones for the regions in which they operate; and
- Interactive voice response system or similar technologies for Thanksgiving and Christmas Day (messages must be returned within one (1) business day)

April 1 – September 30:
- Live CSRs available Monday through Friday, from 8:00 a.m. to 8:00 p.m. in all time zones for the regions in which they operate; and
- Interactive voice response system or similar technologies for Saturdays, Sundays and Federal Holidays (messages must be returned within one (1) business day)

**80.3 - Informational Scripts**
42 CFR §§ 422.111(b) and (c), 422.2262, 422.2264, 423.128(b) and (c), 423.2262, 423.2264

Informational scripts are communications intended to educate and answer beneficiary questions. Informational scripts must make it clear when a beneficiary is going to be transferred to a sales/enrollment department (i.e., the conversation moving from a communication activity to a marketing activity). Before making any transfer to a sales/enrollment (i.e., marketing) department, CSRs must receive the beneficiaries consent, ideally with a yes/no question.

The following represents a sampling of topics for which Plans/Part D sponsors must have scripted language to address enrollee questions:
- Best Available Evidence policy (applicable for Part D);
- Request for pre-enrollment information;
- Benefit and cost sharing information, including out-of-network information;
- Formulary information, including transition process;
- Pharmacy information, including whether a beneficiary's pharmacy is in the Part D sponsor's network;
- Provider information, including whether a beneficiary's physician is in the plan's network
- Claims submission, processing, and payment information Grievance, organization/coverage determination (including exceptions) and appeals process information;
- Information on extra help, including how the beneficiary can obtain extra help;
- Current true out-of-pocket status (applicable for Part D);
- Information on how to obtain needed forms;
- Information on replacing an enrollee's identification card; and
- Service area information.

**80.4 – Telesales and Enrollment Scripts**
42 CFR §§ 422.60(c), 422.2262, 422.2264, 422.2268, 423.32(b), 423.2262, 423.2264, 423.2268

Telesales and enrollment scripts are considered marketing and must be submitted to CMS as outlined in Section 90. If a sales call progresses to a telephonic enrollment, the sales staff must clearly inform the beneficiary that they are enrolling into the Plan (using the specific Plan name/type).

In addition, enrollment scripts must:
- Follow all requirements described in CMS Eligibility and Enrollment Guidance (https://www.cms.gov/Medicare/Eligibility-and-Enrollment/MedicareMangCareEligEnrol/index.html) (Chapter 2 of the Medicare Managed Care Manual) and Chapter 17, Subchapter D, of the Medicare Managed Care Manual, as well as Chapter 3 of the Medicare Prescription Drug Benefit Manual (https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/PartDManuals.html);
- Provide confirmation of having accepted/completed the telephone enrollment request, such as a confirmation tracking number or other tracking mechanism;

- Provide a statement that the individual will receive a notice acknowledging receipt of the enrollment (e.g., acknowledging request for additional information or denial of enrollment); and
- Provide contact information for questions including toll-free telephone and TTY numbers.

## 80.5 – Pharmacy Technical Help Call Center Requirements and Standards
42 CFR § 423.128(d)(1)

Part D sponsors must operate a toll-free pharmacy technical help call center or make available call support to respond to inquiries from pharmacies and providers regarding the beneficiary's Medicare prescription drug benefit. Inquiries may pertain to operational areas such as claims processing, benefit coverage, claims submission, and claims payment. This requirement can be accommodated through the use of on-call staff pharmacists or by contracting with the organization's Pharmacy Benefit Manager (PBM) during non-business hours as long as the individual answering the call is able to address the call at that time.

The call center technical assistance for pharmacies and providers must operate or be available during usual business hours, which CMS interprets to mean during the entire period in which the Part D sponsor's network pharmacies in its Plans' service areas are open (e.g., Part D sponsors whose pharmacy networks include twenty-four (24) hour pharmacies must operate their pharmacy technical help call centers twenty-four (24) hours a day as well).

The pharmacy technical help call center must operate within the following standards:
- Average hold time not to exceed two (2) minutes (the average hold time is defined as the time spent on hold by the caller following the interactive voice response (IVR) system, touch-tone response system, or recorded greeting and before reaching a live person);
- Eighty (80) percent of incoming calls answered within thirty (30) seconds; and
- Disconnect rate of all incoming calls not to exceed five (5) percent.

## 80.6 – Part D Sponsor Coverage Determinations and Appeals Call Center Requirements and Standards
42 CFR §§ 423.128(b)(7), 423.128(d)(1)(iv), 423.566(a)

All Part D sponsors must operate a toll-free call center with live customer service representatives available to respond to providers or enrollees for information related to coverage determinations, including exceptions, prior authorizations, and appeals. Sponsors must provide immediate access to the coverage determination and redetermination processes via their toll-free call centers. Sponsors must operate during normal business hours, 8:00 a.m. to 8:00 p.m., Monday through Friday; in the time zones for the regions in which they operate. Part D sponsors are expected to accept requests for coverage determinations/redeterminations outside of normal business hours, but are not required to have live customer service representatives available to accept such requests outside normal business hours. Additional details are available in Chapter 18 of the Medicare Prescription Drug Benefit Manual (http://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/PartDManuals.html).

Voicemail may be used outside of normal business hours and the voicemail message should:
- Indicate that the mailbox is secure;

- List the information that must be provided so the case can be worked, (e.g., provider identification, beneficiary identification, type of request (coverage determination or appeal), physician support for an exception request, and whether the enrollee is making an expedited or standard request);
- For coverage determination calls (including exceptions requests), articulate the process for resolution within twenty-four (24) hours of call for expedited requests and seventy- two (72) hours for standard requests;
- For appeals calls, articulate the process for resolution within seventy-two (72) hours for expedited appeal requests and seven (7) calendar days for standard appeal requests; and
- For plans that permit oral requests for payment appeals, articulate that different timeframes apply to such appeal requests.

### 80.7 – Activities That Do Not Require the Use of State-Licensed Marketing Representatives

Certain activities conducted by Plan/Part D sponsor customer service representatives do not require the use of state-licensed marketing representatives, unless required by state law. Such activities include:

- Providing factual information;
- Fulfilling a request for materials; or
- Taking demographic information in order to complete an enrollment application at the initiative of the prospective enrollee.

Licensed agents/brokers (employed or contracted) that are customer service representatives cannot act simultaneously as both a customer service representative and a sales/marketing agent/broker. Such individuals must make it clear to the beneficiary when the individual's role changes to a marketing/sales role, subject to beneficiary request and concurrence.

## 90 – Tracking, Submission, and Review Process

### 90.1 – Material Identification
42 CFR §§ 422.2262, 423.2262, 422.2264, 423.2264

CMS requires Plans/Part D sponsors to use a standardized method of identification (material ID) for oversight and tracking of materials beneficiaries receive. This material ID is required on all materials except:
- Membership ID card;
- Envelopes, radio ads, outdoor advertisements, banner or banner-like ads, and social media comments and posts;
- OMB-approved forms/documents, except when otherwise specified by CMS; and
- Agent-developed communication materials that are not marketing.

The material ID is made up of three parts:
- Plan's/Part D sponsor's contract or MCE number, (i.e., "H" for MA or Section 1876 Cost Plans,

24

"R" for Regional PPO plans (RPPOs), "S" for PDPs, or "Y" for Multi-Contract Entity (MCE) identifier) followed by an underscore;
- Any series of alpha numeric characters (Plan/Part D sponsor discretion) followed by an underscore; and
- An uppercase "C" for communication materials or an uppercase "M" for marketing materials (for example: H1234_abc123_C or H5678_efg456_M). The material ID for multi-plan marketing materials must begin with the word "MULTI-PLAN" instead of the organization's contract number.

**Note**: All website pages (including plan-required and third-party) must have a Material ID, but the ID does not have to include "M" or "C".

Non-English and alternate format materials, based on previously created materials, may have the same material ID as the material on which they are based. Refer to section 90.3 for additional information about the submission of non-English and alternate format materials.

### 90.1.1 – Materials Subject to Submission
42 CFR §§ 422.2262, 422.111, 423.2262, 423.128

The HPMS Marketing Module is the system of record for the collection, review, and storage of designated materials. Please refer to the HPMS User Guide for questions regarding the Marketing Module and how to submit materials in HPMS.

Plans/Part D sponsors must submit all marketing materials to CMS using HPMS. Only those required communication materials designated by CMS (e.g., EOC) require prospective submission to HPMS. Please see section 100 on submission requirements for required materials.

HPMS indicates the review time based on the material type. Prospective review materials have a review timeframe of 10 or 45 days, which begins on the date the material is submitted.

**Note**: Under certain circumstances, and with prior approval from CMS, Plans/Part D sponsors may submit materials other than through HPMS.

### 90.2 – Material Replacement
42 CFR §§ 422.2262, 423.2262

If Plans/Part D sponsors change their current year documents, the Plan/Part D sponsor must resubmit updated materials. For the specified materials below, HPMS now has a "material replacement" functionality to allow updated materials to be resubmitted using the same material ID. Plans/Part D sponsors must resubmit the following materials using the material replacement function:
- ANOC
- SB
- EOC
- Star Ratings
- Sales scripts and presentations
- Enrollment scripts

Plans/Part D sponsors may make corrections to all other materials by marking the original material as "no longer in use" and then resubmitting the replacement under a new material ID.

> **Note**: Non-English and alternate format materials should accurately reflect any changes or revisions that Plans/Part D sponsors make to the original English version.

## 90.3 – Non-English Language and Alternate Format Materials
42 CFR §§ 422.2262, 422.2268(a)(7), 423.2262, 423.2268(a)(7)
Plans/Part D sponsors are not required to submit non-English language materials that are based on an English version. If a Plan/Part D sponsor creates a material to be used only in a non- English language, the Plan/Part D sponsor must submit an English translation to HPMS.

Plans/Part D sponsors are not required to submit alternate format versions of a previously submitted standard material.

Plans/Part D sponsors must submit multi-lingual marketing materials that include English and another language (or languages). CMS requires Plans/Part D sponsors to include a note in the comments field specifying that the material is multi-lingual.

Refer to Appendix 1 for the definition of alternate format materials.

## 90.4 – Submission of Websites and Webpages for Review
42 CFR §§ 422.2262, 422.2264, 423.2262, 423.2264

Websites containing any marketing content must be submitted to CMS via HPMS. Plans/Part D sponsors must use code 4006 for required websites and code 4037 for other websites, including those managed by contracted third parties. All websites are considered File & Use submissions.

An initial website must be submitted as a Word document containing the URL. Screenshots, test sites, etc. are not needed. The website may go live five days after HPMS submission. Subsequent submissions (e.g., for website updates) must include the website's URL on a Word document and a summary of the changes. The updates may go live five days after the HPMS submission.

> **Note**: Plans/Part D sponsors are not required to take down their website while making updates. However, the requested changes must not go live for five days following the submission of the changes.

## 90.5 – Submission of Multi-Plan Materials
42 CFR §§ 422.504(l), 422.2262, 423.505(l), 423.2262

Plans/Part D sponsors are responsible for the content of multi-plan materials, including those created by or the activities of third-party on behalf of several Plans/Part D sponsors. Plans/Part D sponsors must ensure that all materials developed on their behalf remain compliant with the most current CMS requirements.

Relevant terms for the multi-plan submission process include:
- **Primary Material** - The base marketing material that serves as a model for submission by Plans/Part D sponsors. Primary materials must first be submitted for review/acceptance prior to all subsequent auxiliary submissions.
- **Auxiliary Material** - The secondary versions of the CMS-approved Primary Material used by other plans.
- **Coordinating Entity (CE)** - The third-party entity that develops the Primary Material for use by the Plans/Part D sponsors with which it contracts.
- **Lead Plan/Part D sponsor (LP)** - Contracted Plan/Part D sponsor that submits the Primary Material for CMS review.
- **Non-Lead Plan/Part D sponsor (NLP)** -  A Plan/Part D sponsor that produces and submits the Auxiliary Material to CMS, based on the approved a Primary Material.

Steps for Multi-Plan Submission:
1. The LP submits the Primary Material into HPMS (LP Region reviews) using the correct material type under the standard submission. The LP must insert the following in the comments field in HPMS:
   a. "MULTI-PLAN MARKETING MATERIAL PRIMARY" (standardized text) in the first line.
   b. The name and role of the CE (e.g., ABC FMO or XYZ PBM) inserted in the second line.
   c. A list of all Multi-Contract Entities (MCE) or Plan/Part D sponsor contracts for which the material is applicable
   d. Any other information necessary for CMS review
2. Once approved/accepted, the LP notifies the CE.
3. The CE provides the NLPs with the primary material's material ID number and marketing code.
4. The NLPs submit Auxiliary Materials. The Auxiliary Material ID must be identical to the approved/accepted Primary Material. The NLPs must insert the following in the comments field in HPMS:
   a. "MULTI-PLAN MATERIAL AUXILIARY" (standardized text) in the first line.
   b. The name and role of the CE
   c. Brief description of the material's previous submission history (e.g., This Multi-plan website was approved by CMS on Month/Day/Year. It was initially submitted by ABC123 Health Care under XXXX material type).

For Multi-plan submission:
- NLPs may not make changes to the previously approved/accepted piece, except to variable fields, name/logo, or changes allowed by CMS.
- NLP auxiliary materials qualify as File & Use and may be distributed following the five (5) calendar day waiting period.
- Communications regarding this process should be documented for tracking purposes.
- The following guidelines apply when Plans/Part D sponsors wish to add an additional Plan/Part D sponsor to a previously approved/accepted multi-plan material:

If a CE wishes to use a material for a Plan/Part D sponsor not identified in the original LP submission (e.g., because a CE contracts with a new Plan/Part D sponsor) the new NLP submits the material and provides an explanation in the comments of HPMS for why it was not listed in the initial listing of contract numbers (e.g., the NLP was not contracted with the CE during the initial submission). The Plan/Part D sponsor should also include the name, phone, and email contact of the CE.

**90.6 – Status of HPMS Material**
42 CFR §§ 422.2262, 423.2262

Plans/Part D sponsors should refer to regulations, laws, the MCMG, and other relevant guidance in developing materials to avoid disapproval by CMS. A disposition indicator will be provided for all materials submitted in HPMS. This includes indicators such as: accepted, alternate format, approved, deemed, disapproved, non-marketing, pending, populated template, SA/LIS, or withdrawn, as defined below:

> **Note**: If a Plan/Part D sponsor does not have an executed contract with CMS, all submitted materials will be marked as conditional.

*Accepted:* Indicates that the marketing material, submitted as File & Use, may be used in the submitted format. The Plan/Part D sponsor may distribute it five (5) calendar days after the submission date.

*Alternate Format:* Indicates the material is submitted in a non-English format.

*Approved:* Indicates the material may be distributed by a Plan/Part D sponsor in the submitted format.

*Deemed:* If CMS does not approve or disapprove materials within the specified review time frame, the materials are deemed approved. The following conditions apply:
- Materials subject to a forty five (45) day review period will be given the status of "deemed" on day 46;
- Materials subject to a ten (10) day review period will be given a status of "deemed" on day 11; and
- Materials from a Plan/Part D sponsor without an executed contract with CMS will receive a conditional deemed approval. After the contract is awarded, the material disposition will be changed to "deemed" and can be used by the Plan/Part D sponsor.

*Disapproved:* Indicates that the material does not comply with applicable standards. CMS will provide a reason for the disapproval in HPMS.

*Non-Marketing:* Indicates that the material type is designated as "Non-Marketing." Plans/Part D sponsors should use the Marketing Code Lookup in HPMS to identify Non-Marketing review materials.

*Pending:*  Indicates that the material is currently under review.

*Populated Template:* Plans/Part D sponsors should submit populated standard templates in HPMS under "Final Expedited Review" codes. These documents will receive a status of "Populated Template (refer to section 90.14)."

*SA/LIS:* Applies to special categories of materials. Please see the HPMS User Guide for an explanation of when this status is applicable (see section 90.2 for information on the material submission process).

*Withdrawn:* Plans/Part D sponsors may request to withdraw a submission prior to use. CMS requires the Plan/Part D sponsor to submit a written request to the Account Manager or Marketing Reviewer stating the reason(s) for the withdrawal. Plans/Part D sponsors may not distribute withdrawn materials.
Please see the HPMS User Guide for additional information.

> **Note:** Materials that have been used, but are no longer used should be marked "no longer in use."

## 90.7 – Resubmitting Previously Disapproved Pieces
42 CFR §§ 422.2262, 423.2262

When a Plan/Part D sponsor resubmits a previously disapproved material, the Plan/Part D sponsor should clearly indicate all changes/updates to the material by highlighting text changes or inserting notes or identifying changes in the comments section.

> **Note:** CMS may require a Plan/Part D sponsor to change previously submitted materials if they are found to be inaccurate, misleading, altered, or otherwise non-compliant.

## 90.8 – File & Use Process
42 CFR §§ 422.2262(b), 423.2262(b)

Under the File & Use process, Plans/Part D sponsors must submit eligible marketing materials at least five (5) calendar days prior to their distribution and certify that the materials comply with all applicable standards. The Marketing Code Lookup in HPMS identifies those materials that qualify for File & Use.

Plans/Part D sponsors without an executed contract may submit File & Use materials. However, please note that once the contract is executed, CMS presumes that the officer of the Plan/Part D sponsor has, by submission, attested that the material complies with the File & Use requirements.

Plans/Part D sponsors may be subject to compliance actions if they:
- Submit or use materials that do not meet the applicable requirements; or
- Fail to file material(s) at least five (5) calendar days prior to its distribution.

**90.9 – File & Use Retrospective Monitoring Reviews**
42 CFR §§ 422.2262(b), 422.2264, 423.2262(b), 423.2264

CMS may periodically conduct retrospective reviews of materials that Plans/Part D sponsors submit under File & Use to ensure compliance with requirements.

**90.10 – Standardized Model Materials**
42 CFR §§ 422.2262(c), 423.2262(c)

CMS provides Plans/Part D sponsors with standardized model materials that must be used without modification to the language, content, format, or order, except as noted below. Some of these materials must be submitted in HPMS. If submission is required, as articulated in section 100, Plans/Part D sponsors must indicate the model/exhibit title and applicable CMS chapter/manual or HPMS memorandum date within the comments section of HPMS.

CMS allows Plans/Part D sponsors to make the following changes to all standardized materials:
- Populating variable fields;
- Correcting grammatical errors;
- Adding customer service phone numbers;
- Adding plan name/logo;
- Adding required disclaimers (refer to Appendix 2 for the appropriate disclaimers);
- Adding plan type; and
- Adding the CMS marketing material identification number.

**90.11 – Non-Standardized Model Materials**
42 CFR §§ 422.2262(c), 423.2262(c)

CMS provides non-standardized models that Plans/Part D sponsors may use at their discretion.

A Plan/Part D sponsor that chooses to modify the non-standardized model must ensure that the non-model document the Plan/Part D sponsor creates contains all content that is in the model. Plans/Part D sponsors must remove any reference to the words "exhibit," "model," or "appendix" used in the title of the model document from the title of the non-model document.

**90.12 – Template Materials**
42 CFR §§ 422.2262, 423.2262

"Template materials" are marketing materials that include placeholders for variable data that a Plan/Part D sponsor will populate at a later time. Template materials are created by Plan/Part D sponsors and are classified as static or standard. Prior to submitting these materials in HPMS, Plans/Part D sponsors should use the Marketing Code Lookup to verify that the material type allows for the submission of templates.

Unpopulated templates must first be submitted with placeholders identifying the field or listing

all variables (e.g., "<date>", "<$10.00 Copay/$15.00 Copay>"). If a Plan/Part D sponsor changes the non-variable text, the Plan/Part D sponsor must resubmit the template in HPMS.

**90.13 – Static Templates**
42 CFR §§ 422.2262, 423.2262

Template materials are considered "static" when they include placeholders for the following variable data fields ONLY:

- Dates;
- Events;
- Addresses, phone or fax numbers;
- Hours of operation;
- Organization or company names;
- Plan/Part D sponsor name;
- Logos;
- Agent/Agency;
- Federal contracting statement/disclaimer (refer to Appendix 2);
- Persons' names and pronoun variations;
- Enrollee specific variables (e.g., case numbers, drug specific references);
- Co-branding information;
- Photos;
- Email and web addresses; and
- Page number references.

CMS does not require Plans/Part D sponsors to submit populated static templates in HPMS.

**90.14 – Standard Templates**
42 CFR §§ 422.2262, 423.2262

Standard Templates are marketing materials that include placeholders for variable data not listed in section 90.13, such as plan specific benefits, premiums, and cost sharing. These materials must be submitted into HPMS.

Plans/Part D sponsors must submit final, populated versions of standard templates in HPMS using the associated "Final Expedited Review" code within thirty (30) days of use. If the template does not have a "Final Expedited Review" code, Plans/Part D sponsors may not submit the document as a standard template. Plans/Part D sponsors must instead submit the document with all fields populated, other than those fields listed in section 90.13. Refer to the HPMS Users' Guide for technical template submission instructions.

## 100 – Required Materials
42 CFR §§ 422.111, 422.2264(a), 423.128, 423.2264(a)

This section provides guidance specific to additional CMS required materials. It also outlines the required materials that Plans/Part D sponsors must have ready to provide to potential and/or existing enrollees. Required materials must be in 12-point Times New Roman font or equivalent. Unless otherwise noted, the materials below designated as communications materials do not require HPMS submission. Materials must be provided as outlined below and must also be provided upon enrollee request. In addition, Plans/Part D sponsors must provide materials in alternate formats upon request.

### 100.1 – Mailings to Multiple Beneficiaries at One Household
42 CFR §§ 422.111, 422.2264, 423.128, 423.2264

Plans/Part D sponsors may mail a single copy of the ANOC, EOC, Provider/Pharmacy Directory, Formulary, and/or notification for electronic documents as described below to multiple members of a household provided members are in the same plan, have the same address, including apartment number (if applicable), and the Plan/Part D sponsor reasonably believes the members are related. The documents (e.g., envelope, cover letter) must clearly notate each individual name. Members in community residences (e.g., nursing facilities, group homes) must receive their own document, regardless of whether they have the same address.

### 100.2 – Electronic Delivery of Materials
42 CFR §§ 422.64, 422.111, 423.48, 423.128

CMS permits the electronic delivery of materials. This section outlines two distinct processes for electronic delivery. The first, as outlined in section 100.2.1, allows Plans/Part D sponsors to make certain required materials available to beneficiaries without requiring the beneficiary to opt-in. The second, as outlined in section 100.2.2, allows for a wider range of materials to be delivered electronically, but also requires the beneficiary to first opt-in.

### 100.2.1 - Notification of Availability of Electronic Materials
42 CFR §§ 422.64, 422.111, 423.48, 423.128

Without prior beneficiary authorization, Plans/Part D sponsors may send existing (i.e., not prospective) enrollees a notice informing enrollees how to access CMS designated required materials electronically instead of mailing hard copies of the documents. The following required materials may use this process:
- EOC;
- Provider/Pharmacy Directories; or
- Formularies.

The notice may reference multiple required documents (e.g., EOC, Provider Directory), must include the plan website to access these documents, the date the documents will be available, and, at minimum, a phone number to request hardcopy documents (additional methods of requesting a hardcopy may also be included with the phone number).

> **Note**: It is acceptable to state "currently available" instead of a date if the documents are already posted before the notice.

If a plan sends a notice that required documents are available online, CMS expects the notice to be mailed no earlier than September 1. Such notes must be sent in time for an enrollee to receive the documents by October 15.

Plans/Part D sponsors may also send a notice informing new members enrolling throughout the year (e.g., June 1 effective date) how to access the EOC, Provider/Pharmacy Directories, and/or Formularies. If an enrollee requests any of these documents in hardcopy, the Plan/Part D sponsor must mail the hard copy within three (3) business days of the request. The hardcopy request remains until the enrollee leaves the plan or requests that hard copies be discontinued

> **Note**: Plans/Part D sponsors may inquire to the member whether the request for a hard copy is a one-time request or is a request to receive the document in hard copy permanently.

### 100.2.2 – Electronic Delivery of Required Materials
42 CFR §§ 422.64, 422.111, 423.48, 423.128

In addition to providing electronic access to the materials outlined in 100.2.1, with prior consent from the enrollee, Plans/Part D sponsors can provide any materials in different media types (e.g., email, web portal, CD, DVD). Plans must:
- Obtain prior consent from the enrollee;
- Specify both the media type and the specific materials;
- Provide an opt-out mechanism so enrollees can receive hard copies;
- When applicable, provide instructions on how and when enrollees can access the electronic documents (for example, if the Plan/Part D sponsor posts the information on a website, they must also provide an email or hardcopy notice informing the enrollee where and when the Plan/Part D sponsor will post the document);
- Provide hard copies of all enrollee materials (excluding plan web pages) to enrollees upon request;
- Ensure enrollee contact information is current, communication materials are delivered and received timely and appropriately, and materials are identified in a way that enrollees understand their importance; and
- Have a process for automatic mailing of hard copies when electronic versions or choice of media types are undeliverable (e.g., an expired email account).

Documents delivered electronically will be considered to be received by the enrollee as of the date the Plan/Part D sponsor sends it, not when the enrollee opens/accesses it.

### 100.3 – Changes and Corrections to Existing Documents
42 CFR §§ 422.2262, 423.2262

Plans/Part D sponsors must review all required documents for accuracy. If changes or corrections to submitted materials (e.g., the benefit or cost-sharing information differs from that in the

33

approved bid) are required, the Plan/Part D sponsor must correct those materials and resubmit as applicable. CMS encourages Plans/Part D sponsors to reprint the corrected version of the ANOC and SB. Below are the mailing and timeframe requirements regarding corrected documents.

- ANOC, EOC, and formulary erratas must be sent in hard copy within a reasonable timeframe;
- SB addenda or reprints must be sent only to existing enrollees if the Plan/Part D sponsor mass mailed the SB; and
- Both hardcopy and online provider/pharmacy directories must be updated within 30 calendar days of receipt of updated or corrected information from the provider/pharmacy to ensure accurate information is provided to enrollees. Upon enrollee request, updated hardcopy directories (reprint including addenda) must be mailed within three (3) business days of the request.

**100.4 – List of Required Materials**
42 CFR Parts 417, 422, 423

Below is a list of required materials identifying each item as either "Marketing" or "Communications." In addition, high-level information is provided for each material.  Guidance (as noted) should be reviewed as applicable.  Additionally, Plans/Part D sponsors should consult the HPMS Marketing Code Lookup for specific codes for uploading required materials.

 Note: Required materials (e.g., drug recall notices) not listed below are considered communications.

Plans/Part D sponsors may enclose additional benefit/plan operation materials with required materials, unless specifically prohibited in instructions (e.g., ANOC instructions) or prohibited as noted below for each material. Additional materials must be distinct from required materials and must be related to the plan in which the beneficiary enrolled.

| **Annual Notice of Change** (Marketing) | |
|---|---|
| *To Whom Required:* | Must be provided to current enrollees of plan, including those with October 1, November 1, and December 1 effective dates. October 1, November 1, and December 1 enrollees must receive both the current year EOC and the next calendar year EOC. |
| *Timing:* | • All Plans/Part D sponsors and all 1876 cost plans must send for enrollee receipt no later than September 30 of each year. **Note**: ANOC must be posted on Plan/Part D website by 10/15. • October 1, November 1, and December 1 enrollees must receive within ten (10) calendar days from receipt of CMS confirmation of enrollment or by last day of month prior to effective date, whichever |
| *Method of Delivery:* | Hard copy, or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Code 1140 File and Use. Must be submitted prior to mailing ANOCs. May be used immediately following submission. |
| *Format Specification:* | Model Required - Current Contract Year. Modifications permitted per instructions. |
| *Guidance and Other Needed Information:* | • Actual Mail Dates (AMDs) and number of recipients (not the number of ANOCs mailed) must be entered into HPMS within 15 days of mailing. • Plans may include the following with the ANOC: ○ Summary of Benefits ○ Notification of Electronic Documents |
| *Translation Required (5% Threshold):* | Yes. |

| **ANOC** (Marketing) **and EOC** (Communications) **Errata** | |
|---|---|
| *To Whom Required:* | Must be provided when errors are found in the ANOC or EOC and sent to current enrollees. |
| *Timing:* | Must send to enrollees immediately following CMS approval. |
| *Method of Delivery:* | Hard copy, or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Codes 1160 (ANOC Errata) and 1170 (EOC Errata). ANOC errata must be submitted by October 15. EOC errata must be submitted by November 15. |
| *Format Specification:* | Model required. |
| *Guidance and Other Needed Information:* | Refer to the annual "Issuance of Contract Year Model Materials" memo. |
| *Translation Required (5% Threshold):* | Yes. |

| **Coverage/Organization Determination, Discharge, Appeals and Grievance Notices** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided to enrollees who have requested an appeal or have had an appeal requested on their behalf. A grievance requested by an enrollee in writing (or on the enrollee's behalf) must be responded to in writing. Grievances requested orally may be responded to orally or in writing, unless the enrollee requests a written response. |
| *Timing:* | Provided to enrollees (generally by mail) on an ad hoc basis, based on required timeframes in Parts 422 and 423, subpart M. |
| *Method of Delivery:* | Hard copy, or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Standardized OMB-approved denial notices for initial coverage denials; model notices for plan level appeals. |
| *Guidance and Other Needed Information:* | Chapter 13 of the Medicare Managed Care Manual and Chapter 18 of the Medicare Prescription Drug Benefit Manual. |
| *Translation Required (5% Threshold):* | Yes. |

| **Enrollment Form/Request** (Communications) | |
|---|---|
| *To Whom Required:* | Upon request. All organizations/sponsors must have available a paper enrollment form in addition to any other acceptable enrollment mechanisms. |
| *Timing:* | Not applicable. |
| *Method of Delivery:* | Paper enrollment forms may be in hard copy or electronic format (e.g., PDF file) and must be provided via email, online portal for current members, and upon request (e.g., if beneficiary does not want to enroll telephonically or electronically). Any enrollment mechanism outlined in enrollment guidance is acceptable for an enrollment request. |
| *HPMS Timing and Submission:* | Submission required by statute. Code 1070 or 1072. |
| *Format Specification:* | Model provided, modification permitted.  Must follow requirements for enrollment mechanisms and required data elements outlined in enrollment guidance. |
| *Guidance and Other Needed Information:* | Eligibility, Enrollment, and Disenrollment – Medicare Managed Care Manual-Chapters 2 and 17D, and Medicare Prescription Drug Manual-Chapter 3. |
| *Translation Required (5% Threshold):* | Yes. |

| **Enrollment and Disenrollment Notices** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided as outlined in enrollment guidance. |
| *Timing:* | Varies; must follow required timeframes as outlined in enrollment guidance. |
| *Method of Delivery:* | Hard copy, or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Models provided, modification permitted.  Must include elements outlined in enrollment guidance. |
| *Guidance and Other Needed Information:* | <ul><li>Includes all enrollment processing notices (acknowledgement, confirmation, denial, rejection, request for more information, attestation of creditable coverage, cancellation, reinstatement, etc.).</li><li>Includes all enrollment adjustment notices (700-series transaction reply code notices, Part D late enrollment penalty notices, etc.).</li><li>Includes all disenrollment notices (advance warning, research of possible ineligibility, disenrollment, cancellation, request for more information, etc.).</li><li>Plans must maintain copies of required notices, as outlined in enrollment guidance. Eligibility, Enrollment, and Disenrollment – Medicare Managed Care Manual-Chapters 2 and 17D and Medicare Prescription Drug Manual-Chapter 3.</li><li>Creditable Coverage Determinations and Late Enrollment  Penalty – Medicare Prescription Drug Manual – Chapter 4.</li><li>Non-renewal and Service Area Reduction Guidance.</li></ul> |
| *Translation Required (5% Threshold):* | Yes. |

| **Evidence of Coverage** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided to all enrollees of plan. |
| *Timing:* | • Must be provided to current enrollees of plan by October 15 of each year.<br>• Must be provided to new enrollees within ten (10) calendars days from receipt of CMS confirmation of enrollment or by last day of month prior to effective date, whichever is later. |
| *Method of Delivery:* | Hard copy; made available electronically, as permitted in 100.2.1; or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Code 1150 File and Use. Submitted prior to October 15 of each year. May be used immediately following submission. |
| *Format Specification:* | Model required. Current Contract Year EOC. Modifications permitted per instructions. |
| *Guidance and Other Needed Information:* | No additional information. |
| *Translation Required (5% Threshold):* | Yes. |

| **Excluded Provider Letter** (Communications) | |
|---|---|
| *To Whom Required:* | When a sponsor has excluded a prescriber or pharmacy from participating in the Medicare program based on an OIG exclusion. |
| *Timing:* | Provided to enrollees on an ad hoc basis. |
| *Method of Delivery:* | Hard copy, or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2 |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model required. |
| *Guidance and Other Needed Information:* | https://oig.hhs.gov/fraud/exclusions.asp |
| *Translation Required (5% Threshold):* | Yes. |

| **Explanation of Benefits – Part D** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided anytime an enrollee utilizes their prescription drug benefit. |
| *Timing:* | Sent at the end of month following the month when benefit was utilized. |
| *Method of Delivery:* | Hard copy, or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model required. |
| *Guidance and Other Needed Information:* | Medicare Prescription Drug Manual Chapters 5 and 6. |
| *Translation Required (5% Threshold):* | Yes. |

| **Explanation of Benefits – Part C** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided anytime an enrollee utilizes a Part C benefit. |
| *Timing:* | Plan may send monthly or per claim with a quarterly summary. |
| *Method of Delivery:* | Hard copy, or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model provided, modification permitted. |
| *Guidance and Other Needed Information:* | Managed Care Manual Chapter 4, Section 190. |
| *Translation Required (5% Threshold):* | Yes. |

| **Formulary** (Communications) ||
|---|---|
| *To Whom Required:* | Must be provided to all enrollees of plan. |
| *Timing:* | • Must be provided to current enrollees of plan by October 15 of each year.<br>• Must also provide to new enrollees within ten (10) calendars days from receipt of CMS confirmation of enrollment or by last day of month prior to effective date, whichever is later. |
| *Method of Delivery:* | Hard copy; made available electronically, as permitted in 100.2.1; or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model required, <span style="color:red">modifications permitted.</span> |
| *Guidance and Other Needed Information:* | Refer to Part D Model Materials at:<br>https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Part-D-Model-Marketing-Materials.html and Medicare Prescription Drug Manual Chapter 6. |
| *Translation Required (5% Threshold):* | Yes. |

| **Low Income Premium Subsidy** (Communications) ||
|---|---|
| *To Whom Required:* | Must be provided to potential enrollees of what their plan premium will be once they are eligible for Extra Help and receive the low-income subsidy. |
| *Timing:* | <span style="color:red">Must be provided prior to effective date of enrollment.</span> |
| *Method of Delivery:* | <span style="color:red">Electronic (web posting)</span> |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model provided, modification permitted. |
| *Guidance and Other Needed Information:* | Refer to Part D Model Materials at:<br>https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Part-D-Model-Marketing-Materials.html. |
| *Translation Required (5% Threshold):* | Yes. |

40

| **Low Income Subsidy (LIS) Rider** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided to all current enrollees who qualify for Extra Help. Enrollees will get an LIS rider from the Plan telling them how much help they will receive in the benefit year toward their Part D premium, deductible, and copayments. |
| *Timing:* | <ul><li>Must be provided at least once per year by September 30.</li><li>Must be sent to enrollees who qualify for Extra Help or have a change in LIS levels within 30 days of receiving notification from CMS.</li></ul> |
| *Method of Delivery:* | Hard copy. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model required. |
| *Guidance and Other Needed Information:* | Medicare Prescription Drug Benefit Manual, Chapter 13, Section 70.2. |
| *Translation Required (5% Threshold):* | Yes. |

| **Membership ID Cards** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided to all plan enrollees. |
| *Timing:* | Must be provided to new enrollees within ten (10) calendars days from receipt of CMS confirmation of enrollment or by last day of month prior to effective date, whichever is later. Must also be provided to all enrollees if information on existing card changes. |
| *Method of Delivery:* | Must be provided in hard copy. In addition to the hard copy, plans may also provide a digital version (e.g., app). |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model not available, must include required content. Combination health and drug cards must follow the Workgroup for Electronic Data Interchange (WEDI) standards. Standalone Part D cards must follow the National Council for Prescription Drug Program (NCPDP) standards. |
| *Guidance and Other Needed Information:* | • Cards must include Plan/Part D sponsor's website address, customer service number, and contract/PBP number.<br>• The front of the Part D sponsor card must include the Medicare Prescription Drug Benefit Program Mark.<br>• Combination health and drug plan cards must follow the WEDI standard and must include the required information.<br>• PPO and PFFS ID cards must include the phrase "Medicare limiting charges apply."<br>• May not use social security number (SSN) or Health care Insurance Claim number (HICN). |
| *Translation Required (5% Threshold):* | No. |

| **Mid-Year Change Notification to Enrollees** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided to all applicable enrollees when there is a mid-year change in benefits, plan rules, formulary, provider network, or pharmacy network. |
| *Timing:* | Ad hoc, based on specific requirements for each issue. |
| *Method of Delivery:* | Hard copy, or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model not available, must include required content. |
| *Guidance and Other Needed Information:* | • Notices of changes in plan rules unless otherwise addressed in a regulation must be provided 30 days in advance.<br>• For changes in provider network and/or pharmacy network, see 42 CFR 422.111 and 422.128.<br>• National Coverage Determination (NCD) changes announced or finalized less than 30 days before effective date, notification required as soon as possible.<br>• Mid-year NCD or legislative changes must publish no later than 30 days after the NCD is announced. Plans may include change in next plan mass mailing (e.g., newsletter), provided it is within 30 days and must be reflected on Plan/Part D website.<br>• Plan/Part D sponsor developed letter/communication. Required elements must be included in letter/communication.<br>• Medicare Managed Care Manual-Chapter 4.<br>• Medicare Prescription Drug Benefit Manual- Chapter 6 and forthcoming guidance effectuating 42 CFR 423.120(b)(5) on formulary changes and required notice to beneficiaries and other entities.<br>• National Coverage Determination website. |
| *Translation Required (5% Threshold):* | Yes. |

| Non-Renewal Notices (Communication) | |
|---|---|
| *To Whom Required:* | Must be provided to each affected enrollee after the Plan/Part D sponsor decides to non-renew or reduce their plan's service area. |
| *Timing:* | At least 90 days before the end of the current contract period. Cost Plans (without Part D) provide notice at least 60 days before the end of the current contract period. |
| *Method of Delivery:* | Notices must be hard copy and sent via U.S. mail. First class postage is recommended. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model required - Current contract year. Modifications permitted per instructions. |
| *Guidance and Other Needed Information:* | • Information about non-renewals or service area reductions may not be released to the public, including current enrollees, until notice is received from CMS.<br>• MAOs may elect to share Non-Renewal and Service Area Reduction (NR/SAR) information only with first tier, downstream, and related entities (FDRs) or anyone that the MAO does business with (i.e., contracted providers).<br>• Additional NR/SAR notice information can be found in the annual "Non-Renewal and Service Area Reduction Guidance and Enrollee Notification Models" HPMS memo. |
| *Translation Required (5% Threshold):* | Yes. |

| **Outbound Enrollment Verification** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided for all agent/broker assisted enrollments. |
| *Timing:* | Must be conducted within 15 calendar days following the receipt of the enrollment request. |
| *Method of Delivery:* | Hard copy, telephonic, email. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model not available, must include required content. |
| *Guidance and Other Needed Information:* | <ul><li>Communication must address enrollment into Part C or Part D Plan and provide customer service number for beneficiary questions regarding costs, benefits, rules, or any other question about the Part C/Part D Plan.</li><li>May be completed via phone call (including during welcome call) or via email, if email is requested by an enrollee.</li><li>Must send a written communication if the Plan/Part D sponsor fails to speak with the individual within 15 calendar days of enrollment requests.</li><li>Agent/brokers are not permitted to be part of the enrollment verification call.</li><li>Enrollment verification processes must stop if Plan/Part D sponsor is notified that beneficiary is ineligible to enroll in plan or if beneficiary has canceled the enrollment.</li><li>Method and timing of the enrollment verification must be documented (date, time, and method of contact).</li></ul> |
| *Translation Required (5% Threshold):* | Yes. |

| **Part D Transition Letter** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided when a beneficiary receives a transition fill for a non-formulary drug. |
| *Timing:* | Must be sent within three (3) days of adjudication of temporary transition fill. |
| *Method of Delivery:* | Hard copy. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model required<br>Modifications permitted |
| *Guidance and Other Needed Information:* | Chapter 6, Section 30.4.10. |
| *Translation Required (5% Threshold):* | Yes. |

| Pharmacy Directory (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided to all current enrollees of the plan. |
| *Timing:* | <ul><li>Must be provided to current enrollees of plan by October 15 of each year.</li><li>Must be provided to new enrollees within ten (10) calendars days from receipt of CMS confirmation of enrollment or by last day of month prior to effective date, whichever is later.</li><li>Must be provided to current enrollees upon request, within three (3) business days of the request.</li><li>Must update directory information any time they become aware of changes. All updates to the online provider directories are expected to be completed within 30 days of receiving information. Updates to hardcopy provider directories must be completed within 30 days, however, hardcopy directories that include separate updates via addenda are considered up-to-date.</li></ul> |
| *Method of Delivery:* | Hard copy; made available electronically, as permitted in 100.2.1; or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model provided, modifications permitted. |
| *Guidance and Other Needed Information:* | For electronic and hard copy versions of a pharmacy directory, the language and guidelines issued in the HPMS memo on 8/16/2016, *Pharmacy Directories and Disclaimers*, for further information please refer to the Part D Model Materials at: https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Part-D-Model-Marketing-Materials.html. |
| *Translation Required (5% Threshold):* | Yes. |

| Pre-Enrollment Checklist (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided to potential enrollees with the Summary of Benefits when the Summary of Benefits is accompanying an enrollment form. |
| *Timing:* | Prior to enrollment. |
| *Method of Delivery:* | In the same format the SB was provided. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model required. Modifications to disclaimer language is not permitted, however, Plans/Part D sponsors may delete bullets that do not apply to a specific plan type. When the pre-enrollment checklist is used for multiple products, they are permitted to add a sentence or additional language before or after the disclaimer to clarify or distinguish how a disclaimer applies to different products. |
| *Guidance and Other Needed Information:* | Must accompany the SB. Refer to Appendix 3. |
| *Translation Required (5% Threshold):* | Yes. |

| Prescription Transfer Letter (Communications) | |
|---|---|
| *To Whom Required:* | When a Part D sponsor requests permission from an enrollee to fill a prescription at a different network pharmacy than the one currently being used by enrollee. |
| *Timing:* | Ad hoc. |
| *Method of Delivery:* | Hard copy. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model required. |
| *Guidance and Other Needed Information:* | Refer to the Part D Model Materials at: https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Part-D-Model-Marketing-Materials.html. |
| *Translation Required (5% Threshold):* | Yes. |

| **Provider Directory** (Communications) | |
|---|---|
| *To Whom Required:* | Must be provided to all current enrollees of the plan. |
| *Timing:* | • Must be provided to current enrollees of Plan by October 15 of each year.<br>• Must be provided to new enrollees within ten (10) calendars days from receipt of CMS confirmation of enrollment or by last day of month prior to effective date, whichever is later.<br>• Must be provided to current enrollees upon request, within three (3) business days of the request.<br>• Must update directory information any time they become aware of changes. All updates to the online provider directories are expected to be completed within 30 days of receiving information. Updates to hardcopy provider directories must be completed within 30 days, however, hardcopy directories that include separate updates via addenda are considered up-to-date. |
| *Method of Delivery:* | Hard copy; made available electronically, as permitted in 100.2.1; or electronically, if enrollee has opted into receiving electronic version as permitted in 100.2.2. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model provided, modification permitted. |
| *Guidance and Other Needed Information:* | Chapter 4 of the Medicare Managed Care Manual and Medicare Advantage and Section 1876 Cost Plan Provider Directory Model. |
| *Translation Required (5% Threshold):* | Yes. |

| Scope of Appointment (Communications) | |
|---|---|
| *To Whom Required:* | Must be documented for all marketing activities, in-person, telephonically, including walk-ins to Plan/Part D sponsor or agent offices. |
| *Timing:* | Prior to the appointment. |
| *Method of Delivery:* | Beneficiary signed hard copy, telephonic recording, or electronically signed. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | No model required, must include required content. |
| *Guidance and Other Needed Information:* | <ul><li>The following requirements must be on the scope of appointment form or on the recorded call:<ul><li>Product types to be discussed</li><li>Date of appointment</li><li>Beneficiary and agent contact information</li><li>Statement stating, no obligation to enroll, current or future Medicare enrollment status will not be impacted, and automatic enrollment will not occur.</li></ul></li><li>A new SOA is required if, during an appointment, the beneficiary requests information regarding a different plan type than previously agreed upon.</li></ul> |
| *Translation Required (5% Threshold):* | Yes. |

| **Star Ratings Document** (Marketing) | |
|---|---|
| *To Whom Required:* | Must be provided to all prospective enrollees when an enrollment form is provided. For online enrollment, Star Ratings document and SB must be made available electronically (e.g., via link) prior to the completion and submission of enrollment request. |
| *Timing:* | Must be provided prior to enrollment. |
| *Method of Delivery:* | Hard copy. |
| *HPMS Timing and Submission:* | Code 1090.<br>Must be uploaded within 21 calendar days of the release of the updated information. |
| *Format Specification:* | Model required. Standardized Star Ratings document is generated from HPMS. |
| *Guidance and Other Needed Information:* | • All Plans/Part D sponsors must provide the Star Ratings document.<br>• New Plans/Part D sponsors that have no Star Ratings are not required to provide until the following contract year.<br>• Updated Star Ratings must be used within 21 calendar days of release of updated information on Medicare Plan Finder.<br>• Updated Star Ratings must not be used until CMS releases Star Ratings on Medicare Plan Finder.<br>• Only the Plan logo may be added to the document (no other changes or alterations are permitted). |
| *Translation Required (5% Threshold):* | Yes. |

| **Summary of Benefits** (Marketing) | |
|---|---|
| *To Whom Required:* | Must be provided to all prospective enrollees when an enrollment form is provided. |
| *Timing:* | Must be available by October 15 of each year. |
| *Method of Delivery:* | Hardcopy or electronic, depending on the format of the enrollment mechanism. |
| *HPMS Timing and Submission:* | Code 1099 File & Use.<br>Submitted prior to October 15 of each year. |
| *Format Specification:* | No model required, must include required content. |
| *Guidance and Other Needed Information:* | Appendix 5 of the MCMG. |
| *Translation Required (5% Threshold):* | Yes. |

| Termination Notices (Communication) | |
|---|---|
| *To Whom Required:* | Notice must be provided to affected enrollees before the termination effective date or the end of services for provider terminations. |
| *Timing:* | CMS and MAO initiated terminations and provider terminations require enrollee notices be sent as specified in CFR Title 42. |
| *Method of Delivery:* | Notices must be hard copy and sent via U.S. mail. First class postage is recommended.<br><br>Notice to the general public requires publishing in one or more newspapers of general circulation. |
| *HPMS Timing and Submission:* | Not applicable. |
| *Format Specification:* | Model required - Current contract year. |
| *Guidance and Other Needed Information:* | Relevant notice requirements are provided in 42 CFR §§ 422.111(e), 422. 512, 422.510, and 422. 508. |
| *Translation Required (5% Threshold):* | Yes. |

## 110 – Agent/Broker Activities, Oversight, and Compensation Requirements

### 110.1 – Agent Requirements
42 CFR §§ 422.2272(c), 422.2274, 423.2272(c), 423.2274

Agents selling Medicare Advantage-Prescription Drug plans (MA, MA-PD), Medicare Prescription Drug plans (PDP) and Section 1876 cost plans must:
- Be licensed and appointed (if applicable) per State law to sell Medicare products;
- Be trained and tested annually;
- Achieve an 85 percent or higher on agent testing; and
- Secure and document an SOA prior to meeting with potential enrollees. (Refer to section 100.4 for specific requirements).

### 110.2 – Permitted Agent Activities
Permitted activities include, but are not limited to:
- Conducting sales presentations;
- Holding one-on-one sales appointments with potential enrollees;
- Providing business reply cards at educational events;
- Creating and distributing communication materials. As outlined in section 90.1, broker-

created communications do not require a material identification number;
- Distributing marketing materials as long as CMS has accepted/approved those materials as submitted through the Plan(s)/Part D sponsor(s) with whom the broker contracts; and
- Using CMS-created materials provided the materials are not modified in any way.

## 110.3 – Plan/Part D Sponsor Oversight
42 CFR §§ 422.504(l), 422.2272(c)-(d), 422.2274, 423.505(l), 423.2272(c)-(d), 423.2274

Plans/Part D sponsors must oversee downstream entities to ensure agents/brokers abide by all applicable state and federal laws, regulations, and requirements. Plans/Part D sponsors are required to:
- Ensure agents/brokers are properly licensed and appointed, per individual state requirements;
- Report to the state where agent is appointed the termination of an agent/broker, including the reason for termination if state law requires;
- Report to CMS Account Managers all enrollments made by unlicensed agent(s) and report for-cause terminations of an agent/broker to CMS.
- Provide training and testing that meets CMS' requirements as found in the Agent and Broker Training and Testing Guidelines;
- Report annually to CMS whether the Plan/Part D sponsor intends to use <span style="color:red">employed, captive, or</span> independent agents or brokers in upcoming plan year and, if applicable, the specific amount or range of amounts the agents/brokers will be paid;
- Submit agent/broker marketing materials to CMS through HPMS prior to use;
- Ensure beneficiaries are not charged a marketing fee by agents; and
- Ensure SOAs are completed for all marketing appointments (including telephonic and walk-ins).

## 110.4 – Compensation Applicability and Definitions
42 CFR §§ 422.2274, 423.2274

Compensation requirements, unless otherwise noted, only apply to independent agent/brokers. Plans/Part D sponsors must ensure the following requirements are met in order to pay compensation:
- Plans/Part D sponsors may only pay agents/brokers who meet state licensure/appointment requirements;
- Agents/brokers who represent the Plan/Part D sponsor must be trained and tested to receive compensation; representation includes:
  - Selling products;
  - Outreach to existing or potential beneficiaries; and
  - Answering or potentially answering questions from existing or potential beneficiaries.
- Unless otherwise noted, compensation is governed by terms of the contract between the Plan/Part D sponsor and the agent/broker and must comply with regulations at 42 CFR 422.2274 and 423.2274. Contracts, including re-negotiating of contracts, is between the Plan/Part D sponsor and the agent/broker.

**110.5 – Plan/Part D Sponsor Compensation Reporting Requirements**
42 CFR §§ 422.2274, 423.2274

- Plans/Part D sponsors must notify CMS whether they are using employed, captive, or independent agents, as well as the compensation payment rates or ranges and referral fees. CMS will notify Plans/Part D sponsors of the deadline annually. Once the submission deadline passes, Plans/Part D sponsors may not change their rates, ranges, or referral fees until the next compensation year.
- Full compensation structures for the next contract year must be in place by October 1 of each year. The structure must include details on compensation dissemination, including specifying payment amounts for initial and renewal compensation.
- Plans/Part D sponsors are responsible for ensuring first tier, downstream, and related entities that represent the plan adhere to all agent/broker and compensation requirements.

**110.6 – Compensation**
42 CFR §§ 422.2274(a)(1) and (2), 423.2274(a)(1) and (2)

Compensation includes monetary or non-monetary remuneration relating to the sale or renewal of a policy including, but not limited to:
- Commissions;
- Bonuses;
- Gifts, prizes, awards; and
- Referral/finder's fees.

Compensation DOES NOT include:
- The payment of fees to comply with state appointment laws;
- Costs associated with training/testing;
- Certification costs; or
- Reimbursement for actual costs (e.g., mileage to and from appointments with beneficiaries, venue rent, snack, materials).

**110.6.1 – Initial Compensation**
42 CFR §§ 422.2274(b)(1)(i), 423.2274(b)(1)(i)

Plans/Part D sponsors may pay initial compensation at or below the fair market value (FMV) as published annually by CMS.

**110.6.2 – Renewal Compensation**
42 CFR §§ 422.2274(b)(1)(ii), 423.2274(b)(1)(ii)

For each enrollment in Year 2 and beyond, Plans/Part D sponsors may pay renewal compensation at an amount that is up to fifty (50) percent of the current FMV a published annually by CMS.

**110.6.3 – Referral/Finder's Fees**
42 CFR §§ 422.2274(h), 423.2274(h)

Referral/Finder's fees paid to independent, captive or employed agents/brokers may not exceed the amount that CMS determines could reasonably be expected to provide financial incentive for an agent or broker to recommend or enroll a beneficiary into a plan that is not the most appropriate to meet his or her needs. Referral fees must be included in the total compensation not to exceed the fair market value for that calendar year. For 2019, the amount is $100 for MA plans and $25 for PDPs.

**110.6.4 – Paying Compensation**
42 CFR §§ 422.2274, 423.2274
- The compensation year is January 1 through December 31. Payments must be calculated and made during the January 1 through December 31 enrollment year (including AEP enrollments).
- Plans/Part D sponsors may determine their payment schedule (e.g., monthly, quarterly). However, compensation must be paid during the enrollment year.
- Compensation is based on the number of months a member is enrolled.
- Compensation paid to third parties selling MA/Part D products must adhere to compensation requirements.

**110.6.5 – Paying Initial Compensation**
42 CFR §§ 422.2274, 423.2274

Plans/Part D sponsors may pay either a full or pro-rated Initial Compensation when:
- The beneficiary's first year of enrollment in any plan, or
- A beneficiary moves from an employer group plan to a non-employer group plan (either within the same Parent Organization or between Parent Organizations).

Plans/Part D sponsors must pro-rate Initial Compensation when:
- A beneficiary changes plans during their initial enrollment year, or
- A beneficiary makes an "unlike plan change." The new plan would only pay the months that the beneficiary is enrolled. The previous plan would recoup the months that the beneficiary was not in the plan.

**110.6.6 – Paying Renewal Compensation**
42 CFR §§ 422.2274, 423.2274

Plans/Part D sponsors may pay Renewal Compensation when:
- In any year following the initial year compensation;
- When a beneficiary enrolls in a new "like plan" within the same Parent Organization or between two (2) different Parent Organizations; or
- When a beneficiary who is a member of an MMP switches to an MA plan with a PDP or an MA-PD plan (and vice versa), if applicable per state MMP policy.

**110.6.7 – Other Compensation Scenarios**
41   CFR §§ 422.2274, 423.2274

- For MA-PD enrollees, Plans/Part D sponsors may pay only the MA compensation.

55

- When a beneficiary enrolls in both a Section 1876 Cost Plan and a stand-alone PDP, the Cost Plan must pay compensation for the Cost Plan enrollment and the Part D sponsor must pay compensation for the Part D enrollment.
- For enrollees in an MA only plan and a PDP plan, compensation for both the MA plan and the PDP plan is paid.

> *A "like plan type" enrollment includes:*
>
> - A PDP to another PDP;
> - An MA, MA-PD, or MMP to another MA, MA-PD, or MMP; or
> - A Section 1876 Cost Plan to another Section 1876 Cost Plan.

> *An "unlike plan type" enrollment includes*:
> - An MA or MA-PD plan to a PDP or Section 1876 Cost Plan;
> - A PDP to a Section 1876 Cost Plan or an MA (or MA-PD) plan; or
> - A Section 1876 Cost Plan to an MA (or MA-PD) plan or PDP.

**Note**: For enrollees who change from two plans (e.g., MA and a stand-alone PDP) (dual enrollments) to one plan (MA-PD), compensation is at the renewal rate for the MA-PD product.

## 110.7 – Compensation Recovery Requirements (Charge-backs)
42 CFR §§ 422.2274, 423.2274

Compensation must be recovered when:
- A beneficiary disenrolls from a plan within the first three (3) months of enrollment (rapid disenrollment); or
- Any other time a beneficiary is not enrolled in a plan, but the Plan/Part D sponsor paid compensation for that time period.

CMS expects Plans/Part D sponsors to retroactively pay or recoup funds based on retroactive beneficiary changes for the current and previous calendar years. Plans/Part D sponsors may choose to recoup or pay compensation for years prior to the previous calendar year. However, if a Plan/Part D sponsor chooses to recoup payments from a prior calendar year, it must also pay funds retroactively that would have been due during that same year.

## 110.7.1 – Rapid Disenrollment
42 CFR §§ 422.2274, 423.2274

Rapid disenrollment applies when an enrollee makes any plan change (regardless of Parent Organization) within the first three (3) months of enrollment. Rapid disenrollment compensation recovery does not apply when a beneficiary enrolls effective October 1, November 1, or December 1 and subsequently uses the Annual Election Period to change plans for an effective date of January 1.

Exceptions to the requirement for a Plan/Part D sponsor to recover compensation because of a rapid disenrollment may be granted when CMS determines that recoupment is not in the best interests of the Medicare program. CMS has made that determination for changes in enrollment

made for the following reasons:
- Other creditable coverage (e.g., employer plan);
- Moving into or out of an institution;
- Gains/drops employer/union sponsored coverage;
- Plan termination, non-renewal, or CMS imposed sanction;
- To coordinate with Part D enrollment periods or State Pharmaceutical Assistance Program;
- Becoming LIS or dual (Medicare and Medicaid) eligible;
- Dual eligible beneficiaries moving from an MA-PD to MMP;
- Qualifying for another plan based on special needs;
- Due to an auto, facilitated, or passive enrollment;
- Death;
- Moves out of the service area;
- Non-payment of premium;
- Loss of entitlement or retroactive notice of entitlement; and
- Moving to a 5-star plan or from an LPI plan into a plan with three or more stars.

**110.7.2 – Other Compensation Recovery**
42 CFR §§ 422.2274, 423.2274

Plans/Part D sponsors must recover a pro-rated amount of compensation (initial and renewal) from an agent/broker when an enrollee disenrolls from a plan, equal to the number of months not enrolled. If a full initial compensation is paid, regardless of effective date, and the enrollee disenrolls mid-year, the total number of months not enrolled must be deducted from compensation and recovered from the agent/broker. (e.g., Age-in effective April 1 and disenrolls September 30 of the same year. Full initial was paid. Recovery is equal to 6/12ths of the initial compensation (January through March and October through December)).

**110.8 – Payments other than Compensation**
42 CFR §§ 422.2274, 423.2274

Payments made to third parties for services other than enrollment of beneficiaries (e.g., training customer service, or agent recruitment) must not exceed FMV or an amount that is commensurate with the amounts paid to a third party for similar services during each of the previous two (2) years. Administrative payments to third parties can be based on enrollment, provided payments are at or below FMV.

# 120 – Use of Medicare Beneficiary Information Obtained from CMS

CMS provides Medicare beneficiary data to Plans/Part D sponsors for the purpose of enrolling, disenrolling, and providing care to members in their plan. The permitted uses of data are outlined in the data use agreement that Plans/Part D sponsors sign. Plans/Part D sponsors may not use Medicare data to develop, market, or operate lines of business unrelated to their Medicare plan operations.

Plans/Part D sponsors who received data from a previous commercial relationship with Medicare

beneficiaries (and employers offering Medicare plans) are not obligated to follow the Data Use Agreement in connection with data previously received. Examples of previous commercial relationships include membership in such products as:

- Long-term care insurance;
- Life-insurance policies;
- Non-Medicare employer or retiree group health plans; or
- Medigap policies.

Plans/Part D sponsors are reminded that other laws – such as the HIPAA privacy rules - may limit the use of information gathered from other sources or in connection with other products offered by the Plan/Part D sponsor. Nothing in this guidance creates an exemption or exception to other applicable laws.

### 120.1 – Consent Requirements for Non-Health Related Mailings

Plans/Part D sponsors may seek and rely on consent from enrollees to use information about them for purposes of marketing.  Such authorization and consent must be compliant with 45 CFR 164.508. The consent requirements for non-health related mailings are separate from "opt-in" requirements for plan materials.

## Appendix 1 – Definitions

42 CFR §§ 422.111, 422.2260, 422.2268, 423.128, 423.2260, 423.2268

The following definitions apply for purposes of the MCMG only.

**Advertisement**
A read, watched, or heard call to attention. Advertisements can be considered communication or marketing based on the content of the message.

**Age-ins**
An individual who is aging into Medicare eligibility, typically the seven month period consisting of three months prior to the individual's birth month, the individual's birth month, and three months following the individual's birth month.

**Alternate Formats**
Alternate formats are used to convey information to individuals with visual, speech, physical, hearing, and intellectual disabilities (e.g., braille, large print, audio).

**Banner and Banner-Like Advertisements**
Banner advertisements are typically used in television ads, and flash information quickly across a screen for the sole purpose of enticing a prospective enrollee to contact the Plan/Part D sponsor to enroll or obtain more information. A "banner-like" advertisement is usually in some media other than television (e.g., outdoor advertising and internet banner ads). Banner advertisements are intended to be brief and to entice someone to call the Plan/Part D sponsor or to alert someone that information is forthcoming.

**Co-Branding**
Co-branding is defined as a relationship between two or more separate legal entities, one of which is an organization that sponsors a Medicare Plan. Co-branding is when a Plan/Part D sponsor displays the name(s) or brand(s) of the co-branding entity or entities on its materials to signify a business arrangement. Co-branding arrangements allow a Plan/Part D sponsor and its co-branding partner(s) to promote enrollment in the plan. Co-branding relationships are entered into independent of the contract that the Plan/Part D sponsor has with CMS.

**Communication**
Communications means activities and use of materials to provide information to current and prospective enrollees.

**Direct Mail**
Direct mail is information sent to an individual to attract his/her attention or interest and allow him/her to request additional information.

**Downstream Entity**
Any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA or Part D benefit, below the level of the arrangement between an MA or PDP organization (or applicant) and a first tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services.

**Educational Event**
Educational events are designed to inform Medicare beneficiaries about Medicare Advantage, Prescription Drug or other Medicare programs and do not include marketing.

**Enrollment Materials**
Enrollment materials are materials used to enroll or disenroll a beneficiary from a plan, or materials used to convey information specific to enrollment and disenrollment issues such as enrollment and disenrollment notices.

**First Tier Entity**
Any party that enters into a written arrangement, acceptable to CMS, with an MA or PDP organization or applicant to provide administrative services, health care, or prescription drug services for a Medicare eligible individual under the MA or Part D program.

**Health Plan Management System (HPMS) Marketing Module**
The HPMS Marketing Module is an automated tool used to enter, track, and maintain materials submitted to CMS for review and approval. Plans/Part D sponsors must submit marketing materials and specified communication materials through the HPMS Marketing Module. The HPMS Marketing Module User Guide provides extensive information on how to use HPMS. Plans/Part D sponsors should refer to the User Guide for any questions regarding the Marketing Module or how to submit materials in HPMS.

**Joint Enterprise**
A joint enterprise is a group of organizations that are state-licensed as risk-bearing entities that jointly enter into a single contract with CMS to offer a Regional Preferred Provider Organization (RPPO) Plan or PDP in a multi-state region. The participating organizations contract with each other to create a single "joint enterprise" and are considered an "entity" for purposes of offering a RPPO or PDP.

**Marketing**
Activities and use of materials that are conducted by the Plan/Part D sponsor with the intent to draw a beneficiary's attention to a plan or plans and to influence a beneficiary's decision- making process when selecting a plan for enrollment or deciding to stay enrolled in a plan (that is, retention-based marketing). Additionally, marketing contains information about the plan's benefit structure, cost sharing, measuring or ranking standards.

**Marketing/Sales Event**
Marketing/sales events are events designed to steer, or attempt to steer, enrollees or potential enrollees toward a plan or a limited set of plans.

**Marketing Appointments**
Marketing appointments are individual appointments designed to steer or, attempt to steer, enrollees or potential enrollees toward a plan or limited number of plans. All individual appointments between an agent and a beneficiary are considered marketing/sales appointments regardless of the content discussed.

**Medication Therapy Management (MTM) program materials**
MTM program materials are:
- Materials provided to enrollees enrolled in the MA or PDP plan who are eligible for the plan's MTM program;
- Materials as a result of MTM services that address issues unique to individual enrollees; and
- The Part D MTM program comprehensive medication review summary in CMS' standardized format that is provided to a beneficiary.

   **Note**: MTM program materials must not include any marketing messages, or promotional messages.

**Model Document**
Model documents are materials for which CMS has provided model language.

**Multi–Contract Entities (MCE)**
MCE is a designation available for Plans/Part D sponsors that have multiple MA/PDP contracts with CMS. Being designated as an MCE allows a Plan/Part D sponsor to submit materials to CMS that are representative of all or a selection of the Plan's/Part D sponsor's contracts.

**Nominal Value**
Nominal value as used here means minimal or trifling value; the standard is an individual item/service worth $15 or less (based on the retail value of the item).

**Outdoor Advertising (ODA)**
Outdoor advertising is an outdoor material intended to capture the attention of a passing audience (e.g., billboards, signs attached to transportation vehicles). ODA may be a communication or marketing.

**Related Entity**
Any entity that is related to the MA or Part D organization by common ownership or control and
1. Performs some of the MA or Part D organization's management functions under contract or delegation;
2. Furnishes services to Medicare enrollees under an oral or written agreement; or
3. Leases real property or sells materials to the MA or Part D organization at a cost of more than $2,500 during a contract period.

**Scripts**
Scripts are standardized text. Informational scripts are designed to respond to beneficiary questions and requests and provide objective information about a plan or the Medicare program. Sales and enrollment scripts are intended to steer a beneficiary towards a plan or limited number of plans, or to enroll a beneficiary into a plan.

**Standardized Language**
Standardized language is language developed by CMS or another Federal agency that is mandatory for use by the Plan/Part D sponsor and cannot be modified except as noted by CMS (e.g., ANOC, EOC, Plan Ratings).

**State Pharmaceutical Assistance Program (SPAP)**
An SPAP is a state program which helps pay drug plan premiums and/or other drug costs for people with Medicare.

**Template Materials**
Template materials are any materials that include placeholders for variable data to be populated at a later time.

**Third Party Marketing Organization (TMO)**
Third-party marketing organizations are entities such as a Field Marketing Organization (FMO), General Agent (GA), or similar type of organization that has been retained to sell or promote a Plan's/Part D sponsor's Medicare products on the Plan's/Part D sponsor's behalf either directly or through sales agents or a combination of both.

## Appendix 2 – Disclaimers

**General Disclaimers**
**(Applicable to Most Plan Types)**

[1] 42 CFR Sections 422.2262(c); 423.2262(c) are applicable to all. **Note:** Disclaimers are not required on the following material types: ID cards, call scripts, banners and banner-like ads, envelopes, outdoor advertising, text messages, and social media.

| | Disclaimer | 42 CFR Section(s) | Example or Required Text | Applicable Documents and Notes |
|---|---|---|---|---|
| 1. | Federal Contracting Statement (communications and marketing) | 422.2264(c), 423.2264(c) | **Example Text:** "[Plan's/Part D sponsor's legal or marketing name] is a [plan type] with a Medicare contract. Enrollment in [Plan's/Part D sponsor's legal or marketing name] depends on contract renewal." | Required on all materials except those specifically excluded by CMS<br><br>Required elements in statement:<br><br>• Legal or marketing name<br>• Type of plan (e.g., HMO, PPO, PFFS, PDP)<br>• Enrollment depends on contract renewal<br><br>Plans should incorporate contract with state/Medicaid Program when appropriate. |
| 2. | Benefit Disclaimer (marketing materials mentioning benefits) | 422.111(a) and (b), 422.2264, 422.2268, 423.128(a) and (b), 423.2264, 423.2268 | **Required Text:** "This information is not a complete description of benefits. Call [insert customer service phone number/TTY] for more information." | Only required on marketing pieces listing 10 benefits or more. |

| | Disclaimer | 42 CFR Section(s) | Example or Required Text | Applicable Documents and Notes |
|---|---|---|---|---|
| 3. | Availability of Non-English Translations (some communication and marketing materials) | 422.2268(a)(7), 423.2268(a)(7) | **Required Text:** "ATTENTION: If you speak [insert language], language assistance services, free of charge, are available to you. Call 1-xxx-xxx-xxxx (TTY: 1-xxx-xxx-xxxx)." | Must be placed in non-English languages that meet the five (5) percent threshold for language translation, as highlighted in Section 100.4. |
| 4. | Plan Online Enrollment Center (marketing) | 422.60(c), 422.2262(c), 423.32(b), 423.2262(c) | **Required Text:** "Medicare beneficiaries may also enroll in <plan name> through the CMS Medicare Online Enrollment Center located at http://www.medicare.gov." | Required on the website page where online enrollment requests are accepted. |
| 5. | Star Ratings (marketing) | 422.2260, 422.2262(c), 423.2260, 423.2262(c) | **Required Text:** "Every year, Medicare evaluates plans based on a 5-star rating system." | Required on any document that references Star Ratings. |
| 6. | Accommodations Disclaimer (communications and marketing) | 422.2268(b)(12)  423.2268(b)(12) | **Required Text:** "For accommodations of persons with special needs at meetings call <insert phone and TTY number>. | Required on all advertisements and invitations to events (educational and marketing). |
| 7. | Mailing Statements (communications and marketing) | 422.2268(a)(2), 423.2268(a)(2) | Plan information – **Required Text:** *"Important [Insert Plan Name] information"*  Health and wellness information – **Required Text:** *"Health and wellness or prevention information"* | These statements are intended for materials sent to current members.  If the plan name is already on the envelope, the plan name does not need to be mentioned in the disclaimer.  Delegated or sub-contracted entities and downstream entities that conduct mailings on behalf of a Plan/Part D sponsor must also comply with this requirement. |

64

| | Disclaimer | 42 CFR Section(s) | Example or Required Text | Applicable Documents and Notes |
|---|---|---|---|---|
| 8. | Promoting Drawings, Prizes or Free Gifts (marketing) | 422.2268(b)(2), 423.2268(b)(2) | **Example Text:** "Eligible for a free drawing, gift, or prizes with no obligation to enroll." <br><br> **Example Text:** "Free gift without obligation to enroll." | Required when promoting drawings, prizes, or free gifts. <br><br> The statement must make it clear that that there is no obligation to enroll in the plan. |
| 9. | Provider Co-branding Materials (communications and marketing) | 422.2268(a)(5), 423.2268(a)(5) | **Required Text:** "Other <Pharmacies/Physicians/Providers> are available in our network." | Required on documents that identify co-branding relationships with network providers/pharmacies. |
| 10. | Out-of-Network/Non-Contracted Providers (marketing) | 422.2262, 422.2264(d) | **Required Text:** "Out-of-network/non-contracted providers are under no obligation to treat <Plan> members, except in emergency situations. Please call our customer service number or see your Evidence of Coverage for more information, including the cost- sharing that applies to out-of-network services." | Required on all materials referencing out–of-network/non-contracted providers. <br><br> Does not apply to standalone PDP plans. |
| 11. | Materials Developed by a Third Party (marketing) | 422.2264, 423.2264 | **Required Text:** "For a complete list of available plans please contact 1-800-MEDICARE (TTY users should call 1-877-486-2048), 24 hours a day/7 days a week or consult www.medicare.gov." | Required on third party materials when the material lists or markets a subset of plans. |

| | Disclaimer | 42 CFR Section(s) | Example or Required Text | Applicable Documents and Notes |
|---|---|---|---|---|
| 12. | Part D sponsors with Limited Access to Preferred Cost Sharing Pharmacies (communications and marketing) | 422.111(a) and (b), 422.2262, 423.128(a) and (b), 423.2262 | **Required Text:** "<insert organization/plan name>'s pharmacy network includes limited lower-cost, preferred pharmacies in <insert geographic area type(s) and state(s) for which plan is an outlier)>. The lower costs advertised in our plan materials for these pharmacies may not be available at the pharmacy you use. For up-to-date information about our network pharmacies, including whether there are any lower-cost preferred pharmacies in your area, please call <insert Member Services phone number and TTY> or consult the online pharmacy directory at <insert website>." | Required on all materials mentioning preferred pharmacies when there is limited access to preferred pharmacies. |
| 13. | NCQA SNP Approval (communications and marketing) | 422.4(a)(1)(iv), 422.111(b)(2)(iii) , 422.2262, 422.2264, 423.2262, 423.2264 | **Required Text:** "[Insert Plan Name] has been approved by the National Committee for Quality Assurance (NCQA) to operate as a Special Needs Plan (SNP) until [insert last contract year of NCQA approval] based on a review of [insert Plan Name's] Model of Care." | Required on all documents that reference NCQA SNP approval.<br><br>Plans/Part D sponsors may not discuss numeric SNP approval scores in marketing materials or press releases.<br><br>No other language related to the NCQA SNP approval may be used. |

## Appendix 3 – Pre-Enrollment Checklist

Instructions:

In addition to displaying disclaimers on the marketing materials listed in Appendix 2, Plans/Part D sponsors must use the model pre-enrollment checklist, which consists of a list of important disclaimers. The one-page document must be included with the SB.

Plans/Part D sponsors are permitted to remove parts or portions of the checklist that are not applicable to a particular plan type or product. Plans/Part D sponsors are not permitted to alter the disclaimer language, but when the pre-enrollment checklist is used for multiple products, they are permitted to add a sentence or additional language before or after the disclaimer to clarify or distinguish how a disclaimer applies to different products. For example: When selecting an HMO product, remember that except in emergency or urgent situations, we do not cover services by out-of-network providers (doctors who are not listed in the provider directory).

## Pre-Enrollment Checklist

Before making an enrollment decision, it is important that you fully understand our benefits and rules. If you have any questions, you can call and speak to a customer service representative at [insert customer service phone number]

### Understanding the Benefits

☐ Review the full list of benefits found in the Evidence of Coverage (EOC), especially for those services for which you routinely see a doctor. Visit [insert Plan website] or call [insert plan phone number] to view a copy of the EOC.

☐ Review the provider directory (or ask your doctor) to make sure the doctors you see now are in the network. If they are not listed, it means you will likely have to select a new doctor.

☐ Review the pharmacy directory to make sure the pharmacy you use for any prescription medicine is in the network. If the pharmacy is not listed, you will likely have to select a new pharmacy for your prescriptions.

### Understanding Important Rules

☐ In addition to your monthly plan premium [plans may delete the monthly plan premium portion for $0 premium plans], you must continue to pay your Medicare Part B premium. This premium is normally taken out of your Social Security check each month.

[**Note**: Fully integrated dual SNPs may elect to remove this section or modify it to convey that the Part B premium is already paid. Plans that have a Part B buy-down may alter the language to convey the amount the plan pays and the beneficiary owes.]

☐ Benefits, premiums and/or copayments/co-insurance may change on January 1, [insert

67

year].

☐ Except in emergency or urgent situations, we do not cover services by out-of-network providers (doctors who are not listed in the provider directory).

☐ [For PPO, PFFS, and other plans that offer out of network coverage] Our plan allows you to see providers outside of our network (non-contracted providers). However, while we will pay for covered services [HMO-POS may insert "certain covered services"] provided by a non-contracted provider, the provider must agree to treat you. Except in an emergency or urgent situations, non-contracted providers may deny care. [If applicable, plans must add the following language] In addition, you will pay a higher co-pay for services received by non-contracted providers.

☐ [For C-SNP plans] This plan is a chronic condition special needs plan (C-SNP). Your ability to enroll will be based on verification that you have a qualifying specific severe or disabling chronic condition.

☐ [For D-SNP plans] This plan is a dual eligible special needs plan (D-SNP). Your ability to enroll will be based on verification that you are entitled to both Medicare and medical assistance from a state plan under Medicaid. [D-SNPs may provide additional information if they impose restrictions to specific Medicaid eligibility category(ies)]

☐ [For I-SNP plans] This plan is an institutional special needs plan (I-SNP). Your ability to enroll will be based on verification that you, for 90 days or longer, have had or are expected to need the level of services provided in a long-term care (LTC) skilled nursing facility (SNF), a LTC nursing facility (NF), a SNF/NF, an intermediate care facility for individuals with intellectual disabilities (ICF/IDD), or an inpatient psychiatric facility.

☐ [For I-SNPs accepting members prior to having at least 90 days of institutional level of care] - This plan is an institutional special needs plan (I-SNP). Your ability to enroll will be based on verification that your condition makes it likely that either the length of stay or the need for an institutional level of care would be at least 90 days.

☐ [For MSAs] MSA Plans combine a high deductible Medicare Advantage Plan and a trust or custodial savings account (as defined and/or approved by the IRS). The plan deposits money from Medicare into the account. You can use this money to pay for your health care costs, but only Medicare-covered expenses count toward your deductible. The amount deposited is usually less than your deductible amount, so you generally have to pay money out of pocket before your coverage begins.

Medicare MSA Plans do not cover prescription drugs. If you join a Medicare MSA Plan, you can also join any separate Medicare Prescription Drug Plan.

There are additional restrictions to join an MSA plan, and enrollment is for a full calendar year unless you meet certain exceptions. Those who disenroll during the calendar year will owe a portion of the account deposit back to the plan. Contact the plan at [insert customer service and TTY] for additional information.

## Appendix 4 – External Links

CMS Eligibility and Enrollment Guidance https://www.cms.gov/Medicare/Eligibility-and-Enrollment/MedicareMangCareEligEnrol/index.html

CMS Medicare Online Enrollment Center https://www.medicare.gov

CMS Plan Finder
https://www.medicare.gov or 1-877-486-2048) https://www.medicare.gov/find-a-plan/questions/home.aspx

CMS Star Ratings https://www.medicare.gov
https://www.medicare.gov/find-a-plan/questions/home.aspx

HIPAA Privacy Rule and Disclosure Requirements https://www.hhs.gov/ocr/privacy/

HIPAA Privacy Rule and Security Requirements
https://www.hhs.gov/ocr/privacy/hipaa/understanding/coveredentities/privacyguidance.html

Internal Revenue Service (IRS) Tax publications https://www.irs.gov or 1-800-TAX-FORM (1-800-829-3676)

Medicare.gov Complaint Website
https://www.medicare.gov/MedicareComplaintForm/home.aspx

Medicare Managed Care Manual
https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019326.html?DLPage=2&DLEntries=10&DLSort=0&DLSortDir=ascending

Medicare Part D Model Materials
https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Part-D-Model-Marketing-Materials.html

Medicare Prescription Drug Benefit Manual https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/PartDManuals.html

National Coverage Determinations (NCD) https://www.cms.gov/medicare-coverage-database/overview-and-quick- search.aspx?list_type=nca

Section 508 of the Rehabilitation Act

https://www.section508.gov

State-specific marketing guidance for MMPs
https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/InformationandGuidanceforPlans.html.

WEDI Health Identification Card Implementation Guide https://www.wedi.org

## Appendix 5 – Summary of Benefits Instructions

Plans must reflect Part C and Part D benefits and cost sharing (if applicable) in the SB. Part C

benefits and cost sharing must include and be in the following order:
- Monthly Plan Premium, including Part C and Part D premium, when applicable;
- Part B premium Buy-Down, if applicable;
- Deductibles, including plan level and category level deductible;
- Maximum Out-of-Pocket Responsibility (does not include prescription drugs);
- Inpatient Hospital coverage;
- Outpatient Hospital coverage;
- Doctor Visits (Primary Care Providers and Specialists);
- Preventive Care;
- Emergency Care;
- Urgently Needed Services;
- Diagnostic Services/Labs/Imaging (include diagnostic tests and procedures, labs, diagnostic radiology, and X-rays);
- Hearing Services (Include mandatory and optional supplemental benefits (if offered));
- Dental Services (Include mandatory and optional supplemental benefits (if offered));
- Vision Services (Include mandatory and optional supplemental benefits (if offered));
- Mental Health Services;
- Skilled Nursing Facility;
- Physical Therapy;
- Ambulance;
- Transportation; and
- Medicare Part B Drugs.

Part D benefits must include:
- Information about all phases of the benefit that apply to your Plan. At a minimum, Part D sponsors must include information that cost-sharing may change when entering another phase of the Part D benefit.
- The levels of prescription medication with both the tier number/name/cost sharing (e.g., Tier 1, Tier 2, etc.) and the more general description (e.g., generic, preferred brand, etc.).
- Information regarding cost sharing differences relative to the pharmacy's status as preferred or non-preferred, mail-order, Long Term Care (LTC) or home infusion, and 30 or 90 days' supply.

To avoid beneficiary confusion when comparing plans, Plans/Part D sponsors must maintain the above order of the data elements. The monthly premium, deductible and the maximum-out-of-pocket cost must always be displayed first. Plans/Part D sponsors may then decide whether to display drug or health benefits next. If any of the benefits are not offered (e.g., transportation), indicate them as "not covered." Plans/Part D sponsors may remove certain benefits if they are not applicable to a particular plan type (e.g., Part D only plan removes Part C benefits). Additional benefits may be listed after all the required elements are provided in the SB.

Other required information in the SB:
- The document must be labeled as "Summary of Benefits" noting the plan year;
- The plan name and type must be clearly labeled for all Plans in the SB. For example,
- <Plan name, HMO or PPO>;
- Description of the plan and types (e.g., HMO, HMO-POS, PPO, MSA, PFFS, SNPs);
- Service area and eligibility requirements, including the Medicaid eligibility criteria applicable to Dual Eligible Special Needs Plans (D-SNPs);
- Phone number, including TTY/TDD;
- Days and hours of operation;
- Website address;
- In-network and out-of-network cost-sharing information for applicable plan types;
- Applicable disclaimers as per Appendix 2;
- Language stating that the complete list of services is found in the Evidence of Coverage (EOC), as well as language directing readers how to access or order the EOC;
- Language that directs readers how to access or order the "Medicare & You" handbook;
- If the SB includes plans with and without Part D prescription drug coverage, the distinction between plans must be clear;
- Notate services that require a physician referral or prior authorization; and
- If optional supplemental benefits are offered, Plans/Part D sponsors must include the additional premium amount.

Medicare Medical Savings Account Plans (MSA) MSA plans must:
- Insert the amount Medicare will deposit into the beneficiaries MSA account; and
- Include language that the beneficiary will pay nothing once the deductible is met.

D-SNPs
The Medicare Improvements for Patients and Providers Act of 2008 (MIPPA) requires Plans provide the Medicaid benefits to prospective enrollees.  This may be done by:
- Including the Medicaid benefits in the SB or
- Providing a separate document with the Medicaid benefits. If a separate document is provided, it must also accompany the enrollment form.

D-SNPs open to dually eligible enrollees with differing levels of cost clearly state how cost-sharing and benefits differ depending on the level of Medicaid eligibility. D-SNPs must describe the Medicaid benefits, if any, provided by the plan. Fully integrated dual eligible SNPs (FIDE SNPs) and other D-SNPs that provide Medicaid benefits have the option to display integrated benefits in the SB. We encourage FIDE SNPs to work with their contracted State Medicaid agencies in developing an SB that displays integrated benefits.

Medicare Premium and Deductible
Plans that use Medicare premium, deductible, or cost sharing amounts (e.g., inpatient hospital) must insert the prior year's Medicare amounts. In addition, the benefit category must also note that these amounts may change for the following year and the plan will provide updated rates as soon as Medicare releases them.

Overall design and layout:

Plans may present multiple plan benefit packages (PBPs) in the same document by displaying the benefits in separate columns. Plans using this option may include similar or different plan types (e.g., HMO to HMO, or HMO to PFFS, or HMO to PPO). Plans may also:

- Make use of colors to enhance the ability to navigate the document.
- Incorporate various icons/graphics to help locate important information, such as how to complete an application online or contact information (i.e., phone number) for customer service help.

     **Note**: SNPs must remain separate from non-SNP plans to avoid confusion for beneficiaries.

Recommendations:

The following recommendations are based on consumer testing:

- Avoid the use of multiple folds and large charts as it may make it cumbersome and difficult to use;
- Include definitions and purpose of the document;
- Avoid using dimensions that are too large as it could diminish the usefulness of the SB; and,
- Avoid the use of footnotes; if necessary to include footnoted information, visually emphasize (e.g., larger or bold font) the inclusion of superscripts in coverage charts.

HPMS Submission Process:

The SB must be submitted in HPMS as one document under the File & Use process using code 1099. SBs may not be submitted as a template or with bracketed information (Refer to section 90 for information on the material submission process).

73

## Appendix 6 - Employer/Union Group Health Plans

Sections 1857(i) and 1860D-22(b) of the Social Security Act, 42 CFR §§ 422.2276, 423.458, 423.2276

Plans/Part D sponsors offering employer group health plans including Employer Group Waiver Plans (EGWPs) are not required to submit at time of use communication and marketing materials specific only to those employer plans. However, as a condition of CMS providing particular waivers or modifications to employer group plans, CMS may request and review any materials in the event of beneficiary complaints or for any other reason it determines to ensure the information accurately and adequately informs Medicare beneficiaries about their rights and obligations under the plan.

CMS waivers to employer group plans are limited in scope to their stated parameters, and employer group plans (including EGWPs) must follow all rules in these guidelines unless CMS explicitly waives them. For specific guidance regarding these waivers, please refer to Chapter 9 of the Medicare Managed Care Manual and Chapter 12 of the Medicare Prescription Drug Benefit Manual (https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/PartDManuals.html).

**Marketing Provisions Table – Employer/Union Group Plans**

| **Marketing Provisions that apply to Employer/Union Group Plans** | |
| --- | --- |
| These requirements are applicable to the transaction between the agent/broker selling the plan to the employer/union. All activities conducted by the employer/union or its designees to sign up individual employees to the plan(s) selected by the employer/union are excluded from these provisions.<br><br>**Note:** This table contains a partial list of exclusions. | |
| **Applicable Provisions (Not Waived)** | **Not Applicable Provisions (Waived)** |
| Nominal Gifts | Unsolicited Contacts |
| Sales/Marketing in Health Care Settings | Cross-selling |
| Sales/Marketing at Educational Events | Scope of Appointments |
| Co-branding | Provision of Meals |
| Appointment of Agents/Brokers | Agent/Broker Compensation |
| State Licensure Requirements | Agent/Broker Testing |
| Reporting of Terminated Agents/Brokers | CMS Prior Review of Marketing Materials |
| Agent/Broker Training<br>Agents must be thoroughly familiar with the products they are selling, including the plan specific details and the Medicare rules that apply to the specific products. The organization/sponsor is responsible for ensuring that the agents selling for them have sufficient knowledge. | Pre-Enrollment Checklist |

## Appendix 7 – Use of Medicare Mark for Part D Sponsors
Section 1140 of the Social Security Act

All Part D sponsors may use the Medicare Prescription Drug Benefit Program Mark only after electronically executing the Medicare Mark License Agreement in HPMS. In certain circumstances, the Medicare Mark License Agreement may be signed in hard copy rather than electronically. Only a CEO, CFO, or COO who is designated as an authorized signer in HPMS is eligible to execute the Medicare Mark License Agreement. The license agreement is effective for a single contract year and Part D sponsors must renew annually to continue using the Medicare Mark. Unless otherwise approved, no individuals, organizations, and/or commercial firms may distribute materials bearing the Medicare Prescription Drug Benefit Program Mark. Part D sponsors may use the mark on communications and marketing materials consistent with this chapter.

### Use of Medicare Prescription Drug Benefit Program Mark on Items for Sale or Distribution

Section 1140 of the Social Security Act

All Part D sponsors may use the Medicare Prescription Drug Benefit Program Mark on items they distribute, provided the item(s) follow(s) guidelines for nominal gifts, as provided in 40.4. Plans cannot sell items with the Medicare Prescription Drug Benefit Program Mark for profit.

#### Approval to Use the Medicare Prescription Drug Benefit Program Mark

Plans/Part D sponsors must submit requests to distribute other items (materials that are not included in this chapter) bearing the Medicare Prescription Drug Benefit Program Mark to CMS at least thirty (30) days prior to the anticipated date of distribution. Plans/Part D sponsors should send requests sent to:
Office of the Administrator/Office of Communications Visual & Multimedia Communications Group

7500 Security Blvd.
Baltimore, MD 21244-1850

Once CMS has approved a request, the following will apply: 1) approval will be effective for a period not to exceed one year; and 2) approval will be granted only for those items for which use of the mark was requested in the request letter and for which CMS granted written approval.

### Prohibition on Misuse of the Medicare Prescription Drug Benefit Program Mark Section 1140 of the Social Security Act

42 U.S.C. section 1320b-10 prohibits the misuse of the Medicare name and marks. In general, it authorizes the Inspector General of DHHS to impose penalties on any person who misuses the term Medicare or other names associated with DHHS in a manner which the person knows or should know gives the false impression that DHHS has approved, endorsed, or authorized it. Offenders are subject to fines of up to $5,000 per violation or in the case of a broadcast or telecast violation, $25,000.

**Mark Guidelines**
Section 1140 of the Social Security Act

The Medicare Prescription Drug Benefit Program Mark is a logotype comprised of the words Medicare Rx with the words Prescription Drug Coverage directly beneath.



Always use reproducible art available electronically. Do not attempt to recreate the Program Mark or combine it with other elements to make a new graphic. Artwork will be supplied in .EPS, .TIFF or .JPG format after notification of approval into the program.

**Mark Guidelines - Negative Program Mark**
Section 1140 of the Social Security Act

The Medicare Prescription Drug Benefit Program Mark may be reversed out in white. The entire mark must be legible.



**Mark Guidelines - Approved Colors**
Section 1140 of the Social Security Act

The two (2)-color mark is the preferred version. It uses PMS 704 (burgundy) and sixty-five (65) percent process black. It is recommended that if the CMS mark is used in conjunction with the brand mark, that the black versions of those logos be used.



The 1-color version in grayscale is acceptable. The mark elements are one-hundred (100) percent black except for the word "Medicare" which is fifty-five (55) percent black.



The 1-color version in one-hundred (100) percent black also is acceptable.



**Mark Guidelines on Languages**

Section 1140 of the Social Security Act
The Spanish version of the Medicare Prescription Drug Benefit Program Mark may be used in place of the English language version on materials produced entirely in Spanish. The two (2)- color version is preferred, but the grayscale, black and negative versions may be used.



**Mark Guidelines on Size**

Section 1140 of the Social Security Act

To maintain clear legibility of the Program Mark, never reproduce it at a size less than one (1) inch wide. The entire mark must be legible.



**Mark Guidelines on Clear Space Allocation**

Section 1140 of the Social Security Act

The clear space around the Medicare Prescription Drug Benefit Program Mark prevents any nearby text, image or illustration from interfering with the legibility and impact of the mark. The measurement "x" can be defined as the height of the letter "x" in "Rx" in the Program Mark. Any type or graphic elements must be at least "x" distance from the mark as shown by the illustration.

78



## Mark Guidelines on Bleed Edge Indicator

Section 1140 of the Social Security Act

The Program Mark may not bleed off any edge of the item. The mark should sit at least one-- eighth (1/8) inch inside any edges of the item.

## Mark Guidelines on Incorrect Use

Section 1140 of the Social Security Act

Following are rules for preventing incorrect use of the Medicare Prescription Drug Benefit Program Mark:
- Do not alter the position of the mark elements;
- Do not alter the aspect ratio of the certification mark;
- Do not stretch or distort the mark;
- Always use the mark only as provided in the CMS approval/license agreement;
- Do not rotate the mark or any of its elements;
- Do not alter or change the typeface of the mark;
- Do not alter the color of any of the mark elements;
- Do not position the mark near other items or images. Maintain the clear space allocation;
- Do not position the mark to bleed off any edge. Maintain one-eighth (1/8) inch safety from any edge;
- Do not use any of the mark elements to create a new mark or graphic; and
- Do not use the mark on background colors, images or other artwork that interfere with the legibility of the mark.

## Mark Guidelines for Part D Standard Pharmacy ID Card Design

Section 1140 of the Social Security Act

Use of the Medicare Prescription Drug Benefit Program Mark on an ID Card must be consistent with guidance mentioned in this section.

**Part D Plan Sponsor Name/Logo**

sponsor
logo
place-
holder

| | |
|---|---|
| **RxBin** | **999999** |
| **RxPCN** | **ABC1234567** |
| **RxGrp** | **ABC123456789** |
| **Issuer** | **(80840)** |
| **ID** | **12345678901** |
| **Name** | **JOHN Q PUBLIC** |

MedicareRx
Prescription Drug Coverage

**CMS - S5555 XXXX**

NAIC Model Laws, Regulations, Guidelines and Other Resources—January 2005

# PRODUCER LICENSING MODEL ACT

**Table of Contents**

| | |
|---|---|
| Section 1. | Purpose and Scope |
| Section 2. | Definitions |
| Section 3. | License Required |
| Section 4. | Exceptions to Licensing |
| Section 5. | Application for Examination |
| Section 6. | Application for License |
| Section 7. | License |
| Section 8. | Nonresident Licensing |
| Section 9. | Exemption From Examination |
| Section 10. | Assumed Names |
| Section 11. | Temporary Licensing |
| Section 12. | License Denial, Non-Renewal or Revocation |
| Section 13. | Commissions |
| Section 14. | Appointments [OPTIONAL] |
| Section 15. | Notification to Insurance Commissioner of Termination |
| Section 16. | Reciprocity |
| Section 17. | Reporting of Actions |
| Section 18. | Compensation Disclosure |
| Section 19. | Regulations |
| Section 20. | Severability |
| Section 21. | Effective Date |

**Section 1.      Purpose and Scope**

This Act governs the qualifications and procedures for the licensing of insurance producers. It simplifies and organizes some statutory language to improve efficiency, permits the use of new technology and reduces costs associated with issuing and renewing insurance licenses.

This Act does not apply to excess and surplus lines agents and brokers licensed pursuant to Section [refer to state excess and surplus lines statutes] except as provided in Section 8 and Section 16B of this Act.

**Drafting Note:** It is recommended that any statute or regulation inconsistent with this Act be repealed or amended.

**Drafting Note:** This Act also requires a report to the insurance commissioner of the termination of a producer by an insurer, whether with or without cause.

**Section 2.      Definitions**

A.      "Business entity" means a corporation, association, partnership, limited liability company, limited liability partnership, or other legal entity.

B.      "Home state" means the District of Columbia and any state or territory of the United States in which an insurance producer maintains his or her principal place of residence or principal place of business and is licensed to act as an insurance producer.

C.      "Insurance" means any of the lines of authority in [insert reference to appropriate section of state law].

D.      "Insurance producer" means a person required to be licensed under the laws of this state to sell, solicit or negotiate insurance.

E.      "Insurer" means [insert reference to appropriate section of state law].

F.      "License" means a document issued by this state's insurance commissioner authorizing a person to act as an insurance producer for the lines of authority specified in the document. The license itself does not create any authority, actual, apparent or inherent, in the holder to represent or commit an insurance carrier.

Producer Licensing Model Act

G.  "Limited line credit insurance" includes credit life, credit disability, credit property, credit unemployment, involuntary unemployment, mortgage life, mortgage guaranty, mortgage disability, guaranteed automobile protection (gap) insurance, and any other form of insurance offered in connection with an extension of credit that is limited to partially or wholly extinguishing that credit obligation that the insurance commissioner determines should be designated a form of limited line credit insurance.

H.  "Limited line credit insurance producer" means a person who sells, solicits or negotiates one or more forms of limited line credit insurance coverage to individuals through a master, corporate, group or individual policy.

I.  "Limited lines insurance" means those lines of insurance defined in [insert reference to state specific limited line statute] or any other line of insurance that the insurance commissioner deems necessary to recognize for the purposes of complying with Section 8E.

J.  "Limited lines producer" means a person authorized by the insurance commissioner to sell, solicit or negotiate limited lines insurance.

K.  "Negotiate" means the act of conferring directly with or offering advice directly to a purchaser or prospective purchaser of a particular contract of insurance concerning any of the substantive benefits, terms or conditions of the contract, provided that the person engaged in that act either sells insurance or obtains insurance from insurers for purchasers.

L.  "Person" means an individual or a business entity.

M.  "Sell" means to exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company.

N.  "Solicit" means attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company.

O.  "Terminate" means the cancellation of the relationship between an insurance producer and the insurer or the termination of a producer's authority to transact insurance.

P.  "Uniform Business Entity Application" means the current version of the NAIC Uniform Business Entity Application for resident and nonresident business entities.

Q.  "Uniform Application" means the current version of the NAIC Uniform Application for resident and nonresident producer licensing.

**Section 3.    License Required**

A person shall not sell, solicit or negotiate insurance in this state for any class or classes of insurance unless the person is licensed for that line of authority in accordance with this Act.

**Section 4.    Exceptions to Licensing**

A.  Nothing in this Act shall be construed to require an insurer to obtain an insurance producer license. In this section, the term "insurer" does not include an insurer's officers, directors, employees, subsidiaries or affiliates.

B.  A license as an insurance producer shall not be required of the following:

(1)  An officer, director or employee of an insurer or of an insurance producer, provided that the officer, director or employee does not receive any commission on policies written or sold to insure risks residing, located or to be performed in this state and:

(a)  The officer, director or employee's activities are executive, administrative, managerial, clerical or a combination of these, and are only indirectly related to the sale, solicitation or negotiation of insurance; or

                                          © 2005 National Association of Insurance Commissioners

(b)     The officer, director or employee's function relates to underwriting, loss control, inspection or the processing, adjusting, investigating or settling of a claim on a contract of insurance; or

(c)     The officer, director or employee is acting in the capacity of a special agent or agency supervisor assisting insurance producers where the person's activities are limited to providing technical advice and assistance to licensed insurance producers and do not include the sale, solicitation or negotiation of insurance;

(2)     A person who secures and furnishes information for the purpose of group life insurance, group property and casualty insurance, group annuities, group or blanket accident and health insurance; or for the purpose of enrolling individuals under plans; issuing certificates under plans or otherwise assisting in administering plans; or performs administrative services related to mass marketed property and casualty insurance; where no commission is paid to the person for the service;

(3)     An employer or association or its officers, directors, employees, or the trustees of an employee trust plan, to the extent that the employers, officers, employees, director or trustees are engaged in the administration or operation of a program of employee benefits for the employer's or association's own employees or the employees of its subsidiaries or affiliates, which program involves the use of insurance issued by an insurer, as long as the employers, associations, officers, directors, employees or trustees are not in any manner compensated, directly or indirectly, by the company issuing the contracts;

(4)     Employees of insurers or organizations employed by insurers who are engaging in the inspection, rating or classification of risks, or in the supervision of the training of insurance producers and who are not individually engaged in the sale, solicitation or negotiation of insurance;

(5)     A person whose activities in this state are limited to advertising without the intent to solicit insurance in this state through communications in printed publications or other forms of electronic mass media whose distribution is not limited to residents of the state, provided that the person does not sell, solicit or negotiate insurance that would insure risks residing, located or to be performed in this state;

(6)     A person who is not a resident of this state who sells, solicits or negotiates a contract of insurance for commercial property and casualty risks to an insured with risks located in more than one state insured under that contract, provided that that person is otherwise licensed as an insurance producer to sell, solicit or negotiate that insurance in the state where the insured maintains its principal place of business and the contract of insurance insures risks located in that state; or

(7)     A salaried full-time employee who counsels or advises his or her employer relative to the insurance interests of the employer or of the subsidiaries or business affiliates of the employer provided that the employee does not sell or solicit insurance or receive a commission.

**Drafting Note:** Persons who provide general insurance advice in connection with providing other professional services such as legal services, trust services, tax and accounting services, financial planning and investment advisory services are not deemed to be soliciting the sale of insurance under this Act. Sections 3 and 4 of this Act are intended to address all persons meeting the definition of "insurance producer" as defined in Title III, Section 336, of Public Law No. 106-102 (the "Gramm-Leach-Bliley Act").

## Section 5.     Application for Examination

A.     A resident individual applying for an insurance producer license shall pass a written examination unless exempt pursuant to Section 9. The examination shall test the knowledge of the individual concerning the lines of authority for which application is made, the duties and responsibilities of an insurance producer and the insurance laws and regulations of this state. Examinations required by this section shall be developed and conducted under rules and regulations prescribed by the insurance commissioner.

B.     The insurance commissioner may make arrangements, including contracting with an outside testing service, for administering examinations and collecting the nonrefundable fee set forth in [insert appropriate reference to state law or regulation].

Producer Licensing Model Act

C.      Each individual applying for an examination shall remit a nonrefundable fee as prescribed by the insurance commissioner as set forth in [insert appropriate reference to state law or regulation].

D.      An individual who fails to appear for the examination as scheduled or fails to pass the examination, shall reapply for an examination and remit all required fees and forms before being rescheduled for another examination.

**Drafting Note:** A state may wish to prescribe by regulation limitations on the frequency of application for examination in addition to other prelicensing requirements.

## Section 6.      Application for License

A.      A person applying for a resident insurance producer license shall make application to the insurance commissioner on the Uniform Application and declare under penalty of refusal, suspension or revocation of the license that the statements made in the application are true, correct and complete to the best of the individual's knowledge and belief. Before approving the application, the insurance commissioner shall find that the individual:

      (1)      Is at least eighteen (18) years of age;

      (2)      Has not committed any act that is a ground for denial, suspension or revocation set forth in Section 12;

      (3)      Where required by the insurance commissioner, has completed a prelicensing course of study for the lines of authority for which the person has applied;

**Drafting Note:** Paragraph (3) would apply only to those states that have prelicensing education requirements.

      (4)      Has paid the fees set forth in [insert appropriate reference to state law or regulation]; and

      (5)      Has successfully passed the examinations for the lines of authority for which the person has applied.

B.      A business entity acting as an insurance producer is required to obtain an insurance producer license. Application shall be made using the Uniform Business Entity Application. Before approving the application, the insurance commissioner shall find that:

      (1)      The business entity has paid the fees set forth in [insert appropriate reference to state law or regulation; and

      (2)      The business entity has designated a licensed producer responsible for the business entity's compliance with the insurance laws, rules and regulations of this state.

**Drafting Note:** Subsection B is optional and would apply only to those states that have a business entity license requirement.

C.      The insurance commissioner may require any documents reasonably necessary to verify the information contained in an application.

D.      Each insurer that sells, solicits or negotiates any form of limited line credit insurance shall provide to each individual whose duties will include selling, soliciting or negotiating limited line credit insurance a program of instruction that may be approved by the insurance commissioner.

## Section 7.      License

A.      Unless denied licensure pursuant to Section 12, persons who have met the requirements of Sections 5 and 6 shall be issued an insurance producer license. An insurance producer may receive qualification for a license in one or more of the following lines of authority:

© 2005 National Association of Insurance Commissioners

    (1)    Life—insurance coverage on human lives including benefits of endowment and annuities, and may include benefits in the event of death or dismemberment by accident and benefits for disability income.

    (2)    Accident and health or sickness—insurance coverage for sickness, bodily injury or accidental death and may include benefits for disability income.

    (3)    Property—insurance coverage for the direct or consequential loss or damage to property of every kind.

    (4)    Casualty—insurance coverage against legal liability, including that for death, injury or disability or damage to real or personal property.

    (5)    Variable life and variable annuity products—insurance coverage provided under variable life insurance contracts and variable annuities.

    (6)    Personal lines—property and casualty insurance coverage sold to individuals and families for primarily noncommercial purposes.

    (7)    Credit—limited line credit insurance.

    (8)    Any other line of insurance permitted under state laws or regulations.

B.    An insurance producer license shall remain in effect unless revoked or suspended as long as the fee set forth in [insert appropriate reference to state law or regulation] is paid and education requirements for resident individual producers are met by the due date.

C.    An individual insurance producer who allows his or her license to lapse may, within twelve (12) months from the due date of the renewal fee, reinstate the same license without the necessity of passing a written examination. However, a penalty in the amount of double the unpaid renewal fee shall be required for any renewal fee received after the due date.

D.    A licensed insurance producer who is unable to comply with license renewal procedures due to military service or some other extenuating circumstance (e.g., a long-term medical disability) may request a waiver of those procedures. The producer may also request a waiver of any examination requirement or any other fine or sanction imposed for failure to comply with renewal procedures.

**Drafting Note:** References to license "renewal" should be deleted in those states that do not require license renewal.

E.    The license shall contain the licensee's name, address, personal identification number, and the date of issuance, the lines of authority, the expiration date and any other information the insurance commissioner deems necessary.

F.    Licensees shall inform the insurance commissioner by any means acceptable to the insurance commissioner of a change of address within thirty (30) days of the change. Failure to timely inform the insurance commissioner of a change in legal name or address shall result in a penalty pursuant to [insert appropriate reference to state law].

G.    In order to assist in the performance of the insurance commissioner's duties, the insurance commissioner may contract with non-governmental entities, including the National Association of Insurance Commissioner (NAIC) or any affiliates or subsidiaries that the NAIC oversees, to perform any ministerial functions, including the collection of fees, related to producer licensing that the insurance commissioner and the non-governmental entity may deem appropriate.

Producer Licensing Model Act

**Section 8.          Nonresident Licensing**

A.          Unless denied licensure pursuant to Section 12, a nonresident person shall receive a nonresident producer license if:

(1)          The person is currently licensed as a resident and in good standing in his or her home state;

(2)          The person has submitted the proper request for licensure and has paid the fees required by [insert appropriate reference to state law or regulation];

(3)          The person has submitted or transmitted to the insurance commissioner the application for licensure that the person submitted to his or her home state, or in lieu of the same, a completed Uniform Application; and

(4)          The person's home state awards non-resident producer licenses to residents of this state on the same basis.

**Drafting Note:** In accordance with Public Law No. 106-102 (the "Gramm-Leach-Bliley Act") states should not require any additional attachments to the Uniform Application or impose any other conditions on applicants that exceed the information requested within the Uniform Application.

B.          The insurance commissioner may verify the producer's licensing status through the Producer Database maintained by the National Association of Insurance Commissioners, its affiliates or subsidiaries.

C.          A nonresident producer who moves from one state to another state or a resident producer who moves from this state to another state shall file a change of address and provide certification from the new resident state within thirty (30) days of the change of legal residence. No fee or license application is required.

D.          Notwithstanding any other provision of this Act, a person licensed as a surplus lines producer in his or her home state shall receive a nonresident surplus lines producer license pursuant to Subsection A of this section. Except as to Subsection A, nothing in this section otherwise amends or supercedes any provision of [refer to state excess and surplus lines statutes].

E.          Notwithstanding any other provision of this Act, a person licensed as a limited line credit insurance or other type of limited lines producer in his or her home state shall receive a nonresident limited lines producer license, pursuant to Subsection A of this section, granting the same scope of authority as granted under the license issued by the producer's home state. For the purposes of Section 8E, limited line insurance is any authority granted by the home state which restricts the authority of the license to less than the total authority prescribed in the associated major lines pursuant to Section 7A(1) through (6).

**Section 9.          Exemption from Examination**

A.          An individual who applies for an insurance producer license in this state who was previously licensed for the same lines of authority in another state shall not be required to complete any prelicensing education or examination. This exemption is only available if the person is currently licensed in that state or if the application is received within ninety (90) days of the cancellation of the applicant's previous license and if the prior state issues a certification that, at the time of cancellation, the applicant was in good standing in that state or the state's Producer Database records, maintained by the National Association of Insurance Commissioners, its affiliates or subsidiaries, indicate that the producer is or was licensed in good standing for the line of authority requested.

B.          A person licensed as an insurance producer in another state who moves to this state shall make application within ninety (90) days of establishing legal residence to become a resident licensee pursuant to Section 6. No prelicensing education or examination shall be required of that person to obtain any line of authority previously held in the prior state except where the insurance commissioner determines otherwise by regulation.

          © 2005 National Association of Insurance Commissioners

**Section 10.**      **Assumed Names**

An insurance producer doing business under any name other than the producer's legal name is required to notify the insurance commissioner prior to using the assumed name.

**Section 11.**      **Temporary Licensing**

A.      The insurance commissioner may issue a temporary insurance producer license for a period not to exceed one hundred eighty (180) days without requiring an examination if the insurance commissioner deems that the temporary license is necessary for the servicing of an insurance business in the following cases:

    (1)      To the surviving spouse or court-appointed personal representative of a licensed insurance producer who dies or becomes mentally or physically disabled to allow adequate time for the sale of the insurance business owned by the producer or for the recovery or return of the producer to the business or to provide for the training and licensing of new personnel to operate the producer's business;

    (2)      To a member or employee of a business entity licensed as an insurance producer, upon the death or disability of an individual designated in the business entity application or the license;

    (3)      To the designee of a licensed insurance producer entering active service in the armed forces of the United States of America; or

    (4)      In any other circumstance where the insurance commissioner deems that the public interest will best be served by the issuance of this license.

B.      The insurance commissioner may by order limit the authority of any temporary licensee in any way deemed necessary to protect insureds and the public. The insurance commissioner may require the temporary licensee to have a suitable sponsor who is a licensed producer or insurer and who assumes responsibility for all acts of the temporary licensee and may impose other similar requirements designed to protect insureds and the public. The insurance commissioner may by order revoke a temporary license if the interest of insureds or the public are endangered. A temporary license may not continue after the owner or the personal representative disposes of the business.

**Section 12.**      **License Denial, Nonrenewal or Revocation**

A.      The insurance commissioner may place on probation, suspend, revoke or refuse to issue or renew an insurance producer's license or may levy a civil penalty in accordance with [insert appropriate reference to state law] or any combination of actions, for any one or more of the following causes:

    (1)      Providing incorrect, misleading, incomplete or materially untrue information in the license application;

    (2)      Violating any insurance laws, or violating any regulation, subpoena or order of the insurance commissioner or of another state's insurance commissioner;

    (3)      Obtaining or attempting to obtain a license through misrepresentation or fraud;

    (4)      Improperly withholding, misappropriating or converting any monies or properties received in the course of doing insurance business;

    (5)      Intentionally misrepresenting the terms of an actual or proposed insurance contract or application for insurance;

    (6)      Having been convicted of a felony;

    (7)      Having admitted or been found to have committed any insurance unfair trade practice or fraud;

Producer Licensing Model Act

(8)     Using fraudulent, coercive, or dishonest practices, or demonstrating incompetence, untrustworthiness or financial irresponsibility in the conduct of business in this state or elsewhere;

(9)     Having an insurance producer license, or its equivalent, denied, suspended or revoked in any other state, province, district or territory;

(10)    Forging another's name to an application for insurance or to any document related to an insurance transaction;

(11)    Improperly using notes or any other reference material to complete an examination for an insurance license;

(12)    Knowingly accepting insurance business from an individual who is not licensed;

(13)    Failing to comply with an administrative or court order imposing a child support obligation; or

(14)    Failing to pay state income tax or comply with any administrative or court order directing payment of state income tax.

**Drafting Note:** Paragraph (14) is for those states that have a state income tax.

B.      In the event that the action by the insurance commissioner is to nonrenew or to deny an application for a license, the insurance commissioner shall notify the applicant or licensee and advise, in writing, the applicant or licensee of the reason for the denial or nonrenewal of the applicant's or licensee's license. The applicant or licensee may make written demand upon the insurance commissioner within [insert appropriate time period from state's administrative procedure act] for a hearing before the insurance commissioner to determine the reasonableness of the insurance commissioner's action. The hearing shall be held within [insert time period from state law] and shall be held pursuant to [insert appropriate reference to state law].

C.      The license of a business entity may be suspended, revoked or refused if the insurance commissioner finds, after hearing, that an individual licensee's violation was known or should have been known by one or more of the partners, officers or managers acting on behalf of the partnership or corporation and the violation was neither reported to the insurance commissioner nor corrective action taken.

D.      In addition to or in lieu of any applicable denial, suspension or revocation of a license, a person may, after hearing, be subject to a civil fine according to [insert appropriate reference to state law].

E.      The insurance commissioner shall retain the authority to enforce the provisions of and impose any penalty or remedy authorized by this Act and Title [insert appropriate reference to state law] against any person who is under investigation for or charged with a violation of this Act or Title [insert appropriate reference to state law] even if the person's license or registration has been surrendered or has lapsed by operation of law.

## Section 13.     Commissions

A.      An insurance company or insurance producer shall not pay a commission, service fee, brokerage or other valuable consideration to a person for selling, soliciting or negotiating insurance in this state if that person is required to be licensed under this Act and is not so licensed.

B.      A person shall not accept a commission, service fee, brokerage or other valuable consideration for selling, soliciting or negotiating insurance in this state if that person is required to be licensed under this Act and is not so licensed.

C.      Renewal or other deferred commissions may be paid to a person for selling, soliciting or negotiating insurance in this state if the person was required to be licensed under this Act at the time of the sale, solicitation or negotiation and was so licensed at that time.

© 2005 National Association of Insurance Commissioners

D.      An insurer or insurance producer may pay or assign commissions, service fees, brokerages or other valuable consideration to an insurance agency or to persons who do not sell, solicit or negotiate insurance in this state, unless the payment would violate [insert appropriate reference to state law, i.e. citation to anti-rebating statute, if applicable].

**Section 14.     Appointments [Optional]**

A.      An insurance producer shall not act as an agent of an insurer unless the insurance producer becomes an appointed agent of that insurer. An insurance producer who is not acting as an agent of an insurer is not required to become appointed.

B.      To appoint a producer as its agent, the appointing insurer shall file, in a format approved by the insurance commissioner, a notice of appointment within fifteen (15) days from the date the agency contract is executed or the first insurance application is submitted. An insurer may also elect to appoint a producer to all or some insurers within the insurer's holding company system or group by the filing of a single appointment request.

**Drafting Note:** The group appointment provision of Subsection B is only applicable in jurisdictions that have implemented an electronic appointment process.

C.      [Optional] Upon receipt of the notice of appointment, the insurance commissioner shall verify within a reasonable time not to exceed thirty (30) days that the insurance producer is eligible for appointment. If the insurance producer is determined to be ineligible for appointment, the insurance commissioner shall notify the insurer within five (5) days of its determination.

D.      An insurer shall pay an appointment fee, in the amount and method of payment set forth in [insert appropriate reference to state law or regulation], for each insurance producer appointed by the insurer.

E.      [Optional] An insurer shall remit, in a manner prescribed by the insurance commissioner, a renewal appointment fee in the amount set forth in [insert appropriate reference to state law or regulation].

**Drafting Note:** This act designates as optional the section on appointments of producers by insurers. That designation recognizes that some states do not require the formal appointment of a producer before business can be conducted with an insurer or multiple insurers.

**Section 15.     Notification to Insurance Commissioner of Termination**

A.      Termination for Cause. An insurer or authorized representative of the insurer that terminates the appointment, employment, contract or other insurance business relationship with a producer shall notify the insurance commissioner within thirty (30) days following the effective date of the termination, using a format prescribed by the insurance commissioner, if the reason for termination is one of the reasons set forth in Section 12 or the insurer has knowledge the producer was found by a court, government body, or self-regulatory organization authorized by law to have engaged in any of the activities in Section 12. Upon the written request of the insurance commissioner, the insurer shall provide additional information, documents, records or other data pertaining to the termination or activity of the producer.

B.      Termination Without Cause. An insurer or authorized representative of the insurer that terminates the appointment, employment, or contract with a producer for any reason not set forth in Section 12, shall notify the insurance commissioner within thirty (30) days following the effective date of the termination, using a format prescribed by the insurance commissioner. Upon written request of the insurance commissioner, the insurer shall provide additional information, documents, records or other data pertaining to the termination.

**Drafting Note:** Those states that do not require formal appointments may delete any reference to appointments in Subsections A and B above.

C.      Ongoing Notification Requirement. The insurer or the authorized representative of the insurer shall promptly notify the insurance commissioner in a format acceptable to the insurance commissioner if, upon further review or investigation, the insurer discovers additional information that would have been reportable to the insurance commissioner in accordance with Subsection A had the insurer then known of its existence.

D.     Copy of Notification to be Provided to Producer.

(1)     Within fifteen (15) days after making the notification required by Subsections A, B and C, the insurer shall mail a copy of the notification to the producer at his or her last known address. If the producer is terminated for cause for any of the reasons listed in Section 12, the insurer shall provide a copy of the notification to the producer at his or her last known address by certified mail, return receipt requested, postage prepaid or by overnight delivery using a nationally recognized carrier.

(2)     Within thirty (30) days after the producer has received the original or additional notification, the producer may file written comments concerning the substance of the notification with the insurance commissioner. The producer shall, by the same means, simultaneously send a copy of the comments to the reporting insurer, and the comments shall become a part of the insurance commissioner's file and accompany every copy of a report distributed or disclosed for any reason about the producer as permitted under Subsection F.

E.     Immunities

(1)     In the absence of actual malice, an insurer, the authorized representative of the insurer, a producer, the insurance commissioner, or an organization of which the insurance commissioner is a member and that compiles the information and makes it available to other insurance commissioners or regulatory or law enforcement agencies shall not be subject to civil liability, and a civil cause of action of any nature shall not arise against these entities or their respective agents or employees, as a result of any statement or information required by or provided pursuant to this section or any information relating to any statement that may be requested in writing by the insurance commissioner, from an insurer or producer; or a statement by a terminating insurer or producer to an insurer or producer limited solely and exclusively to whether a termination for cause under Subsection A was reported to the insurance commissioner, provided that the propriety of any termination for cause under Subsection A is certified in writing by an officer or authorized representative of the insurer or producer terminating the relationship.

(2)     In any action brought against a person that may have immunity under Paragraph (1) for making any statement required by this section or providing any information relating to any statement that may be requested by the insurance commissioner, the party bringing the action shall plead specifically in any allegation that Paragraph (1) does not apply because the person making the statement or providing the information did so with actual malice.

(3)     Paragraph (1) or (2) shall not abrogate or modify any existing statutory or common law privileges or immunities.

F.     Confidentiality

(1)     Any documents, materials or other information in the control or possession of the department of insurance that is furnished by an insurer, producer or an employee or agent thereof acting on behalf of the insurer or producer, or obtained by the insurance commissioner in an investigation pursuant to this section shall be confidential by law and privileged, shall not be subject to [insert open records, freedom of information, sunshine or other appropriate phrase], shall not be subject to subpoena, and shall not be subject to discovery or admissible in evidence in any private civil action. However, the insurance commissioner is authorized to use the documents, materials or other information in the furtherance of any regulatory or legal action brought as a part of the insurance commissioner's duties.

(2)     Neither the insurance commissioner nor any person who received documents, materials or other information while acting under the authority of the insurance commissioner shall be permitted or required to testify in any private civil action concerning any confidential documents, materials, or information subject to Paragraph (1).

(3)     In order to assist in the performance of the insurance commissioner's duties under this Act, the insurance commissioner:

     © 2005 National Association of Insurance Commissioners

(a)    May share documents, materials or other information, including the confidential and privileged documents, materials or information subject to Paragraph (1), with other state, federal, and international regulatory agencies, with the National Association of Insurance Commissioners, its affiliates or subsidiaries, and with state, federal, and international law enforcement authorities, provided that the recipient agrees to maintain the confidentiality and privileged status of the document, material or other information;

(b)    May receive documents, materials or information, including otherwise confidential and privileged documents, materials or information, from the National Association of Insurance Commissioners, its affiliates or subsidiaries and from regulatory and law enforcement officials of other foreign or domestic jurisdictions, and shall maintain as confidential or privileged any document, material or information received with notice or the understanding that it is confidential or privileged under the laws of the jurisdiction that is the source of the document, material or information; and

(c)    **[OPTIONAL]** May enter into agreements governing sharing and use of information consistent with this subsection.

**Drafting Note:** The language in Paragraph 3(a) assumes the recipient has the authority to protect the applicable confidentiality or privilege, but does not address the verification of that authority, which would presumably occur in the context of a broader information sharing agreement.

(4)    No waiver of any applicable privilege or claim of confidentiality in the documents, materials, or information shall occur as a result of disclosure to the commissioner under this section or as a result of sharing as authorized in Paragraph (3).

(5)    Nothing in this Act shall prohibit the insurance commissioner from releasing final, adjudicated actions including for cause terminations that are open to public inspection pursuant to [insert appropriate reference to state law] to a database or other clearinghouse service maintained by the National Association of Insurance Commissioners, its affiliates or subsidiaries of the National Association of Insurance Commissioners.

G.    Penalties for Failing to Report. An insurer, the authorized representative of the insurer, or producer that fails to report as required under the provisions of this section or that is found to have reported with actual malice by a court of competent jurisdiction may, after notice and hearing, have its license or certificate of authority suspended or revoked and may be fined in accordance with [insert appropriate reference to state law].

## Section 16.    Reciprocity

A.    The insurance commissioner shall waive any requirements for a nonresident license applicant with a valid license from his or her home state, except the requirements imposed by Section 8 of this Act, if the applicant's home state awards nonresident licenses to residents of this state on the same basis.

B.    A nonresident producer's satisfaction of his or her home state's continuing education requirements for licensed insurance producers shall constitute satisfaction of this state's continuing education requirements if the non-resident producer's home state recognizes the satisfaction of its continuing education requirements imposed upon producers from this state on the same basis.

**Drafting Note:** States are encouraged to eliminate any licensing and appointment retaliatory fees. In accordance with Public Law No. 106-102 (the "Gramm-Leach-Bliley Act") states should not require non-resident fees that are so disparate from the resident fees that they impose a barrier to entry. Such fees would be prohibited under Public Law 106-102.

## Section 17.    Reporting of Actions

A.    A producer shall report to the insurance commissioner any administrative action taken against the producer in another jurisdiction or by another governmental agency in this state within thirty (30) days of the final disposition of the matter. This report shall include a copy of the order, consent to order or other relevant legal documents.

B.   Within thirty (30) days of the initial pretrial hearing date, a producer shall report to the insurance commissioner any criminal prosecution of the producer taken in any jurisdiction. The report shall include a copy of the initial complaint filed, the order resulting from the hearing and any other relevant legal documents.

**Section 18.     Compensation Disclosure**

A.   (1)   Where any insurance producer or any affiliate of the producer receives any compensation from the customer for the placement of insurance or represents the customer with respect to that placement, neither that producer nor the affiliate shall accept or receive any compensation from an insurer or other third party for that placement of insurance unless the producer has, prior to the customer's purchase of insurance:

(a)   Obtained the customer's documented acknowledgment that such compensation will be received by the producer or affiliate;  and

(b)   Disclosed the amount of compensation from the insurer or other third party for that placement. If the amount of compensation is not known at the time of disclosure, the producer shall disclose the specific method for calculating the compensation and, if possible, a reasonable estimate of the amount.

(2)   Paragraph (1) shall not apply to an insurance producer who:

(a)   Does not receive compensation from the customer for the placement of insurance; and

(b)   In connection with that placement of insurance represents an insurer that has appointed the producer; and

(c)   Discloses to the customer prior to the purchase of insurance:

(i)    That the insurance producer will receive compensation from an insurer in connection with that placement; or

(ii)   That, in connection with that placement of insurance, the insurance producer represents the insurer and that the producer may provide services to the customer for the insurer.

**Drafting Note:** In states where no appointment is required, the phrase "that has contractually authorized the producer to act as its legal agent" may be substituted for "that has appointed the producer."

B.   A person shall not be considered a "customer" for purposes of this section if the person is merely:

(1)   A participant or beneficiary of an employee benefit plan; or

(2)   Covered by a group or blanket insurance policy or group annuity contract sold, solicited or negotiated by the insurance producer or affiliate.

C.   This section shall not apply to:

(1)   A person licensed as an insurance producer who acts only as an intermediary between an insurer and the customer's producer, for example a managing general agent, a sales manager, or wholesale broker; or

(2)   A reinsurance intermediary.

                                                          © 2005 National Association of Insurance Commissioners

D.     For purposes of this section:

    (1)     "Affiliate" means a person that controls, is controlled by, or is under common control with the producer.

    (2)     "Compensation from an insurer or other third party" means payments, commissions, fees, awards, overrides, bonuses, contingent commissions, loans, stock options, gifts, prizes or any other form of valuable consideration, whether or not payable pursuant to a written agreement.

    (3)     "Compensation from the customer" shall not include any fee or similar expense as provided in [insert reference to statutory provisions or regulations] or any fee or amount collected by or paid to the producer that does not exceed an amount established by the commissioner.

    (4)     "Documented acknowledgement" means the customer's written consent obtained prior to the customer's purchase of insurance. In the case of a purchase over the telephone or by electronic means for which written consent cannot reasonably be obtained, consent documented by the producer shall be acceptable.

E.     This section shall take effect [insert date].

**Drafting Note**: States that are considering the licensing of business entities should reference Section 6B of the NAIC's Producer Licensing Model Act and the Uniform Application for Business Entity License/Registration, which address the licensing of a business entity acting as an insurance producer.

## Section 19.     Regulations

The insurance commissioner may, in accordance with [insert appropriate reference to state law], promulgate reasonable regulations as are necessary or proper to carry out the purposes of this Act.

## Section 20.     Severability

If any provisions of this Act, or the application of a provision to any person or circumstances, shall be held invalid, the remainder of the Act, and the application of the provision to persons or circumstances other than those to which it is held invalid, shall not be affected.

## Section 21.     Effective Date

This Act shall take effect [insert date].

**Note**: A minimum of six months to one year implementation time for proper notice of changes, fees and procedures is recommended.

_____

*Chronological Summary of Action (all references are to the <u>Proceedings of the NAIC</u>)*

*1988 Proc. I 9, 18, 91, 101-102, 106-109 (adopted).*
*1989 Proc. I 9, 21, 125, 129, 135-142 (amended and reprinted).*
*1989 Proc. II 13, 22-23, 161, 166-167, 178-184, 189-190 (amended and reprinted).*
*1990 Proc. II 7, 13-14, 159-160, 192, 195 (amended).*
*1997 Proc. 3rd Quarter 25, 26, 1148, 1166-1168 (amended).*
*1999 Proc. 3rd Quarter 121, 123-136 (model adopted by parent committee).*
*2000 Proc. 1st Quarter 9-23, 33 (amended and reprinted).*
*2000 Proc. 3rd Quarter 7, 11, 36-45, 386, 403 (amended and reprinted).*
*2005 Proc. 1st Quarter 55, 56-57  (amended).*

Producer Licensing Model Act

This page is intentionally left blank

© 2005 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

This chart is intended to provide readers with additional information to more easily access state statutes, regulations, bulletins or administrative rulings related to the NAIC model. Such guidance provides readers with a starting point from which they may review how each state has addressed the model and the topic being covered. The NAIC Legal Division has reviewed each state's activity in this area and has determined whether the citation most appropriately fits in the Model Adoption column or Related State Activity column based on the definitions listed below. The NAIC's interpretation may or may not be shared by the individual states or by interested readers.

This chart does not constitute a formal legal opinion by the NAIC staff on the provisions of state law and should not be relied upon as such. Nor does this state page reflect a determination as to whether a state meets any applicable accreditation standards. Every effort has been made to provide correct and accurate summaries to assist readers in locating useful information. Readers should consult state law for further details and for the most current information.

**PRODUCER LICENSING MODEL ACT**

This page is intentionally left blank

© 2017 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

**KEY:**

**MODEL ADOPTION**: States that have citations identified in this column adopted the most recent version of the NAIC model in a **substantially similar manner**. This requires states to adopt the model in its entirety but does allow for variations in style and format. States that have adopted portions of the current NAIC model will be included in this column with an explanatory note.

**RELATED STATE ACTIVITY**: Examples of Related State Activity include but are not limited to: older versions of the NAIC model, statutes or regulations addressing the same subject matter, or other administrative guidance such as bulletins and notices. States that have citations identified in this column **only** (and nothing listed in the Model Adoption column) have **not** adopted the most recent version of the NAIC model in a **substantially similar manner.**

**NO CURRENT ACTIVITY:** No state activity on the topic as of the date of the most recent update. This includes states that have repealed legislation as well as states that have never adopted legislation.

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Alabama | ALA. CODE §§ 27-7-1 to 27-7-40 (1957/2014). | ALA. ADMIN. CODE r. 482-1-109-.01 to 482-1-109-.06 (1994/2009); 482-1-110-.01 to 482-1-110-.09 (1994/2012); 482-1-146-.01 to 482-1-146-.14 (2009/2010); 482-1-147-.01 to 482-1-147-.13 (2012/2014); BULLETIN 5-17-2010 (2010). |
| Alaska | ALASKA STAT. §§ 21.27.010 to 21.27.560 (1966/2014); § 21.90.900 (2006/2010). | ALASKA ADMIN. CODE tit 3, §§ 23.100 to 23.208 (1996/2013); BULLETIN B04-14 (2004); BULLETIN 2006-11; BULLETIN 2009-8 (2009); BULLETIN 2015-3. |
| American Samoa | NO CURRENT ACTIVITY | |
| Arizona | ARIZ. REV. STAT. ANN. §§ 20-281 to 20-302 (2002/2015). | ARIZ. REV. STAT. ANN. §§ 20-2901 to 20-2905 (1998/2014); BULLETIN 2009-4 (2009). |
| Arkansas | ARK. CODE ANN. §§ 23-64-501 to 23-64-520 (2001/2005). | ARK. CODE ANN. §§ 23-64-101 to 23-64-229 (1959/2011); § 23-64301 (2008/2013); BULLETIN 2-2000 (2000); BULLETIN 3-2006 (2006); BULLETIN 5-2008 (2008); BULLETIN 4-2013 (2013); BULLETIN 2-2014 (2014); BULLETIN 4-2014 (2014); BULLETIN 5-2014 (2014). |
| California | | CAL. INS. CODE §§ 1621 to 1758.994 (1959/2016); CAL. CODE REGS. tit. 10, §§ 2186 to 2188.83 (2006/2014); § 260.204.9 (2012); BULLETIN 2009-7 (2009); BULLETIN 2014-6 (2014). |

## PRODUCER LICENSING MODEL ACT

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Colorado | COLO. REV. STAT. §§ 10-2-101 to 10-2-804 (1995/2014). | COLO. REV. STAT. §§ 10-2-201 to 10-2-221 (1977/2012); COLO. REV. STAT. § 18-5-211 (2014); 3 COLO. CODE REGS. §§ 702-1:1-2-4 to 702-1:1-2-5 (1995/2015); § 702-1:1-2-10 (1995/2015); § 702-1:1-2-17 (2009); Notice 05-E-4 (2005); BULLETIN 4-2006; BULLETIN 5-2006; BULLETIN B-1.4 (2013): BULLETIN B-1.28 (2013). |
| Connecticut | CONN. GEN. STAT. §§ 38a-702a to 38a-702r (2002/2004). | CONN. GEN. STAT. §§ 38a-703 to 38a-718 (1949//2005); 2014 Conn. Acts No. 14-216; BULLETIN 1-18 (2012). |
| Delaware | DEL. CODE ANN. tit. 18, §§ 1701 to 1724 (2002/2014). | |
| District of Columbia | D.C. CODE §§ 31-1131.01 to 31-1131.19 (2002/2013). | D.C. MUN. REGS. tit. 26A, §§ 100 to 199 (2003/2013). |
| Florida | FLA. STAT. §§ 626.011 to 626.711 (1959/2014). | FLA. ADMIN. CODE ANN. r. 69B-228.010 to 69B-228-250 (1993/2009); Memorandum 2006-014 (2006). |
| Georgia | | GA. CODE ANN. §§ 33-23-1 to 33-23-46 (1992/2014); GA. COMP. R. & REGS. 120-2-3-.01 to 120-2-3-.50 (1965/2014). |
| Guam | | GUAM GOV'T. CODE §§ 43250 to 43258 (1981). |
| Hawaii | HAW. REV. STAT. §§ 431-9A-101 to 431-9A-130 (2002/2012). | HAW. CODE R. §§ 16-171-301 to 16-171-311 (2005/2013); BULLETIN 2010-1 (2010); Memorandum 2010-1 (2010); Memorandum 2011-2 (2011); Memorandum 2012-3 (2012). |
| Idaho | IDAHO CODE ANN. §§ 41-1001 to 41-1029 (2001/2005). | BULLETIN 2011-1 (2011). |
| Illinois | 215 ILL. COMP. STAT. 5/500-5 to 5/500-150 (2002/2014). . | ILL. ADMIN. CODE tit. 50, §§ 3119.10 to 3119.75 (1985/2015); BULLETIN 2009-4 (2009); BULLETIN 2009-7 (2009); BULLETIN 2010-1 (2010); Memorandum 7-12-2010 (2010). |
| Indiana | IND. CODE §§ 27-1-15.6-1 to 27-1-15.6-33 (2002/2014). | BULLETIN 150 (2007); BULLETIN 151 (2007); BULLETIN 218 (2015). |

© 2017 National Association of Insurance Commissioners

**PRODUCER LICENSING MODEL ACT**

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Iowa | Iowa Code §§ 522B.1 to 522B.18 (2002/2014). | Iowa Code § 508E.3 (2000/2009); Iowa Admin. Code r. 191-10.1 to 191-10.25 (1963/2009); § 191-11.2 (2009); § 191-12 (2009). |
| Kansas | Kan. Stat. Ann. §§ 40-4901 to 40-4918 (2001/2013). | Kan. Stat. Ann. § 40-252 (2011); Kan. Admin. Regs. §§ 81-3-1 to 81-3-7 (2006). |
| Kentucky | Ky. Rev. Stat. Ann. §§ 304.9-010 to 304.9-460 (1970/2011). | 806 Ky. Admin. Regs. 9:220 (1995/2011); 9:070 (1984/2009); Advisory Opinion 2006-07 (2006); Advisory Opinion 2006-04 (2006); Advisory Opinion 2010-2 (2010); Bulletin 2012-1 (2012). |
| Louisiana | La. Rev. Stat. Ann. §§ 22:2391 to 22:2395 (2013); 22:1541 to 22:1573 (2008/2015). | La. Admin. Code tit. XI, §§ 501 to 529 (2011); §§ 701 to 731 (2011); Bulletin 7-18-2006 (2006); Advisory Letter 2010-1 (2010). |
| Maine | Me. Rev. Stat. Ann. tit. 24-A, §§ 1420 to 1420-P (2001). | Me. Rev. Stat. Ann. tit. 24-A, §§ 1401 to 1485 (1997/2010); Bulletin 395 (2014). |
| Maryland | | Md. Code Ann., Ins. §§ 10-101 to 10-132 (2008/2014); Md. Code Regs. 31.03.02.01 to 31.03.02.15 (1987/2014); Bulletin 2010-15 (2010); Bulletin 2011-28 (2011). |
| Massachusetts | Mass. Gen. Laws ch. 175, §§ 162 to 163 (2003). | Mass. Gen. Laws ch. 175, §§ 164 to 177E (1969/2014); Bulletin 2005-09 (2005); Bulletin 2011-12 (2011); Bulletin 2013-09 (2013). |
| Michigan | Mich. Comp. Laws §§ 500.1201 to 500.1204b (1980/2014); §§ 500.1204d to 500.1247 (1972/2013). | Bulletin 2006-09 (2006); Memorandum 5-21-2009 (2009); Memorandum 6-2-2009 (2009); Memorandum 11-3-2009 (2009); Bulletin 2009-15-Ins (2009); Bulletin 2013-17-Ins (2013). |
| Minnesota | Minn. Stat. §§ 60K.30 to 60K.56 (2002/2011). | |
| Mississippi | Miss. Code Ann. §§ 83-17-51 to 83-17-89 (2002/2015). | 2009 Miss. Legis. Serv. 143; Bulletin 2009-2 (2009); Bulletin 2014-9 (2014). |
| Missouri | Mo. Rev. Stat. §§ 375.012 to 375.146 (1939/2014). | Mo. Code Regs. Ann. tit. 20, §§ 700-1.005 to 700-1.150 (1974/2008); § 700-3.200 (2009). |

© 2017 National Association of Insurance Commissioners

NAIC Model Laws, Regulations, Guidelines and Other Resources—1st Quarter 2017

**PRODUCER LICENSING MODEL ACT**

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Montana | | MONT. CODE ANN. §§ 33-17-101 to 33-17-1203 (1959/2013); MONT. ADMIN. R. 6.6.2801 to 6.6.2810 (1990/2009). |
| Nebraska | NEB. REV. STAT. §§ 44-4047 to 44-4066 (2001/2015). | 210 NEB. ADMIN. CODE §§ 38-001 to 38-018 (2009); Notice 10-3-2006; BULLETIN CB-82 (2010). |
| Nevada | NEV. REV. STAT. §§ 683A.020 to 683A.490 (1971/2011). | NEV. ADMIN. CODE §§ 686A.320 to 686A.370 (2005); LCB File No. R009-05 (2005); Notice 5-1-2010 (2010). |
| New Hampshire | N.H. REV. STAT. ANN. §§ 402-J:1 to 402-J:19 (2001/2011). | BULLETIN 06-043-AB (Oct. 2006); BULLETIN 07-077-AB (Oct. 2007). |
| New Jersey | N.J. STAT. ANN. §§ 17:22A-26 to 17:22A-48 (2001). | N.J. ADMIN. CODE §§ 11:17-1.1 to 11:17-5.7 (2016); § 11:17B-3.1; § 11:17B-4.10 (2009); BULLETIN 04-20 (2004); Memorandum 5-3-2011 (2011); BULLETIN 2011-19 (2011); BULLETIN 2014-3 (2014). |
| New Mexico | | N.M. STAT. ANN. §§ 59A-11-1 to 59A-12-2 (1985/2003); BULLETIN 2006-02 (2006); BULLETIN 2010-004 (2010). |
| New York | | N.Y. INS. LAW §§ 2101 to 2139 (1984/2014); Circular Letter 2010-18 (2010). |
| North Carolina | N.C. GEN. STAT. §§ 58-33-1 to 58-33-125 (1988/2013). | 6A N.C. ADMIN. CODE .0500 to .0508 (1992/2003); 11 N.C. ADMIN. CODE 6A.0802 (2011); BULLETIN 2007-B-7; Memorandum 10-1-2010 (2010); Memorandum 11-4-2010 (2010); Memorandum 4-11-2011 (2011); Memorandum 2-3-2014 (2014); Memorandum 2-19-2014 (2014); Memorandum 4-1-2014 (2014). |
| North Dakota | N.D. CENT. CODE §§ 26.1-26-01 to 26.1-26-53 (1985/2013). | N.D. CENT. CODE § 57-38-57 (2013); N.D. ADMIN. CODE §§ 45-02-01 to 45-02-02-15 (1983/2010). |
| Northern Marianas | | 4 N. MAR. I. CODE § 7303 (1984); 11-55 N. MAR. I. ADMIN. CODE § 2. |
| Ohio | OHIO REV. CODE ANN. §§ 3905.01 to 3905.99 (1953/2014). | OHIO ADMIN. CODE 3901-5-01 to 3901-5-08 (2010/2014); BULLETIN 3-22-2010 (2010). |

© 2017 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Oklahoma | OKLA. STAT. tit. 36, §§ 1435.1 to 1435.39 (1980/2014). | OKLA. ADMIN. CODE § 365:1-9-15.1 (1998/2005); § 365:25-3.1 (1989/2013); § 365:25-3-19 (2008/2012); § 365:25-5-41 (2002/2013); §§ 365:25-17-1 to 365:25-17-9; §§ 365:25-19-1 to 365:25-19-9 (2006/2014); BULLETIN 10-1-2007; BULLETIN 6-1-2009 (2009); BULLETIN 8-18-2010 (2010); BULLETIN 1-12-2012 (2012); BULLETIN PC 2013-02 (2013); PRODUCER LICENSING BULLETIN 2013-09 (2013). |
| Oregon | OR. REV. STAT. §§ 744.052 to 744.089 (2003/2009). | OR. ADMIN. R. 836-071-0108 to 836-071-0351 (2000/2012). |
| Pennsylvania | 40 PA. STAT. ANN. §§ 25-1201 to 25-1299.1(2002). | Notice 6-21-2008 (2008); NOTICE 2013-09 (2013). |
| Puerto Rico | | P.R. LAWS ANN. tit. 26, §§ 901 to 948 (1974/1986). |
| Rhode Island | R.I. GEN. LAWS §§ 27-2.4-1 to 27-2.4-22 (2002/2013). | R.I. INS. REG. 103 (2004/2009); 11-5 R.I. CODE. §§ 40:1 to 40:15 (2007/2012); 11-5 R.I. CODE R. §§ 36:1 to 36:8 (2013); BULLETIN 2006-6 (2006); BULLETIN 2007-8 (2007); BULLETIN 2011-2 (2011); BULLETIN 2015-4 (2015). |
| South Carolina | S.C. CODE ANN. §§ 38-43-10 to 38-43-260 (1988/2009). | S.C. CODE ANN. REGS. 69-23 (1984/2010); BULLETIN 16-2009 (2009); BULLETIN 17-2009 (2009); BULLETIN 9-2010 (2010). |
| South Dakota | S.D. CODIFIED LAWS §§ 58-30-1.1 to 58-30-196 (1966/2015). | S.D. ADMIN. R. 20:06:18:01 to 20:06:18:22 (1985/2013); Memorandum 7-25-2006. |
| Tennessee | TENN. CODE ANN. §§ 56-6-101 to 56-6-126 (2003/2014). | TENN. CODE ANN. §§ 997 (2006); TENN. COMP. R. & REGS. 0780-1-56-.01 to 0780-1-56-.12 (2007/2011); BULLETIN 8-14-2006 (2006); Op. Att'y Gen. 09-91 (2009). |
| Texas | | TEX. INS. CODE ANN. §§ 4001.001 to 4001.010 (2005/2015); § 4002.008 (2009); §§ 4004.151 to 4004.155 (2009); § 4005.004; § 4005.054 (2005); §§ 4008.001 to 4008.008 (2009); 28 TEX. ADMIN. CODE §§ 19.1001 to 1030 (1994/2010); BULLETIN B-0041-07 (2007); BULLETIN B-0019-14 (2014). |

NAIC Model Laws, Regulations, Guidelines and Other Resources—1st Quarter 2017

**PRODUCER LICENSING MODEL ACT**

| NAIC MEMBER | MODEL ADOPTION | RELATED STATE ACTIVITY |
|---|---|---|
| Utah | | UTAH CODE ANN. §§ 31A-23a-101 to 31A-23a-505 (1986/2014); UTAH ADMIN. CODE r. 590-244 (2009/2015); 590-88 (2010); BULLETIN 2010-3 (2010); BULLETIN 2011-3 (2011); BULLETIN 2013-5 (2013); BULLETIN 2015-8 (2015). |
| Vermont | VT. STAT. ANN. tit. 8, § 4791 to 4813n (1974/2002). | BULLETIN 172 (2012). |
| Virgin Islands | V.I. CODE ANN. tit. 22, §§ 31-751 to 31-793 (2016). | |
| Virginia | | VA. CODE ANN. §§ 38.2-1800 to 38.2-1845 (1986/2013); § 54.1-118 (2012); ADMIN. LETTER 2012-10 (2012); ADMIN. LETTER 2013-2 (2013). |
| Washington | WASH. REV. CODE ANN. §§ 48.17.010 to 48.17.902 (1947/2012). | WASH. ADMIN. CODE §§ 284-17-001 to 284-17-256 (2008/2013); § 284-97-020 (2011). |
| West Virginia | W. VA. CODE §§ 33-12-1 to 33-12-36 (1957/2004). | V. VA. CODE R. §§ 114-2-1 to 114-2-7 (2008/2009); §§ 114-42-2 to 114-42-8 (1996/2012); § 284-02 (1968/2010); Notice 4-9-2014 (2014). |
| Wisconsin | | WIS. STAT. §§ 628.01 to 628.12 (1975/2014); §§ 628.51 to 628.81 (1975/1981); WIS. ADMIN. CODE INS. §§ 6.50 to 6.75 (1981/2009); BULLETIN dated 2/4/05; BULLETIN dated 9/27/06. |
| Wyoming | WYO. STAT. ANN. §§ 26-9-201 to 26-9-218 (2001/2015). | |

© 2017 National Association of Insurance Commissioners

NAIC Model Laws, Regulations, Guidelines and Other Resources—October 2010

# PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

Discussion about a single licensing system for agents, brokers and other licensees began in the mid-1980s. An agents licensing advisory committee indicated it was in favor of the concept. **1986 Proc. I 132**.

That advisory committee prepared a draft of a single license statute to the task force for consideration in the summer of 1986. **1986 Proc. II 169-171**.

A group of regulators was appointed to review the concept and work on drafting model legislation. A second draft was presented in the fall of 1986. **1987 Proc. I 110-118**.

At the summer 1987 meeting a regulator noted the need for regulators to get more involved in the drafting process. He noted that regulators should be proposing drafts for comments from interested parties, not the other way around. The advisory group did present another draft document for regulator consideration. **1987 Proc. II 94, 100-104**.

A group of regulators met to consider the advisory committee draft in the fall of 1987 and produced the draft that was adopted with only one change. This draft did not repeal the Agents and Brokers Licensing Model Act, but did offer an alternative for those states wishing to adopt the single license procedure concept. **1988 Proc. I 103, 106-109**.

Several provisions of the model were rewritten over the years, but a major review of the entire model was not undertaken until 1998. Once the Single License Procedure Model Act was fully reviewed, the working group would be able to make a recommendation on whether to repeal the Agents and Brokers Model Act. **1998 Proc. 2nd Quarter I 114**.

The focus of the redraft was to codify uniform treatment of producers. That was necessary to create a more efficient licensing system and to preserve state regulation of producers. At the same time the group committed to developing a model law that was realistic and could receive broad support from regulators and the industry. In addition the drafters needed to focus on consumer protection while eliminating statutory requirements that were simply administrative burdens. **1998 Proc. 3rd Quarter 109, 112-113**.

Nearly a year after efforts to redraft the model began, the working group expressed concern that it had gotten off track. The chair restated the regulatory goals of the redraft: 1) break down barriers that do not provide a benefit; 2) create a consensus among industry and regulators; 3) recognize the importance of the Producer Information Network (PIN) and the Producer Database (PDB); and 4) remain focused on the issue of consumer protection. **1999 Proc. 1st Quarter 108**.

A few months later another regulator commented that the working group was on a path to create a monster. Regulator comments reflected an attitude of "we need it because that is the way we do it now." Industry comments reflect an attitude of "we need it because it seems unnecessary and my company was cited for it on a market conduct examination." This project requires more than "thinking outside the box." It requires starting with a clean sheet of paper and designing a new way to regulate people who sell insurance. **1999 Proc. 1st Quarter 91**.

Prior to adoption of the revised model, the regulators affirmed the ultimate goal of a system of uniform licensing. A regulator expressed concern about going to the legislature twice and suggested the alternative of just adopting a provision granting reciprocity. The chair of the drafting group responded that there were many uniform provisions in the model act that were desirable, and predicted that simply granting reciprocity would not get the support of the insurance industry, which supported uniformity. **2000 Proc. 1st Quarter 10**.

The Producer Licensing Model Act was amended after the passage of the Gramm-Leach-Bliley Act of 1999 (GLBA), but before the NAIC had time for extensive review. After that time it became clear that several more issues needed to be addressed. The amendments considered in the fall of 2000 addressed issues related to limited lines, retaliatory fees and other technical changes regarding GLBA issues. **2000 Proc. 3rd Quarter 11**.

© 2010 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 1.**          **Purpose and Scope**

When the NAIC began a major review of the model in 1998, an interested party suggested that Section 1 include language stating that any statute or regulation inconsistent with this act is invalid. The working group decided to add a drafting note. **1998 Proc. 3rd Quarter 106**.

The model had contained a paragraph noting that states had the flexibility to set conditions, terms and fees. Since the focus of the project was uniformity, the working group decided to delete the word "flexible" from the second paragraph, which had been in the model from its inception. **1998 Proc. 3rd Quarter 107**.

At one point a regulator suggested modifying the scope section to clarify that bail bond agents and viatical settlement brokers do not fall within the scope of the model. The working group recognized the concern but agreed not to make an amendment to this section. **2000 Proc. 2nd Quarter 400**.

**Section 2.**          **Definitions**

A.          Earlier versions of the model defined "firm" but during the extensive redraft begun in 1998 the regulators considered a definition instead of "business entity." Included in that discussion was exploration of the idea of a firm license where individuals in the firm would not need to be licensed outside their home state. **1998 Proc. 3rd Quarter 107-108**.

The chair of the drafting group prepared written comments on the proposal. He opined that it went too far in eliminating licensing requirements for non-resident producers. He recommended instead that the model eliminate reference to firms and corporations and focus on licensing each producer. **1998 Proc. 3rd Quarter 110-111**.

One regulator said her state licensed firms because their agents could not obtain a non-resident license in certain states that require a firm license. Several other states spoke of the variations on this theme that their states follow. **1998 Proc. 3rd Quarter 108**.

One regulator said he had concerns about eliminating firm and corporate licensing because the situation might arise when a firm was soliciting in the state but no individual was soliciting. He suggested that the working group eliminate firm appointments but not firm licensure. The chair concurred that this might be a possible solution as firms currently incur appointment fees for each producer and also tremendous internal costs, since they are required also to internally track each appointment. **1998 Proc. 3rd Quarter 108**.

Another regulator said his state did not license corporations, but that the influx of banks and entities that have significant control over agents may lead to the requirement of firm licensure. He opined that there is no need for appointments, as the agent/principal relationship is already established. **1998 Proc. 3rd Quarter 108**.

An interested party suggested the working group focus on licensing agents and let the Secretary of State license entities. He opined the firm licensure is not needed as long as the following issues are addressed: (1) payment of commissions to agents and (2) advertising. **1998 Proc. 3rd Quarter 108**.

At the next meeting discussion continued on the advisability of licensing firms or individuals. One regulator questioned whether a sole proprietor would be considered an individual. The general consensus of the group was that it would. The recommendation was to consider a sole proprietor as an individual unless he incorporated. Then he would fall under the definition of business entity. **1998 Proc. 4th Quarter I 107**.

One regulator expressed concern over the phrase "or other legal entity." He said it was not clearly defined. **1998 Proc. 4th Quarter I 107**.

B.          A regulator questioned whether "home state" meant the producer's primary place of residence or the producer's principal place of business. Staff noted that the federal Gramm-Leach-Bliley Act of 1999 defined the home state as the producer's principal place of business. The working group considered defining the home state as the place where the producer was licensed as a resident producer to avoid problems. **1999 Proc. 4th Quarter 111**.

      © 2010 National Association of Insurance Commissioners

NAIC Model Laws, Regulations, Guidelines and Other Resources—October 2010

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 2** (cont.)

C.      Insurance was first defined in the model adopted in 1988 by referring to the appropriate section of the code. During the extensive redraft in 1998-1999, the regulators considered deleting the definition. Interested parties encouraged the regulators to retain a definition to ensure that it tied back to the definition in the state insurance code. **1999 Proc. 1st Quarter 93**.

D.      The definition of insurance producer changed little during the life of the model. As part of the extensive review begun in 1998, the group discussed whether the terms "solicit, negotiate, effect, procure, deliver and renew" created ambiguity in terms of who needed to be licensed. The working group considered numerous options, such as creating a new section defining licensable activity versus non-licensable activity. Another suggestion was to define a producer as a person required to be licensed under the laws of the state to transact the business of insurance on behalf of an insurer. **1998 Proc. 3rd Quarter 107**.

The working group chair drew up a list of further explanations and examples of what the terms meant. **1998 Proc. 3rd Quarter 111**.

E.      The working group drafting amendments in 1998-1999 looked at the definition of insurer and considered several alternatives. They could continue to use the definition added with the 1997 amendments to refer to the appropriate section of state law, or they could use a definition suggested for the drafters. One regulator expressed concern about conflicting with an existing definition, and another suggested adding the prefix, "For the purposes of this Act," to alleviate that concern. The working group agreed to retain the definition already in place. **1998 Proc. 4th Quarter I 106**.

F.      When the first model was adopted, there was little discussion of its provisions. There was discussion, though of the last-minute amendment to add the second sentence to the definition of license. The sentence was important to make it clear that there was no change intended in the common law interpretation of agency. The drafting group did not express a great concern over this issue, but it was the consensus that the language did not pose any problem as it essentially restated the current status of the law. **1988 Proc. I 103**.

When the NAIC was examining the entire model during the 1998-1999 redraft to promote uniformity and reciprocity, one regulator questioned the purpose of the last sentence. Another regulator responded that the sentence clarifies that the authority granted is what is important and not the paper itself. **1998 Proc. 3rd Quarter 107**.

Further discussion focused on whether the license would specify the classes of insurance. The chair expressed the hope that most states would use the five major lines of insurance specified in the NAIC Declaration of Uniform Treatment. The group decided to retain the definition that had been in the model since its beginning. **1998 Proc. 4th Quarter I 106**.

G.      This definition was included during the extensive redraft that took place in 1998-1999. **2000 Proc. 1st Quarter 11**.

The regulators considered a suggestion to delete the word "credit" from this definition to broaden its effect. A representative from a credit insurance association spoke against that suggestion. He said a lot of work went into the credit insurance definition and said its true intent could be lost. **2000 Proc. 1st Quarter 571-572**.

When considering modifications to limited lines provisions, the chair commented that the subsection references automobile dealer gap protection and that the subsection should be expanded to address all groups selling gap insurance and not just automobile dealers. **2000 Proc. 1st Quarter 572**.

H.      This definition was added as part of the drafting effort that took place in 1998-1999. **2000 Proc. 1st Quarter 11**.

I.      When first beginning a major redraft of the model in 1998, the working group discussed limited lines. Because of the concerns raised, the working group agreed to put the issue of limited lines aside and address it at a later time. **1998 Proc. 3rd Quarter 106**.

© 2010 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the Proceedings of the NAIC

**Section 2I** (cont.)

After the model with its extensive amendments was adopted in January 2000, the working group was asked to further address the issue of limited lines licensure. One regulator suggested eliminating the reference to "credit" in Subsection G to broaden that definition. Another regulator suggested expanding Section 8E and adding definitions for "limited lines insurance" and "limited lines producer." He suggested it was important to incorporate language into the model act that allowed the commissioner to create new limited lines. **2000 Proc. 1ˢᵗ Quarter 571**.

As part of the effort to address limited lines licensing, the working group agreed to add a new definition to the model act describing limited lines insurance. Once regulator suggested that the reference to Section 8E needed to be eliminated as limited lines insurance applies to more than non-
resident producers. An interested party suggested the reference was needed because the goal was to limit the commissioner's authority to create new limited lines necessary to comply with GLBA. He said the first part of the definition applied to resident limited lines licenses and allowed states to create any limited lines license for resident producers. The second part of the definition addressed the need to create new limited lines licenses to ensure compliance with GLBA. **2000 Proc. 2ⁿᵈ Quarter 397**.

J.        The definition was added during the summer 2000 effort to address limited lines. **2000 Proc. 2ⁿᵈ Quarter 397**.

K.        During the drafting efforts of 1998-1999, the drafters agreed to add a definition of negotiate. One regulator suggested adding the phrase "conferring directly or *indirectly*" to the definition. Interested parties expressed concern that the word "indirectly" would be too encompassing. **1998 Proc. 4ᵗʰ Quarter I 108**.

After the model was adopted, regulators continued to discuss the definition of negotiate and its impact on consultants. A regulator said he did not believe consultants would fall under that definition. The chair said that states currently licensing consultants have specific statutes. States with no specific statutes pertaining to consultants needed to consider how they would license or authorize consulting. **2000 Proc. 1ˢᵗ Quarter 573**.

L.        One regulator expressed concern that the definition of person as used in this model act might conflict with the definition of person contained elsewhere in state code. An interested party expressed concern about the old definition with the word "includes." The working group agreed to define person as an individual or a business entity. **1998 Proc. 4ᵗʰ Quarter I 107**.

M.        One regulator questioned the definition of "sell," added with the amendments developed in 1998-1999. He asked why the phrase "money or its equivalent" was used in the definition. An interested party responded that this phrase was used in the commission sharing rules. **1999 Proc. 1ˢᵗ Quarter 92**.

N.        The working group drafting amendments in 1998-1999 decided to add a definition of "solicit" to the model. An interested party urged the working group to keep it as simple as possible. The first definition agreed upon was to approach another with a request or to urge another to apply for or purchase an insurance product. An interested party said that "approach another" could be construed to encompass advertising. The next suggested definition was to approach another with an offer to apply or purchase. An interested party said that "offer" is not the appropriate term to use because the process of submitting an application for insurance is the offer and only insurers "approach" potential applicants. **1998 Proc. 4ᵗʰ Quarter I 107-108**.

An interested party opined that the suggested language "attempt to sell" or "approach" could encompass casual conversations, such as a father talking to his son about insurance. Another responded that this scenario should not be a concern because the father is not an insurance company with a product to sell. **1998 Proc. 4ᵗʰ Quarter I 108**.

O.        The definition added to the model with the amendments on termination simply said it was the cancellation of the relationship between the producer and the insurer. Concern was expressed that the definition may not address terminations initiated by a regulatory agency. The group addressed that concern first by considering adding "… or by operation of law" at the end of the sentence. **1998 Proc. 4ᵗʰ Quarter I 107**.

                                          © 2010 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 2** (cont.)

P.      This definition was added during the extensive redraft that took place in 1998-1999. **2000 Proc. 1st Quarter 12**.

Q.      The working group drafting amendments in 1998-1999 agreed with the suggestion from a trade association that it would be good to define "uniform application." **1998 Proc. 4th Quarter I 107**.

**Section 3.        License Required**

The working group spent a considerable amount of time discussing licensable versus non-licensable activities. An interested party requested guidance on what constitutes advertising versus solicitation. The working group reviewed a list prepared by one of the chairs, which he said had been culled from the *Marketing of Insurance Over the Internet* white paper. He said that a producer enters the state by mail, telephone or by means of electronic communication. **1998 Proc. 3rd Quarter 109**.

An interested party suggested that the working group remove the exceptions to licensing and put them in a separate section. The group also considered defining "solicit," "negotiate" and "effectuate." **1998 Proc. 3rd Quarter 109**.

The working group questioned whether "class or classes of insurance" needed to be defined or whether it should simply say "insurance." **1998 Proc. 4th Quarter I 109**.

The drafting committee spent a great deal of time talking about licensable activities. The chair commented that it needed to be tied to acceptance of an application for insurance in order to ensure that the model focused on individuals actually trying to sell an insurance policy. **1999 Proc. 1st Quarter 110**.

At one point regulators considered adding a second part to Section 3 that said "Solicitation, negotiation and effectuation of an insurance contract includes …" followed by an extensive laundry list of licensable activities. **1999 Proc. 1st Quarter 112**.

Regulators discussed the situation where a telemarketer gathers information from an individual's current policy and then mails the individual a quote and decided it fell within the list of licensable activities. One said that the collection of information and inputting it into a computer was a ministerial function and should not require a license. Another regulator disagreed and opined that providing a quote is equivalent to urging an individual to purchase a specific insurance policy. Regulators agreed that quoting rates from a standard list was not a licensable activity but quoting rates for a specific company was. **1999 Proc. 1st Quarter 110**.

The working group considered whether there should be a difference between quoting rates over the phone or on an Internet web site. One regulator saw those as two different activities and another said they were very similar. **1999 Proc. 1st Quarter 110**.

After extensive discussion of the itemized lists of licensable and non-licensable activities, one regulator commented that a detailed list of licensable and non-licensable activities may not be needed. He suggested regulators review the definitions of effectuate, negotiate and solicit. **1999 Proc. 1st Quarter 109**.

**Section 4.        Exceptions to Licensing**

The model as it existed before 2000 had exceptions to licensing in the same section as the requirements for licensing. As the redraft began in 1998, one of the first suggestions was to place the exceptions in a "carve out" section. **1998 Proc. 3rd Quarter 109**.

In addition a separate section of exceptions existed. The working group agreed to move that section to become Section 4. Many of the requirements in the old Section 10 became provisions of Subsection B. **1989 Proc. II 181-182**.

Numerous exceptions were suggested by interested parties that did not remain until the model was finalized. **1998 Proc. 4th Quarter I 109-110**.

© 2010 National Association of Insurance Commissioners

NAIC Model Laws, Regulations, Guidelines and Other Resources—October 2010

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the Proceedings of the NAIC

**Section 4** (cont.)

During the development of Section 4, a regulator drew up a list of non-licensable activities, which were extensively discussed by the working group. The list contained extensive descriptions of ministerial-type functions. **1999 Proc. 1st Quarter 110, 112-113**.

B.      Discussion took place in the summer of 1988 to amend the model by adding exceptions to the licensing requirements. A version of the exceptions language was adopted in December 1988, but the drafting group expressed its intent to continue other modifications. **1989 Proc. I 129, 138-139**.

A regulator commented that an extensive list of exceptions to licensing was generally unnecessary. One danger of making a list is that it can never be complete and someone always wants to amend it to add another item. **1999 Proc. 1st Quarter 91**.

Interested parties presented a proposal that included a lengthy list of exceptions. Many of the suggestions were incorporated in the final version of the model. **1999 Proc. 1st Quarter 98**.

The working group spent a great deal of time discussing proposals for language in Paragraph (1). An interested party said 35 states had licensing exceptions for officers, directors and employees who engaged in clerical work. The key elements in these exceptions focused on the fact that these individuals did not receive commissions and their primary jobs did not involve the sale, solicitation, or negotiation of insurance. Another interested party suggested adding the word "incidental" to help clear up the gray area surrounding what activities fall within the definition of sell, solicit or negotiate. For example, some states consider the giving of quotes to be a licensable activity and it is unclear whether a person who helps an applicant complete an application needs to be licensed. **1999 Proc 3rd Quarter 143-144**.

An interested party expressed concern about Paragraph (2), which addressed mass marketing of property and casualty insurance. She stated that in group life insurance the employer is the owner of the policy, but the employer is not the owner of a policy of group property and casualty insurance. A regulator said that the paragraph seemed to lump together group insurance and mass marketed insurance and the two items needed to be separated. In mass marketed insurance, the employer makes the coverage available to employees but the employees who select the insurance are individually underwritten and receive an individual policy. The working group agreed to reword the paragraph to clarify the distinction between the two concepts. **1999 Proc. 3rd Quarter 144**.

The working group focused discussion at one point on the language that became Paragraph (5) of Subsection B. The suggestion from interested parties was found to be confusing. The working group clarified its intent for the marketing of insurance through mass media such as the Internet and included the paragraph in its draft. **1999 Proc. 1st Quarter 93**.

The working group reviewed comments regarding multi-state property and casualty risks and considered adding Paragraph (6) to address the concerns raised. One regulator asked where the premium for such a transaction was recorded. The interested party responded that the premium was recorded in the state where the risk was located, but a problem often arose in a market conduct examination when no licensed producer is located in that state. **1999 Proc. 1st Quarter 94**.

An interested party noted that the current draft provided that a person only needed to be licensed in a state where the insured risk had its principal place of business. She noted that this regulatory framework was limited to property and casualty risks. The chair asked working group members if they were willing to extend this concept to all lines of insurance. A regulator responded that this could allow an agent licensed in the headquarter state to do anything in another state. The interested party responded that, if the licensing requirements are the same in all states, this concern should be eliminated. Another regulator suggested the provision should also apply to life and health risks because an employee is typically removed from the actual issuance of coverage. Another regulator responded that the provision would be appropriate if there was reciprocity, but that there would be consumer protection issues without reciprocity. The group voted to limit the exemption to commercial property and casualty risks. **1999 Proc. 2nd Quarter 105**.

      © 2010 National Association of Insurance Commissioners

# PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 4B** (cont.)

Language was added creating a new Paragraph (7) to exempt risk managers. Almost all states exempt risk managers from producer licensing requirements, so the regulators agreed that the model also should exempt risk managers. The chair clarified that the proposed exemption was for employees who work as risk managers for a particular company. **1999 Proc. 2nd Quarter 107**.

At one point in the drafting process a drafting note was added to Subsection B to explain that licensing was not required for employees who responded to requests from existing policyholders on existing policies, provided that those employees were not directly compensated based on premiums resulting from these services. The working group agreed this was appropriate for a drafting note, but interested parties encouraged the group to make this exemption a model provision. At the 1999 Summer National Meeting the group voted to make the provision a drafting note. **1999 Proc. 2nd Quarter 107**.

An interested party opined that an unlicensed person should be able to find out if an existing policyholder is interested in another coverage or policy and then be able to refer that person to a licensed agent (known as "x-dating"). While pointing out that at least one state requires a license for x-dating, another interested party urged the group to say that the gathering of information and x-dating should not require a license. **1999 Proc. 3rd Quarter 144**.

The drafting note was later made part of the model, included as Section 4B(8). When the parent group discussed this provision, the parent chair cautioned the group to draft carefully so that it did not create a loophole to the licensing requirements for the employees of direct writers. To help address this concern, the regulators added a phrase, "provided the person does not otherwise sell, solicit or negotiate." A commissioner said he thought this language would help clarify who needed to be licensed. An interested party said he was not sure what the word "otherwise" added and questioned if this provision would apply to employees talking about the terms of existing policies or if it would apply to employees talking about the terms of new policies. The parent committee chair responded that the intent was to limit the exemption to employees addressing existing policyholders. An interested party said the paragraph should prohibit the placing of out-bound calls or cross-selling to existing policyholders. **1999 Proc. 3rd Quarter 121**.

After the revised model was adopted in January 2000, discussion continued on the meaning of Section 4B(8) as it was included in that model version. Interested parties made an effort to settle differences between them on the language of this exception for licensure of agency and company employees who provide service to existing policyholders or existing insurance contracts. A number of interested parties believed the language should remain as adopted. These organizations anticipated continued discussion on the issue in the individual states as legislation was drafted. Another interested party pointed out that, if uniformity was the ultimate goal, the interpretation of Section 4B(8) would be a problem. Discussion ensued around the possibility of clarifying the meaning of the paragraph. Many variations were discussed related to very specific examples of consumer service representatives not required to be licensed in one state applying for nonresident licenses in other states that did require licenses. **2000 Proc. 3rd Quarter 961**.

As discussion continued the chair of another working group charged with issues related to the federal Gramm-Leach-Bliley Act indicated that it had been the intention when the model was produced to preserve the status quo that was currently in place for the majority of states with regard to consumer service representatives. **2000 Proc. 3rd Quarter 959**.

An interested party said he was disappointed that the model was to reflect the status quo that currently existed in states with regard to consumer service representatives. He felt that the prior meetings had been intended to draft new legislation to modernize rather than to reflect the status quo. **2000 Proc. 3rd Quarter 959**.

An interested party suggested adding a drafting note saying that some states might wish to provide either more or less restrictive limits on the activities of employees of insurers or producers who responded to requests from existing policyholders. **2000 Proc. 3rd Quarter 955**.

Another interested party objected to what he saw as a significant restriction of non-licensed employees who respond to requests from existing policyholders. He questioned whether a change was needed to conform to the drafters' original intent. **2000 Proc. 3rd Quarter 956**.

NAIC Model Laws, Regulations, Guidelines and Other Resources—October 2010

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the Proceedings of the NAIC

**Section 4B** (cont.)

A representative from an agents' trade association said the original intent and the text of the model are in conflict. He supported elimination of the paragraph altogether or deletion of the word "otherwise." Both options would eliminate the existing ambiguity and increase the chances for uniformity. **2000 Proc. 3rd Quarter 956**.

When the Executive Committee considered adoption of the model, a commissioner noted that the exception for consumer service representatives contained in Section 4B(8) could be interpreted to provide a much broader exemption than intended. She recommended the deletion of the paragraph. The servicing activities of consumer service representatives would still be exempted in Section 4B(1)(a). The Executive Committee voted to delete the paragraph. **2000 Proc. 3rd Quarter 11**.

An interested party suggested that a person who gives insurance advice incidental to financial planning advice should not have to be licensed as an insurance producer. Financial planners have a fiduciary relationship with their clients and an obligation to give clients advice regarding their insurance needs. Another interested party opined that a specific exemption is not needed because the current provisions of the model address that scenario. The working group decided to add a drafting note to that effect. **1999 Proc. 2nd Quarter 106**.

### Section 5.    Application for Examination

A regulator opined that the level of detail contained in this section was unnecessary. The key element is that each state should require a written examination. The rest of the information in this section belonged in a regulation. **1999 Proc. 1st Quarter 91**.

### Section 6.    Application for License

A.     A regulator recommended that the reference to prelicensing education be omitted. If a test is well-designed, a person will have to attend a pre-license study class to pass the test. Mandating a class would not increase consumer protection. **1999 Proc. 1st Quarter 91**.

When drafting amendments in the summer of 2000, the working group discussed the need for a technical amendment to Paragraph (3) to specify that a producer must only complete a prelicensing course of study where required by the commissioner. The working group agreed to make this amendment because of the additional language on limited lines licensing that had been added recently. **2000 Proc. 2nd Quarter 394**.

At the working group's next meeting, the chair explained that the proposed amendment did not waive the examination requirement. It would be possible for a state to issue a license for a particular line of authority without requiring a prelicensing course of study. **2000 Proc. 3rd Quarter 404**.

B.     A regulator questioned why states need to license firms if they already license individuals. Another agreed that the license is unnecessary if a state has a mechanism in place to facilitate the payment of commissions. **1999 Proc. 1st Quarter 94**.

For a time regulators considered adding a provision saying that a firm had to disclose to the commissioner all owners, partners, officers and directors. One regulator suggested this was dual regulation because Secretaries of State already tracked this information. **1999 Proc. 2nd Quarter 104**.

A regulator commented that Paragraph (2) should require an officer or director to be responsible for compliance and not just a licensed producer. Another regulator said her state requires an officer to be responsible and requires that officer to be a licensed producer. The working group decided not to change Paragraph (2) and several states reiterated their desire to ensure that states were able to take regulatory action against individuals and not just the agency. **1999 Proc. 3rd Quarter 148**.

C.     This subsection was a part of the model from its inception. It was included without discussion. **1988 Proc. I 108**.

© 2010 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 6** (cont.)

D.      Subsection D was included as part of the extensive redraft adopted in January 2000. **2000 Proc. 1ˢᵗ Quarter 15**.

After its adoption the working group discussed the subsection further. An interested party asked if there was a conflict between this subsection's reference to a "program of instruction" and the reference in Subsection A to a "prelicensing course of study. He suggested adding a new subsection to Section 9 exempting limited lines credit insurance producers from prelicensing and continuing education requirements and examinations. The working group agreed it had never been its intent to have prelicensing and continuing education requirements apply to credit limited lines. **2000 Proc. 1ˢᵗ Quarter 572**.

The chair said the provisions on limited line credit insurance were included in the model act to clarify that individuals selling limited lines credit insurance must undergo some sort of pre-education requirement. He also pointed out that this subsection required the department to approve the course of study. **2000 Proc. 2ⁿᵈ Quarter 398**.

The group decided to amend Subsection D to clarify that the limited line credit insurance program of instruction "may be" approved by the insurance commissioner instead of requiring that the program of instruction must be approved. **2000 Proc. 2ⁿᵈ Quarter 398**.

**Section 7.       License**

A.      The list of licenses was created during the development of the revised model adopted in January 2000. **1999 Proc. 3ʳᵈ Quarter 127**.

During the discussion on limited lines the section was reviewed again, which led to a discussion on variable life insurance and the states' need to regulate licensing. The working group decided to modify Paragraph (5) because the determining factor as to whether a product is a variable product revolves around whether a contract with a separate account is filed with the Securities and Exchange Commission rather than whether the fund is in a separate account. **2000 Proc. 2ⁿᵈ Quarter 399-400**.

Over the period of development of the revised model adopted in January 2000, discussion returned periodically to whether there should be a license for limited lines credit insurance. One regulator spoke against it, because it was generally group coverage where people were enrolled. He said his state did not have a credit license. Another regulator pointed out that 39 states do license limited lines credit producers and it made sense to incorporate that in the model. The majority of states voted to include the limited lines credit insurance license. **1999 Proc. 2ⁿᵈ Quarter 103**.

At the working group's next session, the chair suggested noting that the credit insurance limited license was optional. **1999 Proc. 2ⁿᵈ Quarter 109**.

Discussion on limited lines insurance continued after the revised model was adopted in January 2000. An interested party suggested that the authority for the commissioner to create new limited lines licensing types should be added to the model. Each limited lines license should be based upon a clear demonstrated need for that line and a reasonable expectation that the licensee's activities would remain within the limited scope of authority and purposes of the limited line license. Licensed producers were concerned with specific licensing exemptions granted to groups that segment their approach to selling insurance and they believed that individuals selling insurance should be subject to the same requirements as producers engaged in similar activity. **2000 Proc. 1ˢᵗ Quarter 571**.

While discussing limited lines licenses, the working group debated whether the definition it had just created allowed the commissioner to create new limited lines licenses for residents. An interested party responded that this was addressed in Section 7A(7). **2000 Proc. 2ⁿᵈ Quarter 397**.

There were numerous comments from regulators regarding the need to eliminate the specific provisions related to limited line credit insurance, since the model act was going to address reciprocity for all limited line insurance. A commissioner recommended that the credit provisions remain in the model because these provisions would create greater uniformity, which is needed if credit insurance companies are to compete with banks. One member of the group suggested adding a drafting note explaining that the limited line credit provisions were included in the model act to help create greater uniformity in the

© 2010 National Association of Insurance Commissioners

NAIC Model Laws, Regulations, Guidelines and Other Resources—October 2010

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 7A** (cont.)

licensing of credit insurance. **2000 Proc. 2nd Quarter 398**.

While the Executive Committee was considering adoption of the model in the fall of 2000, a commissioner said that some consumer service representatives deal only with personal lines automobile insurance and, as the model was constructed, they would be required to pass examinations on commercial lines to be licensed. She suggested adding an additional line of authority for personal lines to Section 7A. **2000 Proc. 3rd Quarter 11**.

B.        There was some discussion of setting July 1 as a uniform renewal date. The chair said a renewal date established by birthday or the alphabet could be used. For the time being, the group agreed to remove all reference to a uniform renewal date. This issue could be addressed in the future as an electronic renewal process was established. **1999 Proc. 2nd Quarter 106**.

C.        This provision was part of the model act from its inception. Minor modifications and deletion of the drafting note were part of the amendments adopted in January 2000. **1988 Proc. I 108, 2000 Proc. 1st Quarter 15**.

Discussion of this subsection occurred when the group was reviewing the model relative to limited lines licenses. The chair asked if it was anticipated that a person would have to submit a short renewal or reinstatement application or whether a person could just call a state and request to be reinstated. He suggested requiring a renewal or reinstatement application in Subsection C. Another regulator commented that the purpose of Subsection C was to clarify how long a person could allow a license to lapse until he or she has to take a new licensing examination. The working group agreed to leave the subsection as it was with the understanding that the intent was to require some type of reinstatement request in either electronic or paper format. **2000 Proc. 2nd Quarter 400**.

D.        Subsection D was drafted as part of the amendments developed during 1998-1999. The first draft exempted all producers who were in the military and that was of concern to some regulators. The chair suggested that the exemption could be limited by requiring that the producer request the exemption and that it be approved by the insurance department. **1999 Proc. 2nd Quarter 107**.

E.        A regulator opined that Subsection E was unnecessary and better reserved to administrative regulation. Of particular concern to her was the provision, which had been in the model since the beginning, that spoke of the conditions of expiration and termination. She opined conditions of termination was too broad and could include a failure to comply with any number of sales practice statutes and regulations. It should be revised at least to include only the expiration date. **1999 Proc. 1st Quarter 91-92**.

F.        The subsection was modified as part of the extensive redraft of 1998-1999. **2000 Proc. 1st Quarter 15**.

G.        The working group discussed the need to draft language for states to use in granting a third party under the authority to handle the ministerial processing of applications. **2000 Proc. 2nd Quarter 400**.

A regulator suggested that the language should specifically reference the National Insurance Producer Registry (NIPR) as the third party vendor to help alleviate the need for a state to engage in a full bidding process with outside vendors. **2000 Proc. 2nd Quarter 394**.

When discussing specific language for Subsection G, one concern was whether the language should be broad enough to encompass entities other than the NAIC. One regulator did not feel it necessary to reference the NAIC, but another said he would like to specifically identify the NAIC and NIPR as the primary entities to provide services but, at the same time, wanted to be sure that the language was broad enough to allow a state to contract with other vendors for service. The group also discussed the need for the delegation language to specifically address the collection of fees. **2000 Proc. 3rd Quarter 405**.

© 2010 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 8.        Nonresident Licensing**

After the working group drafted major amendments in 1998-1999, but before the revised model was adopted by the NAIC, Congress passed the Gramm-Leach-Bliley Act (GLBA), also known as S. 900. One of the major sections of GLBA was a provision known as the National Association of Registered Agents and Brokers (NARAB), which would override state law in regard to licensing of non-resident agents unless the majority of states adopted either a system of reciprocity or uniform licensing laws. **1999 Proc. 4th Quarter 110**.

An interested party stressed that there would have to be a majority of states with a system of reciprocity or a majority of states with uniform licensing standards and that a combination of states with reciprocity and uniform standards would not meet the requirements of NARAB. **1999 Proc. 4th Quarter 110**.

NAIC staff explained that the standards for achieving reciprocity were laid out in GLBA: (1) the administrative procedures; (2) continuing education requirements; and (3) elimination of any limitations on non-residents, other than countersignature requirements. The administrative procedures can consist only of the following: (1) a request for licensure; (2) the application that the person submitted to its home state; (3) proof that the producer is licensing and in good standing in its home state; and payment of fees. Continuing education reciprocity means that the non-resident state accepts the producer's satisfaction of the home state's requirements. In addition, the law may place no restrictions or limitations due to the producer's place of residence or operations, so long as it is within the United States, including U.S. territories. **1999 Proc. 4th Quarter 112-113**.

Regulators discussed the advisability of pursuing reciprocity in states. One regulator pointed out that a system of reciprocity might create different standards for resident and non-resident producers, and a state might be hesitant to adopt such a system. Another regulator pointed out that if states obtain legislative approval for a system of reciprocity, they do not have to meet the uniformity requirements of NARAB. An interested party commented that adoption of the Producer Licensing Model Act helped create uniform standards that would make the states more comfortable with a system of reciprocity. **1999 Proc. 4th Quarter 111**.

A.        During the 1998-1999 extensive redraft, one regulator pointed out the need to refer to the Uniform Application developed by the NAIC. **1999 Proc. 1st Quarter 92**.

B.        Subsection B was added in January 2000 to refer to the Producer Database. **2000 Proc. 1st Quarter 15**.

C.        The chair commented that, under current law, he had to terminate a non-resident producer license and have the producer reapply in his state if the non-resident producer moved to another state. A regulator indicated the model act should no require that a new license be issued but should specify that states treat this situation in the same way they treat a change of address. **1999 Proc. 2nd Quarter 106**.

D.        When analyzing the GLBA provisions, an NAIC staff memo noted several amendments that would be necessary to enable the model to meet the reciprocity requirements of GLBA. The draft adopted by the working group did not apply to surplus lines, but GLBA specifically included such agents in its definition of producer. Unless surplus lines brokers were included, adoption of the model would not suffice to meet all reciprocity requirements. **1999 Proc. 4th Quarter 113**.

E.        When discussion of limited licenses began in 1998, the chair of the drafting group opined that individuals who sell limited lines (credit life, etc.) should be licensed, but that there is no need to have these individuals pass a licensing examination and undergo continuing education requirements. For example, he did not see the need to have a bank representative who sells credit insurance take a test about life insurance since the person's primary business is banking and not insurance. **1998 Proc. 3rd Quarter 109**.

An interested party submitted an extensive drafting suggestion for limited lines licensing. He said that store clerks come and go quickly and his proposal addressed that high turnover rate. Another interested party expressed concern about the proposal, asking at what level an entity was licensed—national firm, each franchisee, each business location? **1999 Proc. 1st Quarter 95**.

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 8E** (cont.)

A regulator asked how a non-resident state would license a producer with a limited lines license if the non-resident state did not issue the same type of limited lines license. An interested party opined that the non-resident producer would have to meet the licensing standards established by the license issued by the non-resident state. In other words, the non-resident producer would have to obtain a resident license that granted a similar scope of authority as the non-resident license for which he or she was applying. It was pointed out that GLBA with its reciprocity standards did not require states to adopt another type of license if they did not already have it. **1999 Proc. 4th Quarter 111**.

When the model was before the Executive Committee for adoption, a regulator explained that some trade groups believed it was possible to comply with the GLBA provisions without including limited lines licenses in the Producer Licensing Model Act. However, the same groups conceded that taking that approach involved a greater degree of risk that adoption of the model would not meet the requirements to avoid the creation of NARAB, as outlined in GLBA. NAIC staff and regulators did not believe that was the correct interpretation and the draft under consideration included reciprocal treatment of limited lines licenses. **2000 Proc. 1st Quarter 9**.

After adoption of the model in January 2000, regulators continued to discuss limited lines authority. There was concern voiced that a non-resident state would have to issue a license to a non-resident producer that is similar in scope to the license issued to the non-resident producer in his or her home state. A regulator suggested this could be a problem as the non-resident state may not know the scope of authority granted by the producer's home state. **2000 Proc. 1st Quarter 571**.

NAIC staff indicated that a non-resident state would have to recognize the resident state's authority and grant the same scope of licensing authority as granted by the resident state. Staff also commented that states may need to amend their laws to clarify that they can take regulatory and enforcement action against non-resident producers. A regulator questioned whether resident producers would have a discrimination claim if they could not obtain the same type of license as a non-resident producer. **2000 Proc. 2nd Quarter 396**.

A legal opinion provided by NAIC legal staff said that it appeared that reciprocity under GLBA did not have to extend to other types of licensees not involved in sales activities. Third party administrators, structured settlement providers, viatical settlement providers or adjusters do not fit under the reciprocity or uniformity requirement of GLBA. The legislative history of the federal law clearly indicated that Congress only intended to advance the reciprocal licensing of insurance agents and brokers and not persons or entities providing other insurance-related services. **2000 Proc. 2nd Quarter 410**.

In an effort to address limited lines licensing, the working group decided to add the last sentence of Subsection E. **2000 Proc. 2nd Quarter 397**.

### Section 9.        Exemption From Examination

As originally drafted, the model contained a requirement to file a physical clearance or certification letter. A regulator suggested that this was no longer required from an applicant that resided in a state included in the Producer Database. All states have access to that information. **1999 Proc. 1st Quarter 92**.

The original language was deleted from the proposal submitted in June 1999 and replaced by two subsections of different text. **1999 Proc. 2nd Quarter 116**.

A.        The working group discussed the new Subsection A with its exemption from examinations. When a nonresident producer relocated to another state, one regulator said he should not be exempt from taking the state law portion of the insurance examination. Other regulators said they were comfortable with the language drafted and suggested Section 9 should also include an exemption from prelicensing education. The working group agreed with that suggestion. **1999 Proc. 2nd Quarter 105**.

Near the end of the drafting process a regulator expressed concern about the exemption from both prelicensing education and the examination for nonresident agents who are seeking to become resident agents. He opined there is a consumer protection issue to address and uniformity of agent licensing hurts consumers. Another regulator pointed out that continuing education

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 9A** (cont.)

requirements help ensure producers remain knowledgeable. In response to a motion to change "shall" to "may," six regulators voted in favor and 11 states voted against the motion. **1999 Proc. 3rd Quarter 145**.

**Section 10.        Assumed Names**

The working group drafting amendments to the model in 1998-1999 discussed the need to define "assumed names." They concluded that this issue was addressed by Section 10, which had been in the model from its inception. **1998 Proc. 4th Quarter I 107**.

**Section 11.        Temporary Licensing**

This section was added in December 1988. The version adopted had a Subsection A that was similar to the current model, and optional subsections for temporary life and health or industrial fire licenses. **1989 Proc. I 139**.

The subsections specific to types of coverage were discussed again in May 1989. One trade association requested that the designation of "optional" for these two subsections be deleted. The association suggested that the optional designation might cast prejudice on the home service industry, which relies on states allowing provisions for temporary licenses. Citing concern over the propensity for abuse, regulators expressed concern over allowing agents to sell insurance without proper education and experience. The drafters decided to couple temporary licensing with controls, including a 90-day limit for the license. In addition, a provision was added referring specifically to home service business. **1989 Proc. II 186**.

A regulator suggested deleting this section and replacing it with a provision giving the commissioner the discretion to waive the examination requirement for good cause. **1999 Proc. 1st Quarter 92**.

B.        Subsection B was new material added in the redraft adopted in January 2000. **2000 Proc. 1st Quarter 17**.

**Section 12.        License Denial, Renewal or Revocation**

The first version of Section 12 was found in the model version adopted in December 1988. It was very similar to the current version. **1989 Proc. I 139-140**.

A.        A regulator suggested that items listed in this section should be limited to actions that were relevant to the substance of the Act. For example, she suggested that Paragraph (5) was already prohibited by the unfair trade practices act or sales practices regulations in the states. **1999 Proc. 1st Quarter 92**.

The working group reviewed the suggestions for changes to Paragraph (8), which had been revised to address fraudulent and dishonest practices in all business activities, not just in the business of insurance. The group agreed that the scope of the paragraph should be expanded to address all business activities. **1999 Proc. 3rd Quarter 146**.

B.        In 1988 provisions related to hearings were added and remained in the model without discussion until 1999. At that time one regulator suggested that references to hearing procedures should not be listed in this subsection, but it should instead include a reference to the state's established hearing procedures. **1999 Proc. 1st Quarter 92**.

E.        This subsection was added with the extensive redraft undertaken in 1998-1999. It was added to ensure that a state did not lose its authority to investigate an agent who allowed his or her license to lapse. Several states indicated this had been a problem for them. **1999 Proc. 3rd Quarter 146**.

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 13.        Commissions**

The first version of the model that contained standards for commission payments was adopted in December 1988. The section contained substantially similar language to the current model Subsection A and B. **1989 Proc. I 140**.

When developing the extensive amendments begun in 1998, the working group discussed the licensing requirements surrounding the receipt of commissions. Discussion focused on the sharing of commissions. **1998 Proc. 4th Quarter I 104**.

The language of the original model was replaced with four new subsections. **2000 Proc. 1st Quarter 18-19**.

D.        Several regulators enunciated their states' policies on accepting override commissions. Some required the person to be licensed and some did not. A regulator from a state without an anti-rebate law commented that an agent in another state could refer business to an agent in his state and receive a commission without having to be licensed. **1998 Proc. 4th Quarter I 104**.

An interested party pointed out the distinction between assignment of a commission and sharing commissions. Specifically he questioned whether a field marketing organization that contracts with local producers that actively solicit insurance needs to be licensed if it receives an override commission. **1998 Proc. 4th Quarter I 104**.

An association representative said the focus should be on the substantive reasons for the prohibition on sharing of commissions. The prohibition was designed to prohibit agents from entering into arrangements with unlicensed individuals, such as attorneys, who would solicit business on behalf of agents. The reasons for licensing are two fold: 1) licensing establishes a threshold standard and 2) licensing establishes a chain of responsibility to insurance policies. A regulator opined that regulators need to be able to tie the responsibility for the policy back to an individual but that regulators should not worry about individuals outside the chain of responsibility. **1998 Proc. 4th Quarter I 104**.

A few months later the issue of override commissions came up again. A regulator opined that once the group agreed that a person only needs a license if he or she solicits or negotiates, all references to commission payment fall into place. If a person does not need a license because he did not solicit or negotiate, why would he need a license to receive a share of an override commission? What consumer protection would be added by requiring a regional manager to have a license in a state solely because that manager received a small percentage of the commissions? **1999 Proc. 1st Quarter 91**.

When regulators considered modification of the language that had been in place since 1988, one suggestion was to incorporate the language that had been part of the drafting note into Subsection D. A regulator questioned why states would license firms, because Subsection D would provide for the assignment of commissions. An interested party responded that firms still needed to be licensed so that states could maintain regulatory authority over firms. Licensing of firms goes beyond the issue of commission assignments. **1999 Proc. 1st Quarter 95**.

**Section 14.        Appointments**

The first version of Section 14 appeared in the model as adopted in December 1988. **1989 Proc. I 141**.

When working on the extensive redraft begun in 1998, one of the first topics of discussion was appointments. One regulator noted that appointments were optional and would not be required in a state that did not have them. **1998 Proc. 3rd Quarter 113**.

The entire section was revised and new language adopted in January 2000. **2000 Proc. 1st Quarter 18-19**.

A.        The group drafting extensive amendments in 1998-1999 discussed appointments extensively. One regulator questioned whether a person can act as both an agent and a broker under the model. An interested party said the focus should remain on what activities require licensure and the model should not require brokers to be appointed. Another commented that appointing a broker might mean that the insurer would be found to have a principal/agent relationship with a broker when neither party intended such a relationship to be created. **1998 Proc. 4th Quarter I 105**.

© 2010 National Association of Insurance Commissioners

NAIC Model Laws, Regulations, Guidelines and Other Resources—October 2010

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 14A (cont.)**

An interested party opined that each state should retain the discretion as to who needs to be appointed. Appointments are required for three reasons: 1) generation of revenue; 2) to track who is working for whom; and 3) to create an additional review test for market conduct examiners. **1998 Proc. 4ᵗʰ Quarter I 105**.

Interested parties encouraged regulators to make a distinction between agents of an insurer and agents of an insured. This would preserve the distinction between an agent and a broker without using the term broker. **1999 Proc. 1ˢᵗ Quarter 93**.

B.      During the summer of 1999 the working group added a provision to its draft that allowed an insurer to appoint a producer to all the insurers in a holding company system by filing one appointment request. A fee would still be assessed on a per company basis. Regulators agreed that an insurer could choose to appoint a producer to fewer than all of the companies, so as a point of clarification "or some" was added after "all." **1999 Proc. 2ⁿᵈ Quarter 109**.

C.      A regulator opined that the subsection on verification by the insurance division should be deleted. With the continued development of the Producer Database (PDB) and the Producer Information Network (PIN), appointments will be available for review and the commissioner should not have the burden of sending a notification. States should instead focus on making the information generally available to insurers through PDB. **1999 Proc. 1ˢᵗ Quarter 92**.

Near the end of the drafting process the working group decided to eliminate a phrase from the subsection that required a fee "prior to the renewal date" to allow greater flexibility in the collection of renewal appointment fees. The group also decided to mark the subsection as optional. **1999 Proc. 3ʳᵈ Quarter 145**.

E.      Near the end of the drafting process a suggestion was made to the working group to designate Subsection E as optional. **1999 Proc. 3ʳᵈ Quarter 145**.

**Section 15.        Notification to Insurance Commissioners of Termination**

The first version of this section appeared in the model as adopted in December 1988. It was designated as optional for those states that required company appointments and was limited to notification of termination of an appointment. It also contained a brief confidentiality provision. **1989 Proc. I 141**.

In 1989 the regulatory drafting group decided to delete the phrase providing immunity "so long as they are furnished in good faith." The phrase was deleted and the optional designation for the section was also removed. **1989 Proc. II 187**.

In 1997 a working group developing a producer database recognized the importance of insurance department information on agent terminations. An insurance industry trade association provided draft language providing immunity to insurers reporting terminations for cause. **1997 Proc. 1ˢᵗ Quarter 654**.

A draft considered by the NAIC was designed as a separate model but the regulators decided instead to revise the Single License Procedure Model Act (now known as the Producer Licensing Model Act). **1997 Proc. 2ⁿᵈ Quarter 574-576**.

Amendments considered in the fall of 1997 added new language to the section on terminations. **1997 Proc. 3ʳᵈ Quarter 1166-1168**.

During the extensive redraft of 1998-1999, an interested party asked whether Subsections A, B and C were intended to apply to brokers. The chair responded that these subsections address agents and do not address brokers because a broker does not transact business through an insurer. Another interested party asked if an insurer that knew a broker was engaging in a prohibited act had an obligation to report this to the insurance department. A regulator responded that only agents need to be appointed but that brokers do have a business relationship with insurers; it is just not an agency relationship. A representative from a producers trade association opined that the reporting requirements of Section 15 should apply to brokers. **1999 Proc. 3ʳᵈ Quarter 148**.

© 2010 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the Proceedings of the NAIC

**Section 15** (cont.)

A.      Most of the language in Subsection A was developed by a group that recognized the importance of including termination information in the producer database being developed. The amendments were trying to address the problem where a producer with a significant disciplinary history jumps from company to company and ends up harming consumers and companies. **1997 Proc. 3rd Quarter 1167, 1170**.

An interested party suggested that the working group insert "accurately and truthfully" in Subsection A to ensure that the commissioner had the authority to take action against an insurer that did not report truthfully. He said it is already implied in the actual malice standard of Subsection E, but the "accurately and truthfully" standard should be stated expressly in the model. Another interested party said the phrase is not needed and it may cause problems when minor reporting violations occur. The working group decided not to make the change recommended. **1999 Proc. 3rd Quarter 148**.

The chair noted that Subsections A and D read together required that the insurer notify the insurance department within 30 days of an appointment termination and then the insurer had another 75 days in which to notify the producer. The notification to the producer had to be by certified mail if it involved a "for cause" termination. **1999 Proc. 3rd Quarter 146**.

An interested party suggested that the reference to a self-regulatory organization be modified to a "self-regulatory organization authorized by law." Another interested party responded that the intent of this phrase was to address information maintained by the National Association of Securities Dealers (NASD) and that the change was appropriate. **1999 Proc. 3rd Quarter 146**.

B.      Subsection B was added as a companion to Subsection A with the 1997 amendments. **1997 Proc. 3rd Quarter 1167**.

One state regulator commented that his state objected to Subsection B because it required the state to be notified of not-for-cause terminations of appointment, and his state did not use appointments. **1999 Proc. 3rd Quarter 147**.

C.      The amendments adopted in 1997 included a Subsection C that listed items that would be termination for cause. That list was later deleted, and what had been Subsection D became the new Subsection C. **1997 Proc. 3rd Quarter 1167**.

D.      This subsection was added in 1997 as part of the update of the termination provisions. **1997 Proc. 3rd Quarter 1167**.

During the discussion undertaken as part of the 1998-1999 redraft, a provision was added to require that the termination notice be delivered to the producer by certified mail only in the case of termination for cause; regular mail was satisfactory if it involved a "not for cause" termination. A regulator expressed concern about the requirement in Paragraph (2) that comments submitted by a producer would become a *permanent* part of an insurance commissioner's file. He questioned whether the intent was to ensure that the comments remained a part of the file until the investigation of the termination was closed. The working group agreed this was the intent and decided to delete the word "permanent." **1999 Proc. 3rd Quarter 146**.

E.      This provision was added in 1997 when the NAIC considered model amendments to encourage reporting of terminations. **1997 Proc. 3rd Quarter 1168**.

When the extensive redraft of 1998-1999 was well underway, the chair of the drafting group explained that the main issue with appointment terminations was immunity for insurers that terminated an appointment for cause. Most of the comments received on this issue indicated that the "actual malice" standard was too high of a standard for producers to prove. A regulator responded that a high standard was necessary to help ensure companies give pertinent information to regulators. The working group agreed to leave the language as written. **1999 Proc. 2nd Quarter 105-106**.

F.      Confidentiality provisions were expanded significantly with the addition of amendments to this section drafted in 1997. **1997 Proc. 3rd Quarter 1168**.

© 2010 National Association of Insurance Commissioners

NAIC Model Laws, Regulations, Guidelines and Other Resources—October 2010

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the Proceedings of the NAIC

**Section 15F** (cont.)

While the complete revision of the model in 1998-1999 was progressing, the chair noted that a separate NAIC group was developing standard confidentiality language to be incorporated in several NAIC models, including the Producer Licensing Model Act. That group was still working on the language for recommendation. **1999 Proc. 3rd Quarter 147**.

The working group agreed to a suggestion to incorporate language in Paragraph (5) referring to a database maintained by the NAIC to clarify that information may be disclosed to a database, such as the Producer Database. **1999 Proc. 3rd Quarter 147**.

Subsection F was completely rewritten to follow the language proposed by a group assigned the task of drafting language for several NAIC models to ensure that states would be able to share confidential information with each other and other state, federal and international regulators. **1999 Proc. 3rd Quarter 146**.

The first sentence of Paragraph (1) received extensive attention, and the wording was carefully chosen to provide maximum protection for sensitive information. The drafting team chose to use both the terms "privileged" and "confidential" to ensure the preservation of any applicable legal privilege and to indicate a high degree of intent to protect the documents from public disclosure. Members of the group from various jurisdictions noted court rulings indicating that omission of one or more words or phrases contained in the sentence could result in unintended disclosure. **1999 Proc. 4th Quarter 16**.

The drafting group discussed whether the confidentiality should apply to documents only, or instead to the broader phrase, "documents, materials and other information." The broader language was chosen to protect not only information in tangible form, such as a paper document or a computer disk or hard drive, but also information that may be personal knowledge. The group noted that the reason to choose the broader phrase was to avoid the situation where, for example, examination work papers were protected, but an attempt was made to take the oral deposition of an examiner that would reveal the same sensitive information as the work papers. This protection was further clarified by Paragraph (2). **1999 Proc. 4th Quarter 16**.

A revision to Paragraph (1) was made to clarify that the provisions only applied to documents, materials or information in the possession or control of the commissioner. Some interested parties expressed concern that otherwise the provision might be misinterpreted to include information in the possession of a private entity that happened to have been shared with a commissioner. **1999 Proc. 4th Quarter 16**.

The question of the commissioner's ability or discretion to disclose the confidential information received extensive discussion by the drafting group. The group expressed the concern that the commissioner not be placed in the position of possessing crucial information but be unable to use it to carry out his or her duties. With this in mind, the technical group drafted Paragraph (1) to make it clear that information can be acted upon (implying disclosure), but also limiting the circumstances to "regulatory or legal action brought as part of the commissioner's official duties." **1999 Proc. 4th Quarter 16**.

The provisions of Paragraph (3) received extensive discussion on several occasions. In particular, the group drafted the paragraph to make it clear that the commissioner has the authority both to share and to receive confidential information. The provision concerning the sharing of information with the NAIC and its subsidiaries or affiliates was discussed at length. Regulators expressed a strong need to retain specific language to ensure the ability of the NAIC to maintain confidential data for support of solvency, anti-fraud and other regulatory areas. The language referring to affiliates and subsidiaries was added to address the potential that one or more databases would be maintained by a related NAIC entity. **1999 Proc. 4th Quarter 16**.

During the discussion, Paragraph (4) was added to clarify that persons providing information to a commissioner did not waive any existing privilege or confidentiality protection by doing so. The paragraph was further clarified to show that the transmission of the information by the commissioner to another regulator or law enforcement official did not create a waiver. **1999 Proc. 4th Quarter 16**.

© 2010 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 15F** (cont.)

Various NAIC committees took up the confidentiality language in the context of specific models. A few technical changes were made to address the particular subject matter, but most groups heeded the request that changes be kept to a minimum in order to ensure the creation of a uniform platform for information sharing. **1999 Proc. 4th Quarter 16**.

An interested party asked if the new Paragraph (5) would still permit states to share information through the Producer Database (PDB). There was general consensus that a state could report the termination to the PDB, but that it would not be noted as a "for cause" termination until the state completed its investigation and made a final decision. **1999 Proc. 3rd Quarter 147**.

G.      Subsection G was added with the amendments developed in 1997. The provision adopted at that time provided for a $10,000 fine per violation. **1997 Proc. 3rd Quarter 1168**.

An interested party suggesting adding "or producer" to Subsection G. A regulator asked why that would be added if the producer was not required to report. She asked if adding the phrase meant that insurance departments would accept appointment terminations sent in by a producer on behalf of the insurer. The working group decided to add the phrase. **1999 Proc. 3rd Quarter 148**.

**Section 16.      Reciprocity**

This section first appearing in the draft proposal developed in mid-1999. It was initially titled "Retaliation." The draft contained two subsections: one forbidding different fees for nonresidents, and one allowing the commissioner to waive requirements for an applicant with a valid license from a state with similar requirements or to promote uniformity. **1999 Proc. 2nd Quarter 121**.

The version adopted contained three subsections. The first two are outlined above, and the third spoke of reciprocity for continuing education. **2000 Proc. 1st Quarter 22**.

After the model adoption in January 2000, the working group continued to discuss necessary changes to comply with the federal Gramm-Leach-Bliley Act of 1999 (GLBA). One issue under consideration was elimination of the retaliatory fees, which could result in a loss of revenues. The chair suggested states may wish to consider revising certain fees in order to make the changes revenue neutral. **2000 Proc. 1st Quarter 573**.

Originally the model prohibited a state from charging a higher licensing fee for nonresident producers than it charged for residents. The real intent was to eliminate retaliatory fees and this section did not eliminate retaliatory fees. The group decided to delete the subsection and replace it with a drafting note indicating that states should eliminate retaliatory fees. **2000 Proc. 2nd Quarter 394**.

The group discussed whether the elimination of the subsection about higher fees for nonresidents adequately addressed the issue of retaliatory fees. An interested party commented that GLBA prohibits states from charging nonresident fees that would be considered a barrier to entry. The working group decided to add that comment to the drafting note. **2000 Proc. 3rd Quarter 405**.

A.      The first draft of this subsection met with concern that it appeared to require the commissioner to address the waiver of licensing requirements on an individual basis. An interested party suggested the commissioner should be able to waive licensing requirements on a statewide basis. The draft also said the commissioner "may" waive, and this was a concern. **1999 Proc. 2nd Quarter 104**.

After passage of GLBA in November 1999, an NAIC staff memo pointed out that Subsection A could not say that the commissioner "may" waive the requirements for licensing when the applicant has a valid license in another state; the word "shall" must be used instead. **1999 Proc. 4th Quarter 113**.

© 2010 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 16A** (cont.)

The working group deleted the phrase "license application" from Subsection B, since it was never its intent to waive the license application requirement. **2000 Proc. 2nd Quarter 400**.

**Section 17.        Reporting of Actions**

This section was added as part of the extensive redrafting effort of 1998-1999. **2000 Proc. 1st Quarter 22**.

**Section 18.        Compensation Disclosure**

This subsection was added in December 2005. Discussion of the section took place at a hearing and meeting during the Winter National Meeting, and adoption followed at a special Plenary call late in December. **2004 Proc. 4th Quarter 136, 2005 Proc. 1st Quarter 55.**

Most of the discussion at the national meeting focused on a Subsection B that was subsequently deleted during the Plenary call of the membership. One major issue was whether the independent agent arrangement was a separate issue from the traditional broker arrangement. Earlier drafts used statutory authorization to receive compensation from the customer as the bright-line test, but this did not fully capture the scope of the issues under consideration. The bright-line test had the potential to exclude producers who received compensation only from insurers and certain brokerage situations where a separate contract controls who technically received compensation. Because of this, the phrase "acts on behalf of the customer" was added. A producer who then disclaimed to be "acting on behalf of the customer" would be subject to Subsection A. **2004 Proc. 4th Quarter 137.**

A regulator stated that the typical consumer did not perceive a difference between a captive agent and an independent agent. She opined that an independent agent, who represented that he acted on behalf of a client, should be considered a broker and provide the necessary disclosures. A consumer advocate encouraged the task force to refrain from carving out exceptions to disclosure. An interested party said that the amendment should reference insurance producers who exclusively represented the customer, because it was highly subjective to determine whether a producer acted on behalf of a customer. Another interested party identified the remaining issues to be the exact disclosure required and how to properly identify producers covered by the amendment. He suggested that the bright-line should be whether the producer received compensation from the customer and not on whether the producer acted on behalf of the customer. Another interested party also questioned how to determine whether a particular producer acted on behalf of the customer and suggested the use of the phrase "solely represents the customer." **2004 Proc. 4th Quarter 137.**

Another hearing was held in March 2005. At that time the NAIC president recapped the task force's activities in the five months since the New York Attorney General announced litigation involving the issue of broker compensation. The purpose of the March hearing was to hear comments on two issues: first, whether current laws and industry practices were sufficient for addressing potential conflicts of interest in the marketplace and second, the marketplace ramifications caused by certain large sectors of the marketplace voluntarily or otherwise discontinuing the use of contingent commission arrangements. The task force used information from the hearing and written comments to determine how to approach the remaining issues it was charged to consider: the development of additional requirements, such as recognition of a fiduciary responsibility of producers, disclosure of all quotes received by a broker, and disclosures relating to agent-owned reinsurance arrangements. **2005 Proc. 1st Quarter 70**.

During the hearing, regulators heard testimony about how the National Conference of Insurance Legislators (NCOIL) addressed the issues of broker compensation. The NCOIL model was aimed at disclosure by producers who accepted fees from customers. A commissioner opined that the NCOIL model was appropriate for the personal lines market, which was very different from the large commercial market where most investigations of producer compensation had been directed. **2005 Proc. 1st Quarter 70.**

© 2010 National Association of Insurance Commissioners

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the <u>Proceedings of the NAIC</u>

**Section 18** (cont.)

A consumer advocate urged the task force to recognize the broader issues in producer compensation; the problems were not concentrated only in the large brokerages and commercial lines. He suggested that true transparency could be achieved by enforcing two requirements: first, a comprehensive requirement for producers to disclose their compensation and second, a requirement that producers show customers the three lowest cost alternatives to the recommended product. He said that the NCOIL model would not assist regulators because it represented the industry consensus position. A commissioner asked what the specific content of the disclosure would be and the consumer advocate replied that the dollar amount of compensation should be disclosed if available, and if not, then the method of calculation. A regulator asked whether the disclosure would apply to captive agents. The consumer advocate replied affirmatively, because captive agents did not simply get commissions. These producers had quota and profitability requirements. The consumer needed to know how compensation on one line of business affected the producer's motivation to sell other lines. **2005 Proc. 1ˢᵗ Quarter 70.**

A.      A representative from a producer trade association raised concerns about the definition of "documented acknowledgement" and said that it was impossible for the typical producer to estimate the compensation that would arise from a particular placement. In addition, she said the phrase "insurance transaction" was too broad and that the disclosure should be tied to the placement of a policy. That change was included in the draft. A representative from another producer trade association said that every agent acted in some way on behalf of the customer. A commissioner responded that if this question were litigated, the determining factor would be to which party the producer owed a fiduciary duty. The producer should have the duty to state on whose behalf he or she was acting. The trade association representative responded that every life insurance producer purports to hold himself out as representing the individual customer. A regulator said that was the essence of the issue—whether the producer induced reliance based on a misrepresentation of the producer's loyalty. A consumer advocate responded that the focus should be on disclosure of compensation for all consumers since all producers claim they serve the consumer in some capacity. **2004 Proc. 4ᵗʰ Quarter 137.**

A regulator said that the goal was consumer protection and most producers were honest about their obligations. The consumer advocate responded that, if the objective was consumer protection, the amendment should provide that consumers get disclosure from all producers so that they could weigh the circumstances with complete information. A commissioner said that there were two different issues: corruption and transparency. The task force should deal swiftly with the issue of corruption and resolve to address the transparency of compensation separately. **2004 Proc. 4ᵗʰ Quarter 138.**

At a hearing to determine if further steps were needed, representatives from the producer community said the NAIC amendment adequately addressed the need for producers to disclose the receipt of compensation from insurers in situations where there was a potential for a conflict of interest. The state unfair practices acts addressed inappropriate insurance sales practices and federal and state laws already prohibited bid-rigging and steering problems, which prompted the NAIC to address producer disclosure compensation in the first place. Any additional regulation would be a burden on the producers without any measurable benefit to the insurance consumers. Other speakers enforced support for the NAIC amendment as adopted. The best way to guard against conflicts of interest and the appearance of conflicts would be through transparency. Transparency between brokers and carriers, and between brokers and their clients, included proper and appropriate disclosure of contingency commission arrangements. The NAIC model's additional disclosure obligations were sufficient in addition to other tools that states currently possessed under the Unfair Trade Practices Act and similar laws and regulations including common law. Adding additional specific or detailed disclosures would be unnecessary and perhaps counterproductive. **2005 Proc. 1ˢᵗ Quarter 71.**

A commissioner asked for an explanation of an early comment about when the consumer had leverage to squeeze the producer for rebates because the producer had disclosed compensation. An industry representative explained that if one element or ingredient of the overall premium—in this case, the producer's compensation—was highlighted, increased rebating was a likely result. The commenter said that his association did not believe it was helpful or warranted to highlight one ingredient of the overall premium. Some consumers might try to play one producer against another and encourage that producer to engage in rebating. Although that practice was illegal, it likely would be one of the results from disclosure. Another commissioner said that some of the comments revolved around the fact that contingent commissions benefited consumers because they allowed for lower, more competitive prices. An interested party responded that there were two different kinds of property and casualty brokers here: the very, very large entities versus the middle market and the

NAIC Model Laws, Regulations, Guidelines and Other Resources—October 2010

## PRODUCER LICENSING MODEL ACT

### Proceedings Citations
Cited to the Proceedings of the NAIC

**Section 18A** (cont.)

smaller brokers. For the smaller mid-market and smaller commercial property and casualty producers, contingent compensation arrangements were beneficial in terms of developing relationships and opening markets for producers to place policies. **2005 Proc. 1st Quarter 72.**

The task force chair provided a summary of the group's action plan. The first prong involved developing model legislation to encourage greater transparency. This work resulted in the NAIC's adoption of the broker compensation amendment to the Producer Licensing Model Act in December 2004. Subsequently the task force sought public comment, including a public hearing held during the NAIC Spring National Meeting, to determine if any further model legislation was necessary. The chair stated that, in developing the compensation disclosure amendment, the task force decided to focus mainly on improving disclosure. Comments received since adoption of the amendment were generally supportive of the amendment. Most comments from interested parties discouraged further action, such as requiring statutory fiduciary duty obligations or requiring the disclosure of all quotes by either producers or insurers. However, some interested parties called for stronger disclosure requirements. With regard to the current status of legislative activity, he reported the latest information from the NAIC staff indicated 32 bills or regulations had been introduced in 17 states. Of these, three bills were enacted and one was awaiting signature by the governor. At least two regulations were issued in final form. The bills enacted so far appeared to focus primarily on requiring disclosure in situations where producers received compensation from the customer. The chair indicated the consensus of the task force appeared to be to refrain from making any changes to the compensation disclosure amendment in its current form. This impression was confirmed by a vote of the task force members to leave Section 18 as it had been adopted in December 2004. **2005 Proc. 2nd Quarter 261-262.**

### Section 19.       Regulations

During the extensive drafting effort of 1998-1999, the chair suggested incorporating a provision that granted states rule-making authority. He expressed the opinion that this should not affect uniformity. The working group agreed to incorporate the provision. **1999 Proc. 2nd Quarter 106.**

### Section 20       Severability

### Section 21.       Effective Date

---

*Chronological Summary of Action*

*December 1987: Model adopted.*
*December 1988: Added several new sections to model.*
*June 1989: Model amended.*
*June 1990: Amended license requirement.*
*March 1998: Added to Section 15 on terminations of license.*
*January 2000: Adopted revised model with extensive redrafting to promote uniformity and reciprocity.*
*October 2000: Amended model to address issue of limited lines, consumer service representatives, and other narrow issues.*
*December 2004: During a special Plenary conference call, the model was amended by adding a new Section 18 to address issues related to broker compensation.*

© 2010 National Association of Insurance Commissioners

**PRODUCER LICENSING MODEL ACT**

**Proceedings Citations**
Cited to the <u>Proceedings of the NAIC</u>

This page is intentionally left blank

© 2010 National Association of Insurance Commissioners

ATTACHMENT 3

**DOCUMENTS REVIEWED**

AARP_KRUKAS_0159645
AARP_KRUKAS_0000220
AARP_KRUKAS_0000263
AARP_KRUKAS_0000271
AARP_KRUKAS_0045732
AARP_KRUKAS_0018935
AARP_KRUKAS_0017989
AARP_KRUKAS_0000001
AARP_KRUKAS_0090934
AARP_KRUKAS_0055397
AARP_KRUKAS_0045732
AARP_KRUKAS_0158459
AARP_KRUKAS_0151890
AARP_KRUKAS_0151442
AARP_KRUKAS_0029951
AARP_KRUKAS_0028668
AARP_KRUKAS_0019736
AARP_KRUKAS_0019776
AARP_KRUKAS_0019968
AARP_KRUKAS_0019776
AARP_KRUKAS_0114287
AARP_KRUKAS_0098750
AARP_KRUKAS_0139885
AARP_KRUKAS_0046746
AARP_KRUKAS_0028522
AARP_KRUKAS_0098750
AARP_KRUKAS_0047556
AARP_KRUKAS_0018935
AARP_KRUKAS_0036870
AARP_KRUKAS_0022462
AARP_KRUKAS_0047556
AARP_KRUKAS_0036870
AARP_KRUKAS_0047556
AARP_KRUKAS_0020783
AARP_KRUKAS_0031814
UNITED_KRU_0070728
AARP_KRUKAS_0044818
AARP_KRUKAS_0094950
AARP_KRUKAS_0033984
AARP_KRUKAS_0033989
AARP_KRUKAS_0034006
AARP_KRUKAS_0036836
AARP_KRUKAS_0037170
AARP_KRUKAS_0037018

AARP_KRUKAS_0028517
AARP_KRUKAS_0017635
AARP_KRUKAS_0020777
AARP_KRUKAS_0018344.
AARP_KRUKAS_0037327
AARP_KRUKAS_0021526
AARP_KRUKAS_0034083.
AARP_KRUKAS_0020282
AARP_KRUKAS_0033945
AARP_KRUKAS_0017635
AARP_KRUKAS_0018026
AARP_KRUKAS_0019736
AARP_KRUKAS_0022334
AARP_KRUKAS_0019605
AARP_KRUKAS_0046633
AARP_KRUKAS_0020777
AARP_KRUKAS_0018344
AARP_KRUKAS_0018345
AARP_KRUKAS_0020778
AARP_KRUKAS_0018547
AARP_KRUKAS_0033984
AARP_KRUKAS_0098750
AARP_KRUKAS_0037036
AARP_KRUKAS_0050628
AARP_KRUKAS_0018935
AARP_KRUKAS_0036870
AARP_KRUKAS_0018018
AARP_KRUKAS_0028517
AARP_KRUKAS_0022462
AARP_KRUKAS_0046633
AARP_KRUKAS_0160442
AARP_KRUKAS_0034081
AARP_KRUKAS_0034666
UNITED_KRU_0070728