# Exhibit 60

Page 1

1

2          IN THE UNITED STATES DISTRICT COURT

3               DISTRICT OF COLUMBIA

4

5   HELEN KRUKAS, ANDREA KUSHIM and GEORGIA LUKE, on

6   behalf of themselves and all others similarly

7   situated,

8   PLAINTIFFS

9

10  vs.            No.  18-CV-1124 (BAH)

11

12  AARP, INC., AARP SERVICES, INC. and AARP INSURANCE

13  PLAN,

14  DEFENDANTS

15

16  DEPOSITION OF HELEN KRUKAS

17

18  TAKEN ON BEHALF OF DEFENDANTS

19

20  NOVEMBER 19, 2020

21

22  TINA M. STUMPF, RPR, CSR

23  MISSOURI CCR # 623

24

25

Page 2

1       INDEX OF EXAMINATION
2               PAGE
3 EXAMINATION BY MR. FARR          8
4
5       INDEX OF EXHIBITS MARKED
6               PAGE
7 Exhibit 1 (Notice of Deposition)      33
8 Exhibit 2 (request for production of    35
9       documents)
10 Exhibit 14 (pamphlet)              90
11 Exhibit 15 (sample decision guide)    94
12 Exhibit 16 (guide to AARP Medicare    95
13      supplement insurance
14      portfolio)
15 Exhibit 3 (class action complaint)    96
16 Exhibit 4 (amended complaint)        98
17 Exhibit 10 (document entitled Seniors)   100
18 Exhibit 11 (United American insurance   101
19      company document)
20 Exhibit 12 (United American insurance   102
21      company policy)
22 Exhibit 9 (bank statements)          110
23 Exhibit 5 (application form for the    136
24      original Medigap plan C)
25      (Original Exhibits were retained by Mr. Farr.)

Page 3

1       IN THE UNITED STATES DISTRICT COURT
2               DISTRICT OF COLUMBIA
3
4 HELEN KRUKAS, ANDREA KUSHIM and GEORGIA LUKE, on
5 behalf of themselves and all others similarly
6 situated,
7
8       PLAINTIFFS,
9
10 vs.        No. 18-CV-1124 (BAH)
11
12 AARP, INC., AARP SERVICES, INC. and AARP INSURANCE
13 PLAN,
14
15      DEFENDANTS.
16
17      Deposition of HELEN KRUKAS, taken on
18 behalf of the DEFENDANTS, via Zoom video conference
19 on the 19th day of November, 2020, before Tina M.
20 Stumpf, RPR, CCR, CSR (MO, IL) and Notary Public.
21
22
23
24
25

Page 4

1 APPEARANCES OF COUNSEL:
2
3 FOR THE DEFENDANTS:
4 Mr. Alec Farr
5 Mr. Steven Alagna
6 Bryan Cave LLP
7 1155 F. Street, NW, Suite 500
8 Washington, DC 20004
9 (202)508-6000
10
11 FOR THE PLAINTIFFS:
12 Mr. Kevin Landau
13 Mr. Brett Cebulash
14 Taus Cebulash Landau, LLP
15 80 Maiden Lane, Suite 1204
16 New York, NY 10038
17 klandau@tcllaw.com
18
19 THE COURT REPORTER:
20 Ms. Tina Stumpf
21 Veritext Legal Solutions
22 515 Olive Street, Suite 300
23 St. Louis, MO 63101
24   314-241-6750
25

Page 5

1 THE VIDEOGRAPHER:
2 Mr. Timothy Perry
3 Veritext Legal Solutions
4 515 Olive Street, Suite 300
5 St. Louis, MO 63101
6
7 VIDEO CONCIERGE:
8 Ms. April Carter
9 Veritext Legal Solutions
10 515 Olive Street, Suite 300
11 St. Louis, MO 63101
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1    IT IS HEREBY STIPULATED AND AGREED by and
2  between Counsel for the Plaintiff and Counsel for
3  the Defendant, that this deposition may be taken in
4  shorthand by Tina M. Stumpf, Registered
5  Professional Reporter, Missouri Certified Court
6  Reporter, CCR #623, Notary Public, and afterwards
7  transcribed into typewriting and signature of the
8  witness is not waived by agreement and consent.
9          HELEN KRUKAS,
10  of lawful age, having been first duly sworn to
11  testify to the truth, the whole truth, and
12  nothing but the truth in the case aforesaid,
13  deposes and says:
14      THE VIDEOGRAPHER:  Good morning.
15      THE WITNESS:  Good morning.
16      THE VIDEOGRAPHER:  We're going on the
17  record at nine o'clock central time, on November
18  19th, 2020.
19      This is Media Unit 1 of the video recorded
20  deposition of Helen Krukas, taken by counsel for
21  Defendant in the matter of Helen Krukas, et al,
22  versus AARP, Inc., et al., filed in the U.S.
23  District Court, District of Columbia, Case No.
24  18-CV-1124.
25      My name is Tim Perry, certified legal

Page 7

1  video specialist.  Our certified court reporter is
2  Tina Stumpf.  We are with Veritext Legal Solutions
3  Midwest.
4      Counsel, will you identify yourselves for
5  the record, please?
6      MR. FARR:  Alec Farr, from the law firm of
7  Bryan Cave Leighton Paisner on behalf of the
8  Defendants.
9      MR. ALAGNA:  Steve Alagna, from Bryan Cave
10  Leighton Paisner on behalf of Defendants.
11      MR. LANDAU:  Kevin Landau, from Taus
12  Cebulash and Landau, on behalf of the Plaintiff.
13      MR. CEBULASH:  Brett Cebulash, Taus
14  Cebulash and Landau, on behalf of the Plaintiffs.
15      THE VIDEOGRAPHER:  All right.  Thank you
16  all.  Tina, please swear in the witness.
17      THE REPORTER:  Could you raise your right
18  hand, please.
19      THE WITNESS:  (Raising right hand).
20      THE REPORTER:  Do you solemnly swear the
21  testimony you're about to give is the truth, the
22  whole truth and nothing but the truth, so help you
23  God?
24      THE WITNESS:  I do.
25          EXAMINATION

Page 8

1  QUESTIONS BY MR. FARR:
2      Q   Good morning, Miss Krukas.  Could you
3  state your full name for the record, please?
4      A   Helen Krukas.
5      Q   Miss Krukas, could you tell me where you
6  live, what your address is?

[REDACTED]

9      Q   Miss Krukas, you may have just heard, my
10  name is Alec Farr.  I represent the Defendants,
11  AARP, Inc., AARP Services, Inc., and AARP Insurance
12  Plan, and I'm going to be taking your deposition
13  today.
14      Miss Krukas, have you ever been deposed
15  before?
16      A   No.
17      Q   Okay.  I'm going to go over a series of
18  ground rules for you in the deposition so that we
19  have an orderly proceeding.
20      Can you hear me okay?
21      A   I can.
22      Q   Okay.  I'm going to go over a set of
23  ground rules with you just so we have an orderly
24  proceeding.
25      I'm going to be asking you a series of

Page 9

1  questions to which you have to give answers under
2  oath.  Everything you say is being taken down by the
3  court reporter who is present in this video
4  deposition.
5      Do you understand that?
6      A   I do.
7      Q   It's important that when we go through
8  this process we try to avoid speaking over one
9  another.  It's very normal in human conversation to
10  do that.  But I'd ask that you wait for me to finish
11  my question before you provide your answer.  Even if
12  you think you know where I'm going, just please try
13  to wait for me to finish, and then provide your
14  answer.
15      I'll try to do the same, waiting for you
16  to finish your answer before I ask my next question.
17  That will make it easier for the court reporter.
18      Can you do that for me, please?
19      A   Yes.
20      Q   It's also important that -- and you're
21  doing a great job so far.  It's also important that
22  when you answer my questions you provide a spoken
23  verbal response like a yes, or a no, or an answer,
24  rather than just nodding your head or shaking your
25  head.  That makes it difficult for the court

3 (Pages 6 - 9)

1 reporter.
2     Can you do that for me, please?
3     A   Yes.
4     Q   Okay.  Very good.  We're doing very well
5 so far.
6     If, at any time, you don't understand one
7 of my questions, please just let me know and I'll
8 try to accommodate you.
9     If, at any time, you want to take a break,
10 just let me know and we'll take a break as long as
11 there's no question pending, okay?
12     A   Okay.
13     MR. LANDAU:  Alec, on that note, let me
14 just -- I'm sorry to interrupt.  But Helen, just be
15 mindful, needs to take a break every 45 minutes or
16 so, so I just wanna --
17     MR. FARR:  Okay.  Well, I was going to say
18 we'll probably take a break every hour, --
19     MR. LANDAU:  Okay.
20     MR. FARR:  -- but I can do every 45
21 minutes.  And if you don't understand one of my
22 questions, please let me know.  That's important.
23 Otherwise, I'll assume you understood, and I'll take
24 your answer.
25     So can you do that for me, please?

1     A   Yes.
2     Q   Okay.  Now, Miss Krukas, is there any
3 reason why you might have difficulty understanding
4 my questions, or giving me full and truthful answers
5 that might not be apparent to me?  And by that I
6 mean, without getting into any specifics, are you on
7 any medications?  Are you sick?  Is there anything
8 that might make it difficult for you to understand
9 and respond to my questions fully?
10     A   I don't think so.
11     Q   Okay.  Now, you understand that you just
12 took an oath to swear to tell the truth, the whole
13 truth and nothing but the truth.
14     Do you understand that?
15     A   I do.
16     Q   You understand that that's the same oath
17 that you take in a court of law?
18     A   Yes.
19     Q   Okay.  Do you understand that, you know,
20 penalties of perjury apply if you don't answer my
21 questions fully and truthfully?
22     A   Yes.
23     Q   Okay.  Miss Krukas, I'd just like to start
24 with, you know, what did you do to prepare for
25 today's deposition?

1     A   Um, I spoke with my attorneys.
2     Q   Uh, when did you do that?
3     A   Yesterday.  A -- a few times this week, or
4 last week.
5     Q   How many times this week?
6     A   Once.
7     Q   And what day was that?
8     A   Yesterday.
9     Q   Okay.  And how long did you speak with
10 them?
11     A   About a half an hour.
12     Q   Okay.  And what attorneys did you speak
13 to?
14     A   Mr. Landau and Mr. Cebulash.
15     Q   Cebulash, okay.
16     And was this by phone?
17     A   No.
18     Q   How -- how did you speak to them?
19     A   Zoom.
20     Q   By Zoom?  Okay.
21     So you're familiar with Zoom at this
22 point?
23     A   Yes.
24     Q   Okay.  And you said that this meeting
25 lasted half an hour?

1     A   Approximately.
2     Q   Was anyone else present besides your
3 attorneys?
4     A   No.
5     Q   Okay.  Did your attorneys review any
6 materials with you in that meeting?
7     A   What do you mean materials?
8     Q   Documents?
9     A   No.
10     Q   Did you look at anything to prepare you
11 for the deposition?
12     A   No.
13     Q   Okay.  You said that there were other
14 times that you met with your attorneys to prepare --
15 or spoke to your attorneys to prepare for today's
16 deposition.
17     Were there -- how many other times were
18 there?
19     A   I believe two other times.
20     Q   And were those this week or last week?
21     A   Last week.
22     Q   Okay.  Um, the first time last week, how
23 long did you speak to them?
24     A   I can't remember exactly, but each, um,
25 time we spoke, it was about a half an hour.

4 (Pages 10 - 13)

Page 42

1    Q   Okay.
2    A   If I had any, uh, communications with, uh,
3  United Healthcare.
4    Q   All right.  Um, if you could look at
5  request number two, it calls for "All documents and
6  communications concerning any Medicare supplement
7  policies or coverage in which you've enrolled, other
8  than the United Medigap plan, including but not
9  limited to documents sufficient to show particular
10  Medicare supplement policies or coverage in which
11  you've enrolled, the period in which you were
12  enrolled, and the amount you paid."
13       Did you look for documents like that?
14    A   Yes.
15    Q   All right.  And did you produce those to
16  your attorney?
17    A   Yes.
18    Q   Um, request number three is "All documents
19  and communications concerning any program of
20  Medicare supplement policies or coverage, other than
21  the United Medigap program."
22       Did you look for those documents?
23    A   Yes.
24    Q   Okay.  And did you have any to provide to
25  your attorneys?

Page 43

1    A   Yes.
2    Q   If you could go over to the next page,
3  it's request number four.  It says, "All marketing
4  materials, including but not limited to
5  advertisements, brochures, pamphlets and
6  descriptions concerning or related in any way to
7  your decision to purchase an AARP Medigap policy or
8  policies."
9       Did you look for documents like that?
10    A   Yes.
11    Q   Did you have any marketing materials about
12  the United Medigap plan?
13    A   I don't remember, uh, what all the
14  documents that I gave were, but I gave everything
15  that I had to my attorney.
16    Q   Okay.  I'm just going to go over a couple
17  of other requests here.
18       Request number five is, "All documents or
19  communications you reviewed that led you to conclude
20  that AARP is an unlicensed insurance agent, and/or
21  that the royalty is a commission."
22       Did you have any documents like that?
23    MR. LANDAU:  Object to the form.  Calls
24  for a legal conclusion.  And I would just object,
25  um, as to the line of questioning on this document

Page 44

1  itself.  Um, the document requests are all subject
2  to objections that Plaintiffs interposed in response
3  to this request.  We're not waiving these objections
4  and -- or those objections are preserved here.  But
5  you can answer, Helen, if you can.
6    A   I don't remember what the -- all the
7  documents were that I gave, but I gave everything
8  that I had.
9    Q   Okay.  Do you recall how many documents
10  there were, what the magnitude of documents that you
11  turned over were?
12    A   No.
13    Q   Okay.  Um, Miss Krukas, I'll tell you that
14  in terms of the documents that we understand to be
15  from your files, essentially all that was in there
16  were bank statements and a few documents that seemed
17  to be about another insurance policy.
18       Does that sound right to you in terms of
19  what you turned over to your lawyers?
20    MR. LANDAU:  I object to the form of the
21  question.
22    A   I don't remember all the -- what all the
23  documents, uh, the information contained in the
24  documents.  I just don't remember.  I gave
25  everything I had.

Page 45

1    Q   Okay.  Do you recall when you looked for
2  documents and turned documents over to your lawyer,
3  do you recall any documents that constituted
4  communications with AARP?
5    MR. LANDAU:  Objection, asked and
6  answered.
7    A   I don't recall exactly.  I think yes, but
8  I don't recall exactly.
9    Q   Okay.  Do you recall any documents that
10  you believed to be advertisements or brochures
11  concerning the United Medigap plan that bears the
12  AARP name?
13    MR. LANDAU:  Objection.  Asked and
14  answered.
15    Q   Do you recall --
16    THE REPORTER:  I'm sorry.  I didn't hear
17  her answer.  I'm sorry.  I didn't hear her answer.
18    MR. FARR:  Okay.
19    A   Well, I -- I don't remember.
20    MR. FARR:  She doesn't remember.
21    Q   Do you recall any documents concerning the
22  United Medigap plan?  Like the policy itself, or
23  your application?  Did you have any of those
24  documents?
25    MR. LANDAU:  Objection.  Asked and

12 (Pages 42 - 45)

1 answered.  Object to the form.
2     A   I simply can't remember, but I gave
3 everything that I had.
4        MR. FARR:  All right.  Well, Kevin, I just
5 note for the record, it sounds like there's
6 something that we have to follow up on.  And have
7 you withheld documents, like the witness is
8 describing, subject to your objections?
9        MR. LANDAU:  I have not withheld any
10 documents.  We've produced everything that Miss
11 Krukas provided to us in response to these document
12 requests.
13     Q   Miss Krukas, when you were finished
14 sending documents to your lawyers, did you review
15 what they produced to us in the case?
16     A   No.
17     Q   Okay.  Do we want to take a break now?
18 I'm about to move into another area.
19     A   Okay.
20        MR. FARR:  If you want one every 45
21 minutes, then I'd like to accommodate you.
22        MR. LANDAU:  Perfect.  Thank you.
23        THE WITNESS:  How long of a break?
24        MR. FARR:  All right.  Is five, ten
25 minutes enough for you?

1        THE WITNESS:  Ten minutes.
2        MR. FARR:  Okay.  Let's do ten minutes.
3        MR. LANDAU:  Great.  Thanks.
4        MR. FARR:  You can take the document down
5 now.
6        THE VIDEOGRAPHER:  We're off the record at
7 9:44.
8        (Whereupon, a short break was taken.)
9        THE VIDEOGRAPHER:  And we're back on the
10 record at 9:55 central.  Thanks.
11     Q   All right.  Welcome back, Miss Krukas.
12        Miss Krukas, in your own words, what is
13 this lawsuit about?
14     A   This lawsuit is about something AARP not
15 disclosing that it receives a commission for the
16 Medicare supplemental plans that, uh, that they have
17 and, uh, misleading people by calling it royalties.
18     Q   So I just want to break that down a little
19 bit.
20        You understand that this case concerns the
21 United Medigap Insurance plan that you purchased,
22 right?
23     A   Correct.
24     Q   Okay.  You say that AARP didn't disclose
25 that it received a commission and misled people by

1 calling it royalties.
2        Why do you believe that, if you do?
3        MR. LANDAU:  Object to the form.
4     A   I believe it because I had no idea that
5 they were collecting any money on it.  I always
6 thought of AARP as a club that negotiates on the
7 behalf of, uh, retired people, of its members.  And,
8 uh, it didn't even occur to me to look anyplace
9 else.  And had I known that they were receiving
10 money for it, I would have then gone and shopped
11 around with other brokers.  I scanned the, uh, the
12 fine print, and royalties would not have meant
13 anything to me.
14     Q   In your -- well, in your own words, do you
15 know what a royalty is?
16        MR. LANDAU:  Object to the form.
17     A   In my mind, a royalty is money paid to an
18 entity for the use of its intellectual property.
19     Q   Right.  And do you have any reason to
20 believe that that's not what the payment that United
21 makes to AARP is?
22        MR. LANDAU:  Object to the form.
23     A   I believe that getting a percentage of the
24 premiums paid is not for intellectual property.
25 The -- the amounts, even though the percentage is

1 the same, the amounts are different based upon the
2 plan that one chooses.  So I chose a, um, a plan
3 that was not the cheapest, and so the amount of
4 money that they were getting paid on my plan was
5 greater than a cheaper plan.  And I would, um, I
6 expect that royalties for intellectual property
7 would be the same.
8        And, uh, I thought of them just
9 negotiating a price, not getting, uh, paid for it.
10 I had no idea that royalties had anything to do
11 with, um, purchasing the plan.
12     Q   Okay.  If I could just go back to what I
13 asked before.
14     A   Uh-huh.
15     Q   You said that you believed that the
16 payment was a commission and not a royalty.
17        What evidence do you have that it was a
18 commission and not a royalty?
19        MR. LANDAU:  Object to the form.  Calls
20 for a legal conclusion.
21     A   To me, a commission is a certain
22 percentage of the -- of the premium paid.
23     Q   And what's that based on?
24     A   What I think.
25     Q   It's just what you think?

1    A   Yeah.
2    Q   Do you have any experience with that in
3 the context of intellectual property licensing?
4    A   No.
5        MR. LANDAU: I object to the form.
6    Q   Okay.  And are you aware that intellectual
7 property licensing frequently involves royalties
8 that are keyed to a percentage of sales?
9        MR. LANDAU: I object to the form.  Lacks
10 foundation.
11   A   No.  I'm just an ordinary consumer.
12   Q   Okay.  Did you do any investigation or
13 study of how intellectual property licenses are
14 negotiated or formed?
15   A   No.
16   Q   Okay.  When did you first learn what you
17 just described?
18   A   A couple of years ago.
19   Q   Can you describe how you came to have this
20 belief?
21       MR. LANDAU: I'm going to -- hold on one
22 second.  To -- to the extent, Miss Krukas, that your
23 knowledge, um, of the particular facts here comes
24 from conversations with counsel, I'm going to
25 instruct you not to answer.  To the extent you have

1 an independent basis, outside of the discussions
2 with counsel, you may answer.
3    A   Okay.  Could you repeat the question then?
4    Q   Sure.  When did you first come to this
5 belief that AARP was charging a commission on your
6 United Medigap plan?
7    A   I came to the belief when I found out that
8 they were receiving money based upon my -- uh, on
9 the -- on the plan that I chose.
10   Q   And when did you find that out?
11   A   A couple of years ago.
12   Q   Was it in connection with your filing this
13 lawsuit?
14       MR. LANDAU: And again, I'm going to
15 instruct the witness -- to the extent the answer
16 requires you to divulge communications, um, I
17 instruct you not to answer.  I think you can answer
18 this question yes or no.  But beyond that, um,
19 particular conversations, I would instruct you not
20 to answer.
21   A   I'm sorry.  Could you repeat the question
22 again?
23   Q   Sure.  Let me ask it to you this way.
24       Did you have this information before you
25 spoke to these attorneys?

1    A   What do you mean "this information"?
2    Q   The information that AARP was allegedly
3 receiving a commission in connection with your
4 United Medigap plan?
5    A   I didn't know that they were receiving any
6 money.
7    Q   So you didn't know about it until you
8 spoke to your attorneys, correct?
9        MR. LANDAU: Object to the form.  And, you
10 know, the way that question is phrased, it would
11 require her to divulge attorney-client privileges.
12       MR. FARR: I don't agree with that.
13   Q   Miss Krukas, prior to speaking to any
14 lawyers, did you know about this alleged commission
15 that you've testified about.
16   A   Okay.  You say "alleged commission."
17 Okay?  Um --
18   Q   Did you know prior to this --
19   A   You know, it's hard -- it's hard to answer
20 it, because I didn't think that they were making any
21 money.  Um, I can say that I -- I found out, uh,
22 that they were making money and -- a couple of years
23 ago, and when I heard about it, I thought of it as a
24 commission.
25   Q   How did you hear about it?

1    A   From my attorneys.
2        MR. LANDAU: Okay.  Hold on.  Hold on one
3 second, because I didn't get to interpose my
4 objection.  I would instruct the witness and --
5 because this is a little difficult here doing this
6 by Zoom.  But to the extent you learned of
7 something, I would not want you to divulge
8 attorney-client communications.  We are not waiving
9 attorney-client communications.
10       MR. FARR: I understand that, Kevin.  But
11 factually, whether she knew something before talking
12 to her attorneys is a yes or no, and I got to it
13 that way.  I don't think she divulged anything.  I'm
14 just asking if she had this information prior to
15 speaking to her attorneys, and she said she learned
16 it from her attorneys.  That's fine.  I'm not going
17 to probe beyond that.
18   Q   So Miss Krukas, just so that we're clear,
19 when you purchased your United Medigap plan
20 originally, um, you're saying you weren't aware of
21 any payment United was making to AARP in connection
22 with that policy?
23   A   Correct.
24   Q   And did you see, at the time you purchased
25 the policy originally, did you see any

14 (Pages 50 - 53)

Page 54

1  advertisements or materials that had that
2  information in it?
3      A   I always scan the fine print.
4      Q   Uh-huh.
5      A   And, uh, I don't recall seeing it, any
6  disclosure about royalties.  Uh, I probably did see
7  it and thought it was not significant and didn't
8  apply to my purchase.
9      Q   Okay.  Um, and -- but you don't have any
10 independent recollection of that one way or the
11 other, right, when you say probably saw it?
12         MR. LANDAU:  Objection.  Asked and
13 answered.
14     Q   Do you remember seeing it, as you sit here
15 today?
16     A   Because I glanced over the fine print,
17 which I always do before signing up for anything.
18     Q   Okay.  But my question's a little
19 different.
20         As you sit here today, do you have a
21 recollection of actually seeing anything that
22 referred to a payment from United to AARP at the
23 time you purchased your Medigap insurance?
24         MR. LANDAU:  Objection.  Asked and
25 answered.

Page 55

1      A   No.
2      Q   So you didn't rely on anything that was
3  said about that in purchasing your insurance; did
4  you?
5      A   No.  I relied on, uh, the way I thought
6  AARP -- the kind of organization that AARP was.
7      Q   Okay.
8      A   The way they promote themselves.
9      Q   Okay.  So why don't we talk about that.
10         Um, what kind of organization, to your
11 knowledge, is AARP or AARP?
12     A   Uh, the word I can best use to describe it
13 would be club.  I pay membership fees, and, um, I
14 get, um, discounts for, um, hotel rooms when we go,
15 uh, on road trips.  Um, we'll get a discount for a
16 hotel room.  Um, I thought it was just an
17 organization that aggregates to people with the
18 purpose of, uh, benefiting them.
19     Q   Okay.  Do you know what its
20 responsibilities are, if any, with regard to the
21 United Medigap insurance that you purchased?
22         MR. LANDAU:  I object to the form of the
23 question.
24     A   What -- Its responsibilities?
25     Q   Yeah.  What role it had, if any, with

Page 56

1  regard to the United Medigap plan that bore its
2  trademark?
3         MR. LANDAU:  I object to the form of the
4  question.
5      A   I didn't think that they had any, uh,
6  responsibility, other than getting a good, uh, uh,
7  deal in the premiums for the huge number of members
8  that they have.
9      Q   Okay.  So you thought that its
10 involvement, if any, was negotiating a positive, uh,
11 premium for its members?
12     A   Yes.
13     Q   Okay.  And, to your knowledge, did they
14 carry out that responsibility and get you a positive
15 premium?
16         MR. LANDAU:  I object to the form.
17     A   I actually don't have any idea because I
18 didn't shop around.
19     Q   Okay.  So when you purchased --
20     A   Or I would have.
21     Q   Okay.  We'll talk about -- let's -- let's
22 talk about that.
23         Did you -- did you shop around before you
24 purchased this United Medigap plan?
25     A   No.

Page 57

1      Q   Um, do you know what AARP Services, Inc.,
2  is?
3         MR. LANDAU:  I object to the form.
4      Q   Do you know --
5      A   Is it just -- as opposed to just AARP?
6      Q   Yes.
7      A   No.
8      Q   Okay.  Do you know what the AARP Insurance
9  Plan is separate and apart from AARP?
10         MR. LANDAU:  I object to the form.
11     A   I don't understand the question.
12     Q   There's an entity that you've sued in this
13 case, Miss Krukas, called the AARP Insurance Plan.
14 It's also a trust.
15         Do you know what that entity is?
16         MR. LANDAU:  I object to the form.
17         MR. FARR:  Okay.
18     Q   Do you know what United Health Insurance
19 is?
20         MR. LANDAU:  I object to the form.
21     A   Yes.
22     Q   What is it?  I'm sorry, just so we're
23 clear, United Healthcare Insurance Company, do you
24 know what that is?
25     A   As opposed to something else?

15 (Pages 54 - 57)

Page 58

1    Q    United Health, do you know what it is?
2    A    United Health Insurance?
3    Q    Yes.
4    A    It's a -- it's an insurance company.
5    Q    Do you know what its role, if any, was
6  with respect to the Medigap plan that you purchased?
7    A    Yeah, it was the insurance company.
8    Q    All right.  So its -- its role in this was
9  to provide the insurance to you, correct?
10    A    Yes.
11    Q    AARP wasn't the insurer.  You understood
12  that, right?
13    A    Yes.
14    Q    Okay.  And did you receive the insurance
15  that you paid for from United Health?
16    A    Yes.
17    Q    You got the coverage that you, uh, paid
18  for; is that right?
19        MR. LANDAU:  I object to the form.
20    A    Yes.
21    Q    Now, you talked a little bit about your
22  attorneys and speaking to your attorneys.  I --
23  don't want to get into the substance of those
24  communications, but how did you become involved in
25  this lawsuit as a Plaintiff?

Page 59

1    A    My son told me that there were, um,
2  attorneys who were investigating AARP and that, uh,
3  they'd like to, uh, speak to, um, people who have,
4  uh, AARP insurance.
5    Q    When did that conversation occur?
6    A    I don't remember.  A few years ago.
7    Q    Did your, uh, son provide you with the
8  contact information for these attorneys?
9    A    I -- I'm not sure whether -- No, I don't
10  think so.  I think that I only said yes, I would
11  speak to them and they contacted me.
12    Q    Okay.  So your son arranged for the
13  communication with, uh, the attorneys involved in
14  this lawsuit?
15    A    I guess so.
16    Q    And at this initial conversation, did you
17  meet with them or did you speak to them by
18  telephone?
19    A    By telephone.
20    Q    Okay.  And what was discussed in that
21  meeting, in that call, before you retained them?
22        MR. LANDAU:  Object.  Um, I'm going to
23  instruct the witness not to answer the question on
24  the grounds of attorney-client privilege.
25        MR. FARR:  Okay.

Page 60

1    Q    Did you have any communications with these
2  lawyers about the investigation, as you called it,
3  of AARP, prior to hiring them as your lawyer?
4        MR. LANDAU:  Wait.  Can I get that
5  question back, please?
6        MR. FARR:  I can do it if you want, but --
7        (Reporter read back as requested.)
8    Q    Prior to hiring them as your attorneys,
9  Miss Krukas, did you have any conversations with
10  these lawyers about their -- what you called
11  investigation of AARP?
12        MR. LANDAU:  I -- I -- I think you're --
13  Alec, I think you're getting into the substance of
14  conversation between attorney and client there, so
15  I'm going to instruct Miss Krukas not to answer.
16        MR. FARR:  Well, I'm asking for
17  conversations before she hired you.
18        MR. LANDAU:  That's -- Yeah.  No.  I'm
19  going to instruct the witness not to answer.
20    Q    In your communication with your son about
21  this investigation of AARP, did your son discuss
22  what they were investigating?
23    A    No.
24    Q    Um, why were you interested in speaking to
25  these attorneys about an investigation, as you

Page 61

1  called it, of AARP?
2    A    I thought it would be interesting.
3    Q    Just interesting to get involved in?
4    A    I wasn't sure I was going to get involved.
5    Q    Okay.  Prior to the conversation you had
6  with the attorneys, did you have any complaints
7  about your United Medigap insurance plan?
8    A    Yes.
9    Q    And what were they?
10    A    Um, it was expensive, and, um, my husband
11  and I decided to see if we could get another plan.
12  And we contacted a broker, and, um, we found out
13  that we could get a much, much better plan and at a
14  much better rate, much cheaper.
15    Q    Other than expense, did you have any
16  complaints about the insurance that United provided?
17    A    No, uh, no.
18    Q    Okay.  And prior to this conversation with
19  the attorneys, did you have any complaints about
20  AARP?
21    A    I thought they were getting very
22  expensive.
23    Q    So you thought their membership fees were
24  getting expensive?  Other than that, did you have --
25    A    No.  No, I thought -- no.  The membership

16 (Pages 58 - 61)

Page 62

1 fees are very reasonable.  Uh, no, I thought that
2 the, uh, the United plan was, uh, getting very
3 expensive.
4    Q   Okay.  Yeah, apart from that, did you have
5 any other complaints about AARP?
6    A   No.
7    Q   Okay.  Are you being compensated in any
8 way for serving as a Plaintiff in this case?
9    A   Not any more than everyone else in the
10 class action suit.
11    Q   Okay.  So you're not receiving any
12 particular specific compensation for your time and
13 appearing today?
14    A   No.
15    Q   Are you receiving any compensation for
16 your expenses in serving as the Plaintiff?
17    A   No.
18    Q   Okay.  Why did you agree to file this
19 lawsuit?  What do you hope to get out of it?
20    A   Satisfaction.  I hope to, uh -- I hope to
21 uh, help the rest of the population know what
22 they're getting when they're, uh, uh, purchasing, uh
23 insurance through AARP.
24    Q   Okay.  Other than personal satisfaction,
25 is there specific relief that you're looking for?

Page 63

1       MR. LANDAU:  I object to the form.  Asked
2 and answered.  Calls for a legal conclusion, but you
3 can answer.
4    A   I have no idea.
5    Q   Okay.  Well, are you looking to get money
6 for yourself in the class out of it?
7    A   Yes.
8    Q   Okay.  What would the -- what moneys are
9 you hoping to get out of it?  Is there an amount in
10 mind, or a form of compensation in mind?
11    A   I think we should be reimbursed.  I don't
12 know what will happen in the lawsuit, um, but I -- I
13 hope that there is reimbursement.
14    Q   So you're looking for a rebate on the
15 insurance premiums that you paid?
16       MR. LANDAU:  I object to the form.  Asked
17 and answered.  Um, you may answer.
18    A   The money is the least important part of
19 this whole thing.  It's mainly satisfaction in doing
20 the right thing.  I think that AARP should do the
21 right thing.
22    Q   And what's the right thing, in your view?
23    A   Disclose that they're getting commissions
24 and stop obfuscating that by calling it royalties.
25    Q   Okay.  Again, why do you think that it's a

Page 64

1 commission and not a royalty?
2    A   Because it depends on every transaction.
3 It's a certain percentage of each transaction, and,
4 uh, each transaction is different than the other.
5    Q   And why, in your view, is that -- does
6 that make it a commission instead of a royalty?
7       MR. LANDAU:  Objection.  Asked and
8 answered.
9    Q   Go ahead.
10    A   That's the way the rest of the industry
11 works.
12    Q   What industry are you talking about?
13    A   Insurance.
14    Q   Okay.  And did you ever work in the
15 insurance industry?
16    A   I audited Metropolitan Life Insurance.
17    Q   Okay.
18    A   I purchase car insurance.  I know that
19 they're getting commissions.  I purchase, um,
20 homeowner's insurance.  I know that there's a
21 commission.  And, uh, the plan that I have now we
22 got through a broker who gets a commission.
23    Q   Is that the -- the sum total of the basis
24 for why you believe that the payment that United is
25 making to AARP is a commission and not a royalty?

Page 65

1       MR. LANDAU:  I object to the form.  Asked
2 and answered.
3    A   You know, that's almost like asking me,
4 uh, what I thought my whole life.  It can't be
5 the -- sum total, okay?
6    Q   Okay.
7    A   That's what I think of as a commission.
8    Q   Right now, as you sit here today.  That's
9 really what I'm trying to get at.
10    A   Okay.  Today, and yesterday, and ten years
11 ago, and 20 years ago, and probably 30, 40 years
12 ago.
13    Q   All right.  Understood.
14       And what, if any, experience have you had
15 with intellectual property royalties prior to this
16 lawsuit?
17       MR. LANDAU:  Objection, asked and
18 answered.
19    A   Okay.  I know that if I watch a movie and
20 they use someone's music, they pay a royalty.
21    Q   Uh-huh.
22    A   That -- that is the extent of my
23 experience with royalties.  Just common everyday
24 kind of occurrences.
25    Q   Okay.  So you don't know, for example,

17 (Pages 62 - 65)

1 whether it's typical for intellectual property to be
2 licensed on a running royalty basis that's a
3 percentage of sales?
4      MR. LANDAU:  I object to the form.  Calls
5 for a legal conclusion.  Lacks foundation.
6      A   I don't know anything technical.  All I
7 know is, uh, what's com -- what's commonly known --
8 or what I think is commonly known and, um -- that's
9 what I think of as commonly known.
10     Q   Okay.  And prior to filing this lawsuit,
11 you -- you didn't do any kind of investigation of
12 what are common royalty practices or anything of
13 that nature; did you?
14     A   No.
15     Q   Okay.  Um -- and I just want to get back
16 to this statement you made before about why you
17 filed this lawsuit and what you hope to get out of
18 it.
19         I understand the part about satisfaction,
20 but you think that there should be a return of some
21 amount of money that you and the class members paid;
22 is that right?
23     A   Yes.
24     Q   Okay.  So you're looking for a rebate on
25 your insurance?

1      MR. LANDAU:  I object to the form.  Asked
2 and answered, and vague as to the term "rebate."
3 Calls for a legal conclusion.  You may answer,
4 though.
5      Q   You can answer.
6      A   I think that some money should be coming
7 back.  I don't know whether I would call it a rebate
8 or, uh, a compensation, or what I would call it.
9 But I think that, uh, yes, I think that, uh, the
10 people in the class action deserve to get some of
11 their money back.
12     Q   Okay.  And in your own words, what do you
13 believe, if anything, that AARP did wrong in
14 connection with the United Medigap plan?
15         MR. LANDAU:  Objection.  Asked and
16 answered, but you may answer again.
17     A   I think that they promote themselves as a,
18 uh, club, basically a club for retired people.  And,
19 uh, because of their huge membership, they can, uh,
20 get all sorts of benefits through the members of the
21 club.  And I think that, uh, by disclosing a
22 royalty, as opposed to a commission, which I think
23 it is, they obfuscate the fact that they're getting
24 a commission.  Because if people knew that they were
25 getting a commission they might have looked

1 elsewhere, which I would have done.
2      Q   Why would you have looked elsewhere?
3      A   Because it would have put them on the same
4 plane as every other broker.
5      Q   Can you elaborate on that?  What do you
6 mean "on the same plane"?
7      A   They would have just been one of many
8 people selling insurance.
9      Q   Do you believe the AARP brand, its name,
10 is valuable?
11     A   Yes.
12     Q   Do you believe that AARP's membership list
13 is valuable?
14     A   Yes.
15     Q   If United were going to use AARP's brand
16 and membership list to market its Medigap policy, do
17 you believe AARP should be paid compensation for
18 that?
19         MR. LANDAU:  Objection.  Lacks foundation.
20 You may answer.
21     A   I think that AARP was the one that was
22 marketing the plans.  I didn't go to United Health.
23 I went to AARP.
24     Q   We'll, let's -- we'll talk about that in a
25 second.  But could you answer my question?

1      If United was using the AARP name in
2 association with its Medigap plan, would you agree
3 that it would be reasonable for it to pay AARP for
4 the use of its name?
5      MR. LANDAU:  Objection.  Lacks foundation.
6 Asked and answered.
7      A   I don't even understand how that would,
8 uh, would happen.
9      Q   Well, you understand that AARP has
10 trademarks like its name, right?
11     A   Yeah.
12     Q   Okay.  And if United were to use those
13 trademarks in association with its Medigap plan,
14 would you agree that it would be reasonable for AARP
15 to charge a fee for that?
16         MR. LANDAU:  Objection.  Asked and
17 answered.
18     A   I don't even know how to -- how to answer
19 that.  It's so hypo -- hypothetical.  Because, in my
20 mind, United wasn't selling anything and using
21 AARP's, uh, name.  AARP was selling and -- and
22 that's who I relied on.  I relied on AARP.  I didn't
23 want the -- necessarily United Health insurance.  I
24 was going after what AARP recommended.
25     Q   Okay.  So the A -- well, let's -- let's

18 (Pages 66 - 69)

Page 70

1 take a step back, though, and it will be the last
2 time I'll go into it. I'll try to make it
3 understandable to you.
4     But you testified that you think the AARP
5 brand is valuable, right?
6     A    Yes.
7     Q    If United, or indeed anybody, putting out
8 a product were to use the AARP brand in connection
9 with that product, would you agree that it would be
10 reasonable for AARP to be paid a fee in connection
11 with that?
12     MR. LANDAU:  Objection. Lacks foundation.
13 Asked and answered. Calls for a legal conclusion.
14 You may answer if you can.
15     A    I don't even know how to answer that.
16     Q    Why not?
17     A    I'm sorry. Because I can't imagine --
18 Okay. It's not that I can't imagine. It's because
19 I haven't seen anybody using the AARP trademark.
20 You know, if I buy, um, which I don't buy, but if I
21 were to buy adult diapers, I wouldn't see AARP's,
22 uh, name on it.
23     Q    Well, you saw the AARP trademark in
24 connection with this Medigap policy, right?
25     A    No. I didn't see the, uh, trademark.

Page 71

1 What I saw was AARP.
2     Q    Well, you saw their name?
3     A    Their website.
4     Q    But you saw their name in connection with
5 it, right?
6     A    Yeah. Yeah. Because it was AARP. I
7 was --
8     Q    And you understood that United was the
9 insurance company, right?
10    A    Yes.
11    Q    And you understood that you paid premiums
12 to United, correct?
13    A    Correct.
14    MR. LANDAU:  Object to the form.
15    Q    And the AARP name was used in connection
16 with that United policy, correct?
17    A    AARP was promoting the, uh, policy.
18    Q    All right. Well, we'll get to whether it
19 was AARP promoting it or United promoting it.
20    But you understood it was a United
21 insurance policy, right?
22    A    Yes.
23    Q    And you understood that the AARP name was
24 used in connection with it, right?
25    A    Yes.

Page 72

1     MR. LANDAU:  Asked and answered.
2 Objection.
3     MR. FARR:  She just answered yes.
4     Q    And so wouldn't it be reasonable for
5 United to pay AARP for the use of its name --
6     MR. LANDAU:  Object to the form.
7     Q    -- in the sale of that insurance policy?
8     A    No.
9     MR. LANDAU:  I object to the form. Lacks
10 foundation. Asked and answered. Calls for a legal
11 conclusion.
12    Q    Why would that be -- did you say no?
13    A    I said no.
14    Q    Why?
15    A    Because AARP was selling the policy. You
16 know? I didn't see -- I don't see United Healthcare
17 promoting its policies by using AARP. I see AARP
18 promoting United Healthcare's policies.
19    Q    Okay. And what's that based on when you
20 say, "I see"?
21    A    It's -- it's based on the -- what I think
22 of as AARP, and what I think is common knowledge.
23 That people think that AARP is there to benefit
24 retired people. That they collect membership fees,
25 and I don't know what else funds, uh, AARP, but that

Page 73

1 their purpose is to get good rates for, uh, their
2 members. And I don't understand. I just don't
3 understand anything, other than the commission being
4 paid to AARP.
5     Q    Okay. So you don't understand one way or
6 the other whether it's a commission or a royalty
7 because you don't really understand how royalties
8 work?
9     A    No.
10    MR. LANDAU:  I object to the form. Asked
11 and answered. Calls for --
12    A    I object to that.
13    Q    Okay.
14    A    I'm saying that as a consumer, not an
15 expert, but as a consumer, I think of AARP as a
16 membership club that benefits its members. And,
17 um -- and it -- it never occurred to me that they
18 would get any payment from United Healthcare. I
19 think that United Healthcare would benefit, you
20 know, by, uh, selling insurance to a huge -- to a
21 group that has a huge number of members, and that
22 would be it.
23    Q    Right. And it would benefit by being able
24 to sell its insurance to that huge large number of
25 members of AARP, right?

19 (Pages 70 - 73)