Page 1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF COLUMBIA
 2
 3    HELEN KRUKAS, ANDREA KUSHIM        )
      And GEORGIA LUKE, on behalf        )
 4    Of themselves and all others       )
      Similarly situated,                )
 5                                       )
              Plaintiffs,                )
 6                                       )
              vs.                        ) No. 18-CV-1124(BAH)
 7                                       )
      AARP, INC., AARP SERVICES,         )
 8    INC., and AARP INSURANCE PLAN,     )
                                         )
 9            Defendants.                )
10         DEPOSITION OF ANDREA KUSHIM, produced, sworn and
11    examined on DECEMBER 10, 2020, between the hours of
12    nine o'clock in the forenoon and five o'clock in the
13    afternoon of that day, via Zoom teleconference, before
14    Jeanne M. Pedrotty, a Certified Court Reporter (MO)
15    and Certified Shorthand Reporter (IL), in a certain
16    cause now pending in the United States District Court,
17    District of Columbia, between HELEN KRUKAS, ANDREA
18    KUSHIM and GEORGIA LUKE, on behalf of themselves and
19    all others similarly situated, Plaintiffs, vs. AARP,
20    INC., AARP SERVICES, INC., and AARP INSURANCE PLAN,
21    Defendants; on behalf of the Defendants.
22
23
24
25
```

Page 2

1  INDEX OF EXAMINATION
2                                    Page
3  Questions by Mr. Farr. . . . . . . . .5
   Questions by Mr. Landau. . . . . . . 102
4
5
      INDEX OF EXHIBITS
6
      Exhibit 1 (notice of deposition)
7     Exhibit 2 (request for production)
      Exhibit 4 (complaint)
8     Exhibit 8 (disclosure)
      Exhibit 11 (application)
9
10
         (The exhibits were marked after the
11  deposition and attached to the transcript.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              APPEARANCES
2
       For the Plaintiffs:
3
          Kevin Landau
4         Brett Cebulash
          Taus, Cebulash & Landau
5         80 Maiden Lane
          New York, NY  10038
6
7      For the Defendants:
8         Alec Farr
          Steve Alagna
9         Bryan Cave Leighton Paisner
          One Metropolitan Square
10        St. Louis, MO  63102
11
12
13
       Also present: Tim Perry, videographer
14
15
16
17
     Court Reporter:
18   Jeanne M. Pedrotty, CCR/CSR
     Missouri CCR #618
19   Illinois CSR #084-003893
     Veritext Legal Solutions
20   515 Olive Street
     St. Louis, Missouri 63101
21   (314) 230-7260
     Www.veritext.com
22
23
24
25

Page 4

1      IT IS HEREBY STIPULATED AND AGREED by and between
2  counsel for the Plaintiffs and counsel for the
3  Defendants that this deposition may be taken in
4  shorthand by Jeanne M. Pedrotty, CCR/CSR, a Certified
5  Court Reporter and Certified Shorthand Reporter, and
6  afterwards transcribed into typewriting; and the
7  signature of the witness is expressly reserved.
8           *   *   *   *   *
9          VIDEOGRAPHER:  Good morning.  We are going
10  on the record at 9:01 a.m. central time on December
11  10th, 2020.  This is media unit one of the video
12  recorded deposition of Andrea Kushim taken by counsel
13  for Defendant in the matter of Helen Krukas, et al
14  versus AARP, Inc., et all, filed in the US District
15  Court, District of Columbia, case number 18-CV-1124.
16  My name is Tim Perry, certified legal video
17  specialist, here today with Jeanne Pedrotty, our
18  certified court reporter.  Counsel, will you identify
19  yourself for the record please?
20          MR. FARR:  Alec Farr on behalf of the
21  Defendants and with me is my colleague Steve Alagna.
22          MR. LANDAU:  Kevin Landau, Taus, Cebulash &
23  Landau on behalf of the Plaintiff.
24          MR. CEBULASH:  Brett Cebulash, Taus,
25  Cebulash & Landau on behalf of Plaintiff.

Page 5

1          VIDEOGRAPHER:  Thank you.  Can we swear in
2  the witness please.
3             ANDREA KUSHIM,
4  of lawful age, produced, sworn and examined on behalf
5  of the DEFENDANTS, deposes and says:
6      (Starting time of the deposition:  9:00)
7             EXAMINATION
8  QUESTIONS BY MR. FARR:
9      Q.  Good morning.  Can you please state your
10  full name for the record please?
11      A.  Andrea Joy Kushim.
12      Q.  Ms. Kushim, where do you  live?
13      A.  Southfield, Michigan.
14      Q.  Can you please provide your full address?
15  [REDACTED]
16
17      Q.  Ms. Kushim, have you ever been deposed
18  before?
19      A.  Yes.
20      Q.  How many times?
21      A.  Once.
22      Q.  Okay.  Well, it sounds as if you have been
23  through the process before, and I'm sure your counsel
24  has talked to you about this, but I'm going to provide
25  you with some ground rules for today's deposition just

Page 6

1  so that we're on the same page.  I'll be asking you a
2  series of questions to which you have to provide
3  answers under oath.  Everything we say is being taken
4  down by the court reporter who is also involved in
5  this Zoom deposition.  Do you understand that?
6      A.  Yes.
7      Q.  Now, it's important while we're going
8  through this process  -- and you have done great so
9  far -- that we avoid talking over one another, even
10 though that's a very common thing to do in ordinary
11 conversation.  Please wait for me to finish my
12 question before providing your answers, and I'll try
13 to do my best to wait for you to finish your answers
14 before I do the next question.  That will make it
15 easier on the court reporter.  Can you do that for me
16 please?
17     A.  Yes.
18     Q.  If at any time you don't understand one of
19 my questions, please let me know and I'll try to
20 accommodate you.  Otherwise, I'll assume that you
21 understood me and I'll take your answers.  So please
22 let me know if you don't understand any of my
23 questions.  Okay?
24     A.  Okay.  Yes.
25     Q.  If at any time you need to break, just let

Page 7

1  me know and I'll attempt to accommodate you.  We'll
2  probably break about once every hour.  Do you
3  understand that the oath you just took is the same
4  oath that you take in court?
5      A.  Yes.
6      Q.  Do you understand that it requires you to
7  tell the truth, the whole truth, and nothing but the
8  truth?
9      A.  Excuse me.  Yes.
10     Q.  You understand penalty of perjury applies
11 if you don't answer my questions fully and truthfully?
12     A.  Yes.
13     Q.  Is there any reason today why you can't
14 answer my questions fully and truthfully?  And by that
15 I mean are you sick, are on you any medication, is
16 there anything that would impair your ability to
17 answer my questions?
18     A.  No.
19     Q.  And there is some additional ground rules
20 and questions I have to ask you because of the unusual
21 nature of the deposition we're taking today on Zoom,
22 is there anyone else in the room with you?
23     A.  No.
24     Q.  If anyone comes into the room at any time
25 -- I see we have a pretty wine angle view, if anybody

Page 8

1  else comes in the room, can you please let me know?
2      A.  Sure; absolutely.
3      Q.  Okay.  Are you looking at anything other
4  than the screen on which the deposition is being
5  conducted?
6      A.  No.
7      Q.  By that I mean are you looking at an iPad,
8  another computer, any notes, or anything like that?
9      A.  No.
10     Q.  Okay.  Unless I instruct you otherwise,
11 please don't do that.  There will be times when I
12 direct you to exhibits or documents, but it's
13 important that I am entitled to just your testimony
14 and no one else.  Okay?
15     A.  Yes.
16     Q.  And also please avoid communicating with
17 anyone else during the deposition.  Will you do that
18 for me please?
19     A.  Yes.
20     Q.  We sent you a binder of documents that will
21 be used as exhibits today.  Did you receive that?
22     A.  Yeah.  It's sitting in a box on the chair
23 behind me.
24     Q.  Okay.  Have you opened it prior to the
25 deposition?

Page 9

1      A.  No, I have not.
2      Q.  Okay.  Could you open it now please?
3          MR. LANDAU:  Alec, while we're doing that I
4  know you went through and said you would be taking
5  breaks periodically and when Ms. Kushim needs it.  Ms.
6  Kushim has not the greatest back, and she might need
7  to stand up periodically to stretch it out in between
8  those breaks just so you know.
9          MR. FARR:  Okay.
10         MR. LANDAU:  I want to let you know that.
11 And to the extent her back is not feeling great, she
12 might request a break even before the hour is up.
13     Q.  (By Mr. Farr) That's fine.  Whatever works
14 for her.  I had back surgery myself.  I'm sympathetic.
15     A.  Okay.  It's a brown folder.
16     Q.  That appears to be it.  Great.  Thank you.
17 Just the binder is all we need.  Thank you.  You
18 mentioned earlier you had been deposed before?
19     A.  Yes.
20     Q.  When was that deposition?
21     A.  Probably at least 30 years ago, yeah, a
22 long time ago.
23     Q.  Understood.  What was that case about?
24     A.  It was in reference to an auto accident.
25     Q.  It was auto accident in which you were

Page 10

1  involved?
2      A.   Yes.
3      Q.   Okay.  And what was the result of that
4  case?
5      A.   God, it's so long ago.  I think it was -- I
6  really don't remember.
7      Q.   Were you the plaintiff or the defendant?
8      A.   Well, I was the one that got hit so, yeah.
9      Q.   You were probably the plaintiff then I
10 would assume?
11     A.   Yeah.
12     Q.   Were you represented by your own lawyer or
13 by an insurance lawyer?
14     A.   God, I really don't remember, that's how
15 long ago it was.
16     Q.   I understand.  So it was roughly about 30
17 years ago you think?
18     A.   At least, if not more to be honest.
19     Q.   Have you given any testimony in any other
20 proceeding?
21         MR. LANDAU:  Object to the form.
22     Q.   (By Mr. Farr)  By that I mean by deposition
23 or in court other than that one case?
24     A.   No other deposition.
25     Q.   Have you ever testified in court in any

Page 11

1  other case?
2      A.   Yes.
3      Q.   When was that?
4      A.   Probably 2009.



Veritext Legal Solutions
www.veritext.com                                                      888-391-3376

Page 34

1  my folder.
2      Q.  Understood.  Is there just one folder or
3  were there multiple folders?
4      A.  I don't know.  However big the folder is,
5  you know, you do filing.  It's just in my folder every
6  month, I put my bills in folders.
7      Q.  Understood.  Did you -- so you didn't look
8  in a computer for responsive documents.  Did you look
9  on any portable computer drives or any other
10 electronic storage devices?
11     A.  No.
12     Q.  Did you look for e-mails?
13     A.  No.
14     Q.  Do you believe you have e-mails from AARP
15 or United Healthcare related to your United Medigap
16 policy?
17     A.  No.
18     Q.  Do you recall receiving any such e-mails in
19 the course of your time as a United Medigap insured?
20     A.  No.
21     Q.  Did you search anywhere else besides your
22 AARP folder for responsive documents?
23     A.  No.
24     Q.  Are there any other places where documents
25 relating to your United Medigap policy or AARP might

Page 35

1  be located?
2      A.  No.  I'm your old type person.  I don't
3  like a loft e-mail stuff.  That's why I have my hard
4  copy folders everywhere.
5      Q.  Okay.  Did you print off any documents you
6  received electronically relating to your United
7  Medigap plan or AARP?
8          MR. LANDAU:  Objection to form.
9          THE WITNESS:  No.
10     Q.  (By Mr. Farr)  Now, your counsel has
11 produced some documents to us, did you review the
12 documents they produced before they were sent?
13         MR. LANDAU: Object to form.
14         THE WITNESS:  Well, document -- if it's
15 copies, I send them obviously I reviewed them?
16     Q.  (By Mr. Farr)  Understood.  After you sent
17 them, do you do anything to verify they produced
18 everything to us that you sent them?
19     A.  No.
20     Q.  Okay.  I wanted to call your attention to a
21 couple of requests.  If you look on Page 7, request
22 number two, it calls for all documents and
23 communication concerning any Medicare supplement
24 policies or coverage in which you have enrolled other
25 than the program.  And the program is defined as the

Page 36

1  United Medigap or med sup program.  Do you have any
2  such documents?  Have you ever had or do you have now
3  any other Medicare supplement policies?
4      A.  No.
5      Q.   So the only Medicare supplement policy you
6  ever had is the United medical supplement policy?
7      A.  Correct.
8      Q.  Correct?
9      A.  Correct.
10     Q.  Okay.  The document requests also call for
11 you on the next page on Page 8 in request number four
12 to produce all marketing materials relating to an AARP
13 Medigap policy.  Do you have any market policies?
14         MR. LANDAU:  Objection; you're referring to
15 request four, Alec?
16         MR. FARR:  Correct.
17         MR. LANDAU:  Object to the form;
18 mischaracterizes the document.
19         THE WITNESS:  Do you mind if I take a real
20 quick break?
21         MR. FARR:  Sure.  We can take a break.  Do
22 you want to take an five-minute break?
23         THE WITNESS:  Yeah.  I'm getting a little
24 squirmy.  I'll leave my screen right and come right
25 back.  Is that what I do?

Page 37

1          MR. FARR:  Yeah.
2          MR. LANDAU: You can hit the mute button,
3  Ms. Kushim.  You can hit the mute button and stop
4  video for now if you want.
5          THE WITNESS:  I'll hit the mute.  I'm only
6  going to be like a minute.
7          VIDEOGRAPHER:  Going off the record at
8  9:41.
9          (Whereupon, a short break was taken.)
10         VIDEOGRAPHER:  We're back on the record at
11 9:47?
12     Q.  (By Mr. Farr)  So Ms. Kushim, we were on
13 Page 8 of Exhibit 2 in the binder?
14     A.  Can you tell me now because  -- what
15 section  -- because where you're reading from, I have
16 like tab seven, but you're on Page 7.
17     Q.  Yeah.  It's tab two.
18     A.  That will help me read along with you.
19     Q.  Understood.  It's also up on the screen,
20 but it's tab two and then on Page 8 of that document
21 actually is where I'd like to draw your attention?
22     A.  Okay.  Got it.
23     Q.  So there is request number four.  And that
24 request is all marketing materials including, but not
25 limited to, advertisement brochures, pamphlets, and

**Page 38**

1 descriptions concerning or related in any way to your
2 decision to purchase an AARP Medigap policy or
3 policies. Did you have any such documents in your
4 AARP folder?
5   A. No.
6   Q. Okay. Do you recall having any other
7 marketing materials at any time about the United
8 Medigap policy that you purchased?
9       MR. LANDAU: Object to the form.
10      THE WITNESS: No.
11  Q. (By Mr. Farr) All right. So you can put
12 that aside, but you will probably refer to it later in
13 the course of the deposition. Ms. Kushim, in your own
14 words, what is this lawsuit about?
15  A. Well, it's about transparency. That's the
16 main thing. I'm making payments for insurance and
17 it's not being honest about where my payment is going.
18  Q. So you say it's about transparency and it's
19 not being honest, what do you mean by that?
20  A. So out of my monthly payment going towards
21 insurance, five percent of it is being taken out of
22 that payment as a commission to AARP. And nowhere
23 does it say that my actual principal payment of the
24 month is actually reduced by five percent. You know,
25 you just make one payment and you think that whole

**Page 39**

1 payment is going toward principal, when in fact it's
2 not.
3   Q. Now, you say it's a commission to AARP.
4 How do you know it's a commission to AARP?
5   A. Well, usually when a percent it used, that
6 usually is how commissions are figured, most places
7 use like percent of whatever to figure a commission.
8   Q. Okay. How do you know that the payment to
9 AARP of, you say, five percent is a commission and not
10 intellectual property royalty?
11      MR. LANDAU: Object to the form; calls for
12 legal conclusion, asked and answered. You can answer.
13      THE WITNESS: Pardon me.
14      MR. LANDAU: You can answer. I just want
15 to state my objection for the record.
16      THE WITNESS: So ask it again please then.
17  Q. (By Mr. Farr) Sure. I'm just trying to
18 understand your testimony about transparency and what
19 you call this five percent commission. How do you
20 know that it's a commission to AARP instead of
21 intellectual property royalty payment?
22      MR. LANDAU: And my objection is again
23 calls for legal conclusion, and it's been asked and
24 answered, but you may answer.
25      THE WITNESS: I mean royalty and commission

**Page 40**

1 are two different things in my head.
2   Q. (By Mr. Farr) What in your head is a
3 royalty?
4   A. In my head it would be just a set amount,
5 somebody gets maybe a flat rate perhaps whereas a
6 commission is based on whatever in a sales price was
7 and then a percent of that sale.
8   Q. All right. And what is your understanding
9 of what a royalty is based on?
10  A. I don't know. Perhaps maybe using
11 someone's name. I really don't know.
12  Q. Okay. Are you aware of how intellectual
13 property royalties are arrived at or paid? You
14 haven't had any experience with that in your
15 professional career; correct?
16      MR. LANDAU: Object to the form; asked and
17 answered, but you may answer. Go ahead.
18      THE WITNESS: I have not had experience.
19  Q. (By Mr. Farr) Are you aware that
20 intellectual property licenses are often set as
21 percentage of sales?
22      MR. LANDAU: Object to the form; lacks
23 foundation. You can answer though.
24      THE WITNESS: I'm not aware.
25  Q. (By Mr. Farr) Have you heard of the term

**Page 41**

1 "running royalty"?
2       MR. LANDAU: Object to the form.
3       THE WITNESS: No.
4   Q. (By Mr. Farr) If it was made clear to you
5 with evidence that intellectual property licenses are
6 also set as a percentage of the price of a product,
7 would that change your view on whether the payment
8 from United to AARP is a royalty or commission?
9       MR. LANDAU: Object to the form.
10      THE WITNESS: Can you say that question
11 again? That was kind of like a lot of words.
12  Q. (By Mr. Farr) Understood. I'll try again.
13 If it were shown to you in the course of this case
14 with evidence that intellectual property licenses,
15 royalties are often set as percentage of sales on a
16 product -- so the intellectual property holder gets
17 a percentage of the sales price -- if that were shown
18 to you, would that change your view whether the
19 payment from United to AARP is royalty or commission?
20      MR. LANDAU: Object to the form; calls for
21 legal conclusion, improper hypothetical, but you can
22 answer, if you can.
23      THE WITNESS: Yeah. I'm not sure how to
24 answer that because you're using the word royalty and
25 not commission. So it's still not being fully

Page 42

1 transparent.
2     Q.  Okay.  In what way was there a lack of
3 transparency in your view?
4     A.  Because you're not saying that a commission
5 is coming out of the principal monthly payment I'm
6 making.
7     Q.  And when did you develop this belief that
8 you are telling me now about lack of transparency?
9     A.  Well, when I first read about all this.
10     Q.  And when did you first read about it?
11     A.  Maybe a year or two ago.
12     Q.  And in what connection did you read about
13 it?
14     A.  Something on the Internet.
15     Q.  What was on the Internet that you read?
16     A.  Oh, God.  Just, you know, the part about
17 commissions coming out of monthly payment.  And it
18 bothered me that why would some company you trust do
19 something like that.  So that's the start of me
20 getting involved.
21     Q.  How did you become involved as a plaintiff
22 in this case?
23     A.  I think there was something in the ad if
24 you want more information or ask legal questions or
25 something, I filled out to get more information and

Page 43

1 here we are.
2     Q.  Okay.  Was it an ad that you saw on the
3 Internet?
4         MR. LANDAU: Object to the form.
5         THE WITNESS: No.
6     Q.  (By Mr. Farr)  What was it?
7     A.  It was an article, just a basic article.
8     Q.  What was the website that you saw it on?
9     A.  I don't remember.  I mean I read news, CNN,
10 you know, I don't have a specific thing that I look at
11 all day.
12     Q.  Well, I understand, but I'm talking about
13 this particular thing that you testified about that
14 brought to your attention what you call this lack of
15 transparency.  Where did you see that?  Was that on
16 some news site?
17         MR. LANDAU: Object to the form.
18         MR. FARR:  Or was it an e-mail you received
19 or what was it?
20         MR. LANDAU:  Object to the form; asked and
21 answered.
22         THE WITNESS:  Something on the Internet I
23 read, just an article about in the business section of
24 whatever that day's news was.  AARP, blah, blah --
25 you know, I'm kind of always digging into more

Page 44

1 information, of course, I want to know.
2     Q.  (By Mr. Farr)  Okay.  Was that before or
3 after you became a plaintiff in this case that you saw
4 that?
5     A.  Obviously before.
6     Q.  Understood, yeah.  And after you saw that,
7 what did you do next?
8     A.  I researched a little further and I wanted
9 to know how I could find out more information about
10 this because it bothered me.
11     Q.  What research did you do?
12     A.  I found the name of the legal firm and sent
13 a note like how I can find out more information.
14     Q.  And what's the name of the legal firm in
15 the article that you read?
16         MR. LANDAU:  Object to the form.
17         THE WITNESS:  I don't remember what the
18 name was.  I just clicked it.  I didn't pay attention.
19 I just wanted more information.
20     Q.  (By Mr. Farr)  So there was something to
21 click to get more information about this lawsuit; is
22 that right?
23         MR. LANDAU:  Object to the form.
24         THE WITNESS:  Something like if you want
25 more information about AARP, the AARP issue, click

Page 45

1 here, you know, it's all -- you know.
2     Q.  (By Mr. Farr)  And what happened when you
3 clicked there?  Did it take you to the law firm's
4 website?
5     A.  I think all I did was fill out my name and
6 contact information and that was it for a while.
7     Q.  Okay.  And did someone from that law firm
8 contact you at that point?
9         MR. LANDAU:  Object to the form, lacks
10 foundation.
11         THE WITNESS:  Yes; eventually.
12     Q.  (By Mr. Farr)  After you filled out your
13 information?
14     A.  Yeah.  Well, eventually that's how I became
15 involved with them.
16     Q.  Okay.  Who contacted you from the law firm?
17     A.  Kevin.
18     Q.  Okay.  So Mr. Landau contacted you.  Did
19 you have a conversation with him about becoming a
20 plaintiff in this case?
21         MR. LANDAU:  Ms. Kushim, you can answer
22 that question yes or no without divulging any of the
23 content of our discussion.
24         THE WITNESS:  Okay.  So, yes, he contacted
25 me.

Page 46

1  Q. (By Mr. Farr) All right. And without
2  getting into the specifics, you had a conversation
3  about potentially becoming a plaintiff in this
4  lawsuit; is that right?
5      MR. LANDAU: Same instruction.
6      THE WITNESS: Yes.
7  Q. (By Mr. Farr) Okay. And how many
8  discussions did you have with Mr. Landau before you
9  decided to become a plaintiff in this case?
10 A. I don't recall.
11 Q. Was it more than one?
12 A. One or two maybe.
13 Q. One or two. Did Mr. Landau show you any
14 materials before you decided to become a plaintiff in
15 this case?
16 A. No.
17 Q. Did he show you any documents?
18 A. No.
19 Q. Did he show you any advertising materials?
20 A. No.
21 Q. Did he show you anything that was evidence
22 of any kind of this lack of transparency that you
23 testified about?
24      MR. LANDAU: Object to the form.
25      THE WITNESS: No.

Page 47

1  Q. (By Mr. Farr) So would it be fair to say
2  that your decision to become a plaintiff in this case
3  was based solely on what Mr. Landau told you?
4      MR. LANDAU: Object to the form;
5  mischaracterizes her testimony, asked and answered.
6  Q. (By Mr. Farr) Would that be fair to say,
7  ma'am?
8  A. Okay, I still --
9  Q. He is going to make a lot of objections and
10 they are going to go on like that, but unless he
11 instructs you not to answer, you have to answer my
12 question.
13 A. I see. I see.
14 Q. I'll ask again and he will object again,
15 and after that you can answer.
16 A. Okay.
17 Q. Would it be fair to say that your decision
18 to become a plaintiff in this case was based upon what
19 about Mr. Landau told you solely?
20      MR. LANDAU: Object to the form; asked and
21 answered, mischaracterizes the testimony, but you may
22 answer.
23      THE WITNESS: Not just on that
24 conversation, no.
25 Q. (By Mr. Farr) What else was it based on?

Page 48

1  A. My own discovery of what I read about. So
2  he just confirmed what I read about that, and that's
3  why I wanted to be involved.
4  Q. What you had read in that one article you
5  saw on the Internet; right?
6  A. Correct.
7  Q. Did you do any other investigation about
8  these claims before agreeing to become a plaintiff in
9  this case?
10 A. No.
11 Q. Did you look at any of the documents, for
12 example, in your AARP file before you agreed to become
13 a plaintiff in this case?
14 A. No.
15 Q. Okay. Did you go out on the Internet and
16 look for any other evidence of this alleged lack of
17 transparency that you testified about before agreeing
18 to become a plaintiff in this case?
19 A. No.
20 Q. Prior to seeing that article on the
21 Internet and your conversation with Mr. Landau, did
22 you have any complaints about your United Medigap
23 insurance?
24 A. No.
25 Q. Did you have any complaints about AARP in

Page 49

1  any way?
2  A. No.
3  Q. Did you know Mr. Landau or Mr. Cebulash
4  before you made that phone call?
5  A. No.
6  Q. Did you have any connection with that law
7  firm prior to making that phone call?
8  A. No.
9  Q. Are you being compensated in any way for
10 your service as a class plaintiff?
11 A. No.
12 Q. Are you being paid for your time, for
13 example, to appear today?
14 A. No.
15 Q. Are you having any of your expenses covered
16 by the lawyers?
17 A. No.
18 Q. I take it you understand what AARP is. But
19 in your own words, what is it?
20 A. It's a company that is for us old people
21 that should be trusted. And I always thought was
22 trusted to go to guide us in the right direction about
23 everything.
24 Q. Do you know what, if anything, its
25 responsibilities are with regard to the United Medigap

Page 50

```
 1  policy that you purchased?
 2          MR. LANDAU:  Object to the form.
 3          THE WITNESS:  I don't know its specific
 4  responsibilities.
 5      Q.  (By Mr. Farr)  Okay.  Do you know what its
 6  function is with respect to that United Medigap
 7  insurance?
 8          MR. LANDAU:  Object to the form.
 9          THE WITNESS:  I imagine it's being like an
10  agent.
11      Q.  (By Mr. Farr)  Okay.  You say you imagine
12  it's like being an agent; an agent of whom?
13      A.  I'm imaging AARP as being an agent for
14  United.
15      Q.  What is that belief based on?
16      A.  Well, because the payments are made to AARP
17  and AARP is making the payment for the insurance.  So
18  I mean like you sign up with AARP and then that's who
19  you signed up with.  So they are like the agent.
20      Q.  So you understand they are -- AARP is in
21  some way collecting your premium and then paying that
22  premium over to United; is that right?
23          MR. LANDAU:  Objection; asked and answered.
24      Q.  (By Mr. Farr)  Is that what you mean by
25  "agent"?  I'm just trying to understand your
```

Page 51

```
 1  testimony.
 2      A.  That's the way I believe I understand it.
 3      Q.  Okay.  And what's that based on -- that
 4  understanding?
 5      A.  Just when I see the monthly payment came
 6  out of my checkbook, I believe it's listed as AARP,
 7  you know.  AARP -- United Health.  I think it lists
 8  both of them, so that's how I based it.
 9      Q.  Okay.  Do you know what AARP Services,
10  Inc., is as opposed to AARP, Inc.?
11      A.  Oh --
12          MR. LANDAU: Object to form.
13          THE WITNESS:  No difference.
14      Q.  (By Mr. Farr)  And so I take it -- have you
15  ever heard that name before today, before I asked you
16  that question?
17      A.  I just know of AARP.  I didn't know there
18  is one services or one's that Inc.  I just know it's
19  AARP.
20      Q.  Do you know what AARP Trust is?
21      A.  No.
22      Q.  Okay.  Do you know what United Health Group
23  is?
24      A.  Well, United Health Group --
25      Q.  United Health Insurance, United Group, do
```

Page 52

```
 1  you know those entities?
 2          MR. LANDAU:  Which one?  You were pretty
 3  specific before, Alec.  Do you want to drill down on
 4  specific entities?
 5          MR. FARR:  We can go from the general to
 6  specific.
 7          MR. LANDAU:  Okay.
 8          MR. FARR:  It's not going to make a
 9  difference?
10          MR. LANDAU: Okay.
11          THE WITNESS:  Mine is United Healthcare.
12      Q.   (By Mr. Farr)  Right.
13      A.   And you're saying group, so I don't want to
14  answer wrong.
15      Q.   I understand.  Let's start with United
16  Healthcare.  Are you familiar with United Healthcare
17  Insurance Company?
18      A.   Yes.
19      Q.   Do you know what its role is with respect
20  to your Medigap policy?
21      A.   Well, yeah, it covers the gap.
22      Q.   Right.  Understood.  They are the insurer;
23  you understand that; correct?
24      A.   Correct.
25      Q.   Why did you file or -- strike that.  Why
```

Page 53

```
 1  did you agree to be a plaintiff in this lawsuit?  What
 2  do you hope to get out of it?
 3      A.   I just -- I'm not looking to get anything
 4  out of it.  I just want people to be transparent about
 5  -- a trusted company like this should be more
 6  transparent.  People need to know, you know.  That's
 7  what it's all about.  They just need to let people
 8  know what they are really doing.  It's not right that
 9  it hidden.  That gets me angry.
10      Q.   What in your view is hidden?
11      A.   The part about the five percent that you
12  guys are taking and nobody seems to know about that.
13  All these people who trust that company, it's
14  disappointing.
15      Q.   Do you recall prior to your signing up for
16  your United Health policy that's endorsed by AARP and
17  bears its name?  Do you recall seeing anything in any
18  of the materials that talked about the royalty being
19  paid by United to AARP for the use of its intellectual
20  property?
21      A.   There was the word "royalty" was used in
22  the paragraphs when I would get my annual, you know,
23  sheet of what my payment would be for the next year,
24  but it never mentioned anything about commission.
25      Q.   Okay.  Let me turn your attention -- so I
```

| Page 54 | Page 56 |
|---|---|
| 1 understand your testimony, let me turn your attention<br>2 to tab eight in the binder. And we'll make this<br>3 Kushim Exhibit 8. This is a September 9, 2017<br>4 document to you from United Healthcare Insurance<br>5 Company. And at the bottom -- and I believe this<br>6 might have been what you're referring to. It has<br>7 disclosing United Healthcare Insurance pays royalty<br>8 fees to AARP for use of its intellectual property.<br>9 These fees are used for general purposes of AARP. Is<br>10 that the kind of disclosure that you're talking about?<br>11     A.  Yes.<br>12     Q.  And do you believe this disclosure is<br>13 misleading in some way?<br>14     A.  It's not complete. It's only partial<br>15 disclosure. So you're reading about royalties, but<br>16 it's still not saying anything about five percent.<br>17     Q.  And if it had said something about five<br>18 percent, would that have altered your decision to<br>19 continue to be an insured with United. If it had said<br>20 United Healthcare Insurance Company pays five percent<br>21 royalty fee to AARP for use of its intellectual<br>22 property, would that have made a difference to you?<br>23         MR. LANDAU: Object to the form.<br>24         THE WITNESS: Possibly it might have.<br>25     Q.  (By Mr. Farr)  But you don't know as you | 1 this, this was the one I chose because it was the best<br>2 of the possible option at that time, and I'm not one<br>3 to sit down and go through stuff and have to redo it<br>4 every year. I like something, I like to stay there.<br>5 I don't like change.<br>6     Q.  (By Mr. Farr)  Understood. So you haven't<br>7 investigated -- just so I'm clear, you haven't<br>8 investigated at any time whether there are other<br>9 policies available in your area that are cheaper or<br>10 better than AARP branded United Medigap policy?<br>11         MR. LANDAU: Object to the form; asked and<br>12 answered.<br>13         THE WITNESS: No.<br>14     Q.  (By Mr. Farr)  I just want to go back to<br>15 this disclosure that's in Exhibit 8. Do you recall<br>16 seeing language like this in any marketing materials<br>17 or any documents before you signed up with United<br>18 Medigap?<br>19         MR. LANDAU: Object to the form; asked and<br>20 answered.<br>21         THE WITNESS: Are you talking about that<br>22 note at the bottom about royalty?<br>23     Q.  (By Mr. Farr)  Yes.<br>24     A.  Okay. So have I seen that anywhere else;<br>25 is that what you're asking? |

| Page 55 | Page 57 |
|---|---|
| 1 sit here today if it would have made a difference?<br>2         MR. LANDAU: Object to form.<br>3         THE WITNESS: When I look at other things<br>4 to compare.<br>5     Q.  (By Mr. Okay.  Did you ever look at other<br>6 things to compare?<br>7     A.  No.<br>8     Q.  Okay. Even today knowing what you say you<br>9 know and making these allegations, have you looked at<br>10 other insurance providers for Medigap, to potentially<br>11 switch from United?<br>12     A.  No.<br>13     Q.  So you have done nothing to investigate<br>14 whether there are other policies that you could switch<br>15 to not withstanding these allegations that you are<br>16 making in this case; is that right?<br>17         MR. LANDAU: Object to form.<br>18         THE WITNESS: Well, I'm happy with my<br>19 medical policy. I'm not happy with AARP.<br>20     Q.  (By Mr. Farr)  Okay. So you haven't done<br>21 anything to investigate whether there are other<br>22 policies that are cheaper or better as you sit here<br>23 today?<br>24         MR. LANDAU: Object to the form.<br>25         THE WITNESS: When I first signed up for | 1     Q.  What I'm asking is prior to you signing up<br>2 for United Medigap, do you recall seeing any<br>3 disclosure like that?<br>4         MR. LANDAU: Objection to form.<br>5         THE WITNESS: No.<br>6     Q.  (By Mr. Farr)  So no language like this,<br>7 but United Healthcare pays royalty fees to AARP. You<br>8 don't recall seeing any of that before you signed up?<br>9     A.  Correct.<br>10     Q.  So no language like that played any role in<br>11 your decision to sign up for United Medigap; is that<br>12 right?<br>13         MR. LANDAU: Object to the form.<br>14         THE WITNESS: No. I was happy with what I<br>15 chose.<br>16     Q.  (By Mr. Farr)  Right.  We'll get to that in<br>17 a minute, but I want to focus on this. You say on<br>18 Exhibit 8 this is incomplete.  How is it incomplete?<br>19         MR. LANDAU: Objection; asked and answered.<br>20         THE WITNESS: It's not putting down a<br>21 paragraph. You forgot the next sentence that says by<br>22 the way, we take five percent.<br>23     Q.  (By Mr. Farr)  Well, in that statement who<br>24 is the "we" and who is the five percent being paid by?<br>25 I'm trying to understand your testimony that it's |

Page 58

1  incomplete?
2      A.  So we is AARP are taking an additional five
3  percent out of your principal payment you pay to us,
4  but we're not telling you that just now.  So that's
5  what's missing.
6      Q.  Okay.  And so what is the basis for your
7  statement that it is an additional five percent?
8          MR. LANDAU:  Object to the form.
9          THE WITNESS:  Out of, let's say, $200
10  payment for conversation, pays out of that two hundred
11  bucks, the health is not getting the full two hundred.
12  They are getting five percent taken out of that, and
13  what does that come up to -- 190?  I don't have my
14  head on at the moment.  So they are not getting full
15  $200 I sent, just using that figure.  So, yes, they
16  are getting five percent less than what I gave them,
17  and it's not telling you that.  Just tell me that.
18  Just be open and honest.  We wouldn't be here then.
19      Q.  Well, I'm just trying to understand.  You
20  believe that United is getting less than your
21  hypothetical $200.  Do you believe that's happening
22  against United's will in some way or are they agreeing
23  to pay AARP that five percent?
24          MR. LANDAU:  Object to the form; lacks
25  foundation.

Page 59

1          THE WITNESS:  AARP must be taking that five
2  percent and only sending the difference to the
3  insurance company.
4      Q.  (By Mr. Farr)  What is that based on,
5  ma'am?  Is that just based on what your lawyers have
6  told you, or is that based on anything else?  I'm
7  trying to understand the basis for your testimony.
8          MR. LANDAU:  Object to the form.
9          THE WITNESS:  That's where I read the
10  article where this all came to be.
11      Q.  (By Mr. Farr)  Okay.  So your understanding
12  of how this is working and that this disclosure in
13  Exhibit 8 is incomplete is just based on that article
14  and what your lawyers have told you; is that right?
15          MR. LANDAU:  Objection; asked and answered.
16          THE WITNESS:  Yes.  It's just what I read
17  about.
18      Q.  (By Mr. Farr)  If the evidence showed that
19  United agreed to pay AARP for the use of its
20  intellectual property from the money that you are
21  paying as premium, would that make any difference to
22  you?
23          MR. LANDAU:  Objection; asked and answered.
24          THE WITNESS:  Isn't that what they are
25  trying to do by saying the part about the royalties?

Page 60

1  I mean they are still -- why are they so afraid to use
2  the word "commission"?
3      Q.  (By Mr. Farr)  Well, ma'am, I'll tell you.
4  Because they don't think it is commission, and that's
5  what this lawsuit is about.  So what is the basis for
6  your statement that it's commission?
7          MR. LANDAU:  Object; asked and answered.
8          THE WITNESS:  Because we're back to that
9  five percent figure, five percent is a commission.
10      Q.  (By Mr. Farr)  Is that the sole basis for
11  your understanding that it's commission; that it's a
12  percentage?
13          MR. LANDAU:  Objection; asked and answered.
14          THE WITNESS:  That's usually how
15  commissions are based on a percent.
16      Q.  (By Mr. Farr)  Right.  Are you aware in
17  your life of any other payments -- contracts that are
18  based on percentage that are not "commissions"?
19          MR. LANDAU:  Object to the form.
20          THE WITNESS:  I'm only aware of commission
21  sales.  I don't know.
22      Q.  (By Mr. Farr)  Do you believe as you sit
23  here that United healthcare is not aware of the
24  payment that it's making to AARP for the use of its
25  intellectual property?

Page 61

1          MR. LANDAU: Object to the form.
2          THE WITNESS:  They may be aware.  I don't
3  know.
4      Q.  (By Mr. Farr)  If they are aware  -- if
5  United is aware and has agreed to make this payment,
6  why does it make any difference to you how United pays
7  the money it receives in premiums?
8      A.  Because if you go to an agency and you put
9  you're trust in them agency being AARP, and then you
10  find out afterwards that they are taking and
11  withholding something from you, you lose trust in
12  them.  All I'm asking is to be honest about it.
13  Whatever those two have going between themselves,
14  that's not the issue.  It's I put my trust in AARP to
15  guide me in the right direction and they haven't.
16      Q.  If it had said  -- well, strike that.  If I
17  understand your testimony, you don't recall seeing
18  anything about the payment before you signed up;
19  correct?
20          MR. LANDAU: Object to the form.
21          THE WITNESS:  Correct.  Just giving a
22  monthly payment, boom, that's what your monthly
23  payment is.  I didn't know it would be dissected.
24      Q.  (By Mr. Farr)  Understood.  Well, you
25  haven't done any investigation about where any of the

Page 62

1  money that's part of that premium goes to at all, have
2  you?
3       MR. LANDAU: Objection; asked and answered.
4       THE WITNESS: No.
5       Q. (By Mr. Farr) And why does it make any
6  difference to you how United pays the money that it
7  receives as a premium from you and other insureds?
8       MR. LANDAU: Object to the form; lacks
9  foundation, asked and answered.
10      THE WITNESS: They just need to tell me
11 where the money is going. I do bookkeeping. I'm very
12 detailed. I want to know this much goes for here,
13 this much goes for there, and at the end the whole
14 thing is your total. That's the way I see it.
15      Q. (By Mr. Farr) Okay. And if it had said in
16 this disclosure that you received on September 9,
17 2017, United Healthcare pays five percent in
18 commission to AARP for the use of its intellectual
19 property, would that have made any difference to you?
20      A. It may have. At least they were being
21 honest and give me something to think about. And I
22 might have something I want to compare to somebody
23 else.
24      Q. As you sit here today, you don't know what
25 you would have done under those circumstances?

Page 63

1       MR. LANDAU: Object to the form; asked and
2  answered.
3       THE WITNESS: I don't know what I did
4  yesterday. I can't tell you what I would have thought
5  about them.
6       Q. (By Mr. Farr) Okay. Understood. I asked
7  you earlier what do you hope to get out of this
8  lawsuit. Do you hope to get a rebate on the insurance
9  premium that you are paying?
10      MR. LANDAU: Object to the form; calls for
11 legal conclusion, but you may answer.
12      THE WITNESS: I'm not looking to get
13 anything other than clarity, other than them being
14 open and honest about what they are doing. That's all
15 I'm really looking for; just honesty.
16      Q. (By Mr. Farr) Are you looking for a
17 reduced rate on your health insurance?
18      MR. LANDAU: Objection to the form; calls
19 for legal conclusion. You can answer.
20      THE WITNESS: I have no idea what to
21 expect. I'm not asking for anything. If and when
22 something happens, I just consider myself like
23 everybody else in this, you know, thing. I'm no
24 different and whatever is decided, I'm one of the rest
25 of the class. I'm not looking for anything over and

Page 64

1  above or special.
2       Q. (By Mr. Farr) I understand that I'm asking
3  what do you as class plaintiff hope to obtain for the
4  plaintiffs. Are you hoping to obtain a reduce premium
5  for United Medigap insurance?
6       MR. LANDAU: Object to the form; calls for
7  legal conclusion. You can answer.
8       THE WITNESS: We can all hope for
9  something, but I don't know -- I can't tell you what
10 I really hope for. I don't know what I'm hoping for.
11 I just hope they get straight and just be honest.
12 That's really all I'm hoping for at the moment and
13 we'll see what happens next. Sure if they want to
14 reduce something, who wouldn't take a reduced rate. I
15 just want honesty?
16      Q. Okay. I take it from your testimony
17 before, but correct me if I'm wrong, I believe you
18 said that you are happy with your insurance coverage
19 at United Medigap plan; is that right?
20      A. Yes.
21      Q. So you don't contend in this lawsuit that
22 United or AARP didn't deliver the insurance that you
23 contracted for; is that right?
24      MR. LANDAU: Object to the form, compound.
25 You can answer.

Page 65

1       THE WITNESS: No complaint.
2       Q. (By Mr. Farr) Okay. So you have no
3  complaint that United didn't deliver the insurance you
4  contracted for; is that right?
5       A. Right.
6       Q. And you don't have any complaints with AARP
7  about the insurance you contracted for, the coverage
8  and so forth; right?
9       MR. LANDAU: Object to the form.
10      THE WITNESS: Right.
11      Q. (By Mr. Farr) So you always received the
12 insurance that you thought you were getting; correct?
13      A. Yes.
14      Q. Okay. Do you believe in your own words
15 that United did something wrong?
16      A. Not United.
17      Q. All right. Do you believe in your own
18 words that AARP did something wrong?
19      A. Yes.
20      Q. What did AARP do wrong?
21      A. They did not disclose the five percent that
22 they are taking.
23      Q. Okay. So if I understand you correctly,
24 your complaint is that the exact number of the
25 percentage wasn't disclosed in documents like Exhibit