## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| HELEN KRUKAS, ANDREA KUSHIM, and GEORGIA LUKE, on behalf of themselves and all others similarly situated, | Civil Action No.: 1:18-cv-01124-BAH |
| Plaintiffs, | Chief Judge Beryl A. Howell |
| v. | |
| AARP, INC.; AARP SERVICES INC.; and AARP INSURANCE PLAN, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................... 1

II.     EVIDENCE COMMON TO THE CLASS AND PROCEDURAL HISTORY ........................... 2

    A.   Evidence common to the class ...................................................................... 2

        1.   AARP promotes itself as a healthcare advocate for seniors. ........................ 2

        2.   Defendants solicit Medigap insurance ........................................................ 3

        3.   Defendants collect a commission for their insurance solicitation. ............... 9

        4.   Defendants never disclose that they retain 4.95% of the class's Medigap payments for themselves. ........................................................................ 9

        5.   Defendants' behavior injured Plaintiffs and the class. .............................. 10

    B.   Procedural History ..................................................................................... 10

III.    ARGUMENT ...................................................................................................... 11

    A.   The class—which consists of AARP Medigap enrollees—is ascertainable. ......... 11

    B.   The proposed class satisfies Rule 23(a). ...................................................... 12

        1.   The class—which consists of millions of members—satisfies numerosity .......... 12

        2.   Common questions exist ......................................................................... 13

        3.   Plaintiffs' claims are typical of the class's claims ..................................... 14

        4.   Plaintiffs and their counsel satisfy adequacy ............................................ 15

    C.   The proposed class satisfies Rule 23(b)(3) .................................................. 16

        1.   Predominance ........................................................................................ 17

            a)   *CPPA* ........................................................................................... 18

            b)   *Unjust enrichment* ...................................................................... 26

            c)   *Conversion* .................................................................................. 30

            d)   *Fraudulent omission* ................................................................... 32

        2.   Superiority ............................................................................................ 33

IV.    CONCLUSION ................................................................................................... 35

# TABLE OF AUTHORITIES

PAGE(S)

<u>Cases</u>

*Adler v. Vision Lab Telecomms., Inc.*,
   393 F. Supp. 2d 35 (D.D.C. 2005) ..................................................................... 22, 23

*Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Pompeo*,
   334 F.R.D. 449 (D.D.C. 2020) ................................................................................. 12

*Alliota v. Gruenberg*,
   237 F.R.D. 4 (D.D.C.2006) ...................................................................................... 34

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997) .......................................................................................... 17, 34

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ................................................................................................ 17

*Atwater v. D.C. Dep't of Consumer & Regulatory Affairs*,
   566 A.2d 462 (D.C. 1989) ...................................................................................... 19

*Barnes v. District of Columbia*,
   242 F.R.D. 113 (D.D.C.2007)................................................................................. 34

*Brown v. Pro Football, Inc.*,
   146 F.R.D. 1 (D.D.C. 1992).................................................................................... 26

*Butler v. Sears Roebuck and Co.*,
   727 F.3d 796 (7th Cir. 2013) ................................................................................. 23

*Ceccone v. Equifax Info. Servs. LLC*,
   No. 13-CV-1314 KBJ, 2016 WL 5107202 (D.D.C. Aug. 29, 2016) ...................... 17

*CGC Holding Co., LLC v. Broad & Cassel*,
   773 F.3d 1076 (10th Cir. 2014) ........................................................................ 24, 33

*Chisolm v. TranSouth Fin. Corp.*,
   194 F.R.D. 538 (E.D. Va. 2000) ............................................................................ 24

*City of Goodlettsville v. Priceline.com, Inc.*,
   267 F.R.D. 523 (M.D. Tenn. 2010) ....................................................................... 31

*Coleman through Bunn v. D.C.*,
   306 F.R.D. 68 (D.D.C. 2015) ........................................................................ 13, 26

*Cty. of Monroe, Fla. v. Priceline.com, Inc.*,
   265 F.R.D. 659 (S.D. Fla. 2010) .......................................................................... 31

*Dist. Cablevision Ltd. P'ship v. Bassin*,
   828 A.2d 714 (D.C. 2003) ....................................................................... 19, 20, 23

*Djourabchi v. Self*,
   571 F. Supp. 2d 41 (D.D.C. 2008) ...................................................................... 19

*Edwards v. Safeway, Inc.*,
   216 A.3d 17 (D.C. 2019) ..................................................................................... 32

*Euclid St., LLC v. D.C. Water & Sewer Auth.*,
   41 A.3d 453 (D.C. 2012) ..................................................................................... 26

*Falconi-Sachs v. LPF Senate Square, LLC*,
   142 A.3d 550 (D.C. 2016) ................................................................................... 26

*Fed. Trade Comm'n v. Sperry & Hutchinson Co.*,
   405 U.S. 233 (1972) ............................................................................................. 18

*Ford v. Chartone, Inc.*,
   908 A.2d 72 (D.C. 2006) ..................................................................................... 24

*Frankeny v. Dist. Hosp. Partners, LP*,
   225 A.3d 999 (D.C. 2020) ................................................................................... 25

*Garnett v. Zeilinger*,
   301 F. Supp. 3d 199 (D.D.C. 2018) .................................................................... 15

*Grayson v. AT & T Corp.*,
   15 A.3d 219 ......................................................................................................... 23

*Hall v. District of Columbia*,
   867 F.3d 138 (D.C. Cir. 2017) ............................................................................ 30

*Hardy v. District of Columbia.*,
   283 F.R.D. 20 (D.D.C. 2012) .............................................................................. 26

*Harris v. Koenig*,
   271 F.R.D. 383 (D.D.C. 2010) ...................................................................... 13, 15

*Howard v. Liquidity Servs. Inc.*,
  322 F.R.D. 103 (D.D.C. 2017)............................................................ 13, 14, 15, 17

*Hoyte v. District of Columbia*,
  325 F.R.D. 485 (D.D.C. 2017)................................................................. 12, 14, 15

*In re Adobe Sys. Privacy Litig.*,
  66 F. Supp. 3d 1197 (N.D. Cal. 2014) ............................................................. 19

*In re APA Assessment Fee Litig.*,
  311 F.R.D. 8 (D.D.C. 2015)........................................................................ 24, 34

*In re APA Assessment Fee Litig.*,
  766 F.3d 39 (D.C. Cir. 2014) ............................................................................ 27

*In re Dial Complete Mktg. & Sales Practices Litig.*,
  312 F.R.D. 36 (D.N.H. 2015) ............................................................................ 14

*In re LivingSocial Marketing & Sales Practice Litigation*
  298 F.R.D. 1 (D.D.C. 2013) ........................................................................ 28, 29

*In re McCormick & Co., Inc.*,
  No. 19-8003, 2019 WL 7602224 (D.C. Cir. Sept. 20, 2019)............................. 12

*In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*,
  422 F. Supp. 3d 194 (D.D.C. 2019) ............................................................ 11, 12

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
  325 F.R.D. 136 (D.S.C. 2018) ........................................................................... 31

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013)............................................................................... 24

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001)........................................................................ 26, 35

*J.D. v. Azar*,
  925 F.3d 1291 (D.D.C. 2019) ............................................................................ 11

*Jeffries v. Volume Servs. Am.*,
  928 F.3d 1059 (D.C. Cir. 2019)......................................................................... 25

*Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*,
  870 A.2d 58 (D.C. 2005) .................................................................................. 27

*Krukas v. AARP, Inc.*,
   376 F. Supp. 3d 1 (D.D.C. 2019) ........................................................... *passim*

*Krukas v. AARP, Inc.*,
   458 F. Supp. 3d 1 (D.D.C. 2020) ................................................................ 10

*Mason v. Rostad*,
   476 A.2d 662 (D.C. 1984) ........................................................................... 32

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
   552 F.3d 47 (1st Cir. 2009) ........................................................................ 18

*Mattiaccio v. DHA Grp., Inc.*,
   474 F. Supp. 3d 231 (D.D.C. 2020) ........................................................... 25

*McCarthy v. Kleindienst*,
   741 F.2d 1406 (D.C. Cir. 1984) ................................................................. 26

*Minter v. Wells Fargo Bank, N.A.*,
   274 F.R.D. 525 (D. Md. 2011) ................................................................... 33

*Peart v. D.C. Hous. Auth.*,
   972 A.2d 810 (D.C. 2009) .......................................................................... 30

*Peterson v. H & R Block Tax Servs., Inc.*,
   174 F.R.D. 78 (N.D. Ill. 1997) ............................................................ 24, 33

*Radosti v. Envision EMI, LLC*,
   717 F. Supp. 2d 37 (D.D.C. 2010) ............................................................. 33

*Ramirez v. U.S. Immigration & Customs*,
   *Enf't*, 338 F. Supp. 3d 1 (D.D.C. 2018) .................................................... 11

*Reyes v. Sessions*,
   342 F. Supp. 3d, 141 (D.D.C. 2018) .......................................................... 18

*Rohrer v. Knudson*,
   203 P.3d 759 (Mont. 2009) ........................................................................ 18

*Saucier v. Countrywide Home Loans*,
   64 A.3d 428 (D.C. 2013) ............................................................................ 21

*Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory Sch.*,
   514 A.2d 1152 (D.C. 1986) ........................................................................ 22

*Snowder v. District of Columbia,*
    949 A.2d 590 (D.C. 2008) ........................................................................... 22

*Spegele v. USAA Life Ins. Co.,*
    No. 5:17-CV-00967-OLG, 2020 WL 6342075 (W.D. Tex. Sept. 23, 2020) .......................... 31

*Stanich v. Travelers Indem. Co.,*
    249 F.R.D. 506 (N.D. Ohio 2008) ........................................................... 33

*Sundberg v. TTR Realty, LLC,*
    109 A.3d 1123 (D.C. 2015) ........................................................................ 22

*Torres v. S.G.E. Mgmt., L.L.C.,*
    838 F.3d 629 (5th Cir. 2016) ................................................................. 24

*Trustees of Univ. of D.C. v. Vossoughi,*
    963 A.2d 1162 (D.C. 2009) ....................................................................... 32

*Tyson Foods, Inc. v. Bouaphakeo,*
    136 S. Ct. 1036 (2016) ............................................................................. 17

*Velcoff v. MedStar Health, Inc.,*
    186 A.3d 823 (D.C. 2018) ......................................................................... 19

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ................................................................................. 13

*Wash. Gas Light Co. v. Pub. Serv. Comm'n of D.C.,*
    61 A.3d 662 (D.C. 2013) ........................................................................... 32

*Wells v. Allstate Ins. Co.,*
    210 F.R.D. 1 (D.D.C. 2002) ..................................................................... 21

*Youngblood v. Linebarger Googan Blair & Sampson, LLP,*
    No. 10-2304, 2012 WL 4597990 (W.D. Tenn. Sept. 30, 2012) .................................. 27, 30, 31

*Youngblood v. Linebarger Googan Blair & Sampson, LLP,*
    826 F. Supp. 2d 179 (D.D.C. 2011) ....................................................... 27

## Statutes

D.C. Code Ann. § 28-3905(k)(1)(A) ..................................................... 19
D.C. Code Ann. § 31-1131.02(17) ......................................................... 3
D.C. Code Ann. § 31-1131.02(16) ......................................................... 8
D.C. Code § 28-3904(e), (f) ................................................................. 21
D.C. Code § 28-3904(a) ....................................................................... 21

D.C. Code § 28-3901(a)(3) .................................................................................. 22

DC ST § 31-2502.31 .......................................................................................... 19

Rules

D.C. Circuit. Rule 23 ........................................................................................ 11

FED. R. CIV. P. 23(a)(1) ...................................................................................... 12

FED. R. CIV. P. 23(a)(2) ...................................................................................... 13

FED. R. CIV. P. 23(a)(3) ...................................................................................... 14

FED. R. CIV. P. 23(a)(4) ...................................................................................... 15

FED. R. CIV. P. 23(b)(3) ................................................................................ *passim*

FED. R. CIV. P. 23(c)(1)(B) ................................................................................. 16

FED. R. CIV. P. 23(g) .......................................................................................... 16

FED. R. CIV. P. 23(g)(1)(A)(i)–(iv) ..................................................................... 16

FED. R. CIV. P. 23(g)(1)(B) ................................................................................. 16

Other Authorities

Restatement (Third) of Restitution & Unjust Enrichment § 6 ...................................... 27

Restatement (Third) of Restitution and Unjust Enrichment § 43 ................................ 28

## I.   INTRODUCTION:

Plaintiffs Helen Krukas and Andrea Kushim ("Plaintiffs") respectfully move the Court to certify a class of all persons in the United States who purchased or renewed an AARP Medigap Policy between January 1, 2011, and the present.

Defendants AARP ("AARP") and AARP Services Inc. ("ASI") market AARP as an unbiased advocate for seniors[1] and the nation's "largest nonprofit, nonpartisan organization dedicated to empowering people" over the age of 50.[2] It encourages its members to take advantage of benefits like AARP's magazine and newsletter, discounts on dining and travel, continuing-education programs, and the opportunity to enroll in AARP Medigap—insurance that protects against losses that traditional Medicare doesn't cover, and which is underwritten by UnitedHealth Insurance Group ("United"). But unlike other AARP benefits, if a member purchases AARP Medigap, then they must pay Defendants an undisclosed fee, every month, for as long as the member remains enrolled in AARP Medigap. Specifically, Defendants failed to disclose—as a matter of corporate policy—that they retain 4.95% of the class members' insurance payments as an illegal commission, before forwarding the remainder on to United, as premiums.

The conduct at issue has already been subject to two motions to dismiss. The four claims upheld by the Court—violations of the CPPA, conversion, unjust enrichment, and fraudulent omission—are all well-suited for class treatment. At the heart of these claims are several key, common issues: whether Defendants solicited its members to purchase AARP Medigap

---

[1] AARP and ASI, together with AARP Insurance Plan (the "AARP Trust"), are collectively referred to herein as "Defendants."

[2] Declaration of Jason S. Rathod in Support of Plaintiffs' Class-Certification Motion, Ex. 1, AARP, *Fact Sheet* at 1.

insurance, without a license; whether Defendants received a commission for their part in the transaction; whether Defendants concealed the size of the commission, and the fact that the class would pay for it; and whether Defendants' conduct injured Plaintiffs and the class. As discussed in more detail below, resolution of these issues does not vary from class member to class member, and Plaintiffs have already identified evidence that will help prove their case on a classwide basis. Plaintiffs therefore satisfy all of Rule 23's criteria and, respectfully, the Court should grant Plaintiffs' motion for class certification.

## II. EVIDENCE COMMON TO THE CLASS AND PROCEDURAL HISTORY:

### A. Evidence common to the class:

#### 1. AARP promotes itself as a healthcare advocate for seniors.

AARP—with its 38 million members—is the nation's "largest nonprofit, nonpartisan organization dedicated to empowering people" over the age of 50.[3] AARP publishes a magazine and newsletter for its members; lobbies on their behalf; and provides them with continuing-education programs, among other things.[4] AARP also holds itself out as a healthcare advisor; i.e., a  In conjunction with this healthcare-advisor role, AARP also offers its members AARP Medigap—a supplemental health insurance plan ("SHIP") underwritten by United, and which protects against

---

[3] Ex. 1, AARP, *Fact Sheet* at 1.

[4] *Id.* at 2.

[5] Ex. 2, AARP_KRUKAS_0029951 at slide 11.

[6] *Id.* at slide 57.

[7] Ex. 3, AARP_KRUKAS_0019736 at slide 14.

healthcare costs that traditional Medicare won't cover. Defendants do not, however, disclose to members the extent of their financial stake in AARP Medigap. Today, AARP's revenues from this product exceeds ████████ a year, ████████████████████████████████████

████████████████████████ [8]

### 2. Defendants solicit Medigap insurance.

AARP's reliance on insurance revenues has, in turn, incentivized AARP to blur the line between a nonprofit advocate and a for-profit insurance solicitor; i.e., AARP "ask[s] or urg[es] [its members] to apply for a particular kind of insurance from a particular company." D.C. CODE ANN. § 31-1131.02(17). In the late 1990s, the IRS accused AARP of getting paid to market Medigap insurance (among other things), and of not paying taxes on that revenue.[9] AARP's workaround was to create a taxable, for-profit subsidiary, ASI, to receive a fee for carrying on all insurance-related activities formerly conducted by AARP, including Medigap solicitation efforts (such as Medigap marketing), while allowing AARP to continue collecting "royalty" income tax-free.[10] Defendants' solicitation efforts have since expanded, and today Defendants solicit and sell insurance in at least three respects:

---

[8] *See* Ex. A, Declaration of Gregory Pinsonneault ¶ 96; First Amended Complaint ¶ 37, Nov. 27, 2019, ECF No. 40 ("FAC").

[9] Ex. 4, AARP_KRUKAS_0000586 at '586–87 (AARP noting that the IRS accused it, among other things, of receiving a royalty in exchange for "████████" insurance products); Ex. 5, AARP_KRUKAS_0093834 at slide 19 (noting that, in the wake of the IRS settlement, ASI was charged with "████████" AARP-branded insurance products).

[10] *See* Ex. 6, UNITED_KRU_0035143 at '155 (noting that ASI will "████████████████████████████████████████); Ex. 7, AARP_KRUKAS_0000642 at '645–46 (listing the soliciting activities that ASI would perform); Ex. 8, AARP_KRUKAS_0000685 at '685 (noting that ASI would be performing "████████████████" to support AARP-branded insurance products); Ex. 5, AARP_KRUKAS_0093834 at slide 19 (noting that, in the wake of the IRS settlement, ASI was charged with "████████" AARP-branded insurance products).

*First*, Defendants directly solicit AARP Medigap. United and Defendants' stated goal is to ███████████████████████████████████████[11] when selling AARP Medigap. Indeed, AARP Medigap marketing materials—which AARP owns[12]—were intended to give the impression that *AARP* was soliciting insurance, not United. Among other things, Medigap marketing materials prominently feature the "AARP" logo; never clearly indicate that the communications are coming from United; and explicitly state that they are, in fact, "a solicitation of insurance."[13] Members are also able to enroll in AARP Medigap via www.aarphealthcare.com or (today) www.aarpmedicaresupplement.com,[14] and the product is referred to as *AARP* Medigap—not United Medigap. AARP even vetoed United marketing campaigns that ████████ ██████████████████████████████████████████████[15]

Moreover, AARP leverages its image as a trusted healthcare advisor and advocate for seniors in order to boost the efficacy of its ads, and to recommend AARP-branded Medigap to its members, which drives Medigap sales. AARP recognizes that Medigap policies are typically a ██████████ or ████████████ product, but that its involvement makes AARP Medigap a ██████-based product, which distinguishes it from its competitors.[16] This is because AARP holds

---

[11] Ex. 9, AARP_KRUKAS_0091814 at '821; *see also* Ex. 10, AARP_KRUKAS_0057838 at '838 ████████████████████████████████████████████████████████

[12] Ex. 11, AARP_KRUKAS_0159645 at '711.

[13] *See, e.g.*, Ex. 12, AARP_KRUKAS_0000220; Ex. 13, AARP_KRUKAS_0000263; Ex. 14, AARP_KRUKAS_0000271; FAC ¶ 56 (citing web advertisements).

[14] Ex. 51, UNITED_KRU_0070728 at '731.

[15] Ex. 18, AARP_KRUKAS_0045732 at '734.

[16] Ex. 19, AARP_KRUKAS_0139885 at '885; *see also* Ex. 20, AARP_KRUKAS_0017989 at '992 ██████████████████████████████████████████████████████████████ ████████████; Ex.    , AARP_KRUKAS_0046746 at '748, '753 (same); Ex.    , AARP_KRUKAS_0028522 at '523 (same).

itself out as a trusted, objective healthcare advisor, whose goal is to guide its members through the process of selecting a Medigap plan[17] (a reputation made possible, in part, by AARP's decision to conceal its financial stake in AARP Medigap (see below)). And AARP has been successful: not only does AARP understand that it "████████████████████████████ ████████████,"[18] and as a "████████" and "██████" to its members,[19] but AARP was in fact able to leverage and monetize this trust in order to sell AARP Medigap.[20]

─────────────────

[17] Ex. 23, AARP_KRUKAS_0090934 at '934, '935 (AARP's "Communication Architecture Strategy" is to ████████████████████████████████████████ ██████████"); Ex.   , AARP_KRUKAS_0055397 (████████████████████ ████████████████████████████); Ex.   , AARP_KRUKAS_0045732 at '733, '737 (according to ASI's Vice President of Health Products & Services, "████████████████████████████████████ ██████████."); Ex   , AARP_KRUKAS_0151890 at '890 (██████████████ ████████████████████████████████████████ ████████████████████████████"); Ex.   , AARP_KRUKAS_0151442 at '455 (AARP actively sought for ████████████████ ████████████████████████████ ████████████").

[18] See Ex. 2, AARP_KRUKAS_0029951 at slide 11 (AARP ██████████████ ████████████████████");   at slide 5 (AARP would continue emphasizing its role as a ██████████████ to its members, in order to sell more AARP Medigap policies); Ex.   , AARP_KRUKAS_0028668 at '699 (AARP recognizing that it "████ ████████████████"); Ex.   , AARP_KRUKAS_0019736 at slide 14 (AARP recognizing that it is ████████████████); Ex.   , AARP_KRUKAS_0019776 at '782 (AARP recognizing that it has a "████████████████████████"); Ex. 29, AARP_KRUKAS_0019968 at '986 (AARP describing its mission, in part, as "████████████████████ ████████████████").

[19] Ex. 2, AARP_KRUKAS_0029951 at slide 5.

[20] See Ex. 28, AARP_KRUKAS_0019776 at '794 (according to AARP, it could "████████ ████████████████████████" in order to sell insurance products); Ex.   ,

Further, ASI is intimately involved in all AARP-branded Medigap marketing. ASI must

████████████████████████████████████████████████████████;[21] █████████████████████

█████████████;[22] conducts analyses designed to "████████████████████████████

███████████████████████████████████," and "███████████████████████████

███████████████████████████";[23] ██████████████████████████████████████

████████████████████████ (who sell AARP Medigap directly to consumers);[24] and

███████████████████████████████████████████████████████████

███████[25] And as noted by ASI, all of these efforts were in fact intended to "████████████████

███████████████████████████████████,"[26] i.e., to help sell or solicit insurance, which is

precisely what ASI was created to do.

---

AARP_KRUKAS_0114287 at '287 (AARP leveraged its "███████████████████████████
███████████████████████████████████████████); Ex.    , AARP_KRUKAS_0098750 at
'762 (describing AARP as "██████████████████████████████████████████████
████████").

[21] *See, e.g.*, Ex. 31, AARP_KRUKAS_0098750 at '791 (████████████████████████████
██████████████████████"); Ex. 32, AARP_KRUKAS_0047556 at '565
(AARP–     –United contract describing ████████████████████████████████
██████████████████████"); Ex.    , AARP_KRUKAS_0018935 at '935 ("██████████████████
██████████████████████"); Ex.    , AARP_KRUKAS_0036870 at '883−85, '895 (discussing
ASI's marketing efforts).

[22] Ex. 35, AARP_KRUKAS_0022462 ("████████████████████████████████████████
████████████████████████████████")

[23] Ex. 36, AARP_KRUKAS_0033984.

[24] Ex. 32, AARP_KRUKAS_0047556 at '568 (AARP−ASI−United contract describing ████████
████████████████); *see also* Ex. 34, AARP_KRUKAS_0036870 at '877.

[25] *See* Ex. 37, AARP_KRUKAS_0020783 at slide 4; Ex. 38, AARP_KRUKAS_0031814 (ASI's
annual "████████████████████████").

[26] Ex. 39, AARP_KRUKAS_0037170 at '172.

*Second*, Defendants administer and oversee the AARP Medigap program, generally. ASI



[29]

In addition, as noted by Plaintiffs' expert, Holly Blanchard—a senior-level insurance

regulator for over 16 years, as well as the co-founder and president of "Regulatory Insurance

Advisors," a consulting firm that provides expert regulatory insurance-consulting services to

governmental entities and insurance carriers" (Ex. B, Expert Report of Holly L. Blanchard ¶¶ 3–

11)—AARP's and ASI's activities constituted insurance solicitation, as that term is commonly

used and understood in the insurance industry (*id.* ¶¶ 16–38).

---

[27] *See, e.g.*, Ex. 40, AARP_KRUKAS_0017635 (listing ASI's deliverables); Ex. 42, AARP_KRUKAS_0020777 (same); Ex. 42, AARP_KRUKAS_0046999 (same).

[28] *See* Ex. 43, AARP_KRUKAS_0037327; *see also* Ex. 44, AARP_KRUKAS_0021526 at slide 62; Ex. 45, AARP_KRUKAS_0034083.

[29] *See, e.g.*, Ex. 46, AARP_KRUKAS_0020282 at '284; Ex. 47, AARP_KRUKAS_0033945; Ex. 40, AARP_KRUKAS_0017635.

*Third*, Defendants collect and remit premium payments on behalf of United. As indicated in the graphic below, the AARP Trust—in addition to helping set Medigap rates, among other things—collects all monthly Medigap payments from AARP members; deducts 4.95% from those payments; funnels that 4.95% to AARP (a portion of which is then diverted to ASI); and passes the remainder of the payment on to United, as a premium:[30]



In other words, the AARP Trust helps "exchange a contract of insurance . . . for money or its equivalent, on behalf of an insurance company," i.e., on behalf of United. D.C. CODE ANN. § 31-1131.02(16). (Ex. B, Blanchard Rep. ¶¶ 23, 25, 31, 35.)

---

[30] The displayed chart is taken from Ex. 48, AARP_KRUKAS_0018026 at '045.

### 3. Defendants collect a commission for their insurance solicitation.

Further, the class funds Defendants' solicitation efforts with the 4.95% that Defendants withhold from the class's Medigap payments. As noted by Ms. Blanchard, the payment has all the earmarks of a commission, including that it varies according to premium amounts, and is contingent on the successful sale of insurance. (Ex. B, Blanchard Rep. ¶ 36.)[31]

### 4. Defendants never disclose that they retain 4.95% of the class's Medigap payments for themselves.

Defendants conceal the fact that they retain 4.95% of the class's Medigap payments for themselves. In fact, as a matter of company policy, Defendants keep the precise terms of AARP's royalty confidential and will not disclose the amount of the "royalty," in deference to United.[32] With regard to this charge, AARP's solicitation materials, letters to prospective consumers, billing statements, renewal letters, and the AARP Medigap website (among other things) just note that "UnitedHealthcare Insurance Company pays royalty fees to AARP for the use of its intellectual property. These fees are used for the general purposes of AARP."[33] The AARP Medigap application form itself, which every class member must fill out, says nothing about a royalty at all, let alone that AARP will retain 4.95% of each insurance payment.[34] None

---

[31] Several documents also explicitly note that a portion of the 4.95% pays the ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆." Ex. 49, AARP_KRUKAS_0046633 at '633; Ex.   , AARP_KRUKAS_0160442, at '553.

[32] Ex. 53, Deposition of John Larew at 179:6–182:14, Nov. 5, 2020.

[33] *See, e.g.*, Ex. 13, AARP_KRUKAS_0000263 at '264 (AARP Medigap enrollment-request form); Ex. 51, UNITED_KRU_0070728 at '744 ("Guide to AARP Medicare Supplement Insurance"); Ex. 14, AARP_KRUKAS_0000271 (AARP Medigap advertisement); Ex. 54, KRUKAS000348 (AARP Medigap renewal letter and rate information, mailed to Plaintiff Kushim); AARP / MEDICARE SUPPLEMENT FROM UNITEDHEALTHCARE, https://www.aarpmedicaresupplement.com/?WT.mc_id=VS2 (last visited Dec. 17, 2020).

[34] Ex. 51, UNITED_KRU_0070728 at '731–38.

of these materials inform class members (1) that Defendants' "royalty" is in fact an illegal

"commission"; (2) that—regardless of whether it's labeled a commission or a royalty—insureds

would be the ones paying this charge; or (3) that the charge would be 4.95% of the class's

payments (i.e., Defendants never disclose the size of the charge).

     **5.  Defendants' behavior injured Plaintiffs and the class.**

Plaintiffs and the class purchased AARP Medigap insurance and, as a result of

Defendants' conduct, paid Defendants' a 4.95% commission out of their monthly Medigap

payments.

**B.  Procedural History:**

Plaintiff Krukas filed the original complaint in this litigation on May 10, 2018, asserting

four causes of action: violations of the CPPA, unjust enrichment, conversion, and fraudulent

omission. (ECF No. 1.) Defendants moved to dismiss on July 31, 2018 (ECF No. 8), but the

Court denied that motion in its entirety; holding, in the process—and after a choice-of-law

analysis—that D.C. law applied to Plaintiff's claims, *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1,

27–32 (D.D.C. 2019) (ECF Nos. 27 and 28). Several months later, Plaintiff amended her

complaint to (1) add Plaintiff Kushim[35] and (2) add factual allegations in support of a breach-of-

fiduciary duty claim. (ECF No. 40.) Defendants moved to dismiss that new claim on January 13,

2020 (ECF No. 42), and the Court granted that motion on May 6, 2020, *Krukas v. AARP, Inc.*,

458 F. Supp. 3d 1 (D.D.C. 2020) (ECF Nos. 50 and 51). Accordingly, the four claims from

Plaintiffs original complaint are the only ones at issue here, and they form the basis for

Plaintiffs' class-certification motion.

---

[35] The FAC also added Georgia Luke, who will be withdrawing from this case.

### III. ARGUMENT:

Plaintiffs respectfully move the Court for class certification under Federal Rule of Civil Procedure 23(b)(3), which asks Plaintiffs to show—by a preponderance of the evidence[36]—(1) that the proposed class is ascertainable (to the extent D.C. courts recognize this requirement); (2) that the class satisfies Rule 23(a)'s certification requirements (numerosity, commonality, typicality, and adequacy); and (3) that the class satisfies Rule 23(b)(3)'s two certification requirements (predominance and superiority).

Here, Plaintiffs are moving to certify the following class:

> All persons in the United States who purchased or renewed an AARP Medigap Policy between January 1, 2011, and the present. This class definition excludes the judge or magistrate assigned to this case; Defendants; any entity in which Defendants have a controlling interest; and Defendants' officers, directors, legal representatives, successors, and assigns.

As noted below, this class satisfies each of Rule 23's prerequisites, in large part because the predominant issues in this case—e.g., whether Defendants systematically charged the class an undisclosed and illegal commission—are common questions, making a class action possible, preferable, and appropriate.

### A. The class—which consists of AARP Medigap enrollees—is ascertainable.

First, the class is ascertainable, to whatever extent this is a valid requirement in the D.C. Circuit. "Rule 23 does not expressly require that a class be 'ascertainable,' and the D.C. Circuit 'has not addressed whether Rule 23 contains an ascertainability requirement[.]'" *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 422 F. Supp. 3d 194, 241 (D.D.C. 2019) (quoting *J.D. v. Azar*, 925 F.3d 1291, 1320 (D.D.C. 2019)), *leave to appeal*

---

[36] *Ramirez v. U.S. Immigration & Customs Enf't*, 338 F. Supp. 3d 1, 43 (D.D.C. 2018).

*denied sub nom. In re McCormick & Co., Inc.*, No. 19-8003, 2019 WL 7602224 (D.C. Cir. Sept. 20, 2019); *see also Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Pompeo*, 334 F.R.D. 449, 464 (D.D.C. 2020) (it's unclear whether plaintiffs "must demonstrate ascertainability"). And even if ascertainability is a requirement, D.C. courts have rejected ascertainability's administrative-feasibility prong, so plaintiffs would just need to show that the class definition renders potential class members identifiable according to objective criteria. *McCormick*, 422 F. Supp. 3d at 241−43.

In any event, the class here is both objectively defined and administratively feasible. All persons who "purchased . . . an AARP Medigap Policy between January 1, 2011, and the present" is an objective definition, and class members are easily identifiable by using United's records, which note who paid a Medigap premium during the relevant time period.[37] *See Hoyte v. District of Columbia*, 325 F.R.D. 485, 493 (D.D.C. 2017) ("[T]he class is ascertainable because Plaintiffs have shown that MPD has the names and addresses of the [class members]."). The class is therefore ascertainable.

**B.  The proposed class satisfies Rule 23(a).**

The class also satisfies Rule 23(a), which establishes four prerequisites to a class action: numerosity, commonality, typicality, and adequacy.

### 1.  The class—which consists of millions of members—satisfies numerosity.

First, "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). As a rule, any class consisting of 40 or more members is sufficiently numerous,

---

[37] *See, e.g.*, Ex. 55, UNITED_KRU_0000001 (records maintained by United that contain AARP Medigap members' addresses and payment histories); Ex. 56, AARP_KRUKAS_0073706 (same).

but courts have certified classes as small as 34 members. *Coleman through Bunn v. D.C.*, 306 F.R.D. 68, 76, 82 (D.D.C. 2015). Here, based on Defendants' periodic reports, there are millions of members in the proposed class, making joinder of all members impracticable.[38]

### 2. Common questions exist.

Second, Plaintiffs satisfy commonality, i.e., they identify at least one "question[ ] of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As explained by the Supreme Court, a common question is one that is "capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And because "even a single common question will do," *id.* at 359, commonality is typically considered a "low bar," *Harris v. Koenig*, 271 F.R.D. 383, 389 (D.D.C. 2010) (quotation marks omitted). A class is also particularly likely to satisfy commonality where it challenges a "generally applicable policy or practice," *Coleman*, 306 F.R.D. at 82, such as where a defendant allegedly "misrepresented and/or omitted material facts" to a class, *Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 118 (D.D.C. 2017) (Howell, Chief J.).

Here, a number of the questions underlying Plaintiffs' claims are capable of classwide resolution using common evidence. These include:

- whether Defendants solicits, markets or sells insurance without a license (which Plaintiffs can prove with evidence that Defendant helped design and disseminate AARP Medigap advertising, among other things, without being licensed in D.C. (*see* Section II(A)(2), *supra*));

---



[38] Ex. 57, AARP_KRUKAS_0004364 December (2015 SHIP Program Report showing ██████████████████████████████████████████); Ex. 58, AARP_KRUKAS_0004382 (December 2017 SHIP Program Report showing █████████████ ██████████████████████████████████████); Ex. 59, AARP_KRUKAS_0124555 (September 2018 SHIP Program Report showing █████████████████████████████ █████████████).

- whether Defendants received a commission, service fee, brokerage fee, or other valuable consideration in exchange for selling, soliciting, or negotiating Medigap insurance (*see* Section II(A)(3), *supra*);

- whether Defendants acted as merchants under the CPPA (which Plaintiffs can prove with evidence that Defendants repeatedly described Medigap as a profit source and were actively involved in the design of the insurance product, among other things (*see* pp. 22–23 *infra*));

- whether it would be unjust or inequitable to allow Defendants to retain the 4.95% charge; and

- whether AARP's misstatements and omissions would have misled a reasonable consumer (detailed above, Defendants had a policy to never disclosed the 4.95% throughout the Class Period (*see* Section II(A)(4), *supra*)).[39]

Plaintiffs therefore satisfy commonality.

### 3.  Plaintiffs' claims are typical of the class's claims.

Next, the class must satisfy typicality: that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). A class satisfies typicality if "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Howard*, 322 F.R.D. at 118 (internal citations omitted). The facts and claims of each named representative need not be identical to those of the absent class members; rather, "typicality refers to the nature of the claims of the representative," not the individual characteristics of the plaintiff. *Hoyte*, 325 F.R.D. at 493.

---

[39] *See In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 60 n.12 (D.N.H. 2015) (overruling defendant's objections to class certification because "the exact language [defendant] used to promote [the product] was modified over the years does not alter the fact that the message [defendant] conveyed about [the product] was uniform and consistent").

Here, proof of Plaintiffs' and class members' claims will require the same evidence. Plaintiffs and the class all purchased AARP Medigap; all paid the undisclosed commission to Defendants; and all suffered the same injury based on the same legal theories. Plaintiffs therefore satisfy typicality.

### 4. Plaintiffs and their counsel satisfy adequacy.

The final Rule 23 requirement is adequacy: that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The D.C. Circuit recognizes two criteria for determining adequacy: (1) that the named plaintiffs "must not have antagonistic or conflicting interests with the unnamed members of the class" and (2) that the named representatives "must appear able to vigorously prosecute the interests of the class through qualified counsel." *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 210 (D.D.C. 2018) (quoting *Hoyte*, 325 F.R.D. at 490).

Here, the named plaintiffs have produced documents, sat for depositions, and testified that they are willing to protect the class's interests. *See, e.g.*, Ex. 60, Krukas Tr. 62:18–63:24, 131:19–132:6; Ex. 61, Kushim Tr. 52:25–53:14; 61:8–15; 63:6–64:15. Further, Plaintiffs are aware of the facts of this case. *See, e.g.*, Ex. 60, Krukas Tr. 47:12-49:13; 55:5-58:13; 67:6-68:23; Ex. 61, Kushim Tr. 38:11–39:2, 42:2–6; 58:6–18. That is sufficient to make them adequate representatives. *See Garnett*, 301 F. Supp. 3d at 211; *Howard*, 322 F.R.D. at 135.

Nevertheless, "the qualifications of class counsel are generally more important in determining adequacy than those of the class representatives." *Harris*, 271 F.R.D. at 392. As discussed in more detail in the attached Firm Resumes (Exs. 62–65), proposed Co-Lead Class Counsel are experienced; have the required resources to litigate this case; have spent many hours

investigating and litigating this case; and possess adequate qualifications to protect the interests of the class. Thus, the Plaintiffs and their counsel are adequate.

In addition, pursuant to Federal Rule of Civil Procedure 23(g), Plaintiffs are also seeking the appointment of the firms of Taus, Cebulash & Landau, LLP and Gustafson Gluek PLLC as co-lead class counsel; and Migliaccio & Rathod LLP and Scott Hirsch Law Group, PLLC as class counsel. Upon certifying the class, the Court must also appoint class counsel. FED. R. CIV. P. 23(c)(1)(B), (g). Rule 23(g) requires the Court to consider the following four factors:

1. the work counsel has done in identifying or investigating potential claims in the action;

2. counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

3. counsel's knowledge of the applicable law; and

4. the resources that counsel will commit to representing the class.

FED. R. CIV. P. 23(g)(1)(A)(i)–(iv). The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(1)(B).

Here, again, counsel (1) has identified and investigated the claims at issue in this action; (2) have several decades worth of collective class-action experience; (3) are familiar with the applicable law and defended the claims at issue here from a motion to dismiss; and (4) have the necessary resources to continue litigating this action. (*See* Exs. 62–65.) Plaintiffs therefore respectfully request that the Court appoint the above-named firms as co-lead class counsel and class counsel.

**C.  The proposed class satisfies Rule 23(b)(3).**

Next, because Plaintiffs are moving for certification under Rule 23(b)(3), they have to show (1) that the common issues identified above predominate over any individual issues, and (2) that proceeding as a class would be superior to proceeding with numerous individual actions. As noted below, the proposed class satisfies both requirements.

### 1. Predominance:

At its core, predominance asks whether a case's common issues—when weighted by their collective significance—outweigh any individual issues, rendering the class "sufficiently cohesive to warrant adjudication by representation." *Howard*, 322 F.R.D. at 136 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). In other words, Plaintiffs don't need to show that each element of their claims is susceptible to common proof, or that no individual questions will arise during the litigation—just that common questions are either more central or more numerous than any individual questions. *Id.* Or, as noted by this Court:

> To demonstrate that common issues predominate over individualized issues, a plaintiff need not "prove that each element of his claim is susceptible to classwide proof." Rather, . . . . [t]he predominance inquiry turns on "whether the common, aggregation-enabling, issues in the case are *more prevalent or important* than the non-common, aggregation-defeating, individual issues."

*Id.* (emphasis in original) (quoting, respectively, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (internal quotation marks omitted), and *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). Because of this, courts "routinely find that common questions . . . predominate in the context of consumer challenges to standardized practices." *Ceccone v. Equifax Info. Servs. LLC*, No. 13-CV-1314 KBJ, 2016 WL 5107202, at *7 (D.D.C. Aug. 29, 2016) (citing cases). This includes the Supreme Court, which described certain consumer-protection claims as prototypical class claims; i.e., that predominance is "readily met in certain cases alleging consumer . . . fraud." *Amchem*, 521 U.S. at 625.

Here too, common issues predominate with respect to Plaintiffs' four causes of action, each of which challenges Defendants standardized practices, e.g., collecting an undisclosed and illegal commission from the class. For example:

    a) ***CPPA*:**

Plaintiffs will rely on common evidence to establish Defendants' liability under the CPPA, which has three elements, each of which raises classwide issues: (1) whether Defendants committed an unfair or deceptive trade practice; (2) whether Defendants did so in connection with trade or commerce; and (3) whether Defendants' conduct injured the class. (*See* Ex. 66, Standardized Civil Jury Instructions for the CPPA – Misrepresentations.) More specifically:

***Unfair or deceptive trade practice.*** Plaintiffs will use classwide evidence to show that Defendants violated the CPPA's unfairness prong. Plaintiffs may prove that Defendant engaged in unfair conduct by showing that Defendant's practices: (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers.[40] *See Reyes v. Sessions*, 342 F. Supp. 3d, 141, 150 (D.D.C. 2018) ("[I]t is impossible to frame definitions which embrace all unfair practices [because t]here is no limit to human inventiveness in this field." (*citing Fed. Trade Comm'n v. Sperry & Hutchinson Co*., 405 U.S. 233 (1972) (discussing Section 5 of the FTCA))). The unfairness test is holistic, not disjunctive. *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir. 2009). Courts have described unfair practices as conduct tethered to a general public policy and "comparable"

---

[40] The CPPA was only recently amended to add a claim for unfairness, so there is little caselaw on the question in this jurisdiction. But Plaintiffs submit that this test is widely accepted under similar consumer protections in other jurisdictions and should be applied here. *See, e.g.*, *Rohrer v. Knudson*, 203 P.3d 759, 763–64 (Mont. 2009) (in a question of first impression, surveying different states' laws and adopting this test over others because of "abundant precedent in other jurisdictions").

to a violation of law, *see In re Adobe Sys. Privacy Litig.*, 66 F. Supp. 3d 1197, 1227 (N.D. Cal. 2014) (articulating a similar test under California law). Plaintiffs can also premise CPPA violations on "a trade practice in violation of a law of the District." D.C. Code Ann. § 28-3905(k)(1)(A). As noted by D.C.'s Court of Appeals, acts deemed unlawful under other D.C. statutes are actionable under the CPPA:

> Although § 28–3904 makes a host of consumer trade practices unlawful, its list of such practices was not designed to be exclusive. The remainder of the statute obviously contemplates that procedures and sanctions provided by the Act will be used to enforce trade practices made unlawful by other statutes.

*Atwater v. D.C. Dep't of Consumer & Regulatory Affairs*, 566 A.2d 462, 466 (D.C. 1989); *see also Velcoff v. MedStar Health, Inc.*, 186 A.3d 823, 826 (D.C. 2018) (assuming that violations of D.C.'s Mental Health Information Act could also violate the CPPA). This includes where a defendant imposes an otherwise unlawful fee on a consumer, such as where a District law precludes the defendant from collecting the fee without being properly licensed. *See Djourabchi v. Self*, 571 F. Supp. 2d 41, 53 (D.D.C. 2008) (granting summary judgment); *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 725 (D.C. 2003) ("Accepting the full . . . fee as an imposition on consumers that was void and unenforceable under the common law of the District of Columbia, we hold that consumers could invoke the CPPA to challenge that imposition as an unlawful trade practice.").

Here, Plaintiffs will establish that Defendants violated the CPPA's unfairness prongs by violating D.C.'s insurance laws and the public policy embodied in those laws, which prohibits unlicensed entities from receiving money in exchange for soliciting or selling insurance.[41] And

---

[41] *See, e.g.*, DC ST § 31-1131.13(b) ("A person shall not accept a commission, service fee, brokerage fee, or other valuable consideration for selling, soliciting, or negotiating insurance in the District if that person is required to be licensed under this chapter and is not licensed."); DC ST § 31-2502.31 (compensation of unlicensed persons prohibited); D.C. ST § 31-1131.03 ("A

as noted above, Plaintiffs will do this with common evidence, including: (1) that Defendants

weren't licensed to solicit insurance; (2) that Defendants did so anyway (as indicated by

Defendants' internal documents, which show that they designed Medigap marketing materials in

order to appear as if they were coming from AARP;[42] that they leveraged their position as a

trusted healthcare advocate in order to sell AARP Medigap policies and grow AARP revenues;[43]

and that they were instrumental in designing and disseminating AARP Medigap marketing

materials[44]); and (3) documents revealing that AARP in fact collected a 4.95% charge from class

members, which was used in whole or part to fund Defendants' solicitation efforts.

---

person shall not sell, solicit, or negotiate insurance in the District for any class of insurance
unless the person is licensed for that line of authority in accordance with this chapter.").

[42] *See* p. 4, *supra* (citing, e.g., Ex. 9, AARP_KRUKAS_0091814 at '821 (United–Defendants'
stated goal was to "████████████████████████" when selling AARP
Medigap); Ex. 18, AARP_KRUKAS_0045732 at '734 (AARP ████████████████
████████████████████████████████")).
That same page ██████ that AARP Medigap marketing materials give the impression that AARP
was soliciting insurance, not United, and prominently featured the "AARP" logo; never clearly
indicated that the communications were coming from United; and explicitly state that they are, in
fact, "a solicitation of insurance." *Id.* (citing Ex. 12, AARP_KRUKAS_0000220; Ex. 13,
AARP_KRUKAS_0000263; Ex. 14, AARP_KRUKAS_0000271).

[43] *See* pp. 4–5, *supra* (citing, e.g., Ex. 28, AARP_KRUKAS_0019776 at '794 (according to
AARP, it could "████████████████████████████████████████
████████"); Ex. ██, AARP_KRUKAS_0114287 at '287 (AARP leveraged its ████████
████████████ in order to "████████████████████████████████████
████████████████████████████████████████████"); Ex. ██,
AARP_KRUKAS_0029951 at slide 11 (AARP ████████████████████████████████
████████████"); *id.* at slide 5 (AARP would continue emphasizing its
role as a "████████████████ to its members, in order to sell more AARP Medigap
policies)).

[44] *See* p. 6, *supra* (citing, e.g., Ex. 31, AARP_KRUKAS_0098750 at '791 ("████████████
████████████████████"); Ex. 32, AARP_KRUKAS_0047556 at
'565 (AARP–ASI–United contract describing ASI's ████████████ responsibilities, which
include "████████████████████████████████████████████
████████████████"); Ex. ██, AARP_KRUKAS_0018935 at '935 ("████████████

Plaintiffs will also use common evidence to prove that Defendants violated the CPPA's deception prong. The CPPA makes it a violation to "use ambiguity as to a material fact, which has a tendency to mislead"; "misrepresent as to a material fact which has a tendency to mislead"; or "fail to state a material fact if such failure tends to mislead." D.C. Code § 28-3904(e), (f). And as this Court noted, "A matter is material if: 'a reasonable [person] would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question." *Krukas*, 376 F. Supp. 3d at 41 (quoting *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013)).[45] This applies "whether or not any consumer is in fact misled [or] deceived" by a defendant's conduct. D.C. Code § 28-3904(a). In other words, whether a defendant engages in deceptive conduct turns on whether an omission or misstatement would have deceived an objectively reasonable consumer, not whether a defendant in fact deceives any individuals, which is a purely common question. *See Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 12 (D.D.C. 2002) (certifying a CPPA claim where a defendant "fail[ed] to disclose material changes to its claims handling procedures").

Here, too, whether Defendants engaged in deceptive behavior—either by failing to disclose that the "royalty" is a commission; by failing to disclose the amount of the royalty (even assuming it is one); or by failing to disclose that class members were funding AARP's side deal with United—will turn on whether this behavior would have deceived a reasonable consumer,

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex.   , AARP_KRUKAS_0036870 at '883–85, '895 (discussing ASI's ▮▮▮▮▮▮▮▮▮▮)

[45] The CPPA even prevents a defendant from making misrepresentations where "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in his or her choice of action, although a reasonable [person] would not so regard it." *Krukas*, 376 F. Supp. 3d at 41 (quoting *Saucier*, 64 A.3d at 442).

not whether any of the class members were in fact deceived. Deception is therefore a purely common question requiring only common evidence.

  ***Whether Defendants are "merchants" under the CPPA.***  Whether Defendants are "merchants" under the CPPA is also a common question. The CPPA covers "trade practices arising out of consumer–merchant relationships," *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015) (quoting *Snowder v. District of Columbia*, 949 A.2d 590, 599 (D.C. 2008)). The CPPA defines "merchant" as one "who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services . . . or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code § 28-3901(a)(3). Courts have defined "merchant" as any person or entity sufficiently "connected with the supply side of the consumer transaction." *Adler v. Vision Lab Telecomms., Inc.*, 393 F. Supp. 2d 35, 39 (D.D.C. 2005) (internal quotation marks omitted) (quoting *Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory Sch.*, 514 A.2d 1152, 1159 (D.C. 1986)).

  Here, this Court has already described allegations that (if proved) would establish that Defendants were merchants under the CPPA. *Krukas*, 376 F. Supp. 3d at 37–38. This includes that Defendants marketed AARP Medigap; were heavily involved in AARP Medigap's development and oversight; and collected insurance payments on behalf of United. *Id.* And as noted above, Plaintiffs have already identified evidence supporting these points. (*See* Section II(A)(2), *supra*.) Plaintiffs have also identified a number of documents in which Defendants note that insurance sales are one of their main sources of revenue and describe their efforts to increase AARP Medigap's market share (e.g., "███████████████████████████

██████████████████████████████████; [46] SHIP programs like Medigap were designed to "███████████████"; [47] and Defendants market AARP Medigap in order to ██████████ ██████████" [48]), which suggests that Defendants were in fact "connected with the supply side" of the Medigap transactions. *Adler*, 393 F. Supp. 2d at 39. In any event—and more importantly here—AARP's status as a merchant is an issue that's common to the class rather than individualized for each class member. If Defendants truly believe they're not merchants, then this is "an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate [Defendants]——a course [they] should welcome, as all class members who did not opt out of the class action would be bound by the judgment." *Butler v. Sears Roebuck and Co*., 727 F.3d 796, 799 (7th Cir. 2013).

*Injury.* Finally, Plaintiffs can establish CPPA causation and damages under three theories, each of which requires only common evidence.

*First*, under the CPPA's unfairness prongs, if Defendants retained 4.95% of the class's Medigap payments, in violation of D.C.'s insurance laws, then Defendants' unfair behavior caused a classwide injury. This is in part because the CPPA provides for restitution and disgorgement, *Grayson v. AT & T Corp*., 15 A.3d 219, 241–42, 245 & nn.64–65 (D.C. 2011), so if Defendants illegally took Plaintiffs' money, then the CPPA would simply require Defendants to return this amount to the class (minus any amounts that legitimately paid for AARP's royalty, [49] which Plaintiffs' expert can calculate on a classwide basis (Ex. A, Pinsonneault Decl.

---

[46] Ex. 3, AARP_KRUKAS_0019736 at '763.

[47] Ex. 67, AARP_KRUKAS_0019605 at '605.

[48] Ex. 172, AARP_KRUKAS_0037170 at '172.

[49] *See, e.g.*, *Bassin*, 828 A.2d at 730 (D.C. 2003) (the plaintiffs' net damages were the difference between an unjustified excessive fee and a reasonable fee).

¶¶ 94–101)). Causation is therefore amenable to classwide resolution. *See, e.g.*, *Ford v. Chartone, Inc.*, 908 A.2d 72, 90 (D.C. 2006) (certifying a CPPA class alleging that the defendant charged unconscionably high rates).

    *Second*, Plaintiffs can use common evidence to show classwide injury under the CPPA's deception prong. Defendants failed to disclose—as a matter of corporate policy—that AARP would keep 4.95% of class members' insurance payments in order to fund its "side agreement"[50] with United before forwarding the remainder to United for insurance coverage. The fact of common injury is self-evident: paying for insurance coverage plus a 4.95% payment that AARP keeps for itself costs more than paying for just insurance coverage. In other words, Defendants used common omissions and misstatements in order to mislead the class into paying a charge that Defendants were never legally allowed to receive, or to otherwise fund AARP's side deal, which is a type of injury that courts have described as "paradigmatic[ally]" capable of classwide resolution. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1090 (10th Cir. 2014).[51]

    *Third*, regardless of whether Plaintiffs suffered pecuniary harm (they did), Defendants

---

[50] *Krukas*, 376 F. Supp. 3d at 22–23

[51] *See also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (certifying a class where the defendant misled plaintiffs into believing that an "invoiced amount was honestly owed"); *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 643 (5th Cir. 2016) (certifying a class because no reasonable individual would agree to contribute to an illegal scheme); *In re APA Assessment Fee Litig.*, 311 F.R.D. 8 (D.D.C. 2015) (certifying a class where a membership organization allegedly misled its members into paying inflated membership fees, a portion of which was—unbeknownst to the class—funding the class's membership in some other organization); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 560–61 (E.D. Va. 2000) (certifying a class where they "clearly made payments in reliance upon the assurance that the process of repossession, sale and all subsequent steps were taken in conformity with the law," and noting that "[t]o conclude otherwise would deny human nature, run counter to the traditional presumption in favor of actors operating under rational economic choice, and leave the Court with an absurd conclusion"); *Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84–85 (N.D. Ill. 1997) (certifying a class where "[i]t is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable").

misstatements and omissions deprived class members of truthful information, which had a material impact on reasonable consumers' purchasing decisions. Defendants sold AARP Medigap as a "████"-based product to its members in order to distinguish it from its competitors' "████████" Medigap policies, and their scheme worked. AARP's disclosure of its financial stake in the transaction would have led reasonable consumers to understand that AARP Medigap was no different from the commodity Medigap policies offered by its competitors. Disclosing this interest would change the competitive landscape.[52] This violation and injury would—in turn—trigger the CPPA statutory-damage provision.[53]

Finally, as to amount of damages, the need to calculate individual damage figures has no real bearing on class certification (if it did, then class certification—which typically involves class members with varying damage amounts—would be almost *per se* impossible). *See*

---

[52] The injury resulting from a statutory violation doesn't need to be pecuniary. *See Jeffries v. Volume Servs. Am.*, 928 F.3d 1059, 1067 (D.C. Cir. 2019) (finding that the printing of too many credit-card digits on a receipt, in violation of a federal statute, constituted an "injury in fact at the point of sale" because the statutory prohibition was designed to protect consumers from identity theft, even if the plaintiff himself had not actually suffered any identity theft); *see also Mattiaccio v. DHA Grp., Inc.*, 474 F. Supp. 3d 231, 246–48 (D.D.C. 2020) (citing *Jeffries* and setting forth the conditions under which a purely informational injury based on a statutory violation can constitute an injury in fact); *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1008 (D.C. 2020) ("[Plaintiff] does not need to prove that she was damaged by the misrepresentation or omission" about first year medical resident's role in performing surgery).

[53] The Court previously held that Defendants' engaged in deceptive practices in violation of the CPPA was not enough, by itself, to confer standing. *Krukas*, 376 F. Supp. 3d at 37 n.12. ("[A] violation of [Plaintiffs'] statutory right to truthful information, . . . *without more*, is insufficient to establish standing." (emphasis in original). Since that time, the D.C. Circuit and D.C. Court of Appeals have determined that informational injuries based on statutory violations can provide standing. *See Jeffries*, 928 F.3d 1059 at 1067; *Frankeny* 225 A.3d at 1008. Regardless, the record now demonstrates that Defendants deceptive practices were intended to and did have an impact on how Defendants were able to position AARP Medigap vis-a-vis competitors, and this had a material impact on how Plaintiffs and reasonable consumers made their Medigap purchase decision. .

*Coleman*, 306 F.R.D. at 85 ("[T]he mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification." (quoting *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984))); *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001) (Sotomayor, J.) (citing cases). Courts have also noted that the need to calculate individual damages is even less of a concern when these calculations are "formulaic" or "mechanical," e.g., where they're a simple matter of arithmetic. *See Coleman*,  306 F.R.D. at 85; *Brown v. Pro Football, Inc.*, 146 F.R.D. 1, 3–4 (D.D.C. 1992); *Hardy v. District of Columbia*., 283 F.R.D. 20, 28 (D.D.C. 2012) (certifying a class, in part, because calculating damages "would clearly be a mechanical task").

Here, Defendants and United have records of the class's premium payments, so Plaintiffs can calculate individual damages by multiplying these total payments by 4.95% (minus any percent of that payment that actually purchased an AARP royalty), or by multiplying each monthly payment by the amount of the CPPA's statutory damages. (Ex. A, Pinsonneault Decl. ¶¶ 94–101.) Plaintiffs can therefore easily calculate individual damages, and common questions predominate with respect to their CPPA claim.

### b)  *Unjust enrichment*:

Common issues also predominate with respect to Plaintiffs' unjust-enrichment claim. There are three elements of an unjust enrichment claim under D.C. law: (1) that the plaintiff has conferred a benefit on the defendant; (2) that the defendant retained the benefit conferred; and (3) that it would be unjust for the defendant to retain the benefit under the circumstances. *See Euclid St., LLC v. D.C. Water & Sewer Auth.*, 41 A.3d 453, 463 n.10 (D.C. 2012). Stated another way, unjust enrichment occurs "when a person retains a benefit (usually money) which in justice and equity belongs to another." *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556

26

(D.C. 2016) (internal quotation marks omitted) (quoting *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C. 2005)).

As to the first two prongs, Plaintiffs can use classwide evidence to prove that the class conferred a benefit on Defendants (the 4.95% charge), and that Defendants retained this benefit (again, Defendants and United keep records of who made their Medigap payments).[54] And as to the third prong—whether it would be unjust for AARP to retain the benefit—Plaintiffs can establish it in three distinct ways, each of which requires only common proof.

*First*, as noted by this Court, Plaintiffs can show that AARP collected what constitutes an illegal 4.95% commission on the sale of insurance; i.e., Plaintiffs can show that "[D]efendants retained 4.95% of [Plaintiff's] premiums unjustly. . . . [because] defendants are not insurance agents and cannot retain a commission." *Krukas*, 376 F. Supp. 3d at 44. This is in part because the D.C. Circuit—citing the Restatement—has described overpayments as a "core" example of unjust enrichment. *Id.* (quoting *In re APA Assessment Fee Litig.*, 766 F.3d 39, 47 (D.C. Cir. 2014)); *see also APA*, 766 F.3d at 47 (citing Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. a (2011)). Moreover, courts "routinely certify" unjust-enrichment claims premised on overpayments, such as where a defendant systematically and illegally overcharges a class. *See Youngblood v. Linebarger Googan Blair & Sampson, LLP*, No. 10-2304, 2012 WL 4597990, at *8–9 (W.D. Tenn. Sept. 30, 2012) (citing cases). This includes *Trombley v. National City Bank*, where the plaintiffs accused the defendants of "improperly charging its customers overdraft fees . . . in violation of various state and federal laws," 826 F. Supp. 2d 179, 182

---

[54] *See, e.g.*, Ex. 55, UNITED_KRU_0000001 (records maintained by United that contain AARP Medigap members' addresses and payment histories); Ex. 56, AARP_KRUKAS_0073706 (same).

(D.D.C. 2011), and *In re LivingSocial Marketing & Sales Practice Litigation*, where the plaintiffs accused the defendant of selling gift cards with limited expiration dates, "in violation of a variety of federal and state laws," 298 F.R.D. 1, 4 (D.D.C. 2013).

Here, if Defendants illegally solicited insurance, and were therefore never legally entitled to the class's 4.95%, then Plaintiffs overpaid Defendants, who were unjustly enriched. And as noted above, Plaintiffs can establish this unjust enrichment on a classwide basis, e.g., with evidence that Defendants weren't licensed to solicit insurance; that they did so anyway; and that the class funded these efforts. (*See* Section II(A)(2)–(3), *supra.*) Common questions therefore predominate.

*Second*, regardless of whether the 4.95% was a royalty or a commission, Plaintiffs can prove unjust enrichment by showing that Defendants abused their position as a purported advocate for seniors by omitting facts about its 4.95% charge. As noted in the Restatement, a defendant can unjustly enrich itself by violating a relationship of "trust and confidence" with a plaintiff, regardless of whether that relationship is a fiduciary one:

> Courts in some jurisdictions distinguish fiduciary obligations in a strict sense (such as those existing between trustee and beneficiary, agent and principal, attorney and client, guardian and ward) from analogous obligations owed by persons, not technically fiduciaries, who nevertheless occupy toward others a 'relation of trust and confidence' as regards the transaction in question. The distinction is irrelevant to the rule of this section, because a breach of either sort of obligation leads to the same consequences in restitution.

Restatement (Third) of Restitution and Unjust Enrichment § 43, cmt. a (2011).

Here, whether Defendants were in a relationship of trust and confidence with the class (even if not a fiduciary relationship) in connection with AARP Medigap insurance transaction in question—and whether they violated that trust by concealing facts about the 4.95% charge—are questions that are capable of classwide resolution. As noted above, Plaintiffs have already

identified common evidence indicating that AARP was, in fact, in such a relationship with its members, as it related to healthcare issues; e.g., AARP understood that it had a reputation among its members as (1) a ███████████████████████████████████████; [55] (2) a healthcare ███████████████; [56] (3) "███████████ ███████████████; [57] (4) being ███████████████████ ████████████████████████."[58] Plaintiffs have also identified evidence indicating that Defendants took advantage of this reputation to sell AARP Medigap policies and distinguish its policies from its competitors' "██████████" Medigap products;[59] that Defendants never disclosed their financial interest in the Medigap transaction (█████████████ ████████████████████████ [60] and that Plaintiffs and class members paid the 4.95% commission. Common questions therefore predominate.

*Third*, Plaintiffs can prove unjust enrichment by showing that Defendants misled them into paying for a charge that Defendants were never legally entitled to. *See Krukas*, 376 F. Supp. 3d at 44. And as noted in the CPPA section above, which discusses deception-based claims,

---

[55] Ex. 2, AARP_KRUKAS_0029951 at slide 11.

[56] *Id.* at slide 5.

[57] Ex. 27, AARP_KRUKAS_0028668 at '699.

[58] Ex. 3, AARP_KRUKAS_0019736 at slide 14; *see also* Ex. 28, AARP_KRUKAS_0019776 at '782 (AARP recognizing that it has a "███████████████████████"); Ex. 29, AARP_KRUKAS_0019968 at '986 (AARP describing its mission, in part, as "██████████ ███████████████").

[59] *See* pp. 4–5, *supra* (citing Ex. 19, AARP_KRUKAS_0139885 at '885); *see also id.* (citing Ex. 20, AARP_KRUKAS_0017989 at '992 (indicating that, though Medigap policies traditionally only competed on price, ████████████████████ ████████████████████████); Ex.    , AARP_KRUKAS_0046746 at '748, '753 (same); Ex.    , AARP_KRUKAS_0028522 at '523 (same)).

[60] *See* Section II(A)(4), *supra* (citing Ex. 52, AARP_KRUKAS_0044818 at '822; Ex. 53, Larew Dep. at 179:6–182:14).

Plaintiffs can do this with common evidence. (*See* p. 24, *supra.*) Plaintiffs can therefore establish unjust enrichment on a classwide basis.

Finally, Plaintiffs can prove damages on a class-wide basis. The focus of an unjust-enrichment claim is on the defendant's ill-gotten gains rather than the plaintiff's loss. *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 820 (D.C. 2009); *see also* 1 DAN B. DOBBS, DOBBS LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION § 3.1, at 280 (2d ed. 1993) ("Restitution, in contrast, begins with the aim of preventing unjust enrichment to the defendant. . . . To measure restitution, courts look at the defendant's gain or benefit."). Here, if Defendants illegally retained 4.95% of the class's monthly insurance payments, in order to fund Defendants' illegal insurance efforts, or if Defendants mislead their members about the nature of that 4.95% charge, then Defendants should have to disgorge that amount. This method of proving damages is common to the entire class (it depends simply on classwide proof that class members paid their premiums), and Plaintiffs can easily calculate individual damages based on the amount of those premium payments. (*See* Ex. A, Pinsonneault Decl. ¶¶ 94–101.) Common questions therefore predominate.

       **c)** *Conversion***:**

Common questions also predominate with respect to Plaintiffs' conversion claim, which requires them to show that Defendants "unlawful[ly] exercise[d] . . . control over [Plaintiffs'] personal property." *Krukas*, 376 F. Supp. 3d at 43 (D.D.C. 2019) (quoting *Hall v. District of Columbia*, 867 F.3d 138, 151 (D.C. Cir. 2017)). Courts "routinely certify" conversion claims where a defendant—pursuant to a uniform corporate policy—systematically assumes control of a class's money, but in violation of a given statute (or classwide contract), which makes it possible to establish both (1) a taking and (2) its unlawfulness with common evidence. *See Youngblood*,

2012 WL 4597990, at *8–9 (citing cases). Courts have certified conversion claims where a private tax collector systematically penalized debtors more than it was statutorily permitted to;[61] where online travel brokers systematically failed to pay municipalities the proper amounts of hotel-occupancy taxes;[62] and where insurance companies systematically charged their insureds more than they were permitted to under the class's insurance policies.[63]

Similarly, here, Plaintiffs can prove conversion by showing that Defendants systematically collected a 4.95% charge from the class, and that Defendants were never legally entitled to this money, i.e., because it was compensation for Defendants' unlicensed insurance-solicitation efforts, in violation of D.C.'s insurance laws. And as noted above, Plaintiffs can establish this with common evidence, including documents showing that Defendants collected the 4.95% charge from each of their Medigap insureds; that the charge flowed directly to Defendants; that the charge was (in whole or in part) consideration for Defendants' insurance-solicitation efforts; and that Defendants were not licensed to solicit or sell insurance. (Section II(A)(2)–(3), *supra.*) Common questions therefore predominate.

Moreover, regardless of whether the 4.95% was a commission, Plaintiffs can prove conversion if they were misled into funding AARP's side deal with United. *See Krukas*, 376 F.

---

[61] *Id.*

[62] *Cty. of Monroe, Fla. v. Priceline.com, Inc.,* 265 F.R.D. 659, 670 (S.D. Fla. 2010); *see also City of Goodlettsville v. Priceline.com, Inc.,* 267 F.R.D. 523, 536 (M.D. Tenn. 2010) (same).

[63] *Spegele v. USAA Life Ins. Co.,* No. 5:17-CV-00967-OLG, 2020 WL 6342075, at *13 (W.D. Tex. Sept. 23, 2020) (citing similar cases); *see also In re TD Bank, N.A. Debit Card Overdraft Fee Litig.,* 325 F.R.D. 136, 159–60 (D.S.C. 2018) (certifying a conversion class, based partially on D.C. law, where the defendant bank "systematically . . . withdrew funds from [the classes'] accounts for the payment of fees").

Supp. 3d at 43. And as noted above in the CPPA deception section, Plaintiffs can do this with common evidence.

Finally, Plaintiffs can prove causation and damages with classwide evidence. Causation is inherent in a conversion claim (if a defendant unlawfully takes a plaintiff's property, then they've committed conversion), and—as just noted—Plaintiffs can use common evidence to show that Defendants both took their money and that this was unlawful. And as for damage amounts, if a defendant converts a sum of money, then they simply have to return that sum (plus interest). *See Wash. Gas Light Co. v. Pub. Serv. Comm'n of D.C.*, 61 A.3d 662, 676–77 (D.C. 2013); *see also Trustees of Univ. of D.C. v. Vossoughi*, 963 A.2d 1162, 1175–76 (D.C. 2009) (conversion damages are equal to the value of the converted property).[64] Accordingly, conversion damages here—the money that Defendants syphoned off of the class's Medigap payments—are easily calculable, and common questions predominate. (*See* Ex. A, Pinsonneault Decl. ¶¶ 94–101.)

> **d)** *Fraudulent omission***:**

Plaintiffs can also establish fraudulent omission with common evidence. This requires them to show that Defendants made (1) a misrepresentation or omission; (2) with knowledge; (3) intended to induce reliance; (4) on which the other party did rely; (5) resulting in damages. *Krukas*, 376 F. Supp. 3d at 45. The Court also noted that a duty to disclose material information arises with superior knowledge or a partial disclosure.

---

[64] Punitive damages are also available where a defendant converts property "with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Edwards v. Safeway, Inc.*, 216 A.3d 17, 20 (D.C. 2019) (quoting *Mason v. Rostad*, 476 A.2d 662, 667 (D.C. 1984)).

Here, "(1)" will turn on common evidence because Defendants concealed—as a matter of company policy, and via a uniform set of documents—the fact that AARP would keep 4.95% of class members' insurance payments. Further, whether Defendants knew they were misrepresenting facts, and whether they did so in order to induce reliance, are both common questions (i.e., Defendants' scienter won't vary by class member). And as to whether the class relied on and was damaged by these misrepresentations, courts will infer classwide reliance "when it is logical to do so," 174 F.R.D. at 84–85. This includes where a defendant tricks a class into paying a charge that the defendant was never legally entitled to,[65] and here Defendants misled the class into paying an illegal commission, or into otherwise funding AARP's side deal, which is "paradigmatic[ally]" amenable to a classwide inference of reliance, *CGC Holding*, 773 F.3d at 1090. And finally, as noted in the CPPA section above, Plaintiffs can easily calculate damages—the 4.95% charge—on a classwide and individual basis. (*See* pp. 25–26, *supra*.) Plaintiffs can therefore prove fraudulent omission with common evidence, and common questions predominate.

**2. Superiority**:

Finally, a class action here would be preferable to millions of individual suits. Rule 23(b)(3) requires the Court to determine and ensure that the class-action mechanism is superior

---

[65] *See* footnote 51, *supra* (citing cases); *see also Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 546 (D. Md. 2011) (collecting authority for finding reliance as a common issue based on common sense inferences that the class relied on the legitimacy of transactions in making payments); *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 53 (D.D.C. 2010) (finding that allegations of "misrepresentations in . . . advertising and promotional materials" predominated, notwithstanding potential individual issues); *Stanich v. Travelers Indem. Co.*, 249 F.R.D. 506, 518-21 (N.D. Ohio 2008) ("Where there are uniform presentations of allegedly misleading information, or common omissions throughout the entire class, especially through form documents, courts have found that the element of reliance may be presumed class-wide, thereby obviating the need for an individualized inquiry of each class member's reliance.").

to all other available forms of adjudication. *APA*, 311 F.R.D. at 18.  In determining superiority,

the Court considers: (1) the interest of members of the class in individually controlling the

prosecution of separate actions; (2) the extent and nature of any litigation concerning the

controversy already commenced by members of the class; (3) the desirability or undesirability of

concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to

be encountered in the management of a class action. FED. R. CIV. P. 23(b)(3). The superiority

requirement ensures that resolution of the case through a class action "will 'achieve economies

of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly

situated, without sacrificing procedural fairness or bringing about other undesirable

consequences.'" *Id.* (quoting *Amchem*, 521 U.S. at 615); *see also Alliota v. Gruenberg*, 237

F.R.D. 4, 13 (D.D.C.2006) ("Class actions are the superior method when they serve the purpose

of efficient resolution of the claims or liabilities of many individuals in a single action, as well as

the elimination of repetitious litigation and possibly inconsistent adjudications."); *Barnes v.

District of Columbia*, 242 F.R.D. 113, 123–24 (D.D.C.2007) ("The second prong of Rule

23(b)(3) militates in favor of class actions where common legal or factual questions allow a court

to consolidate otherwise identical actions into a single efficient unit." (internal citation and

quotation omitted)). And as noted by the Supreme Court, consumer-protection actions are ideally

situated for class treatment. *Amchem*, 521 U.S. at 624 (1997).

Here, a class action is superior to individual actions for several reasons. First, absent a

class, class members would not be able to economically justify an action against AARP, given

the relatively small size of each class members' individual damages. Second, while there are

other actions currently pending against Defendants, Plaintiffs' case is the only one seeking to

represent a nationwide class, meaning it represents the only chance of relief for a vast swath of

member-insureds. Third, this action would not be difficult to maintain as a class (as indicated in

the predominance section, above), and a class action would be more judicially economical given

the size of the class, which numbers in the millions.

Additionally, there will be little difficulty in identifying and noticing class members

because all requisite contact information is obtainable by United.  As such, administrative issues

will be easily manageable. Regardless, possible difficulty in the administration of a class action

does not automatically create a bar for certification. *See Visa Check*, 280 F.3d at 140 (2d Cir.

2002) (certifying class consisting of every business in the United States that accepted Visa and/or

MasterCard and stating that "[f]ailure to certify an action under Rule 23(b)(3) on the sole ground

that it would be unmanageable is disfavored, and should be the exception rather than the rule.").

## IV.  CONCLUSION:

For the foregoing reasons, Plaintiffs request that this Court certify the proposed class,

appoint Plaintiffs Krukas and Kushim as class representatives and appoint the law firms of Taus,

Cebulash & Landau, LLP, Gustafson Gluek, PLLC as Lead Counsel and Migliaccio & Rathod,

LLP, and Scott Hirsch Law Group, PLLC as class counsel.


DATED: January 8, 2021                            Respectfully submitted,

                                                  */s/ Jason S. Rathod*
                                                  Jason S. Rathod (D.C. Bar No. 100082)*
                                                  Nicholas A. Migliaccio (D.C. Bar No.
                                                  484366)*
                                                  MIGLIACCIO & RATHOD LLP
                                                  412 H St. NE
                                                  Washington D.C. 20002
                                                  Telephone: (202) 470-3520
                                                  Facsimile: (202) 800-2730
                                                  Email: jrathod@classlawdc.com
                                                          nmigliaccio@classlawdc.com

                                                  Kevin Landau*

Brett Cebulash*
Miles Greaves**
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
Email: klandau@tcllaw.com
        bcebulash@tcllaw.com
        mgreaves@tcllaw.com

Daniel E. Gustafson*
Daniel C. Hedlund*
David Goodwin*
Brittany Resch*
**GUSTAFSON GLUEK PLLC**
220 South Sixth Street #2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Email: dgustafson@gustafsongluek.com
        dhedlund@gustafsongluek.com
        bresch@gustafsongluek.com

Scott D. Hirsch**
**SCARLETT & HIRSCH PA**
7301 W. Palmetto Park Road
Suite 207A
Boca Raton, FL 33433
Telephone: (561) 278-6707
Facsimile: (561) 278-6244
Email: scott@shlawfla.com

*Attorneys for Plaintiffs*

* Admitted to the court
** *Pro hac vice* motions forthcoming