# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

HELEN KRUKAS and ANDREA KUSHIM,
on behalf of themselves and all others similarly
situated,

                    Plaintiffs,

    v.

AARP, INC.; AARP SERVICES INC.; and
AARP INSURANCE PLAN,

                  Defendants.

Civil Action No.: 1:18-cv-01124-BAH

Chief Judge Beryl A. Howell

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   Introduction……………………………………………………………….......1

II.  Factual Summary……………………………………………………………..4

    A.  AARP Medigap Compared to AARP's Other Medicare Offerings……………...4

    B.  Plaintiffs and Class Members – Not United Healthcare – Pay AARP The AARP
       MedSupp "Royalty"……………………………………………………………6

    C.  Defendants' Misleading Disclosures…………………………………………....7

    D.  Defendants Encourage their Members to Enroll in AARP Medigap………………8

    E.  Plaintiffs' AARP Medigap Experience……………………………………………9

III..  Argument……………………………………………………………………12

    A.  Plaintiffs have ARTICLE III Standing Under Three Separate Injury Theories…….13

        1.   Defendants have Wrongfully Retained Plaintiffs' Money………...................14

        2.   Plaintiffs Suffered Monetary Damages……………………………...................17

        3.   Defendants Deprived Plaintiffs of Truthful Information, Thwarting their
            Ability to Make an Informed Purchasing Decision…………………………23

    B.  The Filed-Rate Doctrine Doesn't Bar Plaintiffs' Claims…………………………..28

    C.  Plaintiffs Can Prove Each of their Claims on the Merits…………………………...30

        1.   Plaintiffs can Prove their CPPA Unfairness Claims………………………….30

        2.   Plaintiffs can Prove that the Defendants Violated the CPPA's Deception
            Prong……………………………………………..………………………… 35

        3.   The Court Already Held that D.C. Law Applies to Plaintiffs' Claims………39

        4.   Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs'
            Conversion Claim…………………………………………………….……..42

        5.   Plaintiffs Can Prove their Unjust Enrichment Claim………………………44

IV.  CONCLUSION………………………………………………………………45

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) .................................................................................................................. 12

*Adler v. Hertling*,
451 S.E.2d 91 (Ga. Ct. App. 1994) ......................................................................................... 16

*AHA v. Azar*,
983 F.3d 528 (D.C. Cir. 2020) ................................................................................................ 27

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
37 F.3d 996 (3d Cir. 1994) ...................................................................................................... 23

*Am. Bank, FSB v. Cornerstone Cmty. Bank*,
733 F.3d 609 (6th Cir. 2013) ................................................................................................... 16

*Ams. for Safe Access v. DEA*,
706 F.3d 438 (D.C. Cir. 2013) ................................................................................................ 14

*Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*,
820 F. Supp. 2d 510 (S.D.N.Y. 2011) ..................................................................................... 15

*Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*,
564 F.3d 462 (D.C. Cir. 2009) ................................................................................................ 13

*Attias v. Carefirst, Inc.*, No. 15-cv-00882 (CRC),
2021 U.S. Dist. LEXIS 17336, at *19-20 (D.D.C. Jan. 29, 2021) .......................................... 39

*Atwater v. D.C. Dep't of Consumer & Regulatory Affairs*,
566 A.2d 462 (D.C. 1989) ....................................................................................................... 31

*Austin-Spearman v. AARP*,
119 F. Supp. 3d 1 (D.D.C. 2015) ............................................................................................ 27

*Axon v. Citrus World, Inc.*,
354 F. Supp. 3d 170 (E.D.N.Y. 2018) ..................................................................................... 18

*Barnett v. PA Consulting Grp., Inc.*,
715 F.3d 354 (D.C. Cir. 2013) ................................................................................................ 13

*Bhasker v. Kemper Cas. Ins. Co.*,
284 F. Supp. 3d 1191 (D.N.M. 2018) ..................................................................................... 28

*Bigelow v. RKO Radio Pictures*,
   327 U.S. 251 (1946) ............................................................................ 22

*Bratton v. Hershey Co.*,
   No. 2:16-CV-4322-C-NKL, 2017 WL 2126864 (W.D. Mo. May 16, 2017) .......................... 15

*Campbell v. Clinton*,
   203 F.3d 1924 (D.C. Cir. 200 ........................................................................... 14

*Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
   130 F. Supp. 3d 236 (D.D.C. 2015) ..................................................... 15, 24, 45

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*,
   630 F.3d 217 (D.C. Cir. 2011) ........................................................................ 41

*Car Transp. v. Garden Spot Distributors*,
   805 S.W.2d 632 (Ark. 1991) ........................................................................... 16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................... 12

*Chisolm v. TranSouth Fin. Corp.*,
   194 F.R.D. 538 (E.D. Va. 2000) ....................................................................... 18

*Clark v. Prudential Ins. Co. of Am.*,
   No. CIV. 08-6197 DRD, 2011 WL 940729 (D.N.J. Mar. 15, 2011) ........................................ 28

*Colpitts v. Blue Diamond Growers*,
   No. 20 CIV. 2487 (JPC), 2021 WL 981455 (S.D.N.Y. Mar. 16, 2021) .................................... 17

*Dane v. United Healthcare Co.*,
   401 F.Supp.3d 231 (D. Conn. 2019) ............................................................... 4, 39

*Disability Rts. Council of Greater Wash. v. D.C.*,
   No. CIV.A. 04-0529 (JDB), 2005 WL 513495 (D.D.C. Mar. 3, 2005) .................................... 14

*Dist. Cablevision Ltd. P'ship v. Bassin*,
   828 A.2d 714 (D.C. 2003) ............................................................................. 31

*District Title v. Warren*,
   181 F. Supp. 3d 16 (D.D.C 2014) .................................................................... 44

*Djourabchi v. Self*,
   571 F. Supp. 2d 41 (D.D.C. 2008) ......................................................... 14, 17, 31

*Donoff v. Delta Air Lines, Inc.*,
  No. 18-81258-CV, 2020 WL 1226975 (S.D. Fla. Mar. 6, 2020) ............................................ 20

*Dworman v. Mayor and Board of Aldermen*,
  370 F. Supp. 1056 (D.N.H. 1974) ........................................ 13

*Edmonson v. Lincoln Nat. Life Ins. Co.*,
  725 F.3d 406 (3d Cir. 2013) ........................................ 13

*Envtl. Prot. Agency*,
  No. CV 16-1861 (JDB), 2020 WL 5632410 (D.D.C. Sept. 21, 2020) ...................................... 41

*Estate of Gaither ex rel. Gaither v. D.C.*,
  771 F. Supp. 2d 5 (D.D.C. 2011) ........................................ 41

*Falconi-Sachs v. LPF Senate Square, LLC*,
  142 A.3d 550 (D.C. 2016) ........................................ 44

*Fed. Ins., Co. v. Landis Constr. Corp.*,
  No. CV 06-00379 (AK), 2008 WL 11391665 (D.D.C. July 16, 2008) ...................................... 13

*Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*,
  944 A.2d 1055 (D.C. 2008) ........................................ 37

*Frankeny v. Dist. Hosp. Partners, LP*,
  225 A.3d 999 (D.C. 2020) ........................................ 37, 39

*Friedman v. AARP, Inc.*,
  2019 WL 5683465 (C.D.Cal. 2019) ........................................ 21, 23

*FTC v. Sperry & Hutchinson Co.*,
  405 U.S. 233 (1972) ........................................ 31

*Gregory v. Quality Removal, Inc,*
  ., No. 14-21480-CIV, 2014 WL 5494448, at*2 (S.D. Fla. Oct. 30, 201 .................................. 14

*Grocery Mfrs. Ass'n v. E.P.A.*,
  693 F.3d 169 (D.C. Cir. 2012) ........................................ 14

*Gunn v. Cont'l Cas. Co.*,
  968 F.3d 802 (7th Cir. 2020) ........................................ 28, 29

*Hall v. District of Columbia*,
  867 F.3d 138 (D.C. Cir. 2017) ........................................ 42

*Havens Realty Corp. v. Coleman*,

455 U.S. 363 (1982) ........................................................................................... 25

*Henok v. Chase Home Fin., LLC*,
  947 F. Supp. 2d 6 (D.D.C. 2013) ..................................................................... 41

*Howard v. Riggs Nat'l Bank*,
  432 A.2d 701 (D.C. 1981) ................................................................................. 38

*In re Adobe Sys. Privacy Litig.*,
  66 F. Supp. 3d 1197 (N.D. Cal. 2014) ............................................................. 31

*In re APA Assessment Fee Litig.*,
  311 F.R.D. 8 (D.D.C. 2015) .............................................................................. 18

*In re APA Assessment Fee Litig.*,
  766 F.3d 39 (D.C. Cir. 2014) ................................................................. 15, 19, 45

*In re Glumetza Antitrust Litig.*,
  No. C 19-05822 WHA, 2021 WL 1817092 (N.D. Cal. May 6, 2021) ................ 22

*In re Holmes*,
  264 P.3d 423 (Kan. 2011) ................................................................................. 16

*In re New Jersey Title Ins. Litig.*,
  683 F.3d 451 (3d Cir. 2012) ............................................................................. 30

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
  45 F. Supp. 3d 14 (D.D.C. 2014) ...................................................................... 27

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ............................................................................. 18

*Jeffries v. Volume Servs. Am.*,
  928 F.3d 1059 (D.C. Cir. 2019) ........................................................................ 24

*Jones ex rel. Jones v. Winnebago Indus., Inc.*,
  460 F. Supp. 2d 953 (N.D. Iowa 2006) ............................................................ 42

*Krukas, II*,
  458 F. Supp. 3d ................................................................................................ 39

*Krukas v. AARP*, Inc.,
  376 F. Supp. 3d 1 (D.D.C. 2019) ............................................................. passim

*Lacks v. R. Rowland & Co.*,
  718 S.W.2d 513 (Mo. Ct. App. 1986) ............................................................... 16

vi

*Lannan Found. v. Gingold*,
  300 F. Supp. 3d 1 (D.D.C. 2017) ......................................................................... 15

*Lee v. Bos*,
  874 F. Supp. 2d 3 (D.D.C. 2012) ......................................................................... 36

*Long v. Se. Pa. Transportation Auth.*,
  903 F.3d 312 (3d Cir. 2018) ................................................................................ 25

*McFadden v. Nationstar Mortg. LLC*, No. 20-cv-166-EGS-ZMF,
  2021 U.S. Dist. LEXIS 147319 (D.D.C. July 30, 2021) ...................................... 37

*Mace v. Domash*,
  No. 5-cv-2244 (HHK), 2008 WL 11417279 (D.D.C. 2008) ................................ 16

*Malewicz v. City of Amsterdam*,
  517 F. Supp. 2d 322 (D.D.C. 2007) ..................................................................... 41

*Mann v. Bahi*,
  251 F. Supp. 3d 112 (D.D.C. 2017) ............................................................... 17, 24

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
  552 F.3d 47 (1st Cir. 2009) .................................................................................. 31

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
  475 U.S. 574 (1986) ............................................................................................. 12

*Matter of Duranti*,
  1 B.R. 54 (Bankr. W.D. Wis. 1979) ..................................................................... 16

*Mattiaccio v. DHA Grp., Inc.*,
  474 F. Supp. 3d 231 (D.D.C. 2020) ..................................................................... 25

*McNamara v. Picken*,
  950 F. Supp. 2d 193 (D.D.C. 2013) ..................................................................... 44

*Midwestern Helicopter, LLC v. Coolbaugh*,
  839 N.W.2d 167 (Wisc. Ct. App. 2013) ............................................................... 16

*Miller v. Peter Thomas Roth, LLC*,
  No. C 19-00698 WHA, 2020 WL 363045 (N.D. Cal. Jan. 22, 2020) .................... 18

*Montanez v. HSBC Mortg. Corp. (USA)*,
  876 F. Supp. 2d 504 (E.D. Pa. 2012) ................................................................... 18

*Moore v. Hartman*,
  571 F.3d 62 (D.C. Cir. 2009) ........................................................................ 13

*Muldrow v. EMC Mortg. Corp.*,
  766 F. Supp. 2d 230 (D.D.C. 2011) ................................................................ 39

*Nat'l Sec. Couns. v. C.I.A.*,
  931 F. Supp. 2d 77 (D.D.C. 2013) .................................................................. 14

*Otay Mesa Prop., L.P. v. United States Dep't of the Interior*,
  144 F. Supp. 3d 35 (D.D.C. 2015) .................................................................. 14

*Parr v. Ebrahimian*,
  70 F. Supp. 3d 123 (D.D.C. 2014) .................................................................. 37

*Patel v. Specialized Loan Servicing, LLC*,
  904 F.3d 1314 (11th Cir. 2018)....................................................................... 30

*Peart v. D.C. Hous. Auth.*,
  972 A.2d 810 (D.C. 2009)................................................................................ 16

*Peterson v. H & R Block Tax Servs., Inc.*,
  174 F.R.D. 78 (N.D. Ill. 1997) ........................................................................ 18

*Petrohawk Energy Corp. v. L. Debenture Tr. Co. of New York*,
  No. 06 CIV. 9404 DLC, 2007 WL 211096 (S.D.N.Y. Jan. 29, 2007) ............ 15

*Reid–Walen v. Hansen*,
  933 F.2d 1390 (8th Cir.1991)........................................................................... 42

*Renchard v. Prince William Marine Sales, Inc.*,
  87 F. Supp. 3d 271 (D.D.C. 2015) .................................................................. 13

*Reyes v. Sessions*,
  342 F. Supp. 3d, 141 (D.D.C. 2018) ............................................................... 30

*Rohrer v. Knudson*,
  203 P.3d 759 (Mont. 2009) .............................................................................. 31

*Sarfit, S.A. v. Mayall*,
  No. 88 CIV. 4343 (KMW), 1989 WL 120100 (S.D.N.Y. Oct. 4, 1989).......... 16

*Saunders v. Whit*,
  191 F. Supp. 2d 9510 (D.D.C. 200.................................................................. 14

*Schneider v. Chipotle Mexican Grill, Inc.*,

328 F.R.D. 520 (N.D. Cal. 2018) ........................................................................ 18

*Singh v. George Washington Univ.*,
383 F. Supp. 2d 99 (D.D.C. 2005) ...................................................................... 41

*Sloan v. Urban Title Servs., Inc.*,
689 F. Supp. 2d 123 (D.D.C. 2010) .................................................................... 38

*Smith v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*,
371 F. Supp. 3d 313 (E.D. La. 2019) .................................................................. 14

*Teamsters, Loc. 639, Emps. Tr. Fund v. Merchants Transfer Co.*,
No. 80-770, 1981 WL 2313 (D.D.C. Feb. 2, 1981) ............................................ 13

*Telecommunications Rsch. & Action Ctr. on Behalf of Checknoff v. Allnet Commc'n Servs., Inc.*,
806 F.2d 1093 (D.C. Cir. 1986) .......................................................................... 17

*Tolson v. Hartford Fin.*,
278 F.Supp.3d 27 (D.D.C. 2017) ............................................................. 16, 17, 27

*Torres v. S.G.E. Mgmt., L.L.C.*,
838 F.3d 629 (5th Cir. 2016) ............................................................................... 18

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) .................................................................................. 17, 27

*Trustees of Univ. of D.C. v. Vossoughi*,
963 A.2d 1162 (D.C. 2009) ................................................................................. 15

*United States ex rel. Landis v. Tailwind Sports Corp.*,
No. 1:10-CV-00976 (CRC), 2016 WL 3197550 (D.D.C. June 8, 2016) ............... 41

*Velcoff v. MedStar Health, Inc.*,
186 A.3d 823 (D.C. 2018) ................................................................................... 31

*Vietnam Veterans of Am. v. Shinseki*,
599 F.3d 654 (D.C. Cir. 2010) ............................................................................ 14

*Wash. Gas Light Co. v. Pub. Serv. Comm'n of D.C.*,
61 A.3d 662 (D.C. 2013) ..................................................................................... 15

*Whiting v. AARP*,
701 F. Supp. 2d 21 (D.D.C. 2010) ................................................................. 38, 45

*Willekes v. Serengeti Trading Co.*,
No. CV137498ESMAH, 2016 WL 5334522 (D.N.J. Sept. 22, 2016) ................... 15

## Statutes

D.C. CODE § 31-1131.02(16) ........................................................................ 33
D.C. CODE § 28-3904 ................................................................................... 24
D.C. CODE § 28-3901(c) ............................................................................... 24
D.C. CODE § 28-3904(e), (f) .................................................................. 35, 36
D.C. CODE § 28-3904(a) ......................................................................... 35, 38
D.C. Code § 28-3904 (f) .............................................................................. 36
D.C. CODE § 28-3905(k)(1)(A) ..................................................................... 15
D.C. Code § 28-3901(a)(3) ........................................................................... 33
D.C. CODE § 31-1131.13 ("A ....................................................................... 32
D.C. CODE § 31-1131.02(17) ....................................................................... 32
DC ST § 31-1131.13(b) ("A ......................................................................... 32
DC ST § 31-2502.31 .................................................................................... 32

## Rules

FED. R. CIV. P. 56(c) ................................................................................... 12

x

Plaintiffs Helen Krukas and Andrea Kushim submit this memorandum in opposition to the summary-judgment motion filed by Defendants AARP, Inc. ("AARP"); AARP Services Inc. ("ASI"); and AARP Insurance Plan ("AARP Trust") (collectively, "Defendants").

## I. Introduction

AARP claims to be the nation's "largest nonprofit, nonpartisan organization dedicated to empowering people" over the age of 50. AARP encourages its members to think of it as a trustworthy source of information and guidance, and it leverages that reputation in order to sell seniors AARP-branded Medigap insurance underwritten by UnitedHealth ("AARP Medigap"). But, it does so deceptively and without adequate insurance licensing. Specifically, AARP claims in all of its AARP Medigap marketing materials that "UnitedHealthcare Insurance Company pays royalty fees to AARP for the use of its intellectual property." That's simply not true. Unequivocal evidence establishes that Plaintiffs, and not UnitedHealth, pays AARP's royalty and, as this Court found in connection in its motion to dismiss, "a reasonable consumer could lack information to understand that: (1) a portion of her premiums satisfied UnitedHealth's obligation to pay royalties to AARP; (2) such royalties were calculated as a percentage of what she paid for Medigap coverage; and (3) the operable percentage was 4.95%." *Krukas v. AARP*, Inc., 376 F. Supp. 3d 1, 41 (D.D.C. 2019).

Additionally, record evidence developed during discovery substantiates Plaintiffs' allegations that the 4.95% from every payment is not a royalty but in fact a commission that AARP collects for urging Plaintiffs and class members to purchase AARP Medigap, which it cannot do without a license. *Id.* ¶¶ 40–59, 65. The 4.95% AARP takes from Plaintiffs for AARP Medigap is ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

■

and provides a real-world benchmark demonstrating the amount Plaintiffs paid AARP was substantially inflated.

AARP does not dispute that it does in fact retain 4.95% of its members' Medigap payments, and that it does in fact conceal this information from its members. Nevertheless, AARP argues that despite its misrepresentations that it is legally untouchable conduct because (1) their conduct didn't harm anyone and, (2) even if it did, AARP's behavior is absolutely immunized by the filed-rate doctrine.

But as to "(1)," case law recognizes a cognizable harm when one wrongfully obtains property from another and provides for restitution as a remedy. Here, AARP obtained Plaintiffs' money through deception and through illegal means. Defendants contend that claims for restitution cannot confer standing, but they cite nothing for the proposition and case law clearly indicates otherwise. Plaintiffs can also establish damages. Defendants claim that Plaintiffs lack standing because they got the benefit of their bargain – i.e., the insurance that they paid for. But Plaintiffs' claim is not about whether UnitedHealth delivered satisfactory insurance; it is about AARP's illegal conduct and disclosures and Plaintiffs never bargained to pay AARP a royalty or commission but had to pay for it regardless. This provides an actionable claim for damages. Moreover, Plaintiffs have the benefit of being able to offer a real-world benchmark (i.e., the royalty for MA and PD, when UnitedHealth actually paid for it) to demonstrate that the amount AARP took from them was inflated. And, it can be inferred from Defendants' use of pretextual reasons for concealing the amount of the royalty rate that full disclosure would not allow AARP to continue collecting the same amount from Plaintiffs and class members because such disclosure would undermine their ability to sell AARP-Medigap as a trusted advisor without a vested

interest.

And as to "(2)," Plaintiffs are not seeking to alter the rate UnitedHealth charged—they

are seeking to recover damages and restitution from AARP, an unregulated entity, for their mis-

conduct which does not implicate the filed-rate doctrine, as the Court has already held:

> [P]laintiff's claims focus on her relationship with AARP and its affiliates, not
> with UnitedHealth, the regulated entity responsible for filing rates. This fact un-
> derscores that the plaintiff challenges behavior independent of the terms and con-
> ditions of the filed rate. The plaintiff alleges that, through unfair and deceptive
> trade practices, the defendants collect and retain a commission to which they are
> not legally entitled. Should the plaintiff prevail on these claims to require AARP
> to stop collecting that "commission" on extant terms, no change to UnitedHealth's
> rates would necessarily follow. *Indeed, nothing about the plaintiff's claims*
> *against AARP and its affiliates prevents UnitedHealth from continuing to collect*
> *precisely the approved rates. Any follow-on disruption to UnitedHealth and*
> *AARP's side agreement regarding the "royalty" payment and whether, as a result*
> *of this disruption, UnitedHealth will decide to change the rates filed going for-*
> *ward is irrelevant to an analysis of whether the filed-rate doctrine bars plaintiff's*
> *claims against AARP now.*

The remainder of Defendants' motion is premised on a number of factual mischaracteri-

zations. For example, AARP claims that it could not have solicited insurance because the AARP

Medigap advertisements "are United's." But AARP owns those advertisements; AARP helped

draft those advertisements, which cannot be disseminated without Defendants' approval; and

AARP ensured that they appeared as if they were coming from AARP—its name is contractually

obligated to be the "dominant" name on those advertisements. They also argue that ASI

(AARP's agent) is only involved in "oversight" and not solicitation. But, as will become appar-

ent below, that position is belied by overwhelming evidence.

Defendants attempt to place this case in the same category of other cases that were

brought against both AARP and UnitedHealth but failed. But, as this court previously noted, this

case is differently crafted than the others because of what it challenges (exclusively AARP's

conduct and disclosures) and what it does not challenge (UnitedHealth's rates). And, in fact, one

of the UnitedHealth-AARP cases relied on by Defendants specifically recognizes this distinction:

> In that case [*Krukas*], however, the complaint did not challenge the amount of the
> Medigap insurance rate or the amount collected by the insurance provider that had
> been approved by state insurance agencies. In *Krukas*, the plaintiff's claim fo-
> cused on "AARP's description and practices related to the payment collected by
> AARP from each premium paid[.]" *Id.* at 28. Because Dane explicitly seeks a re-
> fund of his premiums rather than merely challenging AARP's description and
> practices related to payments collected by AARP, the court's reasoning in *Krukas*
> is not applicable here.

*Dane v. United Healthcare Co.*, 401 F.Supp.3d 231 (D. Conn. 2019).

Plaintiffs have been harmed by AARP's actionable conduct and Defendants' mo-

tion for summary judgment should be denied.

## II. Factual Summary

### A. AARP Medigap Compared to AARP's Other Medicare Offerings

AARP—with its 38 million members—is the nation's "largest nonprofit, nonpartisan or-

ganization dedicated to empowering people" over the age of 50. *See* Plaintiffs' Statement of Ma-

terial Facts ("SOMF"), Dkt. 102-1, ¶ 1. AARP publishes a magazine and newsletter for its mem-

bers; lobbies on their behalf; and provides them with continuing-education programs, among

other things. *Id.* AARP also holds itself out as a healthcare advisor; i.e., a "trusted 'curator' that

[will] guide its members" health-insurance choices; a "trusted 'short-cut,'" "counsel[or]," and

"advisor" to its members regarding their health-insurance choices; and a "'go to' health re-

source" and "source of trusted solutions in health." *Id.* ¶¶ 37–39.

AARP offers its members AARP Medigap—a supplemental health insurance plan

("SHIP") underwritten by UnitedHealth, and which protects against healthcare costs that tradi-

tional Medicare does not cover. *Id.* ¶ 4. Defendants do not, however, disclose to members the ex-

tent of their financial stake in AARP Medigap. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

In addition to offering AARP Medigap, AARP also currently endorses two other UnitedHealth-insured, Medicare-related products, PD and MA. *Id.* ¶ 18. The AARP Medigap relationship is outlined in the SHIP Program License and Quality Control Services Agreement (the "SHIP Agreement"); while their relationships for PD and MA are outlined in their own respective agreements. *Id.* ¶¶ 4, 19 ████████████████████████████████████████

Prior to 1998, AARP offered a Medigap product underwritten by Prudential and until that point, UnitedHealth had no experience with Medigap insurance. *Id.* ¶ 21. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████  ██

██████████████████████████

       ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████ Plaintiffs get no benefit from AARP for paying this.

**B. Plaintiffs and Class Members—Not UnitedHealth—Pay AARP the AARP Medigap "Royalty"**

AARP admits that insured members pay AARP directly. SOMF ¶ 8. Class members'

monthly payments are collected and deposited into accounts maintained by AARP Trust. *Id.* ¶ 33

(*see* SHIP at 9.13). ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████



## C. Defendants' Misleading Disclosures

Despite the AARP Medigap transaction described above, all AARP Medigap advertising contains the following disclosure that conceals its true financial interest: "UnitedHealthcare Insurance Company pays royalty fees to AARP for the use of its intellectual property." Gomez Dec. (ECF No. 70) ¶ 14. This identical disclosure is used by AARP and UnitedHealth with the PD and MA plans, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

Defendants state that they cannot disclose the amount of the "royalty" because

7

UnitedHealth will not let them, or disclosure will disadvantage AARP when negotiating other intellectual property licenses. But, while this amount is not readily available to consumers, it is available to sophisticated entities that would be negotiating with AARP because it is not a trade secret and was cited by this and other Courts in public opinions.

### D. Defendants Encourage their Members to Enroll in AARP Medigap

Because of Defendants' enormous financial interest in AARP Medigap—and because of the uniqueness of the AARP–UnitedHealth relationship—Defendants actively solicit AARP Medigap, ███████████████████████████████████

██████████████████████████

AARP does not passively wait to accrue royalty revenue: it directly encourages its members to purchase AARP Medigap, and it devotes an incredible amount of time and resources to the effort. *Id.* ¶¶ 37–66. For example, AARP owns and (along with its agent ASI) helps draft all Medigap marketing materials, which are explicitly labeled as "solicitation[s] of insurance" (*Id.* ¶¶ 42, 60), and which were intended to appear as if they were coming from AARP, not UnitedHealth. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

███████████████████████████



AARP also designed its own website (with ASI's guidance) in order to generate the

greatest amount of Medigap sales ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████

AARP holds itself out as an objective healthcare advisor whose goal is to guide its members through the process of selecting a Medigap plan, and AARP has noted that it is seen as "a trustworthy source of information and guidance"; a "counsel[or]" and "advisor" to its members; and "a trusted 'curator' that [would] guide its members to a good [Medigap] choice." *Id.* ¶¶ 37–

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████

ASI, acting as AARP's agent under the SHIP, was involved in almost all aspects of Medigap marketing, including evaluating and approving all Medigap advertisements (*Id.* ¶ 43);

9

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████

In comparable situations, companies have been required to obtain insurance licenses. *Id.* ¶ 65. This includes (1) websites that provide consumers with general insurance information—and encourage consumers to purchase those products—in exchange for a commission; (2) AAA, which—like AARP—is a large, national membership organization, and which offers its members AAA-branded insurance products underwritten by a third-party insurer; and (3) the NRA, whose endorsement and marketing of NRA-branded insurance programs—in exchange for a royalty— were found to be unlicensed insurance solicitation. Ex. Z, Blanchard Rpt. ¶¶ 57-63, 70-72.

Defendants were also compensated for their solicitation efforts. AARP was not paid a flat fee for its endorsement, it was paid 4.95% of class members' payments, and it did not wait passively for this revenue: Defendants in fact worked to generate sales and revenue, (*Id.* ¶¶ 47, 57) which means that Defendants earned a commission on their Medigap sales, as per the standard i████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ This indicates that the difference was attributable to these solicitation efforts, i.e., it was not for AARP's intellectual property but its services and its ability to deliver AARP members (i.e. a commission). *Id.*

### E. Plaintiffs' AARP Medigap Experience

Defendants recognized that AARP's involvement was critical to the success of the product. As just noted, consumers viewed AARP "as a trusted 'curator' that will guide its members to a good choice." *Id.* ¶ 37. Insurance companies like UnitedHealth, on the other hand, did not have that type of credibility because consumers "struggle to trust an insurance company with their […] recommendation as there's a vested interest." *Id.* ¶ 39.

AARP conceals that it has a vested financial interest in promoting AARP Medigap ███

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

Both Plaintiffs believed that AARP was a trusted advocate for seniors. *Id.* ¶ 71. Both read this disclosure in connection with AARP Medigap purchases and it did not alert them to the fact that AARP had a vested interest that went beyond a traditional royalty that UnitedHealth would pay to AARP at a corporate level or that they, and not UnitedHealth, would pay AARP. *Id.* ¶ 72. Ms. Krukas testified that such information would have been important to her purchasing decisions. *Id.* (*see* Class Ex. 60, Krukas Trans. at 53:24–54:17 and 67:12–68:12 (noting that she probably skimmed the disclosure because that is her practice, but assumed that it didn't apply to her, and noting that the disclosure was misleading because, "[I]f people knew that they were getting a commission they might have looked elsewhere, which I would have done."). Ms. Kushim testified similarly. *Id.* (*see* Class Ex. 61, Kushim Tr. 57:16–58:5, 62:15–23 (recalling seeing the

11

disclosure and testifying that it was misleading because, "You forgot the next sentence that says

by the way, we take five percent," and that, if there was such a disclosure, it would have given

her "something I want to compare to somebody else").

Plaintiffs seek restitution from Defendants for the amounts that they took through decep-

tion and without authority because they were acting as an unlicensed broker. They also seek

damages because Plaintiffs never bargained to pay AARP a royalty or a commission in connec-

tion with their AARP Medigap purchases and they paid an inflated amount to AARP. Addition-

ally, Plaintiff Kushim seeks injunctive relief to compel Defendants to make adequate disclosures.

*See* Declaration of Andrea Kushim ("Kushim Dec.") ¶ 8.

## III. Argument:

Courts should only grant summary judgment if "there is no genuine issueas to any mate-

rial fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P.

56(c).  Facts are "material" if they could affect the outcome of the suit under the governing sub-

stantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court must view the

facts in the light most favorable to the non-moving party (i.e., Plaintiffs), *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), and must view the factual evidence

and draw all reasonable inference in favor of the non-moving party, *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 158–59 (1970).

Defendants have the initial burden of showing the Court the  basis  for  their  motion by

reference to materials on file. *Celotex  Corp.  v. Catrett,* 477 U.S. 317, 323 (1986). Before the

Court can evaluate the non-movant's response in opposition, it must first consider whether the

movant has met its initial burden of showing that there are no genuine issues of material fact and

that it is entitled to judgment as a matter of law. *Fed. Ins., Co. v. Landis Constr. Corp.*, No. CV

06-00379 (AK), 2008 WL 11391665, at *2 (D.D.C. July 16, 2008). "[T]he burden upon the movant is not an easy one and the court will not lightly deprive a party of its right to a trial on disputed material factual issues." *Teamsters, Loc. 639, Emps. Tr. Fund v. Merchants Transfer Co.*, No. 80-770, 1981 WL 2313, at *2 (D.D.C. Feb. 2, 1981) (quoting *Dworman v. Mayor and Board of Aldermen*, 370 F. Supp. 1056, 1063 (D.N.H. 1974)). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009). If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013). A court's role at summary judgment is not to "determine the truth of the matter." *Id.*

## A. Plaintiffs Have Article III Standing Under Three Separate Injury Theories

As an initial matter, Plaintiffs have established Article III standing under several theories of their case. Standing just asks whether a plaintiff (1) suffered a concrete injury, (2) which is "fairly traceable" to the defendant, and (3) which can be redressed by the courts. *Renchard v. Prince William Marine Sales, Inc.*, 87 F. Supp. 3d 271, 278–79 (D.D.C. 2015) (Howell, J.). Standing is also distinct from a merits inquiry: it is easier to establish than the merits,[1] and standing analyses precede merits analyses,[2] so standing shouldn't be conflated with (say) definitively

---

[1] *See Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 424 n.15 (3d Cir. 2013) ("The 'fairly traceable' requirement . . . sets a lower bar than the showing of causation required on the merits." (citing cases)).
[2] *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 175 (D.C. Cir. 2012); *Nat'l Sec. Couns. v. C.I.A.*, 931 F. Supp. 2d 77, 90–91 (D.D.C. 2013) (citing cases).

proving causation.[3] In fact, on summary judgment, when assessing standing, a court must assume that a plaintiff will prevail on the merits of their claim.[4]

Here, Plaintiffs have suffered three distinct types of concrete injuries traceable to Defendants' conduct that can be redressed by this Court, each of which confer Article III standing.

### 1. Defendants have wrongfully retained Plaintiffs' money

Plaintiffs have standing based on their claim that Defendants wrongfully took their money as an illegal commission or through deception. Plaintiffs have standing whenever they claim that a defendant took money from them without the right to do so; or whenever they claim that they conferred a monetary benefit on the defendant, which the defendant should not be allowed to retain—standing theories that underlie thousands of conversion and unjust-enrichment claims throughout the federal court system.[5]

_____

[3] *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 658 (D.C. Cir. 2010); *Disability Rts. Council of Greater Wash. v. D.C.,* No. CIV.A. 04-0529 (JDB), 2005 WL 513495, at *1 (D.D.C. Mar. 3, 2005) ("[W]hen assessing . . . standing . . . a court must not 'conflate standing with merits[.]'" (quoting *Campbell v. Clinton*, 203 F.3d 19, 23–24 (D.C. Cir. 2000))); *Saunders v. White*, 191 F. Supp. 2d 95, 110 (D.D.C. 2002) (faulting a party for "conceiv[ing] of the standing inquiry as duplicating an inquiry into the merits"); *see also Gregory v. Quality Removal, Inc.*, No. 14-21480-CIV, 2014 WL 5494448, at *2 (S.D. Fla. Oct. 30, 2014) (if a standing challenge is actually a merits challenge, courts should assume standing (citing cases)).

[4] *See Otay Mesa Prop., L.P. v. United States Dep't of the Interior*, 144 F. Supp. 3d 35, 57 (D.D.C. 2015) (citing *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013)); *see also Vietnam Veterans*, 599 F.3d at 658 (faulting a district court for "conflat[ing] the merits . . . with standing"); *Smith v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.,* 371 F. Supp. 3d 313, 320 (E.D. La. 2019) (on summary judgment, "[t]he Court assumes the merits of Plaintiff's . . . claims and confines its inquiry to whether she has established the elements of standing." (citing cases)); *Disability Rts. Council*, 2005 WL 513495, at *1 (when assessing standing, courts must assume the legal validity of a damage theory).

[5] While defendants contend these causes of action cannot give rise to standing, they cite nothing for the proposition. Indeed, the case law demonstrates the opposite. *See, e.g.*, *Djourabchi v. Self*, 571 F. Supp. 2d 41, 53 (D.D.C. 2008) (granting plaintiff summary judgment on CPPA claim for return of money from architect who performed work without a license in violation of other D.C. statute); *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 20 (D.D.C. 2017) (throughout, recognizing standing where a defendant wrongfully retains another's money); *Campbell*, 130 F. Supp. 3d at 252 ("[T]heories of injury premised on unauthorized . . . charges . . . are sufficient to establish

Here, Plaintiffs allege that Defendants wrongly retained a portion of the class members' payments though deceptive practices and/or without the required insurance licensing. Plaintiffs have therefore suffered a concrete harm (loss of money) traceable to Defendants' conduct (illegal solicitation and/or deception) that is redressable by the court through an order directing restitution under Plaintiffs' conversion, unjust enrichment and CPPA claims. Plaintiffs have therefore established Article III standing.

Nevertheless, Defendants argue that even if they did illegally retain Plaintiffs' money, it is irrelevant because UnitedHealth might have *legally* taken it anyway, in a hypothetical world. Defs.' Br. at 20–23. But not only is this a merits argument, it is irrelevant, because it is not a valid defense to conversion, unjust enrichment, or a restitution claim under the CPPA's unfairness prong.[6] All three claims just ask whether a defendant took or received money that did not belong to them, and—if they did—then they have to return it.[7] In other words, the claims police

_____

standing[.]" (citing *In re APA Assessment Fee Litig.*, 766 F.3d 39, 47 (D.C. Cir. 2014))); *Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 524 (S.D.N.Y. 2011) (finding standing where the plaintiff "alleges that the defendants improperly transferred and/or received [the plaintiff's] money"); *Petrohawk Energy Corp. v. L. Debenture Tr. Co. of New York*, No. 06 CIV. 9404 DLC, 2007 WL 211096, at *3 (S.D.N.Y. Jan. 29, 2007) (standing premised on the diversion of funds); *see also Bratton v. Hershey Co.*, No. 2:16-CV-4322-C-NKL, 2017 WL 2126864, at *10 (W.D. Mo. May 16, 2017) (standing premised on conversion); *Willekes v. Serengeti Trading Co.*, No. CV137498ESMAH, 2016 WL 5334522, at *5 (D.N.J. Sept. 22, 2016) (same).

[6] As explained in section II(C)(1), below, Plaintiffs can premise CPPA violations on "a trade practice in violation of a law of the District," D.C. Code § 28-3905(k)(1)(A), and when violations result in illegal charges, the remedy can be restitutionary. *See, e.g.,* D.C. Code 28-3905(k)(2)(E) (authorizing "relief as may be necessary to restore to the consumer money . . . which may have been acquired by means of the unlawful trade practice").

[7] If a defendant converts a sum of money, then they simply have to return that sum (plus interest). *See Wash. Gas Light Co. v. Pub. Serv. Comm'n of D.C.*, 61 A.3d 662, 676–77 (D.C. 2013); s*ee also Trustees of Univ. of D.C. v. Vossoughi*, 963 A.2d 1162, 1175–76 (D.C. 2009) (conversion damages are equal to the value of the converted property). Similarly, if a defendant is unjustly enriched by $X, then they have to return that amount. *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 44 (D.D.C. 2019) (unjust-enrichment occurs "when a person retains a benefit (usually money) which in justice and equity belongs to another" (quotation marks omitted)); *Peart v.*

property-right violations so hypothetical causation arguments are irrelevant, in the same sense that a defendant is guilty of theft even if their victim would have spent the stolen money any-way.[8] Accordingly, what the class would have theoretically done with the 4.95%, if Defendants hadn't converted it, has no bearing on whether Defendants illegally took that money in the first place, and Defendants' standing argument fails.[9]

Defendants also argue that *Tolson v. Hartford Fin.*, 278 F.Supp.3d 27 (D.D.C. 2017) stands for the proposition that buying a service from an entity without a license is an informa-tional injury that does not establish concrete injury sufficient to provide standing. Defs.' Br. at 19. But Defendants misread *Tolson*, which actually supports Plaintiffs. *Tolson* involved an insur-ance coverage dispute arising out of sexual predation by an unlicensed massage therapist. The plaintiff obtained a consent judgment against the therapist's employer, enforceable only against

---

*D.C. Hous. Auth.*, 972 A.2d 810, 820 (D.C. 2009); *see also* 1 DAN B. DOBBS, DOBBS LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION § 3.1, at 280 (2d ed. 1993) ("Restitu-tion . . . begins with the aim of preventing unjust enrichment to the defendant. . . . To measure restitution, courts look at the defendant's gain or benefit.").

[8] *See, e.g.*, *Am. Bank, FSB v. Cornerstone Cmty. Bank*, 733 F.3d 609, 615 (6th Cir. 2013) ("[P]roximate cause is not an element of [conversion]." (citing authority)); *Sarfit, S.A. v. Mayall*, No. 88 CIV. 4343 (KMW), 1989 WL 120100, at *2 (S.D.N.Y. Oct. 4, 1989) (a defendant com-mits conversion even when they take money that was otherwise owed to them); *Matter of Du-ranti*, 1 B.R. 54, 56 (Bankr. W.D. Wis. 1979) (a defendant commits conversion even if the prop-erty at issue would have been ultimately—and hypothetically—valueless to the plaintiff); *In re Holmes*, 264 P.3d 423, 436 (Kan. 2011) ("It is no defense to conversion that, later, you earned the converted money."); *Car Transp. v. Garden Spot Distributors*, 805 S.W.2d 632, 636 (Ark. 1991) (noting that "damages naturally flow from a conversion," and that "proximate causation is not an element for the jury to find prior to awarding damages for conversion"); *Midwestern Heli-copter, LLC v. Coolbaugh*, 839 N.W.2d 167, 172 (Wisc. Ct. App. 2013) ("[T]here is no causation element in conversion; the conversion must result in interference with the owner's rights to pos-sess the property."); *Adler v. Hertling*, 451 S.E.2d 91, 97 (Ga. Ct. App. 1994) (whether plaintiffs recouped their conversion losses was "legally irrelevant" to a conversion claim); *Lacks v. R. Rowland & Co.*, 718 S.W.2d 513, 520–21 (Mo. Ct. App. 1986) ("[T]he emphasis is on the nature of the act of conversion, not its result.").

[9] Defendants cite *Mace v. Domash*, No. 5-cv-2244 (HHK), 2008 WL 11417279, at *7 (D.D.C. 2008), which just held that a defendant can't convert something that a plaintiff said they could keep, which is also irrelevant here (Plaintiffs never said AARP could retain their 4.95%, even as-suming that this hypothetical consent could somehow legitimize an illegal commission).

the employer's insurer, which had disclaimed coverage based on exclusions in the insurance contract for sexual misconduct. *Id.* at 31-32. To circumvent the exclusion, the plaintiff argued that her injury was not from the sexual misconduct but from the lack of licensing, which the court rejected. The court did note a potential claim that the plaintiff could assert under the CPPA that was not excluded for "'economic loss[ ] associated with the cost of the massage itself'" but the plaintiff did not plead that claim. *Id.* at 37, n. 10. Here, of course, Plaintiffs' claim is for the economic harm tied to Defendants' conduct selling unlicensed insurance, a claim that this court, like the *Tolson* court, found was actionable in its motion to dismiss order, contrary to Defendants' assertion otherwise. *Krukas*, 376 F. Supp. 3d at 42. Similar claims have been resolved on the merits. *See Djourabchi v. Self*, 571 F. Supp. 2d 41, 53 (D.D.C. 2008) (granting plaintiff summary judgment on CPPA claim for return of money from architect who performed work without a license in violation of other D.C. statute); *Mann v. Bahi*, 251 F. Supp. 3d 112, 126 (D.D.C. 2017) (finding that it was for a jury to decide whether representations that falsely implied a company held a valid license to practice in the jurisdiction constituted a CPPA violation).

### 2.  Plaintiffs suffered monetary damages

The Supreme Court recently reaffirmed that monetary damages are a classic form of cognizable injury,[10] one underlying thousands of cases throughout the federal court system.[11]

---

[10] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("[C]ertain harms readily qualify as concrete injuries . . . . The most obvious are traditional tangible harms, such as . . . monetary harms. If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury[.]").

[11] *See, e.g.*, *Telecommunications Rsch. & Action Ctr. on Behalf of Checknoff v. Allnet Commc'n Servs., Inc.*, 806 F.2d 1093, 1094–95 (D.C. Cir. 1986) (recognizing standing "to contest . . . overcharges"); *Colpitts v. Blue Diamond Growers*, No. 20 CIV. 2487 (JPC), 2021 WL 981455, at *5 (S.D.N.Y. Mar. 16, 2021) ("[T]hat a plaintiff would not . . . have paid the same amount [for a product, but for a defendants' misstatements,] comfortably satisfies the injury-in-fact prong[.]") (citing cases)); *see also Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 177 (E.D.N.Y. 2018) (same; citing cases); *Miller v. Peter Thomas Roth, LLC*, No. C 19-00698 WHA, 2020 WL

Here, Defendants misrepresented and concealed their financial interest in their transaction with Plaintiffs which allowed them to collect money from Plaintiffs that they never bargained to pay. SOMF ¶¶ 22, 23, 28, 29, 66–70. Defendants inform class members in all of their AARP Medigap marketing materials that: "UnitedHealthcare Insurance Company pays royalty fees to AARP for the use of its intellectual property." *Id.* ¶ 67.  But Plaintiffs and class members, and not UnitedHealth, paid AARP the royalty or commission that they did not bargain to pay. *Id.* ¶¶ 8-9. Plaintiffs' payment of a commission or royalty to Defendants that Defendant represented Plaintiffs were not responsible for paying is a direct harm to Plaintiffs that is traceable to Defendants' conduct and can be remedied by the Court under each claim that Plaintiffs assert. Plaintiffs have standing under this injury theory. No reasonable person would pay for a charge that they did not owe.[12]

Moreover, the amount Defendants collected was inflated. ████████████████

████████████████████████████████████████████████████████

_____

363045, at *6 (N.D. Cal. Jan. 22, 2020) (same); *Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 529–30 (N.D. Cal. 2018) (same); *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 512 (E.D. Pa. 2012) (finding standing where a defendant concealed excessive charges).

[12] Indeed, this is why courts routinely presume reliance of class members in fraud cases involving fraudulent overbilling. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (certifying a class where the defendant misled plaintiffs into believing that an "invoiced amount was honestly owed"); *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 643 (5th Cir. 2016) (certifying a class because no reasonable individual would agree to contribute to an illegal scheme); *In re APA Assessment Fee Litig.*, 311 F.R.D. 8 (D.D.C. 2015) (certifying a class where a membership organization allegedly misled its members into paying inflated membership fees, a portion of which was—unbeknownst to the class—funding the class's membership in some other organization); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 560–61 (E.D. Va. 2000) (certifying a class where they "clearly made payments in reliance upon the assurance that the process of repossession, sale and all subsequent steps were taken in conformity with the law," and noting that "[t]o conclude otherwise would deny human nature, run counter to the traditional presumption in favor of actors operating under rational economic choice, and leave the Court with an absurd conclusion"); *Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84–85 (N.D. Ill. 1997) (certifying a class where "[i]t is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable").

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

Nevertheless, Defendants argue that plaintiffs lack Article III standing because Plaintiffs "received the benefit of their bargain: exactly the insurance they sought for exactly the regulator-approved price they agreed to pay" Defs.' Br. at 18. But, as discussed in more detail below in connection with Defendants' closely intertwined filed rate argument, this case is not, and has never been, about the insurance coverage Plaintiffs received from UnitedHealth. It is about Defendants' conduct and their ability to wrongly extract money from Plaintiffs. Plaintiffs did not bargain to pay AARP's commission, but AARP extracted it anyway (at an inflated rate).

The decision in *Levine v. Am. Psychological Ass'n* (*In re APA Assessment Fee Litig.*), 766 F.3d 39 (D.C. Cir. 2014) is closely analogous. There, the American Psychological Association ("APA") led members to believe that they had to pay an amount to retain the benefits of their membership, failing to disclose that a portion of this amount went toward advocacy efforts that members were not actually required to pay to retain membership. *See id.* at 47. The APA nevertheless argued that they could retain the full fee because plaintiffs "received all the benefits they were promised in exchange for the assessment fees," including the advocacy efforts. The D.C. Circuit disagreed: "[plaintiffs] paid the special assessment to attain (or retain) APA membership, and only because defendants intentionally misled them into believing that the assessment was a precondition to their doing so." *Id.* at 48. The D.C. Circuit supplied an analogy:

> [S]uppose [a] landlord intentionally overbills the monthly rent by $500 but also includes an additional promise to perform lobbying activities on behalf of renters. A tenant who pays the overbilled $500 because she believes the rental contract so requires does not lose her unjust enrichment claim if the landlord performs the lobbying services. The landlord cannot immunize himself … by performing services that the tenant never desired in the first place.

*Id*; *see also E.M. v. Shady Grove Reprod. Sci. Ctr. P.C*., CV 19-657 (RC), 2020 WL 6158575, at *41 (D.D.C. Oct. 21, 2020) (finding it irrelevant for standing purposes that consumer was ultimately satisfied with procedure when she was deceived in the first instance). Similarly, here, no number of incantations by AARP that "consumers received the insurance they paid for" can immunize Defendants from liability for causing members to fund a side deal with UnitedHealth;

Defendants rely on *Donoff v. Delta Airlines*, 2020 WL 1226975 (S.D.Fla. March 6, 2020) for their standing argument. There, the court found that the plaintiff lacked Article III standing because Plaintiff got the travel insurance that he bargained for when purchasing through Delta Airline's site despite Delta collecting a commission from Allianz on the sale. But, unlike here, in *Donoff*, Delta did not make any representations at all about whether or how it was compensated, and Delta doesn't act as an advocate for travelers when offering Allianz's insurance on Delta's website. Here, by contrast, AARP made false disclosures regarding its compensation—claiming that "UnitedHealth pays AARP a royalty"—in order to mislead consumers about the source, size, and nature of its compensation so that it could maintain its purported reputation as an advocate for seniors. While the court in *Donoff* indicated that there was no duty for Delta to disclose and Delta did not disclose any information about its compensation, the *Donoff* court indicated that it would be different, had they falsely disclosed their compensation because that would have an impact on the ability of consumers to fairly value the products in the market. *Id.* at *9 ("Absent misrepresentation, a free market economy relies upon price competition rather than forced disclosure of pricing structure.").

Defendants also rely heavily on other cases brought against UnitedHealth and AARP that have been dismissed. But as, noted above, the *Dane* court distinguished this case from the situation before it for similar reasons that this court distinguished this case from the previously

dismissed UnitedHealth-AARP cases when deciding the motion to dismiss – namely, this case challenges harms from AARP's description and practices related to payments from consumers collected by AARP, not the amounts they paid UnitedHealth for insurance. For example, in *Friedman v. AARP, Inc*., 2019 WL 5683465 (C.D.Cal. 2019), which also distinguished this case, and found that the *Dane* case was more similar to it, plaintiffs challenged rates charged by Unit- edHealth, which was also a defendant. *Id*. at *3, n. 6.  Moreover, Plaintiffs here, unlike in *Fried- ma*n, have demonstrated that they were harmed by the misrepresentations because Plaintiffs didn't bargain to pay AARP's royalty and this also cost Plaintiffs and class members more than what the value of a royalty for use of AARP's intellectual property is when actually paid by UnitedHealth. This demonstrates a concrete harm that is separate and apart from the insurance rate UnitedHealth could collect and does not seek to make changes to that rate UnitedHealth can charge.

Defendants also argue Plaintiffs cannot satisfy Article III standing because there isn't "any evidence that UnitedHealth would have sought approval for a lower premium rate absent the royalty payment." Defs.' Bf. at 21. But, again, Plaintiffs aren't challenging the rate paid to UnitedHealth – they are challenging the payment they made directly to AARP. And, as a general matter, plaintiffs are never obligated to establish the exact specifics of a but-for world (which a defendant's behavior precluded, by definition), or to show that—in the actual world—a defend- ant contemplated behaving lawfully:

> Defendants' running argument . . . is that plaintiffs can point to no evidence that
> defendants . . . contemplated any of plaintiffs' but-for scenarios. In other words,
> defendants would premise causation here (and thus their liability) on the notion
> that they must have contemplated a lawful course of action before abandoning it
> for the unlawful. This is both wrong on the law—"[t]he most elementary concep-
> tions of justice and public policy require that the wrongdoer shall bear the risk of
> the uncertainty which his own wrong has created"—and in reasoning—our actors
> have no reason to contemplate action they might have taken in the but-for world

which never came to pass. Our jury will craft the but-for world, in which defend-
ants acted rationally and lawfully, based on measured deviation from the record.

*In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2021 WL 1817092, at *13 (N.D. Cal.

May 6, 2021) (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946)); *see also Wil-*
*liams v. First Gov't Mortg. & Inv'rs Corp.,* 225 F.3d 738, 745 (D.C. Cir. 2000) (noting that "the

amount of [CPPA] damages turns not on whether Williams had better [loan] options," and meas-

uring damages by the amount of the fees the defendants were able to collect from the plaintiff).

Here, Defendants' argument that "the termination of the relationship would have left an

overwhelming gap in UnitedHealth's customer-acquisition strategy that United would have had

to fill with other, costly marketing efforts" is irrelevant and deviates wildly from the record.

Defs.' Br. at 23. Under the SHIP, ███████████████████████████████████████████████



███████████████████████████████████████████████████ UnitedHealth

can start its own Medigap business at that point, should it so choose, to compete with AARP's

product (which would bring more competition to the Medigap market). The scenario that *is* teth-

ered to the record is that under a truthful disclosure where "UnitedHealth pays AARP a roy-

alty…", and not class members, the royalty would be ████████████████████████████

████████████████████████████████████████████████████████ And,

a lower royalty rate directly benefits the insured class members. SOMF ¶ 33 (citing Ex. R and

Pinsonneault Rpt. at ¶ 130).

Defendants have never conducted a real-world experiment in which they disclose that

Plaintiffs pay AARP 4.95% of their insurance payments. Defendants' conduct, though, indicates

that their misrepresentations and omissions were intended to protect their royalty rate. According

to AARP, they can't disclose the amount of the royalty because UnitedHealth won't let them be-

cause "that information is proprietary and could be used competitively by other insurers as well

as licensees negotiating royalties with AARP." But, unlike the average consumer, sophisticated insurance companies or other AARP licensees can access this information ahead of their negotiations because it's not a trade secret – indeed, the rate was cited in this court's opinion on the motion to dismiss as well as previous court orders.[13] AARP's explanation for non-disclosure is pretextual and suggests that the omissions were designed to protect its royalty rate from consumer pressure. *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1013 (3d Cir. 1994) (reversing district court's grant of summary judgment because, among other things, the jury could infer that the defendant engaged in a collusive scheme based on pretextual reasons he offered about the reasons for his business practices in question).

Plaintiffs suffered concrete redressable harm by paying a commission or royalty to Defendants that they never bargained for and at an inflated rate.

### 3. Defendants deprived Plaintiffs of truthful information, distorting the competitive landscape for making purchasing decisions

Plaintiffs also have standing under another theory, i.e., that Defendants deprived the class of material, truthful information, despite presenting themselves as trusted healthcare advisors. Specifically, Defendants' misstatements and omissions deprived class members of truthful information, which had a material impact on reasonable consumers' purchasing decisions. Defendants sold AARP Medigap as a "trust"-based product to its members in order to distinguish it from its competitors' "commodity" Medigap policies, and their scheme worked. SOMF ¶¶ 37-39. AARP's disclosure of its financial stake in the transaction would have led reasonable consumers to understand that AARP Medigap was no different from the commodity Medigap policies offered by its competitors. Disclosing this interest would have changed, and would still change, the

---

[13] *Krukas v. AARP, Inc.*, 376 F.Supp.3d 1 (D.D.C. 2019); *See e.g. Friedman v. AARP, Inc.,* 2014 WL 12561609 (C.D. Cal. Oct. 6, 2014)

competitive landscape. This violation and injury can be remedied by injunctive relief requiring accurate disclosures and/or CPPA statutory-damages. Plaintiff Kushim continues to hold a Medigap policy so has standing to pursue injunctive relief. *See* Kushim Dec. ¶ 8.

Because the CPPA's scope of cognizable harm exceeds Article III's scope of cognizable harm, injury under the CPPA is coterminous with the outer limits of Article III standing (at least in federal court). *Mann v. Bahi*, 251 F. Supp. 3d 112, 119 (D.D.C. 2017) ("D.C. law is clear that the CPPA is meant to extend as far as Article III's requirements will permit."). For example, the CPPA outlaws all misleading advertisements, regardless of whether they result in pecuniary harm;[14] but as this Court already held, a plaintiff needs to show something "more" than the deprivation of truthful information in order to trigger Article III standing. *Krukas*, 376 F. Supp. 3d at 37 n.12. The issue, then, is what kind of informational harm confers federal standing, and Plaintiffs submit that the deprivation of truthful, material information that impacts consumers' choices in a competitive landscape—coupled with Defendants' status as a trusted advisor—*is* more, and constitutes an injury-in-fact.

In *Jeffries v. Volume Servs. Am.*, 928 F.3d 1059 (D.C. Cir. 2019), which postdates the Court's first motion-to-dismiss opinion, the D.C. Circuit held that breaches of trust between a

---

[14] "It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact . . . damaged." D.C. CODE § 28-3904. A core purpose of the D.C. Council's amendment to add an unfairness prong to the CPPA was to further reiterate the importance of consumers receiving such information in the marketplace. *See* Report on Bill 220185, available at http://chairmanmendelson.com/wp-content/uploads/2018/03/B22-185-Consumer-Protection-Clarification-and-Enhancement-Amendment-Act-Packet.pdf (last accessed February 19, 2021) (unfairness prong added to "protect consumer independence by stopping business practices that impede a consumer's ability to make informed choices"); *Campbell*, 130 F. Supp. 3d at 252 (material misrepresentations in sale of insurance deprived plaintiff of truthful information which was sufficient for an injury in fact (citing D.C. CODE § 28-3901(c) ("This chapter establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia."))).

consumer and a merchant *could* confer standing, regardless of whether the consumer suffered any pecuniary harm. The Court likened such situations to breach-of-confidence claims, which were a historically recognized form of injury; noted that "[t]he harm in a breach-of-confidence case occurs when the plaintiff's trust in the breaching party is violated, whether or not the breach has other consequences"; and held that the standing rationale underlying breaches of confidence applied to the statute at issue, regardless of the fact that the two causes of action weren't strictly "identical." *Id.* at 1064–65. In a concurrence, Judge Rogers also reiterated that plaintiffs *can* have Article III standing to "receive 'truthful information'" about significantly important purchase decisions, *see id.* at 1069 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)), and this idea was echoed in *Mattiaccio v. DHA Grp., Inc.*, 474 F. Supp. 3d 231 (D.D.C. 2020), which held that the plaintiff had standing to challenge the deprivation of a disclosure that "creates the possibility for the consumer to respond to inaccurate or negative information," *id.* at 250 (quoting *Long v. Se. Pa. Transportation Auth.*, 903 F.3d 312, 319 (3d Cir. 2018)).

Here, AARP's nondisclosures—its failure to tell its members that they'd be paying AARP a hidden fee—constituted both a breach of trust and a deprivation of material information. AARP repeatedly described itself as the class's trusted healthcare advisor, e.g., a "trusted 'curator' that [would] guide its members" health-insurance choices; a "trusted 'short-cut,'" "counsel[or]," and "advisor" regarding its members' health-insurance choices; and a "'go to' health resource" and "source of trusted solutions in health." SOMF ¶¶ 37-39. And by concealing the extent of their financial ties to AARP Medigap, Defendants deprived the class of truthful, material information, which related to a significant purchase decision, and which deprived the class of the ability (among other things) to accurately weigh the pros and cons of competing health-insurance policies. Plaintiffs therefore submit that federal courts have recognized this as a cognizable

injury, and that Plaintiffs have standing to pursue a theory based on deprivation of truthful information under the CPPA, in addition to their damage theory.

Tellingly, AARP itself has admitted in similar contexts that conduct of this kind constitutes a concrete injury-in-fact. In an amicus brief filed in 2017 in the D.C. Circuit,[15] it said the following about "kickbacks"[16] distorting the housing market beyond individual overcharges:

> Importantly, the harm caused by such kickbacks is more insidious than an overcharge of several hundred or even thousands of dollars to an individual homebuyer. Congress recognized that referrals in exchange for kickbacks distort the real estate settlement market by establishing a financial incentive for lenders to refer homebuyers to settlement services that offer the best financial incentives to lender, rather than those that provide the best value for the borrower. "[T]he advice of the person making the referral may lose its impartiality and may not be based on his professional evaluation of the quality of service provided if the referror or his associates have a financial interest in the company being recommended." H.R. Rep. No. 97-532, at 52.

Ex. CCC, at p. 16. It also decried that "[h]aving the power to make referrals has long been recognized to cause prices to increase. It eliminates incentives for providers to compete for customers based on price." *See id.* at p. 11. Unlike in the context of purchasing a home, with Medigap policies, AARP recognized ▮▮▮▮▮

That is, until AARP entered the scene and was able to leverage its position as a trusted source of healthcare advice to manipulate the market such that consumers selected AARP-branded Medigap plans for this reason, rather than price. *See Id.* The sum of AARP's logic, then, is that the deprivation of truthful information about its financial relationship with United necessarily

---

[15] *See PHH Corp., et al. v. Consumer Financial Protection Bureau*, Case No. 15-1177 (D.C. Cir.) (Dkt. # 1668978), attached as Exhibit CCC to the Declaration of Jason S. Rathod.

[16] AARP defined "kickbacks" as follows: "[a]rguably, where the affiliate charged higher costs without providing more services or any benefit to the buyer, the excess charge could be considered an illegal kickback received in exchange for the referral." *See* Ex. CCC at p. 11.

causes concrete harm to policyholders.[17] Truthful disclosure would restore integrity to the market

and, on standard principles of economics, drive prices down.[18] Plaintiffs submit that these forms

of harm readily satisfy the criterion for something "more" that the Court requires for a concrete

informational injury.

Defendants' citation to *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) (Defs.' Br. at

19) does nothing to unsettle this analysis and, in fact, supports Plaintiffs' argument. *TransUnion*

reiterated that informational injuries trigger standing (1) when a plaintiff "fail[s] to receive . . .

required information," which happened here; (2) when a statute "entitle[s] all members of the

public to certain information," which is what the CPPA requires; and (3) when a plaintiff identi-

fies "downstream consequences from failing to receive the required information," which Plain-

tiffs have also done (e.g., AARP's breach of trust and Plaintiffs' inability to act on the additional

information re: AARP's vested interest, as well as distortion of the market). *Id.* at 2214 (internal

quotation marks omitted).[19] Plaintiffs have standing to pursue a deprivation of truthful

---

[17] In fact, in it its amicus brief it has an entire argument section titled "KICKBACKS CAUSE CONCRETE HARM TO HOMEBUYERS." *See* Ex. __, at p. 16. There is no credible reason to believe kickbacks, as AARP itself broadly defined them, do not similarly cause concrete harm to Medigap purchasers.

[18] *See* Transparency in Coverage, Final Rule of the Dept's of the Treasury, Labor, and Health & Human Servs., T.D. 9929 (Nov. 12, 2020), *available at* https://www.govinfo.gov/content/pkg/FR-2020-11-12/pdf/2020-24591.pdf ("Many empirical studies have investigated the impact of price transparency on non-health care markets, with most research showing that 'price transparency leads to lower and more uniform prices, a view consistent with predictions of standard economic theory.'") (quoting Austin, D.A., and Gravelle, J.G. ''Does Price Transparency Improve Market Efficiency? Implications of Empirical Evidence in Other Markets for the Health Sector.'' United States Congress Congressional Research Service. April 29, 2008. Available at: https://crsre-ports.congress.gov/product/pdf/RL/RL34101 . The agencies' rule on price transparency was re-cently upheld by *AHA v. Azar*, 983 F.3d 528 (D.C. Cir. 2020), which credited the agency's as-sessment that "based on available research in the healthcare industry and traditional economic analysis the disclosure scheme is likely to lead to lower, not higher prices." *Id.* at 539.

[19] In Defendants' remaining cases, the plaintiffs either failed to show (1) the deprivation of mate-rial information or (2) any further harm. *See, e.g., In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 30–31 (D.D.C. 2014) (recognizing denial of

information theory under the CPPA.

**B.  The Filed-Rate Doctrine Doesn't Bar Plaintiffs' claims**

Next, Defendants argue that the filed-rate doctrine bars Plaintiffs' claims, but the doctrine

doesn't apply here at all. Defs.' Br. at 24.

Where federal filed rates are at issue, federal courts have cited the filed-rate doctrine to

preclude state causes of action, as a matter of preemption; and federal causes of action, as a mat-

ter of inherent authority (i.e., because federal courts can interpret and limit the scope of federal

causes of action). *Clark v. Prudential Ins. Co. of Am*., No. CIV. 08-6197 DRD, 2011 WL

940729, at *10 (D.N.J. Mar. 15, 2011). But where *state* filed rates and *state-law* causes of action

are at issue, neither of these rationales are present, and it is "beyond the power of the federal

courts" to assume that the filed-rate doctrine applies—only a state or its highest court can make

that determination. *Id.* In light of this—and because the federal government left insurance regula-

tion to the states—courts have refused to blindly apply the filed-rate doctrine to state insurance

rates, absent some indication from the states themselves. *Bhasker v. Kemper Cas. Ins. Co*., 284

F. Supp. 3d 1191, 1226–35 (D.N.M. 2018); *Clark*, 2011 WL 940729, at *10; *see also Gunn v.

Cont'l Cas. Co*., 968 F.3d 802, 807 n.2 (7th Cir. 2020) (advising the district court to consider this

rule on remand). Or, as noted by the Seventh Circuit, after citing this Court's earlier order with

approval, "[I]t is 'neither prudent nor appropriate for a federal court to impose the filed-rate doc-

trine on a state which has not adopted it, nor should a court stretch or bend a state doctrine to

---

information can constitute an injury but finding that plaintiff pled neither an actual deprivation of
information, nor other harm); *Austin-Spearman v. AARP*, 119 F. Supp. 3d 1, 14 (D.D.C. 2015)
(no injury when the plaintiff "merely allege[d] that AARP's privacy protections were not as
stringent as she believed they would be"); *Tolson v. Hartford Fin. Servs. Grp*., 278 F. Supp. 3d
27, 37-39 (D.D.C. 2017) (finding no injury because the plaintiff accepted a consent judgment
that limited rights and remedies to a contract which excluded her CPPA injuries). Plaintiffs have
done both here, so these cases are inapposite.

more comfortably fit the contours of the federal rule.'" *Gunn*, 968 F.3d at 807 n.2 (quoting *Bhasker*, 284 F. Supp. 3d at 1233).

Here, as both this Court and the Seventh Circuit have noted, there's no indication that D.C. or its courts would apply the filed-rate doctrine to D.C. insurance rates. *Id.*; *Krukas*, 376 F. Supp. 3d at 21 n.7. The only D.C. statute addressing filed rates applies strictly to public utilities, which suggests that D.C. does *not* want the doctrine to apply to insurance rates; and the CPPA's legislative history suggests that it was intended to apply regardless of any preexisting doctrines, such as the filed-rate doctrine. *See Gunn*, 968 F.3d at 810; *Krukas*, 376 F. Supp. 3d at 21 n.7. Moreover, the term "filed rate doctrine" appears in only three Court of Appeals cases, none of which relate to insurance rates, so even if the Court does recognize the filed-rate doctrine, "its contours are yet to be revealed." *Gunn*, 968 F.3d at 810; *Krukas*, 376 F. Supp. 3d at 21 n.7. There is therefore no reason to assume that the filed-rate doctrine applies here—let alone to an unregulated entity.

Moreover, even if D.C. does recognize some form of the filed-rate doctrine, it has no applicability here. Plaintiffs aren't seeking to alter the rate UnitedHealth charged—they're seeking to recover the money that Defendants wrongfully retained, which doesn't implicate the doctrine, as this Court previously recognized:

> [P]laintiff's claims focus on her relationship with AARP and its affiliates, not with UnitedHealth, the regulated entity responsible for filing rates. This fact underscores that the plaintiff challenges behavior independent of the terms and conditions of the filed rate. The plaintiff alleges that, through unfair and deceptive trade practices, the defendants collect and retain a commission to which they are not legally entitled. Should the plaintiff prevail on these claims to require AARP to stop collecting that "commission" on extant terms, no change to UnitedHealth's rates would necessarily follow. *Indeed, nothing about the plaintiff's claims against AARP and its affiliates prevents UnitedHealth from continuing to collect precisely the approved rates. Any follow-on disruption to UnitedHealth and AARP's side agreement regarding the "royalty" payment and whether, as a result of this disruption, UnitedHealth will decide to change the rates filed going*

> *forward is irrelevant to an analysis of whether the filed-rate doctrine bars plain-*
> *tiff's claims against AARP now.*

*Krukas*, 376 F. Supp. 3d at 22–23 (emphasis added).

Here, none of Plaintiffs' recovery theories second guess any determinations by any regulators; none of them turn on the existence of any hypothetical lower rates charged by UnitedHealth; and none of them ask the regulated entity, UnitedHealth, to return anything to the class. As noted above, Plaintiffs' restitution theory posits that AARP had no right to retain money they wrongfully obtained (which Plaintiffs paid directly to AARP and never even came into UnitedHealth's possession), so AARP needs to return that money to Plaintiffs. It says nothing about hypothetical filed rates, which aren't legally relevant to this theory at all. Similarly, Plaintiffs' damage theory focuses on payment of royalties or commissions to AARP that they did not bargain to pay (and which they paid at inflated rates). Neither seeks to change the filed rate, and there's no doubt that the doctrine does not apply to Plaintiff Kushim's request for injunctive relief seeking greater disclosure. *See*, *e.g.*, *In re New Jersey Title Ins. Litig.*, 683 F.3d 451, 461 (3d Cir. 2012) ("the filed rate doctrine does not bar injunctive relief claims against future rates."). The filed-rate doctrine therefore doesn't apply to Plaintiffs' claims here, as this Court already determined.[20]

## C.  **Plaintiffs Can Prove Each of their Claims on the Merits**

### 1.  **Plaintiffs can prove their CPPA unfairness claim**

Plaintiffs have identified significant evidence to show that Defendants violated the CPPA's unfairness prong. A defendant violates this prong whenever their conduct: (1) offends

---

[20] For instance, Defendants again lean heavily on cases such as *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314 (11th Cir. 2018) to reformulate this case as a violation of the Filed Rate Doctrine. *See Defs' Motion at p. 27.* However, this Court has already rejected applicability of that case to this matter. *See Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 24 (D.D.C. 2019) ("The focus of the plaintiff's claims is not the approved rate but AARP's description and practices related to the payments collected by AARP from each premium paid.")

public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers.[21] *See Reyes v. Sessions*, 342 F. Supp. 3d, 141, 150 (D.D.C. 2018) ("[I]t is impossible to frame definitions which embrace all unfair practices [because t]here is no limit to human inventiveness in this field." (*citing FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972) (discussing Section 5 of the FTCA))). The unfairness test is holistic, not disjunctive. *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir. 2009). Courts have described unfair practices as conduct tethered to a general public policy and "comparable" to a violation of law. *See In re Adobe Sys. Privacy Litig.*, 66 F. Supp. 3d 1197, 1227 (N.D. Cal. 2014) (articulating a similar test under California law).

Plaintiffs can also premise CPPA violations on "a trade practice in violation of a law of the District." D.C. CODE § 28-3905(k)(1)(A). As noted by D.C.'s Court of Appeals, acts deemed unlawful under other D.C. statutes are actionable under the CPPA:

> Although § 28–3904 makes a host of consumer trade practices unlawful, its list of such practices was not designed to be exclusive. The remainder of the statute obviously contemplates that procedures and sanctions provided by the Act will be used to enforce trade practices made unlawful by other statutes.

*Atwater v. D.C. Dep't of Consumer & Regulatory Affairs*, 566 A.2d 462, 466 (D.C. 1989); *Djourabchi v. Self*, 571 F. Supp. 2d 41, 53 (D.D.C. 2008) (granting plaintiffs' motion for summary judgment on CPPA claim based on a contractor's violation of a D.C. law that precluded him from collecting a fee without being properly licensed); *see also Velcoff v. MedStar Health, Inc.*, 186 A.3d 823, 826 (D.C. 2018) (assuming that violations of D.C.'s Mental Health Information Act could also violate the CPPA); *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714,

---

[21] The CPPA was only recently amended to add a claim for unfairness, so there is little caselaw on the question in this jurisdiction. But the test is widely accepted under similar consumer-protection statutes in other jurisdictions and should be applied here. *See, e.g.*, *Rohrer v. Knudson*, 203 P.3d 759, 763–64 (Mont. 2009) (in a question of first impression, surveying different states' laws and adopting this test over others because of "abundant precedent in other jurisdictions").

725 (D.C. 2003) ("Accepting the full . . . fee as an imposition on consumers that was void and unenforceable under the common law of the District of Columbia, we hold that consumers could invoke the CPPA to challenge that imposition as an unlawful trade practice.").

Here, the evidence shows that Defendants violated D.C.'s insurance laws, and the public policy embodied in those laws.[22] D.C. law prohibits an unlicensed entity from being paid to solicit insurance,[23] and it defines "solicitation" as "attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company." D.C. CODE § 31-1131.02(17). And as noted throughout this brief, Defendants were in fact asking or urging their members to buy a particular kind of insurance, i.e., AARP Medigap.

As to AARP, it  describes itself as leveraging its role as a trusted healthcare advisor in order to sell Medigap policies to its members. SOMF ¶¶ 42-48. AARP therefore solicits AARP Medigap insurance.

---

[22] *See, e.g*., D.C. Code § 31-1131.13(b) ("A person shall not accept a commission, service fee, brokerage fee, or other valuable consideration for selling, soliciting, or negotiating insurance in the District if that person is required to be licensed under this chapter and is not licensed."); D.C. Code § 31-2502.31 (compensation of unlicensed persons prohibited); D.C. Code § 31-1131.03 ("A person shall not sell, solicit, or negotiate insurance in the District for any class of insurance unless the person is licensed for that line of authority in accordance with this chapter.").

[23] D.C. CODE § 31-1131.13 ("A person shall not accept a commission, service fee, brokerage fee, or other valuable consideration for selling, soliciting, or negotiating insurance in the District if that person is required to be licensed under this chapter and is not licensed.").

ASI, working on behalf of AAR█████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████ASI therefore solicits AARP Medigap insurance.

As for the AARP Trust, it collects and remits premiums. *Id.* at ¶¶ 8-9, 33. In other words, the AARP Trust helps "exchange a contract of insurance . . . for money or its equivalent, on behalf of an insurance company." D.C. CODE § 31-1131.02(16). The CPPA expressly covers defendants of this kind by permitting consumers to hold them liable as a "merchant," which "is not limited to the direct supplier of goods or services to consumers, but includes any person connected with the supply-side of a consumer transaction." *District of Columbia v. Student Aid Ctr., Inc.*, No. 2016 CA 003768, 2017 D.C. Super. LEXIS 18, *5 (Sept. 8, 2017) (quoting D.C. Code § 28-3901(a)(3)); *see also id.* (finding individual officer to be liable because he "sold student debt relief services 'indirectly' ….").

Further, as noted by Plaintiffs' expert, Holly Blanchard, Defendants' activities constitute insurance solicitation, as that term is generally understood by insurance professionals. *Id.* ¶¶ 61, 66. In fact, other membership organizations that offer their own branded insurance products, and perform the same marketing functions, have either obtained licenses to sell insurance (like AAA) or been disciplined for failing to obtain those licenses (like the NRA). Blanchard Rprt. *Id.* ¶¶ 57-63, 70-71. Defendants are therefore in violation of D.C.'s insurance laws.

And finally, Plaintiffs can show that Defendants were paid to solicit insurance. *First*, the percentage-based structure of AARP's royalty, coupled with the fact that AARP in fact encouraged its members to purchase AARP Medigap, in order to drive AARP revenues, indicates that the royalty was in fact a commission, as per the standard industry definition of the term. SOMF ¶¶ 28, 59-66. *Second*, AARP's MA and PD royalties are miniscule in comparison to its Medigap "royalties", indicating that this premium is attributable to AARP's larger role in selling and promoting AARP Medigap (with regard to MA and PD, ASI merely provides brand oversight). *Id.* ¶¶ 22, 28-35.) Defendants therefore receive a commission for selling AARP Medigap, in violation of D.C. insurance law.

Defendants' arguments to the contrary fail for several reasons:

- Defendants argue at length that *UnitedHealth* solicits AARP Medigap (Defs.' Br. at 29, 31), but this has nothing to do with whether Defendants also solicit insurance, and as noted above, they do—they even ███████████████████████████ ██████████ their name on the AARP Medigap materials that Defendants admit are a form of solicitation. *Id.* ¶¶ 40-44.

- Defendants argue that ASI only engages in "quality-control services" and doesn't "urge consumers" to purchase AARP Medigap. (Defs.' Br. at 30.) But ASI ███████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████

- Defendants argue that ███████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████

- Defendants suggest that AARP couldn't have solicited Medigap because universities that endorse credit cards don't automatically become credit-card companies (Defs.' Br. at 31.) But the issue isn't whether an insurance endorsement makes AARP an insurer, it's whether the endorsement means that AARP is encouraging its members to buy a particular insurance product (it does). Plus, Plaintiffs aren't suggesting that the endorsement *alone* makes AARP a solicitor: as just noted, AARP engages in a number of other activities that cross the line into solicitation, including ███████████████████

██████████████████████████████████████

- Defendants argue that UnitedHealth didn't pay it to solicit insurance because ███ ████████████████████████████████████████ (2) the structure of the royalty, in conjunction with AARP's solicitation activities, mean it *is* a commission, and ███ ██████████████████████████

Defendants' unlawful conduct caused substantial injury to consumers. *See supra* III.A. In light of the evidence above, Plaintiffs will be able to show at trial that Defendants violated the CPPA's unfairness prong, and their summary-judgment motion should be denied.

### 2.   Plaintiffs can prove that Defendants violated the CPPA's deception prong

Plaintiffs will also be able to prove that Defendants violated the CPPA's deception prong. The CPPA makes it a violation to "use ambiguity as to a material fact, which has a tendency to mislead"; "misrepresent as to a material fact which has a tendency to mislead"; or "fail to state a material fact if such failure tends to mislead." D.C. CODE § 28-3904(e), (f). And as this Court noted, "A matter is material if: 'a reasonable [person] would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question." *Krukas*, 376 F. Supp. 3d at 41 (quoting *Saucier*, 64 A.3d at 442)).[24] This applies "whether or not any consumer is in fact misled [or] deceived" by a defendant's conduct. D.C. CODE § 28-3904(a). In other words, whether a defendant engages in deceptive conduct turns on whether an omission or misstatement would have deceived an objectively reasonable consumer, not whether a defendant in fact deceives any individuals.

Here, as noted above, Defendants engaged in deceptive conduct that would mislead a

---

[24] The CPPA even prevents a defendant from making misrepresentations where "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in his or her choice of action, although a reasonable [person] would not so regard it." *Krukas*, 376 F. Supp. 3d at 41 (quoting *Saucier*, 64 A.3d at 442).

reasonable consumer through their statements or omissions regarding the 4.95% charge, (1) including its amount, and who pays it, (2) the Defendants' activities as a de facto or unlicensed insurance agent; and (3) the Defendants' misrepresentation of the 4.95% charge as a "royalty" when it qualifies as a commission that they may not legally collect. Plaintiffs can therefore prove their CPPA deception theory.

Defendants contend that they're entitled to summary judgment on this count, but their arguments fail for several reasons. Defs.' Br. at 33.

*First*, Defendants argue that they're not responsible for the misstatements at issue, UnitedHealth is. But again, AARP owns the materials at issue; AARP and ASI helped draft them; AARP and ASI dictate whether or not they get disseminated; and the materials were designed to appear as if they were coming from AARP—meaning that Defendants are responsible for the misstatements at issue. SOMF ¶¶ 40-49, 60-66. And on top of this, Plaintiffs' claims don't solely depend on affirmative misrepresentations but also material omissions. *See Krukas,* 376 F. Supp. 3d at 39; D.C. Code § 28-3904(e), (f) (it is a CPPA violation to "fail to state a material fact if such failure tends to mislead"). And it's *Defendants* who were obligated to disclose the amount of their royalties, and the fact that Plaintiffs would be paying for them, but never did.[25] They can therefore be held liable under the CPPA.

*Second*, Defendants argue that they didn't misstate anything because they weren't in fact

_____

[25] To whatever extent AARP is suggesting that it didn't owe seniors a duty to disclose, *Lee v. Bos,* 874 F. Supp. 2d 3, 6 (D.D.C. 2012), is irrelevant. This Court has already held that Plaintiffs could still prove fraudulent omission if they could show "that defendants had a duty to disclose arising from superior knowledge." *See Krukas*, 376 F. Supp. 3d at 46; *see also Krukas v. AARP, Inc.*, 458 F. Supp. 3d 1, 7 n.5 (D.D.C. 2020). As detailed above, Plaintiffs have properly shown that Defendants knew that Plaintiffs and class members were acting unaware of a material fact that is unobservable or undiscoverable by an ordinarily prudent person upon reasonable inspection. SOMF ¶ 67-70. Moreover, "D.C. Code § 28-3904 (f) does not require a plaintiff to plead and to prove a duty to disclose information." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 444 (D.C. 2013).

paid any commissions. (Defs.' Br. at 33–24.) However, Defendants *were* paid a commission, as noted above; and, in any event, Plaintiffs can prevail on a deception claim even if it was not a commission because they also have established that Defendants failed to disclose the size of the royalty and who paid for it. *Krukas*, 376 F. Supp. 3d at 40 (recognizing a CPPA deception claim based on Defendants' failure to disclose the amount of their royalty and that the class will pay it).

 *Third*, Defendants argue that Plaintiffs haven't established that Defendants' omissions were material. But as an initial matter, issues of materiality are generally questions of fact for the jury, rendering Defendants' entire argument inappropriate. *Krukas*, 376 F. Supp. 3d at 39 (citing cases).[26] And as a matter of common sense, a reasonable juror could conclude that a reasonable consumer would want to know if 4.95% of their monthly insurance premiums—thousands of dollars over the course of a lifetime—were funding a royalty license that the insured had absolutely no use for, and which would play no role for them over the life of their insurance policy. Defendants also sold AARP Medigap as a "trust"-based product—as opposed to its competitors' "commodity" Medigap policies—meaning that if AARP had disclosed its financial stake in the Medigap transaction, then reasonable consumers would understand that AARP Medigap was no different from the commodity Medigap policies offered by its competitors.

 Next, Defendants argue that Plaintiffs testified that Defendants' omissions were immaterial, but that argument also fails for several reasons. (Defs.' Br. at 34.) For example, according to

---

[26] *See also McFadden v. Nationstar Mortg. LLC*, No. 20-cv-166-EGS-ZMF, 2021 U.S. Dist. LEXIS 147319, at *29 n.15 (D.D.C. July 30, 2021) (stating the parties' dispute about whether "a reasonable consumer would not pay such fees if he or she knew the truth" is irrelevant because "this argument is a question of fact for the jury and not a question of law for the court.") (internal citations and quotations removed)*;Parr v. Ebrahimian*, 70 F. Supp. 3d 123, 135 (D.D.C. 2014); *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1005 (D.C. 2020) ("Ordinarily materiality is a question for the factfinder."); *Saucier v. Countrywide Home Loans,* 64 A.3d 428, 442 (D.C. 2013) (misleadingness and materiality under CPPA are jury questions); *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1075 (D.C. 2008) (same).

Defendants, Plaintiffs "admit they were exposed to the royalty disclosure and did not think any-thing of it or wonder how much the royalty was." (*Id.*) But Plaintiffs' point is that the disclosure omitted material information, so the fact that it didn't prompt Plaintiffs to inquire further into the missing information (to whatever extent that's conceptually possible) just proves that the omis-sion was effective. Defendants then argue that their omissions were material because Plaintiffs were "not sure" whether a disclosure would have affected their decision to purchase AARP Medigap. (*Id.*) But, not only does this mischaracterize Plaintiffs' testimony,[27] whether Defend-ants' omissions would have affected Plaintiffs' purchasing decisions is irrelevant under the CPPA, which measures materiality by a reasonable consumer standard,[28] and which doesn't have a reliance requirement.[29] Defendants' argument is therefore irrelevant.[30]

---

[27] Ms. Krukas explained that the way Defendants promoted itself and the product "made it im-possible for [her] to think that there would be a better […] avenue." SOMF ¶ 71 In response to the question "But you don't know whether there was a better avenue or not; do you?," Ms. Krukas responded, "that's precisely the point.". Defendants never asked Ms. Kushim this ques-tion, but she similarly testified that she believed AARP was a disinterested advocate for seniors, and so she trusted them to guide her in the right direction when choosing a Medigap policy.

[28] *Krukas*, 376 F. Supp. 3d at 41 (quoting *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013)). The CPPA even prevents a defendant from making misrepresentations where "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in his or her choice of action, although a reasonable [person] would not so regard it." *Id.* (quoting *Saucier*, 64 A.3d at 442).

[29] A defendant violates the CPPA "whether or not any consumer is in fact misled [or] deceived" by the defendant's conduct. D.C. Code § 28-3904(a).

[30] The cases that Defendants cite do not compel a contrary conclusion. In *Sloan v. Urban Title Servs., Inc.*, 689 F. Supp. 2d 123, 139-140 (D.D.C. 2010), unlike here, the plaintiff "failed to di-rect the Court to the existence of *any* facts from which a reasonable jury could find that the al-leged statements or omissions were material in nature." *Id.* (emphasis supplied). Indeed, in *Sloan*, unlike here, the plaintiff's briefing was "devoid of any discussion regarding materiality and is almost entirely unresponsive to [defendant's] motion for summary judgment on this point." *Id.* By contrast, Plaintiffs here have adduced substantial evidence as detailed above.  De-fendants' reliance on the Court's ruling in *Whiting v. AARP*, 701 F. Supp. 2d 21 (D.D.C. 2010), aff'd, 637 F.3d 355 (D.C. Cir. 2011), is misplaced.  In *Whiting* the court found that at the motion to dismiss stage a "district court could appropriately grant a motion to dismiss a deceptive prac-tices claim if no reasonable person would be so deceived." *Id.* at. 364. This court has already de-nied Defendants' motion to dismiss, and Plaintiff has adduced substantial evidence going to

Finally, Defendants argue that their omissions weren't material because Plaintiffs would have had to pay the same amount for Medigap even absent Defendants' omissions. (Defs.' Br. at 35.) Plaintiffs have shown that they have been harmed by Defendants' misstatements. *See supra* III.A. More fundamentally, this argument confuses materiality with causation and is contradicted by binding precedent. *See Attias v. Carefirst, Inc*., No. 15-cv-00882 (CRC), 2021 U.S. Dist. LEXIS 17336, at *19-20 (D.D.C. Jan. 29, 2021) ("[I]n order to properly discern the content of state law, it is this Court's duty to defer to the most recent decisions of the state's highest court.") (cleaned up); *Frankeny*, 225 A.3d 999, 1008 (D.C. 2020) ("[Plaintiff] does not need to prove that she was damaged by the misrepresentation or omission" about first year medical resident's role in performing surgery to survive summary judgment on CPPA claim). Accordingly, Defendants' motion for summary judgment under the deception prong of the CPPA should be denied.[31]

### 3.   The Court already held that D.C. law applies to Plaintiffs' claims

Next, Defendants argue that the insurance and consumer-protection laws of each class member's home state will apply here (Defs.' Br. at 35–37)—despite the fact that this Court

---

materiality as detailed herein, *supra. Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 710 (D.C. 1981), is factually distinguishable because, unlike here, the defendant was not collecting any money from the plaintiffs. *Id.* The court further found that the defendant was not even subject to the CPPA. *Id.* In *Harrod v. Express Scripts, Inc.,* No. 8:17-cv-1607-T-30TGW, 2019 U.S. Dist. LEXIS 229571, at *13-14 (M.D. Fla. Aug. 16, 2019), the court found that the plaintiff had not established the causation element of her FDUTPA claim. In *Harrod*, unlike here, the plaintiff admitted that she was not aware of the $75 fee because her lawyers voluntarily paid the records finding fees rather than choosing to request the records for free. *Id.* Thus, unlike here, the plaintiff in Harrod "could not have been exposed to [the deceptive practice] and therefore deceived or misled by it." *Id. Dane v. UnitedHealthcare Ins. Co*., 974 F.3d 183, 191 (2d Cir. 2020), is distinguishable because there the plaintiff sued UnitedHealth, and not AARP. Thus, Plaintiffs' theory differs in that it focuses on AARP's material omissions and misrepresentations, and not UnitedHealth's. Finally, in *Muldrow v. EMC Mortg. Corp*., 766 F. Supp. 2d 230, 234 (D.D.C. 2011), unlike here, the plaintiff did not suffer any damages and did not "set forth any facts demonstrating any correlation between her claimed damages and EMC's alleged DCCPPA violations."

[31] Defendants cite several cases in which a plaintiff failed to plead or prove that a given misstatement was material. (Defs.' Br. at 34.) But this says nothing about whether the misstatements at issue here were immaterial (they were), so these cases are inapposite.

already rejected that argument. During the parties' initial motion-to-dismiss briefing, Defendants

argued at length that the laws of Plaintiffs' home states should apply to their claims, for the same

reasons that Defendants repeat in their summary-judgment briefing: because "Plaintiff's Claims

Conflict with the States' . . . System for Regulating Medigap" (Defs.' MTD Br. at 9, July 31,

2018, ECF No. 8); because "Plaintiff purchased her insurance . . . at the rates prescribed by the

insurance regulators in [her home] states" (*id.* at 1); and because Plaintiff's home states "have

comprehensive regulatory schemes for Medigap insurance," *Krukas*, 376 F. Supp. 3d at 28.

But the Court rejected all of these arguments, in a thorough choice-of-law analysis, which

began by noting that D.C. has a "strong government interest in regulating the conduct of its busi-

ness entities":

> The plaintiff is seeking to vindicate her own rights, and the rights of those simi-
> larly situated under the District of Columbia's CPPA. For CPPA claims, "[t]he
> District of Columbia has an interest in protecting its own citizens from being vic-
> timized by unfair trade practices *and an interest in regulating the conduct of its
> business entities.*" Indeed, the CPPA is not limited in its application to consumers
> or companies who are residents of the District, so the plaintiff's residence in Flor-
> ida or previous residence in Louisiana does not prevent her from stating a claim
> under the CPPA. Thus, the District of Columbia has a strong governmental inter-
> est in the application of the CPPA in this case.

*Id.* at 28–29 (citation omitted).[32] The Court also found that while "states may have an in-

terest in regulating insurance companies within their states, AARP is not such an insur-

ance company," and that, "to the extent . . . states have an interest in regulating third-par-

ties involved in the sale of insurance . . . , those interests are less than that third-party's

place of incorporation and place of business"—i.e., D.C.'s interests controlled here. *Id.* at

31.

---

[32] The court recognized that the unlicensed-solicitation aspect of Plaintiff's CPPA claim was
premised on "the local statutory bar prohibiting unlicensed entities from engaging in the solicita-
tion of insurance or accepting a commission for the sale or renewal of an insurance policy," and
cited D.C. CODE §§ 31-1131.13(b); 31-2502.31; and 31-1131.03. *Id.* at 12.

The Court then held that D.C. has the most relevant contacts to this case. This was be-
cause D.C. is where Defendants "make their policies and practices regarding advertising," *id.* at
30; "where AARP is headquartered," *id.*; "where each of the AARP affiliates has its primary
place of business," *id.*; and where the relationship between the parties was centered, *id.* at 31—
again rejecting Defendants' argument that it was centered in Plaintiff's home state. Accordingly,
both the government-interest and significant-contacts analyses suggested that D.C. law should
apply here, and the Court concluded as much—stating that "[D.C.] law will be applied to the in-
stant claims." *Id.* at 32. The Court has therefore already resolved the choice-of-law dispute.

Moreover, Defendants' attempt to relitigate choice-of-law is procedurally improper.
Courts won't cavalierly reverse their previous rulings: "[W]here litigants have once battled for
the court's decision, they should neither be required, nor without good reason permitted, to battle
for it again." *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quota-
tion marks omitted).[33] Instead, under Rule 54(b), before revisiting an earlier decision, courts ap-
ply a three-part test, asking whether there was (1) "an intervening change in the law"; (2) "a clear
error in the first order"; or (3) "the discovery of new evidence." *United States ex rel. Landis v.
Tailwind Sports Corp.*, No. 1:10-CV-00976, 2016 WL 3197550, at *2 (D.D.C. June 8, 2016).[34]

Defendants—who bear the burden of convincing the Court to revisit its choice-of-law

---

[33] *See also Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) ("[J]ustice did not require reconsider[ation where] . . . [the plaintiff] raised no arguments for reconsideration the court had not already rejected[.]"); *Estate of Gaither ex rel. Gaither v. D.C.*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (reconsideration under Rule 54(b) "cannot be used as an opportunity to reargue . . . theories upon which a court has already ruled, nor . . . for present-ing . . . arguments that could have been advanced earlier" (internal quotation marks omitted)).
[34] *See also Nat. Res. Def. Council, Inc. v. Envtl. Prot. Agency*, No. CV 16-1861, 2020 WL 5632410, at *3 (D.D.C. Sept. 21, 2020) (noting, with similar test, that "a court's discretion under Rule 54(b) is limited by the law of the case doctrine" (quotation omitted)); *Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 328 (D.D.C. 2007) ("[W]hile the law of the case doctrine does not necessarily apply to interlocutory orders, district courts generally consider the doctrine's un-derlying rationale when deciding whether to reconsider an earlier decision.").

decision[35]—never explicitly acknowledge these factors, but none of them are present here: there haven't been any intervening changes of law (Defendants never argue there was), no clear error (Defendants never suggest this either, and Plaintiffs note that defendants are frequently required to abide by their home jurisdiction's laws[36]), and the evidentiary record now supports the Court's earlier decision. For example, Defendants remain headquartered in D.C. (SOMF ¶ 10), which is where "AARP devised its scheme" (*Id.* ¶ 11); "prepared and approved [its] marketing materials" (*Id.* ¶ 12); "entered into the Agreement with United[]" (*Id.* ¶ 13);  and retained "4.95% of Plaintiff's Medigap payments" before "forward[ing] it to AARP and ASI." (*Id.* ¶¶ 13-14)  *Krukas*, 376 F. Supp. 3d at 28 (quoting Pls.' MTD Opp. at 25–26, Aug. 31, 2018, ECF No. 13). Defendants have therefore failed to identify any valid reason for the Court to revisit its earlier choice-of-law ruling, and D.C. law applies here.[37]

### 4. Plaintiffs can prove their conversion claim

Plaintiffs will also be able to prove conversion. To establish conversion, a plaintiff just needs to show that a defendant engaged in the wrongful "exercise of ownership, dominion, and control over the personalty of another in denial or repudiation of his right to such property." *Krukas*, 376 F. Supp. 3d at 43 (quoting *Hall v. District of Columbia*, 867 F.3d 138, 151 (D.C.

---

[35] *Henok v. Chase Home Fin., LLC*, 947 F. Supp. 2d 6, 10 (D.D.C. 2013).

[36] *See, e.g.*, *Jones ex rel. Jones v. Winnebago Indus., Inc.*, 460 F. Supp. 2d 953, 974 (N.D. Iowa 2006) ("The defendant's home forum always has a strong interest in providing a forum for redress of injuries caused by its citizens." (quoting *Reid–Walen v. Hansen*, 933 F.2d 1390, 1400 (8th Cir.1991)).

[37] Defendants argue that some of the solicitation materials at issue here were disseminated out of Connecticut, because that's where UnitedHealth is located, so (presumably) Connecticut law must control. (Defs.' Br. at 15–16; Defs.' Class-Cert Opp. at 29, Feb. 5, 2021, ECF No. 66-1.) But Plaintiffs aren't suing UnitedHealth, they're suing AARP, and AARP is based in D.C., which is where they helped dictate the contents of these solicitation materials, along with every other aspect of their behavior at issue in this case. *See* SOMF ¶¶ 40-66. Defendants' argument therefore has no bearing on a choice-of-law analysis.

Cir. 2017)). And as already noted by this Court, Plaintiffs can establish conversion by proving that "4.95% of [their] payments [were] wrongfully charged and illegally diverted to AARP as a commission" and through their deceptive conduct. *Krukas v. AARP, Inc*., 376 F. Supp. 3d at 43.

Here, Defendants *were* illegally paid to solicit insurance (*see supra* III.C.1), and Defendants *did* take that money directly from Plaintiffs. Plaintiffs' money flows directly from their bank accounts to Defendants, which means that *Defendants* are the first party to exercise "dominion and control" over Plaintiffs' money. Defendants concede this in their briefing,[38] as they must, because the class makes their insurance payment ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████ Moreover, Defendants *did* take Plaintiffs' money through misleading conduct. *See supra* III.C.2. Accordingly, AARP wrongfully exercises direct control over Plaintiffs' funds.

Defendants' attacks on Plaintiffs' conversion claim is flawed. *First*, Defendants argue that *UnitedHealth* paid AARP, not Plaintiffs. (Defs.' Br. at 37–38). But as noted, that's incorrect: (1) Plaintiffs' money flowed from their accounts into an account that AARP owned and (2) UnitedHealth never possessed Plaintiffs' money.  Defendants therefore committed conversion.

*Second*, Defendants argue that Plaintiffs made a single insurance payment, therefore the royalty amount isn't sufficiently discrete, as a matter of law. (*Id.* at 38.) But this Court already held that if Defendants illegally deducted 4.95% from Plaintiffs' lump monthly insurance payments, then that amount would be sufficiently discrete:

> The plaintiff's Complaint alleges that for every AARP Medigap policy sold or renewed, AARP Trust collects premium payments that include the 4.95% charge, that AARP Trust then deducts funds equivalent to the 4.95% charge and remits

---

[38] *See* Defs.' Br. at 6 ("AARP Trust . . . collects premiums and . . . transmits those premiums to United net of . . . the royalty[.]" (citing Defs.' SUMF ¶ 18)); *id.* at 30–31 (same (citing Defs.' SUMF ¶ 69)).

> that amount to AARP, Inc. and ASI . . . .The Court is persuaded that this rationale
> sufficiently alleges a right to a specific, identifiable source of money.

*Krukas*, 376 F. Supp. 3d at 43.[39] Defendants argue that the Court based its analysis on the idea

that Plaintiffs made two separate monthly insurance payments, but that's not what the Court said

and the amounts at issue would be sufficiently discrete regardless of whether the Court already

ruled on the issue. *See District Title v. Warren*, 181 F. Supp. 3d 16, 27 (D.D.C 2014) (specific

overpayments were sufficiently discrete, even if comingled with amounts that the plaintiff legiti-

mately owed); *McNamara v. Picken*, 950 F. Supp. 2d 193, 195 (D.D.C. 2013) (suggesting that a

plaintiff *could* establish conversion if "he personally contributed a certain amount of money" to a

partnership that was then "improperly used").[40] And because Plaintiffs can prove that Defendants

did in fact illegally retain an identifiable percentage of their monthly insurance payments, Plain-

tiffs can prove conversion.

### 5.  Plaintiffs can prove their unjust enrichment claim

Plaintiffs will also be able to prove their unjust-enrichment claim. To succeed on this

claim, Plaintiffs only need to show that Defendants retained a benefit that "in justice and equity

belongs to another." *Krukas*, 376 F. Supp. 3d at 44 (quoting *Falconi-Sachs v. LPF Senate*

*Square, LLC*, 142 A.3d 550, 556 (D.C. 2016)). And as this Court already held, Plaintiffs can

prove this by showing (1) that Defendants misled the class into paying AARP's royalties, or (2)

---

[39] Defendants argue that the Court based its analysis on the idea that Plaintiffs made two separate insurance payments each month—one for the royalty and one for any remaining charges. But that's not what the Court said, and Plaintiffs have always maintained that they send one payment for the insurance premium. (*See, e.g.*, FAC ¶¶ 10 (noting that "'the member contribution amount' that . . . Class Members paid monthly to AARP included an embedded 4.95% commission payment to AARP").)

[40] Defendants also cite *McNamara*, but there the plaintiff claimed that he was owed some unspecified amount from a partnership, and the court dismissed the claim because it sounded in contract, not conversion, among other reasons. *Id.* at 195. Here, Plaintiffs aren't claiming that Defendants contractually owe them some vague amount, in exchange for some service that Plaintiffs provided, so *McNamara* is inapposite.

that Defendants illegally retained a portion of the class's insurance payments, in violation of D.C.'s insurance laws. *Id.* And because Plaintiffs paid for AARP's inflated royalty that they didn't bargain for as a result of Defendants' conduct (*see supra* III.A.1), and that these royalties were in fact illegal commissions (*see supra* III.C.1), Plaintiffs can establish unjust enrichment. *See In re APA Assessment Fee Litig.*, 766 F.3d at 47-48, 51 (reversing district court and reinstating unjust enrichment claim on similar facts).

Defendants dispute this by again arguing that UnitedHealth conferred the benefit upon Defendants, not the class. (Defs.' Br. at 38–39.) But not only is this factually inaccurate (see the conversion section, above), there is no direct-benefit requirement under D.C. law, so Defendants' argument is legally irrelevant. *See Campbell*, 130 F. Supp. 3d at 256 ("[A] number of decisions from this Court have expressly held that a benefit indirectly conferred on a defendant can support an unjust enrichment claim." (citing cases)).

Defendants also argue that they weren't unjustly enriched because Plaintiffs weren't damaged, but (1) Plaintiffs *were* damaged, as noted at length above; and (2) this argument ignores Plaintiffs' illegal-commission theory. Defendants' argument therefore fails.[41]

## IV. Conclusion

The Court should deny Defendants' motion for summary judgment in its entirety.

DATED: August 27, 2021

Respectfully submitted,

*/s/ Jason S. Rathod*
Jason S. Rathod
(D.C. Bar No. 100082)

---

[41] Defendants' reliance on the Court's ruling in *Whiting*, 701 F. Supp. 2d 21, is misplaced. In *Whiting* the Court found there was no unjust enrichment because the plaintiff had alleged that she was fully aware that AARP would be paid royalties from UnitedHealth. *Id.* at 31-32. The issue here is that Plaintiffs did *not* know that *they* would be paying the royalty—and that this royalty was an illegal commission—so *Whiting* is irrelevant.

Nicholas A. Migliaccio
(D.C. Bar No. 484366)
**MIGLIACCIO & RATHOD LLP**
412 H St. NE
Washington D.C. 20002
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
jrathod@classlawdc.com
nmigliaccio@classlawdc.com

Daniel E. Gustafson
Daniel C. Hedlund (Admitted *Pro Hac Vice*)
David A. Goodwin (Admitted *Pro Hac Vice*)
Brittany N. Resch
**GUSTAFSON GLUEK PLLC**
120 So. 6th St., Ste. 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dgoodwin@gustafsongluek.com
bresch@gustafsongluek.com

Kevin Landau (Admitted *Pro Hac Vice*)
Brett Cebulash (Admitted *Pro Hac Vice*)
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, New York 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
klandau@tcllaw.com
bcebulash@tcllaw.com

Scott D. Hirsch (Admitted *Pro Hac Vice*)
**SCOTT HIRSCH LAW GROUP, PLLC**
6810 N. State Road 7
Coconut Creek, FL 33073
Telephone: (561) 278-6707
scott@scotthirschlawgroup.com