# EXHIBIT E

# BEHIND THE VEIL:
## The AARP America Doesn't Know



IN RECOGNITION OF FORMER REPRESENTATIVE GINNY BROWN-WAITE WHO REPRESENTED THE 5TH DISTRICT OF FLORIDA FROM 2003 TO 2011. MS. BROWN-WAITE PLAYED AN INTEGRAL ROLE IN THE DEVELOPMENT OF THIS REPORT AND REMAINS A STAUNCH ADVOCATE FOR SENIORS.

# TABLE OF CONTENTS

**Executive Summary** ..................................................................................................................... 1

**Part 1: AARP The Insurance Company** ......................................................................................... 5

    Background and History ................................................................................................................. 5

    AARP's Structure ............................................................................................................................ 5

    AARP's Insurance Business ........................................................................................................... 6

    AARP's Budget and Revenues ...................................................................................................... 6

    AARP's Medicare Insurance Business .......................................................................................... 8

**Part 2: Implications of the Health Care Law for AARP** ........................................................... 11

    AARP's Varying Financial Stakes in Medicare Advantage and Medigap ................................... 11

        Medicare Advantage .............................................................................................................. 11

        Medigap .................................................................................................................................. 11

    Impact of Health Care Law on Medigap and Medicare Advantage Enrollment ......................... 13

    AARP's Financial Windfall from the Health Care Law ............................................................... 15

    AARP's Thinly Veiled Motives .................................................................................................... 17

    AARP's Advocacy for Policy Not in the Best Interest of Its Members Is Not Unprecedented ......... 18

**Part 3: AARP's Tax Status** .......................................................................................................... 21

    AARP as a Tax-Exempt Organization ........................................................................................ 21

    History of Paying Fines to the IRS and Other Government Entities ............................................ 22

    AARP's Generous Executive Compensation Packages .............................................................. 23

    AARP's Travel Policy .................................................................................................................. 24

    Is AARP Breaking Federal Lobbying Laws? ............................................................................... 24

    Should AARP's Tax-Exempt Status Be Revoked? ...................................................................... 26

**Endnotes** ..................................................................................................................................... 29



"THE NEW ARRANGEMENTS WITH INSURANCE COMPANIES CREATE A TREMENDOUS NUMBER OF POTENTIAL CONFLICTS FOR AARP, WHICH IS A POWERHOUSE, PERCEIVED AS THE MOST IMPORTANT VOICE FOR OLDER PEOPLE. AARP WILL NOT BE PERCEIVED AS A TRULY INDEPENDENT ADVOCATE ON MEDICARE IF IT'S MAKING HEFTY PROFITS BY SELLING INSURANCE PRODUCTS THAT PROVIDE MEDICARE COVERAGE."

> MARILYN MOON, FORMER AARP EXECUTIVE

"MAXIMIZING CORPORATE-RELATED INCOME AND PROFITS POSES A SIGNIFICANT CONFLICT OF INTEREST FOR AN ORGANIZATION TRYING TO REPRESENT THE BEST INTEREST OF ITS MEMBERS."

> PUBLIC CITIZEN, A LIBERAL NON-PROFIT CONSUMER ADVOCACY ORGANIZATION

"THERE'S AN INHERENT CONFLICT OF INTEREST. [AARP IS] ENDING UP BECOMING VERY DEPENDENT ON SOURCES OF INCOME."

> JUDITH STEIN, DIRECTOR OF THE CENTER FOR MEDICARE ADVOCACY

# EXECUTIVE SUMMARY

AARP, formerly known as the American Association of Retired Persons, is a tax-exempt non-profit membership organization for those aged 50 years and older. As such, AARP has long been regarded as a protector and advocate of the nation's senior community.

What is less known is the extent to which AARP operates as a massive for-profit enterprise and how that conflicts with its legal requirements to "primarily operate to promote the common good and social welfare of a community of people."

This report highlights AARP's increasing reliance on the "for-profit" sale of insurance, particularly health insurance, and the underlying implication for this storied "non-profit" organization. In conducting the research, one of the central questions became: Why would AARP aggressively advocate for the Democrats' health care law last year which contained nearly one half-trillion dollars in cuts that independent analysts said would negatively impact seniors' access to affordable health care services?

As the facts set forth in this report reveal, AARP is not simply a non-profit entity claiming to advocate on behalf of America's seniors. AARP is in fact a large, complex and sophisticated organization with over $2.2 billion in total assets and had revenues in excess of $1.4 billion in 2009 alone. When measured by the products it endorses and profits it derives from those deals, AARP is one of the nation's largest insurance companies and by far the largest provider of Medicare plans to seniors. AARP is also one of the most powerful and active lobbying groups (in terms of dollars spent) in the country. Further clouding AARP's image is a tangled relationship between the board members of its "for-profit" subsidiaries and the parent "non-profit" AARP which establishes AARP's policy positions – often making it impossible to tell the two sides, and their competing agendas, apart. The mission of the two

appear in direct conflict with one another and, as such, it is very difficult to determine which interests are being represented – those of the "non-profit" or the "for-profit" arm of AARP.

The report also details the Democrats' health care law's significant cuts to Medicare Advantage (MA) and how the interplay in the marketplace between MA and Medigap will increase Medigap sales. This will have a direct, significant, and positive impact on future profits at AARP. Also troubling is the report's central finding: **The Democrats' health care law, which AARP strongly endorsed, could result in a windfall for AARP that exceeds over $1 billion during the next 10 years.**

It should be noted that this report is not the first time AARP's commercial activities have been the focus of federal government actions seeking to address a range of improprieties which appear to conflict with the organization's 501(c)(4) tax-exempt status. In 1994, AARP paid the Internal Revenue Service (IRS) a one-time settlement payment of $135 million in lieu of taxes, resolving an audit over tax returns for years 1985 through 1993 for failure to fully pay unrelated business income tax (UBIT) on its commercial activities. Also in 1994, AARP agreed to pay the U.S. Postal Service $2.8 million to settle allegations that AARP improperly mailed health insurance solicitations at non-profit rates in 1991 and 1992. In 1999, the IRS and AARP once again reached a settlement to conclude an IRS audit of the organization covering tax years 1994 through 1998 with respect to the treatment of revenues AARP received from licensing and selling its name and logo to insurance companies.

More than a decade later, AARP activities and business arrangements continue to raise concerns about which interests are being served at AARP – those of its 40 million members or the AARP business portfolio.

This information calls to mind two specific questions. First, if as its website notes, the mission of AARP is "to enhance the quality of life for all as we age, leading positive social change, and delivering value to members through information, advocacy, and service," is that mission being advanced on behalf of its 40 million members or the community at large? Or are those 40 million members, many of whom are seniors and consider AARP-endorsed Medicare Advantage, Medigap and Part D prescription drug plans as something akin to the 'Good Housekeeping seal of approval,' being shortchanged at the expense of AARP's ever-increasing insurance royalties?

Second, given AARP's significant financial interests in the business of insurance, should the organization continue to enjoy its tax-exempt status derived under section 501(c)(4) of the Internal Revenue Code (IRC)? Such a privilege means that, in exchange for operating primarily to promote the common good and general welfare of the community, including its members, AARP is not subject to federal income taxes, with the exception of unrelated business income tax.

The report is based on a thorough review of public state insurance departments' filings, AARP's consolidated financial statements, AARP's IRS Form 990s, a compilation of media accounts, and other public documents resulting from Congressional inquiries. It should be noted that AARP refused to comply with repeated requests to share with Members of Congress its tax filings and other financial documents, beyond those that AARP is legally required to make available upon request.

While the report shines a bright light on the business activities of AARP, this is just a first look, and the findings included in this report require greater examination. In accordance with the oversight authority of Congress, a copy of this report will be submitted to the IRS so that it can consider further examinations of AARP and its tax-exempt status under IRC section 501(c)(4) and AARP Foundation's tax-exempt status under IRC section 501(c(3).

# KEY FINDINGS

## AARP Structure

AARP, Inc., the 501(c)(4) tax-exempt social welfare organization, is run by 22 board members. However, in 2010, seven of these board members also composed the entire board of the "for-profit" AARP Insurance Plan which funnels money derived from UnitedHealth Group's ("United") AARP-endorsed insurance policies back to AARP, Inc.

## AARP Revenues

AARP has four primary revenue sources: royalty payments (primarily from insurance companies), membership dues, publication advertising, and grants (governmental and non-governmental). In 2009, AARP revenues from royalties were two and half times higher than its membership dues.

Since 2002, income generated from AARP membership dues has increased 32%, or $60 million. However, during this same period, income derived from AARP's business relationships, primarily with insurance companies, nearly tripled, increasing by $417 million. Royalty payments from for-profit companies comprised nearly 46% of AARP's revenue in 2009, while membership dues totaled just 17% of total revenues.

## AARP's Health Insurance Business

AARP endorses just about every type of insurance product under the sun, including three types of Medicare-related insurance products: Part D prescription drug insurance, Medicare Advantage (MA) insurance, and Medicare supplemental insurance, often referred to as "Medigap."

United is AARP's largest business partner. As part of the United and AARP business agreement all three of the Medicare insurance product lines are marketed under the AARP brand name. From 2007 to 2009, United's royalty payments to AARP have grown from $284 million in 2007 to $427 million in 2009, a 50% increase.

State insurance rate filings show that, in 2010, AARP retained 4.95% of seniors' premiums for every Medigap policy sold under its name. Therefore, the more seniors enroll in the AARP branded Medigap plan, the more money AARP receives from United. Unlike AARP's MA policies, in addition to paying the Medigap premium, those wishing to purchase an AARP Medigap policy must also join and pay membership dues to AARP.

Enrollees in AARP's MA plan pay their monthly premiums directly to United. United pays AARP a fixed amount, on a monthly basis, for the use of the AARP name. Therefore, whether there are 5 million or 500 seniors enrolled in an AARP MA plan, AARP is still paid the same amount of money by United.

### Effect of the New Health Care Law on AARP's Insurance Business

The health care law affects both MA and Medigap insurance products and AARP's royalties.

According to the Congressional Budget Office (CBO), funding for MA plans will be reduced by $206 billion from 2010 to 2019. Cuts to the MA program and the resulting declining enrollment in those plans are, as the *Washington Post* reported, "widely expected to drive up demand for private Medigap policies like the ones offered by AARP, according to health care experts, legislative aides, and documents."

In a recent Committee on Ways and Means hearing, Rick Foster, the Chief Actuary for the Centers for Medicare and Medicaid Services (CMS), reinforced this finding in stating: "Well, I think that if our projection ends up being correct, as I have every reason to expect, and something like 6 to 7 million people, beneficiaries, leave Medicare Advantage plans, many of them, perhaps most of them, will want auxiliary coverage and Medigap will be the most straightforward way to get it."

In United's 2010 first quarter earnings call with investors, held after the health care law was enacted, a United executive agreed that future reductions in MA enrollment will create business opportunities in other Medicare products, namely Medigap.

Based on low, mid, and high-range estimates, AARP stands to financially gain, over and above the millions of dollars they currently receive from United, between $55 million and $166 million in 2014 alone as a result of new Medigap enrollees stemming from the health care law's cuts to MA, which AARP strongly endorsed. Under the midrange estimate and under their current contract, AARP's financial gain from the health care law could exceed $1 billion during the next 10 years. Again, this is because AARP will see their royalty payments increase as seniors are forced out of MA plans and buy AARP Medigap plans instead.

### Other Financial Practices at AARP (Charitable Activities, Compensation, and Travel)

Despite a massive increase in revenues, AARP's cash and in-kind contributions to the AARP Foundation only increased 11% ($3.1 million) while cash and in-kind contributions to AARP's Legal Counsel for the Elderly actually decreased 9% ($300,000) from 2004 to 2008 (the only years for which AARP provided data). Meanwhile, the AARP Foundation recently committed an estimated $14 million in each of the next three years to become the primary sponsor of NASCAR driver Jeff Gordon.

Tax-exempt organizations are prohibited generally from providing unreasonable compensation to executives, board directors, and, in some cases members. AARP generally compensates their executives more generously than similarly situated non-profits surveyed. For example, in 2009, then-AARP CEO William Novelli received $1,647,419 in total compensation, including a severance payment of $350,657.

AARP's travel policy will pay for first-class accommodations for board directors on flights exceeding five hours when business class is not available. However, AARP's CEO is allowed to travel first class on any flight that exceeds one hour.

AARP's National Policy Conference New Member Orientation and 2010 Summer Meeting were held at the Hotel Del Coronado in San Diego, CA. This resort describes itself as "… the definitive example of what a luxury resort should be."



# PART 1: AARP THE INSURANCE COMPANY

## Background and History

AARP, formerly known as the American Association of Retired Persons, is a tax-exempt non-profit membership organization for people aged 50 years and older.[1] AARP evolved from the National Retired Teachers Association (NRTA), which was founded in 1947.[2] AARP was incorporated in July, 1958;[3] in August, 1964, AARP filed its Form 1024 application for tax-exempt status under Internal Revenue Code (IRC) section 501(c)(4) as a social welfare organization, and maintains that status today.[4] This means that, in exchange for operating primarily to promote the common good and general welfare of the community,[5] including its members, AARP is not subject to federal income taxes,[6] with the exception of unrelated business income tax.[7] NRTA and AARP officially merged in 1982.[8] Today, NRTA is a division of AARP.[9] In 1999, the American Association of Retired Persons officially changed its name to AARP to reflect a shift to a broader membership base than just retirees.[10] Today, AARP is reported to have over 40 million members, about half of whom are over the age of 65.[11]

## AARP's Structure

Today, AARP is a large, complex and sophisticated enterprise with over $2.2 billion in total assets and generated over $1.4 billion in revenue in 2009.[12] In 2010, the AARP enterprise included AARP, Inc., the tax-exempt social welfare organization under section 501(c)(4) of the IRC, which is parent to the taxable subsidiary AARP Services, Inc., which in turn is the parent to the taxable AARP Financial, Inc.[13] In 2010, there were six other AARP-related organizations, both tax-exempt and taxable.[14] These related organizations, or affiliates, include the AARP Insurance Plan, a grantor trust[15] which collects and processes billions of dollars of insurance premiums.[16] AARP CEO A. Barry Rand describes the AARP Insurance Plan as AARP's "for-profit side."[17] Despite repeated requests, AARP refused to provide to Members of Congress federal tax returns and other financial information relating to the AARP Insurance Plan.[18]

**Chart 1:** AARP Organizational Structure in 2010



Also included in the 2010 AARP empire were the AARP Foundation, AARP, Inc.'s affiliated charity, and the AARP Institute, a wholly-owned subsidiary of the AARP Foundation, both of which are exempt from taxation under IRC section 501(c)(3).[19] The Legal Counsel for the Elderly (LCE), another AARP-affiliated 501(c)(3) organization, AARP Properties LLC and various other taxable affiliated entities and properties comprised the AARP enterprise in 2010.[20] Together, these entities are collectively referred to as "AARP."[21] Chart 1, details AARP's organizational structure.

## AARP's Insurance Business

In 2010, AARP, Inc., the 501(c)(4) tax-exempt social welfare organization, was run by 22 board members.[22] However, seven of these board members also composed the entire board of the "for-profit" AARP Insurance Plan,[23] a grantor trust. Further, an additional two AARP, Inc., board members sat on the board of AARP Services, Inc., which negotiates the lucrative contracts with AARP's insurance business partners.[24] Therefore, in 2010, nearly half of AARP, Inc.'s board members also served on boards of AARP entities that either manage the royalty revenue or negotiate payments from insurance companies to AARP. The chart below details the overlapping leadership between AARP affiliated entities.

## AARP's Budget and Revenues

By any measure, AARP is a large enterprise. More than ten years ago, AARP paid approximately $206 million for its headquarters in Washington, DC.[25] In 2009, the parent organization, AARP, Inc., alone spent over $3.4 million in legal fees, over $713,000 in accounting fees, and over $218 million compensating its officers, directors, and employees.[26]

To financially support and grow such an enterprise, AARP has increasingly relied on endorsement royalty payments from insurance companies seeking to use AARP's brand name in selling their insurance products.[27] AARP is capitalizing on its 60+ year-old reputation as a consumer advocate for the elderly and its invaluable mailing list of millions of members.[28] AARP's increasing reliance on payments from insurance companies to sell AARP-branded insurance products substantially reduces AARP's dependence upon traditional membership organization income sources, such as membership dues, conference registration fees, and publication advertising fees.[29]

AARP has four primary revenue sources: royalty payments (like those from insurance companies), membership dues, publication advertising, and grants (both governmental and non-governmental).[30]

**CHART 2:** AARP's Boards Overlap (2010)



■ Serving (or previously served) on AARP's National Policy Council

☐ Previously served on AARP's Insurance Plan Board of Directors

**AARP, Inc.**
**Board of Directors**

W. Lee Hammond, *President* ■
Gail E. Aldrich, *Vice Chair*
Leobardo Estrada
William J. Hall
Hubert H. Humphrey III ■
Mara Mayor ■ ■
Maeona Mendelson ■
J. David Nelson
John Penn
Robert Romasco ■ ■
George Rowan
Fernando Torres-Gil
Phil Zarlengo ■

Allen Douma ■
Jeannine English
A. James Forbes, Jr.
Catherine Georges ■
Barbara O'Connor
Carol Raphael
Charles E. Reed ■

**AARP Insurance Plan**
(collects insurance premiums)
**In addition to serving on AARP, Inc. Board of Directors**

Jacob Lozada ■
Diane Pratt

**AARP Services**
(negotiates contracts with insurance companies)
**In addition to serving on AARP, Inc. Board of Directors**

**CHART 3:** AARP's Reliance on Royalty Revenue



| Royalties **46.3%** | Membership Dues **17.4%** | Investment Gains **13.4%** | Publication Advertising **7.9%** | Grant Revenue **7.4%** | Program Income **4.3%** | Contributions **3.0%** | Other **0.2%** |

Chart 3 illustrates AARP's primary revenue sources in 2009 and Chart 4 shows the main sources of revenue growth over time. Since 2002, income generated from AARP membership dues has increased 32%, or $60 million.[31] However, during this same period, income derived from AARP's business relationships, primarily with insurance companies, nearly tripled, increasing by $417 million, bringing total royalty revenue to $657 million in 2009.[32] Royalty payments from for-profit companies comprised nearly 46% of AARP revenue in 2009, while membership dues totaled just 17% of total revenues.[33]

It is unlikely that AARP could survive financially, with its current expenses, if the hundreds of millions of dollars in annual insurance industry revenue disappeared and AARP was forced to rely on other sources of income. For example, membership dues would have to be two and one-half times higher (with no drop off in membership), AARP would have to expand its dues-paying membership by 166%, or advertising revenue would have to be almost six times larger to replace the money AARP receives from royalty payments.[34] AARP has grown accustomed to this revenue and has built and maintained extensive and lucrative business ties with multiple private insurance companies to promote AARP-endorsed insurance products.[35]

**CHART 4:** AARP Revenue Sources



$ in millions

Royalty revenue, includes payments from insurance companies

Membership dues

Publication advertising

Federal & other grants

UnitedHealth Group ("United") is AARP's largest business partner.[36] In 2008 and 2009, United accounted for 63% and 65%, respectively, of total royalty payments according to AARP's financial statements.[37] As a result, AARP is becoming increasingly dependent on payments from United. In the span of three years, United's royalty payments to AARP have grown from $284 million to $427 million, a 50% increase.[38] Given that AARP revenues from royalties from for-profit businesses, primarily insurance companies, are two and one-half times higher than its membership dues, it is not surprising questions have arisen about whether AARP is primarily engaged in nonexempt business activities rather than in social welfare activities, which would include the best interests of its members.

To put AARP's insurance business into context, AARP would have been the sixth largest insurance company in 2009 based on its Medicare insurance business alone, in terms of profitability, in the United States if it was classified as such.[39] Since AARP is not actually paying insurance claims, this revenue directly improves AARP's bottom line (minus some small costs associated with negotiating and implementing the contracts).

**TABLE 1:** Top 10 For-profit Insurance Companies by Total Profit (2009)

| Insurance Company | Profits |
| --- | --- |
| WellPoint | $4,746,000,000 |
| UnitedHealth Group | $3,822,000,000 |
| Cigna | $1,302,000,000 |
| Aetna | $1,277,000,000 |
| Humana | $1,040,000,000 |
| **AARP** | **$427,033,000** |
| Coventry Health Care | $242,000,000 |
| Amerigroup | $149,000,000 |
| Universal American | $140,000,000 |
| Centene | $84,000,000 |

AARP advertises its insurance products within AARP's own publications, on its website as one of AARP's member benefit programs, as well as through televised commercials to the general public. Examples of AARP's business relationships with insurance companies include AARP-endorsed: Medicare supplemental insurance (Medigap) plans (United), Medicare Advantage health plans (UnitedHealth Group), Medicare prescription drug plans (United), health insurance for 50 to 64 year olds (Aetna), dental insurance plans (Delta Dental Insurance Company), a hearing program (HearUSA), a vision discount program (EyeMed Vision Care), an auto and home insurance program (Hartford), life insurance (New York Life), and long-term care insurance (Genworth Life Insurance Company).[40]

## AARP's Medicare Insurance Business

The largest portion of AARP's royalty income is derived from Medicare-related insurance products, offered in conjunction with United, which accounted for 65% of all AARP royalty revenue in 2009.[41] AARP endorses three types of Medicare-related insurance products: Part D prescription drug insurance, Medicare Advantage (MA), and Medicare supplemental insurance, often referred to as "Medigap."[42] In 2009, the "for-profit" AARP Insurance Plan processed $6.8 billion in premiums from all sources.[43]

MA plans are required by law to cover all Medicare Part A and B benefits and many plans also cover additional services that traditional Medicare does not cover like dental, vision, and hearing benefits.[44] MA plans also frequently offer reduced cost-sharing, deductibles, and premiums.[45] Many seniors find these extra benefits attractive, as roughly 25% of Medicare beneficiaries are currently enrolled in a MA plan.[46] Furthermore, seniors enrolled in MA tend to have lower incomes than the average senior in Medicare, and Hispanic and African-American seniors are most likely to choose MA over the traditional Medicare program.[47] Best of all for seniors enrolled in MA, many of these plans provide these benefits without charging any premium (other than the required monthly Part B premium).[48]

Medigap plans also offer extra coverage to Medicare beneficiaries, but only to those who are enrolled in traditional Medicare. In 2008, more than one-in-

five (21%) Medicare beneficiaries chose to purchase a Medigap plan to supplement their traditional Medicare coverage.[49] This supplemental coverage includes benefits like first-dollar coverage and reduced copayment and deductibles.[50] For example, all Medigap plans provide additional coverage for hospital stays and reduce seniors' out-of-pocket costs for physician office visits.[51] Unlike MA, however, all Medigap enrollees must pay a monthly premium that exceeds their Part B premium in order to receive these benefits.[52] Premiums can vary widely based upon the company that offers the coverage, even if the coverage is the same.[53] For example, in 2009, in Albany, New York, annual Medigap Plan F premiums ranged between $1,940 to $4,130.[54] MA enrollees are not allowed to purchase a Medigap plan.[55]

AARP offers both MA and Medigap plans as part of a business agreement with United, marketing these insurance products under the AARP brand name.[56] In both instances, the AARP insurance products are dominant players in the market in terms of enrollment. In 2008, 25% of Medicare beneficiaries who enrolled in a Medigap insurance plan purchased the AARP plan.[57] AARP has nearly three times as many Medigap enrollees as their closest competitor, Mutual of Omaha.[58] Similarly, AARP MA plans have the second highest enrollment levels in the nation, accounting for 11% of all MA enrollment in 2010 (United has an additional 7% of the market in non-AARP branded plans).[59] As an insurance market leader, AARP has a significant financial stake in federal policy that impacts MA and Medigap payment policy and enrollment trends. However, as is discussed later in this report, the financial dynamics, as defined by

the contractual relationship between AARP and United, are very different for these insurance product lines.

AARP also benefits financially from selling its name to United to market Medicare outpatient prescription drug insurance (Part D).[60] In 2010, AARP's Part D insurance plans had the highest number of Medicare beneficiaries enrolled, 80% more than its next highest competitor, Humana.[61] AARP's Part D financial arrangement with United is similar to its MA arrangement, in that AARP receives a fixed payment that is independent of actual enrollment levels.[62]

AARP-endorsed products are advertised on television, in various publications, on AARP's website, and through direct mail. As such, AARP members, and the public at large, could assume AARP-endorsed products are generally a good value for consumers.[63] However, independent reports and the experiences of former AARP members reveal that AARP-endorsed products are not necessarily the most comprehensive or the "best buy" that many consumers may assume.[64] News articles often find AARP products to be priced like any other private products, including many of its insurance plans. For example, a comparison of car and home insurance in Scottsdale, AZ found that the AARP-branded insurance product was $1,200 more expensive a year than a competitor.[65] Some former AARP members learn that they are paying significantly more for coverage that is similar to what is being sold by other insurance companies and that AARP's endorsement may not be reflective of a consumer advocate who is on their side.[66]

**TABLE 2:** Insurance Leaders in Medicare Market by Enrollment in 2010

| Insurance Company | Medigap | Medicare Advantage[67] | Part D | Total |
|---|---|---|---|---|
| **AARP/United** | **2,933,065[68]** | **2,003,838*** | **4,500,000[69]** | **9,436,903** |
| Humana[70] | 33,700 | 1,477,666 | 1,917,100 | 3,428,466 |
| Wellpoint [71] | 772,687 | 444,358 | 1,227,118 | 2,444,163 |
| Universal American [72] | 102,735 | 245,093 | 1,881,948 | 2,229,776 |
| Mutual of Omaha [73] | 925,000 | 0 | 0 | 925,000 |

*United sells both AARP branded MA plans as well as other branded plans, 2,003,838 is the total number of MA covered lives, of which AARP accounts for approximately 1.2 million.



# PART 2: IMPLICATIONS OF THE HEALTH CARE LAW FOR AARP

AARP endorsed the health care law stating, "For too long, our members and others have faced spiraling prescription drug costs, discriminatory practices by insurance companies and a Medicare system awash in fraud, waste and abuse."[74] As this section will show, however, AARP's stated concern about insurance industry practices as the basis for endorsing the health care law directly conflicts with its financial dependence on these same insurance companies[75] and the profits it stands to make from resulting changes to the way seniors will get their health benefits. This report raises serious questions about whether AARP can be an honest advocate of seniors' interests while at the same time profiting from the damage inflicted by the AARP-endorsed Medicare cuts. AARP's reliance on selling insurance – primarily to Medicare beneficiaries – to maintain its current business model, begs the questions: What is AARP's financial stake in its varying Medicare products and how did the health care law impact AARP's bottom line?

## AARP's Varying Financial Stakes in Medicare Advantage and Medigap

### Medicare Advantage

AARP has signed a contract with United which allows the company to sell MA insurance plans under AARP's name.[76] The current contract was established in 2008 and runs through 2014.[77] Any Medicare-eligible beneficiary can enroll in an AARP MA insurance plan.[78] AARP MA plan enrollees are insured by United, which solely bears risks for insuring these individuals.[79] This means that if enrollee health care service utilization is lower than expected, United makes money. Conversely, if claims are higher than expected, United could lose money.

Enrollees in AARP's MA plan pay their monthly premiums directly to United.[80] United pays AARP a fixed amount, on a monthly basis, for the use of the AARP brand.[81] The royalty profit that AARP receives from selling its brand for MA marketing purposes is not dependent on or impacted by the number of beneficiaries that enroll in an AARP MA plan.[82] Therefore, whether there are 5 million or 500 seniors enrolled in an AARP MA plan, AARP is still paid the same amount of money by United. So when United makes money on MA, AARP makes money, too. But if United loses money on MA, AARP still makes money. AARP is paid the same amount by United even if enrollment in AARP MA plans decline.

AARP has repeatedly refused to disclose the amount of money it is paid for allowing United to use its name in marketing its MA plans.[83] Similarly, United will not disclose this amount, citing the proprietary and confidential nature of their financial arrangement with AARP, which both parties would have had to agree to disclose.[84] However, to understand the underlying financial implications of the health care law for AARP, the exact amount of money AARP makes from MA insurance is irrelevant. As this report details, AARP's revenue from its MA plans will be unaffected by the declining enrollment that will occur from the health care law. Importantly, the same cannot be said for AARP's Medigap insurance business.

### Medigap

AARP also has a business relationship, which has been in place since 1998, with United to market and sell Medigap insurance plans.[85] Unlike AARP's MA insurance products, only dues-paying AARP members can enroll in an AARP Medigap insurance policy.[86] In 2007, AARP and United renewed their financial contractual agreement, which extends through December 31, 2017.[87] Unlike MA premiums, which are paid directly

to United, Medicare beneficiaries enrolled in an AARP Medigap insurance plan pay their Medigap premiums directly to AARP, specifically into AARP's Insurance Plan, which as previously discussed, is a grantor trust.[88] AARP then holds these premiums for a period of time, invests them, earns interest on them, and then retains a portion of the premium for their own financial gain before sending a percentage of the premiums to United.[89]

Unlike the MA contract, under the Medigap contract between AARP and United, AARP is paid a percentage of the premium for each AARP Medigap policy that is sold.[90] Initially, both AARP and United refused to provide Members of Congress with the percentage of seniors' Medigap premiums that AARP retains, stating that this information was proprietary and confidential.[91] However, some key facts about AARP and United's Medigap contract were uncovered in filings with several state insurance commissioners that are required to be made publicly available.[92]

State insurance rate filings show that AARP retained 4.95% of seniors' premiums for every Medigap policy sold under its name in 2010.[93] Interestingly, United and AARP's previous contract allowed AARP to retain 4% of Medigap premiums in 2007.[94] The new financial arrangement represents a 24% increase over what AARP had been making on its Medigap business in 2007 under the previous contract. Again, the current contract will be in place through 2017.[95]

Because of this structure, and unlike the MA contract, AARP financially benefits as Medigap enrollment increases.[96]

**CHART 5:** Flow of AARP Medicare-Related Royalty Payments



## Impact of Health Care Law on Medigap and Medicare Advantage Enrollment

Just 9% of Medicare beneficiaries are enrolled in traditional fee-for-service Medicare alone.[97] As shown in Table 3, the vast majority of beneficiaries (91%) choose to enroll in some form of supplemental coverage. This supplemental, or additional, coverage can provide seniors with lower out-of-pocket costs and also often times provides them with additional benefits not available in traditional fee-for-service Medicare.[98] For example, seniors with traditional Medicare coverage alone are exposed to a $1,132 deductible for a hospital stay in 2011.[99]

Some sources of supplemental coverage, namely Medicaid and employer-provided coverage, are only available to a select subset of beneficiaries based on their income or previous employer. Medicare beneficiaries who are ineligible for Medicaid or retiree health coverage and who are seeking additional medical coverage can choose to enroll in a Medigap or a MA plan, but they cannot enroll in both.[100] As noted above, Medigap plans charge an additional monthly premium, while only half of enrollees were in a MA plan in 2009 that charged seniors more to enroll.[101] In 2010, roughly one-in-four Medicare beneficiaries were enrolled in a MA plan,[102] while one-in-five were enrolled in a Medigap plan in 2009.[103]

TABLE 3: Sources of Medicare Beneficiaries' Supplemental Coverage in 2006 [104]

| Source of Supplemental Coverage | Percentage of Medicare Beneficiaries |
|---|---|
| Employer retiree coverage | 32% |
| Medigap | 26% |
| Medicare Advantage (MA) [105] | 19% |
| Medicaid ("dual eligible") | 13% |
| Other | 1% |
| None (Traditional Medicare only) | 9% |

The health care law affects both MA and Medigap insurance products and AARP's royalties in dramatically different ways. A single provision of the Democrats' health care law, which spans just over one page of legislative text in the 2,560 page law, impacts Medigap. Section 3210 requires, "to the extent practicable," nominal cost sharing in Medigap plans C and F by January 1, 2015.[106] Such cost-sharing would not be applicable to existing policies, only those newly issued.[107] The Congressional Budget Office (CBO) assumes this provision will reduce federal spending by $100 million.[108] These savings result from the indirect effect of minimizing first dollar coverage that many health economists say can increase utilization of health care services. As such, the provision related to Medigap *alone* is not anticipated to impact enrollment in these plans, meaning Medigap plans remain largely unchanged by the law.

The same cannot be said for MA, which was substantially modified by and targeted for unprecedented cuts in the health care law. These changes will not only affect future enrollment, but will also significantly impact the 11 million Medicare beneficiaries who are currently enrolled in a MA plan.[109] Beginning in 2011, the law will start reducing MA payment rates.[110] Starting in 2014, the law provides certain plans with a new performance bonus for achieving certain quality rankings.[111]

According to CBO, funding for MA plans will be slashed by $206 billion from 2010 to 2019, representing roughly 40% of all Medicare cuts contained in the health law.[112] CBO also predicts that MA enrollees' health benefits will be cut by an average of $816 annually in 2019 alone.[113] The CMS Office of the Actuary (OACT) stated that once these payment changes are "fully phased in, enrollment in MA plans will be lower by about 50%."[114] And as early as 2014, OACT projected that 4.9 million fewer seniors will be enrolled in a MA plan as a result of the law.[115] Furthermore, OACT determined that MA cuts will result in "less generous benefit packages," and, in particular, seniors enrolled in MA could expect to pay higher coinsurance, lose extra benefits like vision or dental care, and pay higher premiums for Medicare Part B or Part D.[116] As evidenced by current enrollment patterns (detailed in Table 3), many of the seniors losing their MA

plan will likely seek additional coverage, and Medigap plans will often be the only available option.

Even for those who still have access to a MA plan, however, the higher premiums and reduced benefits resulting from the health care law could lead many to shift from MA to Medigap. CMS Chief Actuary Richard S. Foster testified to this effect on February 10, 2011, before Congress at a hearing on the health care law's impact on the Medicare program and its beneficiaries:

> Representative David Reichert: "But as Medicare Advantage plans go away, seniors are going to have to make a choice to go someplace, as Mr. Nunes said, or Mr. Tiberi said, they are going to have to go somewhere, and Medigap would be one of those.
>
> I just find it interesting that, I don't know if you are aware or not, but Mr. Herger and I have been investigating AARP's strong financial public support of this health care bill and their interest in the Medigap insurance plans. And as Medicare Advantage disappears, Medigap insurance, United, for example, stands to gain a lot in my opinion. Would you agree with that statement?"
>
> Foster: "Well, I think that if our projection ends up being correct, as I have every reason to expect, and *something like 6 to 7 million people, beneficiaries, leave Medicare Advantage plans, many of them, perhaps most of them, will want auxiliary coverage and Medigap will be the most straightforward way to get it.*" (emphasis added)
>
> Representative Pat Tiberi: "So if you reduced the number of enrollees on Medicare Advantage and they go into Medicare fee-for-service, then they will have an additional out-of-pocket expense, potentially a new Medigap [plan] that they would have to pay for."
>
> Foster: "Typically."
>
> Tiberi: "If you were in the business of providing coverage for seniors and you are providing that coverage as an addition to Medicare fee-for-service, the more Medicare fee-for-service beneficiaries there are, the better it is potentially for you to

supplement your business by offering more coverage to supplement Medicare fee-for-service. *Meaning if there are fewer Medicare Advantage beneficiaries, they have to go back in the Medicare fee-for-service, so you would be potentially benefited.*"
>
> *Foster: "Yes, you would have a broader market opportunity."*
>
> *Tiberi: "Because the odds are that if you are no longer on Medicare Advantage, you would need something other than just Medicare fee-for-service based upon what we already know, right?"*
>
> *Foster: "Yes, sir."* (emphasis added)[117]

United, not surprisingly, believes this is also true. The dynamic of Medicare beneficiaries joining non-MA supplemental insurance offerings, such as Medigap, as a result of the health care law was discussed in United's 2010 first quarter earnings call with investors (held after the health care law was enacted).[118] In this call, a United executive explained that future reductions in MA enrollment will create business opportunities in other Medicare products, namely Medigap.[119]

> Ana Gupte (Sanford Bernstein - Analyst): "I had a question on relative positioning, if you will, for the various products in the senior market. You've got MA I believe you and AARP perhaps have introduced this new [Medigap] offering, and then if you could comment on the Humana CIGNA alliance and the employer market."
>
> Larry Renfro (United - Executive Vice President and Chief Executive Officer of the Public and Senior Markets Group): "As far as the [Medigap] obviously we work very closely with AARP on all products, and we have a common goal of trying to offer a variety of products to the senior population, *so we believe that post reform that [Medigap] and supplemental programs are going to be very, very much in want and needed by the seniors."* (emphasis added)

Ms. Gupte: "Yeah, I think so. I guess overarchingly just one final sort of wrap-up, should we take it that Med Advantage is one piece of your senior business, but you're positioning yourself in multiple products and perhaps in multiple channels and customer bases to sort of have a rounded out senior business, so it's not all about MA?" (emphasis added)

Mr. Renfro: "*Absolutely*. If you look at post-reform, one of our main goals is to outperform fee-for-service, as Steve has stated, and part of that process is looking at adjacencies or products that could sit alongside the senior marketplace.[120] (emphasis added)

There is already evidence of this emerging trend of health insurers encouraging beneficiaries to switch from MA to a Medigap plan. For example, Harvard Pilgrim Health Care in September 2010 announced it will no longer offer its MA plan in 2011, which provided care to 22,000 beneficiaries.[121] Lynn Bowman, vice president at Harvard Pilgrim explained, "We became concerned by the long-term viability of Medicare Advantage programs in general." However, Harvard Pilgrim, in a mailing to the beneficiaries it previously served, "urge[d] customers to switch to a new [Medigap] plan it will begin offering in October."[122]

The MA cuts contained in the health care law will result in millions of seniors no longer selecting MA coverage, either because these plans no longer will be available to some seniors or because they will become too expensive and offer fewer benefits in areas where MA is still an option.[123] Many of the displaced beneficiaries are unlikely to have access to either Medicaid or employer provider coverage, because if they were eligible for either, they likely would already be enrolled in such coverage. As a result, as these 7.4 million seniors[124] seek an alternative to MA to supplement their traditional Medicare coverage, many will turn to Medigap plans. These cuts to the MA program and the resulting declining enrollment in plans are "widely expected to drive up demand for private Medigap policies like the ones offered by AARP, according to health care experts, legislative aides, and documents." [125]

## AARP's Financial Windfall from the Health Care Law

As documented above, United will pay AARP every month from now until 2014 as part of their MA business agreement.[126] These payments will be the same amount regardless of whether 5 million seniors or 500 seniors are enrolled in the MA plan. Enrollment in the AARP MA insurance plan has no impact on AARP's bottom line.

AARP also profits from the Medigap premiums paid by seniors because AARP invests those amounts for a period of time before remitting a portion of the premium to United.[127] This business arrangement is in place through 2017.[128] Thus, under the current contracts, AARP makes money on every senior that drops an AARP MA plan in favor of an AARP Medigap plan, which will be a result of the health care law.

For the purposes of determining AARP's financial windfall from the health law, it was assumed that AARP Medigap insurance plans retain their current market share of 34%.[129] Estimated premiums were calculated using the 10-year average rate of increase for AARP Medigap plans (4.84% per year).[130] The 2010 national average monthly rate, weighted by enrollment, for AARP Medigap plans is $181.99, or $2,183.88 per year.[131] Using the 10-year average rate of increase, the projected national average annual rate will be $2,638 in 2014.

The year 2014 was chosen because the current contracts between AARP and United will still be in force and the MA cuts will have begun. Finally, the analysis estimating AARP's financial windfall uses OACT's projected MA enrollment in 2014, which predicts that 4.9 million fewer seniors will be enrolled in an MA plan as a result of the health care law.[132]

**TABLE 4:** AARP's Financial Windfall in 2014 as a Result of the Health Care Law

| | Low-Range Estimate | Mid-Range Estimate | High-Range Estimate |
|---|---|---|---|
| Estimated number of beneficiaries newly enrolled in Medigap instead of MA | 1,248,500 | 2,497,000 | 3,745,500 |
| AARP's share of new Medigap enrollees based on their current market share (34%) | 424,490 | 848,980 | 1,273,470 |
| Estimated standard annual premium for AARP's Medigap plan[133] | $2,638 | $2,638 | $2,638 |
| Total Medigap premiums collected by AARP for new AARP Medigap plan enrollees *(who would have otherwise stayed in MA if not for the cuts in the health care law)* | $1,119,804,620 | $2,239,604,240 | $3,359,413,860 |
| **Additional premium money AARP could expect to retain as a result of increased enrollment in AARP's Medigap insurance plan *(AARP retains 4.95% of the premium)*** | **$55,430,328** | **$110,860,657** | **$166,290,986** |

Table 4 estimates the financial windfall that AARP could expect to see as a result of increased Medigap enrollment stemming from the health care law's cuts to MA. The low-range estimate assumes that 25% of the 4.9 million seniors who would otherwise be enrolled in MA choose to enroll in a Medigap plan. The mid-range estimate assumes 50% and the high-range estimate assumes a 75% take-up rate. Keep in mind, three out of four seniors who are not enrolled in MA, an employer-sponsored retiree plan, or Medicaid have enrolled in a Medigap plan. The high-range estimate reflects the fact that nearly one-in-five seniors enrolled in MA earn less than $10,000 per year, making it unlikely that they could afford a Medigap policy.[134]

As shown in Table 4, AARP stands to financially gain between $55 million and $166 million in 2014 alone, and this does not include the additional interest AARP earns on the Medigap premiums they receive from seniors. While these are estimates, they do provide an order of magnitude for the net financial windfall AARP stands

to see as a result of the health care law, which AARP strongly endorsed.[135]

To put this financial gain into context, AARP was paid $427 million by United for all of their insurance-related business agreements (MA, Medigap, and prescription drug coverage) in 2009.[136] The amounts estimated under Table 4 are net gains from Medigap. Given that both the MA and Part D royalty payments in 2014 would not fluctuate based on enrollment, it is fair to assume that under the mid-range estimate, AARP could make $538 million from United in 2014. Alternatively, AARP's total revenue from the health care law, derived from new seniors' premiums and its business relationship with United, as calculated by totaling the net high-range estimate and 2009 United royalty payments, could be 39% higher in 2014 than the total royalty revenue AARP received from United in 2009. AARP's financial gain from the health care law, under their existing contract, could exceed $1 billion during the next 10 years, under the mid-range estimate.

Furthermore, while this report focuses on AARP's financial gain from its Medicare insurance business as a result of the Medicare cuts in the health care law, this may not be the only gains realized by AARP. For example, AARP also has a business relationship with Aetna to sell health insurance products targeted to those 50 to 64 years of age.[137] Given that the health care law mandates that nearly every American buy health insurance by 2014 or pay a new tax, AARP could continue its business with Aetna and sell health insurance in Exchanges.[138] Also, AARP could see a significant increase in its membership dues because it requires seniors who want to enroll in an AARP Medigap insurance plan to join AARP as dues-paying members.[139] Furthermore, there are billions of dollars in taxpayer-funded federal grant opportunities created in the health care law, such as health insurance enrollment outreach, which may provide yet another source of future revenue for AARP.[140]

## AARP's Thinly Veiled Motives

Throughout the debate on the health care law, when AARP was confronted with concerns about whether its financial interests were influencing its decision to support the legislation, the organization often countered that it takes positions that are contrary to insurance companies as evidence of its independence.[141] Superficially, this statement may appear to be legitimate. Insurance companies opposed the cuts to MA, which AARP strongly supported.[142] However, based on the contractual arrangement between AARP and United, the $206 billion[143] in cuts to MA plans may be financially harmful for United, but financially beneficial to AARP. Even the *Washington Post* highlighted this point, stating that AARP is poised to gain "substantial earnings from insurance royalties and the potential benefits that could come its way from many of the reform proposals."[144]

Similarly, AARP's position on federally-defined insurance rating rules, and in particular limiting premium variations on the basis of age, was a position opposed by the insurance industry.[145] As noted earlier, AARP, in conjunction with Aetna, sells non-group health insurance to 50 to 64 year olds,[146] which is the group most likely to benefit from these rating changes. Again, this might be seen by some as validating AARP's assertion that it takes positions contrary to the insurance industry and is therefore motivated by its members' interests. However, despite AARP's strong brand name, it is currently at a competitive disadvantage in the pre-retiree and early-retiree non-group insurance market without changes to the insurance rating rules. That is because AARP employs less stringent underwriting practices than other insurance companies offering coverage to this demographic.[147] Beginning in 2014, the health care law will require other insurers to rate insurance products in a manner more consistent with AARP's current practice, which will help eliminate AARP's self-imposed competitive disadvantage in this market.[148] Again, despite appearances to the contrary, AARP's policy position aligns with its own financial incentives for selling health insurance.

**CHART 6:** Highest Federal Lobbying Expenditures 1998-2010



## AARP's Advocacy for Policy Not in the Best Interest of Its Members Is Not Unprecedented

Over the years, AARP has aggressively lobbied Congress on health care and other senior-related issues.[149] As shown in Chart 6, AARP had the fourth highest lobbying expenditures from 1998 to 2010, just below General Electric but above PhRMA.[150]

Despite the sheer size and force of AARP's lobbying efforts, its membership has not always benefitted from the legislation the organization has backed. In fact, the health care law is not the first time AARP decided to support legislation that would have cut Medicare to fund another entitlement program.

In 2007, AARP issued a press release saying it "commends [the] House for passing the CHAMP Act."[151] The "Children's Health and Medicare Protection (CHAMP) Act of 2007" (H.R. 3162) would have cut Medicare by $202.8 billion in order to fund a massive $128.7 billion expansion of the State Children's Health Insurance Program (SCHIP).[152] Thus, AARP supported legislation that would have taken billions of dollars from Medicare to fund efforts to provide 4 million children and their parents with health coverage under SCHIP

(1.5 million of whom already had health insurance).[153] Like the health law, the CHAMP Act would have cut MA that time by $157 billion.[154] As a result, the non-partisan Medicare Payment Advisory Commission (MedPAC) predicted these cuts would have left one-in-five seniors without access to a MA plan.[155] In fact, former Clinton Administration official Kenneth Thorpe predicted that seniors in 22 states would have been left without a single senior enrolled in MA.[156] Further, CBO estimated that 7 million fewer seniors would have enrolled in MA if these cuts had become law, including 3.2 million seniors who were enrolled in MA at the time that would have been forced out of their MA plan.[157]

During the debate over health care reform, AARP used its substantial financial resources and public image as a senior advocacy organization to significantly shape the final health care law.[158] While the health law will likely be financially beneficial for AARP and its insurance business, it could come at the expense of those who AARP claims to represent – seniors. As previously documented, the law contains more than one-half trillion dollars in Medicare cuts, most of which will negatively impact seniors.[159] Most notably, the Obama Administration's own Medicare actuaries warn that the one-half trillion dollars in Medicare cuts included in

the health care law could jeopardize seniors' access to care.[160] Furthermore, the actuaries predict that 7.4 million Medicare beneficiaries, who in the absence of the health care law would have been enrolled in a MA plan, will lose their plan because of the $206 billion in cuts to the program.[161] For those seniors who are able to stay in their MA plan, CBO predicts that the value of extra benefits will be reduced by $816, on average, in 2019.[162]

According to the 2010 Medicare Trustees report, by 2016, 90% of seniors who currently have retiree prescription drug coverage offered by their former employer, or would have participated in the future, will no longer be able to enroll in such coverage as a result of changes made by the Democrats' health care law.[163] Finally, CBO estimates that Medicare Part D plan premiums will increase by 9% as a result of the health care law.[164] This stands in sharp contrast to AARP's claim that the law will "make our health care system work for more Americans."[165]

There have also been longstanding concerns about the conflict of interest between AARP's financial reliance on insurance companies and AARP's public persona as a senior membership organization. For example, in 2007 when AARP renewed its contract with United and signed a contract with Aetna, AARP's then CEO Mr. Novelli predicted AARP would reap $628 million in annual royalty revenues from the contracts.[166] Mr. Novelli explained that, on an annual basis, $400 million of these funds would be used to support the lobbying campaign "Divided We Fail," while just $50 million of the insurance royalties would be spent on "AARP Health Aid," a program to assist AARP members in accessing information on health care services.[167]

AARP has subsequently stated that the organization spent $50 to $58 million to fund the lobbying campaign "Divided We Fail."[168] AARP asserts it did not track how those funds were used, but did provide Members of Congress with a sample list of organizations that received funding, as detailed in Table 5.[169]

**TABLE 5:** Groups Receiving Funding from Divided We Fail

| Name of Organization | Amount |
|---|---|
| 100 Black Men of America, Inc | $100,750 |
| African Methodist Episcopal Church | $50,000 |
| Alpha Kappa Alpha Inc | $15,000 |
| Business and Professional Women | $22,500 |
| Congressional Black Caucus Foundation | $10,000 |
| Human Rights Campaign (HRC) | $5,000 |
| Leadership Conference on Civil Rights | $25,000 |
| League of United Latin American Citizens (LULAC) | $70,000 |
| NAACP | $35,000 |
| National Association for Equal Opportunities in Higher Education (NAFEO) | $10,000 |
| National Association of Latino Elected and Appointed Officials (NALEO) | $125,000 |
| National Council of Churches | $20,000 |
| National Council of La Raza | $10,000 |
| National Hispanic Coalition on Aging | $60,000 |
| Samuel Dewitt Proctor Conference | $25,000 |
| US Hispanic Chamber of Commerce | $25,000 |
| US Hispanic Leadership Institute | $5,000 |



# PART 3: AARP'S TAX STATUS

## AARP as a Tax-Exempt Organization

As stated at the beginning of the report, AARP, Inc. is exempt from federal income tax by virtue of being organized and operated pursuant to section 501(c)(4) of the IRC. In order to attain and retain tax-exempt status, a 501(c)(4) civic or social organization must comply with the following criteria.[170] The organization:

- Must primarily operate to promote the common good and social welfare of a community of people;

- Must be organized as a non-profit;

- May engage in legislative lobbying in the furtherance of the organization's social welfare purpose; and

- May engage in political activity (including campaign-related activity), provided it is not the primary activity of the organization.[171]

Additionally, it should be noted that tax-exempt organizations are expected to compensate their employees in a reasonable manner. Compensation packages that are deemed excessive or unreasonable are subject to monetary penalties.[172]

In order to qualify under section 501(c)(4) of the IRC, an organization must be "operated exclusively for the promotion of social welfare," meaning the organization "is primarily engaged in promoting in some way the common good and general welfare of the community" by "bringing about civic betterments and social improvements."[173] In addition, no part of the net earnings of such entity may inure to the benefit of any private shareholder or individual.[174] As a condition of tax-exempt status, section 501(c)(4) entities are expected to operate for the benefit of the community, however evidence suggests AARP may have strayed from that

mission. The size and extent of AARP's insurance-related business activities compared to AARP's social welfare activities and executive compensation suggest that AARP may not be operating primarily for the benefit of the community. Indeed, AARP's royalty revenues, primarily from insurance companies, nearly tripled from 2002 ($240 million) to 2009 ($657 million).[175]

For example, despite the significant increase in revenues, AARP's charitable affiliates do not appear to be benefiting from this windfall, as shown in Chart 7.[176]

CHART 7: The Disconnect: AARP revenue from its insurance business increased, but little is used to fund its charitable affiliates.



AARP's cash and in-kind contributions to the AARP Foundation only increased 11% ($3.1 million) while cash and in-kind contributions to AARP's Legal Counsel for the Elderly actually decreased 9% ($300,000) from 2004 to 2008 (the only years for which AARP provided data).[177] So one might ask, what is AARP doing with the remaining hundreds of millions of dollars AARP receives each year from their insurance business?

Interestingly, the AARP Foundation recently committed an estimated $14 million in each of the next three years to become the primary sponsor of NASCAR driver Jeff Gordon.[178] Any other companies that want to place their logo on the car will have to purchase the space from AARP.[179] It is unclear how the AARP Foundation's new endeavor, acting as an advertising agency and multimillion dollar NASCAR sponsor, will "provide security, protection, and empowerment for older persons in need" or how it will "provide information, education, and services to ensure people over 50 lead lives of independence, dignity, and purpose."[180] Further, given that the AARP Foundation receives tens of millions of dollars in federal grants each year,[181] this raises questions about whether scarce taxpayer dollars are being used to sponsor a NASCAR team. Moreover, it is unclear which AARP entity will pocket the new revenue associated with selling advertising space on Gordon's car and whether it might be done in a way that undermines the purposes behind the restrictions on tax-exempt entities.

## History of Paying Fines to the IRS and Other Government Entities

AARP's commercial activities and their proper tax treatment have long been a source of controversy.[182] The IRS and tax authorities in the District of Columbia and the State of California examined AARP's financial activities in the 1980s and 1990s.[183] In 1994, AARP paid the IRS a one-time settlement payment of $135 million in lieu of taxes, resolving an audit over tax returns for years 1985 through 1993 for failure to fully pay unrelated business income tax (UBIT) on its commercial activities.[184] It is important to note that AARP's tax liabilities could have been greater than the final settlement agreement.[185] Also in 1994, AARP agreed to pay the U.S. Postal Service $2.8 million to settle allegations that AARP owed $5.6 million for improperly mailing health insurance solicitations at non-profit rates in 1991 and 1992.[186] In 1995, the U.S. Senate Finance Committee held a hearing on whether or not AARP's non-profit, tax-exempt status should be revoked.[187]

In 1999, the IRS and AARP once again reached a settlement to conclude an IRS audit of the organization covering tax years 1994 through 1998 with respect to the treatment of revenues AARP received from licensing and selling its name and logo to insurance companies.[188] The agreement resulted in characterizing future income that AARP receives from insurance companies as royalty income, a type of unrelated business income that is exempt from being taxed because it is excluded from unrelated business taxable income under IRC section 512(b).[189] Also, as a part of the settlement, AARP agreed to establish a wholly owned taxable subsidiary, AARP Services, Inc., which manages the organization's lucrative branding and endorsement deals, including those with insurers.[190]

## AARP's Generous Executive Compensation Packages

Section 501(c)(4) organizations are prohibited from engaging in private inurement, defined generally as providing unreasonable compensation to executives, board directors, and, in some cases members.[191] An organization that violates this prohibition can face revocation of its tax-exempt status.[192] IRC section 4958 provides an intermediate sanction – in other words, a sanction short of revocation – for engaging in an excess benefit transaction, which generally would include excessive compensation.[193] Generally, reasonable compensation is defined as what similar persons in similar positions and duties and similarly situated organizations are paid.[194]

An organization can create a presumption that a compensation arrangement is reasonable by relying on an independent governing body's determination.[195] If the organization is found to have paid excessive compensation, section 4958 imposes an excise tax against the person receiving the compensation. The excise tax is equal to 25% of the excess benefit, meaning the amount exceeding appropriate compensation.[196] If the excess benefit transaction is not corrected within the taxable year, an additional tax equal to 200% of the excess benefit is imposed.[197] An organization manager, not the organization itself, may also be liable for an excise tax equal to 10% of the excess benefit if he or she knowingly and willfully participated in the transaction.[198] However, it is difficult to enforce IRC section 4958 sanctions.[199]

Other non-profit organizations have been strongly criticized for excessive compensation and expenses for arrangements similar to AARP's. For example, in 2007, the Smithsonian Institution and, in particular, then-Secretary Lawrence M. Small were criticized by Senator Charles Grassley of Iowa and the Smithsonian Inspector General for lavish compensation and expenses.[200] Mr. Small's compensation in 2006 was $915,698.[201] As a result of the investigation and ongoing Congressional oversight, Mr. Small resigned and was replaced with G. Wayne Clough who earned $490,000 in his first year.[202] In comparison, Mr. Novelli's compensation in 2006 was $2,024,159 (which included a one-time lump-sum payment of $1,205,835 under his non-vested deferred compensation plan for completing five years of service from 2001 through 2005).[203]

In exchange for tax-exempt status worth billions of dollars, tax-exempt organizations should ensure that their primary objective is to further their charitable and social missions, rather than enriching their employees. As the President of Charity Navigator, Ken Berger, said, "Arguing that those working for the benefit of the neediest people in our society should make millions and multimillions like corporate leaders defies common sense."[204]

The Charity Navigator annual survey of CEO compensation at large non-profits, those with expenses exceeding $500 million, found that median compensation for the 2008 tax year was $695,379.[205] Mr. Novelli's 2008 total compensation of $1,005,380 was 44% higher than the median amount identified by Charity Navigator.[206] Their 2009 study, based on 2007 data, found the average compensation for CEOs at a non-profit with a budget in excess of $100 million was $462,037.[207] AARP generally compensates their executives more than similarly situated non-profits surveyed.[208] For example, in 2009, Mr. Novelli's $1,647,419

**TABLE 6:** Comparison of Compensation of AARP's Top Executives

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| **William Novelli AARP CEO** | **$902,171**[209] | **$1,005,380**[210] | **$1,647,419**[211] |
| Largest charities and foundations executive compensation[212] | $462,037 | $695,379 | N/A |
| Median senior income | $28,305[213] | $29,631[214] | $31,354[215] |

in total compensation, including a severance payment of $350,657,[216] was well above that average. New AARP CEO A. Barry Rand, who took over in April 2009, earned $648,640 in compensation in just 9 months on the job. Not long after joining AARP, Mr. Rand said, "I decided it wasn't about making money…"[217]

In additional to a generous pay package, the CEO of AARP is entitled to an annual $5,000 payment to cover any "incidental expenses", as well as an annual allowance of up to $12,000 for maintenance expenses related to his or her personal vehicle.[218] AARP reported that CEO A. Barry Rand also received relocation benefits of $98,169 in 2009.[219]

## AARP's Travel Policy

AARP reimburses board directors, officers, and key employees for travel and subsistence costs, including ground and air round-trip transportation, hotel, and meals, incurred in performing their duties.[220] AARP will pay for first-class accommodations for board directors on flights exceeding five hours when business class is not available.[221] However, AARP's CEO is allowed to travel first class on any flight that exceeds one hour.[222] Also, board directors are allowed to bring their spouses or companions to AARP-related functions and have their travel and subsistence costs paid for by AARP.[223]

AARP's National Policy Conference New Member Orientation and 2010 Summer Meeting were held at the Hotel Del Coronado in San Diego, CA.[224] This resort describes itself as a "…beacon of grandeur and refinement among vacation destinations in Southern California and the world" and "as the definitive example of what a luxury resort should be."[225] According to the resort's website, room rates for June 11, 2011 range from $299 to $1,400 per night before taxes and other fees.[226] AARP's conference was held from June 6 through June 8, 2010.[227]

The Panel on the Non-profit Sector, on which Mr. Novelli served, articulated what it believed should be the gold standard for non-profits. They suggest that travel on behalf of an organization should be, "carried out in a cost-effective manner."[228] Furthermore, even though AARP's travel policy is different for the CEO, the Panel recommends against making decisions on

travel expenditures based on, "the title or position of the person traveling."[229] Finally, the report states that, "charitable funds generally should not be used for premium or first-class travel but boards should retain the flexibility to permit exceptions when they are in the organization's best interest."[230] Even though AARP's then CEO, Mr. Novelli, helped author the standards set forth by the Panel, it appears that the organization follows different standards as it relates to its travel policy.[231]

## Is AARP Breaking Federal Lobbying Laws?

It is also important to consider whether AARP is complying with the Lobbying Disclosure Act of 1995 (LDA). At issue is whether AARP is using the relationship between its 501(c)(3) and 501(c)(4) tax-exempt organizations to circumvent federal funding prohibitions. Although AARP notes in its consolidated financial statements that the federal grants it receives go to AARP's 501(c)(3) affiliates (the AARP Foundation and the Legal Counsel for the Elderly),[232] the lack of clear barriers between affiliates receiving federal grants and AARP, Inc., the 501(c)(4) lobbying organization, raises questions. Under the LDA, 501(c)(4) organizations that engage in political lobbying activities are prohibited from receiving federal awards, grants, or loans.[233] The purpose of the prohibition is to prevent the conflict of interest that would arise from organizations using federal money to lobby the Congress and federal agencies for even more federal funds.[234] However, AARP's repeated transfers of federal funds between AARP, Inc., the lobbying 501(c)(4) organization, and its related 501(c)(3) organizations may undermine the purpose behind this Act and the intent of Congress in passing the law.

On paper, the AARP Foundation is a separate legal entity and should be independent in its daily operations from AARP, Inc. A training manual for IRS agents states that, "[a]n organization affiliated with an IRC 501(c)(3) organization must observe the formalities of its separate organizational status and deal with the IRC 501(c)(3) organization at arm's length."[235] In reality, the AARP Foundation's (a 501(c)(3)) independence from AARP, Inc., (a 501(c)(4)) is at best questionable.

AARP, Inc. and the AARP Foundation have more than a mere symbiotic relationship, particularly given the

overlapping directors and officers.[236] In 2010, there were ten members of the AARP Foundation's Board of Directors.[237] AARP Foundation Chair N. Joyce Payne and Vice Chair George Rowan also served on AARP, Inc.'s Board of Directors.[238] Three additional members also overlapped between the two boards; including AARP Foundation Audit Chair Joanne Hardy, J. David Nelson, and Fernando Torres-Gil.[239] Finally, AARP Inc.'s Chief Operating Officer, Thomas C. Nelson, also served on the Foundation's Board.[240] As a result, a majority of the Foundation's Board in 2010 was composed of individuals with significant ties to AARP, Inc., creating, at the very least, the potential for conflict of interests between the entities.

AARP, Inc.'s control of the AARP Foundation's Board, as well as the ease with which money can transfer between AARP, Inc., and the AARP Foundation could undermine the purpose behind the federal funding prohibitions under the LDA. For instance, the AARP Foundation received government grants totaling over $97 million, which comprised 81.9% of the Foundation's total revenue, in 2009.[241] Then, the AARP Foundation funneled $3.1 million to AARP, Inc. to conduct charitable work on the Foundation's behalf and also reimbursed AARP, Inc. $858,975 for office supply expenses in 2009.[242] Further muddying the waters, AARP, Inc. transferred $586,943 in cash contributions, loaned $26.6 million, and performed over $10 million worth of in-kind shared services for the AARP Foundation in 2009.[243] Given the large sums of money moving back and forth between the two very differently regulated entities, the true independence of AARP, Inc. and the AARP Foundation merits further examination that only a formal audit would be able to resolve.

**CHART 8:** Financial Transfers Between AARP, Inc. and the AARP Foundation in 2009



## Should AARP's Tax-Exempt Status Be Revoked?

As this report has shown, AARP may be in violation of a number of the requirements imposed on organizations operating under a federal tax exemption.

In particular, one might question whether AARP is primarily operating to promote the common good and general welfare given the fact that AARP has become increasingly dependent on hundreds of millions of dollars in royalty revenue from insurance companies, which have increased substantially in recent years. Furthermore, to maximize revenue from its insurance business, AARP has repeatedly taken positions that, while benefitting AARP financially, run counter to the interests of millions of AARP members and arguably the community at large. Additionally, AARP's structure, with overlapping board membership between its "for-profit" and non-profit entities raises questions as to whether AARP is truly organized as a non-profit or if AARP is simply setting up shell affiliates to maintain tax-exempt status for the parent organization. Lastly, AARP appears to provide compensation packages and travel benefits for its employees, particularly for its executives, that are substantially more lucrative than those for other tax-exempt organizations.

Based upon the available evidence, substantial questions remain about whether AARP should maintain its tax-exempt status. Accordingly, we are forwarding a copy of this report to the IRS with a request that it review this report's findings and assess whether the IRS should conduct a further examination, which would include a review of the many documents AARP withheld from Members of Congress. We recommend the IRS review documents and any information relating to:

- Whether the operational activities of AARP are primarily motivated by political or profit interests, instead of to benefit its members;

- The reasonableness of AARP's executive compensation;

- The separateness of federal grant cash and lobbying activities between AARP's 501(c)(3) charitable organizations and 501(c)(4) advocacy organization;

- Whether it is appropriate to continue characterizing AARP's revenue generated from insurance products as royalty income that is exempt from UBIT.

- The accuracy and consistency of UBIT reporting on Forms 990, Forms 990-T, and audited AARP annual financial statements; and

- Any other issue concerning the tax-exempt status of AARP.



# ENDNOTES

1. *See* AARP.org, AARP History, http://www.aarp.org/about-aarp/info-2009/History.html (last visited Oct. 29, 2010).

2. *See id.*

3. *See* DC.gov, Online Organization Registration: AARP, http://mblr.dc.gov/corp/lookup/status.asp?id=131396 (last visited Oct. 29, 2010).

4. *See* AARP, IRS Form 1024 (last rev. Mar. 1964) (showing that AARP's exemption application was filed on Aug. 19, 1964) (on file with author).

5. *See* IRS.gov, Pub. 557 (06/2008): Tax-Exempt Status for Your Organization, http://www.irs.gov/publications/p557/index.html (last visited Oct. 29, 2010).

6. *See* Cong. Research Serv., Rep. No. RL34608, Tax Issues Relating to Charitable Contributions and Organizations (2009).

7. Unrelated business income tax (UBIT) is a tax for which a tax-exempt organization is generally liable on income derived from activities unrelated to its charitable or exempt purposes.  The tax is based on graduated corporate rates under Internal Revenue Code section 11, up to a top statutory rate of 35%.  However, certain exceptions to the UBIT rules apply to specific categories of income, such as royalty income, that would otherwise generally be subject to UBIT.

8. *See* AARP.org, About NRTA, http://www.aarp.org/about-aarp/nrta/info-2005/about_nrta.html (lasted visited Oct. 29, 2010).

9. *See id.*

10. *See* Stephanie Strom, *Y.M.C.A. is Downsizing to a Single Letter*, N.Y. Times, July 12, 2010, at A10.

11. *See* Gardiner Harris, *A Heated Debate is Dividing Generations in AARP*, N.Y. Times, Oct. 4, 2009, at A22.

12. *See* AARP, Consolidated Financial Statements: December 31, 2009 and 2008 (2010) (on file with author).

13. *See id.*

14. *See id.*

15. A grantor trust is created under a contractual arrangement in which an asset or property is transferred from the entity who created the trust (Grantor) to another person or corporate body (Trustee) to protect, hold, and manage the asset or property for the benefit of a specified list or class of persons (Beneficiaries).  Oftentimes, the grantor is also the trustee, allowing the grantor to control the assets in the trust and recognize income generated by the trust.

16. *See* AARP, *supra* note 12, at 14-15.

17. *See* Bara Vaida, *AARP's Chief: Giving Back*, National Journal, July 31, 2010, at 44.

18. *See, e.g.,* Letter from Thomas C. Nelson, Chief Operating Officer, AARP, to the Honorable Wally Herger, Ginny Brown-Waite, and David Reichert, Members of the U.S. House of Representatives (Dec. 18, 2009); Interview with Tom Paul, Chief Executive Officer, Ovations, UnitedHealth Group, in Washington, D.C. (Apr. 27, 2010).

19. *See* AARP, *supra* note 12.

20. *See id.* at 6-7.

21. *See id.*

22. *See* AARP.org, AARP Leadership, http://www.aarp.org/about-aarp/leadership/ (last visited Oct. 29, 2010).

23. *See* Letter from Thomas C. Nelson to the Honorable Wally Herger, Ginny Brown-Waite, and David Reichert, *supra* note 18 (stating that all trustees of the Insurance Plan also are members of the AARP, Inc. Board of Directors).

24. *See* AARP.org, *supra* note 22.

25. *See* AARP Consolidated Financial Statements As of December 31, 2000 and 1999 (2001), at 13.

26. *See* IRS Form 990, *Return of Organization Exempt from Income Tax*, Part IX: Statement of Functional Expenses, p. 10, lines 5-9 (filed by AARP, 2009).

27. *See* AARP, *supra* note 12.

28. *See* Emilio Pardo, Chief Brand Officer, AARP, Presentation: Valuing and Nurturing Your Brand (Oct. 25-26, 2006).

29. Advertising revenue is subject to UBIT rules under I.R.C. sections 511-513.  So if AARP was unable to rely on royalties from insurance companies, some of its alternative sources of income, like advertising revenue, could be subject to taxation.

30. *See* AARP, *supra* note 12 (showing all revenue sources and that investment revenue is an unreliable revenue source because AARP experienced losses in 2008).

31. *See id.* at 4; AARP, Consolidated Financial Statements as of December 31, 2003 and 2002, at 3 (2004) (on file with author) (showing revenue from membership dues in 2002 of $186,312,000 and in 2009 of $246,170,000).

32. *See* AARP, *supra* note 31 (showing revenue from royalties in 2002 of $240,049,000 and in 2009 of $656,975,000).

33. *See* AARP, *supra* note 12, at 3.

34. *See id.* (showing royalties of $656,975,000, membership dues of $246,170,000, and publications advertising of $112,651,000).

35. *See* Pardo, *supra* note 28.

36.  *See* AARP, *supra* note 12, at 9.

37.  *See id.*

38.  *See id.*; AARP, CONSOLIDATED FINANCIAL STATEMENTS: DECEMBER 31, 2008 AND 2007, at 9 (2009).

39.  *See* AARP, *supra* note 12, at 3; Fortune 500, Health Care: Insurance and Managed Care by Revenues, Profits, http://money.cnn.com/magazines/fortune/fortune500/2010/industries/223/index.html (last visited Oct. 29, 2010).

40.  *See* AARP.org, Health Products, http://www.aarp.org/benefits-discounts/health-products/ (last visited Oct. 29, 2010).

41.  *See* AARP, *supra* note 12.

42.  *See* AARP.org, *supra* note 40.

43.  *See* AARP, *supra* note 12.

44.  *See* CENTERS FOR MEDICARE AND MEDICAID SERVICES (hereinafter CMS), MEDICARE AND YOU 2010 (Jan. 2010), http://www.medicare.gov/Publications/Pubs/pdf/10050.pdf.

45.  *See id.*

46.  *See* MEDICARE PAYMENT ADVISORY COMMISSION (hereinafter MEDPAC), A DATA BOOK: HEALTHCARE SPENDING AND THE MEDICARE PROGRAM 151 (2010) (showing 10.5 million Medicare Advantage (MA) enrollees in 2009).

47.  *See* AMERICA'S HEALTH INSURANCE PLANS, LOW-INCOME & MINORITY BENEFICIARIES IN MEDICARE ADVANTAGE PLANS, 2007 (Sept. 2009), http://www.ahipresearch.org/pdfs/MALowIncomeMinorityReport2009_09-02-09.pdf (last visited Oct. 29, 2010).

48.  *See* THE HENRY J. KAISER FAMILY FOUNDATION, MEDICARE ADVANTAGE 2011 DATA SPOTLIGHT: PLAN AVAILABILITY AND PREMIUMS 3 (Oct. 2010), http://www.kff.org/medicare/upload/8117.pdf.

49.  *See* MEDPAC, REPORT TO THE CONGRESS: ALIGNING INCENTIVES IN MEDICARE 58 (2010).

50.  *See id.*

51.  *See* CMS, CHOOSING A MEDIGAP POLICY: A GUIDE TO HEALTH INSURANCE FOR PEOPLE WITH MEDICARE (2010), http://www.medicare.gov/Publications/Pubs/pdf/02110.pdf.

52.  *See id.*

53.  *See* MEDPAC, *supra* note 49, at 57.

54.  *See id.* at 58.

55.  *See* CMS, *supra* note 44.

56.  *See* AARP.org, *supra* note 40.

57.  *See* MEDPAC, *supra* note 49 (showing 9,492,000 Medigap enrollees in 2008); UNITEDHEALTH GROUP, UTAH STATE INSURANCE FILING ATTACHMENT: STANDARDIZED PLANS – PROJECTION OF NATIONAL LOSS RATIOS (filed in 2010) (on file with author) (showing 2,366,919 covered lives in 2008).

58.  *See* UNITEDHEALTH GROUP, *supra* note 57; E-mail from Melissa Rewinkel, Vice President of Federal Government Affairs, Mutual of Omaha, to Republican Professional Staff, Committee on Ways and Means (Aug. 6, 2010) (on file with author) (showing 925,000 enrollees).

59.  Interview with Susan Morisato, President, Insurance Solutions, UnitedHealthcare Medicare & Retirement, Paul Kallmeyer, Deputy General Counsel, Insurance Solutions, UnitedHealthcare Medicare & Retirement, and Kara Smith, Vice President, Federal Government Affairs, UnitedHealth Group, in Washington, D.C. (collectively UnitedHealth Group) (Mar. 7, 2011).

60.  *See* AARP.org, Medicare Rx Plans, https://aarphealthcare.com/products/medicare/part-d (last visited Oct. 29, 2010).

61.  *Compare* E-mail from Ed Kaleta, Director, Federal Government Relations, Humana, to Republican Professional Staff, Committee on Ways and Means (July 22, 2010) (on file with author) (showing Part D enrollment of 1,917,100), *with* E-mail from Joelle Thornhill, Vice President, Federal Government Affairs, UnitedHealth Group, to Republican Professional Staff, Committee on Ways and Means (July 28, 2010) (on file with author) (showing Part D enrollment of 4,500,000).

62.  Interview with Tom Paul, Chief Executive Officer, Ovations, UnitedHealth Group, *supra* note 18.

63.  *See* Gary Cohn and Darrell Preston, *AARP's Stealth Fees Often Sign Seniors with Costlier Insurance*, BLOOMBERG, Dec. 4, 2008, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive%sid=a4OkPQIPF6Kg (last visited Oct. 29, 2010); Bob Trebilcock, *Is AARP Looking Out for You? Auto and Homeowners Insurance*, CBS MONEYWATCH.COM, Aug. 26, 2009, *available at* http://moneywatch.bnet.com/retirement-planning/article/auto-and-homeowners-insurance-is-aarp-looking-out-for-you/334671/ (last visited Oct. 29, 2010).

64.  *See id.*

65.  *See id.*

66.  *See id.*

67.  *See* THE HENRY J. KAISER FAMILY FOUNDATION, MEDICARE ADVANTAGE 2010 DATA SPOTLIGHT: PLAN ENROLLMENT PATTERNS AND TRENDS (June 2010), http://www.kff.org/medicare/upload/8080.pdf.

68.  Interview with UnitedHealth Group, *supra* note 59.

69.  *See* E-mail from Joelle Thornhill, *supra* note 61.

70.  *See* E-mail from Ed Kaleta, *supra* note 61.

71.  *See* E-mail from Carolyn Hicks, Federal Affairs, Wellpoint, to Republican Professional Staff, Committee on Ways and Means (July 26, 2010) (on file with author).

72.  *See* E-mail from Gary Jacobs, Senior Vice President, Corporate Development, Universal American, to Republican Professional Staff, Committee on Ways and Means (July 22, 2010) (on file with author).

73.  *See* E-mail from Melissa Rewinkel, *supra* note 58.

74.  *See* Press Release, AARP, AARP Statement on Historic Health Insurance Reform Package (Mar. 19, 2010), *available at* http://www.aarp.org/about-aarp/press-center/info-03-2010/hcr_package_support.html (last visited Oct. 29, 2010).

75. *See* AARP, *supra* note 12 (showing royalties account for 46% of AARP's total operating revenue).

76. Telephone Interview with Tom Paul, Chief Executive Officer, Ovations, UnitedHealth Group (Dec. 9, 2009).

77. *Id.*

78. *Id.*

79. *Id.*

80. *Id. See also* Letter from Thomas C. Nelson, *supra* note 18.

81. Telephone Interview with Tom Paul, *supra* note 76.

82. *Id.*

83. *See* Letter from Thomas C. Nelson, *supra* note 18; Letter from K. Lee Blalack II, O'Melveny & Myers LLP, on behalf of UnitedHealth Group, to the Honorable Dave Camp, Wally Herger, Ginny Brown-Waite, and David Reichert (May 3, 2010).

84. Interview with Tom Paul, Chief Executive Officer, Ovations, UnitedHealth Group, in Washington, D.C. (April 27, 2009).

85. *See* Milt Freudenheim, *Prudential, Outbid, Loses $4 Billion of A.A.R.P. Work*, N.Y. Times, Sept. 12, 1996, *available at* http://www.nytimes.com/1996/09/12/business/prudential-outbid-loses-4-billion-of-aarp-work.html (last visited Oct. 29, 2010).

86. Telephone Interview with Tom Paul, *supra* note 76.

87. *See* UnitedHealth Group, Annual Report (Form 10-K), at 82 (filed on Feb. 11, 2009) (on file with author).

88. Telephone Interview with Tom Paul, *supra* note 76.

89. *See* AARP, *supra* note 12.

90. Interview with Tom Paul, *supra* note 62.

91. *Id. See also* Letter from Thomas C. Nelson, *supra* note 18; Letter from K. Lee Blalack II, *supra* note 82.

92. UnitedHealth Group Medicare supplemental rate filings are publicly available in the following states: Colorado, Connecticut, Florida, Massachusetts, New Jersey, New York, Rhode Island, Virginia, and Washington.

93. *See* UnitedHealth Group, New York State Insurance Filing Attachment: 2010 Expenses by Category (filed in 2010) (on file with author) (showing 4.95% royalty per policy).

94. *See, e.g.* E-mail from Sean Londergan, Assistant General Counsel, Vermont Department of Banking, Insurance, Securities and Health Care Administration, to Legal Intern, Republican Staff, Committee on Ways and Means (July 14, 2010) (on file with author); E-mail from Marti Hooper, Actuarial Assistant, Maine Bureau of Insurance, to Legal Intern, Republican Staff, Committee on Ways and Means (July 14, 2010) (on file with author).

95. Telephone Interview with Tom Paul, *supra* note 76.

96. *See* UnitedHealth Group, *supra* note 93.

97. *See* MedPAC, *supra* note 46.

98. *See* CMS, *supra* note 44.

99. *See id.*

100. *See id.*

101. *See* The Henry J. Kaiser Family Foundation, *supra* note 48.

102. *See* MedPAC, *supra* note 46.

103. *See* National Association of Insurance Commissioners, Medicare Supplement Insurance Experience Reports Number of Covered Lives (2009) (on file with author) (showing 7,378,985 individual Medigap policies in 2009).

104. *See* MedPAC, *supra* note 46.

105. MA enrollment grew substantially since 2006, and in 2010, 24% of Medicare beneficiaries were enrolled in MA.

106. *See* Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, § 3210.

107. *See id.*

108. *See* Letter from Douglas Elmendorf, Director, Congressional Budget Office, to the Honorable Nancy Pelosi, Speaker of the House of Representatives (Mar. 20, 2010), http://www.cbo.gov/ftpdocs/113xx/doc11379/AmendReconProp.pdf.

109. *See id.*

110. *See* Health Care Reconciliation Act of 2010, Pub. L. No. 111-152, § 1102.

111. *See id.*

112. *See* Letter from Douglas Elmendorf, *supra* note 108.

113. *See* Congressional Budget Office, Comparison of Projected Enrollment in Medicare Advantage Plans and Subsidies for Extra Benefits Not Covered by Medicare Under Current Law and Under Reconciliation Legislation Combined with H.R. 3590 as Passed by the Senate (Mar. 19, 2010), http://www.cbo.gov/ftpdocs/113xx/doc11379/MAComparisons.pdf.

114. *See* Memorandum from Richard S. Foster, Chief Actuary, CMS, Estimated Financial Effects of the Patient Protection and Affordable Care Act as Amended (Apr. 22, 2010), http://www.cms.gov/ActuarialStudies/Downloads/PPACA_2010-04-22.pdf.

115. *See* E-mail from Richard F. Coyle, Deputy Director, Office of the Actuary, CMS, to Republican Professional Staff, Committee on Ways and Means (July 26, 2010) (on file with author).

116. *See* Memorandum from Richard S. Foster, *supra* note 114.

117. *The Health Care Law's Impact on the Medicare Program and its Beneficiaries: Hearing Before the H. Comm. on Ways and Means*, 112th Cong. (2011).

118. *See* CallStreet Transcript of Q1 2010 UnitedHealth Group, Inc. Earnings Call at 15-16 (Apr. 20, 2010).

119. *See id.*

120. *See id.*

121. *See* Robert Weisman, *Harvard Pilgrim Cancels Medicare Advantage Plan*, Boston Globe, Sept. 28, 2010, *available at* http://www.boston.com/business/healthcare/articles/2010/09/28/harvard_pilgrim_cancels_medicare_advantage_plan/ (last visited Oct. 29, 2010).

122. *See id.*

123. *See* Memorandum from Richard S. Foster, *supra* note 114.

124. *See id.*

125. *See* Dan Eggen, *AARP: Reform Advocate and Insurance Salesman*, Wash. Post, Oct. 27, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/10/26/AR2009102603392.html (last visited Oct. 29, 2010).

126.  Interview with Tom Paul, *supra* note 62.

127. *See* AARP, *supra* note 12.

128. Telephone Interview with Tom Paul, *supra* note 76.

129. *See* National Association of Insurance Commissioners, Medicare Supplement Insurance Experience Reports Number of Covered Lives (2009) (on file with author) (showing 7,378,985 individual Medigap policies in 2009); UnitedHealth Group, *supra* note 57 (showing 2,508,066 covered lives in 2009).

130. See UnitedHealth Group, Florida State Insurance Filing Attachment 19: Standardized National History Rate Increases (filed in 2010) (on file with author).

131. See UnitedHealth Group, supra note 57.

132. See E-mail from Richard F. Coyle, supra note 115.

133. See UnitedHealth Group, supra note 57 (showing a weighted average premium of $181.99 in 2010 projected forward using a 4.84% annual rate increase).

134. See America's Health Insurance Plans, supra note 47.

135. See Press Release, AARP, *supra* note 74.

136.  See AARP, *supra* note 12.

137. *See AARP, UnitedHealth, and Aetna Offer New Health Plans*, Reuters, Apr. 17, 2007, *available at* http://www.reuters.com/article/idUSN1740321320070417 (last visited Oct. 29, 2010).

138. *See* Cong. Research Serv., Rept. No. R40942, Private Health Insurance Provisions in the Patient Protection and Affordable Care Act (PPACA) (2010).

139. Telephone Interview with Tom Paul, *supra* note 76.

140. *See* Letter from Douglas Elmendorf, Director, Congressional Budget Office, to the Honorable Jerry Lewis, Member of the U.S. House of Representatives (May 11, 2010), http://www.cbo.gov/ftpdocs/114xx/doc11490/LewisLtr_HR3590.pdf.

141. *See* Eggen, *supra* note 125.

142. *See* Lisa Wangsness, *Democrats Seek Cuts in Medicare Advantage*, Boston Globe, Sept. 24, 2009,  *available at* http://www.boston.com/news/nation/washington/articles/2009/09/24/democrats_seek_cuts_in_medicare_advantage/ (last visited Oct. 29, 2010).

143. *See* Letter from Douglas Elmendorf, *supra* note 108.

144. *See* Eggen, *supra* note 125.

145. *See* Jane Norman, *Higher Premiums for Older Adults at Issue in Health Care Debate*, CQ Health Beat, Nov. 12, 2009, *available at* http://www.commonwealthfund.org/Content/Newsletters/Washington-Health-Policy-in-Review/2009/Nov/November-16-2009/Higher-Premiums-for-Older-Adults-at-Issue-in-Health-Care-Debate.aspx (last visited Oct. 29, 2010).

146. *See* Robert Pear, *AARP Says it will Become Major Medicare Insurer While Remaining a Consumer Lobby*, N.Y. Times, Apr. 17, 2007, at A21.

147. *See id.*

148. *See* Cong. Research Serv., *supra* note 138.

149. *See* OpenSecrets.org, Lobbying: AARP, http://www.opensecrets.org/lobby/clientsum.php?lname=AARP%year=2010 (last visited Oct. 29, 2010).

150. *See* OpenSecrets.org, Lobbying: Top Spenders, http://www.opensecrets.org/lobby/top.php?indexType=s (last visited Mar. 23, 2011).

151. *See* Press Release, AARP, AARP Commends House for Passing CHAMP Act (Aug. 1, 2007), *available at* http://webcache.googleusercontent.com/search?q=cache:mUQvHkeamLoJ:www.aarp.org/about-aarp/press-center/info2007/champ_statement.html+AARP+Commends+House+for+Passing+CHAMP+Act%cd=3%hl=en%ct=clnk%gl=us (last visited Oct. 29, 2010).

152. *See* Letter from Peter Orszag, Director, Congressional Budget Office, to the Honorable Charles B. Rangel, Member of the U.S. House of Representatives (July 30, 2007), http://www.cbo.gov/ftpdocs/85xx/doc8501/hr3162Rangel.pdf.

153. *See id.* at Table 2.

154. *See id.* at Table 1.

155. *See* MedPAC Staff, Presentation to Commissioners: MIPPA MA Payment Report, at 6 (Apr. 8, 2009), http://www.medpac.gov/transcripts/MA%20pay%20rpt%204%2009%20final.pdf.

156. *See* Adam Atherly, Ph.D. & Kenneth E. Thorpe, Ph.D., The Impact of Reductions in Medicare Advantage Funding on Beneficiaries (Apr. 2007), http://www.bcbs.com/issues/medicare/background/Medicare-Advantage.pdf (showing supplemental state level estimates).

157. *See* Letter from Peter Orszag, Director, Congressional Budget Office, to the Honorable Jim McCrery, Member of the U.S. House of Representatives (Oct. 10, 2007), http://www.cbo.gov/ftpdocs/86xx/doc8691/10-10-MAProvisionsOfCHAMP-McCrery.pdf.

158. *See* Chris Frates, *Intense Lobbying Behind Health Reform*, Politico, Mar. 22, 2010, *available at* http://www.politico.com/news/stories/0310/34831.html (last visited Oct. 29, 2010).

159. *See* Memorandum from Richard S. Foster, *supra* note 114.

160. *See id.*

161. *See id.*

162. *See* Congressional Budget Office, *supra* note 113.

163. The Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, The 2010 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds 181-182 (2010).

164. *See* Congressional Budget Office, Comparison of Projected Medicare Part D Premiums Under Current Law and Under Reconciliation Legislation Combined with H.R. 3590 as Passed by the Senate (Mar. 19, 2010), http://www.cbo.gov/ftpdocs/113xx/doc11379/Comparison.pdf.

165. *See* Press Release, AARP, *supra* note 74.

166. *See* John Reichard, *AARP Flexing Muscle to Remold Health Care*, Cong. Quarterly, Apr. 17, 2007, *available at* http://www.commonwealthfund.org/Content/Newsletters/Washington-Health-Policy-in-Review/2007/Apr/Washington-Health-Policy-Week-in-Review---April-23--2007/AARP-Flexing-Muscle-to-Remold-Health-Care--8212-Including-Medicare-Advantage.aspx (last visited Oct. 29, 2010).

167. *See id.*

168. *See* E-mail from Raymond V. Shepherd III, Esq., Partner, Venable LLP, to Republican Professional Staff, Committee on Ways and Means (Aug. 27, 2010) (on file with author).

169. *See id.*

170. *See* I.R.C. § 501(c)(4); Treas. Reg. § 1.501(c)(4) -1(a). *See also* Raymond Chick & Amy Henchey, *M. Political Organizations and IRC 501(c)(4)*, Internal Revenue Service Exempt Organizations CPE (Continuing Professional Education) Technical Instruction 1995, http://www.irs.gov/pub/irs-tege/eotopicm95.pdf.

171. A 501(c)(4) organization is subject to tax on expenditures for political activities in accordance with Internal Revenue Code section 527. *See generally* Rev. Rul. 2004-6.

172. *See generally* I.R.C. §§ 4958(a)(1), (b); Treas. Reg. §§ 53.4958-1(c)(1)-(2) , 53.4958-3, 53.4958-6 (2002).

173. *See* I.R.C. § 501(c)(4); Treas. Reg. § 1.501(c)(4)-1(a)(2) (2002).

174. *See id.*

175. *Compare* AARP, *supra* note 12 (showing revenue from royalties in 2009 of $656,975,000), *with* AARP, *supra* note 31 (showing revenue from royalties in 2002 of $240,049,000).

176. *See* Letter from Thomas C. Nelson, *supra* note 18.

177. *See id.*

178. *See* NASCAR.com, Gordon Finds Way to Give Back Through Sponsor, http://premium.nascar.com/2010/news/opinion/10/27/one-menz-jmenzer-jgordon-aarp-sponsorship/story_single.html (last visited Oct. 29, 2010).

179. *See id.*

180. *See* AARP, I.R.S. Form 990, Part I, Line 1, Description of Organization Mission (filed for 2009), http://assets.aarp.org/www.aarp.org_/cs/misc/2009_form_990_aarp_foundation.pdf.

181. *See* Letter from Thomas C. Nelson, *supra* note 18.

182. *Business and Financial Practices of the AARP: Hearings Before the Subcomm. on Social Security and Family Policy of the S. Comm. on Finance*, 104th Cong. (1995).

183. *See* AARP, Consolidated Financial Statements: December 31, 2000 and 1999, at 19 (2001) (on file with author).

184. *See Hearings, supra* note 182.

185. *See id.* at 16 (showing that AARP refused to provide to the office of Senator Alan K. Simpson of the Senate Finance Committee a copy of the Closing Agreement between AARP and IRS, which detailed the terms of the settlement).

186. *See id.* at 47-54 (statement of Jeffrey Zelkowitz, Senior Counsel, Classification and Customer Service, U.S. Postal Service, Washington, D.C.); *id.* at 61 (statement of Eugene Lehrmann, President, American Association of Retired Persons, Washington, D.C.).

187. *See Hearings, supra* note 182.

188. *See* Fred Stokeld, *AARP, IRS Reach Agreement*, Tax Notes, July 5, 1999.

189. *See id.*

190. *See id.*

191. *See* I.R.C. § 4958; Treas. Reg. § 53.4958-1 (2002).

192. *See generally* Treas. Reg. § 53.4958-4(b)(1)(ii) (2002); Treas. Reg. § 53.4958-6(c)(2) (2002).

193. *See* Treas. Reg. § 53.4958-6 (2002).

194. *See* I.R.C. § 4958(a)(1); Treas. Reg. § 53.4958-1(c)(1) (2002).

195. *See* I.R.C. § 4958(b); Treas. Reg. § 53.4958-1(c)(2) (2002).

196. *See* I.R.C. § 4958(a)(2); Treas. Reg. § 53.4958-1(d) (2002).

197. *See* § 4958(b); § 53.4958-1(c)(2).

198. *See* § 4958(a)(2); § 53.4958-1(d).

199. *See* Joint Comm. on Taxation, Options to Improve Tax Compliance and Reform Tax Expenditures, JCS-02-05, at 259-260 (Jan. 27, 2005). *See also* Internal Revenue Service, Statistics of Income Division, Excise Taxes Reported by Charities, Private Foundations, and Split-Interest Trusts on Form 4720 (showing total number of returns and dollar amounts for tax on excess benefit transactions available for calendar years 2003 through 2008 reported by foundation managers, office directors, trustees, and other individuals), *available at* http://www.irs.gov/taxstats/charitablestats/article/0,,id=97176,00.html (last visited Oct. 29, 2009).

200. *See* James V. Grimaldi, *Smithsonian Head's Expenses 'Lavish,' Audit Says*, Wash. Post, Feb. 25, 2007, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/02/24/AR2007022401510.html (last visited Oct. 29, 2009).

201. *See id.*

202. *See* Kate Andersen, *Smithsonian's New Chief Shares Pay Cuts, Lost Perks with Staff*, Bloomberg, Nov. 4, 2008, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive%sid=a_2K40GPEbik%refer=muse (last visited Oct. 29, 2010).

203. *See* AARP, I.R.S. Form 990, Part VII: Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors (filed for 2006) (on file with author).

204. *See* Stephanie Strom, *Lawmakers Seeking Cuts Look at Non-profit Salaries*, N.Y. Times, July 26, 2010, *available at* http://www.nytimes.com/2010/07/27/us/27non-profit.html?pagewanted=2%_r=1 (last visited Oct. 29, 2010).

205. *See* Charity Navigator, 2010 CEO Compensation Study (Aug. 2010), http://www.charitynavigator.org/__asset__/studies/2010_CEO_Compensation_Study_FinalRev.pdf.

206. *See* AARP, I.R.S. Form 990, Part VII: Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors (filed for 2008) (on file with author).

207. *See* Charity Navigator, 2009 CEO Compensation Study (Aug. 2009) (on file with author).

208. *Compare id. with* AARP, I.R.S. Form 990, Part VII: Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors (filed for 2009) (on file with author).

209. *See* AARP, I.R.S. Form 990, Part VII: Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors (filed for 2007) (on file with author).

210. *See* AARP, *supra* note 206.

211. *See* AARP, *supra* note 208.

212. *See* Charity Navigator, *supra* note 207; Charity Navigator, *supra* note 205. Note that Charity Navigator measured mean compensation in 2007 and median compensation in 2008. *See id.*

213. *See* U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2007, at 7 (Aug. 2008), http://www.census.gov/prod/2008pubs/p60-235.pdf.

214. *See* U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2009, at 7 (Sept. 2010), http://www.census.gov/prod/2010pubs/p60-238.pdf.

215. *See id.*

216. *See* AARP, *supra* note 208.

217. *See* Vaida, *supra* note 17, at 43.

218. *See* AARP, I.R.S. Form 990, Schedule J, Part III: Supplemental Information, at 39-40 (filed for 2009) (on file with author).

219. *See id.*

220. *See id.*

221. *See id.*

222. *See id.*

223. *See id.*

224. *See* E-mail from Raymond V. Shepherd III, Esq., Partner, Venable LLP, to Republican Professional Staff, Committee on Ways and Means (July 13, 2010) (on file with author).

225. *See* Hotel del Coronado, About the Del, http://www.hoteldel.com/About.aspx (last visited Oct. 29, 2010).

226. See Hotel del Coronado, http://www.hoteldel.com/ (search "View Room Rates") (last visited Mar. 8, 2011).

227. *See* E-mail from Raymond V. Shepherd III, Esq., *supra* note 224.

228. *See* Panel on the Non-profit Sector, Principles for Good Governance and Ethical Practice A Guide for Charities and Foundations (2007), http://www.non-profitpanel.org/Report/principles/Principles_Guide.pdf.

229. *See id.*

230. *See id.*

231. *See id.*

232. *See* AARP, *supra* note 12.

233. *See* Lobbying Disclosure Act, 2 U.S.C. § 1611 (1995). *See also* CRS, Report for Congress: Lobbying Regulations on Non-Profit Organizations

(May 7, 2008).

234. *See id.*

235. *See* Ward L. Thomas & Judith E. Kindell, *Affiliations Among Political, Lobbying and Educational Organizations*, Internal Revenue Service Exempt Organizations CPE (Continuing Professional Education) Technical Instruction 2000, http://www.irs.gov/pub/irs-tege/eotopics00.pdf.

236. *See* AARP.org, *supra* note 22.

237. *See* AARP Foundation, 2009 Annual Report: Together Creating Opportunities (2010), http://assets.aarp.org/www.aarp.org_/cs/misc/fdn_ar_2009.pdf.

238. *See id.*

239. *See id.*

240. *See id.*

241. AARP Foundation, I.R.S. Form 990 (filed for 2009) (on file with author).

242. *See id.*

243. *See id.*

\*    *See* Pear, *supra* note 146.

\*\*   *See* Milt Freudenheim, *Opponents of Medicare Bill Say AARP Has Conflicts*, N.Y. Times, Nov. 21, 2003, *available at* http://www.nytimes.com/2003/11/21/business/opponents-of-medicare-bill-say-aarp-has-conflicts.html (last visited Oct. 29, 2010).

\*\*\*  *See* Grace-Marie Turner, *AARP's Tacit Endorsement of Medicare Cuts Line its Pockets, but Shortchanges Seniors*, L.A. Times, Nov. 4, 2009, *available at* http://discussions.latimes.com/20/sns-200911050804mctnewsservbc-aarp-con-mct1084nov0/10?sort=asc (last visited Oct. 29, 2010).

# NOTES

