# EXHIBIT Z

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HELEN KRUKAS, ANDREA KUSHIM, and GEORGIA LUKE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AARP, INC.; AARP SERVICES INC.; and AARP INSURANCE PLAN,<br><br>Defendants. | No. 18-cv-1124 (BAH) |

**Expert Report of**
**Holly L. Blanchard, FLMI, AIE, CCP, ACP, INS, MCM**
**Regulatory Insurance Advisors, LLC**
**August 25, 2021**

## I.   <u>INTRODUCTION AND QUALIFICATIONS</u>

1.      I have been retained by the Plaintiffs' Counsel to offer my opinion on the issue of whether AARP, Inc. ("AARP"), AARP Services Inc. ("ASI"), and AARP Insurance Plan, (collectively "Defendants.") engaged in certain unlicensed insurance practices and whether this issue can be resolved on a class-wide basis.

2.      The analysis below seeks to apply my specialized knowledge—which is based on my experience, training, and education—to documents and information produced in discovery. If called as a witness at trial or hearing, I could competently testify to the opinions set forth in this report.

3.      My qualifications are set forth in my resume, which is included at Attachment 1 to this declaration. I include a brief summary of my qualifications below.

4.      I have been a senior-level insurance regulator for over 16 years and am frequently asked to make presentations as a subject-matter expert on insurance-related issues.

5.      My career in the insurance industry extends over 20 years, with 16 of those spent in an insurance-regulatory capacity.

6.      I am the co-founder and President of Regulatory Insurance Advisors (RIA), a consulting firm that provides expert regulatory insurance-consulting services to governmental entities and insurance carriers.

7.      Prior to founding RIA, I worked as an insurance regulator for the State of Nebraska Department of Insurance (NDOI), where I served as a Market Conduct Examiner-in-Charge. In this capacity I lead Market Conduct Examinations into the conduct of insurance carriers to ensure that they complied with state and federal statutes.  After serving as a Market Conduct Examiner-in-Charge, I was promoted to the Life and Health Administrator, where I oversaw the rate-and-

form-filing section of the NDOI.  In this capacity, my team reviewed rates and product documents for all lines of Life and Health insurance, including Medigap/Medicare Supplement products.

8.      Throughout the course of my career, I have performed over 60 Market Conduct exams, including reviews of producer-licensing requirements and violations thereof.

9.      I currently serve as an independent board member for Maiden Holdings, Inc., and Maiden Re. As a board member, I serve on the Audit Committee, Corporate Governance Committee, and Compensation Committee.

10.     I am the past President and currently serve on the Board of Directors for the Insurance Regulatory Examiners Society.

11.     I previously served on the Board of Directors for the Association of Insurance Compliance Professionals.

## II.    **REMUNERATION**

12.     I am being compensated for my time in this matter at a rate of $395 per hour. My fees are not contingent upon the nature of any findings or of any analyses, testimony, or the outcome of the proceeding in this matter.

## III.    **BACKGROUND**

13.     I understand Plaintiffs to be alleging that Defendants violated D.C. statutory law and common law by collecting an undisclosed and illegal commission by soliciting Plaintiffs and proposed class members to purchase AARP Medigap policies without a license.   This understanding is based on my review of the Plaintiffs' First Amended Complaint and the Court's orders in this case.  According to the Court's March 17, 2019 order, Plaintiff alleges:

[A] violation of the Washington D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.*, as well as common law violations of

conversion, unjust enrichment, and fraudulent concealment, based on her purchase of a Medicare supplemental health insurance policy, also known as a "Medigap" policy, administered by AARP. *See* Compl. ¶¶ 1, 16, 17, 88, ECF No. 1. These statutory and common law claims are predicated on the plaintiff's allegations that she was "fooled into paying AARP an undisclosed 4.95% commission" when purchasing her Medigap policy and, since "AARP is not licensed as an insurance broker or agent," the defendants "may not legally collect these commissions." *Id.* ¶ 1

\*\*\*

The plaintiff challenges AARP's role in soliciting, marketing, and administering Medigap policies, a state-regulated form of health insurance to supplement Medicare. Since at least 1997, AARP has held, in its name, group Medigap policies underwritten by UnitedHealth Group and UnitedHealthcare Insurance Company (collectively, "UnitedHealth") and offered participation in those group policies to individual AARP members and the general public. *See* Compl. ¶¶ 22, 37, 51. The plaintiff alleges that AARP's administration and provision of other services in support of these group Medigap policies amounted to acting as an unlicensed insurance agent, that the "royalties" paid to AARP as a percentage of premiums constituted illegal commissions, and that AARP materially misrepresented the nature and source of the "royalties," causing consumers to pay more for AARP Medigap policies than they otherwise would. *See* Compl. ¶¶ 4–15.[1]

14.    I understand from counsel that the laws of the District of Columbia apply to all the causes of action in this case.

## IV.    BASES FOR MY OPINION

### a.   Licensing and Compensation of Insurance Producers

15.    Based on my experience in the insurance industry, including my experience as a regulator with the responsibility for preventing misconduct in the insurance industry, as well my experience advising clients on compliance issues, I have an understanding of the terms "soliciting," "selling," "commission," and "producer" as they are used in the industry (described in more detail below).

---

[1] *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 9 (D.D.C. 2019).

16.     My understanding of these terms is consistent with and corroborated by how those terms are described in resources commonly used by insurance-industry professionals,   including the uniform standards set by the National Association of Insurance Commissioners ("NAIC");[2] federal regulations set by the Center for Medicaid and Medicare Services (CMS); Model Law 218: The Producer Licensing Act ("The Model Act");[3] and the District of Columbia insurance statute, D.C. Code § 31-1131, et seq.,[4]   which defines these terms in a manner that is consistent with my understanding.

   i.   **Common insurance-industry definition and understanding of "soliciting insurance."**

17.     "Solicit," as the term is used in the industry, is the act of trying to persuade an insured or potential insured to purchase a particular insurance product from a particular company. This is supported by the definition used in D.C. Code §31-1131.02 and the Model Act, both of which provide that "'[s]olicit' means attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company."

---

[2] The NAIC is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight. NAIC staff supports these efforts and represents the collective views of state regulators domestically and internationally. NAIC members, together with the central resources of the NAIC, form the national system of state-based insurance regulation in the U.S. For additional information visit www.naic.org.

[3] The NAIC, in conjunction with the state regulators, creates Model Laws regarding insurance oversight. The Model Laws are intended to provide consistent statutory requirements for the insurance industry and regulation thereof.  These laws are then adopted by the states as presented in the Model Law or amended to incorporate state-specific requirements.

[4] CMS is a department within the Federal Health and Human Services Division charged with overseeing programs including Medicare, Medicaid, the Children's Health Insurance Program (CHIP), and the state and federal health insurance marketplaces. CMS collects and analyzes data, produces **research** reports, and works to eliminate instances of fraud and abuse within the healthcare system.

### ii. Common insurance-industry definition and understanding of "selling" insurance

18.     To "sell" insurance, as the term is used in the industry, is to exchange insurance coverage for money on behalf of an insurance company.  This understanding is constituent with the Model Act's definition of "sell" as meaning "to exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company."  D.C. Code §31-1131.02 similarly defines "sell" as meaning "to sell or exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company."

### iii. Common insurance-industry definition and understanding of a "commission"

19.     A "commission," as the term is used in the industry, is a percentage-based amount of premiums earned for the sale of insurance.  The NAIC defines "commissions" as "a percentage of premium paid to agents by insurance companies for the sale of policies." Similarly, the definition utilized by state and federal insurance regulators, as provided by the Market Regulation Handbook to determine if an incentive received by a producer or agent is a commission, is:

**Definition:** Commission is the incentive received by the insurance agent or salesperson for the sales achieved in a given period.

**Description:** Commission is generally paid as a percentage of the premium on the insurance policies. This proves as an efficient way of rewarding the concerned person wherein his rewards are directly proportional to the policies sold by him.

**Licensing is required for persons to receive commissions for soliciting, negotiating, or selling insurance.**

20.     A person must be a licensed "producer" in order to solicit, negotiate, or sell insurance, and to receive a commission for those actions.  NAIC Producer Licensing Model Act

(Model Law 218) outlines of the definition of a Producer, provides the licensing requirements for producers, and defines what qualifies as a commission payment.  The Model Act was adopted by all 50 states and five US territories, including the District of Columbia's D.C. Code §§ 31-1131.01 to 31-1131.19, and D.C. Mun Reg Title 26A 100-199, therefore the definition of "producer" and "commission" are consistent throughout the States.

21.     The Model Act and D.C. Code §31-1131.02 define an "insurance producer" as "a person required to be licensed under the laws of this state to sell, solicit or negotiate insurance." The Act and statute then go on to define a "person" as "an individual or business entity," and a "business entity" as "a corporation, association, partnership, limited liability company, limited liability partnership, or other legal entity."

22.     D.C. Code §31-1131.03(a) goes on to state that "[a] person shall not sell, solicit, or negotiate insurance in the District for any class of insurance unless the person is licensed for that line of authority in accordance with this chapter. The license itself shall not create any authority in the licensee to represent or commit an insurance carrier."

23.     Section 13 of the Model Act precludes the payment of commission or other valuable consideration to unlicensed producers:

A.     An insurance company or insurance producer shall not pay a commission, service fee, brokerage, or other valuable consideration to a person for selling, soliciting or negotiating insurance in this state if that person is required to be licensed under this Act and is not so licensed.

B.     A person shall not accept a commission, service fee, brokerage or other valuable consideration for selling, soliciting or negotiating insurance in this state if that person is required to be licensed under this Act and is not so licensed.

C.     Renewal or other deferred commissions may be paid to a person for selling, soliciting, or negotiating insurance in this state if the person was required to

be licensed under this Act at the time of the sale, solicitation or negotiation and was so licensed at the time.

24.     This language was adopted as D.C. Code §§ 31-1131.13-COMMISSIONS, which states:

(a) An insurer or insurance producer shall not pay a commission, service fee, brokerage fee, or other valuable consideration to a person for selling, soliciting, or negotiating insurance in the District if that person is required to be licensed under this chapter and is not licensed.

(b) A person shall not accept a commission, service fee, brokerage fee, or other valuable consideration for selling, soliciting, or negotiating insurance in the District if that person is required to be licensed under this chapter and is not licensed.

(c) Renewal or other deferred commissions may be paid to a person for selling, soliciting, or negotiating insurance in the District if the person was required to be licensed under this chapter at the time of the sale, solicitation, or negotiation and was licensed at that time.

(d) An insurer or insurance producer may pay or assign commissions, service fees, brokerage fees, or other valuable consideration to an insurance agency or to persons who do not sell, solicit, or negotiate insurance in the District unless the payment would violate this chapter or any other District law relating to insurance.

**b.  Record Evidence**

25.     AARP and ASI have entered into a contractual agreement with United Healthcare Insurance Company ("United") and Optum Services Inc. ("Optum," a United subsidiary) to underwrite and issue the AARP Medicare Supplement plans (AARP MedSupp).   In this arrangement, AARP offers AARP members AARP MedSupp policies through a group policy issued by United to AARP.[5]

_____

[5] SHIP Program License and Quality Control Services Agreement (the "SHIP Agreement")

26.     Group policies differ from individual policies. An individual insurance policy is issued by the insurance company directly to an individual and the insurance relationship is between those two parties. The individual is generally the only named insured on the policy (or, if married, the spouse may be on the policy). In contrast, a group policy is issued to an employer, lender or association and the employer, lender or association is the named insured. That named insured entity enrolls employees, borrowers, or members, as the case may be, onto the group policy as the means to provide them coverage under that policy. The individual employee, borrower or member will typically become an added insured under the group policy.

27.     AARP advertises AARP MedSupp through print and online marketing materials presented to members and potential members.[6]

28.     ███████████████████████████████████████████
████████████████████████████████████ A review of the marketing materials presented in print and online show that the materials are, in fact, consistently co-branded with the following dominant AARP logo along with the United logo:



29.     Through the consistent co-branding, AARP urges its members or potential members to apply for and purchase AARP Medicare Supplemental Coverage from United (i.e.,

---

[6] AARP Health Medicare Supplement Plans TV Commercial, 'Get The Ball Rolling' - iSpot.tv – YouTube.
[7] Id. at 3.2.2

from a particular company). Additionally, all marketing materials reviewed contain the disclaimer that "This is a solicitation of insurance. A licensed agent/producer may contact you."[8]

30.     AARP and ASI are significantly involved in AARP Medigap marketing efforts. ASI, as AARP's agent, works closely with United on AARP marketing strategy.



31.     The documents I reviewed indicate that

[8]      *See,      e.g.*,      AARP_KRUKAS_0000220;          AARP_KRUKAS_0000263; AARP_KRUKAS_0000271.

[9] AARP_KRUKAS_0033984.
[10] AARP_KRUKAS_0047556 at '568; *see also* AARP_KRUKAS_0036870 at '877.
[11] *See, e.g.*, AARP_KRUKAS_0020783 at slide 4; AARP_KRUKAS_0031814.
[12] AARP_KRUKAS_0124538 at '541.
[13] AARP_KRUKAS_0162730 at '756.



32.

33.     Defendants administer and oversee the AARP Medigap program, generally. ASI

has authority over United's operations regarding the Medigap program (including the parameters

and benefits of the program);[19] has the authority to consult, review, and consent to premium levels,

---

[14] *Id*. at '550.

[15] AARP_KRUKAS_0165561 at '575.

[16] AARP_KRUKAS_0124538 at '540; at '548–49 (A display of an AARP webpage shows the various options for customers: "Directs to the learn page," "Directs to the Benefits Navigator," and "Directs to the Buy page with copy and graphic about AARP providing access to trusted benefits along with an active call-to-action to purchase the products.").

[17]     AARP_KRUKAS_0150331   (                                              ; AARP_KRUKAS_0150231 (same); AARP_KRUKAS_0155557: at '568

[18] AARP_KRUKAS_0087374

[19] *See* AARP_KRUKAS_0020777; AARP_KRUKAS_0018344; AARP_KRUKAS_0018345.

rates, sales plans, and distribution plans;[20] and has review and modification authority over United's Medigap-related contracts with third-party vendors.[21]

34.     Premiums charged for members who purchase AARP-branded products are collected by the AARP Trust. ████████████████████████████ ████████████████████████████▪



---

<sup>▪</sup> ████████████████████████ *also* AARP_KRUKAS_0021526 at slide 62; AARP_KRUKAS_0034083.

[21] *See, e.g.,* AARP_KRUKAS_0020282 at '284; AARP_KRUKAS_0033945; AARP_KRUKAS_0017635.

[22] AARP_KRUKAS_0018026 at '045.

35.   ████████████████████████████████████ an individual must be an AARP member to purchase the AARP-branded Medicare Supplement products sold through United, and AARP membership is automatically renewed when members join or renew the United plans.

## V.   <u>**OPINION**</u>

36.   Based on my experience, as well as the commonly understood meaning of the terms and concepts discussed above and the documents reviewed, it is my opinion, which I hold within reasonable degree of professional certainty, that AARP and its affiliates are operating in the capacity of a producer and collecting insurance commissions in the form of fees identified as "royalties" without having the appropriate license.

37.   Specifically, Defendants were involved in the development of products, distribution channels, marketing, and oversight of the AARP-branded Medicare Supplement products. They are engaged in soliciting insurance through these activities because they are urging members and potential members to purchase Medicare Supplement products from United and benefitting directly from that purchase.

38.   In addition, by soliciting insurance and collecting premiums, AARP is selling insurance, i.e., it is causing the exchange of insurance because the policies do not become effective until Defendants collect the premium.

39.   Further, although stylized as "intellectual property payments" in the SHIP Agreement, a fee in the amount of 4.95% is collected monthly by AARP based on the amount of premiums paid by the members for new and renewed policies. This is a commission. The amount paid is variable based on the premium amount and is contingent upon the purchase of a policy. If a policy is not purchased, the fee is not paid. This is in contrast to a one-time, nominal referral fee,

which can be collected regardless of the purchase of a policy. Additionally, the catalyst for receiving the fee is the sale of an insurance policy. The fee would not be paid unless the policy is sold, and therefore is tied directly to the policy. This fee is valuable consideration for selling, soliciting, and negotiating insurance.

40.     I have reviewed Defendants' summary judgment filing and understand that they are asserting  that, under the terms of the group policy, the Trust must collect the payments from the members  and then pay AARP the royalty amount and other expenses before sending the amount for insurance to United.  This requirement is not set by insurance law and does not appear in off the shelf-policies. Rather, group insurance policies like the AARP MedSupp policy at issue here are the result of negotiations between the parties and reflect the desires of the parties to the policy (here AARP and United).

41.     Moreover, as a general matter a group policyholders may act as a pass through, meaning those entities merely collect the premiums and send it to the insurance company in order to ensure that premiums are paid, and policies do not lapse. But AARP Trust is not merely acting as a conduit for the premiums – they are retaining 4.95%. The group policy was delivered in D.C. and this conduct without a licensing violates D.C.'s Anti-Rebating and Anti-Inducement laws such as D.C. Code §31-2231.12.

42.     I have also reviewed Defendants' arguments in their motion for summary judgment in which they insist that it is typical and, in some instances, statutorily required for Defendants as group policy holder to collect member premiums.  Defendants cite to the statutes in Nebraska, California, and Texas for this proposition.  However, the Defendants' application of these statutes is not accurate.  None of the statutes cited expressly state that a group policyholder must collect the premiums of all covered under the policy.  Moreover, even if it was statutorily or customarily

required for a group policy holder to collect all premiums of those cover under the policy, it completely ignores the fact that Defendants are dissecting those premiums collected to retain their royalty payment which is really a commission based upon the sale of the insurance.

43.    It appears based on my experience, that AARP engaged in all of these insurance related activities without being a licensed insurance producer.

44.    The determination above can be applied on a class wide basis. to consumers in all U.S. jurisdictions.

### a. Other Companies Engaged in and Compensated for Lead Generation are Licensed as Producers

45.    My opinion is further buttressed by the fact that AARP's marketing activities for Medigap insurance are similar to other lead generation websites that *are* licensed producers and collect a commission for their services. Those websites gather consumer information, provide consumers with information about insurance products, and encourage the purchase of those products.

46.    For instance, www.boomerbenefits.com is a website that offers a "free personalized Medicare supplement comparison."[23]  That website notes that it is a licensed insurance agency at the bottom of the webpage.

47.    Boomerbenefits.com conspicuously notes that "We check for the best rates from over 30 carriers." It also prominently displays the logos for Cigna, Mutual of Omaha, Aetna, and BlueCross and BlueShield – companies that it refers leads to in return for a commission.

---

[23] https://boomerbenefits.com/compare-medicare-supplement-plans/

48.     SelectQuote.com is another website that offers free term life insurance price quotes from a variety of insurers. SelectQuote.com gathers basic information from the consumers and then uses that information to refers the consumer to fitting insurance options.

49.     That website has the disclosure "Licensed name varies by state: SelectQuote Insurance Services, SelectQuote Insurance Agency."[24]

50.     In my experience, a website such as SelectQuote, which generates leads for insurance sales would obtain an insurance producers license in order to collect compensation from insurers for the sale or solicitation of that insurance.

51.     Insure.com, is another example. In addition to providing educational information about different types of insurance, Insure.com gathers basic information from the consumer and, based on the information collected, refers the consumer one or more insurers for purchasing the insurance. The Insure.com website includes a "disclaimer" stating, "The insurance products on Insure.com are from companies from which QuinStreet may receive compensation." QuinStreet is the licensed insurance producer affiliated with Insure.com."

52.     In contrast, the AARP Medicare Supplement coverage from United HealthCare through the www.aarpmedicaresupplement.com website places AARP in forefront as the trusted entity offering Medicare Supplement coverage to its members.  No other Medigap insurers are identified on that website. The website specifically says, "This is a solicitation of insurance.". This is a solicitation by AARP for AARP MedSupp insurance, regardless of whether AARP or United own the website URL or whether United licenses the site name from AARP. Based on my experience in dealing with consumer facing insurance disclosures, it is my opinion that the use of AARP name in the URL, the prevalence of references throughout the page to AARP, the ability to

---

[24] www.selectquote.com

obtain or renew AARP membership information through the site, and discussion of AARP's endorsement are all on the site to convey the message that AARP is urging consumers to purchase AARP MedSupp.  In sum, the totality of references to AARP and its Medicare Supplement insurance plans projects that an individual is being actively solicited to purchase insurance from AARP.

53.     Moreover, the AARP Medigap insurance website www.aarpmedicaresupplement.com only leads to information from UnitedHealth – no other insurers. It clearly drives AARP members to purchase AARP branded Medigap insurance from UnitedHealth, nothing else.

54.     The website www.aarpmedicaresupplement.com is one of several channels AARP uses to solicit consumers to buy UnitedHealth Medigap insurance. It is also a way for AARP to collect a commission on those leads generated for UnitedHealth's Medigap insurance.

55.     AARP's website aarpadvantge.com (discussed above at ¶ 32, which currently directs users to aaarp.org), operates in the same way and Defendants operate as an unlicensed producer through it. The site provides general information about AARP benefits, but it is used as a mechanism to drive leads for AARP MedSupp. When users select more information about AARP MedSupp, they are sent as a lead to United. As noted above, Defendants closely track the success they have generating leads and closing sales through this channel. AARP receives a commission on each AARP Medigap sale.

56.     In further contrast to the AARP Medicare Supplement website, conducting a search for coverage on Medicare.gov returns hundreds of options for Medicare Supplement and Medigap plans, with a range of premiums and insurers offering the plans, allowing a consumer the freedom to choose the plan that fits best into their budget.

**b.   Other Organizations Have Been Recently Found to be Acting as Unlicensed Insurance Agents and Sanctioned for Similar Royalty Payment Structures**

57.     The November 13, 2020 Consent Order issued by the New York State Department of Financial Services against The National Rifle Association of America ("NRA") is both highly relevant and analogous to the conduct of AARP and ASI in this matter.

58.     In its action against the NRA, the State of New York determined that the NRA's endorsement and marketing of insurance programs to its members, for which the NRA received a royalty, constituted as acting as an insurance producer and receiving compensation without being licensed.

59.     The State of New York determined that the Royalty payment the NRA received was impermissible as it was based upon the percentage of the insurance premiums paid by NRA members.

60.     Furthermore, New York found the NRA's marketing materials misleading as they did not disclose the royalty payment was based upon the amounts paid by NRA's members.

61.     As a result of these findings the NRA consented to a penalty of $2,500,000.00 and a five-year ban from participating in or receiving any compensation with any insurance product being offered in the State of New York.

62.     As explained in further detail in this Report, the actions of the Defendants are analogous and are tantamount to solicitation and the unlicensed receipt of commissions.

63.     The State of New York's findings in the Consent Order completely supports my opinion that: regardless of the nomenclature the Defendants wish to ascribe by calling it a "royalty", a percentage-based payment based upon the sale of insurance is considered a "commission" in the insurance industry; and to be able to properly receive commission for soliciting insurance, an entity must be licensed.

### c. United's Marketing Approval Does Not Address Defendants' Role in Preparing Insurance Solicitations

64.     In paragraph 39 of its Statement of Undisputed Material Facts ("SUMF"), Defendants state that "Each state regulator ultimately determines the rates United must charge for coverage, and the marketing United is permitted to use to solicit and sell enrollments in that state or territory." However, here, it is Defendants, not United, that owns and controls the advertising at issue. A regulator would have no way of knowing who drafted the language used in any advertising or Defendant's role in preparing that advertising.

65.     Defendants describe the process by which United marketing materials are approved by state regulators in paragraphs 59-65 of the SUMF. However, that review process does not examine whether ASI – not United – is involved in the solicitation of insurance. Nor does it address whether the payments from United to AARP are correctly recognized as commissions. In my experience, regulators do not have access to information beyond what an entity submits to them so here no regulator would have access to document such as the SHIP agreements. The process for *United* simply does not address the role of *AARP*.

66.     In my experience, the regulators reviewing Medigap advertising are interested in compliance with standards for truthfulness and that the advertising is not deceptive or misleading. The regulators would not be analyzing whether AARP is licensed as a producer or should be licensed as a producer. Enforcement of producer licensing requirements occurs in market conduct examinations within the insurance department. The fact that United files Medigap advertisements with a given state regulator and those advertisements are acknowledged, as opposed to approved, does not mean that the regulator has reviewed and approved ARP's "intellectual property" agreement with United.

67.     Absence of a regulatory enforcement action does not necessarily indicate approval of an insurance market practice. Insurers and mortgage servicers may engage in kickback arrangements for many years without any regulatory penalty.

68.     Further, a state regulator's approval or acknowledgement of a United Medigap/AARP filed advertisement does not give blanket immunity from subsequent challenges. In my experience, even when forms have been filed with a regulator, the regulator and private parties often do challenge the accuracy of the filed disclosures.  Indeed, I have personally been involved in dozens of reviews where regulators found forms to be deceptive after initially approving them. I am also aware of lawsuits alleging deceptive and unfair sales and trade practices that raise issues about materials that, in my experience, were likely filed with regulators. The immunity Defendants suggest simply does not exist and they cite nothing to suggest otherwise.

69.     Defendants similarly suggest that regulators have blessed the "royalty" paid to AARP because regulators have not raised any issue with the "royalty." This is unfounded in my experience. Regulators require transparency in selling, soliciting and negotiation of insurance products. As non-licensed entities Defendants have not been subject to regulatory jurisdiction and oversight and there is no transparency with regulators in the filings I have reviewed regarding their business relationship with United and the financial incentive they have in connection with the selling, soliciting and negotiating of United's AARP branded Medigap product. In my review of the records produced in this case, there would be no way for the insurance regulators in D.C. to know that AARP is being compensated as a percentage of every successful sale as opposed to United paying a flat amount to Defendants. This is significant because Defendants are incentivized based on sales volume. The materials presented to regulators lack transparency because they do not disclose Defendants true financial incentive in the sale of the product.

70.     Unlike Defendants, other large non-profit organizations, such as the AAA and the AMA Insurance Agency (a subsidiary of the American Medical Association), have, in fact, become licensed and, unlike Defendants, subject themselves to regulatory oversight.

71.     In my experience, if regulators were fully aware of the business relationship between Defendants and United, and the fact that the "royalties" received by AARP as compensation were based upon a percentage of every sale, that would greatly alarm the regulators. The regulators would surely mandate further disclosure and/or require AARP to become a licensed insurer.

72.     In my experience, the advertising review and approval process for United does not have any impact on Plaintiffs' claims in this matter.

## VI.     MATERIALS REVIEWED

73.     To form an opinion of the facts presented, the contracted experts reviewed contracts, marketing materials, and other information to provide their assessment and opinion. The list of documents and materials reviewed is cited herein and/or included herein as **Attachment 2.**

## VII.     COMMENTS

I hold the above opinions to within a reasonable degree of professional certainty.

Executed on this _26th_ day of August 2021.

_Holly B. Blanchard_

Holly Blanchard

ATTACHMENT 1



# HOLLY BLANCHARD

Phone: (402) 217-7745
Email: hblanchard@riaconsulting.net

## EMPLOYMENT

**Regulatory Insurance Advisors**                                  January 2016 – Present
*President*:                                                                    Lincoln, NE

Oversees the daily operations and strategic growth of Regulatory Insurance Advisors (RIA). Provides regulatory services for state and federal regulators and oversees a team of insurance experts to provide exceptional regulatory consulting and compliance for our clients. Areas of focus includes: comprehensive market conduct examinations; specialty and targeted market conduct examinations;  risk-assessments for insurers and regulators; creating examination templates and training processes; ACA regulation; Mental Health and Substance Use Disorder parity regulation; Property and Casualty examinations; product filing development and compliance; student health plan expertise; annuity suitability; ACL sampling; and developing market regulation best practices for insurers and regulators.

**Examination Resources**                                            July 2013 – December 2015
*Director*:                                                                          Atlanta, GA

Oversaw a team of form filing reviews and market conduct examiners in providing services to the Center for Consumer Information and Insurance Oversight (CCIIO) for reviewing product filings and market conduct examinations on the ACA direct enforcement states. Provided guidance, training and supervision on various projects, including state and federal ACA examinations. Provided guidance and oversight on special projects for state and federal regulators, including overseeing Network Adequacy and Deficiency Reviews, and targeted examinations in an advisory role.

**Nebraska Department of Insurance**                          February 2005 - July 2013

*Life and Health Administrator*:                                    Lincoln, NE

Regulatory Compliance and Oversight:  Oversaw the rates and form filings for all Life and Annuities, Accident and Sickness and Health policies, including the ACA. Provided, in-depth knowledge of insurance operations and products, producer licensing and oversight as well as extensive knowledge on state statues, regulations and NAIC model laws to interested parties. Lead division in being one of the most effective and efficient in the country by increasing productivity and accuracy and decreasing our turnaround time on filings. Additionally, served on several NAIC Committees and Subcommittees and assisted with editing the Market Regulation Handbook. Worked closely with the Federal Regulators, State Legislatures, and Insurance Companies for the implementation of the Affordable Care Act in the State of Nebraska.

*Project Director:*

Served as the Project Director for the Rate Review Grant established under the Patient Protection and Affordable Care Act (PPACA).  As the Project Director, established and implemented enhancements and requirements for premium rates submitted on Major Medical policies.  In this capacity interacted frequently with the Federal CCIO staff on reporting requirements, federal regulations, and budget operations. Established the original interactive web-based tool for rate information in Nebraska to provide transparency on rate filings to the Nebraska consumers.

*Market Conduct Senior Examiner/Examiner in Charge:*

Performed comprehensive and targeted market conduct examinations on companies and agents in Life and Health and Property and Casualty insurers.  As an Examiner in Charge, worked closely with the examination

team to identify areas of non-compliance on market regulation aspects of the company such as: Operations and Management; Producer Licensing, Underwriting, Marketing and Sales; Policyholder Services; Forms and Rates; Complaints and Claims. Managed the examination from beginning to end, including ensuring comprehensive documentation was compiled, communication with the company was clear and frequent, and statutory violations were identified.  Created comprehensive reports and corrective actions based on findings and violations.

## EDUCATION

- Speech Pathology, University of Nebraska, Lincoln
- Bachelor of Science, Business Administration, Nebraska Wesleyan University
  - o Minor in Communication
  - o Minor in Marketing
- Cornell University, Executive Women in Leadership Certificate, March 2020

## PROFESSIONAL CREDENTIALS

- Market Conduct Management (MCM) designation
- Accredited Insurance Examiner (AIE) designation
- Fellow, Life Management Institute (FLMI)
- Accredited Insurance Examiner (AIE)
- Certified Compliance Professional (CCP)
- Accredited Insurance Professional (ACP)
- Certificate in general Insurance (INS)

## PROFESSIONAL ACTIVITIES AND AFFILIATIONS

- Maiden Holding Board of Directors
  - o Audit Committee
  - o Corporate Governance Committee
  - o Compensation Committe
- IRES Board of Directors, Executive Committee – 2010 through 2014
- IRES Board of Directors – 2006 through current
- AICP Board of Directors-2017 through 2019
- National Small Business Association-Leadership Council 2016 through current

## PRESENTATIONS, PUBLICATIONS & TRAINING

- Association of Insurance Compliance Professionals (AICP) Annual Conference
  - o *Intro to Compliance (2020)-Podcast*
  - o *Oversight of MEWA's and Association Groups (2020)*
  - o *Disability Income and PSO laws (2019)*
  - o *Rule Making and Rule Breaking; Short Term Limited Duration Medical Policies (2019)*
  - o *Mental Health Parity (2018)*
  - o *Short Duration Health Plans (2018)*
  - o *Hot Topics in Health Insurance (2017)*
  - o *Walking the Line: Knowing if your product is in or out of the ACA (2017)*

- Insurance Regulatory Examiners Society (IRES) Career Development Seminar
  - o *Into the Market Conduct Examination (2020)*
  - o *Oversight of the Affordable Care Act (2019)*
  - o *Regulating Third Parties (2019)*
  - o *Short-Term Limited Duration Insurance Cont (2019)*
  - o *Short Term Duration Plans (2018)*
  - o *Hot Topics in Health Insurance (2018)*
  - o *1332 Waivers (2017)*

Lincoln, Nebraska                                                                    Freeport, Maine

*Enhancing Insurance Regulation*

- o  *Deep dive into the Mental Health Parity and Addiction Act (2017)*
- o  *The Evolution of Excepted Benefits in the current era of Healthcare Reform (2017)*
- o  *Disability Income (2017)*
- o  *ACA for Dummies (2015)*
- o  *ACA Implementation, A changing Landscape (2016)*
- o  *"Think Tank": Emerging Regulatory Issues (2016, 2017 and 2018)*

- IRES Foundation Market Conduct School
  - o  *Market Conduct 101 (2018)*
  - o  *ACA-The Next Phase- Examinations (2017)*
  - o  *ACA-We're not done yet (2016)*
  - o  *Cybersecurity (2015)*

- LOMA
  - o  *LOMA 301 Course Instructor (2015)*

- Society of Actuaries Annual Health Meeting 2017
  - o  *Rating and Market Regulation for ACA Products*

ATTACHMENT 2

1

DOCUMENTS REVIEWED

AARP_KRUKAS_0000220
AARP_KRUKAS_0000263
AARP_KRUKAS_0000271
AARP_KRUKAS_0017635
AARP_KRUKAS_0018026
AARP_KRUKAS_0018344
AARP_KRUKAS_0018345
AARP_KRUKAS_0020282
AARP_KRUKAS_0020777
AARP_KRUKAS_0020783
AARP_KRUKAS_0021526
AARP_KRUKAS_0031814
AARP_KRUKAS_0033945
AARP_KRUKAS_0033984
AARP_KRUKAS_0034083
AARP_KRUKAS_0036870
AARP_KRUKAS_0037327
AARP_KRUKAS_0047556
AARP_KRUKAS_0087374
AARP_KRUKAS_0124538
AARP_KRUKAS_0150231
AARP_KRUKAS_0150331
AARP_KRUKAS_0155557
AARP_KRUKAS_0162730
AARP_KRUKAS_0165561