# Exhibit CC

## COMMITTEE ON WAYS AND MEANS

U.S. HOUSE OF REPRESENTATIVES
WASHINGTON, DC 20515

December 21, 2011

Douglas H. Shulman
Commissioner
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, DC 20224

Dear Commissioner Shulman:

On April 8, 2011, we requested the Internal Revenue Service ("IRS") review the report, "Behind the Veil: The AARP America Doesn't Know" and the issues raised therein. The report highlighted a number of serious concerns regarding AARP's organizational structure, as well as its business and political activities, and examined whether it should continue to qualify as a tax-exempt organization under Internal Revenue Code ("IRC") section 501(c)(4). We write today to provide additional information that has come to light since that report was issued.

AARP and HearUSA, Inc.

On May 16, 2011, HearUSA, Inc. ("HearUSA") filed a Chapter 11 bankruptcy petition in the Southern District of Florida bankruptcy court. According to press reports, in 2008, HearUSA entered into an agreement with AARP to endorse hearing aids and to offer these products to AARP's members at a reduced price.[1] The HearUSA website (www.hearusa.com) states AARP members receive a 15 percent discount on certain purchases. Documents that emerged during the bankruptcy detailed the business agreement between AARP and HearUSA. Initially, HearUSA offered to pay AARP $7.6 million a year to become the only hearing aid provider endorsed by AARP. However, the final contract included the following terms: (1) that AARP received a $55 "royalty" fee on each hearing aid sold; (2) HearUSA would spend $4.4 million a year in advertisements promoting AARP-endorsed hearing aids, and (3) HearUSA would make a $250,000 "donation" to the AARP Foundation. According to the press reports, AARP has collected more than $660,000 in "royalty" payments under the agreement.[2]

---

[1] Susan Salisbury, *HearUSA Is Being Acquired But Deal Awaits AARP Approval*, SunSentinel.com, August 2, 2011.
[2] Susan Salisbury, *HearUSA Case Offers Peak at Profitable AARP Brand Endorsements*, SunSentinel.com, July 25, 2011.

In addition, HearUSA agreed to be acquired by Audiology Distribution, LLC ("Audiology"), a subsidiary of Siemens AG. The sale was completed September 9, 2011.[3] According to press reports, the continuation of the AARP contract was essential to the deal: if AARP did not agree to keep the contract in force, there would have been no acquisition. The AARP boards for two different entities within the complex AARP corporate structure needed to approve the transfer of the contracts to Audiology. The contract between AARP and HearUSA is similar to other AARP product endorsements in that AARP exerts financial control and significant influence over the business operations of the endorsed organization in ways that far exceed "quality control."

Among the many issues raised in the Committee's April 8, 2011, joint hearing between the Subcommittees on Health and Oversight were AARP's business operations and whether certain revenues are improperly categorized as royalty payments. The HearUSA contract has raised additional issues regarding AARP's ongoing characterization of certain payments as tax-exempt "revenue" when, in fact, AARP's active role in business operations calls into question the appropriateness of this characterization. As such, we respectfully request IRS consider the following when reviewing AARP's tax-exempt status:

a. Is the $55 per hearing aid payment made to AARP correctly considered a royalty payment or should it be treated as trade or business income subject to the unrelated business income tax?
b. Should the $4.4 million contractually obligated HearUSA-AARP advertising campaign be classified as a donation to AARP or should it be treated as trade or business income subject to the unrelated business income tax?
c. Is the contractually required $250,000 "donation" by HearUSA to AARP a charitable contribution, or is it related to the business agreement, such that it should be considered business income to AARP and subject to the unrelated business income tax?
d. Does the contractual agreement, taken as a whole, indicate that AARP is involved in making critical business decisions focused on increasing AARP's profits, such that AARP should be considered to be in the trade or business of selling hearing aid products?
e. AARP has stated that the organization's wholly owned for-profit subsidiaries protect the larger organization from conflicts of interest and more importantly its tax-exempt status. Given that multiple AARP boards approved the transfer of the contract from HearUSA to Audiology, does the purported firewall between the for-profit and non-profit entities exist in name only?
f. If the different entities within the AARP corporate structure are truly separate entities and managed by independent boards, why is more than one AARP board required to approve the transfer of the contract from HearUSA to Audiology?
g. The "royalty" payments and other benefits paid to AARP under the arrangement with HearUSA, and the requirement that an individual must be a member of AARP to be eligible for a discount, are further evidence that AARP's endorsements are intended

---

[3] Susan Salisbury, *Siemens Unit Buys Hearing Aid Seller; HearUSA Filed for Bankruptcy*, Palmbeachpost.com, September 14, 2011.

2

Confidential

AARP_KRUKAS_0043814

to increase AARP's revenue as opposed to working in the best interest of older Americans. Does AARP's involvement in this and similar endorsement schemes make the organization more like a membership discount club like a Costco or Sam's Club as opposed to a tax-exempt organization?

At the time "Behind the Veil: The AARP America Doesn't Know" was released, AARP refused to provide certain details of the contractual relationship with UnitedHealth Group (United). The information emerging from the HearUSA and AARP contract lends further credence to one of the report's key conclusions, namely that AARP is not simply lending its name and providing quality review to its business partners but instead is significantly involved in the business operations of outside entities. As you know, this distinction is a significant factor in determining whether AARP's revenues from "endorsements," which totaled over $600 million in 2010, should be subject to unrelated business income tax. We request that the IRS look closely at AARP's contracts with third party vendors to determine AARP's involvement in business activities and how its business affairs are managed by the numerous entities in the AARP corporate structure.

AARP's Medicare Insurance Contracts

In addition to this new information regarding HearUSA, Congressional staff recently had the opportunity to review three redacted contracts between AARP and AARP Services, Inc. (ASI) and United. The contracts covered United's marketing and sale of AARP-branded Medigap, Medicare Advantage, and Medicare Part D policies. The contracts raised a number of issues related to AARP's involvement in for-profit business activities and governance issues among the various AARP entities.

The three contracts, signed in January 2008 and which are still in effect, detail AARP and ASI's extensive influence over United's operations, most notably in the Medigap business, and several instances in which United is required to take specific actions, beyond making "royalty" payments, to the benefit of AARP. The contracts include the following provisions that raise numerous questions about AARP's involvement in for-profit activities:

a. ASI is placed in the role of quality control contractor and overseer of United's operations, as it relates to Medigap, Medicare Advantage, and Medicare Part D.
b. The contracts create a "Senior Leaders" team that oversees all aspects of performance under the contracts. Both United and ASI each have two officials appointed to the "Senior Leaders" team, which coordinates all aspects of contract performance and must consent to any action under the contract. At least one United and one ASI "Senior Leader" must consent to any decision. Further demonstrating AARP's active role in directing the decisions of the insurer, ASI must approve United's appointments to the "Senior Leaders" team.
c. ASI has authority over United's "Operating Plan" and may "approve, modify on a line by line basis, or provide specific direction to United," regarding the plan.

Confidential

AARP_KRUKAS_0043815

d. ASI is given prior review and approval authority over all proposed electronic, print, verbal, or scripted communication regarding AARP-endorsed Medigap plans directed at both AARP members and non-AARP members.
e. United is responsible for marketing campaign audits and analysis, but all strategy developments and modifications must be made in collaboration with AARP.
f. ASI oversees and monitors the agent certification process and must approve the agent compensation program.
g. ASI has consultation, review, and consent rights related to any proposed plan design changes including, but not limited to, annual budgets, premium levels and rates, and sales and distribution plans.
h. United is barred from directly or indirectly marketing or offering products or programs that compete with AARP-endorsed Medigap plans.
i. ASI has review and modification authority over United's Medigap-related contracts with third-party vendors exceeding $250,000.
j. United must submit to ASI a detailed projection of policy financials, including recommended member premiums for the coming year. ASI may object to the premium levels, and if no agreement is reached the issue goes to dispute resolution.
k. United may contract with ASI separately to perform consulting and marketing services in connection with the sale of AARP-endorsed Medigap plans. Such agreements are separate from the primary contract but indicate the possibility of the AARP subsidiary's further involvement in business operations.
l. United's annual incentive program for senior executives is, in part, dependent on meeting the "transformational" goals established by AARP and ASI.
m. Any expenditure of Medigap funds not addressed in the contract requires the prior written approval of ASI.

These contracts suggest that AARP's relationship with United is much more than an agreement to license the AARP name. AARP has extensive decision making authority and is deeply involved in United's business operations. The AARP relationship with both United and HearUSA seems to suggest a pattern of business partnerships and activities that permit AARP to engage in for-profit businesses under the cover of its tax-exempt status.

Thank you in advance for the IRS's careful consideration of our report on AARP and the additional information we are forwarding to you.

Wally Herger
Chairman
Subcommittee on Health

Charles Boustany, Jr., MD
Chairman
Subcommittee on Oversight

Dave Reichert
Member of Congress

4

Confidential
AARP_KRUKAS_0043816