# Exhibit CCC

**ORAL ARGUMENT EN BANC SCHEDULED MAY 24, 2017**
_____

**No. 15-1177**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA**
_____

PHH CORPORATION; PHH MORTGAGE CORPORATION; PHH
HOME LOANS, LLC; ATRIUM INSURANCE CORPORATION;
AND ATRIUM REINSURANCE CORPORATION,
                                   Petitioners,
v.

CONSUMER FINANCIAL PROTECTION BUREAU,
                                   Respondent.
_____

ON PETITION FOR REVIEW OF AN ORDER
OF THE OF CONSUMER FINANCIAL PROTECTION BUREAU
(CFPB FILE NO. 2014-CFPB-0002)
_____

**AMICI CURIAE BRIEF OF AARP AND AARP
FOUNDATION IN SUPPORT OF RESPONDENT
CONSUMER FINANCIAL PROTECTION BUREAU**
_____

Julie Nepveu
DC Bar No. 458305
William A. Rivera
DC Bar No. 495725
AARP Foundation Litigation
601 E Street, NW
Washington, DC  20049
202-434-2060
jnepveu@aarp.org

*Counsel for Amici Curiae AARP and AARP Foundation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Amici curiae AARP and AARP Foundation submits the following information in accordance with D.C. Cir. R. 28(a)(1):

A.      Parties and Amici.  All parties and intervenors appearing before the Consumer Financial Protection Bureau and in this court are listed in the Brief for Respondent, except that the Amici Curiae joining this brief are AARP and AARP Foundation, and the attorneys representing AARP and AARP Foundation on the brief are employed at AARP Foundation.

B.      Rulings Under Review.  PHH Corporation, PHH Mortgage Corporation, PHH Home Loans, LLC, Atrium Insurance Corporation, and Atrium Reinsurance Corporation, have appealed the July 4, 2015 Order issued by the Director of the Consumer Financial Protection Bureau in *In the Matter of PHH Corp.*, CFPB No. 2014-CFPB-0002 (July 4, 2015).

C.      Related Cases. An accurate statement regarding related cases appears in the Brief for Respondent.

Dated:  March 31, 2017          /s/*Julie Nepveu*
                                Julie Nepveu

                                *Counsel for Amici Curiae AARP and*
                                *AARP Foundation*

i

## CORPORATE DISCLOSURE STATEMENT

The Internal Revenue Service has determined that AARP is organized and operated exclusively for the promotion of social welfare pursuant to Section 501(c)(4) of the Internal Revenue Code and is exempt from income tax.  The Internal Revenue Service has determined that AARP Foundation is organized and operated exclusively for charitable purposes pursuant to Section 501(c)(3) of the Internal Revenue Code and is exempt from income tax.  AARP and AARP Foundation are also organized and operated as nonprofit corporations under the District of Columbia Nonprofit Corporation Act.

Other legal entities related to AARP and AARP Foundation include AARP Services, Inc., and Legal Counsel for the Elderly.  Neither AARP nor AARP Foundation has a parent corporation, nor has either issued shares or securities.

## STATEMENT REGARDING CONSENT TO FILE, SEPARATE BRIEFING, AUTHORSHIP AND MONETARY CONTRIBUTIONS

All parties have consented to the filing of this brief. Pursuant to Rule 29(c) of the Federal Rules of Appellate Procedure, no person or entity other than amici curiae AARP and AARP Foundation, their members, or their counsel made a monetary contribution to this brief's preparation or submission. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. Pursuant to D.C. Circuit Rule 29(d), as of March 31, 2017, amici curiae

AARP and AARP Foundation are not aware of any other amici filing a brief in

support of Respondent that addresses the interpretation of the Real Estate

Settlement Procedures Act, 93 Pub. L. No. 533, 88 Stat. 1724 (1974), as amended

(codified at 12 U.S.C. § 2601, et seq.).

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

STATEMENT REGARDING CONSENT TO FILE, SEPARATE
BRIEFING, AUTHORSHIP AND MONETARY CONTRIBUTIONS ............... ii

TABLE OF AUTHORITIES ................................................. vi

GLOSSARY ............................................................. xi

STATUTES AND REGULATIONS AT ISSUE ................................. xi

STATEMENT OF INTEREST .............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................... 3

ARGUMENT ........................................................... 7

I.    CFPB's ENFORCEMENT ORDER SHOULD BE AFFIRMED
      BECAUSE IT CORRECTLY INTERPRETS RESPA AND IS
      SUPPORTED BY SUBSTANTIAL FACTS. .............................. 7

      A.    RESPA was enacted to eliminate anti-competitive practices
            and kickbacks that harm homebuyers and real estate
            professionals by increasing the cost of homeownership. .................... 7

      B.    CFPB's interpretation of RESPA is not drastically different
            from that of HUD prior to the transfer of implementation
            authority ........................................................ 13

II.   KICKBACKS CAUSE CONCRETE HARM TO HOMEBUYERS. ......... 16

      A.    Kickbacks create an inherent conflict of interest between real
            estate service providers and homebuyers that unjustly increases
            the cost of homeownership ............................................. 16

iv

B.   Lax enforcement of RESPA and other mortgage-related consumer protection statutes enabled unscrupulous lenders to target older homeowners for high-cost loans, with devastating consequences. ...............................................18

III.   THIS COURT SHOULD DEFER TO CONGRESSIONAL AUTHORITY TO STRENGTHEN AND ENFORCE EXISTING CONSUMER FINANCIAL PROTECTION LAWS ...................................21

A.   Congress created the CFPB to eliminate enforcement gaps that prevent effective enforcement of existing financial consumer protection laws ....................................................................21

B.   Congress significantly expanded CFPB's authority to protect consumers when it transferred implementation authority over RESPA from HUD. ...................................................24

C.   The CFPB Decision is entitled to deference ......................................26

CONCLUSION ........................................................................28

CERTIFICATE OF COMPLIANCE ...................................................29

CERTIFICATE OF SERVICE.............................................................30

# TABLE OF AUTHORITIES*

**Cases**

*Alston v. Countrywide Fin. Corp*.,
        585 F.3d 753 (3d Cir. 2009) ........................................................ 17

*Arthur v. Ticor Title Ins. Co.*,
        569 F.3d 154 (4th Cir. 2009) ...................................................... 17

*Bd. of Dirs. & Officers, Forbes Fed. Credit Union v. Nat'l Credit Union
        Admin.*, 477 F.2d 777 (10th Cir. 1973) ...................................... 26

*Carter v. Welles-Bowen Realty, Inc*.,
        553 F.3d 979 (6th Cir. 2009) ...................................................... 17

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
        467 U.S. 837 (1984) ................................................................... 27

*Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc*,
        60 F. Supp. 3d 1082 (C.D. Cal. 2014). .................................. 26, 27

*Edwards v. First Am. Corp.*,
        798 F.3d 1172 (9th Cir. 2015) .................................................... 17

*Fink v. SEC*,
        417 F.2d 1058 (2d Cir. 1969) ..................................................... 27

*\*In the Matter of PHH Corp*.,
        CFPB No. 2014-CFPB-002 (July 4, 2015) .................................. 3, 4, 6, 8, 10

*In the Matter of Timbervest, LLC*,
        Investment Advisers Act of 1940 Release No. 4197, Investment
        Company Act of 1940 Release No. 31830, SEC Admin. Proc.
        File No. 3-15519 (Sept. 17, 2015) .............................................. 27

* Authorities upon which we chiefly rely are marked with an asterisk.

*Patton v. Triad Guar. Ins. Corp.*,
  277 F.3d 1294 (11th Cir. 2002) ................................................................. 17

*Robinson v. Fountainhead Title Grp. Corp*.,
  252 F.R.D. 275 (D. Md. 2008) .................................................................. 17

*Voss v. SEC*,
  222 F.3d 994 (D.C. Cir. 2000) ................................................................. 27

*Zacharias v. SEC*,
  569 F.3d 458 (D.C. Cir. 2009) ...........................................................26, 27

**Statutes**

5 U.S.C. § 557 .................................................................................................. 22

12 U.S.C. § 2601, et seq.................................................................................... 9
12 U.S.C. § 2602................................................................................................ 12
12 U.S.C. § 2607(b)........................................................................................... 10
12 U.S.C. § 2607(d)(4) ..................................................................................... 25
12 U.S.C. § 5481(12)(A)-(R). ........................................................................... 6
12 U.S.C. § 5565(a)(1)-(2)................................................................................. 25
12 U.S.C. § 1786(e)(3)(A) ................................................................................ 26

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, § 1463, 124 Stat. 1376 (2010) ............................23, 24

Emergency Home Finance Act of 1970,
  Pub. L. No. 91-351, § 701, 48 Stat. 1246 (1970)......................................... 9

Emergency Housing Act of 1975,
  Pub. L. No. 94-50, § 205, 89 Stat. 249 .........................................................3

*Real Estate Settlement Procedures Act,
  Pub. L. No. 93-533, 88 Stat. 1724 (1974)........................... 4, 8, 9, 10, 13, 23

Supplemental Appropriations Act, Housing and Urban-Rural Recovery
  Act of 1983 (HURRA), Pub. L. No. 98-181, § 461, 97 Stat. 1231
  (1983) ..........................................................................................................12

**Regulations**

24 C.F.R. § 3500.4............................................................................. 14
24 C.F.R. § 3500.19........................................................................... 25
24 C.F.R. § 3500.19(b). .....................................................................14

Real Estate Settlement Procedures Act (RESPA);
     U.S. Dep't of Hous. and Urban Dev., Statement of Policy
     1996-2 Regarding Sham Controlled Business Arrangements,
     61 Fed. Reg. 29258 (July 7, 1996) ......................................................12, 14

U.S. Dep't of Hous. and Urban Dev., Real Estate Settlement Procedures
     Act (RESPA) Statement of Policy 1999–1 Regarding Lender
     Payments to Mortgage Brokers, 64 Fed. Reg. 10080 (1999) .......................23

**Legislative History**

Bd. of Governors of the Fed. Reserve Sys. & U.S. Dep't of Hous. and
     Urban Dev., *Joint Report to the Congress Concerning Reform to*
     *the Truth in Lending Act and the Real Estate Settlement Procedures*
     *Act* (1998), http://1.usa.gov/1WR0qU6..................................................22, 23

H.R. Rep. No. 97-532 (1982)................................................... 11, 12, 16, 17

*Reforming The Real Estate Settlement Procedure: Review of HUD's*
     *Proposed RESPA Rule Hearing Before H. Comm. on Fin.*
     *Services*,107th Cong. (2002) (statement of Chairman Oxley)...................... 7

S. Comm. on Banking, Hous., and Urban Affairs,
     *Mortgage Settlement Costs: Report of the Department of*
     *Housing and Urban Development and Veterans Administration*
     93d Cong., 2nd Sess. (Comm. Print 1972) ...................................................9

*U.S. Gov't Accountability Off., GAO-04-280, *Federal and State*
     *Agencies Face Challenges in Combating Predatory*
     *Lending*: *GAO Report to Chairman and Ranking Minority*
     *Member, Special Committee on Aging, U.S. Senate,*
     (2004) ......................................................................... 19, 21,22, 25, 27, 28

Baird Webel, et al., *Financial Regulatory Reform and the 111th Congress*, Cong. Research Serv. (Apr. 16, 2010), http://1.usa.gov/1NMU2ws ..............................................................5, 24

**Other Authorities**

William C. Apgar and Zhu Xiao Di, *Housing Wealth and Retirement Savings: Enhancing Financial Security for Older Americans*, J. Ctr. for Hous. Studies at Harv. Univ. (Sept. 2005), http://bit.ly/20P7XaF ................................................................19

Kermit Baker, et al., *Housing America's Older Adults: Meeting the Needs of an Aging Population*, J. Ctr. for Hous. Studies of Harv. Univ. (2014), http://bit.ly/1umYrKY ........................................19

Debbie Gruenstein Bocian, et al., *Collateral Damage:  The Spillover Costs of Foreclosures,* Ctr. For Responsible Lending (2012), http://bit.ly/1iSq9Os.....................................................................22

Congressional Oversight Panel, *November Oversight Report*: *Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation* (2010), http://1.usa.gov/1B66qg9 ..................18

Diane Thompson, *Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications*, 86 Wash. L. Rev. 755 (2011)..................18

Lori Trawinski, *Nightmare on Main Street: Older Americans and the Mortgage Market Crisis*, AARP Pub. Pol'y Inst. (July 2012), http://bit.ly/XLk7FC ...........................................................19, 20

U.S. Dep't of Hous. and Urban Dev., *Homeownership and Its Benefits*, Urban Pol'y Brief, Number 2 (1995), http://bit.ly/1AzFo2X....................7, 8

U.S. Dep't of Hous. and Urban Dev., *HUD at 50: Creating Pathways to Opportunity*, Office of Pol'y Dev. & Research (Oct. 2015), http://bit.ly/1WMZpSg..................................................................8

U.S. Dep't of Treas. and U.S. Dep't of Hous. and Urban Dev., *Joint Report  on Recommendations to Curb Predatory Mortgage Lending*, (2000), http://bit.ly/1tBfcSo .......................................................18

## **GLOSSARY**

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| Fannie Mae | Federal National Mortgage Association |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| HUD | Department of Housing and Urban Development |
| NCUA | National Credit Union Administration |
| OCC | Office of the Comptroller of the Currency |
| PMI | Private Mortgage Insurance |
| RESPA | Real Estate Settlement Procedures Act |
| SEC | Securities and Exchange Commission |

## **STATUTES AND REGULATIONS AT ISSUE**

Pertinent statutes, regulations, and administrative materials are reproduced in the addendum or contained in the addendum of the Brief for Petitioner.

**STATEMENT OF INTEREST**

Older people are often vulnerable to abusive and illegal mortgage lending and real estate settlement practices that increase the cost of homeownership, such as those at issue in this appeal.  Kickbacks and junk fees—any fee charged for a service to a borrower that has little or no value to the borrower in relation to the charge, and/or may be duplicative, to increase a loan originator's profits—can increase the costs of purchasing a home by thousands of dollars.  Magnified by the prevalence of unscrupulous mortgage lending practices that target older individuals, such costs have contributed to stripping away homeowners' equity. Home equity is often the only asset that older people have to sustain them through their lifespan. Such widespread mortgage lending abuses also correspond to unprecedented numbers of people entering their retirement years having to make mortgage payments and carrying increasingly unaffordable levels of consumer and health care debt that threaten their ability to afford basic necessities such as food, medicine, and shelter.  Practices that threaten the financial security of older people, such as those at issue in this case, are of significant importance to AARP, its members, and low-income older individuals served by AARP Foundation.

AARP is a nonprofit, nonpartisan organization dedicated to fulfilling the needs and representing the interests of people age fifty and older. AARP fights to protect older people's financial security, health, and well-being. AARP's charitable

1

affiliate, AARP Foundation, creates and advances effective solutions that help low-income individuals fifty and older secure the essentials. Among other activities, AARP and AARP Foundation advocate for effective consumer protection through robust legal enforcement, including by participating as amici curiae in federal courts.  As the leading organizations representing the interests of people age fifty and older, AARP and AARP Foundation work to prevent and remedy illegal and abusive practices that threaten the financial security of older people.

AARP supported the creation of the Consumer Financial Protection Bureau ("CFPB") to accomplish one mission: protect consumers from abusive, unfair, and deceptive practices in the financial services marketplace. When Congress created the CFPB, it recognized that the CFPB needed effective tools to enforce and remedy violations of financial consumer protection laws and hold law-breakers accountable for their actions.

This case strikes at the heart of the CFPB's legitimacy and authority to protect consumers, specifically with respect to mortgage lending and settlement practices. Given that other amici will argue that this Court should uphold the constitutionality of the CFPB, this brief will argue in support of the CFPB's enforcement action as a valid exercise of the CFPB's authority to interpret and enforce the Real Estate Settlement Procedures Act. Amici's participation in this case will assist this Court to resolve the issues presented.

## INTRODUCTION AND SUMMARY OF ARGUMENT

During the time period at issue in this case, PHH Corp. was one of the nation's largest home mortgage lenders. *See In the Matter of PHH Corp.*, CFPB No. 2014-CFPB-0002 (July 4, 2015) at 2 [hereinafter Decision].[1]  Because PHH sold most of the mortgage loans that it originated to Freddie Mac and Fannie Mae, borrowers were required to purchase private mortgage insurance ("PMI") if their mortgage loan exceeded 80 percent of the appraised value of their property.

The purpose of PMI is to protect the lender in the event that the borrower defaults on the loan. Nevertheless, the borrower pays the premiums for PMI, usually on an ongoing monthly basis to protect a lender.[2] Similarly, reinsurance does not protect the borrower in the event of loss of income. Instead, reinsurance protects the PMI insurer against the possibility that losses on a pool of loans it insured on behalf of a particular lender in a given book year will exceed an amount

───────────────────

[1]   PHH Mortgage Corp. and PHH Home Loans LLC are owned, in part, by PHH Corp., a publicly owned corporation (collectively, "PHH"). Decision at 2. PHH originates home mortgage loans and, during the relevant period, sold virtually all of its loans to the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). *Id*. PHH also purchased loans from other lenders and sold them in the secondary market. *Id*.

[2]   PMI is generally required for conventional loans that will be sold to a government sponsored enterprise or to other lenders if the loan-to-value ratio exceeds 80 percent. *See* Emergency Housing Act of 1975, Pub. L. No. 94-50, § 205, 89 Stat. 249 (raising the limit on the outstanding balance of a conventional mortgage eligible for purchase by Fannie Mae and Freddie Mac from 70 percent to 80 percent of the value of the property securing the mortgage).

set between them pursuant to contract.  Decision at 3.  If the losses meet the set

cap, the lender will indemnify the insurer.  The CFPB found that PHH did not refer

borrowers to PMI providers that refused to purchase reinsurance from PHH's

affiliate. *Id.*  Thus, in order to get referrals to sell PMI, the insurers would be

forced to enter agreements that forced them to cede a portion of the premium to the

lender's affiliate. *See* Decision at 2-3.

The CFPB initiated an administrative enforcement action Petitioners.  Both

the ALJ and Director Cordray found that PHH's captive reinsurance referral

practices violated the anti-kickback provisions at Section 8 of the Real Estate

Settlement Procedures Act ("RESPA"), 93 Pub. L. No. 533, 88 Stat. 1724 (1974).

*See* Decision at 7-9. Amici agree with arguments made by others in support of

Respondent, but will not repeat those arguments here. Instead, this brief will

address the interpretation of the anti-kickback provisions of RESPA.

Respectfully, the Decision should be affirmed because it correctly applies

the law to findings of fact based upon substantial evidence.  The CFPB's

enforcement order is consistent with HUD's interpretation of RESPA during the

time that it implemented the statue. Petitioners and their amici grossly misrepresent

HUD's actual interpretation of the Section 8 prohibition on giving or receiving

kickbacks for referrals.  Even if the interpretation advanced arguably may have

been considered reasonable due to some unspecified ambiguity, there can no

4

longer be any lingering doubt that HUD viewed the captive reinsurance

arrangement as involving an illegal kickback.

    Moreover, this Court should carefully scrutinize the self-serving claims of

Petitioner and its amici that the CFPB decision is contrary to long-standing binding

HUD guidance interpreting RESPA and its regulations such they have a

protectable reliance interest.   At least five years before the CFPB was formed and

assumed authority over RESPA implementation, large volumes of successful

litigation by state and federal regulators targeted similar illegal in the captive

reinsurance. These actions put Petitioners on notice of HUD's actual interpretation

of RESPA and its regulations. Thus, Petitioners have no reasonable reliance

interest to protect that would allow this Court to invalidate the CFPB decision as a

violation of the APA.

    Congress created the CFPB and vested it with broad remedial authority in

order to protect consumers from widespread abuses in the financial services

marketplace.  It found that the patchwork of regulatory and enforcement agencies,

each with its own jurisdiction and remedial authority, resulted in enforcement gaps

that left consumers vulnerable to illegal practices.  Baird Webel, et al., *Financial

Regulatory Reform and the 111th Congress*, Cong. Research Serv. 10 (Apr. 16,

2010), http://1.usa.gov/1NMU2ws.  To eliminate these gaps, Congress transferred

primary implementation authority for federal financial consumer protection

statutes to the CFPB.  *See* 12 U.S.C. § 5481(12)(A)-(R).  Congress also explicitly authorized the CFPB to exercise the power and authority necessary to carry out its broad consumer protection function.

Effective enforcement of RESPA and other mortgage-related financial consumer protection statutes within the CFPB's jurisdiction is essential to protect older homeowners from illegal kickbacks and other widespread mortgage lending abuses that cause devastating losses, such as those that precipitated the Great Recession and the foreclosure of more than ten million homes. The CFPB's authority to carry out the full scope of the authority that Congress intended it to have is not—and should not be—constrained by the more limited scope of HUD's former authority and resources to enforce indisputably valid statutes that Congress enacted nearly fifty years ago to protect consumers.

Respectfully, amici urge this Court to find that the CFPB acted within valid statutory and constitutional authority and to affirm Director Cordray's Decision in *In the Matter of PHH Corp.*, CFPB No. 2014-CFPB-0002 (July 4, 2015).

## ARGUMENT

**I.    CFPB's ENFORCEMENT ORDER SHOULD BE AFFIRMED BECAUSE IT CORRECTLY INTERPRETS RESPA AND IS SUPPORTED BY SUBSTANTIAL FACTS**

**A.    RESPA was enacted to eliminate anti-competitive practices and kickbacks that harm homebuyers and real estate professionals by increasing the cost of homeownership.**

America historically has sought to encourage homeownership because it provides stability, builds wealth for families and communities, and spurs economic growth.  *See* U.S. Dep't of Hous. and Urban Devel., *Homeownership and Its Benefits*, Urban Pol'y Brief, Number 2 (1995) [hereinafter HUD Homeownership Policy Brief], http://bit.ly/1AzFo2X. "For most American families, buying a home is the single biggest investment they will ever make. . . . As a public policy for the good of communities and families across the country, we want to encourage home ownership."  *Reforming The Real Estate Settlement Procedure: Review of HUD's Proposed RESPA Rule Hearing Before H. Comm. on Fin. Services*, 107th Cong. (2002) (statement of Chairman Oxley).

America has prospered economically for sustained periods as a result of high levels of homeownership. President Clinton, like many Presidents before him, expressed the national consensus that "more Americans should own their own homes, for reasons that are economic and tangible, and reasons that are emotional and intangible, but go to the heart of what it means to harbor, to nourish, to expand

the American Dream."  HUD Homeownership Policy Brief, *supra*, at 7.  Similarly,

Ronald Reagan recognized that homeownership "supplies stability and

rootedness," and Lyndon Johnson promoted homeownership as part of a strategy

for addressing the urban ills of the 1960s, declaring that "owning a home can

increase responsibility and stake out a [person's] place in [the] community. . . .The

[person] who owns a home has something to be proud of and reason to protect and

preserve it."  *Id*.

For decades, government housing policy has encouraged and fostered

homeownership. Congress created the government-sponsored enterprises

("GSEs"), including Fannie Mae and Freddie Mac, to operate and fund a secondary

loan market. The GSE's make more capital available for residential mortgage

lending and spur market efficiencies to help bring down the cost of purchasing a

home.  *See* U.S. Dep't of Hous. and Urban Dev., *HUD at 50: Creating Pathways

to Opportunity*, 15-16 , Office of Pol'y Dev. & Research (Oct. 2015), http://bit.ly/

1WMZpSg.  As the designated regulator for the government-sponsored enterprises,

HUD played an important role in making thirty-year mortgage loan credit readily

widely available.  HUD was also responsible for standardizing mortgage lending

including the underwriting, documents, disclosures, and sales procedures so that

mortgage products  could be sold efficiently on the secondary market, thereby

8

freeing up capital and making more credit more accessible to more people. *See id.*
at 238.

In 1970, Congress recognized that inflated settlement costs pose a significant
barrier to homeownership. It directed HUD and the Veterans Administration to
conduct a joint study and report to Congress the recommendations for legislative
and administrative actions that would help reduce settlement costs and make
homeownership available to more people. *See* Emergency Home Finance Act of
1970, Pub. L. No. 91-351, § 701, 48 Stat. 1246 (1970). The resulting report
identified "an elaborate system of referral fees, kickbacks, rebates, commissions
and the like as inducements to those firms and individuals who direct the
placement of business. These practices are widely employed, rarely inure to the
benefit of the home buyer, and generally increase total settlement costs." S.
Comm. on Banking, Housing, and Urban Affairs, *Mortgage Settlement Costs:
Report of the Department of Housing and Urban Development and Veterans
Administration*, 93d Cong., 2nd Sess. (Comm. Print 1972).

In response, Congress enacted the Real Estate Settlement Procedures Act,
Pub. L. No. 93-533, 88 Stat. 1724 (1974), as amended (codified at 12 U.S.C.
§ 2601, et seq.), specifically "[t]o further the national housing goal of encouraging
homeownership by regulating certain lending practices and closing and settlement
procedures in federally related mortgage transactions to the end that unnecessary

9

costs and difficulties of purchasing housing are minimized, and for other

purposes." *Id.* Section 8 of RESPA specifically prohibits unearned kickbacks from

referrals to third parties for settlement-related products and services.  12 U.S.C.

§ 2607(b).

The housing market has changed drastically since RESPA was enacted.

Mortgage products are more varied and significantly more complex and risky.  For

example, down payment requirements for mortgages have been relaxed, and home

prices have increased drastically. It is also increasingly common for house-rich,

cash-poor homeowners to make ends meet by drawing down equity they have

stored in their homes.  Significant levels of subprime and predatory lending,

relaxed or absent underwriting practices, inflated appraisals, and outright fraud

have also contributed to more mortgage loans being originated that require PMI.

Correspondingly, the PMI industry has become increasingly lucrative.  Decision at

3.

Eager to capture a portion of the ample and relatively risk free[3] profits

generated by providing settlement services to homebuyers, some real estate firms,

title and mortgage insurers, and bank and non-bank mortgage lenders established a

---

[3]   PMI premiums are based on the amount of the loan rather than the relative risk
posed by the borrower.  Originators that want to further reduce their risk of loss
may conduct more restrictive or careful underwriting or quickly sell the home on
the secondary market.

variety of business structures to enable them to increase the amount and type of settlement services they provide. Joint ventures, partnerships, and wholly-owned subsidiaries were among the business structures commonly adopted to give them both the ability to exercise control over and share in the proceeds generated by their affiliate.

Having the power to make referrals has long been recognized to cause prices to increase. It eliminates incentives for providers to compete for customers based on price. Real estate professionals that are assured a referral, regardless of the price they charge, have no incentive to keep prices low. In addition, the assured referral typically does not seek to satisfy the homebuyer's goal to keep costs low. such arrangements are therefore criticized for creating a clear conflict of interest. Additionally, would-be competitors locked out of the referral claim that such referrals are nothing more than illegal kickbacks in disguise. Arguably, where the affiliate charged higher costs without providing more services or any benefit to the buyer, the excess charge could be considered an illegal kickback received in exchange for the referral.

When first enacted, Congress did not contemplate how to address affiliations and partnerships between providers that assure referrals. Increasing pressure prompted it to revisit the harmful impact of such anti-competitive control over affiliates in the real estate settlement service provider industry. *See* H.R. Rep. No.

11

97-532, at 51-52 (1982)  ("[S]ince the real estate industry is structured so that

settlement service providers do not compete for a consumer's business directly, but

almost exclusively rely on referrals from real estate brokers, lenders or their

associates for their business, the growth of controlled business arrangements

effectively reduce the kind of healthy competition generated by independent

settlement service providers.").

Congress ultimately attempted to balance the consumer and business

interests by amending RESPA to permit certain controlled or affiliated business

arrangements to make referrals to their affiliates without risk of liability for illegal

kickbacks.  To ensure the referrals would not have the harmful characteristics of

illegal kickbacks, Congress attached three specific conditions on all affiliated

business that sought to make referrals to each other.[4]  *See* Supplemental

Appropriations Act, Housing and Urban-Rural Recovery Act of 1983 (HURRA),

Pub. L. No. 98-181, § 461, 97 Stat. 1231 (1983).

_____

[4]   The three elements are: necessary to permit a "controlled business
arrangement"  to seek an exemption for making referrals to an affiliate in violation
of Section 8(a), "(1) A requirement for disclosure of the relationship between the
parties giving and receiving the referral, with estimated charges for the referred
business; (2) a bar against the required use of a particular provider (except in
specified exceptions); and (3) a bar against any thing of value being received by
the referring party or an associate beyond a return on ownership interest, return on
franchise relationship, or payments otherwise permissible under Section 8(c) of
RESPA."  Statement of Policy 1996-2 Regarding Sham Controlled Business
Arrangements, 61 Fed. Reg. 29258, 29259 (July 7, 1996).

**B.    CFPB's interpretation of RESPA is not drastically different from that of HUD prior to the transfer of implementation authority.**

Petitioners and their amici urge this Court to find that HUD's longstanding and binding interpretation is drastically different from that of the CFPB, thereby raising significant due process issues.  For example, they claim that HUD interprets Section 8(c)(2) to create a safe harbor from liability in all circumstances so long as there is a "payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed."  *Id.*  But HUD's regulations and guidance during the period it implemented RESPA clearly contradict such an argument.

For example, when HUD amended Regulation X in 1992, it codified HUD's official interpretation relating to the statutory exemption for referrals between affiliates in a controlled business arrangement.  *See* U.S. Dep't of Hous. and Urban Dev., Real Estate Settlement Procedures Act (Regulation X), Final Rule, 57 Fed. Reg. 49600, 49601-02 (Nov. 2, 1992) (codified at 24 C.F.R. § 3500, et seq.).  HUD explained its view that "Section 8(c)(4) . . . only creates a safe harbor against proscriptions in Section 8(a) for certain controlled business arrangements. To the extent that subterfuge payments between affiliated entities do not satisfy the requirements of 8(c)(4), they are already prohibited by Section 8(a).  Moreover, Section 8 does not apply to payment by employers to employees of the same company."  *Id*.

13

HUD then published in the Federal Register an official binding Statement of Policy[5] to address "numerous complaints that some [controlled business arrangements] are being established to circumvent RESPA's prohibitions and are sham arrangements." *See* Statement of Policy 1996-2 Regarding Sham Controlled Business Arrangements, 61 Fed. Reg. 29258, 29259 (July 7, 1996). The statement set forth ten factors and a described a particular framework that HUD would use to evaluate on a case by case basis whether certain affiliated relationships were shams. The HUD letter in which the Petitioners and their amici put so much stock incorporated significant portions of the previously published guidance. *See HUD Letter*, JA225 (explaining HUD will evaluate claims that captive reinsurance arrangements are shams pursuant to the two step process described in 1996-2).[6]

Petitioners cite other authorities as well, including some that don't apply according to their terms. For example, this case does not involve payments to

––––––––––––––––––––

[5]   Pursuant to 24 C.F.R. § 3500.4, HUD's statements of policy that are published in the Federal Register are binding with respect to enforcement of RESPA violations. 24 C.F.R. § 3500.19(b).

[6]   Notably, HUD's description of a "sham arrangement," which would circumvent RESPA's anti-kickback provisions closely resembles the description the CFPB provided of Atrium's business. PHH established Atrium Insurance Corp. as a wholly-owned subsidiary in 1994. Decision at 2. Atrium did not have employees of its own; all of its functions were performed by employees of PHH. *Id.* PHH established Atrium Reinsurance Corp. in 2010 to take over all functions of Atrium Insurance Corp. *Id.*

mortgage brokers or the activities of other regulators.  They also fail to discuss the

applicability of Section 8(4)(c), even it clearly applies to the affiliated arrangement

being investigated. Section 8(c)(4) unambiguously provides that *all* affiliated

business that seek to make referrals pursuant to an exemption from liability must

first satisfy the three elements.[7]  The third element provides "the only thing of

value that is received from the arrangement, other than the payments permitted

under this subsection, is a return on the ownership interest or franchise

relationship."  Thus, if a payment is made that satisfies Section 8(c)(2), it will

cause the affiliated business arrangement to fail the Section 8(c)(4)(C) requirement

that the test is not met if there is *any* payment other than a return on owner equity.

Moreover, this analysis is the starting point in the analysis *every time* there is a

referral arrangement involving affiliated businesses.

This court should reject Petitioner's arguments that the CFPB drastically

changed course regarding the applicability of safe harbors.

---

[7]   In addition to failing the third test, Director Cordray found, based upon
substantial evidence, that PHH also failed the second test because it required the
settlement providers to use its captive reinsurance.

## II.   KICKBACKS CAUSE CONCRETE HARM TO HOMEBUYERS.

The suggestion by PHH and its amici that reinsurance kickback practices do
not harm homebuyers is belied by the facts of this case.  The Director found, and
PHH does not dispute, that between 2008 and 2013, *homeowners that were
referred to PHH's kickback partners were charged $109 million more in mortgage
insurance premiums and other fees specifically to cover the cost of the reinsurance
kickbacks than they otherwise would have paid.*  Decision at 35-37.[8]

### A.   Kickbacks create an inherent conflict of interest between real estate service providers and homebuyers that unjustly increases the cost of homeownership.

Importantly, the harm caused by such kickbacks is more insidious than an
overcharge of several hundred or even thousands of dollars to an individual
homebuyer. Congress recognized that referrals in exchange for kickbacks distort
the real estate settlement market by establishing a financial incentive for lenders to
refer homebuyers to settlement services that offer the best financial incentives to
lender, rather than those that provide the best value for the borrower.  "[T]he
advice of the person making the referral may lose its impartiality and may not be
based on his professional evaluation of the quality of service provided if the
referror or his associates have a financial interest in the company being

---

[8]   Director Cordray found in addition that "[i]f a lender selected a mortgage
insurer that was not on the preferred list, then PHH imposed a surcharge on the
loan."  Decision at 5.

recommended."  H.R. Rep. No. 97-532, at 52.  "The purpose of [RESPA] is to prevent certain practices that are harmful to all consumers by establishing that consumers have a right not to be subject to those practices and providing both public and private remedies of that right."  *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294 (11th Cir. 2002); *see also Arthur v. Ticor Title Ins. Co.*, 569 F.3d 154, 158 (4th Cir. 2009) ("Congress directed § 8 against a particular kind of abuse that it believed interfered with the operation of free markets.").

Moreover, courts have found that lenders violate RESPA's anti-kickback provisions even if the consumer is not directly charged higher fees or premiums to cover the cost of the kickback.  *See, e.g., Edwards v. First Am. Corp.*, 798 F.3d 1172, 1179 (9th Cir. 2015); *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 760-61 (3d Cir. 2009); *Carter v. Welles-Bowen Realty, Inc*., 553 F.3d 979, 988 (6th Cir. 2009); *Robinson v. Fountainhead Title Grp. Corp*., 252 F.R.D. 275, 286-87 (D. Md. 2008).

Unjustly high fees charged at loan origination, such as from illegal kickbacks, may force borrowers into more expensive and riskier loans than they otherwise could afford or into loans that may increase the cost of the loan to more than the value of the property, exceed the permissible debt-to-income ratios, or make the new loan payments unaffordable.  *See* Diane Thompson*, Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications*, 86 Wash.

L. Rev. 755, 765-68 (2011) (discussing unsustainable refinancing practices);
Congressional Oversight Panel, *November Oversight Report: Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation* 10 (2010), http://1.usa.gov/1B66qg9.  Such high-cost, risky loans may make it impossible for a homeowner to qualify for a refinanced loan or bankruptcy restructuring.

> **B.   Lax enforcement of RESPA and other mortgage-related consumer protection statutes enabled unscrupulous lenders to target older homeowners for high-cost loans, with devastating consequences.**

In the years leading up to the recent financial crisis, many older Americans put their homes on the line to secure mortgages that later proved to be unsustainable and, in some cases, were designed to fail.  *See* U.S. Dep't of Treas. and U.S. Dep't of Hous. and Urban Dev., *Joint Report on Recommendations to Curb Predatory Mortgage Lending* (2000), http://bit.ly/1tBfcSo; GAO-04-280, *supra*, at 14-15.  The practice of charging inflated or prohibited fees not only led to homeowners facing foreclosure because their loans were unsustainable, but also made it harder for them to save their homes.  Thompson, *supra,* at 765-68. Abusive residential mortgage servicing practices that emerged as the foreclosure crisis heated up compounded the unscrupulous and predatory mortgage origination practices, forcing even more homeowners into foreclosure.  *Id.*  Such practices also placed older homeowners at additional increased risk of being targeted by

foreclosure rescue scammers.  *See* Lori Trawinski, *Nightmare on Main Street:*

*Older Americans and the Mortgage Market Crisis* 22, AARP Pub. Pol'y Inst. (July

2012), http://bit.ly/XLk7FC [hereinafter *Nightmare on Main Street*] (older

homeowners lost more than $16 million to foreclosure rescue scams between 2009

and 2011).

Even modestly inflated fees make older people particularly vulnerable to

losing their homes because high housing costs consume a disproportionate share of

their often low and fixed income.  William C. Apgar and Zhu Xiao Di, *Housing*

*Wealth and Retirement Savings: Enhancing Financial Security for Older*

*Americans*, J. Ctr. for Hous. Studies at Harv. Univ. 16 (Sept. 2005), http://bit.ly/

1AzzZABO (finding that among the 20 percent lowest income 65+ seniors without

mortgage debt, one in four pays 50 percent or more of their income for housing

costs, such as taxes and utilities.  For homeowners still paying off their mortgage

debt but living at the lower economic margins, the vast majority are paying most of

their income for housing costs); *see also* Kermit Baker, et al., *Housing America's*

*Older Adults: Meeting the Needs of an Aging Population*, J. Ctr. for Hous. Studies

of Harv. Univ. 1 (2014), http://bit.ly/1umYrKY (describing housing as the

lynchpin of well-being and finding that "[a]s the single largest item in most

household budgets, housing costs directly affect day-to-day financial security as

well as the ability to accrue wealth to draw upon later in life").

19

The evidence of harm to older people inflicted by inflated fees and abusive mortgage-related practices is indisputable: approximately 1.5 million families headed by a person over age 50 lost their home to foreclosure between 2007 and 2011 alone. *Nightmare on Main Street* at 2. Families lost not only their shelter, but also the wealth, financial stability, and well-being that homeownership affords them:[9]

> Older Americans often used their home equity in retirement to finance health care, home maintenance, and other large expenses and as a safety net that could be used to meet unexpected needs. Others planned to sell their home to downsize, move closer to family, or to finance a move into an assisted living facility or continuing care retirement community. For most older people, the home is, or in some cases, was, their most valuable asset.

*Id.* at 3.

Congress enacted RESPA because it found that the harm of unjustly inflated settlement costs was concrete and real. This Court should respect that policy decision.

---

[9]   Foreclosure and the threat of foreclosure are also associated with significant negative health consequences.

## III.   THIS COURT SHOULD DEFER TO CONGRESSIONAL AUTHORITY TO STRENGTHEN AND ENFORCE EXISTING CONSUMER FINANCIAL PROTECTION LAWS

Congress identified patchwork regulation and failure to enforce existing consumer protection statutes as significant causes of the foreclosure crisis and the Great Recession.  Contrary to PHH's arguments, the CFPB is explicitly authorized to take administrative action both to disgorge profits and to enjoin illegal practices specifically to protect homeowners from the increased costs of illegal kickbacks and other widespread abuses.  The CFPB's authority to enforce RESPA is not dependent on or constrained by the more limited enforcement authority that Congress granted to HUD.

### A.   Congress created the CFPB to eliminate enforcement gaps that prevent effective enforcement of existing financial consumer protection laws.

RESPA is one of numerous consumer protection statutes that should have—but failed—to protect homebuyers from the desolation caused by widespread illegal and abusive lending and real estate settlement practices.  The mortgage industry often exploited regulatory gaps to circumvent a variety of important existing consumer protections.  For example, to avoid RESPA's anti-kickback provisions, some banks began affiliating with or forming wholly-owned non-bank entities that were not subject to supervision by federal regulators.  *See* GAO-04-280, *supra*, at 9 (describing enforcement patchwork).

21

Despite statutory and policy protection for homeowners, no regulator had

adequate authority to regulate, supervise, and enforce violations for both bank and

non-bank entities, making it easier for law breakers to avoid detection.  *Id.*

Undeterred mortgage lending industry abuses have caused trillions of dollars of

damage and irreparably harmed millions of homeowners.  Debbie Gruenstein

Bocian, et al., *Collateral Damage:  The Spillover Costs of Foreclosures,* Ctr. For

Responsible Lending, 2 (2012), http://bit.ly/1iSq9Os (estimating nearly $2 trillion

in lost property wealth).  The harm caused by illegal and abusive practices is not

limited to that suffered by the homeowners whose loans were abusive, however:

> Importantly, these losses represent only the wealth that has been lost
> or will be lost as a direct result of being in close proximity to homes
> that have begun the foreclosure process. We do not include in our
> estimate the total loss in home equity that has resulted from the crisis
> (estimated at $7 trillion), the negative impact on local governments
> (from lost tax revenue and increased costs of managing vacant
> properties) or the non-financial spillover costs, such as increased
> crime, reduced school performance and neighborhood blight.

*Id.*

HUD's authority and resources to enforce RESPA's anti-kickback

provisions were widely viewed as essentially toothless and ineffective, so Congress

ordered HUD and the Federal Reserve Board to study the problem and report back

to it.  The joint report they produced urged Congress to enhance HUD's

enforcement authority over RESPA.  *See* Bd. of Governors of the Fed. Reserve

Sys. & U.S. Dep't of Hous. and Urban Dev., *Joint Report to the Congress*

*Concerning Reform to the Truth in Lending Act and the Real Estate Settlement Procedures Act,* 81-82 (1998), http://1.usa.gov/1WR0qU6.  Specifically, HUD and the Federal Reserve Board recommended that Congress "[e]xpand injunctive authority of public enforcers, [e]xpand HUD's civil remedies, [s]trengthen criminal sanctions for § 8 [anti-kickback provision] violations, [e]xpand remedies available through private causes of action, [and c]onsider recognizing a competitor's right to sue for injunctive relief or damages for violations of § 8 and 9." *Id.* at 84-85 (noting that RESPA violation complaints exceed HUD's enforcement capacity). HUD further argued, in guidance that it published shortly thereafter, that "broad legislative reform along the lines specified in the HUD/Federal Reserve Board Report remains the most effective way to resolve the difficulties and legal uncertainties under RESPA and the Truth in Lending Act (TILA) for industry and consumers alike."  U.S. Dep't of Hous. and Urban Dev., Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10080, 10080 (1999).

The statutory changes that Congress enacted when it created the CFPB to be the consumer financial service watchdog are in line with the suggestions that were urged by HUD and the Federal Reserve Board as necessary to enforce RESPA effectively and to protect homebuyers from inflated costs.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, § 1463, 124 Stat.

1376 (2010).  Congress explicitly recognized that enforcement gaps left by a

patchwork of enforcement agencies hindered achievement of numerous mortgage-

related consumer protection statutes and left consumers vulnerable to abuse.  *See*

Baird Webel, et al., *Financial Regulatory Reform and the 111th Congress*, Cong.

Research Serv. 10 (Apr. 16, 2010), http://1.usa.gov/1NMU2ws (explaining that the

fragmented regulatory system was one motivating factor in the proposal for a

federal consumer financial regulator for non-depository entities).  Congress chose

to close the enforcement gaps by transferring to the CFPB primary responsibility

over the federal financial consumer protection laws for both bank and non-bank

entities.  *See id.* at 8-9.

> **B.     Congress significantly expanded CFPB's authority to protect consumers when it transferred implementation authority over RESPA from HUD.**

Following the foreclosure crisis, it was clear that broad rule-making,

supervisory, and enforcement authority was necessary to achieve the consumer

protection goals embodied in the mortgage-related statutes.  When Congress

created the CFPB, it deliberately enhanced regulatory and supervisory authority in

order to eliminate the barriers to effective enforcement that had plagued the

CFPB's predecessors.  Congress also intentionally and significantly enhanced the

enforcement authority, resources, and tools of the CFPB compared to those it had

granted to HUD's.  Congress conferred on the CFPB "jurisdiction to grant any

appropriate legal or equitable relief with respect to a violation of Federal consumer

financial law."  12 U.S.C. § 5565(a)(1)-(2).  Specifically, Congress provided that:

> Relief under this section may include, without limitation -- (A) rescission or reformation of contracts; (B) refund of moneys or return of real property; (C) restitution; (D) disgorgement or compensation for unjust enrichment; (E) payment of damages or other monetary relief; (F) public notification regarding the violation, including the costs of notification; (G) limits on the activities or functions of the person; and (H) civil money penalties. . . .

*Id.*  Congress also explicitly authorized the CFPB to take enforcement action and

grant such relief through its administrative process.  *Id.*  Unlike the CFPB, HUD

was never granted the broad remedial and enforcement tools necessary to enforce

RESPA effectively.  *See* 12 U.S.C. § 2607(d)(4) (describing HUD's authority); *see*

*also* Decision at 12.  Thus, the CFPB's authority to enforce REPSA  is not

constrained by HUD's comparatively more narrow enforcement authority.

Additionally, HUD's own regulations contradict PHH's assertion; they

explicitly recognize that other agencies have overlapping authority and jurisdiction

to enforce RESPA.  HUD regulations state that its policy is:

> to cooperate with Federal, State, or local agencies having supervisory powers over lenders or other persons with responsibilities under RESPA.  Federal agencies with supervisory powers over lenders may use their powers to require compliance with RESPA. . . . *Nothing in this paragraph is a limitation on any other form of enforcement that may be legally available.*

24 C.F.R. § 3500.19 (emphasis added); *see also* GAO-04-280, *supra*, at 53

(describing overlapping jurisdiction).

The CFPB's exercise of its enforcement authority and the remedies it imposed are not constrained by HUD's authority because it has independent statutory authority to act.

### C.      The CFPB Decision is entitled to deference.

The CFPB's administrative authority to impose civil monetary penalties in administrative proceedings—similar to that of other agencies—is not unconstitutional.  *See Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082 (C.D. Cal. 2014).  For example, the National Credit Union Administration (NCUA) has similar remedial power to seek injunctive relief.[10]  *See Bd. of Dirs. & Officers, Forbes Fed. Credit Union v. Nat'l Credit Union Admin.*, 477 F.2d 777, 784 (10th Cir. 1973) (affirming the Administrator's reinterpretation of the credit union's charter stating that "in our view the Administrator has given the 1967 charter amendment a reasonable interpretation consonant with the Congressional mandate and the regulations promulgated pursuant thereto").  The CFPB's administrative enforcement authority, like that of the Security Exchange Commission ("SEC"), is entitled to deference.  *See Zacharias v. SEC*, 569 F.3d

_____

[10]  The NCUA is authorized to order the supervised credit union or third-party affiliate to do the following in an administrative action, "make restitution or provide reimbursement, indemnification, or guarantee against loss if— (i) such credit union or such party was unjustly enriched in connection with such violation or practice; or (ii) the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the Board."  12 U.S.C. § 1786(e)(3) (A).

26

458, 469-70 (D.C. Cir. 2009) (affirming the SEC's disgorgement order from

broker-dealers of ill-gotten commissions).  Such agency decision-making findings

are entitled to deference "unless they are arbitrary, capricious, an abuse of

discretion, or not in accordance with law."  *Id.* at 464 (quoting *Voss v. SEC*, 222

F.3d 994, 999-1000 (D.C. Cir. 2000) (internal quotation marks omitted)); *Fink v.

SEC*, 417 F.2d 1058, 1059 (2d Cir. 1969) (affirming the authority of agency to

increase penalty from that suggested by the hearing examiner because the

Administrative Procedure Act, 5 U.S.C. § 557, authorizes the agency to make any

findings or conclusions that in its judgment are proper on the record,

notwithstanding different determination by examiner).

    The statutory requirement that courts review CFPB's administrative

decisions pursuant to a *Chevron* deference standard also do not impermissibly limit

judicial oversight.  *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984);

*Consumer Fin. Prot. Bureau*, 2015 U.S. Dist. LEXIS 28254, at *32-33.   *See

also In the Matter of Timbervest, LLC, et al.*, SEC Admin. Proc. File No. 3-15519.

    In addition, the various elements of the CFPB's remedial powers and

supervisory and enforcement jurisdiction over federal financial consumer

protection statutes are not novel or unusual; many administrative agencies are

vested with similar administrative enforcement authority and processes and are

empowered with broad remedial powers.  *See* GAO-04-280, *supra*, at 43, n. 27

("Banking regulators have broad enforcement powers and can take formal actions (cease and desist orders, civil money penalties, removal orders, and suspension orders, among others) or informal enforcement actions (such as memoranda of understanding and board resolutions).  Not all informal actions are publicly disclosed.").

## CONCLUSION

For these reason, this Court should uphold the CFPB's Administrative Enforcement Order.

Dated:  March 31, 2017                    Respectfully submitted,

                                          */s/ Julie Nepveu*
                                          Julie Nepveu
                                          DC Bar No. 458305
                                          William A. Rivera
                                          DC Bar No. 495725
                                          AARP Foundation Litigation
                                          601 E Street, NW
                                          Washington, DC  20049
                                          202-434-2060
                                          jnepveu@aarp.org

                                          *Counsel for Amici Curiae AARP and*
                                          *AARP Foundation*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and Circuit Rule 32(a)(2) because: this brief contains 6,226 words, (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)) as determined by the word counting feature of Microsoft Office Word 2010).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 14 point Times New Roman font.

Dated:  March 31, 2017          /s/ *Julie Nepveu*
                                Julie Nepveu

                                *Counsel for Amici Curiae AARP and*
                                *AARP Foundation*

**CERTIFICATE OF SERVICE AND FILING**

I hereby certify that on March 31, 2017 the foregoing Brief of Amicus

Curiae AARP Supporting Respondent, Consumer Financial Protection Bureau, was

electronically filed with the Clerk of the Court for the United States Court of

Appeals of the D.C. Circuit using the appellate CM/ECF system which will send

notice of such filing to the following registered CM/ECF users:

/s/ *Julie Nepveu*
Julie Nepveu

*Counsel for Amici Curiae AARP and*
*AARP Foundation*
