**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| HELEN KRUKAS, *et al.*, |
| Plaintiffs, |
| v. |
| AARP, INC., *et al.*, |
| Defendants. |

Civil Action No. 18-1124 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiffs Helen Krukas and Andrea Kushim have brought this putative class action against defendants AARP Inc., AARP Services Inc. ("ASI"), and AARP Insurance Plan ("AARP Trust") (collectively referred to as "AARP"), alleging a violation of the Washington D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.*, as well as common law claims of conversion, unjust enrichment, and fraudulent concealment, based on their purchase of a Medicare supplemental health insurance policy, also known as a "Medigap" policy, offered by UnitedHealthcare Insurance Company ("United") and administered by AARP. *See* First Am. Class Compl. ("FAC") ¶¶ 1–5, 120, 124, 128, 135, ECF No. 40.  These claims are predicated on plaintiffs' allegation that AARP wrongly retained a 4.95% "commission" on the sale of the insurance that AARP was not entitled to receive, *id.* ¶ 1, and that AARP misled plaintiffs into buying their insurance policies by failing to disclose the nature and extent of its financial interest in the sale of AARP Medigap policies, *id.* ¶ 5.

Following more than a year of discovery, defendants have now moved for summary judgment.  *See* Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 95; Defs.' Mem. Supp. Mot.

Summ. J. ("Defs.' Mem."), ECF No. 96.  Defendants' first Motion to Dismiss ("Defs.' First MTD"), ECF No. 8, was denied because plaintiff Krukas adequately alleged financial harm constituting injury in fact and alleged facts sufficient to plead each count.  *Krukas v. AARP, Inc.* ("*Krukas I*"), 376 F. Supp. 3d 1, 34, 36–37 (D.D.C. 2019).[1]  Now, with a more fully developed record and the heightened burden at summary judgment, plaintiffs have failed to establish any concrete injury stemming from defendants' conduct.  They do not argue that their AARP Medigap insurance would have been less expensive were AARP to retain a lower payment or adopt a more limited role in the sale of AARP Medigap insurance, nor do they present any evidence of a lower-priced comparable Medigap insurance policy that they could have purchased had the payment been disclosed and prompted them to look elsewhere for comparable coverage.

Accordingly, this Court now joins numerous others that have rejected similar claims brought by AARP Medigap policyholders against AARP.  *See Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 192 (2d Cir. 2020), *aff'g*, 401 F. Supp. 3d 231 (D. Conn. 2019); *Friedman v. AARP, Inc.*, No. 14-34-DDP, 2019 WL 5683465, at *6 (C.D. Cal. Nov. 1, 2019), *appeal dismissed*, No. 19-56386, 2020 WL 2732230 (9th Cir. Mar. 26, 2020); *Nichols v. AARP, Inc.*, No. 20-cv-6616-JSC (N.D. Cal Feb. 19, 2021), *appeal dismissed*, No. 21-15364 (9th Cir. Aug. 23, 2021).  Defendants' motion is granted, and the case is dismissed for lack of standing.[2]

## I.    BACKGROUND

The factual allegations underlying plaintiffs' claims are described in detail in two prior decisions, *see generally Krukas I*, 376 F. Supp. 3d 1; *Krukas v. AARP, Inc.* ("*Krukas II*"), 458 F.

---

[1]    Plaintiff Krukas was the only named plaintiff in the original complaint, *see* Class Compl. ("Compl.") ¶ 20, ECF No. 1, with plaintiff Kushim added as an additional named plaintiff in the first amended complaint, *see* FAC ¶ 23.

[2]    Also pending is plaintiffs' Motion for Class Certification ("Pls.' Mot."), ECF No. 56, which was stayed pending resolution of defendants' motion for summary judgment, Min. Order (July 23, 2021).  This motion will be denied as moot upon dismissal of the case.

Supp. 3d 1 (D.D.C. 2020), and thus are reviewed below only as relevant to resolution of the pending motion, followed by this case's procedural history.

### A.    Factual Background

Despite vigorous disagreements between the parties about how to characterize certain facts, the details of the AARP Medigap program and key features of its administration, as well as plaintiffs' experience with the program, are not materially disputed by the parties, as explained next.

### 1)    *The AARP Medigap Program*

Defendant AARP, Inc. is a nonprofit membership organization for Americans over the age of 50.  *See* Defs.' Statement of Undisputed Material Facts Supp. Mot. Summ. J. ("Defs.' SMF") ¶ 1, ECF No. 97 (public); Pls.' Corrected Statement of Add. Material Facts ("Pls.' SAMF") and Pls.' Counter-Statement of Genuine Issues ("Pls.' SMF") ¶ 1, ECF No. 113-1 (public).[3]  Medigap insurance is a form of supplemental coverage for healthcare costs not covered by Medicare.  Defs.' SMF ¶ 4 (citing 42 U.S.C. § 1395ss(g)(1)).  Since 1998, United has "offered Medigap coverage to AARP members under a group policy issued to [defendant AARP Trust], a grantor trust that serves as the group policyholder."  Defs.' SMF ¶ 5; *see also* Pls.' SMF ¶ 5.  In collaboration with AARP, United "offers Medigap coverage to AARP members across the nation in all 50 states, four territories, and the District of Columbia."  Defs.' SMF ¶ 7; Pls.' SMF ¶ 7.

---

[3]        Both parties have filed sealed versions of their statements of material facts, docketed at ECF No. 100-1 (Defs.' SMF) and ECF No. 114-2 (Pls.' SMF) respectively.  Insofar as sealed content is referenced in this Memorandum Opinion, it is unsealed to the limited extent necessary to explain the Court's reasoning, *see United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009), or has already been disclosed in connection with this and other litigation, *see generally Krukas I*, 376 F. Supp. 3d 1; *Krukas II*, 458 F. Supp. 3d 1.  Plaintiffs' statement of material facts contains two documents with repeating paragraph designations in the same ECF filing.  The two documents are cited separately.

AARP is not a licensed insurance broker or agent, but instead helps administer and promote the AARP-branded Medigap program through its subsidiary ASI and serves as the group policyholder through AARP Trust. *See* Defs.' Sealed SMF ¶¶ 14, 18; Pls.' Sealed SMF ¶ 14. An agreement between AARP and United governs the administration of their Medigap program. Pls.' SAMF ¶ 4. Under the agreement, AARP grants United a license to use its intellectual property in connection with the program, and in exchange AARP receives 4.95% of the total premium revenues, which AARP characterizes as a royalty for use of its intellectual property. Defs.' Sealed SMF ¶¶ 8, 26; Pls.' SMF ¶ 8.[4] AARP, through ASI, also plays a role in reviewing and approving marketing materials and plays a role in developing brand strategy, Pls.' Sealed SMF ¶ 14, and owns all Medigap marketing materials. Pls.' Sealed SAMF ¶ 42. Additionally, the agreement requires that the "AARP marks" be "dominant." *Id.*; *see also* Pls.' Sealed SMF ¶ 16. AARP member data is used to "identify AARP members for direct mail and other advertising efforts," Defs.' SMF ¶ 17, and ASI informs AARP of the existence of the AARP Medigap program, Defs.' Sealed SMF ¶ 24. AARP uses its position as a trusted advocate for its members to distinguish the AARP Medigap policy from other Medigap programs. Pls.' SAMF ¶¶ 37–38.[5]

AARP Trust serves as the group policyholder, collects premiums from policyholders, and distributes the premiums between AARP and United. Defs.' Sealed SMF ¶ 18; Pls.' Sealed SMF

---

[4]     Plaintiffs dispute characterizing the payment retained by AARP as a "royalty," contending that this payment is better characterized as a "commission" because, plaintiffs allege, AARP solicits insurance and engages in other activities beyond the mere licensing of its intellectual property. *See* Pls.' SMF ¶¶ 8–9, 35. Regardless of how the payment retained by AARP is characterized, however, plaintiffs have not established that they suffered an injury as a result of defendants' conduct. In other words, this dispute is not material, and the payment is described as a "royalty" in this opinion.
        The royalty rate was previously 4.9% rather than 4.95%, *see* Pls.' Sealed SMF ¶ 26; Defs.' Sealed SMF ¶ 26, but this fact is not material.
[5]     Plaintiffs dispute whether defendants' involvement in the marketing and sale of AARP Medigap insurance amounts to "soliciting insurance," *compare, e.g.*, Defs.' Sealed SMF ¶ 14, *with* Pls.' Sealed SMF ¶ 14, but, again, this dispute is not material to resolve the pending motion for summary judgment.

¶ 18.  The Trust transfers the 4.95% royalty to AARP, Inc. pursuant to the terms of the

agreement before transferring the remainder to United.  Defs.' Sealed SMF ¶ 18; Pls.' Sealed

SMF ¶ 18; Pls.' Sealed SAMF ¶¶ 8–9.[6]  The portion transmitted to United is used to cover

claims and expenses and pays United's "risk and profit" charge, which is United's profit on the

premiums.  Defs.' Sealed SMF ¶ 11; Pls.' Sealed SAMF ¶¶ 8–9.  Any remaining funds go into a

Rate Stabilization Fund ("RSF"), which is used at least in part to stabilize rates.  Defs.' Sealed

SMF ¶ 11; Pls.' Sealed SMF ¶ 11.

     The rates for the AARP Medigap program are ultimately determined by state regulators,

Defs.' SMF ¶ 39, which annually evaluate and approve the rates proposed by United in

consultation with AARP, Defs.' Sealed SMF ¶ 41; Pls.' Sealed SMF ¶ 41.  State regulators,

including those in the states where plaintiffs purchased their insurance, review each rate to

ensure it is reasonable and meets applicable loss-ratio standards, Defs.' SMF ¶ 44, which

generally require insurers to spend at least 75% of premium revenue on benefits, *id.* ¶ 45.

Medigap plans may charge only the approved rate.  *Id.* ¶ 46.

     Medigap plans traditionally compete on price, Pls.' Sealed SAMF ¶ 38, because federal

law specifies the benefits that insurers must offer in their Medigap plans, Defs.' SMF ¶ 36 (citing

42 U.S.C. § 1395ss(p)).  Defendants contend that AARP Medigap insurance is frequently among

the lowest in plaintiffs' home states.  Defs.' SMF ¶ 106.  Plaintiffs counter that a majority of

AARP members over the age of 65 would find lower rates from other Medigap insurers, but do

---

[6]    Plaintiffs dispute whether the fee is properly characterized as being paid by United or by the policyholders themselves, *compare* Defs.' Sealed SMF ¶¶ 18, 26, 34 *with* Pls.' Sealed SMF ¶¶ 18, 26, 34; Pls.' Sealed SAMF ¶ 33, but, again, this dispute is immaterial because regardless of how the funds move between policyholders, defendants, and United, plaintiffs concede that (1) the AARP royalty is simply a portion of policyholders' regulator-set and agreed-upon premiums rather than an additional fee, *see* Pls.' Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n") at 2-3, ECF No. 113; Pls.' Sealed SMF ¶¶ 18, 36, and (2) AARP's retention of the royalty is purely a consequence of its agreement with United that governs the administration of the Medigap program, *see* Pls.' SMF ¶¶ 22, 34.  *See also infra* Part III.B.1.  Put simply, while these facts about the royalty payment are material, the precise sequence of events by which ownership over the funds is transferred is not.

not indicate how the premiums would have compared in plaintiffs' home states during the relevant time period.  Pls.' Sealed SMF ¶ 10.

AARP's marketing materials disclose the royalty to prospective insureds, stating that "UnitedHealthcare Insurance Company pays royalty fees to AARP for the use of its intellectual property.  These fees are used for the general purposes of AARP.  AARP and its affiliates are not insurers."  Defs.' SMF ¶ 66; Pls.' SAMF ¶ 67.  The marketing materials do not indicate the royalty rate.  Defs.' Sealed SMF at ¶ 67.[7]  Plaintiffs assert that this disclosure (1) mischaracterizes what is effectively a commission as a royalty, Pls.' SMF ¶ 35; (2) misstates the purpose of the royalty, which they allege is to compensate AARP for soliciting its members, *id.* ¶ 66; and (3) misstates AARP's role in the program, *id.  See also* Pls.' SAMF ¶¶ 69–70.

### 2)  *Plaintiffs' Experience with AARP Medigap*

The two named plaintiffs used AARP Medigap policies for over four years, with one plaintiff still enrolled in this program.  Plaintiff Helen Krukas enrolled in a Louisiana AARP Medigap Policy in 2011, Defs.' SMF ¶ 82, and remained enrolled in this plan through March 2016, *id.* ¶ 87.  She then enrolled in a Florida AARP Medigap plan when she moved to Florida, *id.* ¶ 89, and kept that plan until she switched to a different high-deductible Medigap plan offered by another insurer, *id.* ¶ 90.  Plaintiff Krukas did not compare Medigap premium rates or comparison shop until she switched providers in 2016.  *Id.* ¶ 91.  She explains that she "always thought of AARP as a club that negotiates on the behalf of […] retired people, of its members" and "it didn't even occur to [her] to look anyplace else.  And had [she] known that they were receiving money for it, [she] would have gone and shopped around with other brokers."  Pls.' SMF ¶¶ 91, 94.

---

[7]      Defendants assert that the royalty rate is proprietary, Defs.' Sealed SMF at ¶ 67, but it has been disclosed in connection with this and other litigation, *see generally Krukas I*, 376 F. Supp. 3d 1.

Plaintiff Andrea Kushim enrolled in a Michigan AARP Medigap plan in 2017 and is still enrolled in AARP Medigap today.  Defs.' SMF ¶¶ 92, 94; Pls.' SMF ¶ 94.  She concedes that she did not comparison shop when purchasing the insurance and has not done so in the intervening years.  Defs.' SMF ¶ 94; Pls.' SMF ¶ 94.  Plaintiff Kushim nevertheless asserts that if she had known about the magnitude of the royalty, she might have compared the policy to that of another insurer.  Pls.' SMF ¶ 97.

The plaintiffs concede that they received the exact insurance that they bargained for at the exact price they agreed to pay.  Defs.' SMF ¶ 99.  In other words, plaintiffs knew what they were paying for and how much they were paying, and received a disclosure indicating that AARP would receive a payment, but neither plaintiff knew the magnitude of the royalty payment made to AARP at the time they purchased the AARP Medigap policies.  Pls.' SMF ¶ 99; Pls.' SAMF 72.

## B.    Procedural Background

On May 10, 2018, plaintiff Krukas filed the original complaint, "individually, and on behalf of all others similarly situated," challenging the role of defendants AARP in soliciting, marketing, and administering a supplemental Medicare health insurance program, known as a "Medigap" program.  *See* Compl. at 1.  That original complaint raised four claims: Count One alleged that AARP violated the CPPA by misrepresenting material facts about the 4.95% payment and about AARP's lack of license as an insurance broker or agent.  *Id.* ¶¶ 92–103.  Count Two alleged that defendants' conversion of her ownership right to the 4.95% payment entitled her to damages in the amount she was wrongfully charged.  *Id.* ¶¶ 104–07.  Count Three alleged unjust enrichment based on defendants' retention of the 4.95% payment from plaintiff.  *Id.* ¶¶ 109–11.  Finally, Count Four alleged fraudulent concealment because defendants

concealed or failed to disclose the 4.95% payment, a material fact that defendants should have known should be disclosed or not concealed and that defendants concealed despite defendants' "duty to speak." *Id.* ¶¶ 112–18.

Defendants moved to dismiss this original complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that the complaint's factual allegations were insufficient to support any of plaintiff's claims. *See* generally Defs.' First MTD. Additionally, defendants challenged the justiciability of plaintiff's claims under: (1) the primary jurisdiction doctrine; (2) the filed-rate doctrine; and (3) operation of the applicable statute of limitations. *See id.* at 1. Finally, defendants raised choice-of-law issues as to whether Florida, Louisiana, or District of Columbia law applied to the suit. *See id.*

Defendants' motion to dismiss was denied in *Krukas I*. As to defendants' first proposed ground for dismissal, the Court concluded that the primary jurisdiction doctrine did not require staying or dismissing the CPPA and common law claims because those issues—whether the advertising was deceptive or misleading, and the related common law claims of conversion, unjust enrichment, and fraudulent concealment—did not require agency expertise, but rather were regularly the subject of judicial review. *Krukas I*, 376 F. Supp. 3d at 15–17. Next, the Court held that the filed-rate doctrine, which bars certain suits challenging the reasonableness of regulatory rates approved by administrative bodies, *see id.* at 17–20, did not bar plaintiff's claims, *id.* at 20–26. Assuming without deciding that the filed-rate doctrine "extend[ed] beyond comprehensive federal regulatory schemes" to "a case raising state-law claims implicating state-regulated insurance rates," *id.* at 20, the Court concluded that even though the suit "ha[s] *some* relation to filed rates for state insurance coverage," the complaint attacks not the reasonableness of rates filed by United and approved by the applicable state insurance regulator but instead the

"fraudulent misrepresentation" of "a third-party doing business with" the entity whose rates are regulated.  *Id.* at 22 (emphasis in original).  Moreover, plaintiff's claims did not implicate the filed-rate doctrine because should plaintiff prevail on her claims, "no change to UnitedHealth's rates would necessarily follow."  *Id.*

After determining that District of Columbia law governed the dispute, *see id.* at 27–32, the Court further deemed "dismissal for statute of limitations reasons . . . not appropriate at this time" since key facts remained "unknown."  *Id.* at 32–34. [8]  Then, drawing all inferences in plaintiff's favor, plaintiff Krukas was found to have sufficiently alleged an injury in fact to support standing because she alleged that she had been "misled . . . into paying an illegal 4.95% commission."  *Id.* at 36.  As such, the Court held that the original complaint plausibly stated a claim for relief on each of the four counts.  *Id.* at 34–47.

After the denial of defendants' first motion to dismiss, plaintiffs filed, with defendants' consent, their First Amended Complaint, which added a breach of fiduciary duty claim to the four claims in the initial complaint.  *See* FAC ¶¶ 117–20.  Defendants subsequently filed a second motion to dismiss, challenging Count II of the FAC, alleging fraudulent concealment.  *See* Defendants' second Motion to Dismiss ("Defs.' Second MTD"), ECF No. 42.  This motion was granted because the FAC did not plausibly allege the necessary fiduciary relationship between the plaintiffs and any defendant.  *See Krukas II*, 458 F. Supp. 3d at 7–12.

A scheduling order was entered with the parties' proposed schedule, originally culminating with the filing of any motions for summary judgment on July 10, 2020.  *See* Min. Order (Apr. 3, 2019).  The discovery schedule was extended five times on the joint request of the

---

[8]      Under the choice-of-law analysis, the Court found that even assuming a conflict existed among the laws of Florida, Louisiana, and the District of Columbia, "consideration of the 'governmental interest' and 'significant relationship' tests confirms that the plaintiff's claims are governed by District of Columbia law."  *See id.* at 28.

parties, *see* Min. Order (Aug. 23, 2019); Min. Order (Feb. 7, 2020); Min. Order (May 1, 2020); Min. Order (Aug. 18, 2020); Min. Order (Apr. 14, 2021), so discovery has now been ongoing for well over a year.

### C.    Pending Claims

Plaintiffs have four live claims remaining in their amended complaint.  In Count I, plaintiffs claim that AARP violated the CPPA, D.C. Code § 28-3901 *et seq.*, by (1) misrepresenting material facts concerning the 4.95% royalty and AARP's stake in the sale of AARP Medigap insurance, and (2) engaging in an unlawful trade practice by collecting a "commission" when it was not a licensed insurance broker or agent in any of the relevant jurisdictions.  FAC ¶ 109.  Plaintiffs allege financial harm from these unlawful trade practices and being "deprived of truthful information regarding their choice" of Medigap policies, *id.* ¶ 113, because (1) they "would have sought out and paid less for their Medigap coverage" and (2) they "paid AARP a 4.95% commission that AARP is not legally entitled to as it is not a licensed insurance agent or broker," *id.* ¶ 110.

In Count Three, plaintiffs claim defendants' conversion of their "ownership right to the 4.95% of their payments that was wrongfully charged and illegally diverted to AARP as a commission," *id.* ¶ 122, resulted in damages in the amount of the premium for which they were wrongfully charged, *id.* ¶ 124.

In Count Four, plaintiffs allege unjust enrichment, based on their conferral of a benefit to the defendants "in the form of the hidden 4.95% charge on top of their monthly premium payments that were unlawfully and deceptively charged and illegally diverted to AARP as a commission."  *Id.* ¶ 126.  Defendants allegedly "voluntarily accepted and retained this benefit," *id*. ¶ 127, which was collected "without proper disclosure" and "amounted to a commission in

violation of" District of Columbia law, *id.* ¶ 128, such that defendants' retention of this benefit without paying its value to plaintiffs would be "inequitable," *id.*

Finally, in Count Five, plaintiffs allege fraudulent concealment stemming from AARP's "conceal[ing] or fail[ing] to disclose [the] material fact" that AARP was collecting a 4.95% commission, *id.* ¶ 130, that AARP "knew or should have known that this material fact should be disclosed or not concealed," *id.* ¶ 131, that it concealed the fact "in bad faith," *id.* ¶ 132, in spite of its "duty to speak," *id.* ¶ 135, and that it thereby "induced [plaintiffs] to act by purchasing an AARP-endorsed Medigap plan," *id.* ¶ 133.  Plaintiffs claim to have suffered damages as a result of this fraudulent concealment, *id.* ¶ 134.

As relief, plaintiffs' amended complaint seeks an order: (1) "requiring AARP to restore all money or other property" taken by means of unlawful acts or practices, *id.* at 35; (2) "requiring the disgorgement of all sums taken from consumers by means of deceptive practices, together with all proceeds, interest, income, and accessions," *id.*; (3) certifying a proposed class of "[a]ll persons in the United States who purchased or renewed an AARP Medigap Policy" between 2011 and the present, *id.* ¶ 97, with plaintiffs as Class Representatives and their counsel as Class Counsel, *id.* at 35; and (4) awarding court costs and reasonable attorneys' fees and any other relief the Court deems just and proper, *id.*  Plaintiffs also seek injunctive relief barring defendants from engaging in the "wrongful acts and practices" alleged.  *Id.* ¶ 116.

### D.  Pending Motions

On January 8, 2021, plaintiffs filed a motion to certify a class consisting of "[a]ll persons in the United States who purchased or renewed an AARP Medigap Policy between January 1, 2011, and the present," with limited exceptions.  Pls.' Mot. ¶ 1.  With that motion pending, defendants filed the pending motion for summary judgment on July 22, 2021.  *See* Defs.' Mot.

Consideration of plaintiffs' motion for class certification was stayed pending resolution of defendants' motion for summary judgment, *see* Min. Order (July 23, 2021), which motion is now ripe for resolution.[9]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A genuine issue of material fact exists 'if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party.'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Hairston v. Vance-Cooks*, 773 F.3d 266, 271 (D.C. Cir. 2014)).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts, supported by materials in the record, that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (internal quotation marks and citation omitted)); FED. R. CIV. P. 56(c), (e)(2)–(3).

---

[9]     Defendants' request for oral argument is denied because the briefing is sufficient to resolve the pending motion. *See* D.D.C. Local Civil Rule 7(f) (allowance of an oral hearing is "within the discretion of the Court").

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (internal quotation marks omitted) (alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255). Courts "may not make credibility determinations or weigh the evidence," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (internal quotation marks and citations omitted), since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation marks and citation omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

The fact that a plaintiff's testimony is uncorroborated is immaterial for purposes of summary judgment, since "[c]orroboration goes to credibility, a question for the jury, not the district court." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016). Nonetheless, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks omitted); *accord* FED. R. CIV. P. 56(e). If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v.*

13

*Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

## III.   DISCUSSION

Defendants move for summary judgment on three grounds, arguing that (1) plaintiffs lack standing to pursue any of their claims, Defs.' Mem. at 16; (2) the filed-rate doctrine bars plaintiffs' claims, *id.* at 24, and (3) they are entitled to judgment as a matter of law on each of plaintiffs' claims, *id.* at 28.  Only the first ground need be addressed.  Plaintiffs have failed to establish the threshold requirement of Article III standing to invoke the jurisdiction of the Court, and thus defendants' motion for summary judgment must be granted.

### A.   Article III Standing

"[F]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'"  *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see also Gunn v. Minton*, 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))).

Article III requires a plaintiff to establish "the irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), by showing "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial

relief," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at

560–61); *see also Louie v. Dickson*, 964 F.3d 50, 54 (D.C. Cir. 2020).  "The absence of any one

of these three elements defeats standing."  *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir.

2010).  The "plaintiff must maintain a personal interest in the dispute at every stage of litigation

. . . and must do so 'separately for each form of relief sought,'" *Uzuegbunam v. Preczewski,* 141

S. Ct. 792, 801 (2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services

(TOC), Inc.*, 528 U.S. 167, 185 (2000), and citing *Lujan*, 504 U.S. at 561).  This requirement

reflects the requirement under Article III that a federal court may only resolve "a real

controversy with real impact on real persons."  *TransUnion*, 141 S. Ct. at 2203 (quoting *Am.

Legion v. Am. Humanist Assn.*, 139 S. Ct. 2067, 2103 (2019)).  When "[w]inning or losing [the]

suit would not change" the benefits to which plaintiffs are entitled, they "have no concrete stake

in [the] dispute and therefore lack Article III standing."  *See Thole v U.S. Bank, N.A.*, 140 S. Ct.

1615, 1622 (2020).

### B.    Plaintiffs Have Not Suffered a Concrete Injury to Pursue Damages or Other Monetary Relief

Defendants argue that plaintiffs have failed to meet the first two requirements for Article

III standing by failing to establish any concrete injury and, even if they had, by failing to show

any such injury would have been caused by defendants' conduct.  Defs.' Mem. at 17.  In

defendants' view, plaintiffs "received the benefit of their bargain"—the insurance product they

were happy with at the agreed-upon, regulator-approved rate—and therefore have no "cognizable

injury."  *Id.*

Plaintiffs respond that they have experienced three distinct kinds of injury.  As one type

of injury, they posit that they have suffered monetary damages because defendants

"misrepresented and concealed their financial interest in their transaction with [p]laintiffs which

allowed them to collect money from [p]laintiffs that they never bargained to pay," and that the amount defendants collected was "inflated." Pls.' Opp'n at 18.[10]  Relatedly, they also argue that defendants have "wrongfully retained [their] money," *id.* at 14, "through deceptive practices and/or without the required insurance licensing," *id.* at 15.  Even if they have not suffered monetary damages, plaintiffs contend that they have standing to pursue their common-law and CPPA claims insofar as they seek as relief the return of converted money and restitution.  Third, plaintiffs argue that defendants' alleged misrepresentations deprived plaintiffs of information in a way that "distort[ed] the competitive landscape for making purchasing decisions," such that they lost the opportunity to consider comparable but cheaper insurance policies.  *Id.* at 23.  Each proposed theory of injury falls short of establishing standing.

### 1)   *Plaintiffs Have Not Experienced A Monetary Harm*

Plaintiffs contend that they have suffered a monetary harm stemming from defendants' conduct because defendants "misrepresented and concealed their financial interest in their transactions with [p]laintiffs which allowed them to collect money from [p]laintiffs that they never bargained to pay." *Id.* at 17 (citing Pls.' SMF ¶¶ 22, 23, 28, 29, 66–70).

As support for this injury theory, plaintiffs characterize the money received by defendants as a "pay[ment] for a charge that [plaintiffs] did not owe." *Id.* at 18.  Plaintiffs have conceded, however, that the money received by defendants—regardless of whether it is properly conceived of as a royalty or a commission—is not a surcharge or an additional fee, *see* Defs.' SMF ¶¶ 104–05; Pls.' SMF ¶¶ 104–05, but rather a part of the regulator-approved insurance premiums that plaintiffs and all purchasers of the AARP Medigap plan agree to pay, *see* Pls.' SMF ¶ 36, and that the royalty reflects a rate negotiated between AARP and United, *see id.* ¶ 18.

---

[10]   Importantly, plaintiffs challenge only the amount defendants collected, not the premiums they paid.  *See, e.g.*, Pls.' SMF ¶ 36.

*See also* Pls.' Opp'n at 44 n.39 ("Plaintiffs have always maintained that they send one payment for the insurance premium."); FAC ¶ 10 (asserting that "'the member contribution amount' [p]laintiffs and Class Members paid monthly to AARP included an *embedded* 4.95% commission payment to AARP" (emphasis added)).  Plaintiffs have abandoned their initial allegation—wholly unsupported by the record and contradicted by other allegations in their pleading—that the royalty was "secretly charged *on top of* their insurance premiums."  FAC ¶ 12 (emphasis added).

Plaintiffs argue that they "did not bargain to pay AARP's commission" and that "AARP extracted it anyway (at an inflated rate)."  Pls.' Opp'n at 19.  Yet, the amount paid to AARP is simply a part of the total cost of the insurance that plaintiffs happily purchased.  Plaintiffs do not pay a commission separate from the cost of the product any more than a purchaser of *any* product pays for the individual goods and services that go into making that product—the royalty is *part* of the cost.  Having chosen to pay a certain amount for their Medigap insurance, the exact percentage of that amount defendants retained is immaterial to plaintiffs' choice.  To the extent plaintiffs believe that the amount defendants retain pursuant to their agreement with United is "inflated," *see id.* at 18, United—not plaintiffs—is the contractual party with an interest in lowering the fee, *see* Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply") at 8, ECF No. 109.  For example, a consumer has no cognizable interest in what a general contractor pays a subcontractor, or what the manufacturer of a product pays an outside marketing firm.  Similarly, plaintiffs here have no interest in the payment United makes to defendants.  Regardless of the precise flow of money, plaintiffs knowingly paid a certain amount for insurance, and a portion of that amount went to defendants pursuant to the agreement between defendants and United.

Plaintiffs' assertions that they have "pa[id] for a charge that they did not owe," Pls.' Opp'n at 18, or have been "fraudentl[ly] overbill[ed]," *id.* at 18 n.12, are simply unsupportable on this record.

Plaintiffs' assertion that they are directly paying defendants the royalty or commission, *see* Pls.' Opp'n at 18 (citing Pls.' SAMF ¶¶ 8–9), is immaterial.  As defendants correctly contend, "the mechanics of how United makes the royalty payment to AARP are irrelevant to the question of [p]laintiffs' standing."  Defs.' Reply at 9.  The fact that, pursuant to the agreement between defendants and United, the insurance premiums are collected by AARP Trust and then paid to AARP, Inc., rather than collected by United and then directly paid to AARP, Inc., is inconsequential.  Regardless of which entity collects the funds, plaintiffs have (1) agreed to pay certain insurance premiums and (2) a portion of those premiums are going to defendants pursuant to the terms of AARP's agreement with United.  Plaintiffs are incorrect, given the undisputed facts, that defendants are "extract[ing] money from [p]laintiffs," Pls.' Opp'n at 19, given that plaintiffs are merely paying the premium they agreed to pay.

For this reason, plaintiffs' reliance on *In re APA Assessment Fee Litig.*, 766 F.3d 39 (D.C. Cir. 2014), is misplaced.  In that case, the defendant organization—the American Psychological Association—allegedly misled its members into believing that they had to pay an additional "special assessment" fee that was expressly described as "MUST PAY" on the billing statement, but was not in fact a requirement for membership.  *Id.* at 43.  Plaintiffs alleged that defendants deceived them "into overpaying for APA membership."  *Id.* at 47.  The D.C. Circuit, in reversing dismissal of plaintiffs' unjust enrichment claim, concluded that this theory of harm was cognizable, determined that plaintiffs had plausibly alleged that they were misled into making an *additional*, unnecessary payment, and analogized this to mistaken overpayment of rent.  *Id.* (citing Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. c, illus. 9

(2011)).  By contrast here, there is no such overpayment.  Plaintiffs do not allege, let alone

present evidence, that they were charged *extra* because of defendants' arrangement with United

and the royalty.  Instead, as described above, plaintiffs challenge the *allocation* of the agreed-

upon payment for insurance, not the *amount* they paid.

Plaintiffs also cite *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338

(D.D.C. 2020), for the proposition that a plaintiff has standing to bring a misrepresentation claim

regardless of whether she is satisfied with the product or service she receives.  *See* Pls.' Opp'n at

20.  In that case, the district court rejected the argument that the plaintiff—who had undergone

fertility treatment at defendant's facility and thereafter been terminated discriminatorily as a

patient—lacked standing because she was satisfied with the way the previous treatments turned

out.  *Shady Grove Reprod. Sci. Ctr.*, 495 F. Supp. 3d at 411.  There, however, the plaintiff

alleged that if not for the defendant's misrepresentations, she would not have agreed to undergo

the procedure at the defendant's facility in the first place.  *Id.*  She was plainly unsatisfied with

the health provider's services.  Here, by contrast, plaintiffs concede that they are fully satisfied

with their health insurance.  *See* Pls.' Opp'n at 19 ("this case is not, and has never been, about

the insurance coverage [p]laintiffs received from UnitedHealth").

Second, plaintiffs make the conclusory assertion that "a lower royalty rate directly

benefits the insured class members."  *Id.* at 22 (citing Pls.' SAMF ¶ 33 (citing, in turn, Pls.'

Opp'n, Ex. R, Aug. 16, 2013 AARP Memorandum, ECF No. 114-14 (Sealed) and Pl.'s Opp'n,

Ex. B, Expert Report of Gregory Pinsonneault ¶ 130, ECF No. 114–5 (Sealed)).  This assertion

has no support in the record and has been repeatedly rejected by federal courts in similar cases.

*See Dane*, 974 F.3d at 192 (holding in affirming dismissal of CPPA claim against United and

AARP that the plaintiff "failed to show any concrete and particularized injury because he paid

only the regulator-approved rate and received the Medigap insurance he contracted for");
*Friedman*, 2019 WL 5683465, at *5 ("Plaintiffs' allegations of injury are based on the premise
that AARP was not entitled to receive a commission, however, absent allegations by plaintiffs
that they could have bought the same policy elsewhere for a lower price, they suffered no actual
injury." (internal quotation marks and citation omitted)).  Plaintiffs reason that if defendants
were paid a true "royalty" rather than a "commission," the payment would only be 0.5 percent,
Pls.' Sealed Opp'n at 22,[11] by assuming, without any apparent basis, that *consumers* would
experience lower prices, even in the face of their own concession that "none of [their recovery
theories] turn on the existence of any hypothetical lower rates charged by UnitedHealth," *id.* at
30; *see also* Pls.' SMF ¶ 36 ("This case does not challenge the setting or reasonableness of the
Medigap insurance rates.").  The flaw in the logic underlying this injury theory is obvious.  The
magnitude of the royalty is immaterial if it does not affect plaintiffs' premiums, and plaintiffs
have not only failed to present evidence on this front but have expressly disavowed this theory.[12]

Third, plaintiffs propose that they have an experienced an "economic harm" from the
unlicensed selling of insurance, Pls.' Opp'n at 17, but calling a perceived wrong an "economic

---

[11]    Plaintiffs filed a sealed version of Pls.' Opp'n, docketed at ECF No. 114. Insofar as sealed content is
referenced in this Memorandum Opinion, it is unsealed to the limited extent necessary to explain the Court's
reasoning.

[12]    Plaintiffs make the blanket assertion that "[t]ruthful disclosure would restore integrity to the market and, on
standard principles of economics, drive prices down," Pls.' Opp'n at 27, but this assertion is unsupported by record
evidence, is conclusory, and relies only on authorities describing the benefits of *price transparency*, *see id.* at 27
n.18, and defendants obviously disclose the relevant premium prices.
        Even if plaintiffs' assertion were understood to suggest that the AARP Medigap premiums would decrease,
this argument is not compelling.  As defendants persuasively argue, "United would have been entitled to propose the
same premium rates and retain the revenue not spent on the royalty as profit or spend it on alternative marketing
programs or other expenses."  Defs.' Mem. at 21; *see also id.* at 22 (arguing that "[w]ithout the benefit of AARP's
branding and member data, United would have had to account for additional marketing and consumer-acquisition
costs).  Other courts have rightly rejected conjecture about passed-on savings, noting that such an expectation "lacks
real world credibility."  *Friedman*, 2019 WL 5683465, at *6 ("In lieu of passing on all or some portion of such
savings, businesses may, for example, reduce debt, increase employee compensation, increase advertising
expenditures, invest in new products or business opportunities—all the while being mindful of what competitors are
doing in the marketplace.").

harm" does not make it so.  This is insufficient to establish injury in fact because it is not a "concrete, direct, real, and palpable" injury.  *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297 (D.C. Cir. 2007).  The District of Columbia has an interest in adherence to its licensing provisions.  *See* D.C. Code § 31-2502.42 (setting out penalties for violations of, *inter alia*, D.C. Code § 31-2502.31, prohibiting insurance commissions paid to unlicensed persons).  Absent any complaint about the services rendered or allegation that plaintiffs would have sought insurance elsewhere because of defendants' unlicensed status, the fact that defendants were unlicensed is insufficient to establish injury in fact.  *Compare Tolson v. The Hartford Fin. Servs. Grp., Inc.*, 278 F. Supp. 3d 27, 38 & n.10 (D.D.C. 2017) (holding that the plaintiff had no concrete interest in her massage therapist being licensed), *with Mann v. Bahi*, 251 F. Supp. 3d 112, 119 (D.D.C. 2017) (holding that the plaintiff had standing where he alleged, in an sworn affidavit, that he would not have hired a nursing service if he had known that it was "required to be, but was not, licensed by the D.C. Department of Health" *and* where nurses referred by the service were alleged to provide subpar care); *see also TransUnion*, 141 S. Ct. at 2206 ("An uninjured plaintiff who sues [without having suffered any physical, monetary, or cognizable intangible harm] is, by definition, not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's 'compliance with regulatory law' (and, of course, to obtain some money via [] statutory damages).).")  Plaintiffs concede that economic harm is necessary for a claim based on unlicensed sale to be cognizable, *see* Pls.' Opp'n at 17 (distinguishing *Tolson* only on the ground that plaintiffs have suffered an economic harm), but have demonstrated no economic harm.[13]

---

[13]     Plaintiffs cite *Djourabchi v. Self*, 571 F. Supp. 2d 41, 52 (D.D.C. 2008), for the proposition that a person or entity may be liable for conversion or any other common-law tort simply by providing services without complying with the law governing the provision of those services.  This case not only predates *Spokeo v. Robins*, 578 U.S. 330 (2016), and *TransUnion*, but does not address standing at all. Furthermore, it is easily distinguishable because in that

This theory also fails as to causation because even if plaintiffs have suffered an injury in fact, there is no reason that any injury they experienced would have been a result of defendants' alleged solicitation of insurance without a license.  Plaintiffs have not alleged in their amended complaint—nor is there any evidence in the record—that they would have declined to purchase the AARP Medigap policy had they known that AARP was not a licensed insurance agent, nor do they allege any harm plausibly connected to the fact that defendants were allegedly engaging in the unlicensed solicitation of insurance.[14]  When a consumer obtains the benefit of her bargain, the purchase of an unlicensed good or service is not itself an injury in fact.

2)  ***Plaintiffs' Common-Law Causes of Action and the Requested Remedy of Restitution Provide No Independent Basis for Standing***

Plaintiffs assert another, more attenuated theory of standing predicated on their claims for conversion, unjust enrichment, and for restitution under the CPPA, arguing that they are entitled to relief because defendants "took or received money that did not belong to them." *Id.* at 15; *see also id.* at 15 n.6 (quoting D.C. Code § 28-3905(k)(2)(E) (authorizing "relief as may be necessary to restore to the consumer money . . . which may have been acquired by means of the unlawful trade practice")).  This injury theory does not withstand analysis to confer standing.

Plaintiffs' conversion claim seeks damages in the "amount of the premium for which [plaintiffs] were unlawfully and additionally charged," FAC ¶ 124, even though plaintiffs have

---

case, the defendant contractor expressly held himself out as licensed in D.C. in a signed contract, and plaintiffs relied on that misrepresentation.  *Id.* at 49.  Here, there is no dispute that Medigap materials clearly disclosed that United, not AARP, was the insurer.  *See* Defs.' SMF ¶ 66; Pls.' SMF ¶ 66.

[14]     Plaintiffs also cite *Williams v. First Gov't Mortg. & Inv'rs Corp.*, 225 F.3d 738, 745 (D.C. Cir. 2000) (holding that the amount of damages under the CPPA need not turn on whether the plaintiff "had better options" than defendant agency's loan offerings, but could be measured by the amount of fees and expenses which the defendant agency—which the court found had acted predatorily—had charged plaintiff). *See* Pls.' Opp'n at 22. *Williams*, however, did not address the issue of standing, and as defendants rightly note, "[t]he case hardly stands for the proposition that [p]laintiffs need not show an injury in fact before being awarded the amount of fees they claim to be illegal." Defs.' Reply at 8 n.6.

failed to show that the amount paid to defendants was an "additional" charge or in any way increased their premiums. *See supra* Part III.B.1. Nonetheless, plaintiffs contend that defendants wrongfully exercised control over their money by (1) charging an additional commission and (2) misleading them into paying the commission, Pls.' Opp'n at 15, 43, and that defendants ought to return that amount, *id.* at 15 n.7. Plaintiffs suffer no harm, however, simply because they object to the ultimate recipient of a portion of their premium, *see supra* Part III.B.1, or because of the conclusory assertion that they *might* have sought insurance elsewhere and *might* have found a better price had they been presented with a more comprehensive disclosure, *see infra* Part III.B.3.

This leaves plaintiffs' unjust enrichment claim. Unjust enrichment is different from other claims because it does not require any harm to befall the plaintiff. Restatement (Third) of Restitution & Unjust Enrichment ("Restatement") § 1. An unjust enrichment claim under District of Columbia law requires plaintiffs to allege that they (1) conferred a benefit on defendants; (2) defendants retained the benefit that was conferred; and (3) it would be unjust for defendants to retain the benefit under the circumstances. *Euclid St., LLC v. D.C. Water & Sewer Auth.*, 41 A.3d 453, 463 n.10 (D.C. 2012). The doctrine applies "when a person retains a benefit (usually money) which in justice and equity belongs to another." *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016) (internal quotation marks omitted) (quoting *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C. 2005)). The enrichment of defendants must, however, come at the *expense* of plaintiffs. *Peart v. D.C. Hous. Auth.*, 972 A.2d 810, 815 (D.C. 2009) (framing the question of unjust enrichment as "whether refusing to permit [plaintiff] to recover the value of the benefit she conferred on [defendant] enriches it at her expense"); Restatement § 1 ("A person who is unjustly enriched at the expense

of another is subject to liability in restitution.").  In this context, "expense" does not necessarily refer to a loss experienced by plaintiffs, but also encompasses violations of their rights that do not result in any financial loss.  *Id.* § 1 cmt. a ("While the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss.").

Even if plaintiffs need not establish a *monetary loss* to have standing, they still must allege that defendants' gains were predicated on a violation of plaintiffs' individual rights, that is, that the violation is "particularized" to plaintiffs and that defendants' unjust gains were caused by the violation of plaintiffs' rights.  *Lujan*, 504 U.S. at 560.  Even if defendants were soliciting insurance without a license, this would not be a violation of *plaintiffs'* individual rights, absent some independent allegation of harm.  *See* FAC ¶ 128 (alleging that defendants' retention of the 4.95% fee was "unjust" because the fee was obtained in violation of the D.C. Code provisions prohibiting payment of commissions to unlicensed entities).

The Restatement provides an on-point illustration indicating that no unjust enrichment results from a completed exchange where the plaintiff's argument for injustice rests solely on defendant's lack of compliance with a licensing regime:

> Tenant sues former Landlord seeking restitution of rent paid for the occupancy of Blackacre under an expired lease, on the ground that Landlord failed to register Blackacre as rental property as required by ordinance.  There is no claim that Landlord failed to perform his obligations under the lease.  The regulatory illegality might or might not have afforded Tenant a defense to Tenant's obligation to pay rent, but these facts present a different question.  Tenant has no claim to restitution of rent previously paid because Landlord has not been unjustly enriched.

Restatement § 32, cmt. f, illustration 22; *see also Remsen Partners, Ltd. v. Stephen A. Goldberg Co.*, 755 A.2d 412, 416 (D.C. 2000) (denying recovery of payments made to unlicensed real

estate broker, and noting that "[t]here is no equitable reason for ordering disgorgement where plaintiffs have received the benefits they expected"); *William J. Davis, Inc. v. Slade*, 271 A.2d 412 (D.C. 1970) (providing restitution of payments made less the reasonable value of the premises in their condition when occupied where claimant sought to recover rent paid under a lease that was illegal by reason of substantial housing code violations).

As applied here, plaintiffs do not argue that the cost of their insurance policies were any higher than they would have been absent defendants' allegedly unlawful conduct, and their damage theories do not rely at all on the availability of less expensive insurance. *Cf. Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 417 (3d Cir. 2013) (holding that plaintiff had standing to bring ERISA disgorgement claim and "incurred an injury-in-fact because she suffered an individual loss, measured as the spread or difference between the profit [defendant] earned by investing the retained assets and the interest it paid to her" (internal quotations marks and citation omitted). Instead, they argue that defendants acted wrongfully and that plaintiffs should recover as a result, regardless of whether defendants' conduct made them any better or worse off. This is not sufficient for standing.

The unfairness—and risk for abuse—in plaintiffs' understanding of unjust enrichment is obvious and illustrated by the Restatement. If the purchaser of the good or service is completely happy with the terms of the transaction and the good or service they receive, they cannot both receive the benefit of their bargain *and* collect a windfall from their counterparty.[15]

---

[15]     Beyond the landlord/tenant context, plaintiffs' theory might allow future plaintiffs to take advantage of unlicensed businesses or workers, contracting with them on mutually agreeable terms and then demanding return of any payments regardless of whether they were happy with what they received. The government can obviously enforce its licensing requirements in the absence of any harm to consumers, but consumers may not use claims of unjust enrichment to extract a windfall from those with whom they have willingly dealt on mutually acceptable terms.

Plaintiffs might have a concrete injury if the value of the rendered services were *less* because of defendants' allegedly wrongful unlicensed status, but they cannot recover here.  No harm or injustice—and therefore no injury—results simply by virtue of buying a product or serviced from an unlicensed entity.  *See supra* Part III.B.1.  This applies with full force to plaintiffs' CPPA claim as well, regardless of the availability of the remedy of restitution.  A plaintiff pursuing a claim under the CPPA may not proceed based solely on the fact of a violation of the statute and must establish injury-in-fact.  *See Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016) (holding that CPPA plaintiffs lacked standing where they failed to allege "any cognizable injury" resulting from an alleged CPPA violation); *Silvious v. Snapple Beverage Corp.*, 793 F.Supp.2d 414, 417 (D.D.C. 2011) (collecting cases for the proposition that "a lawsuit under the CPPA does not relieve a plaintiff of the requirement to show a concrete injury-in-fact to himself").

Plaintiffs may not rely on the remedies for their common-law and CPPA claims as grounds for standing because those claims require some harm to plaintiffs or retention of money that rightfully belongs to plaintiffs.  Since plaintiffs received the benefit of their bargain, receiving the insurance they purchased at the agreed-upon price, and have no complaints about the insurance, plaintiff have not established an injury for purposes of their common-law or CPPA claims.

### 3)  *Comparison Shopping*

Finally, plaintiffs contend that defendants' "misstatements and omissions deprived [them] of truthful information, which had a material impact on reasonable consumers' purchasing decisions."  Pls.' Opp'n at 23.  According to plaintiffs, defendants' insufficient disclosures— referring to the payment they received as a "royalty" and not disclosing the magnitude of the

payment—were material because they "deprived [plaintiffs] of the ability . . . to accurately weigh the pros and cons of competing health-insurance policies." *Id.* at 25. If the fee and the nature of AARP's role had been fully disclosed, plaintiffs suggest, they "would have sought out and paid less for their Medigap coverage." FAC ¶ 110; *see also id.* ¶ 112 (alleging that plaintiffs and putative class members were "deceived . . . into paying more for their Medicare supplemental health insurance policies than they otherwise would have" without defendants' allegedly misleading advertisements); Pls.' SAMF ¶ 72. Of course, plaintiffs could have sought other insurance or comparison shopped regardless of what information about the defendants' arrangement with United was disclosed in the materials they received, and plaintiffs concede that AARP disclosed *some* financial stake in the sales. *See* Pls.' SMF ¶ 66. Plaintiffs insist that had the requested disclosures been made regarding the nature of AARP's agreement with United and the scope of the compensation to be paid to AARP, they would have been more skeptical about the price-competitiveness of the offering, and *potentially* sought out cheaper insurance. *See* Pls.' Opp'n at 37–38; Pls.' SAMF ¶ 72.

This alleged harm is too attenuated to constitute a concrete injury in fact. Plaintiffs must establish that a concrete harm resulted from the presentation of misleading information in order to establish standing. *See Clean Label Prod. Found. v. Garden of Life, LLC*, Case No. 20-cv-3229 (RC), 2021 WL 4318099, at *6 (D.D.C. Sept. 23, 2021) (holding that to establish standing under the CPPA, plaintiff must do more than allege that defendant "has generally violated the CPPA by presenting misleading information," and "must [also] identify a concrete harm that accrued as a result"); *see also Krukas I*, 376 F. Supp. 3d at 37 n.12 (holding that "a violation of [plaintiffs'] statutory right to truthful information, . . . without more, is insufficient to establish standing"). In denying defendants' first motion to dismiss, the Court accepted—as was

27

appropriate at that stage of the litigation—plaintiff Krukas's allegations that "she would have sought out a different, lower-priced policy, and therefore she was financially harmed by the allegedly misleading advertisements," and determined that this was sufficient to establish an injury in fact *at that stage* of the litigation. *Krukas I*, 376 F. Supp. 3d at 36. At this stage, however, with the burden on plaintiffs to present evidence establishing injury in fact, plaintiffs' allegations and conclusory assertions are simply not enough.

Plaintiffs' "comparison shopping" theory of harm is entirely predicated on the availability of *cheaper* comparable insurance. Given that they received the agreed-upon insurance at the agreed-upon rate—and apparently have no complaints about the product—they would only have been harmed by defendants' alleged lack of disclosure if some *superior* (i.e., cheaper) policy were available that they would have been able to identify and purchase *if* defendants had indicated the extent of their financial stake in the transaction. Defendants point out that plaintiffs have not asserted—let alone presented evidence of the fact—that they could have bought less expensive insurance if they were aware of the extent of the AARP payment, Defs.' Mem. at 24, and defendants have presented expert testimony that "United's rates were among the lowest (if not the lowest) available in the relevant markets." *Id.* (citing Defs.' SMF ¶ 106). If plaintiffs could not have purchased less expensive or otherwise more desirable insurance instead of AARP Medigap insurance, and received precisely the insurance they bargained for at the agreed-upon rate, they have suffered no injury, regardless of whether defendants' statements or omissions were somehow "misleading" within the meaning of the CPPA. *See Dane*, 974 F.3d at 192 n.7 (holding that allegation that plaintiff would have sought insurance elsewhere had he known the details of AARP's royalty fee arrangement under the AARP Medigap policy was "conclusory and insufficient, on its own and without further detail, to

show a concrete and particularized injury"); *Friedman*, 2019 WL 5683465, *5 (holding, in a case

challenging AARP's collection of the 4.95% fee, that "[p]laintiffs' allegations of injury are based

on the premise that AARP was not entitled to receive a commission, however, 'absent allegations

by plaintiffs that they could have bought the same policy elsewhere for a lower price, they

suffered no actual injury'" (quoting *Peterson v. Cellco Partnership*, 164 Cal. App. 4th 1583,

1591 (2008)).

 Plaintiffs do not even try to meet their burden of showing that any such a preferable

policy was available, instead merely asserting that "whether [d]efendants' omissions would have

affected [p]laintiffs' purchasing decisions is irrelevant under the CPPA." Pls.' Opp'n at 38.

Plaintiffs dispute that "[t]hroughout the relevant time period, United's rates for its AARP-

branded Medigap coverage were among the lowest—and often the lowest—in plaintiffs' home

states," Pls.' SMF ¶ 106, but present no argument on that point in their briefing, noting only in

their statement of genuine issues that the AARP Medigap program had higher rates than its

competitors in *some* states over some time periods, without any reference to the states in which

plaintiffs lived and purchased their AARP Medigap insurance, *see* Pls.' Sealed SMF ¶ 10.  This

does not indicate whether plaintiffs in fact could have purchased cheaper health insurance.  The

bare allegation that defendants deprived of plaintiffs of their ability "to accurately weigh the pros

and cons of competing health-insurance policies," Pls.' Opp'n at 25, is insufficient to show a

concrete injury since plaintiffs have presented no evidence that they would have had any

opportunity or reason to buy a competing health-insurance policy.

 Plaintiffs rely on *Jeffries v. Volume Serv. America, Inc.*, 928 F.3d 1059 (D.C. Cir. 2019),

and defendants' alleged position as a "trusted advisor" to argue that the alleged deprivation of

material information can represent a cognizable injury "regardless of whether the consumer

suffered any pecuniary harm."  Pls.' Opp'n at 25.  *Jeffries*, however, involved an informational

disclosure harm—defined by statute in the Fair and Accurate Credit Transactions Act

("FACTA")—that the D.C. Circuit deemed sufficiently familiar to the harm identified by the

common-law tort of breach of confidence to constitute a concrete injury.  928 F.3d at 1064.

More specifically, the D.C. Circuit found that FACTA "vests consumers with a concrete interest

in using their credit and debit cards without incurring an increased risk of identity theft," and that

the statutory requirement that merchants omit credit card numbers was directed towards that end.

*Id.*  The court then analogized this risk of harm to the breach of confidence tort, which "'lies

where a person offers private information to a third party in confidence and the third party

reveals that information' to another."  *Id.* (quoting *Muransky v. Godiva Chocalatier Inc.*, 922

F.3d 1175, 1190–91 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278

(11th Cir. 2019), *and on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)).

Here, plaintiffs assert no claim under FACTA, nor is the risk of harm they assert

remotely related to the breach-of-confidence tort described in *Jeffries*.  Plaintiffs do not allege

any confidential relationship between the parties or the disclosure of protected information.  *Id.*

While plaintiffs contend that AARP breached plaintiffs' trust by holding itself out as a "trusted

healthcare advisor" and then failing to disclose its financial stake in the sale of the policy, Pls.'

Opp'n at 25, this is not the kind of breach of trust described in *Jeffries*, and plaintiffs have not

provided any evidence that defendants encouraged plaintiffs to purchase a product that was in

any way inferior or overpriced.  Moreover, the risk of harm they identify is far more attenuated

than that identified in *Jeffries*.  Any person whose credit card information was released could be

at heightened risk of identity theft.  Only a small and readily identifiable subset of those

individuals who purchased AARP Medigap insurance—i.e., those who had better options—could possibly have experienced a risk of harm under plaintiffs' comparison shopping theory.[16]

Plaintiffs have therefore failed to establish that defendants' alleged misrepresentation or omission caused them injury by impeding their ability to comparison shop.[17]

* * *

For the foregoing reasons, plaintiffs have failed to establish any injury-in-fact that would grant them standing under Article III to pursue damages on any of the claims in their First Amended Complaint.

### C.       Standing to Pursue Injunctive Relief

Similarly, plaintiffs lack standing to pursue injunctive relief for their claims under Count I (CPPA), *see* FAC ¶¶ 114, 116.  Plaintiffs must demonstrate standing separately for each form of relief sought, and standing for prospective relief requires showing continuing or imminent harm.  *See Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 346 (D.C. Cir. 2018).  Here, plaintiff Kushim makes no real effort to show a risk of ongoing or

---

[16]       As defendants correctly observe, *see* Defs.' Reply at 12, the holding of *Jeffries* is in some tension with the Supreme Court's more recent decision in *TransUnion LLC*, which held that regardless of a provision in the Fair Credit Reporting Act requiring that credit reporting agencies use reasonable procedures to ensure the accuracy of credit reports and the failure of the agency to follow such procedures, the plaintiffs did not have standing because any risk of harm from that failure had not materialized.  141 S. Ct. at 2210–13 (2021); *see also Jeffries*, 928 F.3d at 1065 (observing that "FACTA punishes conduct that increases the risk of third-party disclosure, not the actual disclosure itself).  *Jeffries* is sufficiently distinguishable, however, that the continued viability of its holding need not be addressed.

[17]       The parties dispute the implications of plaintiffs' statements in their depositions regarding their interest in comparison shopping and the effect that disclosure of the magnitude of the AARP payment would have had on that decision.  *Compare* Defs.' Mem. at 24 (citing Defs.' SMF ¶¶ 91, 94, 98) *with* Pls.' Opp'n at 38 & n.27; Pls.' SMF ¶ 98.  Notably, the allegation that plaintiff Kushim "would have sought out other cheaper, lawful Medigap insurance" had she known about the 4.95% fee, FAC ¶ 23, is implausible given that she has continued to hold her AARP Medigap policy after joining this action, *see* Defs.' SMF ¶ 94; Pls.' SMF ¶ 94.  Plaintiffs' "comparison shopping" theory of injury is flatly contradicted by plaintiff Kushim's statement that she had not, even with the relevant knowledge, engaged in comparison shopping, and has not alleged any switching costs that might explain her decision not to do so.  The dispute over whether plaintiff Krukas's ability to comparison shop was impeded need not be resolved since she provides no evidence that, even if she had comparison shopped, a less expensive insurance policy was available.

future injury.  Even if the disclosure of the payment to AARP were insufficient to make her realize the nature of AARP's interest in the sale of AARP Medigap insurance, she is obviously aware of the details of AARP payment by virtue of her involvement in this litigation and is free to comparison shop.  She has not done so and remains enrolled in the United Medigap program today.  Defs.' SMF ¶ 94.  She may continue paying her premiums, which will go in part to AARP, but if she does so with full knowledge of the fee structure and is happy with her policy, she plainly is not being injured by that voluntary and knowing transaction, or by the absence of the disclosures plaintiffs claim were material to the purchase decision.  Nor have plaintiffs presented any reason to believe that the premiums would be any lower if the agreement between AARP and United were deemed unlawful and defendants were enjoined to alter their practices as plaintiffs request in their amended complaint.  Indeed, plaintiffs concede that they do not "challenge the terms and conditions of service between United and its policyholders."  Pls.' SMF ¶ 102.  Accordingly, plaintiffs lacks standing to pursue injunctive relief.

## IV.    CONCLUSION

Plaintiffs have failed to show that they suffered concrete and particularized injuries, and their claims are accordingly dismissed for lack of standing.  Since this case is being dismissed, plaintiffs' motion for class certification is denied as moot.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  November 2, 2021

_____
BERYL A. HOWELL
Chief Judge